James L. Buchal, OSB No. 921618
E-mail: jbuchal@mbllp.com
MURPHY & BUCHAL LLP
P.O. Box 86620
Portland, OR 97286
Tel:    503-227-1011
Fax:    503-573-1939
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARK FITZ, GRAYGUNS, INC.; G4 ARCHERY, LLC; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ELLEN ROSENBLUM, in her official capacity as Attorney General of the State of Oregon; TERRI DAVIE, in her official capacity as Superintendent of the Oregon State Police,<br><br>Defendants. | Case No. 22-cv-1859<br><br>**PLAINTIFFS' EMERGENCY MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**<br><br>**Request for Oral Argument**<br><br>**Telephonic/Videoconferencing Argument Requested** |

**Motions**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 7-4 and 65, Plaintiffs Mark Fitz, Grayguns, Inc., G4 Archery, LLC, Second Amendment Foundation, and Firearms Policy Coalition, Inc. respectfully request that this court enter a temporary restraining order and preliminary injunction restraining Defendants and their officers,

agents, servants, employees, and all persons in concert or participation with them who receive notice of the temporary restraining order from enforcing the provisions of Oregon Ballot Measure 114 which restrict the possession, use, manufacture, sale, or transfer of ammunition magazines capable of holding more than 10 rounds of ammunition ("standard capacity magazines"). This motion is supported by the memorandum of law below and the supporting declarations of Mark Fitz, Jessica Harris, Bruce Gray, and Brandon Combs.

## Introduction to Supporting Memorandum

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court explained that the Second Amendment "elevates above all other interests the right of law-abiding citizens to use arms for self-defense" and that it is not legislation, but "the traditions of the American people—that demands our unqualified deference." *Id.* at 2131 (quotation omitted). In this case, Oregon voters have approved by a slim margin a ballot measure that is irreconcilable with the traditions of the American people. Measure 114, which bans the use, sale, production, and transfer of ammunition magazines capable of holding more than 10 rounds of ammunition, is unconstitutional under the Second Amendment.

The Supreme Court has now repeatedly said that the Second Amendment "protects the possession and use of weapons that are in common use at the time." *Bruen*, 142 S. Ct. at 2128 (quotation omitted). The banned magazines certainly qualify for protection under this standard. They are common features of many of the most commonly owned handguns and rifles in the country and estimates suggest there are as many as over *half a billion* of them in circulation in the United States today. As such, there is no

possible justification for Oregon's unconstitutional ban. And because the law Plaintiffs challenge is unconstitutional, they are entitled to a temporary restraining order and preliminary injunction to stop it from going into effect. Not only are they likely to succeed on the merits, but the threatened constitutional violation of removing Plaintiffs' freedom to use their existing magazines for self-defense, to acquire new magazines, and to supply their customers with additional magazines, would be irreparable if it were to occur, and public interest always favors the injunction of unconstitutional laws.

**Background**

On November 8, 2022, Oregon voters approved Ballot Measure 114 which, among other things, criminalizes the "manufacture, importation, use, purchase, sale, or . . . transfer[] of large-capacity magazines." Measure 114, § 11(2) (attached to the Complaint as Exhibit A). "Large-capacity magazines," with a few limited exceptions, include any magazine 'that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload. *Id.* § 11(1)(d). Given how common magazines holding more than 10 rounds of ammunition are, Oregon's "large capacity" label is a misnomer. They in fact are "standard capacity" magazines.

This magazine ban goes into effect on December 8, 2022. *Oregon State Police Firearms Instant Check System (FICS) Update – Oregon*, https://bit.ly/3TZYw7Y (Nov. 16, 2022). At that point, licensed dealers will be required to permanently dispose of existing noncompliant magazines in their inventories or permanently modify them to accept 10-or-fewer rounds of ammunition. Ex. A, § 11(3)(a). Going forward, dealers and manufacturers will only be allowed to sell non-compliant magazines to military or law-

enforcement buyers and even then only if the magazines have been manufactured with a permanent stamp indicating they were created after the effective date of Measure 114 and was produced in compliance with it. *Id.* § 11(4)(a) & (b). And Oregon citizens who already possess magazines holding more than 10 rounds of ammunition will be barred from acquiring new magazines and required to use their old magazines only under limited circumstances—circumstances that notably exclude carriage in public for self-defense. *Id.* § 11(5)(c).

