IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

OREGON FIREARMS FEDERATION,          )
INC. an Oregon public benefit        )
corporation; BRAD LOHREY,            )
SHERMAN COUNTY SHERIFF; and          )
ADAM JOHNSON, an individual          )
                                     )
                         Plaintiffs, )   Case No. 2:22-cv-01815-IM
                                     )
                  v.                 )
                                     )   December 2, 2022
KATE BROWN, GOVERNOR OF THE          )
STATE OF OREGON, in her              )
official capacity; and ELLEN         )
ROSENBLUM, ATTORNEY GENERAL OF       )
THE STATE OF OREGON, in her          )
official capacity,                   )
                                     )
                         Defendants. )
_____)

TEMPORARY RESTRAINING ORDER HEARING

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE KARIN J. IMMERGUT

UNITED STATES DISTRICT COURT JUDGE

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF OREGON

3                            PORTLAND DIVISION

4
   MARK FITZ, GRAYGUNS, INC.; G4      )
5  ARCHERY, LLC; SECOND AMENDMENT     )
   FOUNDATION; and FIREARMS           )
6  POLICY COALITION, INC.,            )
                                      )
7                      Plaintiffs,    )  Case No. 3:22-cv-01859-IM
                                      )
8               v.                    )
                                      )  December 2, 2022
9  ELLEN ROSENBLUM, in her            )
   official capacity as Attorney      )
10 General of the State of            )
   Oregon; and TERRI DAVIE, in       )
11 her official capacity as           )
   Superintendent of the Oregon       )
12 State Police,                      )
                                      )
13                      Defendants.   )
   _____)

14

15

16

17              TEMPORARY RESTRAINING ORDER HEARING

18                   TRANSCRIPT OF PROCEEDINGS

19            BEFORE THE HONORABLE KARIN J. IMMERGUT

20             UNITED STATES DISTRICT COURT JUDGE

21

22

23

24

25

```
 1                    IN-PERSON or VIDEO APPEARANCES

 2   FOR THE PLAINTIFF(S) in 2:22-cv-01815-IM:
                                JOHN T. KAEMPF
 3                              Kaempf Law Firm, PC
                                2021 SW Main Street
 4                              Suite 64
                                Portland, OR 97205
 5
     FOR THE PLAINTIFF(S) in 2:22-cv-01815-IM:
 6                              LEONARD W. WILLIAMSON
                                Van Ness Williamson
 7                              960 Liberty Street SE
                                Suite 100
 8                              Salem, OR 97302

 9   FOR THE PLAINTIFF(S) in 3:22-cv-01859-IM
                                WILLIAM V. BERGSTROM
10                              Cooper & Kirk, PLLC
                                1523 New Hampshire Avenue, NW
11                              Washington, DC 20036

12   FOR THE PLAINTIFF(S) in 3:22-cv-01859-IM
                                JAMES L. BUCHAL
13                              Murphy & Buchal, LLP
                                PO Box 86620
14                              Portland, OR 97286

15   FOR THE DEFENDANT(S) in 2:22-cv-01815-IM and 3:22-cv-01859-IM:
                                BRIAN SIMMONDS MARSHALL
16                              Oregon Department of Justice
                                Trial Division, Special Litigation Unit
17                              100 SW Market Street
                                Portland, OR 97201
18
     FOR THE DEFENDANT(S) in 2:22-cv-01815-IM and 3:22-cv-01859-IM:
19                              HARRY B. WILSON
                                Markowitz Herbold PC
20                              1455 SW Broadway
                                Suite 1900
21                              Portland, OR 97201

22   FOR AMICUS in 2:22-cv-01815-IM:
                                KAREN LOUISE OSBORNE
23                              KOsborne Law, LLC
                                9721 NE Livingston Mountain Ct.
24                              Camas, WA 98607

25
```

```
 1                          APPEARANCES

 2                          (Continuing)

 3   FOR AMICUS in 2:22-cv-01815-IM:
                          PETE SERRANO
 4                        Silent Majority Foundation
                          5238 Outlet Drive
 5                        Pasco, WA 99301

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                        United States District Courthouse
19                      1000 SW Third Avenue, Room 301
                        Portland, OR 97204
20                      (503)326-8191

21                              *  *  *

22

23

24

25
```

TRANSCRIPT OF PROCEEDINGS

(December 2, 2022)

(In open court:)

THE COURT:  Good morning, everyone.  Please be seated.  And let me first just go over some court ground rules. Obviously, no phones may be on in court, and this also holds true for the overflow courtroom.  You may not have any phones off -- if anything buzzes or makes any funny sounds or the court security folks or marshals notice that you're on your phones, I'm asking them to confiscate your phones, and you will get them back at the end of the hearing.

So no recording, other than the official recording here by my court reporter, is allowed.  So I appreciate you're following that whether you're in this courtroom or the adjacent courtroom.

So I wanted to first call the case and then talk about my plan for this proceeding.  We're here on the record in the case of Oregon Firearms Federation, Inc., et al.  V. Brown, et al., which is Case 22-cv-01815.

We're also here on Fitz, et al. v. Rosenblum, et al., which is Case 22-cv-01859.

In these cases, the parties have agreed to combine the TRO or temporary restraining order hearing together, which was the time already set in the Oregon Firearms Federation case, and the Court agreed to do that.  And so that is my plan.

1      Let me have counsel first state your appearances for the

2  record.

3      First, for plaintiff.

4          MR. KAEMPF:  Your Honor, I am John Kaempf for the

5  plaintiffs.  And let me also introduce who will be addressing

6  other secondary issues.  With me is Mr. Leonard Williamson.

7          MR. WILLIAMSON:  Good morning, Your Honor.

8          THE COURT:  Thank you.

9      Now, it's my understanding Mr. Williamson is part of the

10 amici or amicus counsel, or he's co-counsel with you?

11         MR. KAEMPF:  He's co-counsel with me.

12         THE COURT:  Understood.

13     Okay.  And who else do you have at counsel table?

14         MR. SERRANO:  Yes, ma'am.  Pete Serrano and

15 Karen Osborne on behalf of Amici Silent Majority Foundation.

16         THE COURT:  Thank you very much.  I do note that just

17 counsel of record on the individual cases will be the ones to

18 argue here today.

19     And, Mr. Kaempf, you look confused.

20         MR. KAEMPF:  Oh, if it's okay, Your Honor -- of

21 course, we want to play by the rules -- what we had divided

22 up -- Mr. Williamson and I -- is he's going to, if you'll allow

23 live testimony, he would -- he'll handle that specific witness,

24 if that's okay.

25         THE COURT:  I'm not taking live testimony today.

1          MR. KAEMPF:  Okay.

2          THE COURT:  So I'll talk about that in a minute.  So

3  thank you.

4          MR. KAEMPF:  Okay.

5          THE COURT:  Then for -- let me go to the, actually,

6  other -- Mr. Buchal, I see you on the video.  I know you are

7  here on the Fitz case.  If you would state your appearance,

8  please.

9          MR. BUCHAL:  Yes.  James Buchal appearing for --

10          THE COURT:  Mr. Buchal, we can't hear you.

11          MR. BUCHAL:  Oh, dear.

12     Can you hear me now?

13          THE COURT:  I hear you better.

14     Can folks in the courtroom hear?

15          MR. BUCHAL:  I will speak loudly, Your Honor.  I'm

16  sorry that didn't get picked up before the hearing.  I'm here

17  on behalf of the plaintiffs in the Fitz case.  With me in the

18  virtual courtroom is Mr. William Bergstrom of the law firm of

19  Cooper & Kirk, PLLC, in Washington, who was admitted yesterday

20  pro hac.  Our intention was that he would argue the merits of

21  the TRO and I would address the question of consolidation.

22     And we have some late-breaking news on that when the time

23  is appropriate.

24          THE COURT:  All right.  Thank you, Mr. Buchal.

25     Mr. Bergstrom, did you want to state your appearance as

1  well?

2           MR. BERGSTROM:  Thank you, Your Honor.  Good morning.

3  Will Bergstrom for the plaintiffs in the Fitz case.

4           THE COURT:  All right.  Thank you.

5      And for the defendants.

6           MR. MARSHALL:  Good morning, Your Honor.

7  Brian Marshall for the defendants.

8           MR. WILSON:  Good morning, Your Honor.  Harry Wilson,

9  Special Assistant Attorney General, for defendants.

10          THE COURT:  All right.  Thank you.

11      Let me clarify the purpose of today's hearing, and it is

12  to address the multiple plaintiffs' applications for a

13  temporary restraining order to keep Measure 114 from going into

14  effect on December 8, 2022.  This is the hearing to allow oral

15  argument on your respective motions and responses.  It is not

16  the time for live witnesses.  You should have submitted

17  declarations in support of your positions if you wanted to rely

18  on evidence, and that is the record that I will consider in

19  evaluating the TROs.

20      There will be a time for a preliminary injunction hearing.

21  I want to have counsel confer about the schedule for that.  And

22  then if you do want live testimony for that hearing, I do

23  expect that you'll give notice to the other side of any

24  witnesses two weeks in advance, and there will be an

25  opportunity to take any depositions.  So I do need you to

1  confer on that.

2      And I'll give you a deadline at the end of this hearing

3  for basically a -- submitting your proposal of when you want to

4  have the preliminary injunction briefing scheduled, and then

5  you can propose a time for a hearing as well, consistent with

6  my schedule.

7      So, again, then let me talk a little bit about my plan for

8  today.  Actually, before I do that, the purpose of the

9  preliminary injunction hearing is so that I can have a full

10  record, and we'll talk, I think, a little bit today about what

11  a full record looks like in the post-*Bruen* regime.  So we'll

12  discuss that.  But I do want you to confer after this hearing

13  and give me a proposed schedule for the preliminary injunction

14  hearing.

15      What I want to do today is to start by asking both --

16  well, clarify the scope of my understanding of what's really at

17  issue here and then ask each side some questions.  And then

18  I'll allow each side time to argue their position.  It seemed

19  to me reasonable to have both plaintiffs for the respective

20  cases to have 20 minutes maximum apiece for argument.  I'll

21  give, then, the defendants 30 minutes to argue -- again, I have

22  your briefing -- about anything you want to highlight in your

23  argument or clarify based on some of my questions, and then

24  I'll give the plaintiffs five minutes of rebuttal each.

25      So let me focus now on clarifying the scope of this

1   hearing.  It seems to me, based on the briefing, that the

2   primary issue raised in both cases is about whether the Second

3   Amendment protects magazine capacity; and, specifically, does

4   Measure 114's restriction on magazines containing more than

5   10 rounds of ammunition infringe upon a law-abiding citizen's

6   rights under the Second Amendment to bear arms for

7   self-defense.  So that is my understanding of the crux of this

8   dispute and the issues being raised.

9        It is my impression from the briefing that Ballot Measure

10  114's permit requirement is not really at issue in this TRO

11  because plaintiff has not -- Plaintiff OFF -- I'll refer to

12  Oregon Federation of Firearms -- Oregon Firearms Federation --

13  doesn't provide any legal argument about the permitting issue.

14  And the Fitz TRO isn't challenging the permit requirement at

15  all.

16       So I would like plaintiff -- and why don't I have you,

17  Mr. Kaempf, explain to me whether I'm incorrect on my

18  assessment of what's at issue.

19            MR. KAEMPF:  Well, Your Honor, I hate to start a

20  hearing this way, but you are incorrect on that, respectfully.

21       As we made a record of in our briefs, we also challenge

22  the permits to purchase clauses of Measure 114.  For shorthand,

23  Your Honor, I -- people may call that "PTP," permits to

24  purchase.  And also I might just call it "114" for short.

25  Obviously, you'll understand.  And as we make clear in our

1   motion, we challenge and seek to enjoin all -- all of 114, all

2   of its provisions.

3       Now, two points --

4           THE COURT:  Where is that in your legal argument?

5           MR. KAEMPF:  That is in the briefs.

6       And I wanted to say to Your Honor an initial point.  May I

7   please?  You said that nothing was cited, but there are only

8   two cases in the country.  Federal district judges just like

9   you that have addressed permits to -- permits challenges

10  brought by clients like mine.  And in both cases -- one, the

11  *Wesson* case; and, two, the *Richmond* case -- the courts granted

12  an injunction against the permits to purchase.  Those two cases

13  are in my brief.

14      And what's interesting is those two cases -- and you'll

15  notice Governor Brown doesn't cite anything going the other way

16  because there isn't.  Those were both cited even before *Bruen*.

17  They said, "No, permits to purchase are unconstitutional."  So

18  we challenge that as well.

19         THE COURT:  Okay.  So let me ask you -- why don't I

20  start off, then, with my questions for you.

21      Well, actually, before I ask my questions, Mr. Bergstrom,

22  or, Mr. Buchal, is there anything that I have missed in terms

23  of the crux of what your briefing is about?

24         MR. BERGSTROM:  No, Your Honor.  Your summary is

25  accurate as to us.

1          THE COURT:  Okay.  Thank you.

2      From defendants' perspective, is there anything that I've

3  missed in terms of the -- what you see as the critical issues

4  here?

5          MR. MARSHALL:  Your Honor, no.  We think that this

6  case is primarily -- or this hearing is primarily about the

7  large-capacity magazine issue.  We read the Oregon Firearms

8  Federation plaintiffs as raising a purely facial challenge to

9  the permits to purchase.  We think that that is rejected in

10  footnote 9 of *Bruen*; and, therefore, there's not grounds for a

11  temporary restraining order.

12      Just in candor to the Court -- it's a bit off topic -- I

13  think that the Eyre plaintiffs filed last night a different

14  case with a different preliminary injunction motion, and I also

15  believe that Mr. Buchal is planning to file a case on behalf of

16  another group of plaintiffs at some point that will raise

17  permit to purchase issues.

18      But here I think there's a -- just simply a facial

19  challenge, which we address in our papers.

20          THE COURT:  Okay.  So let me start, then,

21  Mr. Kaempf -- and am I pronouncing your name correctly?

22          MR. KAEMPF:  Yes, it is, Your Honor.  That's

23  actually -- usually they don't get it right; so I appreciate

24  it.  It's pronounced "Kempf."

