

# Oregon Judicial Department

TWENTY-FOURTH JUDICIAL DISTRICT

Robert S. Raschio, Presiding Judge

December 15, 2022

Tyler Smith & Associates, P.C.
Attn: Tyler Smith &Tony L Aiello, Jr
181 N. Grant Street, Suite 212
Canby, OR 97013

Oregon Department of Justice
Attn: Sr. A.G. Brian Marshall
1162 Court St. NE
Salem, OR 97301

Markwitz Herbold PC
Attn: Harry Wilson
Special Assistant Attorneys General
145 SW Broadway, Suite 1900
Portland, OR 97201

Re: Preliminary Injunction on Ballot Measure 114's Magazine Capacity
component:   <u>Joseph Arnold, Cliff Asmussen, et al, Plaintiffs v. Kate Brown,
Governor of the State of Oregon, et al, Defendants</u>, Harney County Circuit
Court case #22CV41008

Parties:

The court will issue a Preliminary Injunction under Oregon Rule of Civil
Procedure (ORCP) 79(A) on Ballot Measure 114 (BM 114) section eleven
known as the large capacity magazine prohibition until a full trial can be
held on the Complaint for Declaratory and Injunctive Relief.

The court will maintain the Temporary Restraining Order under Oregon
Rule of Civil Procedure (ORCP) 79(A) on BM 114 sections one through ten
until the state provides notice that it is prepared to deploy a "Permit to

Exhibit 2
Page 1 of 25

_Verified Correct Copy of Original 12/15/2022._

Purchase" program.  Upon receipt of notice, the court will hold a preliminary injunction hearing within 10 days to determine if the program can constitutionally be deployed.

The court cannot rely on a federal stay.  There is a separate analysis and identified right under Oregon law.  The court adheres to its oral findings from December 6 and 13, 2022.

Defendants are granted a hearing on December 23, 2022, regarding the "Charleston" loophole portion of BM114.  Defendants will identify in a written notice the operative language at issue for that hearing by Friday, December 16 at noon.

The court is segregating each matter because of BM 114, section 12 requiring severability in case of a finding of unconstitutionality of a provision.

Turning to BM 114, section 11, the prohibition on large capacity magazines, the findings in this opinion letter are not binding on the final legal and factual determinations after a final trial on the complaint.  The analysis is limited to findings on the motion for a preliminary injunction.

The court must find that the facts as applied to the law show to a clear conclusion under the factors of ORCP 79.  See Wilson v. Parent, 228 Or 354, 369 (1961).  The clear conclusion must find that the Plaintiffs have established a likelihood of success on the merits which is weighed against the other factors under ORCP 79.

### Factual Findings

Findings one through 23 are from the pleadings and attached exhibits for the temporary restraining hearing held December 6, 2022.   Findings 23 through 37 are from the preliminary injunction hearing and associated exhibits held on December 13, 2022:

All these findings are considered by the court:

1)    At the Temporary Restraining Order hearing, Plaintiffs called a credible factual witness, Ben Callaway, a Harney County firearms dealer with a Federal Firearms License. Mr. Callaway testified

Exhibit 2
Page 2 of 25

_ Verified Correct Copy of Original 12/15/2022._

most firearms currently sold can be modified to hold more than 10 bullets by readily accessible kits and extenders meaning most commonly owned firearms including shotguns and handguns may not be legal for sale under BM 114 pursuant to the language in section 11(1)(d)(A)(Exceptions to the restrictions on large magazines include an "ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition."), because the firearms will have no available operable magazines under the prohibition.

2)   In Oregon, 593 people died from firearms in 2020.   Defendant's brief for Mandamus, pg. 4 <u>see</u> ex. 4 of said declaration. According to the Oregon Health Authority, there were 40,239 deaths that year.   Aggregated, there were 158 deaths by homicide and 835 deaths by suicide, obviously not all be firearms. Website link: <u>Oregon Health Authority: Oregon Death Data: Death Data: State of Oregon</u>.   Death by suicide would not require a large magazine.   In 2020, 122 of the homicides where with a weapon. <u>See Over Half of All Homicides in Oregon Are Committed With a Gun (msn.com)</u>.   70.5% of those weapons were firearms meaning there were 86 homicides with a firearm.   Id.

3)   The number of rounds commonly needed by individuals to defend themselves has not been systematically tracked, nor has the number of rounds fired by individuals in self-defense.   Marshall Dec., ex. 1 (Declaration of Lucy P. Allen), pg. 3.   Allen found from the literature that .3% of 736 incidents of self-defense used more than 10 rounds in the encounter since more than ten shots were fired during the event. Id. at 5.   56% of all acts of self-defense occurred in the home.   Id. at 6.   Large Capacity Magazines are estimated to be used in 3 out of 10,000 acts of self-defense. None of these statistics are Oregon specific, except for some information in Exhibit B of the Allen declaration.   Id. at 36-42.

4)   Exhibit 1(B) determined that there were 179 recorded mass shootings in the country from 1982 until October 13, 2022.   Two of those mass shootings occurred within Oregon causing the tragic loss of 13 lives along with 24 others injured.   (Thurston High

Exhibit 2
Page 3 of 25

_Verified Correct Copy of Original 12/15/2022._

School, May 21, 1998, and Umpqua Community College, October 1, 2015). Id. at 38, 40.

5)  The Declaration was prepared for California litigation.   California has no state constitutional right to bear arms.

6)  The court finds the Colt multi-shot revolver was developed in the 1830s and appeared in the pre-Civil War West.  Marshall Dec., ex. 2 (Declaration of Robert Spitzer), pg. 25.

7)  Oregon first restricted machine guns in 1933.  See Id. at 15 see also 1933 Or Law 488. The limitation was on fully automated weapons described as a weapon of any description by whatever name known, loaded or unloaded, which is designed or modified to allow two or more shots to be fired by a single pressure on the trigger device.  The definition is still operable in Oregon.  ORS 166.201(6).[1]   ORS 166.272 does not allow for possession of such weapons.[2]

8)  The court finds the Spitzer Declaration conflates magazine capacity with the firearm actions, to wit: automatic versus semi-automatic, severely limiting its value to these proceedings.  Marshall Dec., ex. 3 (Declaration of Louis Klarevas) at 63(describing the definitions).

