Stephen J. Joncus, OSB #013072
Joncus Law PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
Van Ness Williamson LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> KATE BROWN, et al., <br><br> Defendants. | Civil No. 2:22-cv-01815-IM (*Lead Case*) <br> Civil No. 3:22-cv-01859-IM (*Trailing Case*) <br> Civil No. 3:22-cv-01862-IM (*Trailing Case*) <br> Civil No. 3:22-cv-01869-IM (*Trailing Case*) <br><br> CONSOLIDATED CASES |
| MARK FITZ, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | **DECLARATION OF STEPHEN HELSLEY** |
| KATERINA B. EYRE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | |

DANIEL AZZOPARDI, et al.,

                       Plaintiffs,

     v.

ELLEN F. ROSENBLUM, et al.,

                     Defendants.

Stephen J. Joncus, OSB No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200 steve@joncus.net

Leonard W. Williamson, OSB No. 910020
VAN NESS, WILLIAMSON LLP
960 Liberty Road S., Ste 100
Salem, Oregon 97302
Telephone: (503) 365-8800
l.williamson@vwllp.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, INC**., an Oregon public benefit corporation; **BRAD LOHREY**, Sherman County Sheriff; **ADAM JOHNSON**, **CODY BOWEN**, Union County Sheriff; **BRIAN WOLFE**, Malheur County Sheriff; **HAROLD RICHARD HADDEN, JR**., <br><br> Plaintiffs, <br><br> v. <br><br> **GOVERNOR KATE BROWN**, Governor of Oregon, and **ATTORNEY GENERAL ELLEN ROSENBLUM**, Attorney General of Oregon, and **TERRI DAVIE**, Superintendent of the Oregon State Police, <br><br> Defendants. | Civil No. 2:22-cv-01815-IM <br><br> **DECLARATION OF STEPHEN HELSLEY** |

**DECLARATION OF STEPHEN HELSLEY**

1.      I am Stephen Helsley, a retired peace officer from the California Department of

Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held

were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

2.    I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For well over two decades, I was first a state liaison and, then later, a consultant to the National Rifle Association, where I was heavily involved in "assault weapon" and magazine legislative issues. For the past ten years I have also served as the historian for the London-based company, John Rigby & Co. (Gunmakers, Ltd.). Rigby is the oldest continuously operating gun maker in the English-speaking world, having been established in 1775.

3.    I have co-authored five books on firearms and have authored or coauthored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

4.     Finally, I am a collector of firearm-related books—of which I have thousands. Included in my book collection are approximately 50 different issues of Gun Digest, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike.

*Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

5.      Attached hereto as **Exhibit Helsley-1** is a true and correct copy of my signed expert witness report, which contains my opinions and analysis related to this matter.

6.      During my 35-years of involvement in the "assault weapon" issue, I have heard innumerable times that the "founding fathers" never envisioned higher capacity firearms than the single shot musket of their day and that the Second Amendment was never intended to offer protection for such arms. Such a notion is preposterous. Among the Founders, George Washington and John Adams were personally involved in the consideration to purchase for the Continental Army 100 Belton 8-shot firearms, which were repeating muskets with detachable magazines. (Washington had been encouraged by Benjamin Franklin to consider the Belton flintlock.)

7.      The Belton flintlock was one of a number of multi-shot firearms (including the Giradoni air rifle and the Lorenzoni among others) that were beginning to appear at the end of the 18th century. Such weapons were complex, likely unreliable, and fragile, but they were also a window into the future. The Belton purchase never materialized – primarily because of cost – but prescient men like the Founders surely understood that it would only be a matter of time before such arms were practical, affordable, and reliable. In the absence of government interest, private citizens would be clients for such arms, and the Founding generation imposed no restrictions to stop them.