Plaintiffs in this case are one individual, two licensed firearm dealers, and two organizations who bring this action to prevent the irreparable harm that would result if the magazine ban goes into effect. Plaintiff Mark Fitz is a law-abiding Oregon citizen and member of Plaintiffs Second Amendment Foundation ("SAF") and Firearms Policy Coalition, Inc. ("FPC") who currently possesses magazines with more than a 10 round capacity. (Declaration of Mark Fitz ("Fitz Decl.") ¶ 4.) If it were not for the magazine ban going into effect on December 8, he would acquire additional noncompliant magazines as necessary after that date and would continue to use his existing magazines in lawful ways other than those specifically enumerated as acceptable in Measure 114. (Id. ¶ 6.) However, because he fears prosecution by Defendants under the magazine ban, and because the ban will destroy the legal market for such magazines in Oregon after December 8, he will not be able to exercise his Second Amendment rights by purchasing and using these commonly possessed magazines. (*See id.*)

Plaintiffs Grayguns and G4 Archery are both federally licensed firearm dealers and their principals are members of Plaintiffs SAF and FPC. (Declaration of Bruce Gray ("Gray Decl.") ¶¶ 2-3; Declaration of Jessica Harris ("Harris Decl.") ¶¶ 2-3.) They will

be forced to stop selling magazines capable of holding more than 10 rounds of ammunition to customers in Oregon on December 8, 2022. (Gray Decl. ¶ 5; Harris Decl. ¶ 5.) Until now, both Grayguns and G4 Archery have done significant business selling products that will be banned under Measure 114. (*See* Gray Decl. ¶ 7; Harris Decl. ¶ 7.) The only reason they will cease this activity is because of fear of prosecution by Defendants under Measure 114. (*See* Gray Decl. ¶ 8; Harris Decl. ¶ 8.)

Plaintiff SAF is a nonprofit educational foundation that seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. (Declaration of Alan Gottlieb ("Gottlieb Decl.") ¶ 4.) SAF has thousands of members in Oregon, including Plaintiff Fitz and owners of Plaintiff G4 Archery, LLC and Grayguns, Inc., and brings this action to vindicate the rights of its members. (*Id.* ¶¶ 5, 7.)

Plaintiff FPC is a nonprofit organization that seeks to defend and promote the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advance individual liberty, and restore freedom. (Declaration of Brandon Combs ("Combs Decl.") ¶ 4.) It has members in Oregon, including Plaintiff Fitz, and brings this action to vindicate the rights of its members. (*Id.* ¶ 6.)

The Defendants are Oregon officials with authority to enforce the magazine ban against Plaintiffs. Defendant Ellen Rosenblum, as Oregon Attorney General, has the authority to direct district attorneys in prosecuting violations of the magazine ban, ORS 180.060(5), and Defendant Terri Davie, as Superintendent of the Oregon State Police, has

authority to enforce all criminal laws, including the magazine ban, throughout the state, ORS 181A.080.

**Argument**

"The purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 704 (9th Cir. 1998). To obtain a preliminary injunction, plaintiffs must establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party to an action, these last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The standard governing the grant of a temporary restraining order is the same. *Brown v. United States Forest Service*, 465 F. Supp.3d 1119, 1123 (D. Or. 2020).