25          THE COURT:  "Kempf"?  Okay.

1    MR. KAEMPF:  Yes.

2    THE COURT:  Mr. Kaempf, I just want to ask you -- I

3 want to start with just some questions for you, and then I'll

4 ask some questions of defendants, and then you'll have a chance

5 to have your argument.

6    So you've made it clear now that you still are challenging

7 the permitting requirement.  It seems to me that the -- *Bruen*

8 makes very clear that the "shall issue permits" restrictions

9 are constitutional and have -- there are 43 states that have

10 "shall issue permit" requirements.  *Bruen*, of course, involved

11 a different kind of permitting requirement that left discretion

12 to the permitting agency.

13    Justice Kavanaugh in his dissent says the kinds of

14 requirements that would be constitutional would be things like

15 fingerprinting, background checks, mental health record checks,

16 firearms training, among other possible requirements.

17    Isn't that what the permitting requirement in Measure 114

18 does?

19    MR. KAEMPF:  No, Your Honor.  If I could,

20 respectfully, one, Justice Kavanaugh concurred; so he was with

21 the majority in *Bruen*.  And when he addressed the "shall issue"

22 states and the 43 states that have "shall issue" laws, this was

23 the key point.  He said in those states, unlike 114, they have,

24 quote, "Objective licensing requirements."  Okay.  But the

25 problem is 114 says, "We'll only issue a permit to purchase if

1    an applicant does not present reasonable grounds for a permit

2    agent to conclude that the applicant has been or is reasonably

3    likely to be a danger to self or others."

4        So see how it's requiring the proof of a negative, in

5    essence, in 114?  Unlike what Justice Kavanaugh said in his

6    concurrence, it's, "Well, you're not going to get it unless you

7    show you won't -- you -- that you don't present reasonable

8    grounds to deny that," and that turns the Second Amendment on

9    its head.

10       And I also want to note, Your Honor, it's -- it uses the

11   phrase "permit agents."  Permit agents are going to apply that

12   standard, which is not objective.  Exactly the opposite of what

13   Justice Kavanaugh's concurrence in *Bruen* said was okay.

14       It opens the door to a -- who knows?  A permit agent.  I'm

15   sorry.  That just sounds a little Orwellian, if that's the

16   phrase.  "Well, let me see.  I don't think you presented

17   reasonable grounds, John Q. Public; so we're going to deny

18   this," and that's contrary to *Bruen*, which says the Second

19   Amendment creates a presumptive right to keep and bear arms.

20           THE COURT:  So, obviously, Measure 114 has an

21   appellate process.  So if someone doesn't -- isn't a

22   law-abiding citizen, isn't issued a permit within the timeframe

23   allotted under the statute, they can appeal it.  They can

24   appeal it directly to the circuit court and then the Court of

25   Appeals.

1    Is there for the -- again, a TRO is an extraordinary

2    remedy.  With respect to the permitting portion, how can your

3    clients show irreparable harm as a result of this permitting

4    regime?

5             MR. KAEMPF:  Your Honor, it's because of *Bruen*.  It's

6    because it takes *Bruen* and turns it upside down and says,

7    "Well, we don't have a presumptive right.  We've got to go

8    through all of this," which, by the way, takes a long time, and

9    my clients have given me an earful about the queue that's going

10   with these background checks; then you've got the

11   fingerprinting and all of this.  That's irreparable injury

12   because it delays a profound constitutional right to have a

13   gun.  That's one irreparable injury.

14            THE COURT:  But your clients haven't applied yet;

15   so how --

16            MR. KAEMPF:  Well, that's what we're here to do

17   today, Your Honor, is a preliminary injunction.  As you well

18   know, we're saying, "Please don't make us go through that."

19   Because last year, in the *Diocese of Brooklyn* case, the Supreme

20   Court said a key reason for injunctive relief is to prevent the

21   risk of irreparable injury, and that's part of what we're

22   asking for today.

23            THE COURT:  Okay.  I want to move off the permitting

24   piece.  I have briefing on it; and, obviously, you can argue

25   whatever you'd like in your argument.

1          Now, the *Bruen* decision, despite all of its complexity,

2    which it is very complicated, does not hold that all gun

3    regulations are unconstitutional.  And, indeed, the *Bruen* court

4    stated that the Second Amendment is not a regulatory

5    straitjacket and that it's not unlimited in its scope; and

6    properly interpreted, the Second Amendment allows a variety of

7    gun regulations.  So I -- and I think all of -- *McDonald*,

8    *Heller* and *Bruen* all make clear that the individual defense --

9    self-defense is the central component of the Second Amendment.

10         So with that in mind, I wanted to ask you, Mr. Kaempf, can

11   the Government properly regulate certain firearms?  So machine

12   guns.  What's your client's position on whether machine guns,

13   which have been regulated, can still be regulated under *Bruen*?

14              MR. KAEMPF:  Your Honor, we're not here to say there

15   can never be a regulation on guns.  We're just focused on 114.

16              THE COURT:  So what can be regulated?

17              MR. KAEMPF:  What can be regulated?  Things like

18   having a background check.  Sure.  Saying people have to show

19   proof of some kind of firearms safety.  Because things like

20   that are consistent with the historic --

21              THE COURT:  I'm talking about types of weapons.  Are

22   there -- or types bullets.  So let me ask you this:  Could the

23   Government regulate body armor-piercing bullets or poisonous

24   bullets?

25              MR. KAEMPF:  Well, it would depend on who wants to

1    use it, you know.  I'm not here to say they could never do

2    that.

3              THE COURT:  I'm putting law enforcement and military

4    aside because here there's an exception in 114 for law

5    enforcement and military use.  High-capacity magazines are

6    still allowed to be used by those groups.  But I'm asking for

7    the individual right of self-defense under the Second

8    Amendment.  Should the Government be able to regulate body

9    armor-piercing bullets?

10             MR. KAEMPF:  No.  Because the presumption under

11   *Bruen* is that a person has the right to have that kind of

12   protection.  And it would be up to the Government to say,

13   "Well, you know, this has always been regulated.  It's part of

14   our historic tradition; so we can do that," and I wouldn't see

15   that burden being met.

16             THE COURT:  So is there some analysis that goes into

17   this "What is necessary for self defense?"  Is that something

18   that I should be looking at?  Is body armor-piercing bullets,

19   for example -- which is not the issue in this case -- do I look

20   at whether is having 11 rounds versus 10 rounds -- is it

21   necessary for effective self-defense of an individual outside

22   the home?

23             MR. KAEMPF:  Yes.  And you will see, in part, through

24   my client Kevin Starrett, the president of OFF -- as we're

25   calling it today for shorthand -- he states in his declaration

1   that having magazines in excess of 10 rounds is common.  It has

2   been for decades.  And so it -- it is absolutely the opposite

3   of the historic tradition that *Bruen* requires you to apply to

4   say, "Well, now we're going to -- we're going to limit them."

5           Your Honor, they're everywhere.  And also you'll note,

6   including the Glock --

7           THE COURT:  What's everywhere?

8           MR. KAEMPF:  Magazines in excess of 10 rounds.  They

9   come stock with -- for example, the Glock.  That's the most

10  popular handgun.  You buy it; it comes stock with rounds in

11  excess of 10.

12          THE COURT:  But whether a firearm is common, that's

13  not the end of the inquiry, is it?

14          MR. KAEMPF:  I'm not saying it's the end of the

15  inquiry, but what I am saying is --

16          THE COURT:  What is the end?  What else do I need to

17  determine?  Don't I need to determine that it's commonly used

18  for self-defense, individual self-defense?

19          MR. KAEMPF:  Yes.  And they are in common use, and

20  they have been for decades in excess of 10 rounds.

21          THE COURT:  For self-defense?

22          MR. KAEMPF:  Yes.  As a matter of fact, as *Bruen*

23  says, self-defense is the central component of the Second

24  Amendment.  It's not to go out and do a mass shooting.  It's,

25  "Look at me.  I'm in the dark.  I'm walking home from work, and

1   now someone is coming after me.  I have the right to defend

2   myself, including with excess of 10 rounds," which

3   Mr. Starrett's declaration shows, have been in common use for

4   decades.

5        If I could, Your Honor, as to *Bruen* -- I'll get to the

6   test in a moment.

7             THE COURT:  I'm not ready for your argument yet.  I

8   still --

9             MR. KAEMPF:  Oh, I'm sorry.  You go ahead,

10  Your Honor.

11            THE COURT:  Yes.  Thank you.

12       Now, do you agree or disagree that weapons that use

13  high-capacity magazines are more dangerous than ones that use

14  lower capacity?

15            MR. KAEMPF:  Well, it depends on how you define "high

16  capacity," Your Honor.  One of the issues that we take with 114

17  and defense counsel is having in excess of 10 rounds is not

18  high capacity.

19            THE COURT:  Okay.  So within the meaning of 114,

20  which does call those high-capacity magazines --

21            MR. KAEMPF:  That's one of the reasons why we're

22  challenging it.  Because in the day-to-day use and our nation's

23  historic tradition, that's not high capacity.  They are

24  creating this image of somebody out there with an AK-47 that --

25            THE COURT:  Let me just have you answer my question,

 1   though, which is having -- is it more dangerous or not to have

 2   a magazine with up to 10 bullets versus 11 or more?

 3          MR. KAEMPF:  People are more able to defend

 4   themselves -- the central component of the Second Amendment --

 5   if they have magazine rounds in excess of 10 rounds.  That's

 6   because, as we said in the briefing, if you get attacked

 7   randomly, like in the dark, as I said -- these kinds of things

 8   that happen all the time -- you don't have time to change

 9   rounds and all of that.  You need to have in excess of 10

10   rounds.

11       And as we point out in the briefing, the criminal is going

12   to have in excess of 10 rounds, and that's what you're going to

13   be dealing with, or, by the way, multiple criminals.  It makes

14   it more safe, and it helps -- addresses the central component

15   of the Second Amendment if people can have magazines in excess

16   of 10 rounds for self-defense.

17          THE COURT:  All right.  Let me ask you one additional

18   question, which is -- I know three of your plaintiffs are

19   sheriffs.  Now, they're -- what is the harm that they face from

20   Ballot Measure 114, since they are allowed to continue to have

21   high capacity, as we -- as defined in the statute, under

22   Measure 114, in the course of their duties?  So tell me about

23   that.  What's the irreparable harm?

24          MR. KAEMPF:  Yes, Your Honor, if I could.  In fact, I

25   spoke with Sheriff Bowen this morning and confirmed that.

1          First of all, in his county, Union County --

2               THE COURT:  And if you can focus now just on the

3     record and the case, not a conversation that you've had.

4               MR. KAEMPF:  Okay.  Well, the record that we have is

5     we have the declaration from Sheriff Lohrey about the fact that

6     it's going to cause a financial hit because of all of these

7     regulations and he -- you know, in terms of the limits of his

8     staff and the -- the weapons that they can have and their

9     ability to protect people if they have to comply with all of

10    this in limiting the rounds.

11         And also to have to go --

12              THE COURT:  Hold on a second.  So that is not a

13    Second Amendment protection -- the financial impact.  The

14    Second Amendment protects right to -- for the individual to

15    bear arms in self-defense.  So what is the irreparable harm?

16    The financial harm is not part of the Second Amendment.

17              MR. KAEMPF:  Well, it infringes on the Second

18    Amendment rights of law enforcement to adequately protect the

19    citizens of the counties that are at -- that are at issue in

20    this case.

21              THE COURT:  So does -- do law enforcement officers

22    have a Second Amendment right to protect others?  Is that part

23    of the Second Amendment?

24              MR. KAEMPF:  Yes, it is.  They do.  And it's part of

25    the reason why they have weapons to protect all of us, and it's

1   recognized as part of our nation's historic tradition that we

2   have law enforcement with weapons to also help people when

3   they're under attack.

4          THE COURT:  But you would agree that law enforcement

5   conceivably should have weapons that are different than private

6   citizens should have, wouldn't you?

7          MR. KAEMPF:  No.

8          THE COURT:  Okay.

9          MR. KAEMPF:  I don't see a historic tradition of

10  that.

11         THE COURT:  Okay.  Mr. Buchal, let me ask you.  On --

12  with regard to, you know, the Fitz case -- I know you represent

13  some gun sellers.

14     Or, I guess, Mr. Bergstrom.  Sorry.  You represent some

15  gun sellers.  Is there a Second Amendment right with regard to

16  selling guns?  Is that a right?  Selling?  Is that protected by

17  the Second Amendment?

18         MR. BERGSTROM:  Well, Your Honor, in *Teixeira* -- I

19  don't know if I'm pronouncing that correctly, but in *Teixeira*

20  the Ninth Circuit held that gun sellers and ammunition sellers

21  have the right to bring lawsuits on behalf of their customers,

22  which the customers would have a right to possess and keep

23  these firearms.  And sellers have standing under the Ninth

24  Circuit and under a couple of Supreme Court cases to represent

25  the rights of their purchasers.

1        THE COURT:  But in terms of irreparable harm, is

2   there a Second Amendment right that the sellers -- that

3   infringes upon sellers if Measure 114 goes into effect?

4        MR. BERGSTROM:  Well, so the right that would be

5   irreparably harmed is the right of purchaser.  So we have one

6   plaintiff, Mr. Fitz, who is a purchaser, and there were -- our

7   plaintiffs Grayguns and G4 Archery also have other purchasers

8   who, starting on December 8th, won't be able to purchase these

9   firearms.

10        THE COURT:  Okay.  Thank you.

11     Let me switch now to ask the defense a couple of

12   questions.

13     And then, Mr. Kaempf, I'll get back to you, and you'll be

14   able to make your argument and --

15        MR. BERGSTROM:  Your Honor, can I --

16        THE COURT:  Mr. Bergstrom?

17        MR. BERGSTROM:  I'm sorry to speak out of turn, but I

18   was wondering if I could address some of the questions you had

19   asked the other plaintiffs?

20        THE COURT:  Absolutely.

21        MR. BERGSTROM:  Yeah, so the question you had

22   asked --

23        THE COURT:  Why don't I do this:  Why don't I have

24   you just answer that in the course of your argument.