9)  Since 1949, when the first mass shooting occurred, there have been 30 mass shootings resulting in 10 or more deaths.  Id. at 6.  None occurred in Oregon.  Id.  Of the mass shooting with fatalities

---

[1] ORS 166.201(6): "Machine gun" means a weapon of any description by whatever name known, loaded or unloaded, which is designed or modified to allow two or more shots to be fired by a single pressure on the trigger

[2] ORS 166.273:  Unlawful possession of machine guns, certain short-barreled firearms and firearms silencers. (1) A person commits the crime of unlawful possession of a machine gun, short-barreled rifle, short-barreled shotgun or firearms silencer if the person knowingly possesses any machine gun, short-barreled rifle, short-barreled shotgun or firearms silencer.  (2) Unlawful possession of a machine gun, short-barreled rifle, short-barreled shotgun or firearms silencer is a Class B felony     (3) A peace officer may not arrest or charge a person for violating subsection (1) of this section if the person has in the person's immediate possession documentation showing that the machine gun, short-barreled rifle, short-barreled shotgun or firearms silencer is registered as required under federal law.    (4) It is an affirmative defense to a charge of violating subsection (1) of this section that the machine gun, short-barreled rifle, short-barreled shotgun or firearms silencer was registered as required under federal law. [1989 c.839 §13a; 1997 c.749 §8; 1997 c.798 §1].

Exhibit 2
Page 4 of 25

_Verified Correct Copy of Original 12/15/2022._

of 14 or over, the assailants used large capacity magazines. There have been 13 mass shootings with 14 or more fatalities since 1966. Id. at pg. 6.

10) There have been 69 mass shooting events involving the death of 6 or more people from 1990 to 2017. 64% of those events involved large capacity magazines, or 44 over that 27-year period. Id. at 44-49. The exhibit states, "[a]lthough 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limited the power to detect significant associations… Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overstated" regarding the use of large capacity magazines in mass shootings. Id. at 49-50

11) Further, the "impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive law and taken to states with more restrictive laws." Id. at 50.

12) "In total, 1,460 people were injured or killed over the 37-year period" in mass shootings from 1981-2017. Id. at 54. Harney County has a population of 7495 people.

13) "Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths…" Id. at 63.

14) Other types of gun violence, e.g. suicide, domestic violence homicides and red flag order violations are not responsive to large capacity magazine bans. Id. at 63.

15) The remainder of the study only looks at Full Automated Weapon bans and cites by the author of the Declaration as making claims of public policy benefits from large capacity magazine bans. Id. at 66. The study stated it could not create a distinct statistical evaluation of whether such bans have an independent impact on mass shootings from restrictions of the action of the firearms. Id. at 66-67.

Exhibit 2
Page 5 of 25

_Verified Correct Copy of Original 12/15/2022._

16) Marshall Dec., ex. 4 has no description of the effects of large capacity magazines in the 593 firearm deaths in Oregon in 2020, though notes 455 of the deaths were from suicide.

17) Marshall Dec., ex. 5 is a study heavily relied upon by the defendants entitled "Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States". The study indicates there were 604 mass shooting events involving four or more fatalities from 1984 until 2017 equaling 2,976 homicides. Marshall Dec., ex. 5 at 11. "Nationally, the annual rate of mass shooting fatalities per 1 million population nationwide was .36 per 100,000 population..." Id. The results were the researchers "found no evidence that concealed carry laws, assault weapons bans, prohibitions for domestic abusers and violent misdemeanants, or point-of-sale [criminal background checks] were associated with the incidents of fatal mass shootings." Id. Further, inferences cannot be made that large capacity magazine bans have an effect on casualties, only that there may such an inference. Even though there is evidence that large capacity magazine bans and firearm licensing has an effect on mass shooting incidents, "there are large confidence intervals." Id. at 17. The final conclusion of the article on large capacity magazines is striking to the court: "LCM bans also *seem* to reduce the incident of fatal mass shootings". The court finds the article states there no scientific certainty large capacity magazine bans have an impact on fatalities and casualties. See also Marshall Dec, ex. 5 at 28-42 (statistical significance of the large capacity magazine ban on mass shootings is variable).

18) The mean annual rate of mass shootings in Oregon per 1 million population is .06 and of fatalities is .30 per million of population. Id. at 24. The data is not linked large capacity magazines usage.

19) Of importance in other parts of this litigation: "The findings of this study suggest that the most common policy prescriptions offered by advocates on each side of the debate over gun control—comprehensive background checks and assault weapon bans on one side and so-called "Right to Carry" laws reducing restrictions on civilian concealed carry of firearms on the other side—do not

Exhibit 2
Page 6 of 25

Case 3:22-cv-01859-IM    Document 33-2    Filed 12/20/22    Page 7 of 25

7-Opinion Letter Re Arnold, et al, Plaintiffs v. Kati Brown, et al, Defendants.

_Verified Correct Copy of Original 12/15/2022._

seem to be associated with the incidence of fatal mass shootings."
Id. at 17.

20) Marshall Dec., ex. 6 does not apply to large capacity magazines.

21) Marshall Dec., ex. 7 (Declaration of Ryan Busse) states that "many
widely available guns are designed with universal magazine
acceptance.  Many handguns can accept a magazine within 15 to
20 plus rounds…Firearms manufactures…can easily modify a
'high capacity' magazine into one that will accept only 10
rounds…" Marshall Dec., ex. 7 at 4.  The most popular self-
defense firarms "in history" (1911 style pistol) come with standard
magazines of seven to eight rounds.  Id.  The model can be
adapted by interchangeable magazines to hold more than 10
rounds. Id.  Additional magazines can be purchased at a minimal
cost.  Id. at 5.