8.      The State also argues that magazines capable of holding more than 10 rounds do not warrant Second Amendment protection because they are accessories and not necessary to the functioning of the firearm for which they are designed. The State also argues that if the weapon can function in the absence of the magazine, then the magazine is an accessory. As a single-shot,

that is correct, it could function – but not as intended. Consider such logic applied to a pickup truck. If a rear tire is removed, the truck can still be driven, but not as intended. A Glock pistol requires only the slide and barrel to fire a round, but that would not make the Glock's frame a mere accessory. The Glock is just one example of many firearms that doesn't require all of its parts to be present to discharge a cartridge. An expansive definition of "accessory" is thus a serious threat to Second Amendment rights. If by designating a part an "accessory" it can be banned, taxed, or otherwise restricted, there is no protection for the complete firearm.

9.      An expert for the defense (Ryan Busse) makes the related point that large capacity magazines are not typically manufactured by the same company that produces the firearm itself and therefore magazines should be considered an accessory. Again, I am the historian for a British company whose two main product lines were developed and patented in the third quarter of the 19th century. Do we produce all the key parts of those guns and rifles? – no. Could we? – yes. Some key parts, including the receiver, are precision machined by a specialty manufacturer for us. That does not mean our receivers are mere "accessories". The use of outside vendors is simply a good business practice to produce the best possible product in the most cost-effective manner.

10.      AR-type magazines have been manufactured for over 60 years. Production totals aren't known but given the number of rifles and pistols that accept AR or other magazines capable of holding over ten rounds, it certainly wouldn't be unreasonable to put the total between 500 million and 1 billion. They are undoubtedly in common use by millions of Americans for lawful purposes including self-defense, sports shooting, competitions, hunting, and other similar purposes.

11.      I have received no remuneration for any work done in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed

within the United States on January $\frac{2}{\phantom{xx}}$, 2023.


_Stephen Helsley_
Stephen Helsley

# EXHIBIT HELSLEY – 1

## Expert Witness Report of Stephen Helsley

*Oregon Firearms Federation, Inc. et al. v. Brown, et al.*
United States District Court (Oregon)
Case No: 2:22-cv-08151-IM
December 20, 2022

### I.    INTRODUCTION

Counsel for plaintiffs in *Oregon Firearms Federation, Inc. et al. v. Brown, et al* (OR. Case No. 2:22-cv-08151-IM have asked me to offer an opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

### II.    BACKGROUND & QUALIFICATIONS

I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent involved shootings and a wide range of homicides involving firearms.

I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For the past 24 years, I was first a state liaison and, then later, a consultant to the National Rifle Association.

I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

Finally, I am a collector of firearm-related books—of which I have approximately three thousand. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies.

I have qualified as an expert in both criminal and civil matters.

A. Published Articles

In recent years, I have written or contributed to the following published articles and opinion editorials:

1. Articles

- *Of Birmingham and* Belgium, Double Gun Journal, vol. 18, iss. 2 (2007).
- *The .470 Nitro Express*, Sports Afield (June/July 2007).
- *Readings on the Roots of* the .410, Shooting Sportsman, Nov./Dec. 2007.
- *Hunting in Wales*, Hunting and Fishing (Russia), Dec. 2007.
- *A Pair for a Pair of Friends*, Shooting Sportsman, March/April 2008.
- *A Welsh Fantasy*, Shooting Sportsman, July/Aug. 2008.
- *A Maine Gun Goes Home*, Shooting Sportsman, Sept./Oct. 2008.
- *The Pin Fire Comes Home*, Libby Camps Newsletter, Winter 2008.
- *John Rigby & Co.*, Hunting and Fishing (Russia), July 2008.
- *The All-American Double Rifle*, Safari, Sept./Oct. 2008.
- *Eastern Oregon Odyssey*, Shooting Sportsman, Nov./Dec. 2008.
- *Rigby Marks 275th Anniversary*, Safari, Nov./Dec. 2009.
- *Finding* Papa's Guns, Shooting Sportsman, March/April 2010.
- *The Searcy Stalking Rifle*, Safari, May/June 2010.
- *The Ruggs Riders*, Shooting Sportsman, July/Aug. 2010.
- *Searcy Brings Back the Rising-Bite*, Shooting Sportsman, Sept./Oct. 2010.
- *John Rigby & Co.*, African Hunting Gazette, Fall 2010.
- *The Ageless .416 Rigby*, Safari, Nov./Dec. 2012.
- *J. P. Clabrough*, Shooting Sportsman, March/April 2015.
- *The Mystery of Hemingway's Guns*, Friends and Neighbors, Summer 2015.
- *The Enigma of Hemingway's Guns*, Master Gun (Russia), Sept. 2015.
- *The Mystery of Hemingway's Guns*, CRPA Firing Line, Sept./Oct. 2015.
- *Pistols at Dawn*, CRPA Firing Line, Jan./Feb. 2016.
- *The Silver Star*, CRPA Firing Line, Jan./Feb. 2016.
- *Women Guns & Politics*, CRPA Firing Line, March/April 2016.
- *Hunting the Big Mouse*, CRPA Firing Line, Sept./Oct. 2016.
- *Do Guns Make Heroes? The Congressional Medal of Honor*, CRPA Firing Line, Nov./Dec. 2016.
- *Thumbs-Up Guns*, Shooting Sportsman, Jan./Feb. 2017.
- *Is Your Gun Safely Stored? (Part 1)*, Friends and Neighbors, Summer 2017.
- *History of William Powell and His Patents*, Master Gun (Russia), Aug. 2017.
- *Guns from San Francisco and Birmingham*, Master Gun (Russia), Oct. 2017.
- *Is Your Gun Safely Stored? (Part 2)*, Friends and Neighbors, Autumn 2017.

### 2. Opinion Editorials

▪ *It's About Time: State has Eroded Gun Owner's Rights*, Sac. Bee (July 4, 2010).

▪ *Nevada Views: Is Gun Registration Worth Cost?* Nev. Rev. J. (Sept. 16, 2012).

▪ *Gun Roundup Program Has Too Many Flaws*, Sac. Bee (May 3, 2013).

### B. Expert Witness History

In the past ten years, In the past 10 years I have been deposed in Parker v. State of California (ammunition) and Duncan v. Bonta (magazines).

### COMPENSATION

I am not being compensated for my work on this report.

## IV.   ASSIGNMENT

Plaintiffs' counsel has asked me to provide opinion on the historical existence and prevalence of firearms and/or magazines capable of holding more than ten rounds of ammunition and the reasons law-abiding Americans, including law enforcement and private citizens, so often select such items.

Counsel has also asked that I provide opinion on the utility of firearm magazines with the ability to accept more than ten rounds of ammunition in self-defense, as well as the impact of ten-round magazine limitations on law-abiding citizens.

## V.   OPINIONS & ANALYSIS

*1. Magazines over ten rounds are, and have historically been, a common choice for self-protection for use in both rifles and handguns.*

The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59 (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92 (15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century

version of Lorenzoni's design, with a 12- shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.

Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20- rounds were available but enjoyed limited popularity because they were so ungainly.

In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed. During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster—and by extension concealed carry for self-defense.

In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10- rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI—the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both increased after the war as a result of the training "doughboys" received before going to France. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target-shooting standard for a half-century or more and popular for self-defense.

Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double-action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of other makes that followed—CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986 and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000, while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012),

*available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-usannual- statistical-update-2012.pdf. The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a considerable number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. The clear majority of California law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under California Penal Code section 32310.

The homeowner and the concealed weapon permit holder want a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one—to increase his or her chances of staying alive. For virtuous citizens buy their guns to protect themselves from the same criminals that police carry guns to protect the citizens, the public, and themselves from. For this reason, armed citizens have historically modeled their choice of firearms on what police carry.