**I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE OREGON'S MAGAZINEBAN VIOLATES THE SECOND AMENDMENT.**

As an initial matter, this case presents an open question: Can states lawfully block the use, possession, manufacture, and sale of magazines with a capacity of more than 10 rounds? The Ninth Circuit previously held, in *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc), that such a regulation is permissible under the Second Amendment, but that decision was vacated by the Supreme Court, *Duncan v. Bonta*, 142 S. Ct. 2895 (2022), in light of its decision in *Bruen*. *Duncan*'s rationale lacks even persuasive authority in this case, having been entirely undercut by *Bruen*.

Therefore, in answering this question, this Court must analyze it as a matter of first impression under *Bruen*. That means this Court must begin by reviewing the Second

Amendment's text; and "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Here, the Second Amendment's text covers the banned magazines, so it falls to Defendants to justify their regulation as consistent with historical tradition rooted in the Founding. They cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms.

A.  **The Banned Magazines Are "Arms" Within the Meaning of the Second Amendment.**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed. U.S. Const. amend. II. "Arms" in the Second Amendment includes, "prima facie, all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The standard capacity magazines banned by Measure 114 fall within the scope of this text because constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J. concurring in the judgment). In this case, that means the right to own "Arms" must include the right to own magazines that make those arms functional, since "without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Indeed, the Ninth Circuit recognized before *Bruen* that its "caselaw supports the conclusion that there must be some corollary,

albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *see also Duncan v. Bonta*, 19 F.4th at 1151 (Bumatay, J., dissenting). Because magazines are an integral part of a firearm, a limitation on magazines operates as a limitation on the firearms themselves. Thus, California's law operates as a ban on arms capable of firing in excess of 10 rounds without reloading.

### B. Oregon's Ban on Standard Capacity Magazines Cannot Be Historically Justified

#### 1. Only "dangerous and unusual" arms can be banned consistent with our history and tradition.

"[W]hen the Second Amendment's plain text covers an individual's conduct . . . the government must demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. While in many cases this will involve analyzing a variety of historical statutes that the government will suggest are analogous to the modern day regulation, both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And a law by definition *does not* fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

Page 8: PLAINTIFFS' EMERGENCY MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

This test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm (or in this case, magazine) ownership. *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, 1:22-cv-01685, Doc. 18 at 9 (July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a ban on certain semiautomatic rifles because "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes"). In the context of broad bans on "arms" like the standard capacity magazines targeted by Oregon here, *the Supreme Court has already doner the historical spadework*—and the only restrictions it has deemed consistent with historical practice are those limited to restraints on *dangerous and unusual* arms that *are not in common use*.

This Court's task is therefore a simple one: it must merely determine whether the banned magazines are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Thus, magazines that are in common use for lawful purposes, by definition, *do not* fall within this category and *cannot be banned*. *Bruen*, 142 S. Ct. at 2143.

To determine whether a firearm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just, say, in Oregon. *See id.* at 2131 ("It is this balance—struck by the

Page 9: PLAINTIFFS' EMERGENCY MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

traditions *of the American people*—that demands our unqualified deference." (emphasis added)); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). Therefore, the Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like Oregon's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions. In this way, the Amendment is similar to other constitutional guarantees that serve to hold state and local governments to minimum standards that are applicable nationwide, for "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers." Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 370 (1992).

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the magazines that ordinary citizens have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[*w*]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). And in *Bruen* the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms—"demand[ ] [the

courts'] unqualified deference." 142 S. Ct. at 2131. Thus, unless the government can show that a certain type of magazine is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, that is the end of the matter. Firearms owned by law-abiding citizens for lawful purposes are "Arms" and cannot be banned.

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that the banned item is "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

2. **Standard capacity magazines holding more than 10 rounds of ammunition are in common use.**

This case thus reduces to a single straightforward question: are the magazines banned by Oregon in "common use" according to the lawful choices of contemporary Americans? They unquestionably are.