25        MR. BERGSTROM:  Okay.  Can do.

1          THE COURT:  Let me ask the defense now.  I know in

2     both the preamble to Ballot Measure 114 and also in your

3     briefing there's a lot of talk about homicides and mass

4     shootings and statistics related to those.

5          Does the legal landscape post-*Bruen* require me to

6     essentially ignore the public interest, that you have been

7     setting forth in your briefing, in analyzing whether a

8     restriction or regulation is constitutional under the Second

9     Amendment?

10          MR. MARSHALL:  Not wholly, Your Honor.  I think it

11     is -- in a context, it's going to be different than it was

12     under the intermediate scrutiny test that was pre-*Bruen*, but I

13     think it's still relevant on this motion in two respects:

14          The first respect is that it's relevant to the public

15     interest prong of the preliminary injunction hearing.  And so

16     insofar as the plaintiffs are seeking to get a temporary

17     restraining order on the basis of, sort of, serious questions,

18     or something like that, about how the balance of the equities

19     tips, I think that still remains part of the Court's role in

20     equity, that remains a component of the preliminary injunction

21     test, and so I think it's relevant for that reason.

22          Now, even on the merits, when we come -- when we get to

23     trial, I think it's still going to be relevant to the Court's

24     inquiry because there is a style of balancing test that

25     requires us to look at it in the light of history.  Does this

1    have the same burdens on people and the same benefits to the

2    Government as our historical antecedents that we identify do?

3         And so to the extent that large-capacity magazines create

4    a risk of a single individual killing large numbers of people,

5    that is relevant to the -- to *Bruen*, both because it's an

6    unprecedented social problem occasioned by a change of

7    technology that did not exist in the 18th century, and *Bruen*

8    acknowledges it in that respect; and, secondly, as the Court

9    gives -- gives its historically grounded understanding of how

10   the benefits and burdens are weighed, I think it still remains

11   relevant that the Court will have to hear whether these

12   large-capacity magazine restrictions are effective.  And

13   evidence on this record is that they are very effective, that

14   they are the most effective based on the best empirical

15   research that we are aware of and the best empirical

16   research -- the only empirical research that's been provided to

17   the Court on this motion.

18        THE COURT:  Let me ask you.  Along the lines of sort

19   of how *Bruen* should be analyzed or regulations should be

20   analyzed under *Bruen*, is it -- I'm aware of the case in the

21   Southern District of California that is having a full-blown

22   hearing regarding -- with experts, and I'm not sure of the

23   details, but certainly that seems to be where *Bruen* suggests we

24   go, in terms of looking at what was the historical context

25   looking back even to the 16th century, England, and what was --

1    what existed at the time of the Founders and then all the --

2    what restrictions were available, what weapons were available.

3    What do you envision, from the defense's perspective, I'm going

4    to need, in terms of -- to really analyze whether or not the

5    Government or the defense has met its burden now that *Bruen* has

6    placed upon the defense?

7           MR. MARSHALL:  You are going to need history, and we

8    provided history to you, actually, from those in California who

9    have provided declarations, given the briefing schedule.  We're

10   in the process of retaining those same experts.  We think that

11   that's going to be required under footnote 6 of *Bruen*, that we

12   are going to need to present historical evidence of those

13   antecedents.

14         We present some of that, what we could achieve in

15   presenting that to the Court in a week, and have presented that

16   to the Court with historians.  I mean, we have Ph.D.-level

17   historians from each century -- 18th, 19th, and 20th -- that

18   talk about historical antecedents.  We provide that.  There's

19   no history provided by the plaintiffs.

20         And perhaps this is outside of my question; so please cut

21   me off, and I'll do it in my argument, but I just want to make

22   a delineation between the burden of proof at trial, which we

23   completely accept that if on the threshold question that they

24   establish that a large-capacity magazine is, in fact, an arm

25   within the Second Amendment, that our burden to establish that

1    it is within the historic traditions of weapons regulation

2    consistent with that right.  That will be our burden at trial.

3        On the preliminary injunction stage, it remains their

4    burden to establish a likelihood of success.

5        We cite, I think, a very persuasive authority from the

6    Federal Circuit that talks about how to handle preliminary

7    injunctions when the non-movant has the burden of proof at

8    trial.  And the Federal Circuit encounters this all the time in

9    patent practice, where a patent-holder has the presumption and

10   it's going to be -- if you're going to rely on invalidity at a

11   preliminary injunction stage, that that's going to be the

12   defendants' burden.  And the Federal Circuit, I think, very

13   persuasively holds that it remains the movant's burden on the

14   motion to establish that.  And I don't know how they intend to

15   meet that burden, given that they presented no history to the

16   Court.

17        THE COURT:  Although, let me ask you about that, and

18   that was actually my next question.  Sort of how you square the

19   burden from -- that are required for plaintiff to get a TRO

20   versus the *Bruen* burden that has now been placed on the defense

21   in analyzing firearms regulations.

22        Is it fair to say, however, in reviewing the element of a

23   TRO likelihood of success on the merits, that I still have to

24   make some analysis based on any evidence presented in the

25   record, which I note the defendants have presented significant

1  records from the other cases that show historical treatment of

2  firearms and restrictions?  Don't I have to make some analysis

3  of whether or not the Government has made a showing with regard

4  to the merits and then determine whether the plaintiff can show

5  likelihood of success on the merits based on the showing made

6  by the Government?  Am I analyzing that properly?

7          MR. MARSHALL:  Yes, I think you are analyzing it

8  correctly.

9      That's actually what the Federal Circuit does in these

10  patent infringement cases.  So there's a presumption of the

11  validity of the patent, and the plaintiff comes to the Court.

12  That's the same situation they're in.  We're now bracketing the

13  question of whether it's an arm.  We obviously disagree about

14  that.  But assuming it is an arm, then the burden shifts to us

15  because they have a presumption under *Bruen* that there is

16  invalidity that -- that it's our burden.

17      And so we have a burden of production, but that's a

18  pretty minimal burden.  We need to provide some evidence to the

19  Court.  We provided quite a bit of evidence.  Unfortunately,

20  too much, I think, than can really be, you know, sunk into; but

21  the -- but there -- but once we've met that burden of

22  production, then it kind of tips back to the other side to say,

23  "What is the Court's prediction?" not "Have we established

24  definitively the merits of the case today?"; but, rather, "Can

25  the Court predict that it is likely that they will succeed or

1    likely that we will not meet our burden?"

2       And, I think, based on the record that we have provided --

3    that both sides have provided to the Court, we have shown that

4    it is likely that we -- it's unlikely that they will succeed or

5    it's likely that we will succeed in establishing that it's

6    within the historic tradition.

7       I just wanted to make this sort of small point that, if it

8    really was in equipoise, that, like, sides presented equally

9    persuasive cases on that point, I think that the Federal

10    Circuit's conclusion that that -- that the movant loses that

11    case is quite persuasive.

12       THE COURT:  Okay.  Thank you.

13       Let me ask you one more question.  You cite several

14    appellate court cases that have held -- including the Ninth

15    Circuit -- that have held that restrictions on large-capacity

16    magazines are consistent with the Second Amendment.  Does *Bruen*

17    change that analysis?

18       MR. MARSHALL:  So it absolutely changes it.  All of

19    those cases that we cite are two-step cases; right?  And step

20    two, the intermediate scrutiny case, goes away.  Those cases

21    are still very relevant, I think, for kind of three reasons:

22       The first reason is that they contain a number of factual

23    conclusions that are not going to change about the nature of

24    large-capacity magazines.  What they do, how many of them there

25    are in the world, what their dangers are, and what their

1    benefits or lack of benefits for self-defense are, all of those

2    are -- I think are fair game for the Court to rely on.  And

3    when you're choosing between whether to, you know, agree with

4    whatever materials are cited by each side or declarations here,

5    there's a lot of persuasive value to what a court of appeals on

6    a much more full record was presented with and then

7    concluded -- several courts of appeals -- not just one -- but

8    many courts of appeals have kind of come to similar conclusions

9    that these are not useful for self-defense.  They're extremely

10   dangerous.  Those kinds of factual determinations, I think,

11   remain persuasive on those factual points as you determine

12   likelihood of success.  So I think that's one way in which they

13   remain relevant.

14       The second is that the threshold test, what was step one

15   in the other -- in the prior regime, the pre-*Bruen* regime, is

16   effectively the same as in the post-*Bruen*.  That's the same

17   question.  Does the Second Amendment apply at all?  The Fourth

18   Circuit concluded that it didn't apply at all.  And in

19   *Duncan v. Bonta*, on that first question, the Ninth Circuit got

20   very, very close on that en banc court to saying, you know,

21   "It's not covered at all, but we know it's so clear under

22   intermediate scrutiny, we're not going to bother with it."

23       But here, you know, it becomes more relevant.  And so if

24   the Court had to make a prediction on that threshold question,

25   the best predictor of what the higher court is going to do is

that seven-to-four en banc decision where seven judges of the
Ninth Circuit, sitting on that en banc court, which will still
stay intact as the California case progresses, that they have
concluded -- that they were very, very close to concluding
that -- I can't remember the precise phrasing.  Something like,
you know, "serious merit," or something of that nature, that it
isn't an arm at all because it's not more useful for
self-defense than for military purposes.

So I think they remain important for that threshold
question.  And many courts have really gone in that same way,
where they assume, without deciding, that they are an arm,
conclude it's not intermediate scrutiny, but there's very
little authority that the Government was -- that the Government
is wrong on that in all -- any of those seven cases, and
there's definitely authority that goes the other way.

The third thing that I think is just relevant for the
Court is it's in the position of having to decide this question
on an incomplete record and a temporary retraining order.  It's
that this litigation, this type of litigation, has been going
on for a very long time.  I mean, going back -- the first of
those seven cases we cite was back in 2011, and plaintiffs
haven't been winning any of them.

Now, granted, the standard has changed, and the standard
changed in -- in *Heller*, and it changed again in *Bruen*; but
even so, plaintiffs are not winning these cases on

 1    large-capacity magazines.  And I think that just has some

 2    relevance to -- as the Court just thinks about the situation

 3    that we're in -- that there are 12 states that have

 4    large-capacity magazines that -- and have considerable

 5    restrictions on them.  Oregon has made the decision -- the

 6    people of Oregon have made a decision that we're going to

 7    become the 13th.  I don't think that there's a really good

 8    reason that we should be the only ones to be enjoined.

 9             THE COURT:  And let me ask you in the -- in terms of

10    factors to consider for balance of the equities in the case,

11    is -- am I balancing, in the defendants' view, the Second --

12    assuming, for the sake of argument, a Second Amendment

13    infringement versus, obviously, the electorate passed Ballot

14    Measure 114, so some interest in having people get what they

15    voted for, but what are really the considerations you think I

16    need for the TRO analysis on the balance of equities?

17             MR. MARSHALL:  So I think the consideration is

18    whether they have shown a risk of constitutional injury or --

19    and, actually, I -- I misspoke.  It's not a risk of

20    constitutional injury.  That they have to show a likelihood of

21    constitutional injury.  And we cite other district judges who

22    have been in very similar situations that say that the

23    serious -- serious questions test, if the -- if the point that

24    you are raising in order to establish that you have an

25    irreparable injury is a constitutional injury, you actually

1    have to show a violation of the -- of the Constitution.   I

2    mean, not show in the sense of prove at trial, but show in the

3    sense of likelihood of success.

4         So, I think, if the first question is do they show that

5    likelihood of success such that they have established any

6    irreparable injury on this record and then if you balance that

7    on our side of irreparable interest, the first is the sovereign

8    interest of the State, and here the State as -- as instructed

9    by the people to enact their laws, and the second is the public

10   safety interest.   And there is an implication for the pendency

11   of the litigation or the pendency until a preliminary

12   injunction can be held -- preliminary injunction hearing can be

13   held in which the Court takes evidence as to whether or not the

14   people or -- and the State are required to take the risk that

15   they voted to lessen just a few -- a few weeks ago, and our

16   position is that they should not be forced to bear that risk on

17   this record without showing an actual likelihood of success on

18   the Second Amendment claim.

19            THE COURT:   Let me ask you one more follow-up

20   question to that.   Although you make the argument that

21   magazines are not firearms within the meaning of the Second

22   Amendment, with respect to the harm, you said that the

23   plaintiffs haven't shown any actual harm is imminent from

24   passage or effective -- or if Ballot Measure 114 goes into

25   effect.   What about the individual who now owns a high-capacity

1   magazine or a magazine under the high-capacity definition of

2   Ballot Measure 114?  They can have it at home.  They can use it

3   at home.  They can use it for recreation.  They can use it for

4   hunting.  They can use it if they're law enforcement.  But they

5   can't simply, if I understand the measure correctly, be out

6   carrying it for self-defense.  They would have to have a 10 or

7   fewer rounds of ammunition magazine instead.  Am I right on

8   what's allowed?

9              MR. MARSHALL:  Yes.  We agree.

10              THE COURT:  So if it's a Second Amendment --

11   assuming, for the sake of argument, I were to find it is a

12   Second Amendment violation, then they could not do that as of

13   Friday.

14              MR. MARSHALL:  That's right.

15              THE COURT:  So is that enough to show an imminent

16   harm or not?

17              MR. MARSHALL:  I've lost the hypothetical.  I

18   apologize.

19       Am I assuming that they have won the Second Amendment

20   debate, or am I assuming that they -- that we don't have an

21   answer to that?  I just need to make sure that I understand

22   what you're asking me to opine on.

23              THE COURT:  So assuming the magazines do fall under

24   the Second Amendment and there is likelihood of success on the

25   merits --

1          MR. MARSHALL:  Okay.

2          THE COURT:  -- then can they show irreparable injury

3    under the --

4          MR. MARSHALL:  Sure.  That would be a constitutional

5    injury.  The Court would have to weigh that against the

6    interest -- the sovereign interest of the State and the public

7    safety interest.  I mean, they show authorities that I think

8    are a little bit out of the norm.  It's not really answering

9    the question that the Court is faced with here where the public

10   safety interests are so extraordinary but the -- but they

11   are -- but, you know, that would be an irreparable harm if they

12   establish a constitutional violation.  I think our argument is

13   essentially that they haven't.