22) Further, "buying multiple magazines and maintaining a large
supply of magazines is and has been encouraged by firearms
manufacturers and firearm retailers."  Id. at 7.  "Additionally, there
is a well-known sales spike for magazines whenever regulations
are implemented as consumers anticipate laws or 'grandfathering'
with purchases meant to ensure legal supply for a long period of
time."  Id.  "[M]ost gun owners purchase several magazines for
each gun…they can easily modify…"  Id. at 8.

23) Of note for the preliminary injunction question, a "recent example
of this well-known reality includes 'freedom week' in California in
which a court allowed the sale and purchase of large-capacity
magazines during one week in Spring 2019 resulting in massive
sales spikes…"  Id. at 7.   The court finds that deliberate action
from the court is warranted to not create a whipsaw effect so
described.

24) BM 114 is impacting the ability for firearms dealers to stock their
stores.   Midway USA, a national distributor of firearms, is issuing
the following:  "Order Contains Restricted Products.  These
products cannot be included in your order due to the following:
Oregon has restricted the sale of magazines that have a capacity

Exhibit 2
Page 7 of 25

_Verified Correct Copy of Original 12/15/2022._

of more than ten rounds, or those that can be adapted to hold more than ten rounds—e.g., those with floor plate or end plate." Plaintiffs Preliminary Injunction Hearing (PIH) ex. 1.  Plaintiffs PIH ex. 11 shows the same result with other manufacturers.

25) California's restriction on large capacity magazines is much narrower than BM 114.  See Plaintiffs PIH ex. 5.

26) Defendants offer an exhibit showing firearm manufacturers do offer magazines of 10 rounds or less that are California compliant. Defendants PIH Declaration of Greg Scott and ex. 1-10, pg. 1-112. Most appear through the testimony and exhibits to be capable of ready modification to increase capacity.

27) Mr. Callaway creditably testified at the preliminary injunction hearing that most, if not all, current magazines are readily adaptable or easily modifiable within a period of seconds with a hand drill or pocketknife to be able to hold more than ten rounds with all popular gun brands.  The defense expert, James Yurgealitis, did not dispute that testimony.  In fact, he stated "anything is possible" for modifying magazines with a technical skill range of little to some.  The adaptability of magazines includes just taping two magazines together to create one with a twenty-round capacity.

28) Mr. Callaway also testified that fix plates on magazines diminish the life of the magazines since they cannot be maintained.  The defendants raised the length of magazine life as part of their analysis of why BM 114 has no impact on current large capacity magazine owners.  Mr. Callaway described that the normal approach of cleaning magazines for safety and functionality is to remove the end plate after every second use to clean out the grime and oil the spring mechanism.  He testified it was not possible to do the same cleaning process with fixed end plates thus significantly diminishing the product's use potential.  Mr. Yurgealitis described using air compression, cleaning fluid baths and ultrasound technology to clean those mechanisms, a process which is time consuming, requires special equipment and is expensive in comparison to detachable face plate cleaning

Exhibit 2
Page 8 of 25

_Verified Correct Copy of Original 12/15/2022._

techniques and is not as effective as the detachable end plate design.

29) Replacing magazines, according to Mr. Callway, generally costs $40 to $50.  The process creates a cost prohibition to owning firearms, particularly for indigent.

30) Mr. Yurgealitis noted that there are magazines for the commercial market with magazine restrictions.  The other jurisdictions do not have adaptability restrictions.  As he testified, in direct testimony, there is "no magazine on the market that cannot be modified" because of the floorplate.

31) Dr. Brian DeLay testified that the development of firearms was significant between 1860 and 1872.  He, also, submitted a separately filed declaration on December 12, 2022. The testimony was crafted to eliminate the time and effort made in that development.  He testified that during Polk's War of 1846 to 1848, multi-capacity revolvers and rifles were in use and for sale to the private market.  Emigrants on the Oregon trail had the same types of firearms.  Large capacity magazines protypes were in development since 1580, though not generally in the marketplace largely due to a lack of functional stability for use by the public.  But, "almost certainly" the framers and adopters of the Oregon Constitution would have been aware of those developments and the ongoing developments in firearm technology.  The Kopple Law Review article comes to the same conclusion about the multi-round technology development and public knowledge around statehood.  Plaintiffs PIH ex. 4.  As does the Hlebrinsky Declaration on the technology of that timeframe.  Plaintiffs PIH, ex. 7.  All these experts agree that there was no clear distinction between private and military use at the time of statehood.  Dr. DeLay did testify that most private gun manufacturers were angling for military contracts but would sell any firearm to private citizens in they could afford one.  Private citizen purchases supported their own self-defense and defense of the state in the form of militia activities.  Meriwether Lewis bought his large capacity magazine weapon for the expedition.  The Hornback exhibit bolsters this factual finding regarding the broad scope of

Exhibit 2
Page 9 of 25

_ Verified Correct Copy of Original 12/15/2022._

firearms used by early leaders and settlers in Oregon.  Plaintiffs PIH ex. 10.

32) Dr. DeLay testified there were no historical antecedents in the law banning any type of firearm in 1857 to 1859.  Hlebrinsky, also, finds that there were no historical antecedents.  Plaintiffs' PIH ex. 9.  DeLay and Hlebrinsky agreed laws banning particular possession of types of firearms did not begin generally until the 20th century, post-dating statehood.

33) Magazines are an integral part of firearms.  See Plaintiffs PIH ex. 6, at 12-25.  Limiting magazine sizes has a direct impact on who can use a firearm in self-defense.  Weaker individuals cannot use larger caliber firearms due to the recoil impact for self-defense.  Weaker individuals compensate for the inability to use larger caliber ammunition with by large magazines.  Id. at 15-16.

34) Unlikely declarant Busse, declarant Hanish states that large capacity magazines are in fact ubiquitous.  Id. at 18.