> 2. *Limiting the law-abiding citizen to a magazine of ten rounds limits their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds to stop the aggressive actions of offenders, while having negligible impact on the ability of criminals to carry out violent crimes.*

Based on my experience with and understanding of the customs and practices of citizens licensed to carry guns in public, individuals often carry *only* the gun, without spare ammunition or magazines. Similarly, most plainclothes police officers do not find it practical to carry multiple handguns.

Likewise, the average homeowner who keeps a defensive firearm is unlikely to have time to gather spare ammunition or magazines. Rather, they are generally limited to one firearm and its magazine capacity. For the homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally prohibits the gathering of multiple firearms or magazines. Ideally, one hand would be occupied with the handgun and the other with a telephone to call the police. Assuming an individual even had time for a magazine change, most people do not sleep with firearms or magazines attached to their bodies or wearing clothing that would allow them to stow spare magazines or ammunition on their person. They would have only what was in the firearm.

The off-duty officer and the private law-abiding citizen are thus unlikely to have much, if any, spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a spare, loaded rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

Uniformed police officers who are traditionally armed against the same criminals, on the other hand *are* normally wearing body armor. They generally have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car. And they will have instant radio access to dispatch and fellow officers if backup help is needed. Further, they will generally have both a loaded gun *and* two additional magazines. Each of those magazines would generally hold 17 rounds of 9mm or 15 rounds of .40 caliber cartridges. Collective law enforcement experience has determined this to be critical to allowing the officer to survive a gunfight with armed criminals.

What's more, the average citizen is not trained like law enforcement personnel and is generally not as readily prepared for combat with an armed criminal. As noted, they are likely to have a single firearm loaded with a single magazine available, and they are more susceptible to the psychological effects that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots.

For these reasons, having a magazine over ten rounds at one's disposal certainly could make a difference in self-defense situations, and likely would during home invasions or when facing armed attackers. In my opinion, law-abiding citizens will thus be at a disadvantage in such situations if California enforces its ban on the possession of magazines over ten rounds.

Criminals bent on causing harm, on the other hand, are not likely to be meaningfully affected by California's magazine restrictions. Even assuming they were impeded from obtaining magazines over ten rounds by Penal Code section 32310, they could simply arm themselves with multiple weapons and/or magazines, and they often do. Criminals have time to assess and plan shootings, whereas victims do not. Indeed, it is the attacker who chooses when, where, how, and whom to attack. So, the attacker is not as burdened by the surprise and shock that the victim is and is generally prepared for the confrontation with several firearms and a substantial amount of ammunition.

The virtuous citizen cannot practically be expected to have accessible multiple guns, magazines, or spare ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

Supporters of the magazine capacity limitation may point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six shot revolvers. It

should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer or the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

Finally, it is worth noting that it is difficult to say exactly how many private citizens have fired more than ten rounds in a self-defense shooting, because the number of rounds fired in such cases is very often an omitted fact in written accounts of such defensive gun uses. Often the accounts just say, "multiple shots fired." That could mean more or less than ten. This does not seem to be the case with shootings involving police officers, for which, the number of shots fired is generally documented. In my experience researching such shootings, officers often fire more than ten rounds. And cases where an individual officer fired less than ten rounds, but where multiple officers were shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate. Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the same criminals the police are armed to deal with.

> 3.   *A firearm equipped with a magazine capable of holding more than ten rounds is more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so.*

Gunfights frequently involve a lot of "missing." This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard pressed to find someone who had been in a gunfight that complained about having too much ammunition.

Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers' hand or—if things got really serious—let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

The notion that a bullet can "knock-down" a person is a largely Hollywood inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states— "For every action, there is an opposite and equal reaction." Put another way: if the recoil of the firearm doesn't knock you down, neither will the impact of the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as "stopping power." A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance, but placement is still the most critical factor.

A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American heroes who were awarded the Congressional Medal of Honor. Many of these men

continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See, e.g.*, *The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (October 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious-shootouts-in-us-history/.

"Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery (Note: I wasn't "knocked down") and then bouncing another round off my spine that exited my right leg. From a prone position, I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4—where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds, and I could have "fought on" if more ammunition had been available. A total of 18 rounds were fired.

Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him—both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss—whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident, I was awarded the department's Medal of Valor.

The "take away" from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

## VII. REFERENCES

Silvio Calabi, Steve Helsley & Roger Sanger, *The Gun Book for Boys* 56-57 (Shooting Sportsman Books 2012).

United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf.

*The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984).

Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious-shootouts-inus-history/.

## VIII. CONCLUSION

It is clear to me from my collective experiences and from the analysis described above that firearms and magazines with ammunition capacities exceeding ten rounds have existed and have been in use since at least the 18th Century.

It is also clear that Americans commonly choose and use magazines capable of holding more than ten rounds of ammunition for lawful purposes, including self-defense.

Dated: December 20, 2022

Stephen Helsley
Stephen Helsley

# RESUME

**NAME:**              HELSLEY, STEPHEN C.  (Steve)

**ADDRESS:**           1040 Brookline Circle
                       El Dorado Hills, CA 95762

**TELEPHONE:**              (916) 933-3538 (Home)
                       (916) 719-2325 (Mobile)
                       schmjh@pacbell.net or Stephen@johnrigbyandco.com

## CURRENT STATUS

**Historian** – John Rigby & Co., London, England (est. 1775)

## PROFESSIONAL HISTORY

**National Rifle Association (**1993 to 2020**)**
**Consultant** (2000 to 2020) to the National Rifle Association's (NRA) Institute for
Legislative Action (ILA).

**State Liaison** (1993 to 2000) -- As a State Liaison of the NRA's ILA, I was the principal
advocate for the organization's state and local political interests in California, Arizona and
Nevada. My primary functions included legislative lobbying and coordination of the NRA's
election efforts.

**California Department of Justice** (1967-1993)
**Assistant Director, Division of Law Enforcement (1988 until retirement)** -- Appointed by
Attorney General Van de Kamp in October 1988, I served in the position until my retirement. I
had overall responsibility for the drug enforcement, intelligence, forensic, training and criminal
investigation programs of the Department of Justice.

**Chief, Bureau of Forensic Services** (1985-1988) -- Reassigned by Attorney General Van de
Kamp in February 1985 and served in the position until October 1988. I was responsible for the
management of twelve crime laboratories that provided forensic support to approximately 400
law enforcement agencies in California.

**Chief, Bureau of Narcotic Enforcement** (1979-1985) -- Appointed by Attorney General
Deukmejian in June 1979 to lead the Bureau's seven regional offices and direct state level drug
law enforcement efforts.

**Special Agent in Charge -** Fresno Office (1976-1979) -- Responsible for management of
investigations conducted by the Bureaus of Investigation and Narcotic Enforcement in Central
California.

**Special Agent Supervisor -** San Diego Office (1972-1976) -- Supervised a team of Special
Agents who conducted investigations of major drug traffickers.

**RESUME**
HELSLEY, STEPHEN C.
Page 2

> **Special Agent -** Fresno Office (1967-1972) -- Conducted investigations of drug traffickers and provided training to local law enforcement officers.

## SIGNIFICANT ACCOMPLISHMENTS

> **CAL-DNA** (1989) -- First conceived and then directed implementation of the CAL-DNA program. CAL-DNA is based on analysis of deoxyribonucleic acid that produces what is generally referred to as "genetic fingerprints."

> **California Criminalistics Institute** (1986) -- Directed the conceptualization, planning and implementation of a training, research and advanced casework program to support California's forensic laboratories.

> **Chinese/American Police Science Conference** (1986) -- Selected as one of 26 Americans from the criminal justice field to travel to the Republic of China and address Chinese law enforcement officials at the inaugural conference.