According to the 2021 National Firearms Survey, 48% of gun owners have owned magazines that hold more than 10 rounds. William English, *2021 National Firearms*

Page 11:   PLAINTIFFS' EMERGENCY MOTIONS FOR A TEMPORARY
          RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND
          SUPPORTING MEMORANDUM

*Survey: Updated Analysis Including Types of Firearms Owned* at 22 (May 13, 2022), *available at* https://bit.ly/3yPfoHw. Given the survey's estimate that 81.4 million Americans own firearms, approximately 39 million Americans have owned at least one magazine that holds more than 10 rounds. And that is a conservative estimate since only current gun owners were polled. Those individuals frequently owned more than one such magazine. In fact, Professor English found that American gun owners have owned as many as 269 million handgun magazines that hold over 10 rounds and an additional 273 million rifle magazines over that threshold for a total of 542 million such magazines. *Id.* at 24. And there is nothing surprising about this result—many of the most popular handguns in the country are manufactured with magazines holding more than 10 rounds. *See, e.g.,* GUN DIGEST 2018 386-88 (Jerry Lee and Chris Berens, ed. 2017) (Glocks); *id.* at 374 (Beretta); *id.* at 408 (Smith & Wesson); *id.* at 408 (Sig Sauer); MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS 87, 90 (2013) (noting that Glock pistols, which are "hugely popular for . . . home and personal defense," typically come equipped with magazines with a capacity over ten rounds). The same is true of many of the most popular semi-automatic rifles. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Data from the Firearm Industry Trade Association indicates that over *three quarters* of modern sporting rifle magazines in the country have a capacity of more than 10 rounds, and 52% have a capacity of 30 rounds. *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*, *available at* https://bit.ly/3GLmErS.

These magazines are commonly possessed for lawful purposes. According to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. And such magazines may be lawfully owned in the vast majority of states; only eight other states have laws as strict as Oregon's that limit magazine capacity to ten rounds for all firearms. *See* Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://www.npr.org/2022/11/15/1133915672/oregon-midterm-results-gun-control-ballot-measure.

These statistics conclusively demonstrate that these magazines are commonly owned and used overwhelmingly by law-abiding Americans for lawful purposes. "[C]ourts throughout the country [including in this Circuit,] agree that large-capacity magazines are commonly used for lawful purposes." *Duncan*, 19 F.4th at 1155–56 (Bumatay, J., dissenting); *see also Fyock*, 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use."); *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N. J.*, 910 F.3d 106, 116–17 (3d Cir. 2018) ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of [large capacity magazine] regulation."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the

parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so . . . that capacity is surely not ten."). As a result, under *Bruen* and *Heller*, Oregon's magazine ban is certainly unconstitutional and Plaintiffs have demonstrated they are likely to succeed on the merits of their claim.

## II. THE REMAINING INJUNCTION FACTORS ALL FAVOR PLAINTIFFS.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 20-12). This is no less true in the context of a Second Amendment challenge. "The constitutional right to bear arms in public for self-defense is not 'a second class right, subject to an entirely different body of rules than other Bill of Rights guarantees.' " *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality op.)). As such, for the same reasons that Plaintiffs have demonstrated the Oregon magazine ban infringes their Second Amendment rights, they have established irreparable harm.

The existence of an ongoing constitutional violation also disposes of the "balance of the equities" and "public interest" factors this Court considers in granting a preliminary injunction. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). And Oregon will not be harmed in

any way by an injunction that merely keeps in place the status quo which has *always* prevailed in Oregon until now—that citizens may own magazines capable of holding more than 10 rounds of ammunition and use them for lawful purposes.

## Conclusion

For these reasons, the Court should enter a temporary restraining order and preliminary injunction in Plaintiffs' favor against enforcement of the unconstitutional Oregon magazine ban.

Dated: November 30, 2022.   Respectfully submitted,

*s/ James L. Buchal*
James L. Buchal, OSB No. 921618
E-mail: jbuchal@mbllp.com
MURPHY & BUCHAL LLP
P.O. Box 86620
Portland, OR 97286
Tel: 503-227-1011
Fax: 503-573-1939
*Attorney for Plaintiffs*