14         THE COURT:  All right.  Thank you.

15      So now I do want to get to time for you all to argue

16   anything you would like in support of your positions, and I

17   will go -- start with Mr. Kaempf.

18      And, Mr. Bergstrom, if you need a little bit of additional

19   time -- I know I didn't have you answer the questions, but I

20   know you're paying close attention; so if you do need a little

21   -- I'll tell you when it's 20 minutes, but if you need

22   additional time, I'm happy to afford that to you just to answer

23   those questions.

24         MR. BERGSTROM:  Thank you.

25         THE COURT:  Mr. Kaempf, you're on.

1          MR. KAEMPF:  Thank you, Your Honor.  Can I clarify?

2    Did you say, "20 minutes"?

3          THE COURT:  I said, "20 minutes."

4          MR. KAEMPF:  Okay.  So I have the floor, then.  Is

5    that okay, Judge?

6          THE COURT:  You do.  Sometimes I ask questions,

7    though; so --

8          MR. KAEMPF:  I -- I know, but I wanted to start with

9    a couple of astounding things that defense counsel just said.

10   He just said that you look at the cases that were already

11   decided; and they are, quote, "The best predictor," end quote.

12   They are the best predictor of how you should rule, you know,

13   how courts above you would rule.  And what do you know?  We

14   cited nine.  Not one or two.  Nine.  Think about it.  *Bruen*

15   only came out in June.  Nine district court cases.  Your peers

16   across the country.  And in all of them -- the defense cites

17   zero.  In all nine cases, citing *Bruen* and its new test,

18   district judges, like you, struck down those gun laws as

19   unconstitutional, and they include these attempted bans by

20   various states.  Every one of them struck down by your peers.

21   One, an assault weapons ban; two, a ban on large-capacity

22   magazines; three, having a concealed carry permit; four, having

23   to show good moral character; five, having to list all your

24   social media accounts; six, barring all firearms on private

25   property, absent the property owners' permission; seven,

1   barring "untraceable," quote/unquote, "firearms"; eight, no

2   concealed carry at any place of worship or religious

3   observation; nine, no obliterated serial numbers; ten, you

4   cannot possess a gun if you're, quote/unquote, "under

5   indictment."  No.  You would have to be an actual felon.  Ten,

6   you cannot carry a handgun outside for self-defense.

7       So I accept defense counsel's assertion that you should

8   look to the cases as the best predictor, and that's nine best

9   predictors that under *Bruen* it's a new day, and this law is

10   unconstitutional.

11      If I may, Your Honor?

12          THE COURT:  Mr. Kaempf, let me just ask you.  I know

13   you cited certainly some of those in your briefing.  Did you

14   cite all of those in your briefing?  I just --

15          MR. KAEMPF:  Yes.

16          THE COURT:  Okay.  Perfect.

17          MR. KAEMPF:  I cited nine -- to be clear, I cited

18   nine cases.  It's all nine that I could find, applying *Bruen* in

19   just the last few months, and then having somebody bring a

20   challenge into court, like yours, and in all nine that I found,

21   boom, unconstitutional under *Bruen*.

22      So that's the best predictor, and that's their own test,

23   and we're happy to apply it.

24      May I, Your Honor?  I also found, if I could, briefly, to

25   set the table for the *Bruen* test, that there are ten brief

1   guiding principles from *Bruen*.   One, the Second Amendment

2   elevates above all other interests the right of law-abiding

3   citizens to have arms for self-defense.

4          Two, this demands unqualified deference.

5          Three, the constitutional right for public self-defense is

6   not a second-class right, Your Honor.

7          Four, individual self-defense is the central component of

8   the Second Amendment right.   Self-defense.

9          Five -- this is important; and, obviously, out of respect

10   for you, Judge -- but I have to say this -- five, the very

11   enumeration of the right takes it out of the hands of the

12   Government.

13          And, six, it -- *Bruen* says, quote, the constitutional

14   guarantees are -- if they are subject to future judges'

15   assessments of their usefulness, that is no constitutional

16   guarantee at all.

17          Obviously, I have great respect for Your Honor, but what

18   *Bruen* is telling you is -- is it's not up to you.   We already

19   have the balancing.   It happened in 1791 when we passed the

20   Second Amendment.   The balancing is over, and it -- it is an

21   unqualified command, and it has -- it's not something -- and it

22   says it is not subject to the evolving product of federal

23   judges.   It is not.

24          Seventh, the Second Amendment guarantees the individual

25   right to possess and carry weapons in case of confrontation.

1    Okay?  That's why the central component is self-defense.

2        Eight, the Second Amendment protects the possession and

3    use of weapons that were in common use at the time.  We all

4    know we're going to talk about common use and historic

5    tradition.

6        Nine, *Bruen* said the Second Amendment's, quote, "reference

7    to arms" does not apply only to those arms in existence in the

8    18th century.

9        And, tenth, and, finally, in terms of *Bruen*'s guiding

10   principles before the test, the Court said that the Second

11   Amendment extends to all instruments that constitute bearable

12   arms.  Even those not in existence at the time of the finding.

13       And in the *Heller* case, Your Honor, the Court specifically

14   held that large-capacity magazines are firearms.

15       So you've got *Heller*, and you've got *Bruen*, and the

16   presumption is that we have the right to engage in self-defense

17   in commonly used magazines in excess of 10 rounds as

18   established by Sheriff Lohrey's declaration and Mr. Starrett's

19   declaration.

20       So with those 10 guiding principles, that -- the new test

21   is real simple.  Quote, "When the Second Amendment's plain text

22   covers an individual's conduct, the Constitution presumptively

23   protects" -- presumptively protects.  The Government -- it is

24   defense counsel -- the Government must then justify its

25   regulation by demonstrating that it is consistent with the

nation's historical tradition of firearm regulation.

And this is important.  The word "only."  Only then may the Court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

So, Your Honor, this is different than any preliminary injunction motion I have had in my 30 years of doing this here in Oregon because -- yes, I brought the motion.  I represent the plaintiffs.  But, really, under *Bruen*, they've got to show you contrary to the Second Amendment's presumption and its plain text.  They've got to say, you know, actually, this is part of the historical tradition, banning magazines over 10 rounds and all this stuff, the permits to purchase, and all these requirements, and everything that's in 114.  Oh, yeah, it is not.

And we submit they cannot subvert the burden, and what we object to is that 114 says -- turns *Bruen* upside down.  It says, "Well, an affirmative defense is if people applying for a gun can show this or that and the moral character and these various things."  No.  The burden is on them.  It's basically they have to have an affirmative defense and say, "Look*, Bruen* says the Second Amendment applies."  The central component is self-defense, and they've got to prove to you their affirmative defense of showing why it doesn't.  Why these regulations are allowed.  Why they're part of the historic tradition, and they're not because they've been in common use for a very long

1   time.

2        And as to text, which *Bruen* says controls, it allows

3   plaintiffs to buy as many magazine rounds as they want.

4   There's no restriction on magazine rounds in the Second

5   Amendment, and there never has been in our historic tradition.

6        The Second Amendment doesn't say there's a limit.  It

7   says -- no, no, no, the right -- the people have -- "shall."

8   "The right to bear arms shall" -- mandatory -- "shall not be

9   infringed."

10        It doesn't say, "Oh, but if you get a permit, then you

11   have that right."  Background check and all this.  No.  It says

12   the right of the people to bear arms shall not be infringed,

13   and *Bruen* makes that very clear.

14        It is the Government that has the burden to demonstrate

15   that 114 is part of our nation's historical tradition, and they

16   do not.

17        So you have to look at history.  And because, remember, as

18   *Bruen* makes clear, the Second Amendment is a preexisting right

19   that we got from England.  It's not some new novel thing, and

20   let's all have means-end scrutiny and talk about what's good.

21   No, no, no.  It codified a preexisting right, and the Court

22   says, "Elevated above all others."  And it's the defense's

23   burden to say, "No.  Actually, you don't get that right.  We

24   are going to put all these regulations on it."  They can't meet

25   that because it's absolutely not part of our historic

1    tradition.

2         If I could, Your Honor, now that I have stated the ten key

3    principles of *Bruen* and, obviously, its straightforward test to

4    the four elements of a preliminary injunction.

5         May I, Your Honor?

6         Okay.

7              THE COURT:  It's your argument.

8              MR. KAEMPF:  Okay.  I --

9              THE COURT:  Fifteen.

10             MR. KAEMPF:  I didn't know if you had a question, but

11   thank you.

12        Anyway, the -- before you get into the four elements, as

13   the Court knows, a preliminary injunction in a TRO balance the

14   elements.  So if you're stronger on one versus another, that

15   can make up for it, and you still deserve a TRO or a

16   preliminary injunction.  And the other background fact that's

17   important is that the purpose -- the purpose of a preliminary

18   injunction is to preserve the status quo.  That's all we want.

19        We're not saying, "Judge, do something new and impose all

20   these new regulations on Oregon."  We just want you to preserve

21   the status quo.  To keep it the way that it's been for decades.

22        And, by the way, that's not going to be unsafe for anybody

23   because it's been that way for decades -- people having in

24   excess of 10 rounds -- and we're not having any dangerous

25   situations because those are commonly used for self-defense.

1    And we show a likelihood of success on the merits -- first
2  element -- like the nine other district court cases I cite -- I
3  cited to you since *Bruen*, and under *Bruen*'s terms itself and
4  under *Heller*, applying the test that it's an unqualified
5  command that we shall have the right to keep and bear arms.

6    So we believe we will succeed on the merits just like the
7  nine other cases that I cited to you, and defense counsel has a
8  team of lawyers.  They cite zero because there aren't any.

9    Two, a likelihood of irreparable harm.  Under the *Diocese*
10 *of Brooklyn* case from the Supreme Court in 2020, the court says
11 that the purpose of an injunction is to prevent the risk of
12 irreparable injury.  We've got a risk.  We ask you to prevent
13 it, and it will be that if on December 8, a mere six days from
14 now, we have to go through all of this, and they -- the -- see,
15 the problem with 114 is -- and these, quote/unquote, "permit
16 agents," okay -- "trust the Government" -- is that it's -- it
17 now puts a presumption of guilt.  You've got to go into the
18 permit agent and show why you're good enough to have a gun.
19 And, well, but if the permit agent has, quote/unquote,
20 "reasonable grounds" -- "reasonable grounds," then you don't
21 get the permit to purchase.

22    And Justice Kavanaugh, in his concurrence in *Bruen*, says,
23 "No.  It's got to be a clear objective standard."  And 114 is
24 just the opposite.  And that's the irreparable harm that will
25 happen if it comes in.  Because now we can't go and get 10

1   rounds and buy them like we've been doing -- in excess of 10

2   rounds, like we've been doing for decades, transfer them where

3   we want, have them where we want, and we ask you to prevent

4   that, as well as having to give up the weapons, these various

5   things that will take -- that will occur.

6       And this is important.

7           THE COURT:  Are you saying background checks are

8   unconstitutional?

9           MR. KAEMPF:  No, I'm not saying background checks are

10  unconstitutional.  I'm saying that part of the irreparable

11  injury is to look at all of 114's terms as a whole, that are

12  not consistent with our historic tradition.

13      And this is important, Judge:  In the *Elrod v. Burns* case

14  from the Supreme Court case in 1976, the Court said, quote,

15  "The loss of constitutional freedoms for even minimal" --

16  minimal -- "periods of time, constitutes irreparable injury."

17      That's what we're talking about.  One second of 114 going

18  into effect on December 8 and we have, as a matter of law,

19  according to the Supreme Court, an irreparable injury.

20      Now, to the third element, which is whether an injunction

21  is in the public interest, it is.

22      The *Melendres* case from the Ninth Circuit, Your Honor,

23  says, quote, "It is always in the public interest to prevent

24  the violation of constitutional rights."  The word in there is

25  "prevent."

1        That's why we're here today, Your Honor.  Please, as the

2   Ninth Circuit said in *Melendres*, prevent the violation of our

3   Second Amendment rights, which 114 is, under the new *Bruen*

4   test.  That is why we meet the public interest.  And by the

5   way, we're doing that for all Oregonians, not just the

6   plaintiffs in this case -- all the many members of the

7   Oregon Firearms Federation, to uphold their constitutional

8   right -- and it's in the public interest, please, to do that

9   and prevent the irreparable injury.

10       And the other thing we would point out, in terms of the

11  public interest, Your Honor, is keeping the long safe status

12  quo of lots of people having magazines in excess of 10 rounds,

13  which guns, like the Glock gun, the most popular handgun, they

14  come stock with more than 10 rounds.  Just keeping the status

15  quo the way it is, is not going to endanger anyone.  So that --

16  the public interest, we believe, strongly favors the plaintiffs

17  here, both on the facts and the controlling appellate law I

18  just cited to.

19       And then the fourth and final prong, Your Honor, as you

20  know, is the balance of the equities.  And that tips in favor

21  of the plaintiffs sharply because -- in part, because of the

22  irreparable injury that's caused if you allow this to go in.

23       And what we want is to merely prevent unlawful regulations

24  from going into effect.

25       If Oregon law stays the same way it's been for decades

1  concerning permits to purchase not applying like 114 has them,

2  concerning people having -- being in excess of 10 rounds,

3  that's not going to damage the public interest.  There's not

4  going to be some mass shooting just because the law stays the

5  way it's been for a very long time.

6      And also, Your Honor, it will make -- to allow this to go

7  into effect will allow -- will make Oregonians less safe

8  because, you know, you hear the line that, "Well, then only the

9  criminals will have the guns, if guns are illegal," and that's

10  the point.  If we established in the declarations of my

11  client's -- Sheriff Lohrey, Adam Johnson, Kevin Starrett --

12  that these magazines in excess of 10 rounds are commonly used

13  for self-defense, including if law enforcement has to deal with

14  people, and they -- they are in excess of 10 rounds and private

15  people and the criminal who's -- a criminal is not going to go

16  through background checks.  They are not going to follow the

17  rules, but then the law-abiding people are hamstrung, and then

18  they get ambushed, perhaps in the dark.  That will be very

19  unsafe for people.  If it's "Well, we, can't have a magazine in

20  excess of 10 rounds," and that is not supported by our historic

21  tradition, there are not analogues to that, that the Court

22  would apply.