35) The article by William English, Ph.D., at Georgetown University, "2021 National Firearm Survey:  Updated Analysis Including Types of Firearms Owned, Expanded Report May 13, 2022". is of note to the court's findings on the question of "ubiquitous". Plaintiffs PIH ex. 6, 26-82.

36) In Vermont, 30% of the state's residents own firearms.  Of those 30%, 29.3% have used a firearm in self-defense in which 45.9% of the incidents were against multiple assailants.   Id. at 65.

37) The current rate of gun ownership in the country is 31.9%.  Plaintiffs PIH ex. 6, 27.  Of that group, 31.1% have used their guns in self-defense.  Id. at 34.

38) In Oregon, 38.3% of citizens are estimated to own firearms.  Id at 35.  Of those, 49.8% are estimated to own magazines that hold 11 plus rounds.   Id. at 52.

Exhibit 2
Page 10 of 25

_Verified Correct Copy of Original 12/15/2022._

With those facts, the role of the judiciary is to determine whether Ballot Measure 114, section 11 exceeds the legal limits of the people's authority under the Oregon Constitution.  See Elkhorn Baptist Church v. Brown, 366 Or 506, 510 (2020).

## Article I, Section 27 Analysis:

Oregon Constitution provides the right for the people "to bear arms for the defense of themselves, and the state".  Oregon Constitution Article I, section 27.

As pointed out by the Defendants, the Oregon Constitution "has content independent of that of the federal constitution." State v. Soriano, 68 Or App 642, 645 (1984).[3]  Therefore, any irreparable harm of BM 114 must be considered separately under Oregon law and is not dependent on a federal determination.   The pleading before this court focused solely on the Oregon Constitution.

The Oregon Constitution must be at least as protective as the Federal Constitution on any matter of a constitutional right.[4] If it is not, the question becomes, does the United State Constitution have a more protective right thus making the Oregon provision unenforceable pursuant to Supremacy Clause.

According to Hon. Jack L. Landau, retired Oregon Supreme Court Justice:

> In some cases, the court adopted a historical or originalist approach, as in State v. Kessler. That case involved the meaning of Article I, § 27, which guarantees the right to bear arms. The court observed that federal court decisions construing the Second Amendment guarantee of a right to bear arms "are not particularly helpful." Turning to the meaning of the state

---

[3] While this court disagrees with some of the factual conclusions of U S. District Court Judge Karin Immergut, which are not binding on Oregon state courts, she is analyzing the measure under the Second Amendment jurisprudence.  This court does not reach that analysis since there is a clear preliminary showing that the measure is unconstitutional under Oregon Constitution Article I, section 27 by reading the provision and Oregon jurisprudence related to the constitutional protection provided to the citizens of Oregon to "bear arms for the defense of themselves, and the state".

[4] The Second Amendment to the U.S. Constitution reads· "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  Plainly read, the Second Amendment right to bear arms is captured in the "and the state" language of Article I, section 27.

Exhibit 2
Page 11 of 25

_ Verified Correct Copy of Original 12/15/2022._

constitutional guarantee, the court declared that its task was "to respect the principles given the status of constitutional guarantees and limitations by the drafters ...." The court set out a history of the provision, from its roots in the English Bill of Rights of 1689 to colonial American fears of standing armies and concerns for personal safety to the state constitution of Indiana, from which the Oregon guarantee was borrowed. In the end, the court concluded that the "arms" that the state constitution guarantees a right to possess consist of those that would have been used by nineteenth-century settlers for personal defense and military purposes.

Jack Landau, "An Introduction to Oregon Constitutional Interpretation", 55 Willamette L. Rev. 261, 265-66, Spring 2019.

The judicial review concept of precision in the drafting the Constitution of Oregon started in 1863: "If the framers of the Constitution had intended to limit them to one hundred dollars, they could and certainly would have used different and more appropriate language to embody their intention." Noland v. Costello, 2 Or. 57, 58 (1863). State v. Hirsch similarly cited a range of modern treatises and articles on the historical origins of the constitutional right to bear arms, as well as more contemporaneous sources, including writings of the framers of the Second Amendment, on which Article I, Section 27, of the Oregon Constitution is a decedent. See, e.g., State v. Hirsch, 114 P.3d 1104, 1109 (Or. 2005) ("[W]e must discern the intent of the drafters of Article I, Section 27, and the people who adopted it.").

"A constitution is dependent upon ratification by the people. Its language should therefore be considered in the sense most obvious to the common understanding of the people at the time of its adoption." Landau at 266.

This court is bound by the interpretation of the Oregon Constitution by the Supreme Court and Courts of Appeals of Oregon.

The current constitutional interpretation under Article I, section 27 is found in State v. Christian, 354 Or. 22 (2013).   First, the Oregon Constitution allows for reasonable restriction on ownership of weapons that promote public safety.  Id. at 33-34.   Second, the reasonable restrictions cannot

Exhibit 2
Page 12 of 25

_Verified Correct Copy of Original 12/15/2022._

unduly frustrate the right to bear arms.  Id. at 38.  ("…the legislature may specifically regulate the manner of possession and the use of protected weapons to promote public safety as long as the exercise of that authority does not unduly frustrate the right to bear arms guaranteed by Article I, section 27.").[5]

The holding limits the inquiry to a facial challenge of the constitutionality of a statute.  Christian at 40.

The Supreme Court indicated that total bans on types of weapons and firearms used for self and state defense violates Article I, section 27.  Id. at 40-41 quoting State v. Delgado, 298 Or 395 at 403-404 ("The problem here is that ORS 166.510(1) absolutely proscribes the mere possession or carrying of such arms [switchblades].  This the constitution does not permit.").

The evidence shows the distinction the defendants are trying to draw between firearms and magazines is a fiction.  Firearms do not function without magazines.   An analogy would be making a distinction between a car and its engine.

## ORCP 79 Analysis:

With this constitutional analytical framework in mind, the court will turn to the requirement of ORCP 79(A)(1)(a) for a preliminary injunction.