> **Campaign Against Marijuana Planting (CAMP)** -- In 1983, conceived and brought the CAMP program to fruition. CAMP is a statewide approach to California's marijuana problem and involved over 100 federal, state, and local agencies.

> **National Alliance of State Drug Enforcement Agencies (NASDEA)** -- Elected chairman in 1982 of NASDEA, an organization of state level drug law enforcement agency directors from 45 states who worked with federal agencies on legislative and policy issues.

> **Narcotic Task Force Program** -- In 1977, I initiated, and in later years fully developed, the Department of Justice's Narcotic Task Force Program. The program is designed to coordinate and enhance local and state enforcement efforts.

## SPECIAL AWARDS

> **Public Personnel Award** (1989) -- Selected by the Governor's Committee for Employment of Disabled Persons for this award in recognition of efforts on behalf of disabled employees.

> **Attorney General's Excellence Award** (1986) -- For work in furthering the Department's Affirmative Action and Equal Employment Opportunity programs.

> **DEA Administrator's Award** (1985) -- For contributions to both the Drug Enforcement Administration and the national drug law enforcement effort.

**RESUME**
HELSLEY, STEPHEN C.
Page 3

**Attorney General's Valor Medal** (1974) -- For actions during an undercover cocaine investigation that resulted in hostage situation and gunfight.

**U.S. Air Force Commendation Medal** (1970) -- For training support to the Office of Special Investigations and undercover investigations conducted on pilots assigned to the Strategic Air Command.

**Attorney General's Purple Heart Medal** (1970) -- Returned to duty after sustaining four gunshot wounds during an undercover heroin investigation.

**EDUCATION**

University -     Graduated from California State University Fresno with a Bachelor of Science Degree in Criminology (1967).

Continuing -    FBI National Academy (1975) - Graduated from the 102nd session with a 4.0 grade point average.

Graduate level course work in Business Administration and seminars in Telecommunication Management.

Completion of 45 units in Russian studies programs (1991-1993).

**CERTIFICATION**

Advanced Certification -- Peace Officers Standards and Training

Lifetime Community College Limited-Service Teaching Credential

**PROFESSIONAL MEMBERSHIP**

Lifetime Honorary Membership -- National Alliance of State Drug Enforcement Agencies

Life Member -- National Association for the Advancement of Colored People (NAACP)

**CIVIL STATUS**

Married to Marilyn Jane Helsley for 54 years -- three adult children and eight grandchildren.

**RESUME**
HELSLEY, STEPHEN C.
Page 4

## FIREARMS RELATED EXPERIENCE

NRA Benefactor Member.  Life Member since 1972.  Member since 1961.

Life Member -- California Rifle and Pistol Association.

Life Member -- Arizona State Rifle and Pistol Association.

Life Member -- Folsom Shooting Club, Inc.

Technical Adviser – Association of Firearm and Tool Mark Examiners

Member – American Society of Arms Collectors

Member -- California Side-By-Side Society

NRA Certified Police Firearms Instructor.

Chief firearms instructor -- California Department of Justice (1970-79).

Executive level law enforcement experience with special weapons, firearms training, shooting review boards, legislation and the development of policy concerning the use of firearms. Extensive experience in the management of the forensic analysis of firearms.

Broad formal competition experience in numerous handgun and rifle disciplines.

Firearm collector with an emphasis on vintage British sporting arms - including flintlock, percussion and cartridge models.

Reloader and bullet-caster for 50 types of cartridges (brass and paper) from .223 to 8-bore.

Author of numerous published articles on rifles, shotguns and handguns in national and international journals.

Chief Judge for the 2001 Gold Medal Concours d'Elegance of Fine Guns in Millbrook, New York.

Co-author of *Hemingway's Guns*, *Rigby – A Grand Tradition*, *The Gun Book for Boys, The Gun Book for Parents* and *The Gun Book for Girls*.