23      So for those reasons, Your Honor, applying the new *Bruen*

24  test, I ask you to rule consistent with your nine peers in all

25  nine cases decided since *Bruen*, which defense counsel says is,

1   quote/unquote, "the best predictor."  Yes, please do the same,

2   and we ask that you grant our motion for a preliminary

3   injunction and a TRO today, Your Honor.

4          Thank you.

5          THE COURT:  And, Mr. Kaempf, just on your last point,

6   what evidence is there in the record that magazines of more

7   than 10 rounds are commonly used in self-defense?

8          MR. KAEMPF:  That is in Mr. Starrett's declaration.

9          THE COURT:  But it's not based on any -- I mean, he

10  says it, but is there any evidence that --

11         MR. KAEMPF:  Well, he's the president of the

12  Oregon Firearms Federation and has extensive experience with

13  handguns and in his role as the lead plaintiff, and I haven't

14  heard any challenge to whether his testimony is admissible.

15      And I also believe it's referenced in amicus briefs that

16  this is something that is standard in the United States and has

17  been for a very, very long time.

18         THE COURT:  All right.  Thank you.

19         MR. KAEMPF:  Thank you, Your Honor.

20         THE COURT:  Mr. Bergstrom, this is your time.

21         MR. BERGSTROM:  Thank you, Your Honor.  I'm going to

22  discuss -- I'll discuss our brief first, and then if there's

23  time remaining or if there's questions that you asked earlier

24  that I didn't get to, I'll address them then.  But I would like

25  to start off just by talking about the likelihood of success on

1    the merits in this case.

2         So as you mentioned, our plaintiffs only challenge the

3    magazine ban.  So the ban on magazines capable of holding more

4    than 11 rounds.

5         And under *Bruen*, the test this Court needs to take to

6    analyze these cases is straightforward.  If the Second

7    Amendment plain text covers the conduct regulated by the

8    statute or, in this case, the ballot measure, the constitution

9    presumptively protects that conduct.  And to justify its

10   regulations, the Government must demonstrate the regulation is

11   consistent with our nation's historical tradition of firearm

12   regulation.

13        So taking the text of the event at first, the text says,

14   "A well-regulated" --

15             THE COURT REPORTER:  Could you have him slow down,

16   please?

17             THE COURT:  Mr. Bergstrom, I'm going to ask you to

18   slow down.  Our court reporter is having difficulty picking you

19   up; so --

20             MR. BERGSTROM:  Sorry.  Your Honor.

21        And sorry to the court reporter.

22        So the Second Amendment says that it's the right of the

23   people to keep and bear arms.  And I know that there's

24   disagreement between the parties and the State as to whether or

25   not magazines constitute arms.  A couple things to say on that.

First, I think that that framing is really not the most helpful way of looking at it.  I think the fundamental issue here is that the State of Oregon has made it illegal for people to purchase or to carry firearms equipped with magazines holding more than 11 rounds or 11 or more rounds, and that's a category of firearm that is extremely commonly used.  And that category of firearm is certainly protected as an arm.

So whether you look at this as through the question, "Are magazines protected arms?" I would point to the Third Circuit's *Association of New Jersey Rifle and Pistol Clubs'* analysis of this and the *Duncan v. Bonta's* panel opinion's analysis of this showing that they properly are considered arms.

But even leaving that aside, whether they're arms or components of arms, the effect of the regulation is to make it illegal to carry or to buy a firearm that is capable of holding 17 rounds, as in the case of a Glock handgun; and that is, undoubtedly, a regulation on arms.

So then the question is, "Can it be justified by reference to our nation's historical tradition of firearm regulations?" And in this case, as we -- as Your Honor has discussed, asking questions already, there are -- there are cases under *Bruen* where we need to spend a lot of time digging into the historical records, seeing what other statues are out there; but in this case, the Supreme Court has done the historical framework.

1        It has already said, both in *Heller* and reiterated again

2   in *Bruen*, that the sort of weapons that are protected --

3   weapons protected were those in common use at the time.  That

4   comes from the *Heller* opinion at page 627.  And that -- and the

5   Supreme Court said that this limitation is fairly supported by

6   the historical tradition of prohibiting the carriage of

7   dangerous and unusual firearms.

8        So there we have, I think, the answer to the question that

9   Your Honor was asking earlier about what could be regulated.

10       What can be regulated here is dangerous and unusual arms.

11  Dangerous and unusual -- and unusual ammunition, things like

12  that.

13       What cannot be regulated is -- or what at least cannot be

14  made illegal to purchase or to use are arms that are in common

15  use at the time, and that time is today.  We look at whether or

16  not they're in common use today.

17       And I want to have a little caveat here to what Your Honor

18  was asking about earlier.  While self-defense is a component of

19  the right, an important component of the right, it's not the

20  be-all and end-all of the right.

21       So *Heller* says --

22            THE COURT:  Hold on, Mr. Bergstrom.  Doesn't the

23  Supreme Court actually say it's the core right of the Second

24  Amendment?

25            MR. BERGSTROM:  The Supreme Court does use the word

1   "core," but elsewhere, *Heller* says that the protected arms are

2   those that are typically possessed by law-abiding citizens for

3   lawful purposes.  So not just for self-defense but for all

4   lawful purposes.

5        So it's not an element of the common use test that we have

6   to show that these -- these arms are commonly used in

7   self-defense, just that they are commonly used by people for

8   lawful purposes.

9        And lawful purposes can include target shooting.  It

10  obviously includes self-defense, but it can also include target

11  shooting, hunting, sport and recreation.

12       I mean, if you think about it another way, a bolt-action

13  rifle, I believe, would be -- I have not looked at this, but I

14  would believe would be used rarely for self-defense, but it's

15  unquestionably an arm that's in common use for hunting and

16  would be protected under the Supreme Court's tests from both

17  *Heller* and from *Bruen*.

18       So then when you -- when Your Honor asked about whether or

19  not machine guns or certain ammunition can be regulated, the

20  question in every case is, is it commonly possessed by law

21  abiding citizens?  And if it's commonly possessed, then it

22  cannot be banned.

23       This relates to the historical tradition against dangerous

24  and unusual weapons being banned.  In *Caetano* the Supreme

25  Court, or Justice Alito, said very clearly that this is a

conjunctive test, meaning arms cannot be banned just because
they're dangerous or just because they're unusual.  They must
be both dangerous and unusual.

  In *Caetano*, therefore --

    THE COURT:  And, Mr. Bergstrom, is there a point at
which the number of rounds in a magazine -- in a single
magazine becomes dangerous?

    MR. BERGSTROM:  Your Honor, there may well be, and
there may well also be a point at which the number of rounds in
a single magazine becomes unusual, but in the D.C. Circuit's
*Heller II* decision, the majority said that whatever that
threshold is, it's well above 10.  And if you look into our
brief, we've submitted evidence that as -- as counsel for OFF
said, the Glock handgun comes standard with a magazine and is
the most popular handgun in the country.  The most popular
rifles in the country are frequently used with 30-round
magazines and overwhelmingly used with magazines with capacity
in excess of 10.

  So when we're looking at this, the question the Court
should be asking is, "Are these -- are these magazines commonly
owned and commonly possessed and used for lawful purposes?"
And they are.  All the evidence shows that they are.

  And that, we submit, effectively ends the inquiry.

  A couple other questions that Your Honor asked earlier,
that I would like to address, if I can -- you asked what the

1  value of the previous appellate cases are that address this

2  issue.  The *Heller II* and *Kolbe* and the Third Circuit's

3  *Association of New Jersey Rifle and Pistol Clubs*, and I think

4  I've got a point of some common ground here with the State when

5  they say they are -- they have all been abrogated by *Bruen*.

6  They are no longer good law, and their conclusions rested on

7  step two of the analysis.  And *Bruen* says clearly step two of

8  the analysis is, in fact, not part of the analysis.  But they

9  do have some helpful analysis.

10  Now, where I'm going to differ from Oregon is what -- what

11  parts of the analysis are helpful.

12  But the State mentioned that -- that several of these

13  cases go on their way to address the commonality issue that I'm

14  addressing here, and they find that these magazines are

15  overwhelmingly commonly owned by law-abiding citizens for

16  lawful purposes.  And, really, from our perspective, that ends

17  this inquiry.

18  So we think that the Third Circuit decision, the D.C.

19  Circuit decision, although they, under the oldest, went the

20  wrong way for plaintiffs in this case, they provide the -- they

21  provide the kernels of analysis that this Court needs to take

22  in to go the correct way.

23  I would caution that we shouldn't count the win/loss

24  record of plaintiffs before *Bruen*.  Because *Bruen* specifically

25  said that every circuit court to address this issue -- what the

1    analysis ought to be under *Heller* -- had gotten it precisely

2    wrong.  And so I don't think that those cases should be relied

3    on for sort of counting who's the winner and the loser, but

4    they do have helpful facts about commonality that I think

5    predict what the record in this case will show.

6         As to what the record in this case ought to ultimately

7    look like, either -- either at the PI hearing or at summary

8    judgment, both *Heller* and *Bruen* were decided without the aid of

9    expert testimony.

10        And in *Bruen*, the Supreme Court specifically responded to

11   the dissent's suggestion that it ought to be -- that it ought

12   to remand the case for development of a record of some sort,

13   and it said that -- it said that in light of the text of the

14   Second Amendment, along with the nation's historical history of

15   firearm regulation, the conclusion that a state may not prevent

16   law-abiding citizens from publicly carrying handguns because

17   they have not demonstrated a special need for self-defense did

18   not turn on factual questions.  It was essentially an issue of

19   pure law, and that's how we view this case.

20        Whether or not Oregon's Ballot Measure 114 violates

21   plaintiff's Second Amendment rights is an issue of pure law.

22   It involves analyzing the text of the amendment and taking

23   judicial notice of facts about common use.

24        In *Caetano*, I would note that the facts that Justice Alito

25   used to find that stun guns were in common use were facts that

1   he had taken judicial notice of.  They were not facts that were

2   submitted through expert testimony of some sort or through any

3   other testimony.

4        THE COURT:  But, Mr. Bergstrom, let me ask you about

5   it.  From just looking at *Bruen*, it certainly states in it that

6   it urges courts to look at English history dating from the late

7   1600s and American colonial views leading up to the founding to

8   determine whether a regulation in question comports with the

9   American history and tradition of firearm regulation.

10       I'm not an expert.  A litigant is not in a position to

11   provide that information.  So don't I have to delve into that

12   historical analysis even by the terms of *Bruen* itself?

13       MR. BERGSTROM:  Well, it's a legal history analysis,

14   and it's history that was presented in *Bruen* through briefing.

15       I mean, I'm not saying that there shouldn't be,

16   necessarily, amicus briefs to assist the Court, but it is --

17   but in *Bruen* it was done without -- without expert witnesses,

18   and I think it -- I think it can and should be done without

19   expert witnesses in other Second Amendment cases.  And I think

20   that's especially true in this one, where, as I said, the

21   Supreme Court has already done the relevant historical work

22   here and has found that there is -- there is a tradition of

23   banning certain types of firearms in this country or strictly

24   regulating their use, but that tradition is limited to firearms

25   that are dangerous and unusual.  And as I said, that's

1  conjunctive; so if the Court finds, as I think it must, that

2  these magazines are in common use and that firearms equipped

3  with these magazines are in common use for lawful purpose --

4  for lawful purposes by law-abiding citizens, then that's

5  effectively the end of the inquiry under *Bruen*.

6         THE COURT:  Is there evidence in the record that

7  these high-capacity weapons, again within the meaning of 114,

8  are used for hunting; and, if so, where is it in the record?

9         MR. BERGSTROM:  So, again, there's no evidence that

10  they are used for hunting in the record, that I'm aware of.

11  There may be in the OFF case.  I apologize if I'm misstating

12  something.  But we have not submitted anything saying that

13  they're used for hunting, but they are used for lawful

14  purposes.

15         THE COURT:  Like what?  What's the evidence in the

16  record that they're used for lawful purposes?

17         MR. BERGSTROM:  Well, I think it's -- I think it's,

18  A, I believe the Court can take a look, as we suggested, at the

19  Third Circuit decision in *Association of New Jersey Rifle and*

20  *Pistol Clubs'* --

21         THE COURT REPORTER:  I'm sorry.  He needs to --

22         THE COURT:  Slow it down because it's hard to hear

23  you.

24         MR. BERGSTROM:  Oh, apologies.

25       The *Duncan v. Bonta*, both the panel opinion and

1    Judge Bumatay's dissent going to the facts on this issue.  And

2    we submitted in our brief facts that show that there are half a

3    billion of these magazines in the country.

4                 THE COURT:  But that doesn't --

5                 MR. BERGSTROM:  Now, well --

6                 THE COURT:  But we also have competing facts that

7    they're used for mass shootings.  So where in the record does

8    it tell me that they're commonly used for self-defense is the

9    question?  And then even with your argument that they are

10   commonly used for other purposes, lawful purposes, like

11   hunting, other recreation, shooting at the range, but what --

12   what other purposes are in the record that I have that you have

13   submitted?

14                MR. BERGSTROM:  Well, again, Your Honor, I -- I'm

15   going to construe the record here to include things in the

16   cases cited in our briefs, if that's okay.  Because the cases

17   cited in our briefs establish, for example, that the Glock

18   handgun -- that's the most popular handgun in the country --

19   comes standard with this firearm.

20        Now, I mean, the vast majority of handguns are used

21   lawfully for lawful purposes, for self-defense, things like

22   that.  The Court can take judicial notice of that and find that

23   these are commonly used for lawful purposes.

24        Similarly, if there are half a billion of these magazines

25   in the country, even if every -- even if every firearm --

1   firearm crime that took place annually -- or every crime that

2   took place with a crime -- with a -- excuse me -- let me try

3   one more time.  If every crime committed with a firearm

4   wasn't -- was committed with a firearm equipped with a large --

5   with what the State of Oregon has dubbed a "large-capacity

6   magazine" and each one used an individual one, it would still

7   be a minute fraction of the overall number of these magazines

8   in the country.