"When determining whether to issue a preliminary injunction, courts consider, among other things, the likelihood that the party requesting the injunction will ultimately prevail on the merits of its claim and whether, if the injunction is not issued, the party will be irreparably harmed during the litigation of the claim.  Courts also balance the harm to the movant against harm to the opposing party and the public if the injunction is issued." Elkhorn Baptist Church v. Brown, 366 Or 506, 518-519 (Internal citations removed).

---

[5] The Oregon Supreme Court, in its early interpretations of the Oregon Constitution ask the lower courts to consider "what did those conservative pioneer citizens have in mind."  Jones v. Hoss, 132 Or 175, 178-179 (1930).

Exhibit 2
Page 13 of 25

_ Verified Correct Copy of Original 12/15/2022._

Application of the law to BM114 must lead the court to a clear conclusion that those factors are met preliminarily.  See Wilson v. Parent, 228 Or 354, 369 (1961).

The preliminary injunction requires the plaintiff to meet the burden of production or persuasion by the providing evidence.   See Arlington Sch. Dist. No. 3 v. Arlington Educ. Ass'n, 184 Or App 97, 102 (2002).

The plaintiffs have produced such clear and persuasive evidence.  The defendants evidence bolsters the clarity of the court's determination.

### (1) Likelihood of success.

BM 114, section 11 will dramatically change the rules on law abiding citizens who currently own weapons or wish to purchase weapons with large capacity magazines. The vast majority of gun owners are responsible, careful citizens with a great deal of respect and care for their firearms and only use them for law purposes including self-defense.

The large capacity magazines provisions will go into effect unless the court issues a preliminary injunction immediately impacting their constitutional right to bear arms.

### a) Construction of BM 114, section 11

BM 114, section 11 is titled "Prohibitions/Exceptions to Large-Capacity Magazines. [6]  The court will focus on specific language but has considered the section as a whole.

Section 11 prohibits any fixed (built into the gun) or detachable (external clips) magazines that hold over ten rounds of ammunition.  "Large-capacity magazine" means a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition…"  BM 114 section 11(d).

---

[6] Section 11 is attached as Exhibit 1 of the Defendants' response to Plaintiffs' motion for a temporary restraining order.

Exhibit 2
Page 14 of 25

_Verified Correct Copy of Original 12/15/2022_

The prohibition has an exception for "ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition."  BM 114 section 11(d)(A).

A new Class A misdemeanor is created for anyone who manufactures, imports, possesses, uses, purchases, sells or otherwise transfers any large capacity magazine upon effective date.  BM 114 section 11(2), (6).  The ban does not apply to sales to the military or law enforcement.  BM 114 section 11 (4).

BM 114 section 11(5) creates an affirmative defense to the crime.  The accused would need to prove they possessed the large capacity magazine prior to adoption of the measure.  Then the accused would need to prove that their possession the item was in use in specific ways and/or kept in specific places.  If they chose, owners could relinquish their property prior to "commencement of prosecution by arrest, citation, or a formal charge."  Id. at (5)(d).  The court assumes that the investigative agency would have broad discretion as to when to arrest the individual eliminating the option of just giving up the item.

The section requires licensed gun dealers cease sales immediately and within 180 days to alter or divest from all banned items.  BM 114, section 11(3).

### b) Existence of Large Capacity Magazines at Statehood.

The Plaintiffs demonstrate that firearms with magazine capacity over 10 rounds of ammunition were in existence at the adoption of the Oregon Constitution in 1857. Plaintiffs' Motion for Order to Show Cause, pg. 15-17. Article I, section 27 was adopted without any noted debate by the delegates.  Claudia Brown and Andrew Grade, "A Legislative History of Oregon", 37 Willamette L. Rev. 469 (2001).  The court infers from that silent record that no concerns were raised over the types of firearms allowed for self or state defense.   The defendant does not point to any co-occurring Oregon statute proscribing large magazine firearms for citizens or any other types of weapons.

The Oregon Supreme Court has held modern equivalents to the weapon today is "substantially different from its historical antecedent" and that the drafters were "aware that technological changes were occurring in

Exhibit 2
Page 15 of 25

Verified Correct Copy of Original 12/15/2022_

weaponry as in tools generally." Delgado, 298 or at 403.  The Court could not "freeze the meaning of the state constitution to the time of adoption, but is instead to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform...the constitutional text to modern circumstances." Couey v. Atkins, 257 Or 460, 490 (2015) (internal citations omitted).  The analysis of this court is that the framers and the population were aware of, and even anticipating, more powerful firearms including with larger magazine capacities.

The caselaw does not suggest that the firearms development is frozen in time at founding as is argued by the defendants.  In fact, the courts have assumed development over time. As such, the court finds that the firearms today are the direct decedents of the firearms from the timeframe of statehood: multi-shot handguns and rifles.  The type of magazine is essential to the protective power of the firearm as was testified to by one of the defendants' witnesses.

The precedent in Oregon shows no historical statutory bans on the size of magazines or on the types of firearms until 1933.  All preceding restrictions were on use, e.g. prohibitions on riding horses through town terrifying neighbors with firearms.

The right to bear arms included military firearms used for state and self-defense at the time the provision was drafted. [7]  As noted, large capacity magazines predated the automation and mass production of metals.  Large capacity magazines existed in the 1830s, nearly two hundred years ago.  The type of firearm with a large capacity magazine was known and used for self-defense at statehood and would have been understood to be firearm

---

[7] "In State v. Kessler, 289 Or. at 369, 614 P.2d 94, the court held: 'Firearms and other hand-carried weapons remained the weapons of personal defense, but the arrival of steam power, mechanization, and chemical discoveries completely changed the weapons of military warfare. The development of powerful explosives in the mid-nineteenth century, combined with the development of mass-produced metal parts, made possible the automatic weapons, explosive, and chemicals of modern warfare  P Cleator, Weapons of War 153–177 (1967) '  Oregon State Shooting Ass'n v. Multnomah Cnty., 122 Or. App. 540, 545–46, 858 P.2d 1315, 1319–20 (1993).  Automatic weapons are banned in Oregon as are other military grade weapons.