9        The vast majority of them are never used in crime.  They

10  are only used by law-abiding citizens for lawful purposes.

11  That's, I think, a matter of arithmetic.

12            THE COURT:  Let me ask you -- and this is just sort

13  of related but doesn't necessarily go to the analysis that

14  you're talking about, but if one has access to magazines of 10

15  or less -- 10 or fewer rounds in one -- and, obviously, you can

16  carry multiple magazines up to that amount under Ballot Measure

17  114 -- what can't someone do in terms of some of those common

18  law-abiding purposes?  Is there anything one can't do if you

19  have the lower-capacity magazine?

20            MR. BERGSTROM:  Well, Your Honor, respectfully, I'm

21  going to take issue with the question.  So in *Heller* -- *Heller*

22  said specifically that this is not the way that we can think

23  about firearms.  The State can't take away some options and

24  leave other equally good -- even if they're equally good

25  options.  We don't concede they're equally good options, but

1   let's say the State took away, at random, you know, 50 percent

2   of the firearms and left the other 50 percent there and said,

3   "Well, you can use the other half." *Heller*, at page 629, said,

4   "It is no answer to say, as petitioners do, that it's

5   permissible to ban the possession of handguns as long as

6   possession of other firearms (*i.e.* long guns) is allowed.  It's

7   enough to note, as we have observed, that the American people

8   have considered the handgun to be the quintessential

9   self-defense weapon."

10   So in that case -- and *Heller* was more focused on

11   self-defense than on other uses; but, again, the principle

12   applies to all lawful uses.  It's the choice of the American

13   people that count, and the American people have overwhelmingly

14   chosen firearms that are equipped with magazines in excess of

15   10 rounds.

16   And Oregon can't say -- can't be heard to argue that they

17   should be just as happy with -- with firearms holding fewer

18   rounds because that is -- that decision -- the Supreme Court

19   has told us that the Second Amendment takes certain options off

20   the table and --

21   THE COURT:  Let me ask you two things.  One, you

22   quoted the Third Circuit case; but isn't it, in fact, true both

23   the D.C. Circuit and the Third Circuit decide -- basically

24   stated they were not deciding whether large-capacity magazines

25   were, in fact, in common use.  They decided the case

1   specifically saying, "We're not deciding that issue whether

2   they're in common use."  Isn't that correct?

3            MR. BERGSTROM:  Well, just to be clear, the *Heller*

4   opinion I just quoted to you, that's the Supreme Court's

5   *Heller*.

6            THE COURT:  Yeah, let me ask you about that.

7   *Heller* -- my second question is isn't *Heller* a complete ban on

8   firearms?  That's not what we have here.

9            MR. BERGSTROM:  Well, taking your questions in turn,

10  both the -- the D.C. Circuit and the Third Circuit, both,

11  ultimately, did not have to decide the first issue because they

12  could resolve the case on the "Here's the scrutiny approach

13  that the Supreme Court has now decisively rejected."

14           THE COURT:  So they didn't decide.  But you said I

15  could use that as a record for determining that these are

16  commonly used magazines; but that's not what I can take from

17  the Third Circuit, is it?

18           MR. BERGSTROM:  Well, they ultimately did not need to

19  decide.  They did decide that -- I believe the *Heller* decision

20  and the Third Circuit decision both decided they were commonly

21  used.  Whether or not --

22           THE COURT:  *Heller*?

23           MR. BERGSTROM:  Sorry.  The *Heller II* decision.  The

24  D.C. Circuit one.  Both decided that they were commonly used, I

25  believe.

1        And then as to --

2        Could you remind me what your second question was?

3             THE COURT:  My second question was *Heller* involved a

4   complete ban on firearms, didn't it?

5             MR. BERGSTROM:  Yes, it did; but that's --

6             THE COURT:  That's not what we have here; right?

7             MR. BERGSTROM:  Well, it is a ban on purchase and

8   sale and transfer and on possession of new magazines of an

9   entire category of arms.  It's a ban on firearms capable of

10  firing more than 11 rounds without reloading.  So in that case,

11  it's the same as *Heller.*

12       *Heller* banned handguns, but it left people able to acquire

13  rifles.  And the Supreme Court said that was not an adequate

14  tradeoff.  You can't ban an entire category of arms unless it's

15  dangerous and unusual, or I think they used the term "highly

16  unusual in society at large" in *Bruen.*

17       And that's not the case with these firearms equipped with

18  these magazines.

19            THE COURT:  Okay.  Thank you.

20            MR. BERGSTROM:  Thank you, Your Honor.

21            THE COURT:  Anything further?

22            MR. BERGSTROM:  No, Your Honor.

23            THE COURT:  Let me hear from the defense.

24            MR. MARSHALL:  So I want to start where the last

25  piece of argument left off, which is this question of whether

1    large-capacity magazines are arms at all.

2         And I think the Court of -- the language used by the Court

3    of Appeals in these cases is a little bit confusing, and so I

4    think that maybe the Court and Mr. Bergstrom were talking past

5    each other.  I'll try to resolve some of that.

6         Let's just start with *Heller*, and I think that the

7    important passage in *Heller* on this point is, in part, the

8    part -- the piece that Mr. Bergstrom quoted, which is that the

9    handgun is the quintessential.  The quintessential.  That it's

10   uniquely well-suited.  What that argument was responding to was

11   the argument that a long gun was sufficient to allow citizens

12   of the District of Columbia to defend themselves, and the

13   *Heller* opinion says, "No, it's not."  And the reason it's not

14   is because it is uniquely well-suited to have a handgun for

15   self-defense.  That's the reasoning of *Heller*.  And that's

16   because it is -- it is uniquely well-suited that it is the

17   quintessential weapon for self-defense, that that is why it is,

18   in fact, an arm, as opposed to those that the Government can

19   continue to ban, which have other purposes that they are better

20   suited for.  For example, military purposes or criminal

21   purposes.

22        And I think that is where we get into disagreement with

23   Mr. Bergstrom's reading of some of these Court of Appeals cases

24   that we both agree have some bearing on the question.

25        So as the Court said, that the -- on remand in *Heller* and

1    in that Third Circuit decision in *New Jersey Association --*

2    *Association of -- New Jersey Rifle Association*, something like

3    that -- the New Jersey Rifle Association case.  In each of

4    those cases they have said there are a lot of large-capacity

5    magazines in the states and in the nation as a whole.  But both

6    of those courts said that fact alone is not sufficient.

7    Because what the Court needs to determine is whether they are,

8    in fact, commonly used for self-defense purposes.

9        And so every piece of -- that I was able to track down of

10   these courts of appeals cases where there's quotations in the

11   briefing that say there are millions or hundreds of millions of

12   large-capacity magazines in the United States, this is in --

13   true in the Third Circuit case.  This is true in the D.C.

14   Circuit's case in the remand in *Heller*.  They said, "But that's

15   not enough."

16       The next paragraph says, "That's not enough for the Court

17   to conclude that it is, in fact, an arm."  Then they go to the

18   intermediate -- the intermediate scrutiny test and -- and

19   decide on that ground, which has been superseded.

20       That's exactly what *Duncan v. Bonta* said.  The facts

21   they're providing to the Court here are the same facts the

22   Ninth Circuit had when it decided *Duncan v. Bonta* en banc.

23       I mean, Mr. Bergstrom committed to you the panel opinion.

24   That panel opinion was reversed by the en banc court.  So I

25   think the en banc court's opinion is the one that you should

look at, which, as I said before, is extremely close to saying
and, I think, provides basically the entire reasoning that the
Court would need to conclude that on this record they have not
established that these are, in fact, arms protected by the
Second Amendment.

And then you go to the Fourth Circuit case, which, I
think, is the only one that I'm -- that I -- I have not -- I
can't say this with certainty, but I think that -- I do know
that the Fourth Circuit case -- I do not -- I can't speak to
all seven of those cases with certainty, but the Fourth Circuit
case certainly did decide that it was not an arm, and it had
these facts in front of it that these are -- there are lots of
individuals who have large-capacity magazines; but, again, it
rejected the notion that they were arms protected by the Second
Amendment at all.

And so, in our view, the Court does have to turn to the
question of whether they are, in fact, commonly used for
self-defense.  The best record -- the best evidence in the
record is the Allen declaration at ECF 17-1.  The Court can
also look to the failure of proof on behalf of the plaintiffs
on this point in all the Court of Appeals cases that we talked
about.  But that says that the -- that it is extraordinarily
rare that defensive uses, as cataloged by the National Rifle
Association, involved a firing of -- firing of more than 10
rounds.  It's extremely rare.  Like, less than 1 percent rare.

1    That the average number of shots fired in defensive use is

2    2.3 -- 2.3 rounds.  There's no contrary evidence that has any

3    sort of systematic evaluation of how commonly used they are.

4    And so on this record, the Court really has to defer to what

5    has been presented to it.

6        Now, this goes to the question of whether we're talking in

7    the world of pure law or facts.  And I would just say that we

8    think that the facts matter here, both on the history and on

9    the actual burdens and benefits of large-capacity magazines;

10   and I think footnote 6 of *Bruen* is really important because it

11   says that the courts are supposed to rely on the ordinary

12   litigation process, the party presentation principle, to

13   determine the history.

14       And that is what we have tried to abide by here by

15   presenting history to the Court and actual facts of what the

16   historical tradition is.

17       I also differ with my friend about the question of

18   whether, once you determine that it is commonly held, that that

19   is the end of the case.  It's just not.  That's the first

20   question, is to whether it is commonly held for self-defense

21   purposes.  It's the threshold question as to whether this is an

22   arm and protected by the Second Amendment at all.

23       If they prevail on that, it becomes the State's burden to

24   establish it's within the historical tradition of regulation of

25   arms, and we provide several examples from the 18th century,

1   19th century, and 20th century of places where there are

2   unusually dangerous weapons that are prohibited by the states

3   and that they are constitutionally permitted to do so.

4        And so on this second question of what the historical

5   record looks like, I just -- I don't see what -- what is being

6   presented by the plaintiffs on that issue, and I think it's

7   really important that it's not -- that we have to show the

8   exact same -- the exact same regulation existed in the past.  I

9   mean, that -- these weapons didn't exist in the 18th century.

10  They didn't exist in the 19th century in the same way, with the

11  same level of lethality.

12       The question is whether an analogous regulation exists.

13  And that Blackstonian category of "dangerous and unusual" is

14  the category which it -- which this falls into if we get past

15  the threshold question of whether this is an arm at all.

16            THE COURT:  Let me ask you.  How does one define

17  "dangerous"?  For example, is that something that can evolve

18  over time?

19       So, again, you make a point in your briefing on how

20  large-capacity or capacity magazines over 10 have been used in

21  mass shootings.  That -- and you make the point in your

22  briefing that it's a relatively recent phenomenon.  Can I

23  consider or is it appropriate for a court to consider that

24  outside circumstances might make something more dangerous than

25  it would inherently be, or is that not the right analysis?

1          MR. MARSHALL:  So the --

2          THE COURT:  So in evaluating whether in -- using

3     *Bruen*'s analysis, is something unusual or dangerous, can

4     something be seemingly innocuous, a magazine with a certain

5     number of rounds previously, but now that society has seen the

6     use of that particular instrument in a way that perhaps wasn't

7     contemplated, does it become -- does the instrument itself or

8     the magazine itself or the gun itself become unusual and

9     dangerous, or not?

10         I mean, I'm just, again, sort of struggling with how much

11    to take into account the events that both are in the preamble

12    of 114 but also that are cited in your briefing.  And your

13    brief ends, I believe, with a shooting in a synagogue.  So I'm

14    just trying to understand exactly how to include those -- or

15    decide whether I should include those scenarios in my analysis.

16         MR. MARSHALL:  Okay.  I'll answer that a few ways.

17    So the first way is that *Bruen* says that if it is an

18    unprecedented technological change or an unprecedented social

19    problem either/or unprecedented psychological change.

20         So, you know, at some point in this case -- I don't know

21    whether they made it into this -- into the briefing here --

22    there are going to be weapons cited to you that are going to

23    say, "Well, there was a 12-shot firearm.  You know, a

24    12 magazine -- a 12-round magazine on this firearm in the 18th

25    or 19th century," et cetera.  Whether it was dangerous then and

1    dangerous now are two different things because of the other

2    technologies that were around.  You know, they're around that.

3         So if you have 12 rounds but every round takes two seconds

4    to fire, that's a lot different than 12 rounds today.  So

5    technological change matters.

6         Second:  Unprecedented social problem.  And I think you're

7    referring to the Klarevas declaration where we provide a

8    catalog of every shooting at which a single shooter has killed

9    10 or more people in American history.  And you just see a

10   spike from 1998 onward, and that -- sorry -- from 2009 onward

11   and the number of those there.

12        I think that is in the category of "unprecedented social

13   problem," that there is a risk that a single individual can

14   commit that many killings by themself.

15        So I think that is relevant to the Court's analysis.

16        I think it would be helpful for the Court to also look at

17   page 10 of the Klarevas declaration -- ECF 17-5 -- where we

18   provide some pretty clear data of how recently large-capacity

19   magazines came into the stream of commerce in the United

20   States.

21        And so it said -- in 1955 one percent of firearms used

22   large-capacity magazines.  1965 one percent.  1975 two percent.

23   1985 five percent.  1995, just prior to the federal prohibition

24   and the assault weapons ban, seven percent.

25        So we're not talking about a long tradition where there

1   have been large-capacity magazines.  What we're seeing is a

2   reaction to this unprecedented social problem combined with

3   technological change.

4        And, I guess, I -- I guess, I'll respectfully have to just

5   push back a bit on the notion that it's something extrinsic to

6   the technology that is causing this problem.  I think that

7   attachment 8 is an extremely persuasive empirical study that

8   shows the relationship between large-capacity magazines and the

9   capacity to keep the -- to have these -- to have mass

10  shootings.  I think there is also another set of empirical

11  research, which is Klarevas, et al.  So it's not the

12  declaration that Klarevas wrote, but it's a peer-reviewed

13  publication that he wrote.  That's at ECF-5 at 32.  It says,

14  "Table 2," there.  That talks -- that shows the relationship

15  between prohibiting large-capacity magazines and the likelihood

16  in any manner of things, whether you look at it as how many

17  people when there's -- how many people die in an attempted mass

18  shooting, how many mass shootings are there, all of those

19  datapoints all turn on whether a state makes the choice that

20  the people of Oregon just made, which is whether or not that

21  state decides to permit large-capacity magazines to be used.