Kessler subject matter was billy clubs and not firearms.  All discussions regarding firearms is dicta.

Exhibit 2
Page 16 of 25

being developed for militia usage and self-defense.  See Christian, 354 at 30 quoting State v. Kessler, 289 Or 359, 368 (1980).[8],[9]

The court finds that magazines indistinguishable from the firearms they power and are protected weapons and Ballot Measure 114, section 11 acts on a prohibition on firearms and their protected uses under Article I, section 27.

### c) Public safety

President Barack Obama eulogized to the Sandy Hook Families in Newton, Connecticut a decade ago, the court echoes, "I am very mindful that mere words cannot match the depths of your sorrow, nor can they heal your wounded hearts."

The court is incapable improving on that important, profound sentiment.

The Defendants concede the ballot measure's intention is to reduce mass shootings.

Mr. Marshall, for the Defendants, is right that mass shootings deliver a special type of terror in our heart and minds and that the majority of voters in Oregon believed that banning large capacity magazines would help to relieve a "grave and immediate risk to the health, safety and well-being of the citizens of this state." BM 114, Preamble.

The facts do not support their conclusion.

"[J]udges must…not be intimidated into upholding majority rule." Edward Trompke, "A Natural Tension", Or. St. B. Bull., Feb/March 2002, at 9, 14. "Judicial independence and judicial accountability are both shields and swords, but both are intended to protect judges, to allow them to fairly decide all cases, and ultimately to protect the rights of every person." Id. at 15.

---

[8] Kessler found that the term "arms" in Article I, sec 27 are weapons used by militia and for self-defense maintained by the individual. 289 at 370   Kessler also announced that "regulation is valid if the aim of public safety does not frustrate the guarantees of the state constitution." Id.
[9] See Plaintiffs Motion Pg. 16 on firearm development.  The Defendants have not shown that large capacity magazines are "advanced weapons of modern warfare", see Defendants' Response, pg. 10 quoting Kessler at 369. The court weighs that assertion against the ubiquitous nature of large capacity magazine in distribution to the public.

Exhibit 2
Page 17 of 25

_ Verified Correct Copy of Original 12/15/2022._

_Verified Correct Copy of Original 12/15/2022_

Oregon Constitution allows for reasonable restrictions to promote public safety. Christian at 33-34. The promotion of public safety cannot be based upon a merely speculative harm.

BM 114, section 11 does not restrain dangerous practices or regulate the carrying or use of firearms, only the possession of a ubiquitous weapon design. Id. at 32. "[A]ny restriction must satisfy the purpose of the authority in the face of Article I, section 27: the protection of public safety." Id. at 33 quoting State v. Hirsch/Friend at 677.

While the preamble of the ballot measure states it promotes public safety, the court finds from both sides' pleadings and exhibits, it does not do so in any measurable way. Their primary article states the restrictions on large capacity magazines seems to have an effect on the outcome of mass shooting events, but the sample size is too small to say definitively. Factual finding 17. Correlation does not equal causation.

Further, the court finds that there is less than a 1 in 1,000,000 chance of a person being a fatality in a mass shooting in Oregon, and even less with an offender who is using large capacity magazines. [10]

That the large capacity magazine bans promote public safety is mere speculation.[11] The court cannot sustain a restraint on a constitutional right on mere speculation that the restriction could promote public safety. Certainly, a court cannot use a mere speculation in determining guilt in a criminal case, damages in a negligence case, future harm in a parole matter, or the many other legal matters where disallowing that outcome. See State v. Hedgpeth, 365 Or 724, 733 (2019); Smith v. Providence Health & Servs – Oregon, 361 Or 456, 475-76 (2017); Smith v. Bd. of Parole & Post-Prison Supervision, 343 Or 410, 419 (2007); Lea v. Gino's

---

[10] Large Capacity Magazines are used in 3 out of every 10,000 incidents of self-defense outside of the home, a constitutionally protected activity. There is no analysis of such use when defending the home. See Defendant's Response, pg. 12. BM 114, section 11 makes it illegal to possess large capacity magazines in the home unless the accused provides affirmative proof of ownership prior to passage and that the possession met one of the exceptions under the law.

[11] Defendants argue that every mass shooting since 2004 with 14 or more deaths used large capacity magazines. See Defendants' Response, pg. 14. They fail to note that there have been ten such events in last eighteen years as is borne out in their exhibits. See Marshall Dec, Ex. 1, pg. 36-40. There have been 110 mass shootings of four or more victims in the same timeframe, many of which did not involve large capacity magazines. Id.

Exhibit 2
Page 18 of 25

_ Verified Correct Copy of Original 12/15/2022 _

<u>Pizza Inn, Inc.</u>, 271 Or 682, 688 (1975) ("Prosser on Torts (2nd ed), s 42, p. 200 expresses … What is required is evidence from which reasonable men may conclude that, upon the whole, it is more likely that there was negligence than that there was not. Where the conclusion is a matter of mere speculation or conjecture, or where the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct the jury that the burden of proof has not been sustained.")

Firearms owners deploy more than ten rounds in three out of 10,000 legal acts of self-defense which is frequency of 100 times higher than any chance of fatality from a mass shooting.  The right to bear arms in self-defense is constitutionally protected and is presumed to protect public safety using the current technology of the day.

BM 114, section 11 does not reasonably promote public safety, meaning it not a permissible legislative regulation, therefore it is facially unconstitutional prior to analyzing how unduly burdensome the measure is on firearm ownership.[12] Magazine size is a regulation on a firearm.  That regulation must reasonably promote public safety.  Large capacity magazine prohibition has not been shown to promote public safety in a calculatable way beyond the protection already achieved by the status quo.

The court cannot read BM 114, section 11 in any way that creates a constitutional act.