22       So I think all of that is -- is quite relevant.

23            THE COURT:  So taking, for example, that last

24  statistic, in terms of -- if you can show the relationship --

25  or if there's evidence -- or there is evidence in the record

1    that you have presented that shows a relationship between harm

2    reduction in mass shootings and the capacity of magazines,

3    where does that fit into the analysis?

4           MR. MARSHALL:  So that fits into the analogical

5    reasoning component.  So we first take a look at what

6    historically our ancestors were doing when they decided how to

7    regulate the weapons of their time, and so you look at where

8    the burdens and the benefits of those regulations were.  And so

9    you know, the -- at a very high level, the regulations of --

10   over the 18th and 19th and early 20th century is Americans

11   continue to -- can continue to bear arms that are necessary for

12   self-defense, that have -- they are uniquely well-suited for

13   self-defense, but there's a category of weapons that are not

14   uniquely well -- uniquely well-suited for self-defense, and the

15   Government continues to have authority to prohibit them.

16       And so you -- and so that -- and so when you're looking at

17   those benefits and burdens, you have to look at what the

18   benefits and burdens -- and I think this is straight out of

19   *Bruen* -- are to the modern -- to the modern -- the modern piece

20   of this.  I think it's a little bit unclear whether you're

21   supposed to assume the State is right or whether the State has

22   to prove it's right about those burdens, whether -- you know,

23   what level of proof we have to provide on what the modern

24   benefits and burdens are.

25       But I think at some level the Court is going to have to

1   dig into the question of -- of are large-capacity magazines, in

2   fact, necessary to self-defense?  How much would -- does this

3   compromise capacity of self-defense at all, and I think the

4   answer is, you know, very, very little or not at all; and

5   then -- and then what are the benefits to the public of -- of

6   taking one particular component of a weapon off the table, and

7   I think we will be able to show at trial that there's a very

8   large benefit to that and that the people, when they put this

9   on the ballot, because they were outraged by what they were

10  seeing in other states and had fear that that would come here,

11  that they have -- that they are entitled to make that decision.

12          THE COURT:  And if I -- am I correct that one could,

13  even after Ballot Measure 114, have multiple magazines in their

14  possession at one time?

15          MR. MARSHALL:  Absolutely.

16          THE COURT:  With rounds up to 10 rounds?

17          MR. MARSHALL:  Absolutely.  No limit whatsoever.

18      Last point, I -- to the extent that the Court would like

19  more recent decisions from -- that are post-*Bruen* that come out

20  the other way and uphold Government regulations, we would

21  commend to the Court *Range* v. *Attorney General* out of the Third

22  Circuit.  I don't have a Westlaw number, but the case number is

23  21-2835, November 16, 2022.

24      We didn't focus very much on post-*Bruen*, large-capacity

25  magazine cases, because there really aren't any.  There are two

1    district court decisions out of Colorado that my friends on the

2    other side have cited to you.  Both of those were presented to

3    TROs where the Government didn't even respond.  Both of those

4    TROs are no longer in force.

5         I think the plaintiffs in those cases voluntarily

6    dismissed, and there's some negotiation among the parties about

7    how to move forward at the outset; but I think you will be the

8    first judge to adjudicate a TRO on the question of

9    large-capacity magazines and whether the states retain, after

10   *Bruen*, the ability to impose this.

11              THE COURT:  Let me switch gears for a minute, just to

12   the permitting.  One of the issues raised in the briefing is

13   that the State is still working on how the permitting is going

14   to work, and it's not yet fully in place.  Is there -- and now

15   plaintiff argues -- which, again, it did not argue in its

16   briefing, specifically, about the non-discretion -- excuse

17   me -- the discretionary nature now, is what I'm understanding,

18   of the permitting scheme.

19        Can you respond to that argument?

20              MR. MARSHALL:  Which one?  Or both?

21              THE COURT:  I would --

22              MR. MARSHALL:  The readiness?

23              THE COURT:  Readiness.

24              MR. MARSHALL:  The administrative implementation?

25              THE COURT:  Correct.

1           MR. MARSHALL:  So on the administrative

2    implementation, there will be -- people will -- Oregonians will

3    be able to apply for a permit on December 8th.

4           THE COURT:  All right.

5           MR. MARSHALL:  And so I want to be clear about this.

6           THE COURT:  Actually, let me ask you this --

7           MR. MARSHALL:  I -- we can talk about this as long as

8    you want.  My preference, though, is that I would rather

9    discuss it in the context where the administrative case --

10   where the administrative issue is raised squarely, which is the

11   "Eyre" case -- "Aire"?  I -- I apologize.  I'm learning a lot

12   of case names to this, but the third filed case.

13          THE COURT:  Yeah.

14          MR. MARSHALL:  Where this question is, albeit

15   without -- well, I shouldn't argue on -- I don't -- I'll stay

16   out of the substance, but just to say we will present an

17   evidentiary record on readiness when that issue is squarely

18   raised.  We interpreted the first filed case to raise only a

19   facial challenge.  We responded on a facial basis.  We

20   disagree that -- we agree that it's a "shall" -- we believe it

21   is a "shall issue" regime under *Heller*, and we do think that

22   the State will be ready to implement the permit to purchase

23   requirement on December 8th.

24          THE COURT:  Isn't there some argument, if the State

25   is not ready to implement, that goes -- cuts against

1   irreparable harm, in any event?

2            MR. MARSHALL:  I'm sorry.  I lost that.

3            THE COURT:  If the State is not ready to implement,

4   that means people are not going to be having to seek permits?

5   Or that's -- am I misunderstanding?

6            MR. MARSHALL:  You know, I think we're starting to

7   argue a case where my opponent on that case is not at the

8   podium.  So I -- I would rather say it the other way.  I mean,

9   I think the answer is I -- I think that's a hypothetical that

10  won't occur because I think the State is intending to implement

11  on December 8th and will be ready to do so.  And if --

12  depending on what the Court's schedule allows, we will present

13  that evidence at the appropriate hearing.

14           THE COURT:  All right.  Thank you.

15      Mr. Kaempf, you've got five.

16      And, Mr. Bergstrom, you have five as well.

17           MR. KAEMPF:  Thank you, Your Honor.

18      May I clear up a few things about the record?  And I would

19  point you at this point, Your Honor, to the declaration of

20  Kevin Starrett, the president of the Oregon Firearms

21  Federation.  In particular, if you look at paragraph 2 of his

22  declaration in the record, it says, quote, "Magazines over 10

23  rounds are commonly possessed by the American public and have

24  been for generations.  Such magazines have existed since before

25  the American Revolution.  They have been commonly possessed in

1   the United States since 1862."

2       Think about that.  That's -- at the time that was

3   President Lincoln.  Okay.

4       "And their popularity has steadily increased ever since

5   that time."

6       And then paragraph 4 of Mr. Starrett's declaration in the

7   record says, "Magazines of up to 30" -- not just 10 now --

8   "magazines up to 30 rounds for rifles and up to 20 rounds for

9   handguns are standard equipment for many popular firearms.

10  These magazines are overwhelmingly used for lawful" --

11  lawful -- "purposes."  And "Common sense tells us the small

12  percentage of the population who are violent gun criminals is

13  not remotely large enough to explain the massive market for

14  magazines of more than 10 rounds that has existed since the mid

15  19th century."

16      So I just want to -- if anybody had this impression, "Oh,

17  well, 114 was needed because these are more than 10 rounds.

18  That's just crazy.  We've got to stop it."  No.  It's been

19  going on -- people have had more than 10 rounds since the

20  1860s.  That's in the record through Mr. Starrett's

21  declaration, and I think that that is important.

22      And he also says, in paragraph 7, "There's nothing unusual

23  or novel about magazines that could hold more than 10 rounds."

24      And he also says in the same paragraph that the banned

25  magazines in Ballot Measure 114 are commonly preferred by

law-abiding Oregonians, including the plaintiffs, for

self-defense, and it's been that way since the 1860s.  And I

think that's very important.

Now, another issue on the record, Your Honor, is in the

amicus briefings I'm looking at from the Silent Majority

Foundation.  They point out that we have -- and this is on

page 8 of Amicus Silent Majority Foundation, on the numbers you

were getting to, the statistics that I think are important.

THE COURT:  Let me ask you about that.  You did not

submit that in support of your TRO.  I -- that just was -- I

allowed it to be part of the record yesterday.  It just came

in.  What authority is there, really, to allow you to rely on

that record today in support of your TRO?

MR. KAEMPF:  Because they are amicus for me, on my

side, and they were allowed to apply.  They are not amicus for

the defense.  They are amicus for the plaintiff.

THE COURT:  Well, "amicus" is "friend of the court."

They're supposed to give me neutral information.

MR. KAEMPF:  But I -- I -- sure.  But the point is

what they submit supports our position, including the

statistics.

May I just briefly finish, Your Honor?

THE COURT:  I'm not sure I'm going to consider it at

this point.

MR. KAEMPF:  Oh, no, no, and I would just say this:

1   When you look at *Heller*, when you look at *McDonald*, when you

2   look at *Bruen*, amicus briefs are routinely considered by the

3   court in making its decision.  So I think that that is

4   something routine that the court would do.

5       Yes, it's "friend of the court," and what those statistics

6   show is how there are hundreds and millions of magazines that

7   are in circulation in the United States in excess of 10 rounds;

8   and, again, it's been that way since the 1860s.

9       And even without amicus, Mr. Starrett's declaration

10  establishes that the prevalence of magazines in excess of 10

11  rounds, that they are used primarily by -- lawfully by people

12  for self-defense and that it's been that way since the 1860s.

13      One other thing I want to point out, if I could, is they

14  talk about these seven appellate cases; but, Your Honor, those

15  really are in the dustbin in light of *Bruen*.  I mean, it's just

16  the whole two-step thing and the means-end and these things

17  addressed by seven other appellate cases, those -- those don't

18  matter any more than I don't think anybody would cite

19  *Roe v. Wade* anymore in light of the *Dobbs* decision.  Okay?

20  Respectfully, to them.

21      I think that what matters are the nine cases that I cited

22  to you that say, "Look, *Bruen* is a new day.  Here we are.

23  We're applying it."  And all those constitutional challenges to

24  you, including a ban of -- on large-capacity magazines and

25  "You've got to show me your social media accounts" and this,

1   that, and the other thing that are similar to 114 -- nine

2   cases.  That's what matters, and he said that's what -- the

3   cases are the best predictor.  That's the best predictor.

4       So we respectfully ask Your Honor to join your nine peers

5   by applying *Bruen* and its presumption that because we have

6   "People shall have the right to bear arms" that this, 114, is

7   unconstitutional and will cause irreparable injury no later

8   than six days from now, and we have shown that it's in the

9   public interest to keep the law as it is until then.

10      They haven't -- the State hasn't shown a harm if you keep

11  things the way they've been for years, and we ask that you

12  please issue a preliminary injunction and a TRO before

13  December 8th so they're -- under the Supreme Court's decision

14  in the *Diocese of Brooklyn*, that prevents -- prevents the

15  irreparable harm.  That's the point of why we're here today.

16      And as I said earlier, the purpose of a TRO is to preserve

17  the status quo, and the status quo, since 1860 -- okay? -- has

18  been that we have magazine rounds in excess of -- in excess of

19  10; and the status quo, since 1791, when we adopted the Second

20  Amendment, does not require a permit to purchase and all of

21  this.  Okay?  It does not.  And *Bruen* says you look at the

22  plain text.  And if what we want to do is covered by it, then

23  it's presumptively -- presumptively protected.  And the State

24  has not shown that there is -- there are historical analogues

25  or historical tradition for 114.

1      114 would be the most extreme law in the nation if it's

2   allowed to go into effect.  That's why we filed the lawsuit;

3   and, in particular, because of *Bruen*, we think, as the nine

4   cases show, this Court should also grant the injunctive relief,

5   Your Honor.

6      And thank you very much.

7          THE COURT:  All right.  Thank you, Mr. Kaempf.

8   Mr. Bergstrom, you have five.

9          MR. BERGSTROM:  Thank you, Your Honor.  I'll be

10  brief, but I will speak slowly.

11     First, I would like to correct myself, if I can, on the

12  Third Circuit and D.C. Circuit opinions that you referenced.

13  Your Honor was correct.  In both cases, the court did not

14  ultimately decide the issue of commonality.  Although in both

15  cases the court said that millions of the -- the records showed

16  millions of these magazines were owned, and the Third Circuit

17  said they are typically possessed by law-abiding citizens for

18  hunting, pest control, and occasional self-defense.

19     If I can also amend the answer on where -- where in the

20  record can the Court find evidence that these hundreds of

21  millions of magazines are used lawfully?  On page 13 of our

22  brief, we cite the National Firearms Survey that

23  Professor English put together, and he polled owners on

24  why they -- what purposes they owned these magazines for.

25  64 percent of them said target shooting.  62 percent of them

1  said home defense.  42 percent said hunting.  41 percent said

2  defense outside the home.

3       So those are all lawful purposes protected by the Second

4  Amendment that these hundreds of millions of magazines are used

5  for.

6       Counsel for the State mentioned the *Duncan* en banc opinion

7  that vacated the *Duncan* -- the *Duncan* panel opinion.  And I

8  would just like to point out that I was not intending to rely

9  on the *Duncan* panel opinion as anything close to binding

10  precedent.  I think it's persuasive for this Court, and we can

11  kind of go back and forth on this because, of course, the

12  *Duncan* en banc opinion was vacated by the Supreme Court

13  following *Bruen*.

14       So none of them are good law, but the Court should look to

15  the bits that are persuasive.