### d) Unduly Burdensome.

Even if BM 114, section 11 is a reasonable restriction, it cannot unduly frustrate the right to bear arms.  <u>Christian</u> at 38.  BM 114, section 11 restrictions on current gun ownership and future purchases unduly frustrates the right to bear arms under Article I, sec. 27.

Considering the testimony of Callaway, Yurgealitis and Declarant Busse: most commonly sold firearms can be adapted by interchangeable

---

[12] Defendants' analysis on page 11 regarding regression analysis overstates their own literature significantly.  Their own literature states that there seems to be a correlation as hypothesis due to the very small statistical size and the incompleteness of the literature.  <u>See</u> factual finding 17.

Exhibit 2
Page 19 of 25

_ Verified Correct Copy of Original 12/15/2022._

magazines to hold more than 10 rounds.  Most, if not all, magazines are readily modifiable to hold more than 10 rounds.

Magazines are necessary to make firearm operable.  <u>Fyock v. City of Sunnydale</u>, 779 F3d 991, 998 (9th Cir 2015).

A plain reading of BM 114, section 11(d) makes the sale, possession or transfer, except upon death, of those firearms punishable by crime.   Those firearms with magazines are capable, now or in the future, of readily restored, changed, or being converted to accept more than ten rounds.  Based upon the preliminary evidence, the result of BM 114 would be a near absolute prohibition on handguns and many other firearms with their magazines.  <u>See</u> <u>Delgado</u> at 403-4.

Further, the Court of Appeals rejected the notion of modification to make a firearm legal, after the fact, under <u>Oregon State Shooting Ass'n v. Multnomah Cnty.</u>, 122 Or. App. 540, 548–49, 858 P.2d 1315, 1321 (1993):

> While it is argued by the defendants the firearms can be modified to meet the requirements of BM 114, the law does not support the proposition.   The dissent concludes that, because the "semi-automatic firearms may be illegally modified to become automatic weapons * * * is not a reason to deprive them of section 27 protection under the tests adopted by the Supreme Court." 122 Or. App. at 556, 858 P.2d at 1325. That is backwards. The weapons have been modified, ostensibly so that they will not be classified as military weapons, which, under the Supreme Court's tests are not entitled to the constitutional protection. Those "modifications" cannot be used to bootstrap these weapons into personal defense weapons so that they come within the constitutional protection. The weapons are not the "sort" of weapons for defense of self intended by the drafters to come within Article I, section 27.

BM 114, sec 11 provides no definition on how such a modification would be permanent in the eyes of the law.

There is restraint on purchase, transfer, and possession of firearms with large capacity magazines fixed or detachable.   Any firearm that can be modified to hold a large capacity magazine is also prohibited to be sold in

Exhibit 2
Page 20 of 25

_Verified Correct Copy of Original 12/15/2022._

the State of Oregon.   If a future kit is developed to modify a current model of magazine or firearm, that model would then become immediately prohibited under BM 114, sec 11.  Kits can be used to expand fixed magazines.

Most, if not all, firearms requiring detachable magazines will be unusable and unpurchasable under BM 114, section.  Since most, if not all, detachable magazines can be "readily restored, changed or converted to accept" more than ten rounds, those cannot be sold under this law.  BM 114, section 11, (1)(d).  See factual findings 24-29.  There is no other way to read the provision that would make it facial constitutional.  The "or" component language restrains the number of firearms that could be sold to less than 10% of what is currently on the market.

Current owners of large capacity magazines are criminalized under the law.  As is pointed out by the plaintiffs, "BM 114 provides no general exception even for continuing to possess magazines already owned prior to the effective date.  Rather, BM 114 provides a mere 'affirmative defense'."

If found with a large capacity magazine, the owner has a choice of relinquishing the large capacity magazine without further process or face arrest at an officer's discretion.  BM 114, sec 11(5)(d) see also Defendants' response, pg. 4.

Once arrested and criminally charged with a Class A misdemeanor, with a maximum penalty of 364 days in jail and a fine up to $6,250, the accused can exercise an affirmative defense proving the possession of the large capacity magazine prior to passage of BM 114, section 11.

An affirmative defense places the burden on the accused to prove their right to possess the large capacity magazine by a preponderance of the evidence.  See Oregon State Bar Bar Books, Criminal Law in Oregon, section 19.1-2.  Proof may be testimony subject to creditability determination by the fact finder but is, generally, better bolstered by documentation.  All of the exceptions to the crime in section 11(c) are also part of an affirmative defense.  The accused must establish proper storage, on the private property of the owner or while engaging in public or private shooting range or hunting and that if they were transporting the magazine, it was in a vehicle lock box.   In other words, the possession is presumed illegal until the accused owner of the large capacity magazine proves

Exhibit 2
Page 21 of 25

_Verified Correct Copy of Original 12/15/2022._

otherwise in a court of law after the state had established a prima facia case of guilty by surviving a motion for judgment of acquittal.

Defending against a criminal charge is expensive, time consuming and extremely stressful with private legalcounsel.  All indigent defendants would face the same challenges, except would be entitled to court-appointed counsel. [13]

### e) Preliminary Conclusion on Likelihood of Success.

Under these findings and legal analysis, "there can be no reasonably likely circumstance in which application of [section 11] would pass constitutional muster." <u>Christian</u> at 41.

The statutory scheme is very burdensome on lawful firearm owners who possess large capacity magazines legally now.  Clear from the preliminary record, magazines capable of holding more than ten rounds come standard with many popular firearms and firearm platforms on the market today and are possessed by law-abiding citizens for lawful purposes.  The measure criminalizing currently lawful conduct creating presumed criminals out of 1 in every 5 Oregonians.  In other words, under <u>Christian</u>, the regulations are unduly burdensome on currently lawful conduct and are without a public safety promotion.

The court is clearly persuaded the plaintiffs have a likelihood of success of showing BM 114, section 11 is unconstitutional under Article I, section 27. The court will not turn to the federal constitution.