16       The *Kolbe* Fourth Circuit case that the State relies on, I

17  would like to say that is an unpersuasive pre-*Bruen* decision,

18  and the reason it's unpersuasive is *Kolbe* applied a test that

19  was unique.  These other cases went through the two-step

20  analysis.  *Kolbe* did -- *Kolbe* applied, like, an M-16 test,

21  which the -- I believe it was the *Duncan* panel noted was

22  effectively a jurisprudential dead end.

23       The Fourth Circuit not -- has decided to analyze this

24  issue that way, and no other circuit has followed suit.

25       In *Bruen*, at the -- *Bruen* makes very clear that that was

1   not the way courts would be analyzing this.  *Bruen* reiterates

2   that it's common use and dangerous and unusual weapons that can

3   be banned; but, otherwise, firearms are protected by the Second

4   Amendment.

5       Last of all, the State talked about its evidence on the

6   historical tradition, and the Court asked where this -- where

7   this evidence about mass shootings and horrible crimes comes

8   into this analysis, and the State said it was through the

9   analogy prong of the *Bruen* test.  And I would like to just say,

10  first of all, the way that the analogies have to work under

11  *Bruen* is that regulations -- the State's right.  We're not

12  looking for a historical twin, but we are looking for laws that

13  burden the rights in the same way and for the same reasons.

14      So, for example, the State, I know, references in its

15  briefing, sort of, restrictions on private military groups.

16  That does -- restricting the ability to form a private military

17  group versus restricting the ability to purchase a firearm

18  equipped with a 17-round magazine -- those do not burden the

19  right in the same way.  And so the -- those cannot be

20  considered analogues under *Bruen*.

21      More broadly, footnote 7 of *Bruen* -- I would direct the

22  Court to footnote 7, which cautions specifically against

23  engaging in means-end scrutiny under the guise of the

24  analogical inquiry.  The court said the Second Amendment is the

25  product of an interest-balancing by the people, not the

1  evolving product of federal judge.  An analogical reasoning

2  requires judges to apply faithfully the balance that has been

3  struck by the founding generation to modern circumstances.

4      So that means that to the extent that the Court -- the

5  State's analogical argument depends upon finding that the

6  interests the State is pursuing are really important or that

7  the State really does mean well in its regulation.  That's

8  irrelevant.  And the court in *Bruen* specifically cautioned

9  against considering it.

10      So with that, I'll just conclude by saying that, because

11  plaintiffs are likely to succeed on the merits of their claim,

12  the other preliminary injunction factors follow suit, and this

13  Court should enter a temporary restraining order in our favor.

14      Thank you.

15          THE COURT:  All right.  Thank you, Mr. Bergstrom.

16      Obviously, this is a very complicated area of law; so I am

17  going to take your briefing under advisement and consider the

18  arguments that you've made here and go back and check some of

19  the cases that you have highlighted.  So I'm not making a

20  decision on this today.

21      I do want the parties to confer -- whatever decision I

22  make, there's going to be a preliminary injunction hearing.

23  Obviously, the timing could be affected by the decision I make,

24  but whether -- I would still like the parties to confer and

25  plan by December 6th, maybe, just to give me a proposed

1    briefing schedule.

2              MR. MARSHALL:  Your Honor?

3              THE COURT:  Is that too soon?

4              MR. MARSHALL:  So I'll just ask for a couple of

5    things.  First, if we can have -- if we can time it off of when

6    the Court releases its order because that will influence the

7    parties' positions.

8              THE COURT:  I'll do -- I expect -- I hope to have a

9    decision out Monday; latest Tuesday.

10             MR. MARSHALL:  Okay.

11             THE COURT:  So before -- certainly before Measure 114

12   goes into effect.

13        So why don't I allow you, then, say, 24 hours from the

14   time I issue my decision to come up with a proposed briefing

15   schedule for a preliminary injunction hearing.

16        Does that make sense?

17             MR. MARSHALL:  And just to make sure that we're

18   clear, the preliminary injunction hearing that you are

19   contemplating is a live testimony hearing, or what is it?  Or

20   you would like the parties to confer?

21             THE COURT:  I want the parties to confer and let me

22   know what -- how you would like to approach it.  I've done both

23   in cases that I have had; so it's up to you.  If you can

24   adequately present the -- it does seem to me that to have a

25   fully developed record is going to require some historical

1   information from, potentially, experts; but I -- I'd leave that

2   to you to formulate how best to represent your side.

3        But let me know if -- what I don't want is last-minute

4   people calling people to come into court.  I want two weeks

5   notice before a witness is coming in so the other side has --

6   I'm trying to get the best data I can and from the best experts

7   that are available.  And if it means at some point I have to

8   select my own expert, that might be -- certainly, that's

9   something courts look at doing.  So I haven't decided.  I would

10  like you to confer and make a recommendation to me on how best

11  to approach this very complicated area of law and which is a

12  new landscape.  So I want to understand it better from both

13  sides so I can make a reasonable decision.

14       So, I think, on this case, we're done.  I know on the --

15       Oh, I want to talk about consolidation.  Mr. -- and it did

16  seem to me that there is merit to consolidating the cases; but

17  why don't I first -- is there -- from the defendants'

18  perspective, is there an objection to consolidation?

19            MR. MARSHALL:  Oh, I apologize.  I forgot I'm the

20  defendant.

21       There is -- no.  We are moving for consolidation.  I said

22  "in due course" in my email earlier today, but if you are

23  inviting it, we move -- we so move.

24            THE COURT:  Mostly, I wanted to hear objections to

25  it.

1          MR. MARSHALL:  No objection.

2          THE COURT:  But I wanted to make sure that there was

3    at least support for actually consolidating the cases.

4       Mr. Kaempf?

5       And I do see your hand, Mr. Buchal.  I'll get to you.

6       Mr. Kaempf, does your client or clients -- do they take a

7    position?

8          MR. KAEMPF:  A couple of things.  No, and I -- quite

9    simply, Your Honor, I hope you will understand this has been a

10   fire drill for about a week for me and my staff and my clients,

11   and I saw the emails going back and forth about consolidation.

12   I pride myself on not being cagey with judges, but on that one

13   I can't take a position because I simply haven't had time to

14   think about it.  But I promise that I will do that promptly.

15      And the other thing I wanted to say, Judge, is that in my

16   years of doing this, I had never seen a judge at any level

17   issue an order to hold an emergency hearing on a federal

18   holiday like you did on Thanksgiving, and we -- whichever way

19   you rule -- obviously, we hope it's for the plaintiffs -- but

20   we just wanted to thank you for that and your staff because,

21   you know, I am sensing it -- it was a bit of a fire drill on

22   your side of the courtroom as well.  We thank you for doing

23   that.  We thank you for the emergency hearing.  And I will

24   confer with the defense, and we'll get to the Court on the

25   issue of consolidation.

1          Thank you, Judge.

2               THE COURT:  Okay.  And I'm not opposed to waiting on

3     the issue of consolidation.  I think I will consolidate the

4     hearings, at least for all intents and purposes and for

5     discovery purposes, unless there's an objection to that.

6          But, Mr. Buchal, do you have an objection to that, while I

7     also wait for Mr. Kaempf to make his decision in the next few

8     days or weeks?

9          Go ahead, Mr. Buchal.

10              MR. BUCHAL:  Yes.  I wanted to apologize for not

11    stating our position in the email yesterday.  Obviously,

12    there's questions of law and fact in common.  The issue arises

13    under *Hall v. Hall* of how do we keep the separateness of the

14    cases and maintain the separate character and which pieces do

15    we glue together?  And there are substantial differences

16    between our case and the OFF case.  They have two claims; we

17    have one.  We have what we think is a simple claim that can be

18    resolved quickly and maybe on summary judgment.  We have sort

19    of a different approach to litigating it.  They have this

20    takings thing that could cause delay and prejudice to us, we

21    think.

22         The other issue is the "Aire" case or "Eyre" -- I don't

23    know how to pronounce it -- was filed yesterday, and it has the

24    magazine claims and the permit to purchase claims in one case.

25    And then later today, before 5:00, pursuant to an agreement

1   with the State or a demand by the State, I will be filing a

2   different permit to purchase case.

3       So at that point, we will have four cases.  Two of them

4   are -- the pure magazine case, Fitz; the OFF case, which is

5   magazine and facial permit to purchase; the Eyre case, which is

6   everything; and the new case, whose name I can't pronounce, the

7   plaintiff, which will be just permit to purchase.

8       So figuring out how to glue these things together and so

9   forth and so on seems to me like something we shouldn't do on

10  the spot.  So my thought was that, when you send us together to

11  set up the preliminary injunction schedule, why don't you have

12  us also present to you a plan for what the consolidation would

13  look like that we think makes sense?  And it might go beyond

14  just Rule 48(a) consolidation to a Rule 48 -- excuse me --

15  42(b) bifurcation too, to try and maybe to get all the like

16  issues in two different hearings in some useful way, but we

17  really haven't had a chance to talk about it.  And so it was on

18  that basis we thought that a formal consolidation decision

19  today would be premature.

20              THE COURT:  Thank you, Mr. Buchal.  I appreciate your

21  clarifying that, and I do think that's an excellent suggestion.

22      So I will have the parties confer.  Again, it doesn't have

23  to occur immediately, but I just want to make sure I'm not

24  wasting judicial resources by having four -- now what I hear is

25  four different cases, but also your resources and discovery

1   resources from staff who have to come up with all the

2   discovery.  So I want to make sure we streamline as much as

3   possible.

4        But I do recognize that you raise some very good points,

5   Mr. Buchal, about some pieces should be -- either be separate

6   or consolidated or handled in a way that the parties have a

7   chance to think about.

8        So that's -- that's what -- I'll leave it up to you to

9   confer, and just get back to me at some point so we don't have

10  multiple hearings.

11       Mr. Kaempf, did you want to say anything?

12          MR. KAEMPF:  Yeah.  Just to conclude with that -- in

13  talking about the different cases, if I could, just for the

14  record, that I didn't spend a lot of time on this orally, but

15  we do in our motion make clear that we make both a facial and

16  an as-applied challenge to 114.  So that is in the record.

17       Thank you, Judge.

18          THE COURT:  All right.  I know the Eyre folks -- do I

19  have somebody here on the Eyre case?

20       Let me do this:  I -- we just want to do scheduling for

21  that.  Why don't I have you confer with defendants.  I don't

22  know that I'm going to hold a hearing in that case because of

23  the untimeliness of filing the TRO right before the statute

24  goes into effect, but have you all had a chance.  What I -- I

25  think what I would like to do is recess now -- I have to give

1    folks a break -- and then have you come back at 1:00, if you

2    would like to talk to me about it, or we can do a phone call.

3         MR. MARSHALL:  I think proceeding at 1:00 would be

4    great if that works for Mr. Buchal's schedule.  I did make an

5    offer to Mr. Buchal that if -- if -- that, in our view, the

6    boat for plaintiff seeking this relief on this particular

7    setting ends at 5:00 tonight.  And so if they are under the

8    wire at 5:00 tonight with a preliminary injunction on the

9    same -- on the same terms, that -- that they are able to be

10   part of that boat and can be a part of one of these multiparty

11   hearings, but we would object if they file after 5:00 p.m.

12   tonight.

13        So if Mr. Buchal or Mr. Bergstrom are available to

14   represent -- I assume Mr. Bergstrom is associated with

15   Mr. Buchal for the other case as well.  If they can represent

16   those plaintiffs, the -- in the case to come, I would just like

17   to coordinate all the schedules on that.  We will -- yes, I'm

18   happy to return at 1:00 p.m.

19        THE COURT:  All right.  Mr. Buchal?

20        MR. BUCHAL:  Mr. Bergstrom is not in the other case

21   yet because it hasn't been filed yet.  I can be available at

22   1:00 p.m.  I need to turn into a pumpkin at 5:00 p.m. because

23   of my mother's 90 birthday I have to take her to; but it sounds

24   to me like coming back in an hour is no problem.

25        THE COURT:  Why don't we say 1:30 so you can actually

1   have a chance to confer also, and then let me know at least

2   what your proposal is.

3       And, again, I'm not positive I'm going to do a hearing in

4   that case, but I'll hear -- hear what your views are on

5   scheduling and how this is all going to fit in.

6           MR. MARSHALL:  One thing that would help the

7   conferral is just to know the Court's schedule.  I notice that

8   you have a three-day criminal jury trial starting on Tuesday is

9   what was on the website this morning, and I -- it -- whether

10  Tuesday and Wednesday are or are not available.

11          THE COURT:  I am actually not here all next week.

12          MR. MARSHALL:  Thank you, Your Honor.

13          THE COURT:  So we would be -- any hearings would be

14  remote and either extremely early for you all or extremely late

15  for me.

16          MR. MARSHALL:  Okay.

17          MR. KAEMPF:  Thank you, Judge.

18      May I clarify on this coming back at 1:30?

19          THE COURT:  You are not involved in that; so you do

20  not need to come back.

21          MR. KAEMPF:  I appreciate that.  Thank you.

22          THE COURT:  You're welcome to come as any member of

23  the public.

24          MR. KAEMPF:  No, I understand.  I'm not being

25  ordered.

1          THE COURT:  No.  Just in terms of the schedule, you

2   don't need to be here.  Mr. Bergstrom, totally up to you.  I

3   just -- and, again, I could do it by phone if that's easier.  I

4   just want you to confer and propose a briefing schedule on the

5   Eyre case, and then Mr. Buchal can tell us whether there will

6   be another case filed by 5:00 p.m. or not.

7          So with that, we'll be in recess.

8          Thank you, everybody.

9          MR. KAEMPF:  Thank you, Your Honor.

10          MR. MARSHALL:  Thank you, Your Honor.

11          MR. BERGSTROM:  Thank you, Your Honor.

12          MR. BUCHAL:  Thank you Your Honor.

13          MR. WILSON:  Thank you, Your Honor.

14                      (Hearing concluded.)

1                    C E R T I F I C A T E

2                  Case No. 2:22-cv-01815-IM

3                            and

4                  Case No. 3:22-cv-01859-IM

5            Temporary Restraining Order Hearing

6                     December 2, 2022

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
15
     Official Court Reporter        Signature Date: 12/6/2022
16   Oregon CSR No. 98-0346         CSR Expiration Date: 9/30/2023

17

18

19

20

21

22

23

24

25