### (2) Imminent and Irreparable Harm.

Plaintiffs show implementation of BM 114 would, if their challenge is successful, cause an irreparable harm to gun owners and those seeking to purchase firearms for self-defense.   Any depravation of a constitutional right, even temporarily, constitutes an irreparable injury.  <u>See</u> <u>Elkhorn Baptist Church v. Brown</u>, 366 Or 506, 519, <u>see also</u> 366 Or at 546 (2020) (Garrett, J., concurring).

---

[13] "The public defense crisis is playing out throughout the state…this too is exponentially worse in rural areas for a wide variety of reason."  Oregon State Bar President Kamron Graham, "Rural Oregon Needs Our Engagement", Oregon State Bar Bulletin, December 2022, pg  30.  Rural Oregon is a place with a rich culture of firearm ownership and pride in their capacity to handle their use without interference.

Exhibit 2
Page 22 of 25

_ Verified Correct Copy of Original 12/15/2022._

The Plaintiffs have shown there is a likelihood that the court will find the section facially unconstitutional.  Christian at 40.

There are no circumstances where section could be constitutional.   The Defendants state as a "practical matter, Plaintiffs can continue to 'keep and bear arms".  Defendant's response, pg. 12.[14]  On its face, that statement may seem persuasive, but that is borne by the facts.  The state can only fetter the right to bear arms with a clear showing that the regulation promotes public safety and is not unduly burdensome. BM 114, section 11 fails to meet either legal standard.

Defendants have not shown how delaying implementation would cause imminent and irreparable harm.  This is particularly emphasized by the delay in implementation of the "permit-to-purchase" program. The status quo is not improved by implementation of the BM 114, section 11.

### (3) Balancing Harms.

There is little to no harm in delaying implementation of BM 114 while the parties prepare and present evidence at an injunction hearing.

Based upon the court findings, there is a clear preliminary showing of an irreparable harm to the right to bear arms under Article I, section 27 under BM 114, sec 11 preventing a mere speculative harm of allowing the ongoing possession and purchase of large capacity magazines.

The numbers are starkly in support of this preliminary determination.   If allowed to go into effect, 1 in 19 of all Oregonians are presumed guilty of a class A misdemeanor unless they can prove otherwise. See Factual Finding 38.  More than ten rounds are needed in three out of every 10,000 acts of legal, justifiable self-defense acts.  The chance of being a fatality in a mass shooting in Oregon is .3 in a million.  There have been 13 mass shootings with 14 or more fatalities since 1966, a very low number with naturally high emotionally responses.

---

[14] Defendants even argue that both "firearms and magazines are durable goods with a long useful life. Plaintiffs can continue to keep and bear the arms they currently possess. ."  There is no analysis for the Defendants on how many mass shootings used large capacity magazine and how many of those were newly purchased.  The evidence is also that the fixed plate magazines do not have a long and useful life. The long and useful life relies on the ability to remove the base/floor plate for regular cleaning.

Exhibit 2
Page 23 of 25

_ Verified Correct Copy of Original 12/15/2022._

Finally, the defendants' own literature "seems" to show that the ban will help with fatalities.   No definitive scientific evidence has been provided that large capacity magazine bans have any impact on the number of fatalities or casualties now or in future events.

The implementation of BM 114, section 11 would have an immediate impact on the liberty interests of 1 in 5 Oregonians and make it harder for the weaker individuals in our society to defend themselves against attackers.

### (4) Public Interest.

The legal standard is "there are situations where the public interest would be so seriously affected by the issuance of an injunction that the court will deny an application therefor". <u>Elkhorn Baptist Church v. Brown</u>, 366 Or 544 <u>quoting</u> <u>Bennett v. City of Salem, et al</u>, 192 Or 531, 546 (1951).

As described above, the public interest in this matter is real and significant. The people of Oregon voted for the measure by a margin of 975,553 (50.65%) for the measure, and 950,589 (49.35%) against.  Oregon Secretary of State website, <u>State of Oregon: Voting & Elections - Voting & Elections</u>. The court acknowledges the proponents demonstrated that our society has become exacerbated by the relentless news about mass shootings in the country and the slaughter of innocents.  BM114, Preamble.

However, there is strong evidence presented by the proponents of BM114 that public safety is not promoted by the exercise of the authority contained in BM114 and the measure unduly frustrates the right to bear arms making it unconstitutional.  There is a nearly equal public interest in issuing a preliminary injunction.

There is a serious harm to the public interest, as well, when individuals are arrested, prosecuted and convicted of a Class A misdemeanor under an unconstitutional statutory regime, a potential if BM114 is allowed to go in effect at this time.

A delay for judicial review of the constitutionality of the measure outweighs immediate implementation subject to potentially overturning the measure after the review.  The public interest demands judicial scrutiny and

Exhibit 2
Page 24 of 25

Verified Correct Copy of Original 12/15/2022.

deliberation to avoid a see-sawing back and forth on this issue. A final determination needs to be made on the constitutionality of the measure prior to lifting any injunction.

On balance, the public interest in implementation of BM114 weighs in favor of the Preliminary.

## CONCLUSION

The court ORDERS the temporary restraining order remains on Ballot Measure 114, sections one through ten. Upon receipt of notice from the Defendants the "permit to purchase" process is administratively ready, the court will hold a preliminary injunction hearing within 10 days, unless fixed by the court on a different date, to determine if the program can constitutionally be implemented.

The next hearing related to background checks will be on December 23, 2022, at 10:00 AM as noted above. The identified statutory provisions of the law subject to that review will be filed by Defendants in writing by December 16, 2022 at noon.

The court ORDERS a preliminary injunction is GRANTED as to Ballot Measure 114, section 11 until a full hearing on the complaint can be heard where the court can determine by clear and convincing evidence whether BM 114, sec. 11 is constitutional under Article I, sec 27.

Plaintiffs shall prepare each order separately and submit them by December 16, 2022, at noon.

So Ordered,

Robert S. Raschio
24th Judicial District
Presiding Circuit Court Judge

Exhibit 2
Page 25 of 25