Stephen J. Joncus, OSB #013072
JONCUS LAW PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>KATE BROWN, et al.,<br><br>               Defendants. | Civil No. 2:22-cv-01815-IM (*Lead Case*)<br>Civil No. 3:22-cv-01859-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01862-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01869-IM (*Trailing Case*)<br><br>CONSOLIDATED CASES<br><br><br>**DECLARATION OF MARK HANISH** |
| MARK FITZ, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br><br>               Defendants. | |
| KATERINA B. EYRE, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>               Defendants. | |

DANIEL AZZOPARDI, et al.,

                                Plaintiffs,

       v.

ELLEN F. ROSENBLUM, et al.,

                                Defendants.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Stephen J. Joncus, OSB No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
steve@joncus.net

Leonard W. Williamson, OSB No. 910020
VAN NESS, WILLIAMSON LLP
960 Liberty Road S., Ste 100
Salem, Oregon 97302
Telephone: (503) 365-8800
l.williamson@vwllp.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, INC**., an Oregon public benefit corporation; **BRAD LOHREY**, Sherman County Sheriff; **ADAM JOHNSON**, **CODY BOWEN**, Union County Sheriff; **BRIAN WOLFE**, Malheur County Sheriff; **HAROLD RICHARD HADEN, JR**., <br><br> Plaintiffs, <br><br> v. <br><br> **GOVERNOR KATE BROWN**, Governor of Oregon, and **ATTORNEY GENERAL ELLEN ROSENBLUM**, Attorney General of Oregon, and **TERRI DAVIE**, Superintendent of the Oregon State Police, <br><br> Defendants. | Civil No. 2:22-cv-01815-IM <br><br> **DECLARATION OF MARK HANISH** |

I, Mark Hanish, declare as follows:

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

1.      I am a firearm industry senior executive with over two decades of experience building indoor shooting ranges, running domestic and international sales and marketing departments for firearms, ammunition, and accessory companies, along with designing products with various engineering departments for the commercial, law enforcement, and military markets. I have also spent over 25 years as a professional shooter, holding several world, national and state level titles, using the firearms technologies that are relevant to this case.

2.      I have been retained by the Plaintiffs in this matter to provide a well-rounded industry perspective on firearms technology and the marketplace, specifically as it relates to semi-automatic firearms with detachable magazines that are capable of holding over ten rounds. This report was prepared at the Plaintiffs' request for *Oregon Firearms Federation, Inc. et al v. Brown et al*, Case No. 22-CV-01815-IM and *Eyre et al v. Rosenblum et al*, Case No. 22-cv-01862-IM. I have been retained to write a declaration at the rate of $300/hour.

**Background and Qualifications**

3.      I have spent the last twenty years as a firearms, ammunition, and defense industry executive. In addition to my role in the firearms industry, I have also been a professional shooter, competing in domestic and international matches in practical pistol and 3-gun for over 25 years.[1]  I have a Bachelor of Science Degree in Entrepreneurship and Business Management from the W.P. Carey School of Business at Arizona State University. Through the Barrett Honors College, I wrote an Honor's Thesis for the basis of my first

---

[1] 3 Gun is a speed and accuracy sport, where the athlete uses the three platforms of semi-automatic firearms – rifles, pistols, and shotguns – all with what were considered large capacity magazines.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

firearms training and supply business, whose growth led to the conceptualization of a luxury indoor shooting range. My partners and I founded the Scottsdale Gun Club, which at the time of the facility opening (2004) was the world's largest and most luxurious public indoor range, creating a new market segment.

4.      While developing the Scottsdale Gun Club, my partners and I operated The Armory gun store, which focused on self-defense and tactical products and training. My position was Founder and Vice President of Sales and Marketing for the Scottsdale Gun Club and at the time we created an entirely new model of high-end shooting and retail facilities. In addition to my sales and marketing roles, I was responsible for our product selection and purchasing. The Scottsdale Gun Club retained its tactical firearms and training roots and was nationally known as the leader in that category. We were doing such high volume in those categories we started a firearms and ammunition distribution business to resell products to other gun stores. Prominent firearms manufacturers would consult with me on their expansions into AR-15s and tactical market segments. Notably, we also launched a manufacturing brand, U.S. PALM, that developed and produced a line of high-tech polymer 30rd magazines for AK pattern rifles. These magazines are still manufactured and distributed nationwide.

5.      In 2010, I transitioned from the dealer and distributor side of the industry into sales for FNH USA, LLC (later becoming FN America, LLC), which is a subsidiary of Fabrique Nationale out of Herstal, Belgium. In the South Carolina manufacturing facility FN has produced a multitude of arms for the US Military to include the M4, M16, M249, M240, and MK19. FN also began developing a robust commercial presence of which I was a part. Over six years, I rose to the position of Senior Director of Commercial Sales. I also was on the FNH USA professional shooting team. During my tenure at FN, I contributed to many aspects

of the commercial business for US operations, including sales, product management, production forecasting, and marketing. At FN America we produced and marketed both pistol and rifle lines, almost all were sold with "large capacity" magazines as the standard offering. I have first-hand knowledge of the changes within the firearms industry market over the past several decades and I have been able to create consistent growth of the core business even in unstable market conditions. I worked closely with the production and engineering side of the company. With those departments, I principally directed the design for most models in the FN15 line, working to define the market position and models for the consumer, which included both Law Enforcement and Commercial markets. The FN15 is the company's AR-15 style line of rifles. Additionally, I conceptualized and worked with the team to design a high-end collector line of firearms, known as the Military Collector Series. These firearms included semi-automatic versions of American military issue firearms: the M4, the M16, and the M249 which generated over $10million in revenue the first year of production.

6. In 2016, I became the Vice President of Sales and Marketing for Surefire, LLC, a company that specializes in tactical illumination devices, firearm suppressors, and "large capacity" magazines for AR-15 style rifles for the civilian, law enforcement, and military markets. At Surefire, I managed US commercial and law enforcement business. Internationally, I managed commercial, law enforcement and military markets. In 2019, I became the President of Global Sales and Marketing for Ammo Inc. and in just over 3 years sales increased from $4M to $240M. I was responsible for all sales, marketing, and product development activities including the design and development of specialty cartridges for US Special Operations Command. I successfully competed for and won several government contracts in a short period of time. AMMO acquired GunBroker.com, the largest internet

marketplace for the firearms industry in 2021. In 2022, I joined the team at Timney Triggers as their Vice President of Sales, thanks in large part to my rich and well-rounded knowledge of the firearms industry. Due to my high-profile positions in a range of companies that directly impact the conversation about firearms technology available to the public and the military, as well as the ammunition side of the market. I am uniquely qualified to discuss this matter.

7.     As I have previously stated, not only is my experience in the industry as an executive, but as a shooter and collector. I have personal experience purchasing and using "large capacity magazines" prior to 1994 and continuing throughout the entire 10 years of the federal ban and beyond. I also have an extensive background of practical application as a professional shooter. I have held multiple world, national, and state shooting titles across disciplines for over 25 years. Notably, I was a part of the 3 Gun National Pro Tour for six years, as a regular finalist and 2012 overall runner up. 3 Gun Nation was a television show that aired on NBC Sports and Sportsman Channel promoting the practical shooting use of semi-automatic rifles, pistols, and shotguns with "large capacity" magazines.

*8.*     Due to my professional background within the firearms industry, I have served on the Board of the American Suppressor Association and have regularly appeared as an on-camera expert for the National Shooting Sports Foundation, the Outdoor Channel's Gun Stories with Joe Mantegna, and Gallery of Guns TV. I have also been an industry guest speaker for college students at institutions such as the School of the Art Institute of Chicago and the W.P. Carey School of Business' MBA Program. Previously, I have provided expert witness testimony in *Duncan v. Bonta,* Case No. 3:17-c-v-01017-BEN-JLB and *Washington v. Federal Way Discount Guns, LLC.*, King County Superior Court, Case No.: 22-2-20064-2.

**Scope of Work**

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

9.    In this document, I will provide a general statement on the popularity of AR-15 style and similar rifles and their common use in the firearms market, with a specific emphasis on limitations in advertising and other avenues that contributed to this robust market. I will then discuss the importance of magazines to the fundamental operation of a semi-automatic firearm, as well as address their extensive use before and after 1994 and the ways in which manufacturers have responded to the changing in legislation. I will conclude on a discussion surrounding the 1911 style semi-automatic pistol and its waning popularity in a defensive handgun market in favor of smaller caliber and higher capacity pistols that are far superior for the broadest spectrum of self-defense uses.

10.    For the purposes of this report, I will use the terms "high capacity" magazine and "large capacity magazine" and the abbreviation "LCM" interchangeably to reference magazines capable of holding more than ten rounds. I use the terms as they relate to the ways in which they are referenced in documents and the way they are defined in the Violent Crime Control and Law Enforcement Act (1994).

**AR-15 and Civilian Popularity**

11.    AR-15 style rifles with 30 round magazines are one of the most common rifles sold and used by law abiding consumers today. The demand for AR-15s and similar rifles grew steadily since their inception and continued through the 1994-2004 federal "Assault Weapons Ban" (AWB). The Colt AR-15 first became available on the commercial market in 1964. In addition to the domestic production, throughout the 1970s and 1980s, semi-automatic rifles with "large capacity magazines", similar in style and function, were imported into the United States for sale to the commercial market.  These comparable rifles followed an overarching trend in firearms design towards smaller calibers with larger magazine capacities. A few

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

notable examples of these were manufactured by Beretta, Daewoo, FN, HK, IMI, SIG, STEYR, as well as several AK pattern rifles. The importation of these foreign made rifles however was restricted in 1989. Domestic manufacturers such as Colt, Bushmaster, Olympic Arms, Pac-West Arms, Eagle Arms / Armalite, and DPMS that were previously building AR-15 style rifles continued, for the most part, with production of slightly modified rifles to comply with the new federal regulations. These rifles increased exponentially in popularity as more consumers became aware of them, as they have many benefits for a multitude of applications including personal defense, target shooting, competition, and hunting. The AR-15 style of rifle is lightweight, has low recoil, is relatively easy to learn how to use, can be customized by the consumer, and is easily adjustable to fit most users of varying sizes and physical abilities. During the AWB period, many companies were discouraged from investing in production capacity to enter the AR-15 style rifle market due to legislative uncertainty. In the years following the sunset of the AWB more recognizable brands such as Smith & Wesson, Ruger, Sig Sauer, FN, and Remington were willing to invest the capital and enter the market. These well-known and trusted brands responded to market demand for AR-15 style rifles manufactured by established companies.

12.    There is a lot of debate surrounding the effectiveness of advertising and its impact on the consumer. In terms of firearms marketing, however, it is important to note that there are significant limitations on the manufacturer due to the nature of the product which must be considered when analyzing how successful and how much of an impact firearms industry marketing has actually had on consumer decision making.

Marketing and Advertising Limitations and Considerations

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

13.    As a Senior Executive at one of the larger firearms manufacturers in the world,
I have been responsible for determining the firearms product mix and production quantities
based on the marketplace. Most manufacturers forecast their future sales, and corresponding
production, to match the products and quantities their customers are demanding rather than the
other way around. Its common sense to manufacture and deliver what your customers are
asking to purchase. Beyond those core product sales, companies introduce new products to
market that are either a variation of a core product, a direct response to new customer demand,
or a totally new concept product. Consumer demand for the AR-15 style and similar rifles,
along with "high capacity" magazines for both rifles and pistols, has been the market driver
for the increased production and sales.

14.    In Busse's declaration, he asserts the gun industry is responsible for collectively
pushing AR-15 style rifles and "high capacity" magazines onto the market – a notion that fails
to consider the myriad of factors that influence consumer purchasing behavior. There are many
fine marketing professionals in the industry capable of creating innovative campaigns, but they
still are forced to compete for consumer attention without access to most standard marketing
avenues. Marketing is severely restricted and companies in the firearms industry are prohibited
or limited when using typical services to sell to the consumers through means of television,
Google Ads, e-commerce platforms, merchant payment processing services and mainstream
social media (Facebook, Instagram, YouTube, etc). Without the ability to advertise via most
technology, industry does its best to respond to consumer demand with antiquated feedback
channels. Most firearms industry advertising is limited to endemic periodicals, limited cable
television channels such as the Outdoor Channel, and websites visited directly by consumers
or found through organic search results.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

15.     While firearms manufacturers have had restrictions imposed upon on their abilities to market, there are other factors to consider for the proliferation and popularity of the AR-15 and similar rifles that were completely outside of the scope of the industry. For example, the Global War on Terror (GWOT) starting in 2001 produced images and video of American service members with their rifles and tactical gear, which was broadcast across major media outlets. In the early years of the war, the televised GWOT exposed the entire American consumer market to the likeness of the iconic Colt and FN M4/M16 fueling awareness of the semi-automatic commercial AR-15 style rifle. The War on Terror has continued for decades, and a generation of consumers, including service members, now desired to own AR-15 style semi-automatic rifles.  There is a long history of service rifles becoming familiar to the generation that used them in conflict, and the resulting desire to bring those rifles home from service and onto the shooting range and into the field for sporting uses.

16.     However, the Hughes Amendment, a portion of the Firearm Owners' Protection Act of 1986, which essentially banned the civilian ownership of machine guns made after 1986, prevents this practice in some form from continuing. The military issued machine guns are no longer allowed to be transferred, but the desire to own and use the issued rifles has not subsided.  While in my role at FN America, I directed the design and sales for most of the commercial FN15 model rifles. Additionally, I was instrumental in creating and launching the Military Collector Series consisting of the FN15 M4, FN15 M16 and FN M249s. This Military Collector Series was comprised of semi-automatic replicas of the government issued M4, M16, and M249.  These rifles were exceptionally well received by general commercial customers and service members desiring a replica of their issued rifle. The consumer demand for these

rifles for sport and self-defense was driven mainly by the customer's familiarity with the designs either through service or media exposure.

17.    Today the AR-15 style rifle is one of the most popular rifles in America. However, that popularity was not just engineered by the firearms industry, who have limited advertising channels. Rather, the popularity of this firearm has more to do with the design's features, benefits, and adaptability to be well suited for a wide array of legitimate uses. These rifles are commonly used for lawful purposes, including target and sport shooting, and they are also good for use in self-defense situations due to most owners' familiarity with the rifle. To quantify the acceptance and widespread adoption of these rifles, it is of note that according to the 2021 National Firearms Survey (expanded May 2022) about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.[2]

**"Large Capacity Magazines" and the Firearms Market**

18.    Busse's declaration asserts that "large capacity magazines" (LCM) are only recently popular, which is a specious argument. In 1993, the year prior to the 1994 federal ban, semi-automatic pistols accounted for 80% of handguns produced in the US.[3] According to Christopher S. Koper in his 2004 Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003 report "*Approximately 40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models being manufactured and advertised prior to the ban were sold with LCMs or had a variation that*

---

[2] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at
SSRN: https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494
[3] *(Zawitz, 1995, p. 3). PDF attachment*

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

*was sold with an LCM"*.[4] This study clearly illustrates the significance of large capacity magazines on the market even before the Federal Assault Weapons Ban. This is further corroborated by the fact that there were enough LCMs in circulation prior to the AWB to sustain their availability in the marketplace for 10 years. LCMs were available for consumers to purchase throughout the entirety of the federal ban, though their market price rose as new supply was restricted. Today, that trend of most pistols and rifles being sold with LCMs continues to grow. The vast majority of popular handguns today come standard with 15-20+ round magazines, and semi-automatic AR-15 style rifles are sold with 30-round magazines. The 2021 National Firearms Survey (expanded May 2022) reported:

> **48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.[5]**

19.     As far as I am aware, the legal concept at the federal level of using the arbitrary quantity of greater than 10 rounds to define a magazine as a "large capacity ammunition feeding device" first appeared in the Violent Crime Control and Law Enforcement Act of 1994. Since the inception of magazine fed firearms, designers explored magazine designs and manufacturing methods to maximize intended functionality and reliability of their firearms without arbitrary capacity limitations. It wasn't until restrictions were legally mandated did engineers modify or alter their designs to conform to a random capacity limit. In order to comply with capacity laws, manufacturers were compelled to redesign or modify existing standard capacity magazines to limit their capacity to hold no more than 10rds, with severe

---

[4] https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

[5] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at
SSRN: https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494

consequences if an 11th round can still be forced in the magazine. Often the regulations are left ambiguous and subject to court interpretation after the fact as to what constitutes a permanent modification preventing the magazine from being considered readily convertible back to standard capacity. Manufacturers make every effort to avoid exposing themselves and their customers to this legal risk. Reducing the standard capacity of a magazine to hold 10 or fewer rounds has been accomplished through a variety of methods, some of which result in a less than optimal magazine design while potentially introducing a higher risk of failure, increased costs, and often adding unnecessary complexity. Some of the methods used to reduce capacity include:

1. Narrowing of the internal width down the entire length of the magazine, altering the internal geometry from the original design intent.
2. Creating indentations in the side of the magazine designed to limit the downward travel of the follower in the magazine tube. This method is sometimes coupled with weakening cuts made to the remainder of the circumference of the magazine tube adjacent to the indentations. In this design the magazine spring usually extends to the baseplate and is at risk of catching or hanging up on the indentations, impeding normal operation.
3. Shortening the magazine tube in conjunction with designing a novel base pad that extends upward into the firearm to connect with and complete the magazine assembly. These base pads with magazine tube extender pieces are more complicated to use, costly to manufacture, and their increased complexity invites a possible reduction in structural integrity.
4. Inserting an object into the magazine to limit follower travel and permanently attaching the base pad to encapsulate the object in the magazine tube. Permanently attaching a base pad prevents disassembly to properly clean the magazine, resulting in a severe degradation of performance and reliability.
   a. *Note:* Busse cites the example of plugs being inserted in tubular magazines to reduce the rounds in a shotgun to comply with state wildlife regulations, which would satisfy the requirement for a game warden inspection while the shotgun is in use but would not meet the requirement for a "permanent" modification to reduce a magazine's capacity.[6]

---

[6] Declaration of Ryan Busse, ¶ 14

5. Installing a pin or rivet through the exterior of the magazine body to limit the travel of the follower.

Magazines are an Integral Part of a Firearm

20.     The burden on the manufacturers to produce these 10rd or less magazines was reduced with the sunset of the AWB in 2004. The few states remaining with their own capacity limits require manufacturers to continue to modify their products as described above to comply with the restrictions. This increases costs for manufacturers to design or redesign magazines, producing lower quantities of the restricted magazines that potentially don't reach the manufacturing amounts required to realize volume savings. Manufacturers may also choose not to offer the affected models for sale to the residents of the restrictive state, reducing the options for those residents to select from.

21.     Magazine fed firearms are systems with many parts that must function together in order to operate properly, and the ammunition feeding device is critical to the overall performance and success of the firearm. To this day, especially in modern handguns, the magazine is often the cornerstone of the pistol design. Unless designing a new pistol to utilize an existing magazine, engineers will start a new pistol project with designing the magazine first. The ammunition feeding device must be optimized to reliably deliver cartridges into the operating system. The engineers must consider the dimensions of the cartridge, with specific attention to the cartridge case being either a straight wall or a tapered case, and angles at which the magazine presents cartridges to the action.  The manner in which the magazine and action interface is critical.  The remainder of the firearm design builds upon the foundation laid by the magazine's form.  Many, if not most, modern pistols are built around a magazine designed to hold more than 10 rounds. Pistols designed for defensive use balance maximizing the

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

number of rounds carried for personal protection within a size constraint of the pistol to perform its intended function. Even though subcompact pistols are designed primarily for concealment and safety while carrying, designers also attempt to maximize magazine capacity as well. Pistols designed for recreation, sport, and competition are usually designed to maximize capacity, accuracy, and reliability with few constraints on size.

22.     As an integral part of the firearm, magazines are required for proper function. While firearms are one of the few consumer items designed for several lifetimes of service, their magazines are an item that can degrade with use. In addition to the routine maintenance of replacing springs and worn followers, feed lips of magazines which hold the next round in position to be presented to the action, may both wear and crack from the cycling of the action. Magazines and their feed lips are also susceptible to bending, cracking, denting, or deforming and being rendered unserviceable when dropped during normal use. This is not uncommon, and therefore, not an exceptionally rare occurrence that would only affect high volume shooters.  Shooters run the risk of damaging a magazine every time they practice a reload and eject a magazine onto the ground.

23.     A prudent firearms owner will purchase enough magazines to sustain the use of their firearm as intended over the remainder of their lifetime, accounting for damaged and worn-out magazines along the way. Many handguns and rifles have proprietary magazines that are specific to the manufacturer, product family, and many times the specific model. Replacement magazines may not be available in the future as there is no guarantee the manufacturer will be in business to support the platform, and there is no guarantee that an aftermarket company will produce that specific magazine. A firearm without a functional magazine is of little use to an owner, and of little value to another consumer. There is less risk

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

for consumers that possess firearms capable of accepting a magazine with a somewhat standardized interface.  These firearms are generally older legacy designs that were used in rifles and pistols adopted by militaries.  Magazines for the AR-15 style rifles and model 1911 pistols fall into this category.  Busse uses only these two limited examples to proclaim magazines as a universal accessory.[7] He fails to address hundreds of popular models of handguns and rifles that use proprietary magazines. Previously owned proprietary magazines that become damaged during use, may be refurbished by the consumer through the replacement of damaged parts. During the 1994-2004 AWB period, individual manufacturers would not sell consumers all the magazine components required to build a new magazine. Some would designate a single component of the magazine as their control item and refuse to sell that item to consumers. Any consumer needing to repair a legally owned pre-ban magazine was out of luck if they had broken or damaged the restricted part.

24.     As previously stated, magazines are so critical to the firearm, engineers often start the design of a new firearm around the magazine. Magazines are a highly specialized item to manufacture, whether they are stamped and welded from steel or aluminum, injection molded from an advanced polymer, or a combination of stamped feed lip and mag catch parts over-molded into a polymer body.  These specific manufacturing processes require specialized equipment, skillsets, and sometimes stabilized environments not found in most firearms manufacturing facilities. Firearms manufacturers choose to utilize the services of highly skilled outside vendors to deliver a superior product built to their design specifications precisely because of the importance of the magazine in the overall system. As an added benefit to all

---

[7] Busse, ¶ 9

commercial, law enforcement, and military customers, these specialized magazine companies have grown and matured and are far more capable to produce significantly higher quality products for the entire marketplace. Magazines built today are some of the most advanced magazines in history and as a result, are structurally safer and more reliable for the end user. Gun barrels and other critical components are also routinely outsourced to specialized manufacturers. For example, a firearm manufacturer may specify a hammer forged barrel to meet safety and performance standards, and it would be absurd to contend the mere act of outsourcing somehow reduces the importance of the barrel.

25.    The magazine is correctly considered an integral part of the firearm, not merely an accessory. It is considered such a vital part of the firearm that the magazine's value is included in the cost of the firearm for calculation of the Firearms and Ammunition Excise Tax (FAET) paid by the manufacturer or importer.[8] It is only additional magazines that are treated as non-taxable extra parts. To contrast, accessories, even if included with the firearm, are not subject to FAET. Typical examples of accessories include holsters, cleaning kits, gun locks, optics, and other accoutrement not critical to the function of the firearm.

**Consumer Demand and Defensive Pistol Selection**

26.    In Busse's declaration he focuses heavily on the 1911 design as the foundational basis to claim 7 or 8 rounds of ammunition is more than adequate for a defensive pistol. This limited perspective is understandable given his career at one of the larger manufacturers of 1911 style pistols. However, there are a multitude of shortcomings with the anecdotal statements employed to support this position. There are exponentially greater numbers of

---

[8] https://www.ttb.gov/images/pdfs/presentations/FAET-Return-Walkthrough.pdf

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

pistols more effective for self-defense while offering a superior balance of reliability, affordability, and capacity. It is widely understood that most of the less expensive models of 1911s, and even many of the mid-level price point pistols in the $1000-$1500 range from companies like Colt and Kimber may require an additional investment in gunsmithing services to make them suitably reliable for defensive use.  Many people cannot afford one of the higher priced 1911 pistols that are generally suitable for defense from the manufacturer, nor can everyone handle the recoil of the .45 ACP and have the confidence to defend themselves with the 7 or 8 rounds available. Persons of a smaller stature and/or having reduced strength may select a 1911 design pistol in 9mm for its reduced recoil, but in turn they are accepting the accompanying risk of using single stack 9mm magazines which are inherently less reliable due to the tapered case of the 9mm cartridge. The 1911 design is also less intuitive and requires more familiarity and training for novice shooters to master. For these and many other reasons, many of the leading firearms trainers in the country recommend a multitude of superior modern design pistol options for self-defense firearms.

27.     In comparing aggregated data on broad categories of self-defense pistols, the BATF&E's 2020 Annual Firearms Manufacturing and Export Report does not give specific model information, but rather we can make inferences from the pistol category, which is broken down into caliber ranges. We find there were just shy of 3.9 million 9mm and .380 pistols manufactured in 2020, and in comparison, just over 705,000 pistols comprise the up to .50 caliber category.[9] This category includes all pistols chambered in .45 ACP, not just 1911s, as well as additional designs and calibers such as the .40 S&W, making the 1911 production

---

[9] 2022.06.10_afmer_2020_cover_sheet_508 (1) PDF Attached

somewhere below that ceiling. With further examination of the manufacturer's individual

reporting data, it is evident the market clearly indicates significantly higher demand for modern

pistols in smaller calibers and higher capacity than .45 ACP pistols.

28.     The 2021 National Firearms Survey (expanded May 2022) provides pertinent

information regarding the carry and use of firearms for self-defense. Information and graph

from the Survey:

> 31.1% of gun owners, or approximately 25.3 million adult Americans, have used a
> gun in self-defense. Gun owners engage in approximately 1.67 million defensive uses
> of firearms per year. Handguns are the firearm most commonly used in defensive
> incidents (65.9%) The majority of defensive gun uses take place outside of the home
> (74.8%). About half of defensive gun uses involve more than one assailant (51.2%).



How many assailants were involved? (%)

29.     Conclusions drawn in the survey state that "presumably, it would be

advantageous to have a firearm with a larger capacity magazine if one needed to engage more

than one assailant, which these responses suggest is indeed common. Although in most

defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of

incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self-

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

defense, multiple rounds were fired."[10] A law abiding person that carries a firearm for defense of themselves and their loved ones, does not have the luxury of knowing when and where they will be forced to react to an attack.  Large capacity magazines afford responsible citizens a similar advantage extended to first responders to prevail and return home safely.  A person in a life-or-death self-defense situation has enough challenges to overcome, without an arbitrary restriction on the number of rounds in the magazine available to them in that moment of their greatest need.

**Conclusion**

30.     It is my findings, as an industry expert with a range of backgrounds in the tactical firearms market and culture, that several factors contributed to the popularity of the AR-15 style and comparable rifles starting in the 1960s and that this phenomenon is not solely the result of an industry marketing scheme. These rifles are a superb choice for personal defense, target shooting, competition, and hunting for the broadest spectrum of lawful users of all sizes and abilities.  Furthermore, I conclude that large capacity magazines have been popular since well before their 1994 regulation and rebut any assertion that these magazines were not common at the time. Additionally, I provided a perspective on the importance of a magazine to firearms design as well as ways in which the industry have improved these magazines to be of superior technology ultimately being fundamentally safer. I finish the report with an analysis on the proliferation of smaller caliber and higher capacity self-defense handguns that have far surpassed the production and popularity of the 1911 style design in

---

[10] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at
SSRN: https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

today's gun ownership community. Finally, I note that many of the pistols that have a common

magazine capacity that exceeds 10 rounds are useful in self-defense and for other lawful

purposes.

Dated this ⎯29⎯ day of December 2022.


Mark Hanish
Mark Hanish
Declarant

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**U.S. Department of Justice**
Office of Justice Programs



# Bureau of Justice Statistics
# Selected Findings

July 1995, NCJ-148201

## *Firearms, crime, and criminal justice*

# Guns Used in Crime

By Marianne W. Zawitz
BJS Statistician

### How often are guns used in violent crimes?

According to the National Crime Victimization Survey (NCVS), almost 43.6 million criminal victimizations occurred in 1993, including 4.4 million violent crimes of rape and sexual assault, robbery, and aggravated assault. Of the victims of these violent crimes, 1.3 million (29%) stated that they faced an offender with a firearm.*

In 1993, the FBI's *Crime in the United States* estimated that almost 2 million violent crimes of murder, rape, robbery, and aggravated assault were reported to the police by citizens. About 582,000 of these reported murders, robberies, and aggravated assaults were committed with firearms. Murder was the crime that most frequently involved firearms; 70% of the 24,526 murders in 1993 were committed with firearms.

### How do we know about the guns used by criminals?

No national collection of data contains detailed information about all of the guns used in crimes. Snapshots of

## Highlights

- Although most crime is not committed with guns, most gun crime is committed with handguns. *pages 1 & 2*
- Although most available guns are not used in crime, information about the 223 million guns available to the general public provides a context for evaluating criminal preferences for guns. *page 2*
- By definition, stolen guns are available to criminals. The FBI's National Crime Information Center (NCIC) stolen gun file contains over 2 million reports; 60% are reports of stolen handguns. *page 3*
- In 1994, the Bureau of Alcohol, Tobacco and Firearms (ATF) received over 85,132 requests from law enforcement agencies for traces of guns used in crime. Over three-quarters of the guns traced by the ATF in 1994 were handguns (mostly pistols), and almost a third were less than 3 years old. *page 4*
- Surveys of inmates show that they prefer concealable, large caliber guns. Juvenile offenders appear to be more likely to possess guns than adults. *page 5*
- Studies of the guns used in homicides show that large caliber revolvers are the most frequent type of gun used in homicides, but the number of large caliber semiautomatic guns used in murders is increasing. *page 5*
- Little information exists about the use of assault weapons in crime. The information that does exist uses varying definitions of assault weapons that were developed before the Federal assault weapons ban was enacted. *page 6*

information about the guns used by criminals are available from—
- official police records concerning the guns recovered in crimes and reports gathered from victims
- surveys that interview criminals
- surveys that interview victims of crime.

From these sources, we know how often guns are involved in crime, how guns are used in crime, what general categories of firearms are most often used in crime, and, to a limited extent, the specific types of guns most frequently used by criminals.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| What are the different types of firearms? | |
|---|---|
| **Types** | |
| **Handgun** | A weapon designed to fire a small projectile from one or more barrels when held in one hand with a short stock designed to be gripped by one hand. |
| Revolver | A handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges, each within a separate chamber. Before a revolver fires, the cylinder rotates, and the next chamber is aligned with the barrel. |
| Pistol | Any handgun that does not contain its ammunition in a revolving cylinder. Pistols can be manually operated or semiautomatic. A semiautomatic pistol generally contains cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered. |
| Derringer | A small single- or multiple-shot handgun other than a revolver or semiautomatic pistol. |
| **Rifle** | A weapon intended to be fired from the shoulder that uses the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger. |
| **Shotgun** | A weapon intended to be fired from the shoulder that uses the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger. |
| **Firing action** | |
| Fully automatic | Capability to fire a succession of cartridges so long as the trigger is depressed or until the ammunition supply is exhausted. Automatic weapons are considered machineguns subject to the provisions of the National Firearms Act. |
| Semiautomatic | An autoloading action that will fire only a single shot for each single function of a trigger. |
| Machinegun | Any weapon that shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot without manual reloading by a single function of the trigger. |
| Submachinegun | A simple fully automatic weapon that fires a pistol cartridge that is also referred to as a machine pistol. |
| **Ammunition** | |
| Caliber | The size of the ammunition that a weapon is designed to shoot, as measured by the bullet's approximate diameter in inches in the United States and in millimeters in other countries. In some instances, ammunition is described with additional terms, such as the year of its introduction (.30/06) or the name of the designer (.30 Newton). In some countries, ammunition is also described in terms of the length of the cartridge case (7.62 x 63 mm). |
| Gauge | For shotguns, the number of spherical balls of pure lead, each exactly fitting the bore, that equals one pound. |

Sources: ATF, *Firearms & Explosives Tracing Guidebook,* September 1993, pp. 35-40, and Paul C. Giannelli, "Ballistics Evidence: Firearms Identification," *Criminal Law Bulletin,* May-June 1991, pp. 195-215.

**Handguns are most often the type of firearm used in crime**

• According to the Victim Survey (NCVS), 25% of the victims of rape and sexual assault, robbery, and aggravated assault in 1993 faced an offender armed with a handgun. Of all firearm-related crime reported to the survey, 86% involved handguns.

• The FBI's Supplemental Homicide Reports show that 57% of all murders in 1993 were committed with handguns, 3% with rifles, 5% with shotguns, and 5% with firearms where the type was unknown.

• The 1991 Survey of State Prison Inmates found that violent inmates who used a weapon were more likely to use a handgun than any other weapon; 24% of all violent inmates reported that they used a handgun. Of all inmates, 13% reported carrying a handgun when they committed the offense for which they were serving time.

**What types of guns do criminals prefer?**

Research by Wright and Rossi in the 1980's found that most criminals prefer guns that are easily concealable, large caliber, and well made. Their studies also found that the handguns used by the felons interviewed were similar to the handguns available to the general public, except that the criminals preferred larger caliber guns.

**What types of guns are available generally?**

The Bureau of Alcohol, Tobacco and Firearms (ATF) estimates that from 1899 to 1993 about 223 million guns became available in the United States, including over 79 million rifles, 77 million handguns, and 66 million shotguns. The number of guns seized, destroyed, lost, or not working is unknown.

The number of new handguns added to those available has exceeded the number of new shotguns and rifles in recent years. More than half of the guns added in 1993 were handguns.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Over 40 million handguns have been produced in the United States since 1973.

Since over 80% of the guns available in the United States are manufactured here, gun production is a reasonable indicator of the guns made available. From 1973 to 1993, U.S. manufacturers produced —
• 6.6 million .357 Magnum revolvers
• 6.5 million .38 Special revolvers
• 5.4 million .22 caliber pistols
• 5.3 million .22 caliber revolvers
• 4.5 million .25 caliber pistols
• 3.1 million 9 millimeter pistols
• 2.4 million .380 caliber pistols
• 2.2 million .44 Magnum revolvers
• 1.7 million .45 caliber pistols
• 1.2 million .32 caliber revolvers.

During the two decades from 1973 to 1993, the types of handguns most frequently produced have changed. Most new handguns are pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993.

The number of large caliber pistols produced annually increased substantially after 1986. Until the mid-1980's, most pistols produced in the United States were .22 and .25 caliber models. Production of .380 caliber and 9 millimeter pistols began to increase substantially in 1987, so that by 1993 they became the most frequently produced pistols. From 1991 to 1993, the last 3 years for which data are available, the most frequently produced handguns were —
• .380 caliber pistols (20%)
• 9 millimeter pistols (19%)
• .22 caliber pistols (17%)
• .25 caliber pistols (13%)
• .50 caliber pistols (8%).

## Stolen guns are a source of weapons for criminals

All stolen guns are available to criminals by definition. Recent studies of adult and juvenile offenders show that many have either stolen a firearm or kept, sold, or traded a stolen firearm:
• According to the 1991 Survey of State Prison Inmates, among those inmates who possessed a handgun, 9% had acquired it through theft, and 28% had acquired it through an illegal market such as a drug dealer or fence. Of all inmates, 10% had stolen at least one gun, and 11% had sold or traded stolen guns.
• Studies of adult and juvenile offenders that the Virginia Department of Criminal Justice Services conducted in 1992 and 1993 found that 15% of the adult offenders and 19% of the juvenile offenders had stolen guns; 16% of the adults and 24% of the juveniles had kept a stolen gun; and 20% of the adults and 30% of the juveniles had sold or traded a stolen gun.
• From a sample of juvenile inmates in four States, Sheley and Wright found that more than 50% had stolen a gun at least once in their lives and 24% had stolen their most recently obtained handgun. They concluded that theft and burglary were the original, not always the proximate, source of many guns acquired by the juveniles.

## How many guns are stolen?

The Victim Survey (NCVS) estimates that there were 341,000 incidents of firearm theft from private citizens annually from 1987 to 1992. Because the survey does not ask how many guns were stolen, the number of guns stolen probably exceeds the number of incidents of gun theft.

The FBI's National Crime Information Center (NCIC) stolen gun file contained over 2 million reports as of March 1995. In 1994, over 306,000 entries were added to this file including a variety of guns, ammunition, cannons, and grenades. Reports of stolen guns are included in the NCIC files when citizens report a theft to law enforcement agencies that submit a report to the FBI. All entries must include make, caliber, and serial number. Initiated in 1967, the NCIC stolen gun file retains all entries indefinitely unless a recovery is reported.

### Most stolen guns are handguns

Victims report to the Victim Survey that handguns were stolen in 53% of the thefts of guns. The FBI's stolen gun file's 2 million reports include information on —
• 1.26 million handguns (almost 60%)
• 470,000 rifles (22%)
• 356,000 shotguns (17%).



**From 1985 to 1994, the FBI received an annual average of over 274,000 reports of stolen guns**

Number of stolen gun entries into NCIC

Source: FBI, National Crime Information Center, 1995.

## How many automatic weapons are stolen?

Under the provisions of the National Firearms Act, all automatic weapons such as machine guns must be registered with the ATF. In 1995, over 240,000 automatic weapons were registered with the ATF. As of March 1995, the NCIC stolen gun file contained reports on about 7,700 machine guns and submachine guns.

## What types of handguns are most frequently stolen?

Most frequently reported handguns in the NCIC stolen gun file

| Percent of stolen handguns | Number | Caliber | Type |
|---|---|---|---|
| 20.5% | 259,184 | .38 | Revolver |
| 11.7 | 147,681 | .22 | Revolver |
| 11.6 | 146,474 | .357 | Revolver |
| 8.8 | 111,558 | 9 mm | Semiautomatic |
| 7.0 | 87,714 | .25 | Semiautomatic |
| 6.7 | 84,474 | .22 | Semiautomatic |
| 5.4 | 68,112 | .380 | Semiautomatic |
| 3.7 | 46,503 | .45 | Semiautomatic |
| 3.3 | 41,318 | .32 | Revolver |
| 3.1 | 39,254 | .44 | Revolver |
| 1.5 | 18,377 | .32 | Semiautomatic |
| 1.3 | 16,214 | .45 | Revolver |

## Upon request, the ATF traces some guns used in crime to their origin

The National Tracing Center of ATF traces firearms to their original point of sale upon the request of police agencies. The requesting agency can use this information to assist in identifying suspects, providing evidence for subsequent prosecution, establishing stolen status, and proving ownership. The number of requests for firearms traces increased from 37,181 in 1990 to 85,132 in 1994.

Trace requests represent an unknown portion of all the guns used in crimes. ATF is not able to trace guns manufactured before 1968, most surplus military weapons, imported guns without the importer's name, stolen guns, and guns missing a legible serial number.

Police agencies do not request traces on all firearms used in crimes. Not all firearms used in crimes are recovered so that a trace could be done and, in some States and localities, the police agencies may be able to establish ownership locally without going to the ATF.

## Most trace requests concern handguns

Over half of the guns that police agencies asked ATF to trace were pistols and another quarter were revolvers.

| Type of gun | Percent of all 1994 traces |
|---|---|
| Total | 100.0% |
| Handgun | 79.1 |
| Pistol | 53.0 |
| Pistol Revolver | 24.7 |
| Pistol Derringer | 1.4 |
| Rifle | 11.1 |
| Shotgun | 9.7 |
| Other including machinegun | 0.1 |

While trace requests for all types of guns increased in recent years, the number of pistols traced increased the most, doubling from 1990 to 1994.

## What are the countries of origin of the guns that are traced?

Traced guns come from many countries across the globe. However, 78% of the guns that were traced in 1994 originated in the United States and most of the rest were from —

- Brazil (5%)
- Germany (3%)
- China (3%)
- Austria (3%)
- Italy (2%)
- Spain (2%).

## Almost a third of the guns traced by ATF in 1994 were 3 years old or less

| Age of traced guns | Traces completed in 1994 | |
|---|---|---|
| | Number | Percent |
| Total | 83,362 | 100% |
| Less than 1 year | 4,072 | 5 |
| 1 year | 11,617 | 14 |
| 2 years | 6,764 | 8 |
| 3 years | 4,369 | 5 |

## What crimes are most likely to result in a gun-tracing request?

| Crime type | Percent of all 1994 traces | Percent of traces by crime type | | | | | | |
| | | Handgun | | | | | Rifle | Shotgun |
| | | Total | Total | Pistol | Pistol Derringer | Pistol Revolver | | |
|---|---|---|---|---|---|---|---|---|
| Weapons offenses | 72% | 100% | 81% | 55% | 1% | 25% | 10% | 9% |
| Drug offenses | 12 | 100 | 75 | 50 | 2 | 23 | 14 | 11 |
| Homicide | 6 | 100 | 79 | 49 | 1 | 29 | 11 | 10 |
| Assault | 5 | 100 | 80 | 50 | 1 | 28 | 10 | 11 |
| Burglary | 2 | 100 | 57 | 34 | 1 | 22 | 24 | 19 |
| Robbery | 2 | 100 | 84 | 53 | 1 | 29 | 7 | 10 |
| Other | 2 | 100 | 76 | 54 | 1 | 21 | 14 | 10 |

Note: Detail may not add to total because of rounding.
Source: ATF, unpublished data, May 1995.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

### What guns are the most frequently traced?

The most frequently traced guns vary from year to year.  The ATF publishes a list of the 10 specific guns most frequently traced annually.  The total number of traced guns on the top 10 list was 18% of the total traced from 1991 to 1994.  Most of the top 10 guns were pistols (over 30% were .25 caliber pistols), although a number of revolvers and a few shotguns and rifles were also included.  The most frequently traced gun was a Smith and Wesson .38 caliber revolver in 1990, the Raven Arms P25 (a .25 caliber pistol) from 1991 through 1993, and the Lorcin P25  in 1994.

**10 most frequently traced guns in 1994**

| Rank | Manufacturer | Model | Caliber | Type | Number traced |
|------|-------------|-------|---------|------|---------------|
| 1 | Lorcin | P25 | .25 | Pistol | 3,223 |
| 2 | Davis Industries | P380 | .38 | Pistol | 2,454 |
| 3 | Raven Arms | MP25 | .25 | Pistol | 2,107 |
| 4 | Lorcin | L25 | .25 | Pistol | 1,258 |
| 5 | Mossburg | 500 | 12G | Shotgun | 1,015 |
| 6 | Phoenix Arms | Raven | .25 | Pistol | 959 |
| 7 | Jennings | J22 | .22 | Pistol | 929 |
| 8 | Ruger | P89 | 9 mm | Pistol | 895 |
| 9 | Glock | 17 | 9 mm | Pistol | 843 |
| 10 | Bryco | 38 | .38 | Pistol | 820 |

Source:  ATF, May 1995.

### What caliber guns do criminals prefer?

In their 1983 study, Wright, Rossi, and Daly asked a sample of felons about the handgun they had most recently acquired.  Of the felons sampled —
• 29% had acquired a .38 caliber handgun
• 20% had acquired a .357 caliber handgun
• 16% had acquired a .22 caliber handgun.

Sheley and Wright found that the juvenile inmates in their 1991 sample in four States preferred large caliber, high quality handguns.  Just prior to their confinement —
• 58% owned a revolver, usually a .38 or .357 caliber gun
• 55% owned a semiautomatic handgun, usually a 9 millimeter or .45 caliber gun
• 51% owned a sawed-off shotgun
• 35% owned a military-style automatic or semiautomatic rifle.

### Do juvenile offenders use different types of guns than adult offenders?

A study of adult and juvenile offenders by the Virginia Department of Criminal Justice Services found that juvenile offenders were more likely than adults to have carried a semiautomatic pistol at the crime scene (18% versus 7%).

They were also more likely to have carried a revolver (10% versus 7%).  The same proportion of adults and juveniles (3%) carried a shotgun or rifle at the crime scene.

### Some studies of guns used in homicides provide information about caliber

McGonigal and colleagues at the University of Pennsylvania Medical Center studied firearm homicides that occurred in Philadelphia: 145 in 1985 and 324 in 1990.  Most of the firearms used in the homicides studied were handguns: 90% in 1985 and 95% in 1990.  In both years, revolvers were the predominant type of handgun used; however, the use of semiautomatic pistols increased from 24% in 1985 to 38% in 1990.  The caliber of the handguns used also changed:

In Philadelphia, handguns most often used:

| In 1985, of 91 homicides | | In 1990, of 204 homicides | |
|---|---|---|---|
| 44% | .38 caliber revolver | 23% | 9 mm pistol |
| 19% | .25 caliber pistol | 18% | .38 caliber revolver |
| 14% | .22 caliber revolver | 16% | .357 caliber revolver |
| 14% | .32 caliber revolver | 16% | .22 caliber revolver |
| 3% | 9 mm pistol | 10% | .32 caliber revolver |
| 2% | .357 caliber revolver | 6% | .380 caliber pistol |

The Virginia Department of Criminal Justice Services studied 844 homicides that occurred in 18 jurisdictions from 1989 through 1991.  Firearms were identified as the murder weapon in 600 cases.  Over 70% of the firearms used were handguns.  Of those handguns for which the caliber and firing action could be identified, 19% were .38 caliber revolvers, 10% were .22 caliber revolvers, and 9% were 9 millimeter semiautomatic pistols.

The Hawaii Department of the Attorney General, Crime Prevention Division, studied 59 firearm-related homicides in Honolulu from 1988 to 1992.  Handguns were used in 48 homicides (over 80%) including 11 handguns of 9 millimeter caliber, 10 of .357 caliber, 10 of .38 caliber, and 5 of .25 caliber.

### What caliber guns are used in the killings of law enforcement officers?

From 1982 to 1993, of the 687 officers who were killed by firearms other than their own guns, more were killed by .38 caliber handguns than by any other type of weapon.

| Type of firearm | Percent of law enforcement officers killed with a firearm |
|---|---|
| .38 caliber handgun | 25.2% |
| .357 Magnum handgun | 12.1 |
| 9 millimeter handgun | 9.5 |
| 12 gauge shotgun | 7.4 |
| .22 caliber handgun | 5.4 |
| .22 caliber rifle | 4.4 |

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## How often are assault weapons used in crime?

Little information exists about the use of assault weapons in crime. The information that does exist uses varying definitions of assault weapons that were developed before the Federal assault weapons ban was enacted.

In general, assault weapons are semiautomatic firearms with a large magazine of ammunition that were designed and configured for rapid fire and combat use. An assault weapon can be a pistol, a rifle, or a shotgun. The Federal Violent Crime Control and Law Enforcement Act of 1994 bans the manufacture and sale of 19 specific assault weapons identified by make and manufacturer. It also provides for a ban on those weapons that have a combination of features such as flash suppressors and grenade launchers. The ban does not cover those weapons legally possessed before the law was enacted. The National Institute of Justice will be evaluating the effect of the ban and reporting to Congress in 1997.

In 1993 prior to the passage of the assault weapons ban, the Bureau of Alcohol, Tobacco and Firearms (ATF), reported that about 1% of the estimated 200 million guns in circulation were assault weapons. Of the gun-tracing requests received that year by ATF from law enforcement agencies, 8% involved assault weapons.

### Assault weapons and homicide

A New York State Division of Criminal Justice Services study of homicides in 1993 in New York City found that assault weapons were involved in 16% of the homicides studied. The definition of assault weapons used was from proposed but not enacted State legislation that was more expansive than the Federal legislation. By matching ballistics records and homicide files, the study found information on 366 firearms recovered in the homicides of 271 victims. Assault weapons were linked to the deaths of 43 victims (16% of those studied).

A study by the Virginia Department of Criminal Justice Services reviewed the files of 600 firearm murders that occurred in 18 jurisdictions from 1989 to 1991. The study found that handguns were used in 72% of the murders (431 murders). Ten guns were identified as assault weapons, including five pistols, four rifles, and one shotgun.

### Assault weapons and offenders

In the 1991 BJS Survey of State Inmates, about 8% of the inmates reported that they had owned a military-type weapon, such as an Uzi, AK-47, AR-15, or M-16. Less than 1% said that they carried such a weapon when they committed the incident for which they were incarcerated. A Virginia inmate survey conducted between November 1992 and May 1993 found similar results: About 10% of the adult inmates reported that they had ever possessed an assault rifle, but none had carried it at the scene of a crime.

Two studies indicate higher proportions of juvenile offenders reporting possession and use of assault rifles. The Virginia inmate survey also covered 192 juvenile offenders. About 20% reported that they had possessed an assault rifle and 1% said that they had carried it at the scene of a crime. In 1991, Sheley and Wright surveyed 835 serious juvenile offenders incarcerated in 6 facilities in 4 States. In the Sheley and Wright study, 35% of the juvenile inmates reported that they had owned a military-style automatic or semiautomatic rifle just prior to confinement.

### Sources

*Assault Weapons and Homicide in New York City,* Office of Justice Systems Analysis, New York State Division of Criminal Justice Services, May 1994.

Bureau of Alcohol, Tobacco and Firearms, *ATF Facts,* November 1994.

Bureau of Alcohol, Tobacco and Firearms, *Firearms & Explosives Tracing Guidebook,* September 1993.

Bureau of Alcohol, Tobacco and Firearms, unpublished data.

BJS, *Criminal Victimization 1993,* Bulletin, NCJ-151658, May 1995.

BJS, *Guns and Crime,* Crime Data Brief, NCJ-147003, April 1994.

BJS, National Crime Victimization Survey, 1992, unpublished data.

BJS, *Survey of State Prison Inmates, 1991,* NCJ-136949, March 1993.

"Crimes Committed with Firearms in the State of Hawaii, 1983-1992," *Crime Trends Series,* Department of the Attorney General, Crime Prevention Division, Vol. 2, Issue 1, April 1994.

Federal Bureau of Investigation, *Crime in the United States 1993,* October 4, 1994.

Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted,* annually 1987 to 1992.

Federal Bureau of Investigation, National Crime Information Center, unpublished data.

Giannelli, Paul C., "Ballistics Evidence: Firearms Identification," *Criminal Law Bulletin,* May-June 1991.

*Guns and Violent Crime,* Criminal Justice Research Center, Commonwealth of Virginia, Department of Criminal Justice Services, January 1994 with updated data for homicide study.

McGonigal, Michael D., MD, John Cole, BS, C. William Schwab, MD, Donald R. Kauder, MD, Michael R. Rotondo, MD, and Peter B. Angood, "Urban Firearm Deaths: A Five-year Perspective," *The Journal of Trauma,* Vol. 35, No. 4, October 1993, pp. 532-37.

Sheley, Joseph F., and James D. Wright, "Gun Acquisition and Possession in Selected Juvenile Samples," National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention, *Research in Brief,* NCJ-145326, December 1993.

Wright, James D., and Peter H. Rossi, *Armed and Considered Dangerous* (New York: Adline de Gruyter) 1986.

Wright, James D., Peter H. Rossi, and Kathleen Daly, *Under the Gun: Weapons, Crime, and Violence in America* (New York: Adline de Gruyter) 1983.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Note**

Data in this report from the 1993 National Crime Victimization Survey are the first released on this topic since the survey was redesigned. Because of changes in the methodology, direct comparisons with BJS's victim survey data from prior years are not appropriate. Additional information about the survey's redesign can be obtained from the Bureau of Justice Statistics Clearinghouse at 1-800-732-3277.

The Bureau of Justice Statistics is the statistical arm of the U.S. Department of Justice. Jan M. Chaiken, Ph.D., is director.

BJS Selected Findings summarize statistics about a topic of current concern from both BJS and non-BJS datasets.

Substantial assistance in preparing this document was provided by Roy Weise and Gary Boatman of the Criminal Justice Information Systems Division of the FBI; Edward Troiano, Emmett Masterson, Gerald Nunziato, Gary Kirchoff, and Kris Denholm of the Bureau of Alcohol, Tobacco and Firearms; Jim McDonough of the Virginia Department of Criminal Justice Services; Henry Brownstein and Kelly Haskin-Tenenini of the New York State Division of Criminal Justice Services; and Larry Greenfeld, Thomas Hester, and Michael Rand of the Bureau of Justice Statistics. Verification and publication review were provided by Yvonne Boston, Ida Hines, Rhonda Keith, and Priscilla Middleton of the Bureau of Justice Statistics.

July 1995, NCJ-148201

*Guns Used in Crime* is the first of a series of reports on firearms and crime that will become part of a longer document, *Firearms, Crime, and Criminal Justice*. Other topics to be covered in this series include weapons offenses and offenders, how criminals obtain guns, and intentional firearm injury. The full report will focus on the use of guns in crime, trends in gun crime, consequences of gun crimes, characteristics of offenders who use guns, and sanctions for offenders who use guns. This report will not cover the involvement of firearms in accidents or suicides.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:**

| | |
|---|---|
| **Document Title:** | **Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003** |
| **Author(s):** | **Christopher S. Koper** |
| **Document No.:** | **204431** |
| **Date Received:** | **July 2004** |
| **Award Number:** | **98-IJ-CX-0039** |

**This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.**

<div style="border:1px solid black; text-align:center;">

**Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.**

</div>

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets and Gun Violence, 1994-2003

## Report to the National Institute of Justice, United States Department of Justice

By

**Christopher S. Koper**
(Principal Investigator)

With

Daniel J. Woods and Jeffrey A. Roth

**June 2004**

Jerry Lee Center of Criminology
University of Pennsylvania
3814 Walnut Street
Philadelphia, PA 19104



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**TABLE OF CONTENTS**

Preface                                                                                          i
Acknowledgments                                                                                  ii

1. Impacts of the Federal Assault Weapons Ban, 1994-2003: Key Findings and
Conclusions                                                                                       1
2. Provisions of the Assault Weapons Ban                                                          4
    2.1. Assault Weapons                                                      4
    2.2. Large Capacity Magazines                                             6
    2.3. Foreign Rifles Capable of Accepting Large Capacity Magazines for
        Military Rifles                                    8
    2.4. Ban Exemptions                                                       10
    2.5. Summary                                                              11
3. Criminal Use of Assault Weapons and Large Capacity Magazines Before the
Ban                                                                                             14
    3.1. Criminal Use of Assault Weapons                                      15
    3.2. Criminal Use of Large Capacity Magazines                             18
    3.3. Summary                                                              19
4. Overview of Study Design, Hypotheses, and Prior Findings                                      20
    4.1. Logical Framework for Research on the Ban                            20
    4.2. Hypothesized Market Effects                                          21
    4.3. Prior Research on the Ban's Effects                                  23
5. Market Indicators for Assault Weapons: Prices and Production                                  25
    5.1. Price Trends for Assault Weapons and Other Firearms                  25
    5.2. Production Trends for Assault Weapons and Other Firearms             33
    5.3. Summary and Interpretations                                         36
6. Criminal Use of Assault Weapons After the Ban                                                 39
    6.1. Measuring Criminal Use of Assault Weapons: A Methodological
        Note                                              39
    6.2. National Analysis of Guns Reported By Police to the Federal
        Bureau of Alcohol, Tobacco, and Firearms          40
    6.3. Local Analyses of Guns Recovered By Police                           46
    6.4. Summary                                                              51
7. Market Indicators for Large Capacity Magazines: Prices and Importation                        61
    7.1. Price Trends for Large Capacity Magazines                            61
    7.2. Post-Ban Importation of Large Capacity Magazines                    65
    7.3. Summary and Interpretations                                         65

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

**TABLE OF CONTENTS (CONTINUED)**

8. Criminal Use of Large Capacity Magazines After the Ban                          68
        8.1.  Baltimore                                                              69
        8.2.  Anchorage                                                             73
        8.3.  Milwaukee                                                             75
        8.4.  Louisville                                                            77
        8.5.  Summary                                                              78
9.  The Consequences of Crimes With Assault Weapons and Large Capacity
Magazines                                                                          80
        9.1.  The Spread of Semiautomatic Weaponry and Trends in Lethal and
        Injurious Gun Violence Prior to the Ban                                     81
        9.2.  Shots Fired in Gun Attacks and the Effects of Weaponry on Attack
        Outcomes                                                                    83
        9.3.  Post-Ban Trends in Lethal and Injurious Gun Violence                  91
        9.4.  Summary                                                              96
10.  Looking to the Future: Research Recommendations and Speculation About
the Possible Consequences of Reauthorizing, Modifying, or Lifting the Assault
Weapons Ban                                                                        98
        10.1.  Research Recommendations and Data Requirements                       98
        10.2.  Potential Consequences of Reauthorizing, Modifying, or Lifting
        the Assault Weapons Ban                                                     100
References                                                                         102

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## PREFACE

Gun violence continues to be one of America's most serious crime problems. In 2000, over 10,000 persons were murdered with firearms and almost 49,000 more were shot in the course of over 340,000 assaults and robberies with guns (see the Federal Bureau of Investigation's annual *Uniform Crime Reports* and Simon et al., 2002). The total costs of gun violence in the United States – including medical, criminal justice, and other government and private costs – are on the order of at least $6 to $12 billion per year and, by more controversial estimates, could be as high as $80 billion per year (Cook and Ludwig, 2000).

However, there has been good news in recent years. Police statistics and national victimization surveys show that since the early 1990s, gun crime has plummeted to some of the lowest levels in decades (see the *Uniform Crime Reports* and Rennison, 2001). Have gun controls contributed to this decline, and, if so, which ones?

During the last decade, the federal government has undertaken a number of initiatives to suppress gun crime. These include, among others, the establishment of a national background check system for gun buyers (through the Brady Act), reforms of the licensing system for firearms dealers, a ban on juvenile handgun possession, and Project Safe Neighborhoods, a collaborative effort between U.S. Attorneys and local authorities to attack local gun crime problems and enhance punishment for gun offenders.

Perhaps the most controversial of these federal initiatives was the ban on semiautomatic assault weapons and large capacity ammunition magazines enacted as Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994*. This law prohibits a relatively small group of weapons considered by ban advocates to be particularly dangerous and attractive for criminal purposes. In this report, we investigate the ban's impacts on gun crime through the late 1990s and beyond. This study updates a prior report on the short-term effects of the ban (1994-1996) that members of this research team prepared for the U.S. Department of Justice and the U.S. Congress (Roth and Koper, 1997; 1999).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## ACKNOWLEDGMENTS

This research was supported by National Institute of Justice (U.S. Department of Justice) grants 2003-IJ-CX-1029 to the University of Pennsylvania and 98-IJ-CX-0039 to the Urban Institute.  The Jerry Lee Center of Criminology, University of Pennsylvania provided additional support.  The views expressed are those of the author.  They do not reflect official positions of the United States Department of Justice and should not be attributed to the trustees of the University of Pennsylvania, the Urban Institute, or any of the other persons or organizations listed below.

The author wishes to thank several people and organizations that assisted this effort in numerous ways.  Daniel Woods assisted with data analysis.  Jeffrey Roth, who directed our first study of the assault weapons ban, provided advice and editorial input.  Additional research assistance was provided by the following former employees of the Urban Institute:  Gretchen Moore, David Huffer, Erica Dinger, Darin Reedy, Kate Bunting, Katie Gorie, and Michele Waul.  The following persons and organizations provided databases, information, or other resources utilized for this report:  Glenn Pierce (Northeastern University), Pamela Shaw and Edward Koch (Baltimore Police Department), Robert Shem (Alaska State Police), Bill McGill and Mallory O'Brien (currently or formerly of the Firearm Injury Center, Medical College of Wisconsin), Rick Ruddell (California State University, Chico), Scott Doyle (Kentucky State Police), Terrence Austin and Joe Vince (currently or formerly of the Bureau of Alcohol, Tobacco, Firearms, and Explosives), Carlos Alvarez and Alan Lynn (Metro-Dade Police Department), Charles Branas (Firearm and Injury Center, University of Pennsylvania), Caroline Harlow (Bureau of Justice Statistics), and Rebecca Knox (Brady Center to Prevent Handgun Violence).  Robert Burrows (Bureau of Alcohol, Tobacco, Firearms, and Explosives) and Wain Roberts (Wain Roberts Firearms) shared technical expertise on firearms.  Anonymous reviewers for the National Institute of Justice provided thorough and helpful comments on earlier versions of this report, as did Terrence Austin and Robert Burrows of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  Finally, I thank Lois Mock, our National Institute of Justice grant monitor, for her advice and encouragement throughout all of the research that my colleagues and I have conducted on the assault weapons ban.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 1. IMPACTS OF THE FEDERAL ASSAULT WEAPONS BAN, 1994-2003:  KEY FINDINGS AND CONCLUSIONS

This overview presents key findings and conclusions from a study sponsored by the National Institute of Justice to investigate the effects of the federal assault weapons ban.  This study updates prior reports to the National Institute of Justice and the U.S. Congress on the assault weapons legislation.

### The Ban Attempts to Limit the Use of Guns with Military Style Features and Large Ammunition Capacities

- Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs).  The ban is directed at semiautomatic firearms having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense (examples include flash hiders, folding rifle stocks, and threaded barrels for attaching silencers).  The law bans 18 models and variations by name, as well as revolving cylinder shotguns.  It also has a "features test" provision banning other semiautomatics having two or more military-style features.  In sum, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 models and variations that are prohibited by the law.  A number of the banned guns are foreign semiautomatic rifles that have been banned from importation into the U.S. since 1989.

- The ban also prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to as large capacity magazines, or LCMs).  An LCM is arguably the most functionally important feature of most AWs, many of which have magazines holding 30 or more rounds.  The LCM ban's reach is broader than that of the AW ban because many non-banned semiautomatics accept LCMs.  Approximately 18% of civilian-owned firearms and 21% of civilian-owned handguns were equipped with LCMs as of 1994.

- The ban exempts AWs and LCMs manufactured before September 13, 1994.  At that time, there were upwards of 1.5 million privately owned AWs in the U.S. and nearly 25 million guns equipped with LCMs.  Gun industry sources estimated that there were 25 million pre-ban LCMs available in the U.S. as of 1995.  An additional 4.7 million pre-ban LCMs were imported into the country from 1995 through 2000, with the largest number in 1999.

- Arguably, the AW-LCM ban is intended to reduce gunshot victimizations by limiting the national stock of semiautomatic firearms with large ammunition capacities – which enable shooters to discharge many shots rapidly – and other features conducive to criminal uses.  The AW provision targets a relatively small number of weapons based on features that have little to do with the weapons'

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

1

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

operation, and removing those features is sufficient to make the weapons legal.
The LCM provision limits the ammunition capacity of non-banned firearms.

**The Banned Guns and Magazines Were Used in Up to A Quarter of Gun Crimes Prior to the Ban**

- AWs were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%. Most of the AWs used in crime are assault pistols rather than assault rifles.

- LCMs are used in crime much more often than AWs and accounted for 14% to 26% of guns used in crime prior to the ban.

- AWs and other guns equipped with LCMs tend to account for a higher share of guns used in murders of police and mass public shootings, though such incidents are very rare.

**The Ban's Success in Reducing Criminal Use of the Banned Guns and Magazines Has Been Mixed**

- Following implementation of the ban, the share of gun crimes involving AWs declined by 17% to 72% across the localities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995-2003 post-ban period. This is consistent with patterns found in national data on guns recovered by police and reported to ATF.

- The decline in the use of AWs has been due primarily to a reduction in the use of assault pistols (APs), which are used in crime more commonly than assault rifles (ARs). There has not been a clear decline in the use of ARs, though assessments are complicated by the rarity of crimes with these weapons and by substitution of post-ban rifles that are very similar to the banned AR models.

- However, the decline in AW use was offset throughout at least the late 1990s by steady or rising use of other guns equipped with LCMs in jurisdictions studied (Baltimore, Milwaukee, Louisville, and Anchorage). The failure to reduce LCM use has likely been due to the immense stock of exempted pre-ban magazines, which has been enhanced by recent imports.

**It is Premature to Make Definitive Assessments of the Ban's Impact on Gun Crime**

- Because the ban has not yet reduced the use of LCMs in crime, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. However, the ban's exemption of millions of pre-ban AWs and LCMs ensured that the effects

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

2

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

of the law would occur only gradually.  Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers.

**The Ban's Reauthorization or Expiration Could Affect Gunshot Victimizations, But Predictions are Tenuous**

- Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement.  AWs were rarely used in gun crimes even before the ban.  LCMs are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current magazine capacity limit) without reloading.

- Nonetheless, reducing criminal use of AWs and especially LCMs could have non-trivial effects on gunshot victimizations.  The few available studies suggest that attacks with semiautomatics – including AWs and other semiautomatics equipped with LCMs – result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms.  Further, a study of handgun attacks in one city found that 3% of the gunfire incidents resulted in more than 10 shots fired, and those attacks produced almost 5% of the gunshot victims.

- Restricting the flow of LCMs into the country from abroad may be necessary to achieve desired effects from the ban, particularly in the near future.  Whether mandating further design changes in the outward features of semiautomatic weapons (such as removing all military-style features) will produce measurable benefits beyond those of restricting ammunition capacity is unknown.  Past experience also suggests that Congressional discussion of broadening the AW ban to new models or features would raise prices and production of the weapons under discussion.

- If the ban is lifted, gun and magazine manufacturers may reintroduce AW models and LCMs, perhaps in substantial numbers.  In addition, pre-ban AWs may lose value and novelty, prompting some of their owners to sell them in undocumented secondhand markets where they can more easily reach high-risk users, such as criminals, terrorists, and other potential mass murderers.  Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations for the reasons noted above, though this effect could be difficult to measure.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 2. PROVISIONS OF THE ASSAULT WEAPONS BAN

### 2.1. Assault Weapons

Enacted on September 13, 1994, Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994* imposes a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs).[1]  The AW ban is not a prohibition on all semiautomatics.  Rather, it is directed at semiautomatics having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense.  Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept ammunition magazines holding large numbers of bullets.[2]  Indeed, several of the banned guns (e.g., the AR-15 and Avtomat Kalashnikov models) are civilian copies of military weapons and accept ammunition magazines made for those military weapons.

As summarized in Table 2-1, the law specifically prohibits nine narrowly defined groups of pistols, rifles, and shotguns.  A number of the weapons are foreign rifles that the federal government has banned from importation into the U.S. since 1989.  Exact copies of the named AWs are also banned, regardless of their manufacturer.  In addition, the ban contains a generic "features test" provision that generally prohibits other semiautomatic firearms having two or more military-style features, as described in Table 2-2.  In sum, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 model and caliber variations that meet the AW criteria established by the ban.[3]

Figures 2-1 and 2-2 illustrate a few prominent AWs and their features.  Figure 2-1 displays the Intratec TEC-9 assault pistol, the AW most frequently used in crime (e.g., see Roth and Koper 1997, Chapter 2).  Figure 2-2 depicts the AK-47 assault rifle, a weapon of Soviet design.  There are many variations of the AK-47 produced around the world, not all of which have the full complement of features illustrated in Figure 2-2.

---

[1]  A semiautomatic weapon fires one bullet for each squeeze of the trigger.  After each shot, the gun automatically loads the next bullet and cocks itself for the next shot, thereby permitting a somewhat faster rate of fire relative to non-automatic firearms.  Semiautomatics are not to be confused with fully automatic weapons (i.e., machine guns), which fire continuously as long as the trigger is held down.  Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934.

[2]  Ban advocates stress the importance of pistol grips on rifles and heat shrouds or forward handgrips on pistols, which in combination with large ammunition magazines enable shooters to discharge high numbers of bullets rapidly (in a "spray fire" fashion) while maintaining control of the firearm (Violence Policy Center, 2003).  Ban opponents, on the other hand, argue that AW features also serve legitimate purposes for lawful gun users (e.g., see Kopel, 1995).

[3]  This is based on AWs identified by ATF's Firearms Technology Branch as of December 1997.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 2-1.  Firearms Banned by the Federal Assault Weapons Ban**

| Firearm | Description | 1993 Blue Book Price | Pre-Ban Federal Legal Status | Examples of Legal Substitutes |
|---|---|---|---|---|
| Avtomat Kalashnikov (AK) (by Norinco, Mitchell, Poly Technologies) | Chinese, Russian, other foreign and domestic:  .223 or 7.62x39mm caliber, semiauto. rifle; 5, 10, or 30 shot magazine, may be supplied with bayonet | $550 (generic import); add 10-15% for folding stock models | Imports banned in 1989. | Norinco NHM 90/91 [1] |
| Uzi, Galil | Israeli: 9mm, .41, or .45 caliber semiauto. carbine, mini-carbine, or pistol. Magazine capacity of 16, 20, or 25, depending on model and type (10 or 20 on pistols). | $550-$1050 (Uzi) $875-$1150 (Galil) | Imports banned in 1989 | Uzi Sporter [2] |
| Beretta AR-70 | Italian: .222 or .223 caliber semiauto. paramilitary design rifle; 5, 8, or 30 shot magazine. | $1050 | Imports banned in 1989. | |
| Colt AR-15 | Domestic: primarily .223 caliber  paramilitary rifle or carbine; 5 shot magazines, often comes with two 5-shot detachable magazines.  Exact copies by DPMS, Eagle, Olympic, and others. | $825-$1325 | Legal (civilian version of military M-16) | Colt Sporter, Match H-Bar, Target models |
| Fabrique National FN/FAL, FN/LAR, FNC | Belgian design: .308 caliber semiauto. rifle or .223 combat carbine with 30 shot magazine.  Rifle comes with flash hider, 4 position fire selector on automatic models. Discontinued in 1988. | $1100-$2500 | Imports banned in 1989. | L1A1 Sporter (FN, Century) [2] |
| Steyr AUG | Austrian: .223/5.56mm caliber semiauto. paramilitary design rifle. | $2500 | Imports banned in 1989 | |
| SWD M-10, 11, 11/9, 12 | Domestic: 9mm, .380, or .45 caliber paramilitary design semiauto. pistol; 32 shot magazine.  Also available in semiauto. carbine and fully automatic variations. | $215 (M-11/9) | Legal | Cobray PM11, 12 |
| TEC-9, DC9, 22 | Domestic: 9mm caliber semiauto. paramilitary design pistol, 10 or 32 shot magazine.; .22 caliber semiauto. paramilitary design pistol, 30 shot magazine. | $145-$295 | Legal | TEC-AB |
| Revolving Cylinder Shotguns | Domestic:  12 gauge, 12 shot rotary magazine; paramilitary configuration | $525 (Street Sweeper) | Legal | |

[1] Imports were halted in 1994 under the federal embargo on the importation of firearms from China.
[2] Imports banned  by federal executive order, April 1998.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

5

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 2-2.  Features Test of the Federal Assault Weapons Ban**

| Weapon Category | Military-Style Features (Two or more qualify a firearm as an assault weapon) |
|---|---|
| Semiautomatic pistols accepting detachable magazines: | 1)  ammunition magazine that attaches outside the pistol grip<br>2)  threaded barrel capable of accepting a barrel extender, flash hider, forward handgrip, or silencer<br>3)  heat shroud attached to or encircling the barrel<br>4)  weight of more than 50 ounces unloaded<br>5)  semiautomatic version of a fully automatic weapon |
| Semiautomatic rifles accepting detachable magazines: | 1)  folding or telescoping stock<br>2)  pistol grip that protrudes beneath the firing action<br>3)  bayonet mount<br>4)  flash hider or threaded barrel designed to accommodate one<br>5)  grenade launcher |
| Semiautomatic shotguns: | 1)  folding or telescoping stock<br>2)  pistol grip that protrudes beneath the firing action<br>3)  fixed magazine capacity over 5 rounds<br>4)  ability to accept a detachable ammunition magazine |

## 2.2.  Large Capacity Magazines

In addition, the ban prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to hereafter as large capacity magazines, or LCMs).[4]  Most notably, this limits the capacity of detachable ammunition magazines for semiautomatic firearms.  Though often overlooked in media coverage of the law, this provision impacted a larger share of the gun market than did the ban on AWs.  Approximately 40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM (calculated from Murtz et al., 1994).  Still others could accept LCMs made for other firearms and/or by other manufacturers.  A national survey of gun owners found that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17).  The AW provision did not affect most LCM-compatible guns, but the LCM provision limited the capacities of their magazines to 10 rounds.

---

[4]  Technically, the ban prohibits any magazine, belt, drum, feed strip, or similar device that has the capacity to accept more than 10 rounds of ammunition, or which can be readily converted or restored to accept more than 10 rounds of ammunition.  The ban exempts attached tubular devices capable of operating only with .22 caliber rimfire (i.e., low velocity) ammunition.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 2-1.  Features of Assault Weapons:
The Intratec TEC-9 Assault Pistol**



**Threaded Barrel**
Designed to accommodate a silencer

**Barrel Shroud**
Cools the barrel of the weapon so it will
not overheat during rapid firing.  Allows
the shooter to grasp the barrel area during
rapid fire without incurring serious burns.

**Large Capacity Magazine Outside Pistol Grip**
Characteristic of an assault weapon, not a
sporting handgun.

Adapted from exhibit of the Center to Prevent Handgun Violence.

As discussed in later chapters, an LCM is perhaps the most functionally important
feature of many AWs.  This point is underscored by the AW ban's exemptions for
semiautomatic rifles that cannot accept a detachable magazine that holds more than five rounds
of ammunition and semiautomatic shotguns that cannot hold more than five rounds in a fixed
or detachable magazine.  As noted by the U.S. House of Representatives, most prohibited AWs
came equipped with magazines holding 30 rounds and could accept magazines holding as
many as 50 or 100 rounds (U.S. Department of the Treasury, 1998, p. 14).  Also, a 1998 federal
executive order (discussed below) banned further importation of foreign semiautomatic rifles
capable of accepting LCMs made for military rifles.  Accordingly, the magazine ban plays an
important role in the logic and interpretations of the analyses presented here.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 2-2.  Features of Assault Weapons:
The AK-47 Assault Rifle**

**Flash Suppressor**
Reduces the flash from the barrel
of the weapon, allowing the
shooter to remain concealed when
shooting at night.

**Barrel Mount**
Designed to
accommodate a
bayonet, serves no
sporting purpose.

**Folding Stock**
Sacrifices accuracy for
concealability and mobility
in combat situations.

**Large Capacity
Detachable Magazine**
Permits shooter to fire dozens
of rounds of ammunition
without reloading.

**Pistol Grip**
Allows the weapon to be
"spray fired" from the hip.
Also helps stabilize the
weapon during rapid fire.

Adapted from exhibit of the Center to Prevent Handgun Violence.

## 2.3.  Foreign Rifles Accepting Large Capacity Military Magazines

In April of 1998, the Clinton administration broadened the range of the AW ban
by prohibiting importation of an additional 58 foreign semiautomatic rifles that were still
legal under the 1994 law but that can accept LCMs made for military assault rifles like
the AK-47 (U.S. Department of the Treasury, 1998).[5]  Figure 2-3 illustrates a few such
rifles (hereafter, LCMM rifles) patterned after the banned AK-47 pictured in Figure 2-2.
The LCMM rifles in Figure 2-3 do not possess the military-style features incorporated
into the AK-47 (such as pistol grips, flash suppressors, and bayonet mounts), but they
accept LCMs made for AK-47s.[6]

---

[5]  In the civilian context, AWs are semiautomatic firearms.  Many semiautomatic AWs are patterned after
military firearms, but the military versions are capable of semiautomatic and fully automatic fire.
[6]  Importation of some LCMM rifles, including a number of guns patterned after the AK-47, was halted in
1994 due to trade sanctions against China (U.S. Department of the Treasury, 1998).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

**Figure 2-3. Foreign Semiautomatic Rifles Capable of Accepting Large Capacity Military Magazines: AK47 Copies Banned by Executive Order in 1998**



MISR

ARM

MAK90

WUM 1

Taken from U.S. Department of the Treasury (1998)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 2.4.  Ban Exemptions

### 2.4.1.  Guns and Magazines Manufactured Prior to the Ban

The ban contains important exemptions.  AWs and LCMs manufactured before the effective date of the ban are "grandfathered" and thus legal to own and transfer. Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock) (Cox Newspapers, 1989, p. 1; American Medical Association Council on Scientific Affairs, 1992), though those counts probably did not correspond exactly to the weapons prohibited by the 1994 ban.  The leading domestic AW producers manufactured approximately half a million AWs from 1989 through 1993, representing roughly 2.5% of all guns manufactured in the U.S. during that time (see Chapter 5).

We are not aware of any precise estimates of the pre-ban stock of LCMs, but gun owners in the U.S. possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994 (Cook and Ludwig, 1996, p. 17), and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995 (Gun Tests, 1995, p. 30).  As discussed in Chapter 7, moreover, an additional 4.8 million pre-ban LCMs were imported into the U.S. from 1994 through 2000 under the grandfathering exemption.

### 2.4.2.  Semiautomatics With Fewer or No Military Features

Although the law bans "copies or duplicates" of the named gun makes and models, federal authorities have emphasized exact copies.  Relatively cosmetic changes, such as removing a flash hider or bayonet mount, are sufficient to transform a banned weapon into a legal substitute, and a number of manufacturers now produce modified, legal versions of some of the banned guns (examples are listed in Table 2-1).  In general, the AW ban does not apply to semiautomatics possessing no more than one military-style feature listed under the ban's features test provision.[7]  For instance, prior to going out of business, Intratec, makers of the banned TEC-9 featured in Figure 2-1, manufactured an AB-10 ("after ban") model that does not have a threaded barrel or a barrel shroud but is identical to the TEC-9 in other respects, including the ability to accept an ammunition magazine outside the pistol grip (Figure 2-4).  As shown in the illustration, the AB-10 accepts grandfathered, 32-round magazines made for the TEC-9, but post-ban magazines produced for the AB-10 must be limited to 10 rounds.

---

[7]  Note, however, that firearms imported into the country must still meet the "sporting purposes test" established under the federal Gun Control Act of 1968.  In 1989, ATF determined that foreign semiautomatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 AW ban) fail the sporting purposes test and cannot be imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features.  Consequently, it is possible for foreign rifles to pass the features test of the federal AW ban but not meet the sporting purposes test for imports (U.S. Department of the Treasury, 1998).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Another example is the Colt Match Target H-Bar rifle (Figure 2-5), which is a legalized version of the banned AR-15 (see Table 2-1). AR-15 type rifles are civilian weapons patterned after the U.S. military's M-16 rifle and were the assault rifles most commonly used in crime before the ban (Roth and Koper, 1997, Chapter 2). The post-ban version shown in Figure 2-5 (one of several legalized variations on the AR-15) is essentially identical to pre-ban versions of the AR-15 but does not have accessories like a flash hider, threaded barrel, or bayonet lug. The one remaining military feature on the post-ban gun is the pistol grip. This and other post-ban AR-15 type rifles can accept LCMs made for the banned AR15, as well as those made for the U.S. military's M-16. However, post-ban magazines manufactured for these guns must hold fewer than 11 rounds.

The LCMM rifles discussed above constituted another group of legalized AW-type weapons until 1998, when their importation was prohibited by executive order. Finally, the ban includes an appendix that exempts by name several hundred models of rifles and shotguns commonly used in hunting and recreation, 86 of which are semiautomatics. While the exempted semiautomatics generally lack the military-style features common to AWs, many take detachable magazines, and some have the ability to accept LCMs.[8]

## 2.5. Summary

In the broadest sense, the AW-LCM ban is intended to limit crimes with semiautomatic firearms having large ammunition capacities – which enable shooters to discharge high numbers of shots rapidly – and other features conducive to criminal applications. The gun ban provision targets a relatively small number of weapons based on outward features or accessories that have little to do with the weapons' operation. Removing some or all of these features is sufficient to make the weapons legal. In other respects (e.g., type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), AWs do not differ from other legal semiautomatic weapons. The LCM provision of the law limits the ammunition capacity of non-banned firearms.

---

[8] Legislators inserted a number of amendments during the drafting process to broaden the consensus behind the bill (Lennett 1995). Among changes that occurred during drafting were: dropping a requirement to register post-ban sales of the grandfathered guns, dropping a ban on "substantial substitutes" as well as "exact copies" of the banned weapons, shortening the list of named makes and models covered by the ban, adding the appendix list of exempted weapons, and mandating the first impact study of the ban that is discussed below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 2-4. Post-Ban, Modified Versions of Assault Weapons:
The Intratec AB ("After Ban") Model (See Featured Firearm)**



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

12

**Figure 2-5. Post-Ban, Modified Versions of Assault Weapons:**
**The Colt Match Target HBAR Model**



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

### 3. CRIMINAL USE OF ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES BEFORE THE BAN

During the 1980s and early 1990s, AWs and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass murder incidents that raised public concern about the accessibility of high powered, military-style weaponry and other guns capable of discharging high numbers of bullets in a short period of time (Cox Newspapers, 1989; Kleck, 1997, pp.124-126,144; Lenett, 1995). In one of the worst mass murders ever committed in the U.S., for example, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California MacDonald's restaurant on July 18, 1984 using an Uzi carbine, a shotgun, and another semiautomatic handgun. On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, and a number of other firearms, killed 7 persons and wounded 15 others at his former workplace in Louisville, Kentucky before taking his own life. Another particularly notorious incident that precipitated much of the recent debate over AWs occurred on January 17, 1989 when Patrick Purdy used a civilian version of the AK-47 military rifle to open fire on a schoolyard in Stockton, California, killing 5 children and wounding 29 persons.

There were additional high profile incidents in which offenders using semiautomatic handguns with LCMs killed and wounded large numbers of persons. Armed with two handguns having LCMs (and reportedly a supply of extra LCMs), a rifle, and a shotgun, George Hennard killed 22 people and wounded another 23 in Killeen, Texas in October 1991. In a December 1993 incident, a gunman named Colin Ferguson, armed with a handgun and LCMs, opened fire on commuters on a Long Island train, killing 5 and wounding 17.

Indeed, AWs or other semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded (Kleck, 1997, pp.124-126, 144). Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers, 1989; also see Roth and Koper, 1997, Chapter 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups. All of this intensified concern over AWs and other semiautomatics with large ammunition capacities and helped spur the passage of AW bans in California, New Jersey, Connecticut, and Hawaii between 1989 and 1993, as well as the 1989 federal import ban on selected semiautomatic rifles. Maryland also passed AW legislation in 1994, just a few months prior to the passage of the 1994 federal AW ban.[9]

Looking at the nation's gun crime problem more broadly, however, AWs and LCMs were used in only a minority of gun crimes prior to the 1994 federal ban, and AWs were used in a particularly small percentage of gun crimes.

---

[9] A number of localities around the nation also passed AW bans during this period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 3.1. Criminal Use of Assault Weapons

Numerous studies have examined the use of AWs in crime prior to the federal ban. The definition of AWs varied across the studies and did not always correspond exactly to that of the 1994 law (in part because a number of the studies were done prior to 1994). In general, however, the studies appeared to focus on various semiautomatics with detachable magazines and military-style features. According to these accounts, AWs typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al., 1993; Hargarten et al., 1996; Hutson et al., 1994; 1995; McGonigal et al., 1993; New York State Division of Criminal Justice Services, 1994; Roth and Koper, 1997, Chapters 2, 5, 6; Zawitz, 1995). A compilation of 38 sources indicated that AWs accounted for 2% of crime guns on average (Kleck, 1997, pp.112, 141-143).[10]

Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for this and our prior study (see Chapter 6 and Roth and Koper, 1997, Chapters 5, 6):

- Baltimore (all guns recovered by police, 1992-1993): 2%
- Miami (all guns recovered by police, 1990-1993): 3%
- Milwaukee (guns recovered in murder investigations, 1991-1993): 6%
- Boston (all guns recovered by police, 1991-1993): 2%
- St. Louis (all guns recovered by police, 1991-1993): 1%
- Anchorage, Alaska (guns used in serious crimes, 1987-1993): 4%
- National (guns recovered by police and reported to ATF, 1992-1993): 5%[11]
- National (gun thefts reported to police, 1992-Aug. 1994): 2%
- National (guns used in murders of police, 1992-1994): 7-9%[12]
- National (guns used in mass murders of 4 or more persons, 1992-1994): 4-13%[13]

Although each of the sources cited above has limitations, the estimates consistently show that AWs are used in a small fraction of gun crimes. Even the highest

---

[10] The source in question contains a total of 48 estimates, but our focus is on those that examined all AWs (including pistols, rifles, and shotguns) as opposed to just assault rifles.

[11] For reasons discussed in Chapter 6, the national ATF estimate likely overestimates the use of AWs in crime. Nonetheless, the ATF estimate lies within the range of other presented estimates.

[12] The minimum estimate is based on AW cases as a percentage of all gun murders of police. The maximum estimate is based on AW cases as a percentage of cases for which at least the gun manufacturer was known. Note that AWs accounted for as many as 16% of gun murders of police in 1994 (Roth and Koper, 1997, Chapter 6; also see Adler et al., 1995).

[13] These statistics are based on a sample of 28 cases found through newspaper reports (Roth and Koper, 1997, Appendix A). One case involved an AW, accounting for 3.6% of all cases and 12.5% of cases in which at least the type of gun (including whether the gun was a handgun, rifle, or shotgun and whether the gun was a semiautomatic) was known. Also see the earlier discussion of AWs and mass shootings at the beginning of this chapter.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

estimates, which correspond to particularly rare events such mass murders and police murders, are no higher than 13%. Note also that the majority of AWs used in crime are assault pistols (APs) rather than assault rifles (ARs). Among AWs reported by police to ATF during 1992 and 1993, for example, APs outnumbered ARs by a ratio of 3 to 1 (see Chapter 6).

The relative rarity of AW use in crime can be attributed to a number of factors. Many AWs are long guns, which are used in crime much less often than handguns. Moreover, a number of the banned AWs are foreign weapons that were banned from importation into the U.S. in 1989. Also, AWs are more expensive (see Table 2-1) and more difficult to conceal than the types of handguns that are used most frequently in crime.

### 3.1.1. A Note on Survey Studies and Assault Weapons

The studies and statistics discussed above were based primarily on police information. Some survey studies have given a different impression, suggesting substantial levels of AW ownership among criminals and otherwise high-risk juvenile and adult populations, particularly urban gang members (Knox et al., 1994; Sheley and Wright, 1993a). A general problem with these studies, however, is that respondents themselves had to define terms like "military-style" and "assault rifle." Consequently, the figures from these studies may lack comparability with those from studies with police data. Further, the figures reported in some studies prompt concerns about exaggeration of AW ownership (perhaps linked to publicity over the AW issue during the early 1990s when a number of these studies were conducted), particularly among juvenile offenders, who have reported ownership levels as high as 35% just for ARs (Sheley and Wright, 1993a).[14]

Even so, most survey evidence on the actual use of AWs suggests that offenders rarely use AWs in crime. In a 1991 national survey of adult state prisoners, for example, 8% of the inmates reported possessing a "military-type" firearm at some point in the past (Beck et al., 1993, p. 19). Yet only 2% of offenders who used a firearm during their conviction offense reported using an AW for that offense (calculated from pp. 18, 33), a figure consistent with the police statistics cited above. Similarly, while 10% of adult inmates and 20% of juvenile inmates in a Virginia survey reported having owned an AR, none of the adult inmates and only 1% of the juvenile inmates reported having carried them at crime scenes (reported in Zawitz, 1995, p. 6). In contrast, 4% to 20% of inmates surveyed in eight jails across rural and urban areas of Illinois and Iowa reported having used an AR in committing crimes (Knox et al., 1994, p. 17). Nevertheless, even assuming the accuracy and honesty of the respondents' reports, it is not clear what

---

[14] As one example of possible exaggeration of AW ownership, a survey of incarcerated juveniles in New Mexico found that 6% reported having used a "military-style rifle" against others and 2.6% reported that someone else used such a rifle against them. However, less than 1% of guns recovered in a sample of juvenile firearms cases were "military" style guns (New Mexico Criminal Justice Statistical Analysis Center, 1998, pp. 17-19; also see Ruddell and Mays, 2003).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

weapons they were counting as ARs, what percentage of their crimes were committed with ARs, or what share of all gun crimes in their respective jurisdictions were linked to their AR uses. Hence, while some surveys suggest that ownership and, to a lesser extent, use of AWs may be fairly common among certain subsets of offenders, the overwhelming weight of evidence from gun recovery and survey studies indicates that AWs are used in a small percentage of gun crimes overall.

### 3.1.2. Are Assault Weapons More Attractive to Criminal Users Than Other Gun Users?

Although AWs are used in a small percentage of gun crimes, some have argued that AWs are more likely to be used in crime than other guns, i.e., that AWs are more attractive to criminal than lawful gun users due to the weapons' military-style features and their particularly large ammunition magazines. Such arguments are based on data implying that AWs are more common among crime guns than among the general stock of civilian firearms. According to some estimates generated prior to the federal ban, AWs accounted for less than one percent of firearms owned by civilians but up to 11% of guns used in crime, based on firearms reported by police to ATF between 1986 and 1993 (e.g., see Cox Newspapers, 1989; Lennett, 1995). However, these estimates were problematic in a number of respects. As discussed in Chapter 6, ATF statistics are not necessarily representative of the types of guns most commonly recovered by police, and ATF statistics from the late 1980s and early 1990s in particular tended to overstate the prevalence of AWs among crime guns. Further, estimating the percentage of civilian weapons that are AWs is difficult because gun production data are not reported by model, and one must also make assumptions about the rate of attrition among the stock of civilian firearms.

Our own more recent assessment indicates that AWs accounted for about 2.5% of guns produced from 1989 through 1993 (see Chapter 5). Relative to previous estimates, this may signify that AWs accounted for a growing share of civilian firearms in the years just before the ban, though the previous estimates likely did not correspond to the exact list of weapons banned in 1994 and thus may not be entirely comparable to our estimate. At any rate, the 2.5% figure is comparable to most of the AW crime gun estimates listed above; hence, it is not clear that AWs are used disproportionately in most crimes, though AWs still seem to account for a somewhat disproportionate share of guns used in murders and other serious crimes.

Perhaps the best evidence of a criminal preference for AWs comes from a study of young adult handgun buyers in California that found buyers with minor criminal histories (i.e., arrests or misdemeanor convictions that did not disqualify them from purchasing firearms) were more than twice as likely to purchase APs than were buyers with no criminal history (4.6% to 2%, respectively) (Wintemute et al., 1998a). Those with more serious criminal histories were even more likely to purchase APs: 6.6% of those who had been charged with a gun offense bought APs, as did 10% of those who had been charged with two or more serious violent offenses. AP purchasers were also more likely to be arrested subsequent to their purchases than were other gun purchasers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Among gun buyers with prior charges for violence, for instance, AP buyers were more than twice as likely as other handgun buyers to be charged with any new offense and three times as likely to be charged with a new violent or gun offense. To our knowledge, there have been no comparable studies contrasting AR buyers with other rifle buyers.

## 3.2. Criminal Use of Large Capacity Magazines

Relative to the AW issue, criminal use of LCMs has received relatively little attention. Yet the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 14% to 26% of most gun crimes prior to the ban (see Chapter 8; Adler et al., 1995; Koper, 2001; New York Division of Criminal Justice Services, 1994).

- Baltimore (all guns recovered by police, 1993):  14%
- Milwaukee (guns recovered in murder investigations, 1991-1993): 21%
- Anchorage, Alaska (handguns used in serious crimes, 1992-1993): 26%
- New York City (guns recovered in murder investigations, 1993): 16-25%[15]
- Washington, DC (guns recovered from juveniles, 1991-1993): 16%[16]
- National (guns used in murders of police, 1994): 31%-41%[17]

Although based on a small number of studies, this range is generally consistent with national survey estimates indicating approximately 18% of all civilian-owned guns and 21% of civilian-owned handguns were equipped with LCMs as of 1994 (Cook and Ludwig, 1996, p. 17).  The exception is that LCMs may have been used disproportionately in murders of police, though such incidents are very rare.

As with AWs and crime guns in general, most crime guns equipped with LCMs are handguns.  Two handgun models manufactured with LCMs prior to the ban (the Glock 17 and Ruger P89) were among the 10 crime gun models most frequently recovered by law enforcement and reported to ATF during 1994 (ATF, 1995).

---

[15]  The minimum estimate is based on cases in which discharged firearms were recovered, while the maximum estimate is based on cases in which recovered firearms were positively linked to the case with ballistics evidence (New York Division of Criminal Justice Services, 1994).
[16] Note that Washington, DC prohibits semiautomatic firearms accepting magazines with more than 12 rounds (and handguns in general).
[17]  The estimates are based on the sum of cases involving AWs or other guns sold with LCMs (Adler et al., 1995, p.4).  The minimum estimate is based on AW-LCM cases as a percentage of all gun murders of police.  The maximum estimate is based on AW-LCM cases as a percentage of cases in which the gun model was known.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 3.3. Summary

In sum, AWs and LCMs were used in up to a quarter of gun crimes prior to the 1994 AW-LCM ban. By most estimates, AWs were used in less than 6% of gun crimes even before the ban. Some may have perceived their use to be more widespread, however, due to the use of AWs in particularly rare and highly publicized crimes such as mass shootings (and, to a lesser extent, murders of police), survey reports suggesting high levels of AW ownership among some groups of offenders, and evidence that some AWs are more attractive to criminal than lawful gun buyers.

In contrast, guns equipped with LCMs – of which AWs are a subset – are used in roughly 14% to 26% of gun crimes. Accordingly, the LCM ban has greater potential for affecting gun crime. However, it is not clear how often the ability to fire more than 10 shots without reloading (the current magazine capacity limit) affects the outcomes of gun attacks (see Chapter 9). All of this suggests that the ban's impact on gun violence is likely to be small.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 4. OVERVIEW OF STUDY DESIGN, HYPOTHESES, AND PRIOR FINDINGS

Section 110104 of the AW-LCM ban directed the Attorney General of the United States to study the ban's impact and report the results to Congress within 30 months of the ban's enactment, a provision which was presumably motivated by a sunset provision in the legislation (section 110105) that will lift the ban in September 2004 unless Congress renews the ban. In accordance with the study requirement, the National Institute of Justice (NIJ) awarded a grant to the Urban Institute to study the ban's short-term (i.e., 1994-1996) effects. The results of that study are available in a number of reports, briefs, and articles written by members of this research team (Koper and Roth, 2001a; 2001b; 2002a; Roth and Koper, 1997; 1999).[18] In order to understand the ban's longer-term effects, NIJ provided additional funding to extend the AW research. In 2002, we delivered an interim report to NIJ based on data extending through at least the late 1990s (Koper and Roth, 2002b). This report is based largely on the 2002 interim report, but with various new and updated analyses extending as far as 2003. It is thus a compilation of analyses conducted between 1998 and 2003. The study periods vary somewhat across the analyses, depending on data availability and the time at which the data were collected.

### 4.1. Logical Framework for Research on the Ban

An important rationale for the AW-LCM ban is that AWs and other guns equipped with LCMs are particularly dangerous weapons because they facilitate the rapid firing of high numbers of shots, thereby potentially increasing injuries and deaths from gun violence. Although AWs and LCMs were used in only a modest share of gun crimes before the ban, it is conceivable that a decrease in their use might reduce fatal and non-fatal gunshot victimizations, even if it does not reduce the overall rate of gun crime. (In Chapter 9, we consider in more detail whether forcing offenders to substitute other guns and smaller magazines can reduce gun deaths and injuries.)

It is not clear how quickly such effects might occur, however, because the ban exempted the millions of AWs and LCMs that were manufactured prior to the ban's effective date in September 1994. This was particularly a concern for our first study, which was based on data extending through mid-1996, a period potentially too short to observe any meaningful effects. Consequently, investigation of the ban's effects on gun markets – and, most importantly, how they have affected criminal use of AWs and LCMs – has played a central role in this research. The general logic of our studies, illustrated in Figure 4-1, has been to first assess the law's impact on the availability of AWs and LCMs, examining price and production (or importation) indices in legal markets and relating them to trends in criminal use of AWs and LCMs. In turn, we can relate these market patterns to trends in the types of gun crimes most likely to be affected by changes in the use of AWs and LCMs. However, we cannot make definitive assessments of the

---

[18] The report to Congress was the Roth and Koper (1997) report.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

ban's impact on gun violence until it is clear that the ban has indeed reduced criminal use of AWs and LCMs.

**Figure 4-1.  Logic Model for Research on the Assault Weapons Ban**



## 4.2.  Hypothesized Market Effects

### 4.2.1.  A General Description of Gun Markets

Firearms are distributed in markets commonly referred to as primary and secondary markets.  Illicit gun transactions occur in both markets.  Primary markets include wholesale and retail transactions by federally-licensed gun dealers, referred to as federal firearm licensees.  Licensed dealers are required to, among things, follow federal and state background procedures to verify the eligibility of purchasers, observe any legally required waiting period prior to making transfers, and maintain records of gun acquisitions and dispositions (though records are not required for sales of ammunition magazines).

Despite these restrictions, survey data suggest that as many as 21% of adult gun offenders obtained guns from licensed dealers in the years prior to the ban (Harlow, 2001, p. 6; also see Wright and Rossi, 1986, pp. 183,185).  In more recent years, this figure has declined to 14% (Harlow, 2001, p. 6), due likely to the Brady Act, which established a national background check system for purchases from licensed dealers, and reforms of the federal firearms licensing system that have greatly reduced the number of licensed gun dealers (see ATF, 2000; Koper, 2002).  Some would-be gun offenders may be legally eligible buyers at the time of their acquisitions, while others may seek out corrupt dealers or use other fraudulent or criminal means to acquire guns from retail dealers (such as recruiting a legally entitled buyer to act as a "straw purchaser" who buys a gun on behalf of a prohibited buyer).

Secondary markets encompass second-hand gun transactions made by non-licensed individuals.[19]  Secondary market participants are prohibited from knowingly transferring guns to ineligible purchasers (e.g., convicted felons and drug abusers).  However, secondary transfers are not subject to the federal record-keeping and background check requirements placed on licensed dealers, thus making the secondary

---

[19]  Persons who make only occasional sales of firearms are not required to obtain a federal firearms license (ATF, 2000, p. 11).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

market almost entirely unregulated and, accordingly, a better source of guns for criminal users.[20]  In the secondary market, ineligible buyers may obtain guns from a wide variety of legitimate or illegitimate gun owners: relatives, friends, fences, drug dealers, drug addicts, persons selling at gun shows, or other strangers (e.g., see Wright and Rossi, 1986; Sheley and Wright, 1993a).  Of course, ineligible purchasers may also steal guns from licensed gun dealers and private gun owners.

Secondary market prices are generally lower than primary market prices (because the products are used), though the former may vary substantially across a range of gun models, places, circumstances, and actors.  For example, street prices of AWs and other guns can be 3 to 6 times higher than legal retail prices in jurisdictions with strict gun controls and lower levels of gun ownership (Cook et al., 1995, p. 72).  Nonetheless, experts note that primary and secondary market prices correspond to one another, in that relatively expensive guns in the primary market are also relatively expensive in the secondary market.  Moreover, in any given locality, trends in secondary market prices can be expected to track those in the primary market because a rise in primary market prices for new weapons will increase demand for used weapons and therefore increase secondary market prices (Cook et al., 1995, p. 71).

### 4.2.2. The AW-LCM Ban and Gun Markets

In the long term, we can expect prices of the banned guns and magazines to gradually rise as supplies dwindle.  As prices rise, more would-be criminal users of AWs and LCMs will be unable or unwilling to pay the higher prices.  Others will be discouraged by the increasing non-monetary costs (i.e., search time) of obtaining the weapons.  In addition, rising legal market prices will undermine the incentive for some persons to sell AWs and LCMs to prohibited buyers for higher premiums, thereby bidding some of the weapons away from the channels through which they would otherwise reach criminal users.  Finally, some would-be AW and LCM users may become less willing to risk confiscation of their AWs and LCMs as the value of the weapons increases.  Therefore, we expect that over time diminishing stocks and rising prices will lead to a reduction in criminal use of AWs and LCMs.[21]

---

[20]  Some states require that secondary market participants notify authorities about their transactions.  Even in these states, however, it is not clear how well these laws are enforced.

[21]  We would expect these reductions to be apparent shortly after the price increases (an expectation that, as discussed below, was confirmed in our earlier study) because a sizeable share of guns used in crime are used within one to three years of purchase.  Based on analyses of guns recovered by police in 17 cities, ATF (1997, p. 8) estimates that guns less than 3 years old (as measured by the date of first retail sale) comprise between 22% and 43% of guns seized from persons under age 18, between 30% and 54% of guns seized from persons ages 18 to 24, and between 25% and 46% of guns seized from persons over 24.  In addition, guns that are one year old or less comprise the largest share of relatively new crime guns (i.e., crime guns less than three years old) (Pierce et al., 1998, p. 11).  Similar data are not available for secondary market transactions, but such data would shorten the estimated time from acquisition to criminal use.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

However, the expected timing of the market processes is uncertain. We can anticipate that AW and LCM prices will remain relatively stable for as long as the supply of grandfathered weapons is adequate to meet demand. If, in anticipation of the ban, gun manufacturers overestimated the demand for AWs and LCMs and produced too many of them, prices might even fall before eventually rising. Market responses can be complicated further by the continuing production of legal AW substitute models by some gun manufacturers. If potential AW buyers are content with an adequate supply of legal AW-type weapons having fewer military features, it will take longer for the grandfathered AW supply to constrict and for prices to rise. Similarly, predicting LCM price trends is complicated by the overhang of military surplus magazines that can fit civilian weapons (e.g., military M-16 rifle magazines that can be used with AR-15 type rifles) and by the market in reconditioned magazines. The "aftermarket" in gun accessories and magazine extenders that can be used to convert legal guns and magazines into banned ones introduces further complexity to the issue.

## 4.3. Prior Research on the Ban's Effects

To summarize the findings of our prior study, Congressional debate over the ban triggered pre-ban speculative price increases of upwards of 50% for AWs during 1994, as gun distributors, dealers, and collectors anticipated that the weapons would become valuable collectors' items. Analysis of national and local data on guns recovered by police showed reductions in criminal use of AWs during 1995 and 1996, suggesting that rising prices made the weapons less accessible to criminal users in the short-term aftermath of the ban.

However, the speculative increase in AW prices also prompted a pre-ban boost in AW production; in 1994, AW manufacturers produced more than twice their average volume for the 1989-1993 period. The oversupply of grandfathered AWs, the availability of the AW-type legal substitute models mentioned earlier, and the steady supply of other non-banned semiautomatics appeared to have saturated the legal market, causing advertised prices of AWs to fall to nearly pre-speculation levels by late 1995 or early 1996. This combination of excess supply and reduced prices implied that criminal use of AWs might rise again for some period around 1996, as the large stock of AWs would begin flowing from dealers' and speculators' gun cases to the secondary markets where ineligible purchasers may obtain guns more easily.

We were not able to gather much specific data about market trends for LCMs. However, available data did reveal speculative, pre-ban price increases for LCMs that were comparable to those for AWs (prices for some LCMs continued to climb into 1996), leading us to speculate – incorrectly, as this study will show (see Chapter 8) – that there was some reduction in LCM use after the ban.[22]

---

[22] To our knowledge, there have been two other studies of changes in AW and LCM use during the post-ban period. One study reported a drop in police recoveries of AWs in Baltimore during the first half of 1995 (Weil and Knox, 1995), while the other found no decline in recoveries of AWs or LCMs in Milwaukee homicide cases as of 1996 (Hargarten et al., 2000). Updated analyses for both of these cities

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

23

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Determining whether the reduction in AW use (and perhaps LCM use) following the ban had an impact on gun violence was more difficult.  The gun murder rate dropped more in 1995 (the first year following the ban) than would have been expected based on preexisting trends, but the short post-ban follow-up period available for the analysis precluded a definitive assessment as to whether the reduction was statistically meaningful (see especially Koper and Roth, 2001a).   The reduction was also larger than would be expected from the AW-LCM ban, suggesting that other factors were at work in accelerating the decline.  Using a number of national and local data sources, we also examined trends in measures of victims per gun murder incident and wounds per gunshot victim, based on the hypothesis that these measures might be more sensitive to variations in the use of AWs and LCMs.  These analyses revealed no ban effects, thus failing to show confirming evidence of the mechanism through which the ban was hypothesized to affect the gun murder rate.  However, newly available data presented in subsequent chapters suggest these assessments may have been premature, because any benefits from the decline in AW use were likely offset by steady or rising use of other guns equipped with LCMs, a trend that was not apparent at the time of our earlier study.

We cautioned that the short-term patterns observed in the first study might not provide a reliable guide to longer-term trends and that additional follow-up was warranted.  Two key issues to be addressed were whether there had been a rebound in AW use since the 1995-1996 period and, if so, whether that rebound had yet given way to a long-term reduction in AW use.  Another key issue was to seek more definitive evidence on short and long-term trends in the availability and criminal use of LCMs.  These issues are critical to assessing the effectiveness of the AW-LCM ban, but they also have broader implications for other important policy concerns, namely, the establishment of reasonable timeframes for sunset and evaluation provisions in legislation.   In other words, how long is long enough in evaluating policy and setting policy expiration dates?

---

are presented in Chapters 6 and 8.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 5.  MARKET INDICATORS FOR ASSAULT WEAPONS:  PRICES AND PRODUCTION

This chapter assesses the ban's impact on the availability of AWs in primary and secondary markets, as measured by trends in AW prices and post-ban production of legal AW substitute models.  Understanding these trends is important because they influence the flow of grandfathered weapons to criminals and the availability of non-banned weapons that are close substitutes for banned ones.  In the next chapter, we assess the impact of these trends on criminal use of AWs, as approximated by statistics on gun seizures by police.  (Subsequent chapters present similar analyses for LCMs.)

Following our previous methods, we compare trends for AWs to trends for various non-banned firearms.  The AW analyses generally focus on the most common AWs formerly produced in the U.S., including Intratec and SWD-type APs and AR-15-type ARs produced by Colt and others.   In addition, we selected a small number of domestic pistol and rifle models made by Calico and Feather Industries that fail the features test provision of the AW legislation and that were relatively common among crime guns reported by law enforcement agencies to ATF prior to the ban (see Roth and Koper, 1997, Chapter 5).  Together, this group of weapons represented over 80% of AWs used in crime and reported to ATF from 1993 through 1996, and the availability of these guns was not affected by legislation or regulations predating the AW-LCM ban.[23]  We also examine substitution of legalized, post-ban versions of these weapons, including the Intratec AB-10 and Sport-22, FMJ's PM models (substitutes for the SWD group), Colt Sporters, Calico Liberty models, and others.  We generally did not conduct comparative analyses of named foreign AWs (the Uzi, Galil, and AK weapons) because the 1989 federal import ban had already limited their availability, and their legal status was essentially unchanged by the 1994 ban.

The exact gun models and time periods covered vary across the analyses (based on data availability and the time at which data were collected).  The details of each analysis are described in the following sections.

### 5.1.  Price Trends for Assault Weapons and Other Firearms

To approximate trends in the prices at which AWs could be purchased throughout the 1990s, we collected annual price data for several APs, ARs, and non-banned comparison firearms from the *Blue Book of Gun Values* (Fjestad, 1990-1999).  The *Blue Book* provides national average prices for an extensive list of new and used firearms based on information collected at gun shows and input provided by networks of dealers

---

[23]  The Intratec group includes weapons made by AA Arms.  The SWD group contains related models made by Military Armaments Corporation/Ingram and RPB Industries.  The AR-15 group contains models made by Colt and copies made by Bushmaster, Olympic Arms, Eagle Arms, SGW Enterprises, Essential Arms, DPMS, and Sendra.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

and collectors. The *Blue Book* is utilized widely in the gun industry, though prices in any given locality may differ notably from the averages appearing in the *Blue Book*.

To assess time trends in gun prices, we conducted hedonic price analyses (Berndt, 1990) in which the gun prices were regressed upon a series of year and model indicators. The coefficients for the year indicators show annual changes in the prices of the guns relative to 1994 (the year the ban went into effect), controlling for time-stable differences in the prices of various gun models. Since manufacturers' suggested retail prices (MSRP) were not available for banned AWs during post-ban years, we utilized prices for AWs in 100% condition for all years.[24] For non-banned firearms, we used MSRP.[25] For all models, we divided the gun prices by annual values of the gross domestic product price deflator provided in the December 2001 and 2000 issues of *Economic Indicators* and logged these adjusted prices.

Each model presented below is based on data pooled across a number of firearm models and years, so that observation $P_{jt}$ represents the price of gun model j during year t. We weighted each observation, $P_{jt}$, based on cumulative estimates of the production of model j from 1985 or 1986 (depending on data availability) through year t using data provided by gun manufacturers to ATF and published by the Violence Policy Center (1999).[26, 27]

---

[24] Project staff also collected prices of weapons in 80% condition. However, the levels and annual changes of the 80% prices were very highly correlated (0.86 to 0.99) with those of the 100% condition prices. Therefore, we limited the analysis to the 100% prices.

[25] We utilized prices for the base model of each AW and comparison firearm (in contrast to model variations with special features or accessories).

[26] The regression models are based on equal numbers of observations for each gun model. Hence, unweighted regressions would give equal weight to each gun model. This does not seem appropriate, however, because some guns are produced in much larger numbers than are other guns. Weighting the regression models by production estimates should therefore give us a better sense of what one could "typically" expect to pay for a generic gun in each study category (e.g., a generic assault pistol).

[27] Several of the selected weapons began production in 1985 or later. In other cases, available production data extended back to only the mid-1980s. Published production figures for handguns are broken down by type (semiautomatic, revolver) and caliber and thus provide perfect or very good approximations of production for the handgun models examined in this study. Rifle production data, however, are not disaggregated by gun type, caliber, or model. For the ARs under study, the production counts should be reasonable approximations of AR production because most of the rifles made by the companies in question prior to the ban were ARs. The rifles used in the comparison (i.e., non-banned) rifle analysis are made by companies (Sturm Ruger, Remington, and Marlin) that produce numerous semiautomatic and non-semiautomatic rifle models. However, the overall rifle production counts for these companies should provide some indication of differences in the availability of the comparison rifles relative to one another. Because production data were available through only 1997 at the time this particular analysis was conducted (Violence Policy Center, 1999), we used cumulative production through 1997 to weight the 1998 and 1999 observations for the comparison handgun and comparison rifle models. This was not a consideration for AWs since their production ceased in 1994 (note that the AW production figures for 1994 may include some post-ban legal substitute models manufactured after September 13, 1994). Nonetheless, weighting had very little effect on the inferences from either of the comparison gun models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

*5.1.1.  Assault Pistol Prices*

The analysis of AP prices focuses on the Intratec TEC-9/DC-9, TEC-22, SWD M-11/9, and Calico M950 models.  Regression results are shown in Table 5-1, while Figure 5-1 graphically depicts the annual trend in prices for the period 1990 through 1999.  None of the yearly coefficients in Table 5-1 is statistically significant, thus indicating that average annual AP prices did not change during the 1990s after adjusting for inflation.  Although the model is based on a modest number of observations (n=40) that may limit its statistical power (i.e., its ability to detect real effects), the size of the yearly coefficients confirm that prices changed very little from year to year.   The largest yearly coefficient is for 1990, and it indicates that AP prices were only 4% higher in 1990 than in 1994.[28]

This stands in contrast to our earlier finding (Roth and Koper, 1997, Chapter 4) that prices for SWD APs may have risen by as much as 47% around the time of the ban.  However, the earlier analyses were based on semi-annual or quarterly analyses advertised by gun distributors and were intended to capture short-term fluctuations in price that assumed greater importance in the context of the first AW study, which could examine only short-term ban outcomes. *Blue Book* editions released close in time to the ban (e.g., 1995) also cautioned that prices for some AWs were volatile at that time.  This study emphasizes longer-term price trends, which appear to have been more stable.[29]

---

[28]  To interpret the coefficient of each indicator variable in terms of a percentage change in the dependent variable, we exponentiate the coefficient, subtract 1 from the exponentiated value, and multiply the difference by 100.

[29]  Although the earlier analysis of AP prices focused on the greatest variations observed in semi-annual prices, the results also provide indications that longer-term trends were more stable.  Prices in 1993, for example, averaged roughly 73% of the peak prices reached at the time the ban was implemented (i.e., late 1994), while prices in early 1994 and late 1995 averaged about 83% and 79% of the peak prices, respectively.  Hence, price variation was much more modest after removing the peak periods around the time of the ban's implementation (i.e., late 1994 and early 1995).   The wider range of APs used in the current study may also be responsible for some of the differences between the results of this analysis and the prior study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 5-1. Regression of Assault Pistol and Comparison Handgun Prices on Annual Time Indicators, 1990-1999, Controlling for Gun Model**

| | Assault Pistols (n=40) | | Comparison Handguns (n=38) | |
| --- | --- | --- | --- | --- |
| | **Estimate** | **T Value** | **Estimate** | **T Value** |
| Constant | 1.56 | 26.94*** | -0.21 | -6.81*** |
| 1990 | 0.04 | 1.07 | 0.12 | 2.07** |
| 1991 | 0.01 | 0.30 | 0.09 | 1.79* |
| 1992 | -0.01 | -0.32 | 0.05 | 1.30 |
| 1993 | -0.03 | -1.09 | 0.02 | 0.48 |
| 1995 | 0.01 | 0.22 | -0.02 | -0.48 |
| 1996 | -0.01 | -0.45 | -0.09 | -2.69*** |
| 1997 | -0.03 | -1.13 | -0.11 | -3.26*** |
| 1998 | 0.00 | -0.10 | -0.07 | -1.99* |
| 1999 | -0.02 | -0.58 | -0.14 | -4.02*** |
| Tec-9 | -0.67 | -11.95*** | | |
| Tec-22 | -0.89 | -15.59*** | | |
| SWD | -0.64 | -11.49*** | | |
| Davis P32 | | | 0.09 | 3.63*** |
| Davis P380 | | | 0.20 | 8.20*** |
| Lorcin L380 | | | 0.29 | 11.35*** |
| | | | | |
| F value | 27.79 | | 16.24 | |
| (p value) | <.01 | | <.01 | |
| Adj. R-square | 0.89 | | 0.83 | |

Time indicators are interpreted relative to 1994. Assault pistol model indicators are interpreted relative to Calico 9mm. Comparison handgun models are interpreted relative to Lorcin .25 caliber.
* Statistically significant at $p<=.10$.
** Statistically significant at $p<=.05$.
*** Statistically significant at $p<=.01$.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 5-1. Annual Price Trends for Assault Pistols and SNS Handguns, 1990-1999**



Assault pistol prices basd on TEC9, TEC22, SWD M11/9, and Calico M950.  SNS prices based on Davis P32 and P380 and Lorcin L25 and L380.

### 5.1.2. Comparison Handgun Prices

For comparison, Table 5-1 and Figure 5-1 illustrate price trends for a number of non-banned, cheaply priced, and readily concealable semiautomatic handgun models:  the Davis P32 and P380 and the Lorcin L25 and L380.  Such guns are often referred to as Saturday night specials (SNS).  By a number of accounts, SNS-type guns, and Davis and Lorcin models in particular, are among the guns most frequently used in crime (ATF, 1995; 1997; Kennedy et al., 1996; Wintemute, 1994).  Although the differences between APs and SNS handguns (particularly the fact that most SNS handguns do not have LCMs) suggest they are likely to be used by gun consumers with different levels of firearms experience and sophistication, the SNS guns are arguably a good comparison group for APs because both groups of guns are particularly sensitive to criminal demand.  Like AP buyers, SNS buyers are more likely than other gun buyers to have criminal histories and to be charged with new offenses, particularly violent or firearm offenses, subsequent to their purchases (Wintemute et al., 1998b).

Prices of SNS handguns dropped notably throughout the 1990s.  Prices for SNS handguns were 13% higher in 1990 than in 1994.  Prices then dropped another 13% from 1994 to 1999.  This suggests that although AP prices remained generally stable throughout the 1990s, they increased relative to prices of other guns commonly used in crime.  We say more about this below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

*5.1.3. Assault Rifle Prices*

To assess trends in prices of ARs, we examined prices for several Colt and Olympic rifle models in the AR-15 class, as well as Calico models M900 and M951 and Feather models AT9 and AT22.[30] Because rifle production data are not disaggregated by weapon type (semiautomatic, bolt action, etc.), caliber, or model, the regressions could only be weighted using overall rifle production counts for each company. For this reason, we calculated the average price of the ARs made by each company for each year and modeled the trends in these average prices over time, weighting by each company's total rifle production.[31]

Results shown in Table 5-2 and Figure 5-2 demonstrate that AR prices rose significantly during 1994 and 1995 before falling back to pre-ban levels in 1996 and remaining there through 1999. Prices rose 16% from 1993 to 1994 and then increased another 13% in 1995 (representing an increase of nearly one third over the 1993 level). Yet by 1996, prices had fallen to levels virtually identical to those before 1994. These patterns are consistent with those we found earlier for the 1992-1996 period (Roth and Koper, 1997, Chapter 4), though the annual price fluctuations shown here were not as dramatic as the quarterly changes shown in the earlier study.

Note, however, that these patterns were not uniform across all of the AR categories. The results of the model were driven largely by the patterns for Colt rifles, which are much more numerous than the other brands. Olympic rifles increased in price throughout the time period, while prices for most Calico and Feather rifles tended to fall throughout the 1990s without necessarily exhibiting spikes around the time of the ban.

---

[30] Specifically, we tracked prices for the Match Target Lightweight (R6530), Target Government Model (R6551), Competition H-Bar (R6700), and Match Target H-Bar (R6601) models by Colt and the Ultramatch, Service Match, Multimatch M1-1, AR15, and CAR15 models by Olympic Arms. Each of these models has a modified, post-ban version. We utilized prices for the pre-ban configurations during post-ban years.

[31] Prices for the different models made by a given manufacturer tended to follow comparable trends, thus strengthening the argument for averaging prices.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 5-2.  Regression of Assault Rifle and Comparison Semiautomatic Rifle Prices on Annual Time Indicators, 1991-1999, Controlling for Gun Make**

|  | Assault Rifles (n=36) | | Comparison Rifles (n=27) | |
|---|---|---|---|---|
|  | **Estimate** | **T value** | **Estimate** | **T value** |
| Constant | 1.31 | 21.15*** | 1.40 | 76.75*** |
| 1991 | -0.12 | -1.98* | -0.01 | -0.21 |
| 1992 | -0.13 | -2.26** | 0.01 | 0.30 |
| 1993 | -0.15 | -2.78** | 0 | -0.13 |
| 1995 | 0.12 | 2.47** | 0.03 | 1.08 |
| 1996 | -0.11 | -2.27** | 0.04 | 1.69 |
| 1997 | -0.11 | -2.23** | 0.03 | 1.46 |
| 1998 | -0.12 | -2.47** | 0.02 | 0.91 |
| 1999 | -0.14 | -2.71** | 0.03 | 1.21 |
| Colt (AR-15 type) | 1.07 | 19.93*** |  |  |
| Olympic (AR-15 type) | 1.14 | 16.08*** |  |  |
| Calico | 0.43 | 5.53*** |  |  |
| Ruger |  |  | 0.26 | 20.07*** |
| Remington |  |  | 0.29 | 21.69*** |
| F statistic | 50.52 |  |  | 63.62 |
| (p value) | <.01 |  |  | <.01 |
| Adj. R-square | 0.94 |  |  | 0.96 |

Time indicators interpreted relative to 1994. Assault rifle makes interpreted relative to Feather.
Comparison rifle makes interpreted relative to Marlin.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## Figure 5-2. Annual Price Trends for Assault Rifles and Comparison Semiautomatic Rifles, 1991-1999



Assault rifle prices based on Colt and Olympic AR-type, Calico, and Feather models. Comparison rifle prices based on selected Remington, Marlin, and Sturm Ruger models.

### 5.1.4. Comparison Semiautomatic Rifles.

The analysis of comparison rifle prices includes the Remington 7400, Marlin Model 9, and Sturm Ruger Mini-14 and Mini-30 models (the Ruger model prices were averaged for each year). The AW legislation exempted each of these semiautomatic rifles by name, though the exemption does not apply to Mini-14 models with folding stocks (a feature included in the ban's features test). The Ruger models are of particular interest since they are among only four exempted guns that can accept LCMs made for military rifles (U.S. Department of the Treasury, 1998, p. 23), though Ruger produced LCMs only for the Mini-14 model and substituted a 5-round magazine for this gun in 1989 (Fjestad, 2002, pp. 1361-1362). The Marlin model was also manufactured with an LCM prior to 1990 (Fjestad, 2002, p. 917). The Remington model is manufactured with a detachable 4-round magazine.

Prices for these guns remained steady throughout the decade (see Table 5-2 and Figure 5-2). The largest change was a 4% increase (non-significant) in prices in 1996 relative to prices in 1994. Therefore, the rifle price spikes in 1994 and 1995 were specific to assault rifles. However, the steady annual price trends may mask short-term fluctuations that we found

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

previously (Roth and Koper, 1997, Chapter 4) for some non-banned semiautomatic rifles (including the Ruger Mini-14) during 1994 and early 1995.[32]

## 5.2. Production Trends for Assault Weapons and Other Firearms

To more fully assess the ban's effects on gun markets, examination of pre and post-ban trends in production of AWs and legal AW substitutes is a useful complement to studying price trends. Our earlier work revealed a spike in AW production during 1994 as the ban was being debated. Post-ban production of legal AW substitutes should reveal additional information about the reaction of gun markets to the ban. If production of these models has fallen off dramatically, it may suggest that the market for AWs has been temporarily saturated and/or that consumers of AWs favor the original AW models that have more military-style features. Stable or rising production levels, on the other hand, may indicate substantial consumer demand for AW substitutes, which would suggest that consumers consider the legal substitute models to be as desirable as the banned models.

### 5.2.1. Production of Assault Pistols and Other Handguns

Figure 5-3 presents production trends for a number of domestic AP manufacturers from 1985 through 2001 (the most recent year available for data on individual manufacturers).[33]  After rising in the early 1990s and surging notably to a peak in 1994, production by these companies dropped off dramatically, falling 80% from 1993-1994 to 1996-1997 and falling another 35% by 1999-2000 (Table 5-3).[34]  Makers of Intratec and SWD-type APs continued manufacturing modified versions of their APs for at least a few years following the ban, but at much lower volumes than that at which they produced APs just prior to the ban. Companies like AA Arms and Calico produced very few or no AP-type pistols from 1995 onward, and Intratec – producers of the APs most frequently used in crime – went out of business after 1999.

However, the pattern of rising and then falling production was not entirely unique to APs. Table 5-3 shows that production of all handguns and production of SNS-type pistols both declined sharply in the mid to late 1990s following a peak in 1993.  Nonetheless, the trends –

---

[32] We attributed those short-term fluctuations to pre-ban uncertainty regarding which semiautomatic rifles would be prohibited by the ban. Also note that the prior findings were based on a different set of comparison semiautomatic rifles that included a number of foreign rifles. We concentrated on domestically produced rifles for this updated analysis in order to make more explicit links between rifle price and production trends (data for the latter are available only for domestic firearms).

[33] Production figures for individual manufacturers through 2000 have been compiled by the Violence Policy Center (2002). Year 2001 data are available from ATF via the Internet (see www.atf.treas.gov). National gun production totals through 1998 are also available from ATF (2000, p. A-3).

[34] The assault pistol production figures used here and in the price analysis include 9mm and .22 caliber pistols made by Intratec, 9mm pistols manufactured by AA Arms, all non-.22 caliber pistols manufactured by S.W. Daniels, Wayne Daniels, and Military Armaments Corporation (which together constitute the SWD group), and .22 and 9mm pistols manufactured by Calico. Intratec produces a few non-AW models in .22 and 9mm calibers, so the Intratec figures will overstate production of assault pistols and their legal substitutes to some degree. The comparison, SNS production figures are based on all handguns produced by Lorcin Engineering and Davis Industries.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

33

both peak and decline – were more dramatic for APs than for other handguns. Production of APs rose 69% from 1990-1991 to 1993-1994, while SNS production and overall handgun production each increased 47%. From 1993-1994 to 1996-1997, production of AP-type handguns, SNS models, and all handguns declined 80%, 66%, and 47%, respectively. Further, production of AP-type handguns continued to decline at a faster rate than that of other handguns through the end of the decade.[35]

## Figure 5-3. Assault Pistol Production, 1985-2001



---

[35] Lorcin, a prominent SNS brand that we examined for the price and production analyses, went out of business after 1998. Unlike the situation in the AP market (where, to our knowledge, former AP makers have not been replaced on any large scale), the SNS market appears to have compensated somewhat to offset the loss of Lorcin. The SNS change from 1996-1997 to 1999-2000 is based on examination of a larger group of SNS-type makers, including Lorcin, Davis, Bryco, Phoenix Arms, and Hi-Point. Production among this group declined by 22% from 1996-1997 to 1999-2000, a decline greater than that for total handgun production but less than that for AP-type production.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 5-3. Production Trends for Assault Weapons and Other Firearms, 1990-2000\***

| Firearm Category | % Change 1990/91 to 1993/94 | % Change 1993/94 to 1996/97 | % Change 1996/97 to 1999/2000 |
|---|---|---|---|
| Total Handguns | 47% | -47% | -10% |
|     Assault Pistols (or Post-Ban Models) | 69% | -80% | -35% |
|     SNS Handguns | 47% | -66% | -22% |
| Total Rifles | 22% | 8% | 18% |
|     Assault Rifles (or Post-Ban Models) | 81% | -51% | 156% |
|     Comparison Rifles | 15% | 13% | -16% |

\* Total handgun and rifle figures include all production by U.S. manufacturers. Assault pistols include Intratec group, SWD group, and Calico models. SNS figures are based on Lorcin Engineering and Davis Industries for changes up through 1996-1997. Because Lorcin went out of business after 1998, the SNS change from 1996-1997 to 1999-2000 is based on a larger group of SNS makers including Lorcin, Davis, Bryco, Phoenix Arms, and Hi-Point. Assault rifles include AR-15 type models by Colt and others. Comparison rifles include Sturm Ruger, Remington, and Marlin.

### 5.2.2. Production of Assault Rifles and Other Rifles

As shown in Figure 5-4, production of AR-15 type rifles surged during the early 1990s, reaching a peak in 1994.[36] AR production during the early 1990s rose almost 4 times faster than total rifle production and over 5 times faster than production of the comparison rifles examined in the price analysis (Table 5-3). Yet, by 1996 and 1997, production of legalized AR-type rifles had fallen by 51%, as production of other rifles continued increasing. AR production trends reversed again during the late 1990s, however, rising over 150%.[37] Total rifle production increased much more modestly during this time (18%), while production of the comparison rifles declined.

---

[36] Note again that the AR and legalized AR production figures are approximations based on all rifles produced by the companies in question (rifle production data are not available by type, caliber, or model), but it appears that most rifles made by these companies during the study period were AR-type rifles. Also, the figures for the comparison rifle companies (Ruger, Marlin, and Remington) are based on all rifles produced by these companies (the price analysis focused on selected semiautomatic models).

[37] There was also a notable shift in market shares among AR makers, as Bushmaster overtook Colt as the leading producer of AR-15 type rifles (Figure 5-4).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 5-4. Assault Rifle Production, 1986-2001 (AR-15 Type)**



Other: Olympic, Eagle/Armalite, DPMS, Essential Arms, Sendra.

### 5.3. Summary and Interpretations

Below, we offer some interpretations of the patterns found in the price and production analyses, keeping in mind that these analyses were largely descriptive, so causal inferences must be made cautiously. As documented in our earlier study, Congressional debate over the AW-LCM ban triggered speculative price increases for AWs in the months leading up to the ban's enactment. This study's examination of longer-term, annual price trends suggests that this speculative effect was very brief (and perhaps quite variable across jurisdictions) for APs but persisted through 1995 for ARs. This implies that speculators and sophisticated gun collectors (who we suspect played a large role in driving price trends) have more interest in ARs, which tend to be higher in quality and price than APs.

Responding to the speculative price growth, AW manufacturers boosted their production of AWs in 1994. Although total handgun and rifle production were increasing during the early 1990s, the rise in AW production was steeper, and there was a production peak unique to AWs in 1994 (production of other handguns peaked in 1993). It seems that this boost in the supply of grandfathered AWs was sufficient to satisfy speculative demand, thereby restoring national average AP prices to pre-ban levels within a year of the ban and doing the same for AR prices by 1996. AW prices remained stable through the late 1990s, and production of legalized AW-type weapons dropped off

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

substantially, at least through 1998. This suggests that the supply of grandfathered AWs was sufficient to meet demand through the late 1990s.

However, prices of APs rose relative to other handguns commonly used in crime during the 1990s. Handgun prices and production declined in general during the late 1990s, implying a decrease in demand for APs and other handguns that probably stemmed from the nation's declining crime rates.[38] But the AW ban's restriction of the AP supply, combined with the interest of speculators and collectors in these guns, may have prevented AP prices from falling as did prices for other handguns. The market patterns also suggest that consumers of APs are not as easily satisfied by legalized APs with fewer military-style features; despite the increasing value of APs (in relative terms), post-ban production of legalized APs declined faster than did production of other handguns, and some AP makers went out of business.

Prices of ARs, on the other hand, remained steady during the late 1990s (after the speculative price bubble of 1994-1995) both in absolute terms and relative to other rifles. The failure of AR prices to rise in at least relative terms, as occurred for APs, and the temporary drop in production of AR-type rifles after the ban may signify that the AR market was saturated relative to the AP market for a least a number of years following the ban. However, demand for AR-type rifles later rebounded, as evidenced by the resurgence in production of legalized, AR-type rifles in the late 1990s. In fact, more of these guns were produced in 1999 than in 1994. Unlike AP users, therefore, rifle users appear to be readily substituting the legalized AR-type rifles for the banned ARs, which may be another factor that has kept prices of the latter rifles from rising. All of this suggests that rifle owners, who have a lower prevalence of criminal users than do handgun owners, can more easily substitute rifles with fewer or no military features for the hunting and other sporting purposes that predominate among rifle consumers.

Another relevant factor may have been a surge in the supply of foreign semiautomatic rifles that can accept LCMs for military weapons (the LCMM rifles discussed in Chapter 2) during the early 1990s. Examples of LCMM rifles include legalized versions of banned AK-47, FN-FAL, and Uzi rifles. Importation of LCMM rifles rose from 19,147 in 1991 to 191, 341 in 1993, a nine-fold increase (Department of the Treasury, 1998, p. 34). Due to an embargo on the importation of firearms from China (where many legalized AK-type rifles are produced), imports of LCMM rifles dropped

---

[38] It seems likely that the rise and fall of handgun production was linked to the rising crime rates of the late 1980s and early 1990s and the falling crime rates of the mid and late 1990s. Self-defense and fear of crime are important motivations for handgun ownership among the general population (e.g., Cook and Ludwig, 1996; McDowall and Loftin, 1983), and the concealability and price of handguns make them the firearms of choice for criminal offenders. It is likely that the peak in 1993 was also linked to the Congressional debate and passage of the Brady Act, which established a background check system for gun purchases from retail dealers. It is widely recognized in the gun industry that the consideration of new gun control legislation tends to increase gun sales.

The decline in production was more pronounced for SNS handguns, whose sales are likely to be particularly sensitive to crime trends. Criminal offenders make disproportionate use of these guns. We can also speculate that they are prominent among guns purchased by low-income citizens desiring guns for protection. In contrast, the poor quality and reliability of these guns make them less popular among more knowledgeable and affluent gun buyers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

back down to 21,261 in 1994.  Importation of all foreign LCMM rifles was ended by federal executive order in 1998.

ATF has reported that criminal use of LCMM rifles increased more quickly during the early 1990s than did that of other military-style rifles (U.S. Department of the Treasury, 1998, p. 33; also see Chapter 6).  Accordingly, it is possible that the availability of LCMM rifles also helped to depress the prices of domestic ARs and discourage the production of legalized ARs during the 1990s, particularly if criminal users of rifles place a premium on the ability to accept LCMs.  It is noteworthy, moreover, that the rebound in domestic production of legalized ARs came on the heels of the 1998 ban on LCMM rifles, perhaps suggesting the LCMM ban increased demand for domestic rifles accepting LCMs.

In sum, this examination of the AW ban's impact on gun prices and production suggests that there has likely been a sustained reduction in criminal use of APs since the ban but not necessarily ARs.  Since most AWs used in crime are APs, this should result in an overall decline in AW use.  In the following chapter, we examine the accuracy of this prediction.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 6. CRIMINAL USE OF ASSAULT WEAPONS AFTER THE BAN

### 6.1. Measuring Criminal Use of Assault Weapons: A Methodological Note

In this chapter, we examine trends in the use of AWs using a number of national and local data sources on guns recovered by law enforcement agencies (we focus on the domestic AW models discussed at the beginning of the previous chapter). Such data provide the best available indicator of changes over time in the types (and especially the specific makes and models) of guns used in violent crime and possessed and/or carried by criminal and otherwise deviant or high-risk persons. The majority of firearms recovered by police are tied to weapon possession and carrying offenses, while the remainder are linked primarily to violent crimes and narcotics offenses (e.g., see ATF, 1976; 1977; 1997; Brill, 1977). In general, up to a quarter of guns confiscated by police are associated with violent offenses or shots fired incidents (calculated from ATF, 1977, pp. 96-98; 1997; Brill, 1977, pp. 24,71; Shaw, 1994, pp. 63, 65; also see data presented later in this chapter). Other confiscated guns may be found by officers, turned in voluntarily by citizens, or seized by officers for temporary safekeeping in situations that have the potential for violence (e.g., domestic disputes).

Because not all recovered guns are linked to violent crime investigations, we present analyses based on all gun recoveries and gun recoveries linked to violent crimes where appropriate (some of the data sources are based exclusively, or nearly so, on guns linked to violent crimes). However, the fact that a seized gun is not clearly linked to a violent crime does not rule out the possibility that it had been or would have been used in a violent crime. Many offenders carry firearms on a regular basis for protection and to be prepared for criminal opportunities (Sheley and Wright, 1993a; Wright and Rossi, 1986). In addition, many confiscated guns are taken from persons involved in drugs, a group involved disproportionately in violence and illegal gun trafficking (National Institute of Justice, 1995; Sheley and Wright, 1993a). In some instances, criminal users, including those fleeing crime scenes, may have even possessed discarded guns found by patrol officers. For all these reasons, guns recovered by police should serve as a good approximation of the types of guns used in violent crime, even though many are not clearly linked to such crimes.

Two additional caveats should be noted with respect to tracking the use of AWs. First, we can only identify AWs based on banned makes and models. The databases do not contain information about the specific features of firearms, thus precluding any assessment of non-banned gun models that were altered after purchase in ways making them illegal. In this respect, our numbers may understate the use of AWs, but we know of no data source with which to evaluate the commonality of such alterations. Second, one cannot always distinguish pre-ban versions of AWs from post-ban, legalized versions of the same weapons based on weapon make and model information (this occurs when the post-ban version of an AW has the same name as the pre-ban version), a factor which may have caused us to overstate the use of AWs after the ban. This was more of a problem for our assessment of ARs, as will be discussed below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Finally, we generally emphasize trends in the percentage of crime guns that are AWs in order to control for overall trends in gun violence and gun recoveries. Because gun violence was declining throughout the 1990s, we expected the number of AW recoveries to drop independently of the ban's impact.

## 6.2.  National Analysis of Guns Reported By Police to the Federal Bureau of Alcohol, Tobacco, and Firearms

### 6.2.1.  An Introduction to Gun Tracing Data

In this section, we examine national trends in AW use based on firearm trace requests submitted to ATF by federal, state, and local law enforcement personnel throughout the nation.  A gun trace is an investigation that typically tracks a gun from its manufacture to its first point of sale by a licensed dealer.  Upon request, ATF traces guns seized by law enforcement as a service to federal, state, and local agencies.  In order to initiate a trace on a firearm, the requesting law enforcement agency provides information about the firearm, such as make, model, and serial number.

Although ATF tracing data provide the only available national sample of the types of guns used in crime and otherwise possessed or carried by criminal and high-risk groups, they do have limitations for research purposes.  Gun tracing is voluntary, and police in most jurisdictions do not submit trace requests for all, or in some cases any, guns they seize.  Crime and tracing data for 1994, for example, suggest that law enforcement agencies requested traces for 27% of gun homicides but only 1% of gun robberies and gun assaults known to police during that year (calculated from ATF, 1995 and Federal Bureau of Investigation, 1995, pp. 13, 18, 26, 29, 31, 32).

The processes by which state and local law enforcement agencies decide to submit guns for tracing are largely unknown, and there are undoubtedly important sources of variation between agencies in different states and localities.  For example, agencies may be less likely to submit trace requests in states that maintain their own registers of gun dealers' sales.  Knowledge of ATF's tracing capabilities and procedures,[39] as well as participation in federal/state/local law enforcement task forces, are some of the other factors that may affect an agency's tracing practices.  Further, these factors are likely to vary over time, a point that is reinforced below.

Therefore, firearms submitted to ATF for tracing may not be representative of the

---

[39]  To illustrate, ATF cannot (or does not) trace military surplus weapons, imported guns without the importer name (generally, pre-1968 guns), stolen guns, or guns without a legible serial number (Zawitz 1995).  Tracing guns manufactured before 1968 is also difficult because licensed dealers were not required to keep records of their transactions prior to that time.  Throughout much of the 1990s, ATF did not generally trace guns older than 5-10 years without special investigative reasons (Kennedy et al., 1996, p. 171).  Our data are based on trace requests rather than successful traces, but knowledge of the preceding operational guidelines might have influenced which guns law enforcement agencies chose to trace in some instances.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

types of firearms typically seized by police.  In general, not much is known about the
nature of potential bias in tracing data.  In prior studies, however, AWs tended to be more
common in tracing data than in more representative samples of guns confiscated by
police (Kleck, 1997, pp. 112, 141).  This suggests that police have been more likely
historically to initiate traces for seized AWs than for other seized guns.  Although
comparisons across studies are complicated by varying definitions of AWs used in
different analyses, studies of guns confiscated by police or used in particular types of
crimes generally suggest that AWs accounted for up to 6% of crime guns and about 2%
on average prior to the federal AW ban (see Chapter 3 and Kleck, 1997, p. 141), whereas
studies of pre-ban tracing data indicated that 8% of traced guns, and sometimes as many
as 11%, were AWs  (Cox Newspapers, 1989; Lenett, 1995; Zawitz, 1995).

    Changes over time in the tracing practices of law enforcement agencies present
additional complexities in analyzing tracing data.  Due to improvements in the tracing
process, ATF promotional efforts, and special initiatives like the Youth Crime Gun
Interdiction Initiative (see ATF, 1997; 1999 and more recent reports available via the
Internet at www.atf.treas.gov),[40] the utilization of tracing grew substantially throughout
the 1990s in jurisdictions that chose to participate (also see ATF, 2000; Roth and Koper,
1997).  To illustrate, trace requests to ATF rose from roughly 42,300 in 1991 to 229,500
in 2002 (see Table 6-1 in the next section), an increase of 443%.  This growth reflects
changes in tracing practices (i.e., changes in the number of agencies submitting trace
requests and/or changes in the percentage of recovered guns for which participating
agencies requested traces) rather than changes in gun crime; gun homicides, for example,
were falling throughout the 1990s (see Table 6-1 in the next section) and were a third
lower in 2002 than in 1991.

    Therefore, an increase in trace requests for AWs does not necessarily signal a real
increase in the use of AWs.  Further, examining trends in the percentage of trace requests
associated with AWs is also problematic.  Because law enforcement agencies were more
likely to request traces for AWs than for other guns in years past, we can expect the
growth rate in tracing for non-AWs to exceed the growth rate in traces for AWs as gun
tracing becomes more comprehensive. Consequently, AWs are likely to decline over time
as a share of trace requests due simply to reporting effects, except perhaps during periods
when AWs figure prominently in public discourse on crime.[41]

---

[40]  As part of this initiative, police in a few dozen large cities are submitting trace requests to ATF for all
guns that they confiscate.  The initiative began with 17 cities in 1996 and has since spread to 55 major
urban jurisdictions.

[41]  To illustrate, assume that a hypothetical police agency recovers 100 guns a year, 2 of which are AWs,
and that the agency has a selective tracing policy that results in the submission of trace requests for 20 of
the guns, including 1 of the recovered AWs.  Under this scenario, the department would be almost three
times as likely to request traces for AWs as for other guns.  If the department adopted a policy to request
traces on all guns (and again recovered 2 AWs and 98 other guns), AW traces would double and traces of
other guns would increase by more than 400%.  Moreover, AWs would decline from 5% of traced guns to
2% of traced guns due simply to the change in tracing policy.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

*6.2.2. Traces of Assault Weapons, 1990-2002*

Figure 6-1 illustrates the share of all traces that were for AWs from 1990 through 2002. A more detailed assessment of annual changes in traces for AWs and other guns is presented in Table 6-1. Changes in gun murders are also shown in Table 6-1 to emphasize the differences in trends for tracing and gun crime. Below, we summarize key points from the analysis. Due to the instrumentation problems inherent in tracing data, statistical tests are not presented.[42]

**Figure 6-1. Police Recoveries of Assault Weapons Reported to ATF (National), 1990-2002**



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

---

[42] Nearly 30% of the tracing records lack specific gun model designations (the crucial elements for conducting a trace are the gun make and serial number). For the makes and types of guns likely to be AWs, however, the missing model rate was slightly under 10%. Further, we were able to identity some of the latter weapons as AWs with reasonable confidence based on the makes, types, and calibers alone. Nevertheless, we conducted a supplemental analysis using only those records for which the gun model was identified. The results of that analysis were substantively very similar to those presented below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 6-1. Annual Percentage Changes in Gun Murders and Police Requests to ATF for Traces of Assault Weapons and Other Firearms, 1991-2002 (Number of Traces in Parentheses)**

| Year | Gun Murders (1) | All Traces (2) | AW Traces* (3) | AP Traces (4) | AR Traces (5) | AW and AW Substitute Traces (6) | Violent Crime Traces (7) | AW Violent Crime Traces (8) | LCMM Rifle Traces** (9) |
|------|------|------|------|------|------|------|------|------|------|
| 1991 | 9% | 14% (42281) | 14% (2378) | 24% (1775) | -6% (603) | 14% (2378) | 19% (6394) | 20% (344) | -- |
| 1992 | -1% | 6% (44992) | 1% (2398) | 4% (1838) | -7% (560) | 1% (2398) | 3% (6558) | 7% (367) | -- |
| 1993 | 5% | 20% (54189) | 25% (2994) | 20% (2199) | 42% (795) | 25% (2994) | 26% (8248) | 41% (516) | 252% (183) |
| 1994 | -4% | 53% (82791) | 11% (3337) | 23% (2706) | -21% (631) | 11% (3337) | 22% (10083) | -18% (424) | 223% (592) |
| 1995 | -10% | -6% (77503) | -19% (2730) | -24% (2051) | 8% (679) | -18% (2747) | 23% (12439) | -15% (362) | -10% (530) |
| 1996 | -9% | 66% (128653) | 12% (3059) | 13% (2309) | 10% (750) | 17% (3214) | 67% (20816) | 27% (459) | 40% (743) |
| 1997 | -7% | 42% (183225) | 31% (4019) | 31% (3017) | 34% (1002) | 36% (4362) | 11% (23147) | 13% (519) | 24% (925) |
| 1998 | -11% | 5% (192115) | 0% (4014) | -9% (2751) | 26% (1263) | 7% (4681) | 3% (23844) | -22% (404) | 33% (1227) |
| 1999 | -8% | -2% (188296) | -11% (3581) | -12% (2414) | -8% (1167) | -6% (4406) | 3% (24663) | 0% (404) | -18% (1003) |
| 2000 | 1% | -3% (182961) | -11% (3196) | -16% (2027) | 0% (1169) | -6% (4143) | -13% (21465) | -25% (305) | -14% (859) |
| 2001 | -1% | 18% (215282) | 1% (3238) | 5% (2138) | -6% (1100) | 3% (4273) | 20% (25822) | 6% (322) | -3% (833) |
| 2002 | 6% | 7% (229525) | 19% (3839) | 4% (2214) | 48% (1625) | 12% (4765) | 20% (30985) | 65% (531) | 4% (865) |

* Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models.
** Foreign semiautomatic rifles accepting large capacity military magazines (banned by executive order in 1998). (Data are not shown for 1991 and 1992 because very few of these guns were traced in those years.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

*6.2.2.1. Assault Weapons as a Percentage of Crime Gun Traces*

As shown in Figure 6-1, AWs declined from 5.4% of crime gun traces in 1992-1993 to 1.6% in 2001-2002, a decline of 70%. Although this downward trend could be attributable in large part to changes in tracing practices, it is noteworthy that it did not begin until 1994 (the year of the ban); during the pre-ban years, 1990 to 1993, AWs accounted for a steady share of traces despite a 46% increase in total tracing volume. It is also remarkable that about 3,200 AWs were traced in both 2000 and 2001, which is virtually identical to the average number traced during 1993 and 1994 (3,166) even though total traces increased more than 190% during the same period (Table 6-1, columns 2 and 3).[43]

*6.2.2.2. Annual Changes in Traces for Assault Weapons and Other Guns*

Throughout most of the post-ban period (particularly 1995 to 2001), AW traces either increased less or declined more than total traces (Table 6-1, columns 2 and 3), a pattern that is also consistent with a decline in the use of AWs relative to other guns, though it too may be distorted by changes in tracing practices. This pattern was largely consistent whether analyzing all traces or only traces associated with violent crimes (columns 7 and 8).[44]

The years when total traces declined or were relatively flat are arguably the most informative in the series because they appear to have been less affected by changes in tracing practices. For example, there was a 6% decline in total trace requests from 1994 to 1995 (the years featured in our earlier study) that coincided with a 10% drop in gun murders (Table 6-1, column 1). Therefore, it seems tracing practices were relatively stable (or, conversely, reporting effects were relatively small) from 1994 to 1995. The 19% reduction in AW traces during this same period implies that AW use was declining faster than that of other guns. Furthermore, there were fewer AW traces in 1995 than in 1993, the year prior to the ban. The fact that this occurred during a period when the AW issue was very prominent (and hence police might have been expected to trace more of the AWs they recovered) arguably strengthens the causal inference of a ban effect.[45]

Total traces also declined slightly (2%-3%) in 1999 and 2000. In each of those years, the decline was greater for AWs (11%). Thus, in years when tracing declined overall, AW traces fell 3 to 6 times faster than did total traces. Put another way, AWs fell between 9% and 13% as a percentage of all traces in each of these years.

The general pattern of AW traces increasing less or declining more than those of

---

[43] These general findings are consistent with those of other tracing analyses conducted by ATF (2003 Congressional Q&A memo provided to the author) and the Brady Center to Prevent Gun Violence (2004).
[44] A caveat is that requests without specific crime type information are often grouped with weapons offenses (ATF, 1999). Therefore, traces associated with violent crimes are likely understated to some degree.
[45] This inference is also supported by our earlier finding that trace requests for AWs declined by only 8% in states that had their own AW bans prior to the federal ban (Roth and Koper, 1997, Chapter 5).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

other crime guns was clearly apparent for APs but less consistent for ARs (Table 6-1, columns 4 and 5). For example, AR traces went up 26% in 1998 while total traces went up only 5% and AP traces declined 9%. In 2000, total and AP traces fell 3% and 16%, respectively, but AR traces remained flat. This is consistent with predictions derived from the price and production analyses described above. But note that the post-ban AR counts could be overstated because the data do not distinguish pre-ban from post-ban versions of some popular AR-15 type rifles like the Colt Sporter and Bushmaster XM-15. (Also note that the percentage of traces for ARs did fall from 1.4% in 1992-1993 to 0.6% in 2001-2002.)

More generally, the use of post-ban AW-type weapons (including both legalized APs and ARs) has not been widespread enough to completely offset the apparent decline in the use of banned AWs. Combined traces for banned AWs and AW substitutes (Table 6-1, column 6) also followed the pattern of increasing less or declining more than did total traces throughout most of the period, though the differences were not as pronounced as those between AWs and total traces. In 1999 and 2000, for example, AWs traces dropped 11%, while combined traces for AWs and legal substitutes declined only 6%. Still, the latter figure was greater than the 2%-3% drop for total traces.

Finally, traces of the LCMM rifles banned by executive order in 1998 were generally rising to that point, reaching levels as high as those for AR-15 type rifles (Table 6-1, column 9). Since 1998, however, the number of traces for LCMM rifles has fallen substantially. Despite a 4% increase from 2001 to 2002, the number of LCMM traces in 2002 (865) was 30% lower than the peak number traced in 1998 (1,227). Tentatively, this suggests that the 1998 extension of the ban has been effective in curtailing weapons that offenders may have been substituting for the ARs banned in 1994.

### 6.2.2.3. Did Use of Assault Weapons Rebound in 2002?

In 2002, tracing volume increased 7%, which closely matched the 6% increase in gun murders for that year. In contrast to the general pattern, AW traces increased by 19%, suggesting a possible rebound in AW use independent of changes in tracing practices, a development that we have predicted elsewhere (Roth and Koper, 1997) based on the boom in AW production leading up to the ban. The disproportionate growth in AW traces was due to ARs, however, so it could partially reflect increasing use of post-ban AR-type rifles (see the discussion above).

Moreover, this pattern could be illusory. With data from the most recent years, it was possible to run a supplementary analysis screening out traces of older weapons (not shown). Focusing on just those guns recovered and traced in the same year for 2000 through 2002 revealed that recoveries of AWs declined in 2001, more so for ARs (16%) than for APs (9%), while total traces increased 1%.[46] Traces for APs and ARs then

---

[46] The tracing database indicates when guns were recovered and when they were traced. However, the recovery dates were missing for 30% of the records overall and were particularly problematic for years prior to 1998. For this reason, the main analysis is based on request dates. The auxiliary analysis for 2000-

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

increased in 2002 (1% and 6%, respectively) but by less than total traces (8%). Therefore, the disproportionate growth in AR traces in 2002 shown in Table 6-1 may have been due to tracing of older AWs by newly participating police agencies.

### 6.2.2.4. Summary of the ATF Gun Tracing Analysis

Complexities arising from recent changes in the use of gun tracing by law enforcement warrant caution in the interpretation of ATF gun tracing data. Notwithstanding, the data suggest that use of AWs in crime, though relatively rare from the start, has been declining. The percentage of gun traces that were for AWs plummeted 70% between 1992-1993 and 2001-2002 (from 5.4% to 1.6%), and this trend did not begin until the year of the AW ban. On a year-to-year basis, AW traces generally increased less or declined by more than other gun traces. Moreover, in years when tracing volume declined – that is, years when changes in reporting practices were least likely to distort the data – traces of AWs fell 3 to 6 times faster than gun traces in general. The drop in AW use seemed most apparent for APs and LCMM rifles (banned in 1998). Inferences were less clear for domestic ARs, but assessment of those guns is complicated by the possible substitution of post-ban legal variations.

### 6.3. Local Analyses of Guns Recovered By Police

Due to concerns over the validity of national ATF tracing data for investigating the types of guns used in crime, we sought to confirm the preceding findings using local data on guns recovered by police. To this end, we examined data from half a dozen localities and time periods.

- All guns recovered by the Baltimore Police Department from 1992 to 2000 (N=33,933)
- All guns recovered by the Metro-Dade Police Department (Miami and Dade County, Florida) from 1990 to 2000 (N=39,456)
- All guns recovered by the St. Louis Police Department from 1992 to 2003 (N=34,143)
- All guns recovered by the Boston Police Department (as approximated by trace requests submitted by the Department to ATF) from 1991 to 1993 and 2000 to 2002 (N=4,617)[47]

---

2002 focuses on guns both recovered and traced in the same year because it is likely that some guns recovered in 2002 had not yet been traced by the spring of 2003 when this database was created. Using only guns recovered and traced in the same year should mitigate this bias.

[47] The Boston Police Department has been tracing guns comprehensively since 1991 (Kennedy et al., 1996). However, we encountered difficulties in identifying Boston Police Department traces for several years in the mid-1990s. For this reason, we chose to contrast the 1991 to 1993 period with the 2000 to 2002 period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

- Guns recovered during murder investigations in Milwaukee County from 1991 to 1998 (N=592)[48]
- Guns linked to serious crimes in Anchorage and other parts of Alaska and submitted to state firearm examiners for evidentiary testing from 1987 to 2000 (N=900)[49]

The selection of these particular locations and samples reflects data availability.[50] The locations were not selected randomly, and some of the samples are small for conducting trend analysis of relatively rare events (i.e., AW recoveries). Accordingly, we must use caution in generalizing the results to other places. However, the data sources reflect a wide geographic range and cover post-ban periods extending through at least the latter 1990s (and typically through the year 2000 or beyond). To the extent that the results are similar across these jurisdictions, therefore, we can have more confidence that they reflect national patterns.

In each jurisdiction, we examined pre-post changes in recoveries of AWs (focusing on the domestic AW group defined earlier) and substitution of post-ban AW models for the banned models. Where possible, we conducted separate analyses of all AW recoveries and those linked specifically to violent crimes.[51] We also differentiated between AP and AR trends using the larger databases from Baltimore, Miami, and St. Louis. But since most of these databases do not extend more than two years beyond 1998, we do not present analyses specifically for LCMM rifles.

Key summary results are summarized in Table 6-2, while more detailed results from each site appear at the end of the chapter in Tables 6-3 through 6-6 and Figures 6-2 through 6-6.[52] The number of AW recoveries declined by 28% to 82% across these

---

[48] The data are described in reports from the Medical College of Wisconsin (Hargarten et al., 1996; 2000) and include guns used in the murders and other guns recovered at the crime scenes. Guns are recovered in approximately one-third of Milwaukee homicide cases.

[49] The data include guns submitted by federal, state, and local agencies throughout the state. Roughly half come from the Anchorage area. Guns submitted by police to the state lab are most typically guns that were used in major crimes against persons (e.g. murder, attempted murder, assault, robbery).

[50] We contacted at least 20 police departments and crime labs in the course of our data search, focusing much of our attention on police departments participating in ATF's Youth Crime Gun Interdiction Initiative (YCGII) (ATF, 1997; 1999). Departments participating in the YCGII submit data to ATF on all guns that they recover. Though the YCGII did not begin until 1996 (well after the implementation of the AW ban), we suspected that these departments would be among those most likely to have electronically-stored gun data potentially extending back in time to before the ban. Unfortunately, most of these departments either did not have their gun data in electronic format or could not provide data for other reasons (e.g., resource constraints). In the course of our first AW study (Roth and Koper, 1997), we contacted many other police departments that also did not have adequate data for the study.

[51] All of the Milwaukee and Anchorage analyses were limited to guns involved in murders or other serious crimes. Despite evidence of a decline, AW recoveries linked to violence were too rare in Boston to conduct valid test statistics.

[52] We omitted guns recovered in 1994 from both the pre and post-ban counts because the speculative price increases for AWs that occurred in 1994 (see previous section and Roth and Koper, 1997, Chapter 4) raise questions about the precise timing of the ban's impact on AW use during that year, thereby clouding the designation of the intervention point. This is particularly a concern for the Baltimore analysis due to a

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

locations and time periods, but the discussion below focuses on changes in AWs as a share of crime guns in order to control for general trends in gun crime and gun seizures. Prior to the ban, AWs ranged from about 1% of guns linked to violent crimes in St. Louis to nearly 6% of guns recovered in Milwaukee murder cases.[53]

AWs dropped as share of crime guns in all jurisdictions after the ban. Reductions ranged from a low of 17% in Milwaukee (based on guns linked to homicides) to a high of 72% in Boston (based on all crime guns) but were generally between 32% and 40%.[54, 55] A decline in the use of AWs relative to other guns was generally apparent whether examining all AW recoveries or just those linked to violent crimes.[56] An exception was in St. Louis, where

---

state AP ban that took effect a few months prior to the federal AW ban.

[53] These figures should be treated as approximations of the prevalence of AWs. On the one hand, the numbers may understate the prevalence of AWs to a small degree because they are based on only the domestic AW group defined earlier. Based on analysis of national ATF gun tracing data, we estimated previously that the domestic AW group accounts for 82% of AWs used in crime (Roth and Koper, 1997, Chapter 5). To further test the reliability of this assessment, we investigated the prevalence of all banned AW models among guns recovered in Baltimore using an ATF list of all guns defined as AWs under the 1994 Crime Act criteria (118 model and caliber combinations). We chose the Baltimore database because it provides a complete inventory of guns recovered by police in that city during the study period and, having been maintained by crime lab personnel, is particularly thorough with regard to make and model identifications. Though there was some ambiguity in classifying a small number of AK-type semiautomatic rifles (there are many civilian variations of the AK-47 rifle, some of which were legal under the 1994 legislation), our examination suggested that the domestic AW group accounted for approximately 90% of the AWs recovered in Baltimore. (In addition, including all AWs had virtually no effect on the pre-post changes in AW use in Baltimore.) But as discussed previously, the counts could also overstate AW use to some degree because imprecision in the identification of gun models in some data sources may have resulted in some legalized firearms being counted as banned AWs.

[54] The AW counts for Miami also include Interdynamics KG9 and KG99 models. These models were produced during the early 1980s and were forerunners to the Intratec models (ATF restricted the KG9 during the early 1980s because it could be converted too easily to fully automatic fire). These weapons were very rare or non-existent in most of the local data sources, but they were more common in Miami, where Interdynamics was formerly based. Including these guns increased the AW count in Miami by about 9% but did not affect pre-post changes in AW recoveries.

[55] State AW legislation passed in Maryland and Massachusetts could have had some impact on AW trends in Baltimore and Boston, respectively. Maryland implemented an AP ban, similar in coverage to the federal AW ban, in June 1994 (Maryland has also required background checks for retail sales of a broader list of state-defined AWs since 1989), and Massachusetts implemented additional legislation on federally-defined AWs in late 1998. The timing and scope of these laws make them largely redundant with the federal ban, so they should not unduly complicate inferences from the analysis. However, Maryland forbids additional transfers of grandfathered APs, and Massachusetts has imposed additional requirements for possession and transfer of LCMs and guns accepting LCMs. Both states also have enhanced penalties for certain crimes involving APs, LCMs, and/or guns accepting LCMs. Hence, the ban on AWs was arguably strengthened in Baltimore and Boston, relative to the other jurisdictions under study. This does not appear to have affected trends in AW use in Baltimore, which were very similar to those found in the other study sites. However, use of AWs and combined use of AWs and post-ban AW substitutes declined more in Boston than in any other study site. Although the trends in Boston could also reflect ongoing, post-2000 reductions in use of AWs and similar weapons (Boston was one of the only study sites from which we obtained post-2000 data), it is possible that the Massachusetts legislation was also a contributing factor.

[56] There may be some inconsistency across jurisdictions in the identification of guns associated with violent crimes. In Miami, for example, 28% of the guns had an offense code equal to "other/not listed," and this percentage was notably higher for the later years of the data series.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 6-2. Pre-Post Changes in Assault Weapons As a Share of Recovered Crime Guns For Selected Localities and Time Periods:  Summary Results (Total Number of Assault Weapons for Pre and Post Periods in Parentheses) [a]**

| Locality and Time Period | AWs | AWs (Linked to Violence) | APs | ARs | AWs and Post-Ban Substitutes |
|---|---|---|---|---|---|
| Baltimore (all recoveries) pre=1992-1993, post=1995-2000 | -34%*** (425) | -41%** (75) | -35%*** (383) | -24% (42) | -29%*** (444) |
| Miami-Dade (all recoveries) pre=1990-1993, post=1995-2000 | -32%*** (733) | -39%*** (101) | -40%*** (611) | 37%* (115) | -30%*** (746) |
| St. Louis (all recoveries) pre=1992-1993, post=1995-2003 | -32%*** (306) | 1% (28) | -34%*** (274) | 10% (32) | -24%** (328) |
| Boston (all recoveries) pre=1991-1993, post=2000-2002 | -72%*** (71) | N/A | N/A | N/A | -60%*** (76) |
| Milwaukee (recoveries in murder cases) pre=1991-1993, post=1995-1998 | N/A | -17% (28) | N/A | N/A | 2% (31) |
| Anchorage, AK (recoveries in serious crimes) pre=1987-1993, post=1995-2000 | N/A | -40% (24) | N/A | N/A | -40% (24) |

a.  Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models.  See the text for additional details about each sample and Tables 6-3 through 6-6 for more detailed results from each locality.
* Statistically significant change at chi-square p level < .1
** Statistically significant change at chi-square p level < .05
*** Statistically significant change at chi-square p level < .01

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

AWs declined as share of all guns but not of guns linked to violent crimes, though the latter test was based on rather small samples.

These reductions were not due to any obvious pre-ban trends (see Figures 6-2 through 6-6 at the end of the chapter). On the contrary, AW recoveries reached a peak in most of these jurisdictions during 1993 or 1994 (Boston, which is not shown in the graphs due to missing years, was an exception). We tested changes in AW prevalence using simple chi-square tests since there were no observable pre-existing time trends in the data. Due to the small number of AWs in some of these samples, these changes were not all statistically significant. Nonetheless, the uniformity of the results is highly suggestive, especially when one considers the consistency of these results with those found in the national ATF tracing analysis.

The changes in Tables 6-2 through 6-6 reflect the average decline in recoveries of AWs during the post-ban period in each locality. However, some of these figures may understate reductions to date. In several of the localities, the prevalence of AWs among crime guns was at, or close to, its lowest recent year analyzed (see Figures 6-2 through 6-6 at the end of the chapter), suggesting that AW use continues to decline. In Miami, for example, AWs accounted for 1.7% of crime guns for the whole 1995 to 2000 period but had fallen to 1% by 2000. Further, the largest AW decline was recorded in Boston, one of two cities for which data extended beyond the year 2000 (however, this was not the case in St. Louis, the other locality with post-2000 data).

Breakouts of APs and ARs in Baltimore, Miami, and St. Louis show that the decline in AW recoveries was due largely to APs, which accounted for the majority of AWs in these and almost all of the other localities (the exception was Anchorage, where crimes with rifles were more common, as a share of gun crimes, than in the other sites). Pre-post changes in recoveries of the domestic AR group weapons, which accounted for less than 1% of crime guns in Baltimore, Miami, and St. Louis, were inconsistent. AR recoveries declined after the ban in Baltimore but increased in St. Louis and Miami. As discussed previously, however, the AR figures may partly reflect the substitution of post-ban, legalized versions of these rifles, thus overstating post-ban use of the banned configurations. Further, trends for these particular rifles may not be indicative of those for the full range of banned rifles, including the various foreign rifles banned by the 1994 law and the import restrictions of 1989 and 1998 (e.g., see the ATF gun tracing analysis of LCMM rifles).[57]

---

[57] As discussed in the last chapter, our research design focused on common AWs that were likely to be most affected by the 1994 ban as opposed to earlier regulations (namely, the 1989 import ban) or other events (e.g., company closings or model discontinuations prior to 1994). However, an auxiliary analysis with the Baltimore data revealed a statistically meaningful drop in recoveries of all ARs covered by the 1994 legislation (not including the LCMM rifles) that was larger than that found for just the domestic group ARs discussed in the text. Similarly, an expanded AR analysis in Miami showed that total AR recoveries declined after the ban, in contrast to the increase found for the domestic group ARs. (Even after expanding the analysis, ARs still accounted for no more than 0.64% of crime guns before the ban in both locations. As with the domestic AR group, there are complexities in identifying banned versus non-banned versions of some of the other ARs, so these numbers are approximations.) Consequently, a more nuanced view of AR trends may be that AR use is declining overall, but this decline may be due largely to the 1989 import

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Finally, the overall decline in AW use was only partially offset by substitution of the post-ban legalized models.  Even if the post-ban models are counted as AWs, the share of crime guns that were AWs still fell 24% to 60% across most jurisdictions.  The exception was Milwaukee where recoveries of a few post-ban models negated the drop in banned models in a small sample of guns recovered during murder investigations.[58]

### 6.4. Summary

Consistent with predictions derived from the analysis of market indicators in Chapter 5, analyses of national ATF gun tracing data and local databases on guns recovered by police in several localities have been largely consistent in showing that criminal use of AWs, while accounting for no more than 6% of gun crimes even before the ban, declined after 1994, independently of trends in gun crime.  In various places and times from the late 1990s through 2003, AWs typically fell by one-third or more as a share of guns used in crime.[59, 60]  Some of the most recent, post-2000 data suggest

---

restrictions that predated the AW ban.  It is not yet clear that there has been a decline in the most common ARs prohibited exclusively by the 1994 ban.

[58] This was not true when focusing on just those guns that were used in the incident as opposed to all guns recovered during the investigations.  However, the samples of AWs identified as murder weapons were too small for valid statistical tests of pre-post changes.

[59] These findings are also supported by prior research in which we found that reported thefts of AWs declined 7% in absolute terms and 14% as a fraction of stolen guns in the early period following the ban (i.e., late 1994 through early 1996) (Koper and Roth, 2002a, p. 21).  We conducted that analysis to account for the possibility that an increase in thefts of AWs might have offset the effect of rising AW prices on the availability of AWs to criminals.  Because crimes with AWs appear to have declined after the ban, the theft analysis is not as central to the arguments in this paper.

[60] National surveys of state prisoners conducted by the federal Bureau of Justice Statistics show an increase from 1991 to 1997 in the percentage of prisoners who reported having used an AW  (Beck et al., 1993; Harlow, 2001).  The 1991 survey (discussed in Chapter 3) found that 2% of violent gun offenders had carried or used an AW in the offense for which they were sentenced (calculated from Beck et al. 1993, pp. 18,33).  The comparable figure from the 1997 survey was nearly 7% (Harlow, 2001, pp.3, 7).

Although these figures appear contrary to the patterns shown by gun recovery data, there are ambiguities in the survey findings that warrant caution in such an interpretation.  First, the definition of an AW (and most likely the respondents' interpretation of this term) was broader in the 1997 survey.  For the 1991 survey, respondents were asked about prior ownership and use of a "…military-type weapon, such as an Uzi, AK-47, AR-15, or M-16" (Beck et al., 1993, p. 18), all of which are ARs or have AR variations.  The 1997 survey project defined AWs to "…include the Uzi, TEC-9, and the MAC-10 for handguns, the AR-15 and AK-47 for rifles, and the 'Street Sweeper' for shotguns" (Harlow, 2001, p. 2).  (Survey codebooks available from the Inter-University Consortium for Political and Social Research also show that the 1997 survey provided more detail and elaboration about AWs and their features than did the 1991 survey, including separate definitions of APs, ARs, and assault shotguns.)

A second consideration is that many of the respondents in the 1997 survey were probably reporting criminal activity prior to or just around the time of the ban.  Violent offenders participating in the survey, for example, had been incarcerated nearly six years on average at the time they were interviewed (Bureau of Justice Statistics, 2000, p. 55).  Consequently, the increase in reported AW use may reflect an upward trend in the use of AWs from the 1980s through the early to mid 1990s, as well as a growing recognition of these weapons (and a greater tendency to report owning or using them) stemming from publicity about the AW issue during the early 1990s.

Finally, we might view the 1997 estimate skeptically because it is somewhat higher than that from most other sources.  Nevertheless, it is within the range of estimates discussed earlier and could reflect a

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

reductions as high as 70%.[61]  This trend has been driven primarily by a decline in the use of APs, which account for a majority of AWs used in crime.  AR trends have been more varied and complicated by the substitution of post-ban guns that are very similar to some banned ARs.  More generally, however, the substitution of post-ban AW-type models with fewer military features has only partially offset the decline in banned AWs.

These findings raise questions as to the whereabouts of surplus AWs, particularly APs, produced just prior to the ban.  Presumably, many are in the hands of collectors and speculators holding them for their novelty and value.[62]  Even criminal possessors may be more sensitive to the value of their AWs and less likely to use them for risk of losing them to police.

Finally, it is worth noting the ban has not completely eliminated the use of AWs, and, despite large relative reductions, the share of gun crimes involving AWs is similar to that before the ban.  Based on year 2000 or more recent data, the most common AWs continue to be used in up to 1.7% of gun crimes.

---

somewhat higher use of AWs among the subset of offenders who are most active and/or dangerous; recall that the highest estimate of AW use among the sources examined in this chapter came from a sample of guns recovered during murder investigations in Milwaukee (also see the discussion of offender surveys and AWs in Chapter 3).

[61] Developing a national estimate of the number of AW crimes prevented by the ban is complicated by the range of estimates of AW use and changes therein derived from different data sources.  Tentatively, nonetheless, it appears the ban prevents a few thousand crimes with AWs annually.  For example, using 2% as the best estimate of the share of gun crimes involving AWs prior to the ban (see Chapter 3) and 40% as a reasonable estimate of the post-ban drop in this figure implies that almost 2,900 murders, robberies, and assaults with AWs were prevented in 2002 (this assumes that 1.2% of the roughly 358,000 gun murders, gun robberies, and gun assaults reported to police in 2002 [see the *Uniform Crime Reports*] involved AWs but that 2% would have involved AWs had the ban not been in effect).  Even if this estimate is accurate, however, it does not mean the ban prevented 2,900 gun crimes in 2002; indeed, the preceding calculation assumes that offenders prevented from using AWs committed their crimes using other guns.  Whether forcing such weapon substitution can reduce the number of persons wounded or killed in gun crimes is considered in more detail in Chapter 9.

[62] The 1997 national survey of state prisoners discussed in footnote 60 found that nearly 49% of AW offenders obtained their gun from a "street" or illegal source, in contrast to 36% to 42% for other gun users (Harlow, 2001, p. 9).  This could be another sign that AWs have become harder to acquire since the ban, but the data cannot be used to make an assessment over time.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 6-3.  Trends in Police Recoveries of Domestic Assault Weapons in Baltimore, 1992-2000** [a]

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2000 |  |
|  |  |  |  |
| Total AWs | 135 | 290 |  |
| Annual Mean | 67.5 | 48.33 | -28% |
| AW's as % of Guns | 1.88% | 1.25% | -34%** |
|  |  |  |  |
| APs | 123 | 260 |  |
| Annual Mean | 61.5 | 43.33 | -30% |
| APs as % of Guns | 1.71% | 1.12% | -35%** |
|  |  |  |  |
| ARs | 12 | 30 |  |
| Annual Mean | 6 | 5 | -17% |
| ARs as % of Guns | 0.17% | 0.13% | -24% |
|  |  |  |  |
| Total AWs and Substitutes | 135 | 309 |  |
| Annual Mean | 67.5 | 51.5 | -24% |
| AWs/Subs as % of Guns | 1.88% | 1.33% | -29%** |
|  |  |  |  |
| **B.  Recoveries Linked to Violent Crimes** [b] |  |  |  |
|  |  |  |  |
| Total AWs | 28 | 47 |  |
| Annual Mean | 14 | 7.83 | -44% |
| AWs as % of Violent Crime Guns | 2.1% | 1.24% | -41%* |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b.  Murders, assaults, and robberies
* Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance).
** Chi-square p level < .01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 6-2. Police Recoveries of Assault Weapons in Baltimore, 1992-2000**



As % of Recovered Guns (N=33,933)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 6-4. Trends in Police Recoveries of Domestic Assault Weapons in Miami (Metro-Dade), 1990-2000** [a]

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1990-Dec. 1993 | Jan. 1995-Dec. 2000 |  |
|  |  |  |  |
| Total AWs | 403 | 330 |  |
| Annual Mean | 100.75 | 55 | -45% |
| AW's as % of Guns | 2.53% | 1.71% | -32%*** |
|  |  |  |  |
| APs | 355 | 256 |  |
| Annual Mean | 88.75 | 42.67 | -52% |
| APs as % of Guns | 2.23% | 1.33% | -40%*** |
|  |  |  |  |
| ARs | 43 | 72 |  |
| Annual Mean | 10.75 | 12 | 12% |
| ARs as % of Guns | 0.27% | 0.37% | 37%* |
|  |  |  |  |
| Total AWs and Substitutes | 403 | 343 |  |
| Annual Mean | 100.75 | 57.17 | -43% |
| AWs/Subs as % of Guns | 2.53% | 1.78% | -30%*** |
|  |  |  |  |
| **B.  Recoveries Linked to Violent Crimes** [b] |  |  |  |
|  |  |  |  |
| Total AWs | 69 | 32 |  |
| Annual Mean | 17.25 | 5.33 | -69% |
| AWs as % of Violent Crime Guns | 2.28% | 1.39% | -39%** |

a. Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b. Murders, assaults, and robberies
* Chi-square p level < .1 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
** Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
*** Chi-square p level <.01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 6-3. Police Recoveries of Assault Weapons in Miami (Metro-Dade), 1990-2000**



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 6-5.  Trends in Police Recoveries of Domestic Assault Weapons in St. Louis, 1992-2003 [a]**

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2003 | |
|  |  |  |  |
| Total AWs | 94 | 212 | |
| Annual Mean | 47 | 23.56 | -50% |
| AW's as % of Guns | 1.33% | 0.91% | -32%** |
|  |  |  |  |
| APs | 87 | 187 | |
| Annual Mean | 43.5 | 20.78 | -52% |
| APs as % of Guns | 1.23% | 0.81% | -34%** |
|  |  |  |  |
| ARs | 7 | 25 | |
| Annual Mean | 3.5 | 2.78 | -21% |
| ARs as % of Guns | 0.1% | 0.11% | 10% |
|  |  |  |  |
| Total AWs and Substitutes | 94 | 234 | |
| Annual Mean | 47 | 26 | -45% |
| AWs/Subs as % of Guns | 1.33% | 1.01% | -24%* |
|  |  |  |  |
| **B.  Recoveries Linked to Violent Crimes [b]** | | | |
|  |  |  |  |
| Total AWs | 8 | 20 | |
| Annual Mean | 4 | 2.2 | -45% |
| AWs as % of Violent Crime Guns | 0.8% | 0.81% | 1% |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b.  Murders, assaults, and robberies
* Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
** Chi-square p level <.01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

### Figure 6-4. Police Recoveries of Assault Weapons in St. Louis, 1992-2003

As % of Recovered Guns (N=34,143)



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 6-6. Trends in Police Recoveries of Domestic Assault Weapons in Boston, Milwaukee, and Anchorage (Alaska)** [a]

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **Boston** | Jan. 1991-Dec. 1993 | Jan. 2000-Dec. 2002 |  |
| (All Gun Traces) |  |  |  |
| AWs | 60 | 11 |  |
| Annual Mean | 20 | 3.7 | -82% |
| AWs as % of Guns | 2.16% | 0.6% | -72%* |
|  |  |  |  |
| AWs and Substitutes | 60 | 16 |  |
| Annual Mean | 20 | 5.3 | -74% |
| AWs/Subs as % of Guns | 2.16% | 0.87% | -60%* |
|  |  |  |  |
| **Milwaukee** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 |  |
| (Guns Recovered in Murder Cases) |  |  |  |
| AWs | 15 | 13 |  |
| Annual Mean | 5 | 3.25 | -35% |
| AWs as % of Guns | 5.91% | 4.91% | -17% |
|  |  |  |  |
| AWs and Substitutes | 15 | 16 |  |
| Annual Mean | 5 | 4 | -20% |
| AWs/Subs as % of Guns | 5.91% | 6.04% | 2% |
|  |  |  |  |
| **Anchorage** | Jan. 1987-Dec. 1993 | Jan. 1995-Dec. 2000 |  |
| (Guns Tested for Evidence) |  |  |  |
| AWs | 16 | 8 |  |
| Annual Mean | 2.29 | 1.33 | -42% |
| AW's as % of Guns | 3.57% | 2.13% | -40% |
|  |  |  |  |
| AWs and Substitutes | N/A | N/A |  |

a. Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
* Chi-square p level < .01 (changes in percentages of guns that were AWs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## Figure 6-5. Assault Weapons Recovered in Milwaukee County Murder Cases, 1991-1998



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

## Figure 6-6. Police Recoveries of Assault Weapons in Anchorage (Alaska), 1987-2000



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 7.  MARKET INDICATORS FOR LARGE CAPACITY MAGAZINES:  PRICES AND IMPORTATION

      The previous chapters examined the AW-LCM ban's impact on the availability and criminal use of AWs.  In this chapter and the next, we consider the impact of the ban's much broader prohibition on LCMs made for numerous banned and non-banned firearms.  We begin by studying market indicators.  Our earlier study of LCM prices for a few gun models revealed that prices rose substantially during 1994 and into 1995 (Roth and Koper, 1997, Chapter 4).  Prices of some LCMs remained high into 1996, while others returned to pre-ban levels or oscillated more unpredictably.  The price increases may have reduced LCM use at least temporarily in the short-term aftermath of the ban, but we could not confirm this in our prior investigation.

### 7.1.  Price Trends for Large Capacity Magazines

      For this study, we sought to approximate longer term trends in the prices at which users could purchase banned LCMs throughout the country.  To that end, we analyzed quarterly data on the prices of LCMs advertised by eleven gun and magazine distributors in *Shotgun News*, a national gun industry publication, from April 1992 to December 1998.[63]  Those prices are available to any gun dealer, and primary market retailers generally re-sell within 15% of the distributors' prices.[64]  The distributors were chosen during the course of the first AW study (Roth and Koper, 1997) based on the frequency with which they advertised during the April 1992 to June 1996 period.  For each quarterly period, project staff coded prices for one issue from a randomly selected month.  We generally used the first issue of each selected month based on a preliminary, informal assessment suggesting that the selected distributors advertised more frequently in those issues.  In a few instances, first-of-month issues were unavailable to us or provided too few observations, so we substituted other issues.[65]  Also, we were unable to obtain *Shotgun News* issues for the last two quarters of 1996.  However, we aggregated the data annually to study price trends, and the omission of those quarters did not appear to affect the results (this is explained further below).

      We ascertained trends in LCM prices by conducting hedonic price analyses,

---

[63]  The *Blue Book of Gun Values*, which served as the data source for the AW price analysis, does not contain ammunition magazine prices.

[64]  According to gun market experts, retail prices track wholesale prices quite closely (Cook et al., 1995, p. 71).  Retail prices to eligible purchasers generally exceed wholesale (or original-purchase) prices by 3% to 5% in the large chain stores, by about 15% in independent dealerships, and by about 10% at gun shows (where overhead costs are lower).

[65]  The decision to focus on first-of-month issues was made prior to data collection for price analysis update.  For the earlier study (Roth and Koper, 1997), project staff coded data for one or more randomly selected issues of every month of the April 1992 to June 1996 period.  For this analysis, we utilized data from only the first-of-month issues selected at random during the prior study.  If multiple first-of-month issues were available for a given quarter, we selected one at random or based on the number of recorded advertisements.  If no first-of-month issue was available for a given quarter, we selected another issue at random from among those coded during the first study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

similar to those described in the AW price analysis (Chapter 5), in which we regressed inflation-adjusted LCM prices (logged) on several predictors: magazine capacity (logged), gun make (for which the LCM was made), year of the advertisement, and distributor. We cannot account fully for the meaning of significant distributor effects. They may represent unmeasured quality differentials in the merchandise of different distributors, or they may represent other differences in stock volume or selling or service practices between the distributors.[66] We included the distributor indicators when they proved to be significant predictors of advertised price. In addition, we focused on LCMs made for several of the most common LCM-compatible handguns and rifles, rather than try to model the differences in LCM prices between the several hundred miscellaneous makes and models of firearms that were captured in the data. Finally, for both the handgun and rifle models, we created and tested seasonal indicator variables to determine if their incorporation would affect the coefficient for 1996 (the year with winter/spring data only), but they proved to be statistically insignificant and are not shown in the results below.[67]

### 7.1.1.  Large Capacity Magazines for Handguns

The handgun LCM analysis tracks the prices of LCMs made for Intratec and Cobray (i.e., SWD) APs and non-banned semiautomatic pistols made by Smith and Wesson, Glock, Sturm Ruger, Sig-Sauer, Taurus, and Beretta (each of the manufacturers in the former group produces numerous models capable of accepting LCMs). In general, LCMs with greater magazine capacities commanded higher prices, and there were significant price differentials between LCMs made for different guns and sold by different distributors (see Table 7-1). Not surprisingly, LCMs made for Glock handguns were most expensive, followed by those made for Beretta and Sig-Sauer firearms.

Turning to the time trend indicators (see Table 7-1 and Figure 7-1), prices for these magazines increased nearly 50% from 1993 to 1994, and they rose another 56% in 1995. Prices declined somewhat, though not steadily, from 1996 to 1998. Nevertheless, prices in 1998 remained 22% higher than prices in 1994 and nearly 80% higher than those in 1993.

---

[66] For example, one possible difference between the distributors may have been the extent to which they sold magazines made of different materials (e.g., steel, aluminum, etc.) or generic magazines manufactured by companies other than the companies manufacturing the firearms for which the magazines were made. For example, there were indications in the data that 3% of the handgun LCMs and 10% of the AR-15 and Mini-14 rifle LCMs used in the analyses (described below) were generic magazines. We did not control for these characteristic, however, because such information was often unclear from the advertisements and was not recorded consistently by coders.

[67] Project staff coded all LCM advertisements by the selected distributors. Therefore, the data are inherently weighted. However, the weights are based on the frequency with which the different LCMs were advertised (i.e., the LCMs that were advertised most frequently have the greatest weight in the models) rather than by production volume.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 7-1. Regression of Handgun and Rifle Large Capacity Magazine Prices on Annual Time Indicators, 1992-1998, Controlling for Gun Makes/Models and Distributors**

| | Handgun LCMs (n=1,277) | | Rifle LCMs (n=674) | |
|---|---|---|---|---|
| | Estimate | T value | Estimate | T value |
| Constant | -1.79 | -12.74*** | -4.10 | -19.12*** |
| 1992 | -0.19 | -2.11** | -0.48 | -4.20*** |
| 1993 | -0.38 | -6.00*** | -0.55 | -6.14*** |
| 1995 | 0.44 | 6.88*** | -0.25 | -2.64*** |
| 1996 | 0.29 | 4.05*** | -0.12 | -0.93 |
| 1997 | 0.36 | 6.33*** | -0.31 | -3.68*** |
| 1998 | 0.20 | 3.51*** | -0.44 | -5.19*** |
| Rounds (logged) | 0.26 | 5.73*** | 0.84 | 15.08*** |
| Cobray | -0.36 | -4.15*** | | |
| Glock | 0.41 | 8.15*** | | |
| Intratec | -0.40 | -4.18*** | | |
| Ruger | -0.42 | -7.79*** | | |
| Smith&Wesson | -0.08 | -1.71* | | |
| Sig-Sauer | 0 | -0.09 | | |
| Taurus | -0.31 | -6.10*** | | |
| AK-type | | | -0.25 | -3.15*** |
| Colt AR-15 | | | 0.14 | 1.68* |
| Ruger Mini-14 | | | -0.08 | -0.92 |
| Distributor 1 | -0.72 | -16.38*** | -0.35 | -5.15*** |
| Distributor 2 | -0.15 | -0.97 | -0.83 | -5.24*** |
| Distributor 3 | -0.16 | -3.93*** | 0.19 | 2.69*** |
| Distributor 4 | -0.55 | -5.72*** | 0.16 | 0.80 |
| Distributor 5 | -0.07 | -1.79* | -0.18 | -2.65*** |
| Distributor 6 | -0.53 | -1.23 | -0.12 | -0.32 |
| Distributor 7 | -1.59 | -3.70*** | -0.10 | -0.91 |
| Distributor 8 | | | 0.14 | 0.70 |
| Distributor 9 | -0.91 | -12.52*** | -0.48 | -4.00*** |
| F statistic | 58.76 | | 21.22 | |
| (p value) | <.0001 | | <.0001 | |
| Adj. R-square | 0.51 | | 0.38 | |

Year indicators are interpreted relative to 1994, and distributors are interpreted relative to distributor 10.
Handgun makes are relative to Beretta and rifle models are relative to SKS.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## Figure 7-1. Annual Price Trends for Large Capacity Magazines, 1992-1998



Based on 1,277 sampled ads for LCMs fitting models of 8 handgun makers and 674 sampled ads for LCMs fitting 4 rifle model groups.

### 7.1.2. Large Capacity Magazines for Rifles

We approximated trends in the prices of LCMs for rifles by modeling the prices of LCMs manufactured for AR-15, Mini-14, SKS,[68] and AK-type rifle models (including various non-banned AK-type models).  As in the handgun LCM model, larger LCMs drew higher prices, and there were several significant model and distributor effects.  AR-15 magazines tended to have the highest prices, and magazines for AK-type models had the lowest prices (Table 7-1).

Like their handgun counterparts, prices for rifle LCMs increased over 40% from 1993 to 1994, as the ban was debated and implemented (see Table 7-1 and Figure 7-1).  However, prices declined over 20% in 1995.  Following a rebound in 1996, prices moved downward again during 1997 and 1998.   Prices in 1998 were over one third lower than the peak prices of 1994 and were comparable to pre-ban prices in 1992 and 1993.

---

[68]  The SKS is a very popular imported rifle (there are Russian and Chinese versions) that was not covered by either the 1989 AR import ban or the 1994 AW ban.  However, importation of SKS rifles from China was discontinued in 1994 due to trade restrictions.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 7.2. Post-Ban Importation of Large Capacity Magazines

ATF does not collect (or at least does not publicize) statistics on production of LCMs. Therefore, we cannot clearly document pre-ban production trends. Nevertheless, it seems likely that gun and magazine manufacturers boosted their production of LCMs during the debate over the ban, just as AW makers increased production of AWs. Regardless, gun industry sources estimated that there were 25 million LCMs available as of 1995 (including aftermarket items for repairing magazines or converting them to LCMs) (Gun Tests, 1995, p. 30).

Moreover, the supply of LCMs continued to grow even after the ban due to importation of foreign LCMs that were manufactured prior to the ban (and thus grandfathered by the LCM legislation), according to ATF importation data.[69] As shown in Table 7-2, nearly 4.8 million LCMs were imported for commercial sale (as opposed to law enforcement uses) from 1994 through 2000, with the largest number (nearly 3.7 million) arriving in 1999.[70] During this period, furthermore, importers received permission to import a total of 47.2 million LCMs; consequently, an additional 42 million LCMs may have arrived after 2000 or still be on the way, based on just those approved through 2000.[71, 72]

To put this in perspective, gun owners in the U.S. possessed 25 million firearms that were equipped with magazines holding 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17). Therefore, the 4.7 million LCMs imported in the U.S. from 1994 through 2000 could conceivably replenish 19% of the LCMs that were owned at the time of the ban. The 47.2 million approved during this period could supply nearly 2 additional LCMs for all guns that were so equipped as of 1994.

## 7.3. Summary and Interpretations

Prices of LCMs for handguns rose significantly around the time of the ban and, despite some decline from their peak levels in 1995, remained significantly higher than pre-ban prices through at least 1998. The increase in LCM prices for rifles proved to be more temporary, with prices returning to roughly pre-ban levels by 1998.[73]

---

[69] To import LCMs into the country, importers must certify that the magazines were made prior to the ban. (The law requires companies to mark post-ban LCMs with serial numbers.) As a practical matter, however, it is hard for U.S. authorities to know for certain whether imported LCMs were produced prior to the ban.

[70] The data do not distinguish between handgun and rifle magazines or the specific models for which the LCMs were made. But note that roughly two-thirds of the LCMs imported from 1994 through 2000 had capacities between 11 and 19 rounds, a range that covers almost all handgun LCMs as well as many rifle LCMs. It seems most likely that the remaining LCMs (those with capacities of 20 or more rounds) were primarily for rifles.

[71] The statistics in Table 7-2 do not include belt devices used for machine guns.

[72] A caveat to the number of approved LCMs is that importers may overstate the number of LCMs they have available to give themselves leeway to import additional LCMs, should they become available.

[73] A caveat is that we did not examine prices of smaller magazines, so the price trends described here may not have been entirely unique to LCMs. Yet it seems likely that these trends reflect the unique impact of the ban on the market for LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 7-2. Large Capacity Magazines Imported into the United States or Approved For Importation for Commercial Sale, 1994-2000**

| Year | Imported | Approved |
|------|----------|----------|
| 1994 | 67,063 | 77,666 |
| 1995 | 3,776 | 2,066,228 |
| 1996 | 280,425 | 2,795,173 |
| 1997 | 99,972 | 1,889,773 |
| 1998 | 337,172 | 20,814,574 |
| 1999 | 3,663,619 | 13,291,593 |
| 2000 | 346,416 | 6,272,876 |
| *Total* | *4,798,443* | *47,207,883* |

Source: Firearms and Explosives Imports Branch, Bureau of Alcohol, Tobacco, Firearms, and Explosives. Counts do not include "links" (belt devices) or imports for law enforcement purposes.

The drop in rifle LCM prices between 1994 and 1998 may have due to the simultaneous importation of approximately 788,400 grandfathered LCMs, most of which appear to have been rifle magazines (based on the fact that nearly two-thirds had capacities over 19 rounds), as well as the availability of U.S. military surplus LCMs that fit rifles like the AR-15 and Mini-14. We can also speculate that demand for LCMs is not as great among rifle consumers, who are less likely to acquire their guns for defensive or criminal purposes.

The pre-ban supply of handgun LCMs may have been more constricted than the supply of rifle LCMs for at least a few years following the ban, based on prices from 1994 to 1998. Although there were an estimated 25 million LCMs available in the U.S. as of 1995, some major handgun manufacturers (including Ruger, Sig Sauer, and Glock) had or were close to running out of new LCMs by that time (Gun Tests, 1995, p. 30). Yet the frequency of advertisements for handgun LCMs during 1997 and 1998, as well as the drop in prices from their 1995 peak, suggests that the supply had not become particularly low. In 1998, for example, the selected distributors posted a combined total of 92 LCM ads per issue (some of which may have been for the same make, model, and capacity combinations) for just the handguns that we incorporated into our model.[74] Perhaps the

---

[74] Project staff found substantially more advertisements per issue for 1997 and 1998 than for earlier years. For the LCMs studied in the handgun analysis, staff recorded an average of 412 LCM advertisements per year (103 per issue) during 1997 and 1998. For 1992-1996, staff recorded an average of about 100 ads per year (25 per issue) for the same LCMs. A similar but smaller differential existed in the volume of ads for the LCMs used in the rifle analysis. The increase in LCM ads over time may reflect changes in supply and

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

demand for enhanced firepower among handgun consumers, who are more likely to acquire guns for crime or defense against crime, was also a factor (and perhaps a large one) putting a premium on handgun LCMs.

Although we might hypothesize that high prices depressed use of handguns with LCMs for at least a few years after the ban, a qualification to this prediction is that LCM use may be less sensitive to prices than is use of AWs because LCMs are much less expensive than the firearms they complement and therefore account for a smaller fraction of users' income (e.g., see Friedman, 1962). To illustrate, TEC-9 APs typically cost $260 at retail during 1992 and 1993, while LCMs for the TEC-9, ranging in capacity from 30 to 36 rounds, averaged $16.50 in *Shotgun News* advertisements (and probably $19 or less at retail) during the same period. So, for example, a doubling of both gun and LCM prices would likely have a much greater impact on purchases of TEC-9 pistols than purchases of LCMs for the TEC-9. Users willing and able to pay for a gun that accepts an LCM are most likely willing and able to pay for an LCM to use with the gun.

Moreover, the LCM supply was enhanced considerably by a surge in LCM imports that occurred after the period of our price analysis. During 1999 and 2000, an additional 4 million grandfathered LCMs were imported into the U.S., over two-thirds of which had capacities of 11-19 rounds, a range that covers almost all handgun LCMs (as well as many rifle LCMs). This may have driven prices down further after 1998.

In sum, market indicators yield conflicting signs on the availability of LCMs. It is perhaps too early to expect a reduction in crimes with LCMs, considering that tens of millions of grandfathered LCMs were available at the time of the ban, an additional 4.8 million – enough to replenish one-fifth of those owned by civilians – were imported from 1994 through 2000, and that the elasticity of demand for LCMs may be more limited than that of firearms. And if the additional 42 million foreign LCMs approved for importation become available, there may not be a reduction in crimes with LCMs anytime in the near future.

---

demand for LCMs during the study period, as well as product shifts by distributors and perhaps changes in ad formats (e.g., ads during the early period may have been more likely to list magazines by handgun model without listing the exact capacity of each magazine, in which case coders would have been more likely to miss some LCMs during the early period). Because the data collection effort for the early period was part of a larger effort that involved coding prices in *Shotgun News* for LCMs and numerous banned and non-banned firearms, it is also possible that coders were more likely to miss LCM ads during that period due to random factors like fatigue or time constraints.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 8.  CRIMINAL USE OF LARGE CAPACITY MAGAZINES AFTER THE BAN

Assessing trends in criminal use of LCMs is difficult.  There is no national data source on crime guns equipped with LCMs (ATF national tracing data do not include information about magazines recovered with traced firearms), and, based on our contacts with numerous police departments over the course of this study and the first AW study, it seems that even those police departments that maintain electronic databases on recovered firearms do not typically record the capacity of the magazines with which the guns are equipped.[75,76]  Indeed, we were unable to acquire sufficient data to examine LCM use for the first AW study (Roth and Koper, 1997).

For the current study, we obtained four data sources with which to investigate trends in criminal use of LCMs.  Three of the databases utilized in the AW analysis – those from Baltimore, Milwaukee, and Anchorage – contained information about the magazines recovered with the guns (see the descriptions of these databases in Chapter 6).  Using updated versions of these databases, we examined all LCM recoveries in Baltimore from 1993 through 2003, recoveries of LCMs in Milwaukee murder cases from 1991 to 2001, and recoveries of LCMs linked to serious crimes in Anchorage (and other parts of Alaska) from 1992 through 2002.[77]  In addition, we studied records of guns and magazines submitted to the Jefferson Regional Forensics Lab in Louisville, Kentucky from 1996 through 2000.  This lab of the Kentucky State Police services law enforcement agencies throughout roughly half of Kentucky, but most guns submitted to the lab are from the Louisville area.  Guns examined at the lab are most typically those associated with serious crimes such as murders, robberies, and assaults.

The LCM analyses and findings were not as uniform across locations as were those for AWs.  Therefore, we discuss each site separately.  As in the AW analysis, we emphasize changes in the percentage of guns equipped with LCMs to control for overall trends in gun crime and gun recoveries.  Because gun crime was falling during the latter 1990s, we anticipated that the number of guns recovered with LCMs might decline independently of the ban's impact.  (Hereafter, we refer to guns equipped with LCMs as LCM guns.)

---

[75] For the pre-ban period, one can usually infer magazine capacity based on the firearm model.  For post-ban recoveries, this is more problematic because gun models capable of accepting LCMs may have been equipped with grandfathered LCMs or with post-ban magazines designed to fit the same gun but holding fewer rounds.

[76] As for the AW analysis in Chapter 6, we utilize police data to examine trends in criminal use of LCMs. The reader is referred to the general discussion of police gun seizure data in Chapter 6.

[77] Findings presented in our 2002 interim report (Koper and Roth, 2002b) indicated that LCM use had not declined as of the late 1990s.  Therefore, we sought to update the LCM analyses where possible for this version of the report.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**8.1. Baltimore**

In Baltimore, about 14% of guns recovered by police were LCM guns in 1993. This figure remained relatively stable for a few years after the ban but had dropped notably by 2002 and 2003 (Figure 8-1). For the entire post-ban period (1995-2003), recoveries of LCM guns are down 8% relative to those of guns with smaller magazines (Table 8-1, panel A), a change of borderline statistical significance. Focusing on the most recent years, however, LCM gun recoveries were 24% lower in 2002 and 2003 than during the year prior to the ban, a difference that was clearly significant (Table 8-1, panel B).[78,79,80] This change was attributable to a 36% drop in LCM handguns (Table 8-1, panel C). LCM rifles actually increased 36% as a share of crime guns, although they still accounted for no more than 3% in 2002 and 2003 (Table 8-1, panel D).[81]

Yet there was no decline in recoveries of LCM guns used in violent crimes (i.e., murders, shootings, robberies, and other assaults). After the ban, the percentage of violent crime guns with LCMs generally oscillated in a range consistent with the pre-ban level (14%) and hit peaks of roughly 16% to 17% in 1996 and 2003 (Figure 8-1).[82] Whether comparing the pre-ban period to the entire post-ban period (1995-2003) or the most recent years (2002-2003), there was no meaningful decline in LCM recoveries linked to violent crimes (Table 8-2, panels A and B).[83] Neither violent uses of LCM

---

[78] Data on handgun magazines were also available for 1992. An auxiliary analysis of those data did not change the substantive inferences described in the text.

[79] The Maryland AP ban enacted in June 1994 also prohibited ammunition magazines holding over 20 rounds and did not permit additional sales or transfers of such magazines manufactured prior to the ban. This ban, as well as the Maryland and federal bans on AWs that account for many of the guns with magazines over 20 rounds, may have contributed to the downward trend in LCMs in Baltimore, but only 2% of the guns recovered in Baltimore from 1993 to 2000 were equipped with such magazines.

[80] All comparisons of 1993 to 2002-2003 in the Baltimore data are based on information from the months of January through November of each year. At the time we received these data, information was not yet available for December 2003, and preliminary analysis revealed that guns with LCMs were somewhat less likely to be recovered in December than in other months for years prior to 2003. Nevertheless, utilizing the December data for 1993 and 2002 did not change the substantive inferences. We did not remove December data from the comparisons of 1993 and the full post-ban period because those comparisons seemed less likely to be influenced by the absence of one month of data.

[81] This increase may have been due largely to a general increase in rifle seizures. LCM rifles actually dropped as a percentage of all rifle recoveries from 1993 to 2002-2003, suggesting that recoveries of LCM rifles were increasing less than recoveries of other rifles.

[82] For 1996, 45% of all records and 24% of those linked to violent crimes had missing data for magazine capacity (due to temporary changes in operational procedures in the Baltimore crime lab). For other years, missing data rates were no more than 6%. Based on those cases for which data were available, the share of guns with LCMs in 1996 was comparable to that in other years, particularly when examining all gun recoveries. At any rate, the analyses focusing on 1993, 2002, and 2003 reinforce the findings of those that include the 1996 data.

[83] The ammunition capacity code in the Baltimore data usually reflected the full capacity of the magazine and weapon, but sometimes reflected the capacity of the magazine only. (For instance, a semiautomatic with a 10-round magazine and the ability to accept one additional round in the chamber might have been coded as having a capacity of 10 or 11.) Informal assessment suggested that capacity was more likely to reflect the exact capacity of the magazine in the early years of the database and more likely to reflect the full capacity of the gun and magazine in later years. For the main runs presented in the text and tables, guns were counted as having LCMs if the coded capacity was greater than 11 rounds. This ensured that LCMs were not overestimated, but it potentially understated LCM prevalence, particularly for the earlier

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

handguns or LCM rifles had declined appreciably by 2002-2003 (Table 8-2, panels C and D).  Hence, the general decline in LCM recoveries may reflect differences in the availability and use of LCMs among less serious offenders, changes in police practices,[84] or other factors.

### Figure 8-1. Police Recoveries of Guns Equipped With Large Capacity Magazines in Baltimore, 1993-2003



years.   However, coding the guns as LCM weapons based on a threshold of 10 (i.e., a coded capacity over 10 rounds) in 1993 and a threshold of 11 (i.e., a coded capacity over 11 rounds) for 2002-2003 did not change the inferences of the violent crime analysis.  Further, this coding increased the pre-ban prevalence of LCMs by very little (about 4% in relative terms).

[84]  During the late 1990s, for example, Baltimore police put greater emphasis on detecting illegal gun carrying (this statement is based on prior research and interviews the author has done in Baltimore as well as the discussion in Center to Prevent Handgun Violence, 1998).  One can hypothesize that this effort reduced the fraction of recovered guns with LCMs because illegal gun carriers are probably more likely to carry smaller, more concealable handguns that are less likely to have LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 8-1.  Trends in All Police Recoveries of Firearms Equipped With Large Capacity Magazines, Baltimore, 1993-2003**

| | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A. All LCM Guns** | Jan.-Dec. 1993 | Jan. 1995-Nov. 2003 | |
| Total | 473 | 3703 | |
| Annual Mean | 473 | 445.86 [a] | -6% |
| LCM Guns as % of All Guns | 13.51% | 12.38% | -8%* |
| **B. All LCM Guns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 430 | 626 | |
| Annual Mean | 430 | 313 | -27% |
| LCM Guns as % of All Guns | 13.47% | 10.3% | -24%*** |
| **C. LCM Handguns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 359 | 440 | |
| Annual Mean | 359 | 220 | -39% |
| LCM Handguns as % of All Guns | 11.25% | 7.24% | -36%*** |
| **D. LCM Rifles** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| LCM Rifles | 71 | 183 | |
| Annual Mean | 71 | 91.5 | 29% |
| LCM Rifles as % of All Guns | 2.22% | 3.01% | 36%** |

a. Annual average calculated without 1996 and 2003 (to correct for missing months or missing magazine data).
* Chi-square p level < .10 (changes in percentages of guns equipped with LCMs were tested for statistical significance)
** Chi-square p level <.05 (changes in percentages of guns equipped with LCMs were tested for statistical significance)
** Chi-square p level < .01 (changes in percentages of guns equipped with LCMs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 8-2.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Violent Crime Cases, Baltimore, 1993-2003**

|  | Pre-Ban Period | Post-Ban Period | Change [a] |
|---|---|---|---|
| **A.  All LCM Guns** | Jan.-Dec. 1993 | Jan. 1995-Nov. 2003 | |
| Total | 87 | 711 | |
| Annual Mean | 87 | 81.86 [b] | -6% |
| LCM Guns as % of All Guns | 14.01% | 14.44% | 3% |
| **B.  All LCM Guns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 79 | 104 | |
| Annual Mean | 79 | 52 | -34% |
| LCM Guns as % of All Guns | 13.96% | 13.65% | -2% |
| **C.  LCM Handguns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 62 | 81 | |
| Annual Mean | 62 | 40.5 | -35% |
| LCM Handguns as % of All Guns | 10.95% | 10.63% | -3% |
| **D.  LCM Rifles** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| LCM Rifles | 17 | 23 | |
| Annual Mean | 17 | 11.5 | -32% |
| LCM Rifles as % of All Guns | 3% | 3.02% | 1% |

a.  Changes in the percentages of guns with LCMs were statistically insignificant in chi-square tests.
b.  Annual average calculated without 1996 and 2003 (to correct for missing months or missing magazine data).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 8.2. Anchorage

In the Alaska database, magazine capacity was recorded only for guns recovered during the post-ban years, 1995 through 2002. However, we estimated pre-ban use of LCM handguns by identifying handgun models inspected during 1992 and 1993 that were manufactured with LCMs prior to the ban.[85] This permitted an assessment of pre-post changes in the use of LCM handguns.

As shown in Figure 8-2 (also see Table 8-3, panel A), LCM guns rose from 14.5% of crime guns in 1995-1996 to 24% in 2000-2001 (we present two-year averages because the sample are relatively small, particularly for the most recent years) and averaged about 20% for the entire post-ban period. LCM handguns drove much of this trend, but LCM rifles also increased from about 3% of crime guns in 1995-96 to 11% in 2000-2001.

### Figure 8-2. Police Recoveries of Guns Equipped With Large Capacity Magazines in Anchorage (Alaska), 1995-2002



As % of Guns Submitted for Evidentiary Testing (N=405)

Two year averages.

---

[85] To make these determinations, we consulted gun catalogs such as the *Blue Book of Gun Values* and *Guns Illustrated.*

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 8-3.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Violent Crime Cases, Anchorage (Alaska), 1992-2002 [a]**

|  | Pre-Ban Period | Post-Ban Period | Change [b] |
|---|---|---|---|
| **A.  All LCM Guns** | N/A | Jan. 1995-Dec. 2002 | |
| Total | | 80 | |
| Annual Mean | | 10 | N/A |
| LCM Guns as % of All Guns | | 19.75% | N/A |
| **B.  LCM Handguns** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2002 | |
| Total | 17 | 57 | |
| Annual Mean | 8.5 | 7.13 | -16% |
| LCM Handguns as % All Handguns | 26.15% | 22.35% | -15% |
| **C.  LCM Handguns** | Jan. 1992-Dec. 1993 | Jan. 2001-Dec. 2002 | |
| Total | 17 | 10 | |
| Annual Mean | 8.5 | 5 | -41% |
| LCM Handguns as % of All Handguns | 26.15% | 19.23% | -26% |

a.  Based on guns submitted to State Police for evidentiary testing.
b.  Changes in the percentages of guns equipped with LCMs were statistically insignificant in chi-square tests.

Investigation of pre-post changes for handguns revealed an inconsistent pattern (Figure 8-3).  LCM handguns dropped initially after the ban, declining from 26% of handguns in 1992-1993 to 18% in 1995-1996.  However, they rebounded after 1996, reaching a peak of 30% of handguns in 1999-2000 before declining to 19% in 2001-2002.

For the entire post-ban period, the share of handguns with LCMs was about 15% lower than in the pre-ban period (Table 8-3, panel B).  By the two most recent post-ban years (2001-2002), LCM use had dropped 26% from the pre-ban years (Table 8-3, panel C).  These changes were not statistically significant, but the samples of LCM handguns were rather small for rigorous statistical testing.  Even so, it seems premature to conclude

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

that there has been a lasting reduction in LCM use in Alaska.  LCM use in 2001-2002 was somewhat higher than that immediately following the ban in 1995-1996, after which there was a substantial rebound.  Considering the inconsistency of post-ban patterns, further follow-up seems warranted before making definitive conclusions about LCM use in Alaska.

### Figure 8-3. Police Recoveries of Handguns Equipped With Large Capacity Magazines in Anchorage (Alaska), 1992-2002



Two-year averages.  Data for 1994 excluded.

### 8.3. Milwaukee

LCM guns accounted for 21% of guns recovered in Milwaukee murder investigations from 1991 to 1993 (Table 8-4, panel A).  Following the ban, this figure rose until reaching a plateau of over 36% in 1997 and 1998 (Figure 8-4).  On average, the share of guns with LCMs grew 55% from 1991-1993 to 1995-1998, a trend that was driven by LCM handguns (Table 8-4, panels A and B).[86]  LCM rifles held steady at between 4% and 5% of the guns (Table 8-4, panel C).

We also analyzed a preliminary database on 48 guns used in murders during 2000 and 2001 (unlike the 1991-1998 database, this database did not include information on other guns recovered during the murder investigations).  About 11% of these guns were LCM guns, as compared to 19% of guns used in murders from 1991 to 1993 (analyses not shown).  However, nearly a quarter of the 2000-2001 records were missing information on magazine capacity.[87]  Examination of the types and models of guns with

---

[86]  LCM guns also increased as share of guns that were used in the murders (the full sample results discussed in the text include all guns recovered during the investigations).
[87]  Magazine capacity was missing for less than 4% of the records in earlier years.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

unidentified magazines suggested that as many as 17% of guns used in murders during 2000 and 2001 may have been LCM guns (based on all those that either had LCMs, were models sold with LCMs prior to the ban, or were unidentified semiautomatics). While this still suggests a drop in LCM use from the peak levels of the late 1990s (26% of guns used in murders from 1995 to 1998 had LCMs), it is not clear that LCM use has declined significantly below pre-ban levels.

**Table 8-4.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Murder Cases, Milwaukee County, 1991-1998**

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All LCM Guns** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| Total | 51 | 83 | |
| Annual Mean | 17 | 20.75 | 22% |
| LCM Guns as % of All Guns | 20.9% | 32.42% | 55%* |
| **B.  LCM Handguns** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| Total | 40 | 71 | |
| Annual Mean | 13.33 | 17.75 | 33% |
| LCM Handguns as % of All Guns | 16.39% | 27.73% | 69%* |
| **C.  LCM Rifles** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| Total | 11 | 12 | |
| Annual Mean | 3.67 | 3 | -18% |
| LCM Rifles as % of All Guns | 4.51% | 4.69% | 4% |

* Chi-square p level < .01 (changes in percentages of guns equipped with LCMs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## Figure 8-4. Recoveries of Guns Equipped With Large Capacity Magazines in Milwaukee County Murder Cases, 1991-1998



As % of Guns Recovered in Murder Cases (N=571)

### 8.4.  Louisville

The Louisville LCM data are all post-ban (1996-2000), so we cannot make pre-post comparisons.  Nonetheless, the share of crime guns with LCMs in Louisville (24%) was within the range of that observed in the other cities during this period.  And similar to post-ban trends in the other sites, LCM recoveries peaked in 1997 before leveling off and remaining steady through the year 2000 (Figure 8-5).  LCM rifles dropped 21% as a share of crime guns between 1996 and 2000 (analyses not shown), but there were few in the database, and they never accounted for more than 6.2% of guns in any year.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 8-5. Police Recoveries of Guns Equipped With Large Capacity Magazines in Louisville (Kentucky), 1996-2000**



Year 2000 data are not for the full year.

## 8.5. Summary

Despite a doubling of handgun LCM prices between 1993 and 1995 and a 40% increase in rifle LCM prices from 1993 to 1994, criminal use of LCMs was rising or steady through at least the latter 1990s, based on police recovery data from four jurisdictions studied in this chapter. These findings are also consistent with an earlier study finding no decline in seizures of LCM guns from juveniles in Washington, DC in the year after the ban (Koper, 2001).[88] Post-2000 data, though more limited and inconsistent, suggest that LCM use may be dropping from peak levels of the late 1990s but provide no definitive evidence of a drop below pre-ban levels.[89] These trends have been driven primarily by LCM handguns, which are used in crime roughly three times as

---

[88] From 1991 to 1993, 16.4% of guns recovered from juveniles in Washington, DC had LCMs (14.2% had LCMs in 1993). In 1995, this percentage increased to 17.1%. We did not present these findings in this chapter because the data were limited to guns recovered from juveniles, the post-ban data series was very short, and the gun markets supplying DC and Baltimore are likely to have much overlap (Maryland is a leading supplier of guns to DC – see ATF, 1997; 1999).

[89] We reran selected key analyses with the Baltimore, Milwaukee, and Louisville data after excluding .22 caliber guns, some of which could have been equipped with attached tubular magazines that are exempted from the LCM ban, and obtained results consistent with those reported in the text. It was possible to identify these exempted magazines in the Anchorage data. When they were removed from Anchorage's LCM count, the general pattern in use of banned LCMs was similar to that presented in the main 1995-2002 analysis: guns with banned LCMs rose, reaching a peak of 21% of crime guns in 1999-2000, before declining slightly to 19% in 2001-2002.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

often as LCM rifles.  Nonetheless, there has been no consistent reduction in the use of LCM rifles either.

The observed patterns are likely due to several factors:  a hangover from pre-ban growth in the production and marketing of LCM guns (Cook and Ludwig, 1997, pp. 5-6; Wintemute, 1996);[90] the low cost of LCMs relative to the firearms they complement, which seems to make LCM use less sensitive to prices than is firearm use;[91] the utility that gun users, particularly handgun users, attach to LCMs; a plentiful supply of grandfathered LCMs, likely enhanced by a pre-ban surge in production (though this has not been documented) and the importation of millions of foreign LCMs since the ban;[92] thefts of LCM firearms (see Roth and Koper, 1997, Chapter 4); or some combination of these factors.[93]  However, it is worth noting that our analysis did not reveal an upswing in use of LCM guns following the surge of LCM importation in 1999 (see the previous chapter).  It remains to be seen whether recent imports will have a demonstrable effect on patterns of LCM use.

Finally, we must be cautious in generalizing these results to the nation because they are based on a small number of non-randomly selected jurisdictions.  Nonetheless, the consistent failure to find clear evidence of a pre-post drop in LCM use across these geographically diverse locations strengthens the inference that the findings are indicative of a national pattern.

---

[90] To illustrate this trend, 38% of handguns acquired by gun owners during 1993 and 1994 were equipped with magazines holding 10 or more rounds, whereas only 14% of handguns acquired before 1993 were so equipped (Cook and Ludwig, 1997, pp. 5-6).

[91] Although elevated post-ban prices did not suppress use of LCMs, a more subtle point is that LCM use rose in most of these locations between 1995 and 1998, as LCM prices were falling from their peak levels of 1994-1995.  Therefore, LCM use may have some sensitivity to price trends.

[92] However, we do not have the necessary data to determine if LCMs used in crime after the ban were acquired before or after the ban.

[93] In light of these considerations, it is conceivable that the ban slowed the rate of growth in LCM use, accelerated it temporarily (due to a pre-ban production boom), or had no effect.  We do not have the data necessary to examine this issue rigorously.  Moreover, the issue might be regarded as somewhat superfluous; the more critical point would seem to be that nearly a decade after the ban, LCM use has still not declined demonstrably below pre-ban levels.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## 9. THE CONSEQUENCES OF CRIMES WITH ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES

One of the primary considerations motivating passage of the ban on AWs and LCMs was a concern over the perceived dangerousness of these guns and magazines. In principal, semiautomatic weapons with LCMs enable offenders to fire high numbers of shots rapidly, thereby potentially increasing both the number of person wounded per gunfire incident (including both intended targets and innocent bystanders) and the number of gunshot victims suffering multiple wounds, both of which would increase deaths and injuries from gun violence. Ban advocates also argued that the banned AWs possessed additional features conducive to criminal applications.

The findings of the previous chapters suggest that it is premature to make definitive assessments of the ban's impact on gun violence. Although criminal use of AWs has declined since the ban, this reduction was offset through at least the late 1990s by steady or rising use of other guns equipped with LCMs. As argued previously, the LCM ban has greater potential for reducing gun deaths and injuries than does the AW ban. Guns with LCMs – of which AWs are only a subset – were used in up to 25% of gun crimes before the ban, whereas AWs were used in no more than 8% (Chapter 3). Furthermore, an LCM is arguably the most important feature of an AW. Hence, use of guns with LCMs is probably more consequential than use of guns with other military-style features, such as flash hiders, folding rifle stocks, threaded barrels for attaching a silencers, and so on.[94]

This is not to say that reducing use of AWs will have no effect on gun crime; a decline in the use of AWs does imply fewer crimes with guns having particularly large magazines (20 or more rounds) and other military-style features that could facilitate some crimes. However, it seems that any such effects would be outweighed, or at least

---

[94] While it is conceivable that changing features of AWs other than their magazines might prevent some gunshot victimizations, available data provide little if any empirical basis for judging the likely size of such effects. Speculatively, some of the most beneficial weapon redesigns may be the removal of folding stocks and pistol grips from rifles. It is plausible that some offenders who cannot obtain rifles with folding stocks (which make the guns more concealable) might switch to handguns, which are more concealable but generally cause less severe wounds (e.g. see DiMaio, 1985). However, such substitution patterns cannot be predicted with certainty. Police gun databases rarely have information sufficiently detailed to make assessments of changes over time in the use of weapons with specific features like folding stocks. Based on informal assessments, there was no consistent pattern in post-ban use of rifles (as a share of crime guns) in the local databases examined in the prior chapters (also see the specific comments on LCM rifles in the previous chapters).

Pistol grips enhance the ability of shooters to maintain control of a rifle during rapid, "spray and pray" firing (e.g., see Violence Policy Center, 2003). (Heat shrouds and forward handgrips on APs serve the same function.) While this feature may prove useful in military contexts (e.g., firefights among groups at 100 meters or less – see data of the U.S. Army's Operations Research Office as cited in Violence Policy Center, 2003), it is unknown whether civilian attacks with semiautomatic rifles having pistol grips claim more victims per attack than do those with other semiautomatic rifles. At any rate, most post-ban AR-type rifles still have pistol grips. Further, the ban does not count a stock thumbhole grip, which serves the same function as a pistol grip (e.g., see the illustration of LCMM rifles in Chapter 2), as an AR feature.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

obscured, by the wider effects of LCM use, which themselves are likely to be small at best, as we argue below.[95]

Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns.[96]  But by forcing AW and LCM offenders to substitute non-AWs with small magazines, the ban might reduce the number of shots fired per gun attack, thereby reducing both victims shot per gunfire incident and gunshot victims sustaining multiple wounds.  In the following sections, we consider the evidence linking high-capacity semiautomatics and AWs to gun violence and briefly examine recent trends in lethal and injurious gun violence.

## 9.1.  The Spread of Semiautomatic Weaponry and Trends in Lethal and Injurious Gun Violence Prior to the Ban

Nationally, semiautomatic handguns grew from 28% of handgun production in 1973 to 80% in 1993 (Zawitz, 1995, p. 3).  Most of this growth occurred from the late 1980s onward, during which time the gun industry also increased marketing and production of semiautomatics with LCMs (Wintemute, 1996).  Likewise, semiautomatics grew as a percentage of crime guns (Koper, 1995; 1997), implying an increase in the average firing rate and ammunition capacity of guns used in crime.[97]

---

[95]  On a related note, a few studies suggest that state-level AW bans have not reduced crime (Koper and Roth, 2001a; Lott, 2003).  This could be construed as evidence that the federal AW ban will not reduce gunshot victimizations without reducing LCM use because the state bans tested in those studies, as written at the time, either lacked LCM bans or had LCM provisions that were less restrictive than that of the federal ban. (New Jersey's 1990 AW ban prohibited magazines holding more than 15 rounds.  AP bans passed by Maryland and Hawaii prohibited magazines holding more than 20 rounds and pistol magazines holding more than 10 rounds, respectively, but these provisions did not take effect until just a few months prior to the federal ban.)  However, it is hard to draw definitive conclusions from these studies for a number of reasons, perhaps the most salient of which are the following:  there is little evidence on how state AW bans affect the availability and use of AWs (the impact of these laws is likely undermined to some degree by the influx of AWs from other states, a problem that was probably more pronounced prior to the federal ban when the state laws were most relevant); studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by AW bans (see discussion in the main text); and the state AW bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate.

[96]  One might hypothesize that the firepower provided by AWs and other semiautomatics with LCMs emboldens some offenders to engage in aggressive behaviors that prompt more shooting incidents.  On the other hand, these weapons might also prevent some acts of violence by intimidating adversaries, thus discouraging attacks or resistance.  We suspect that firepower does influence perceptions, considering that many police departments have upgraded their weaponry in recent years – often adopting semiautomatics with LCMs – because their officers felt outgunned by offenders.  However, hypotheses about gun types and offender behavior are very speculative, and, pending additional research on such issues, it seems prudent to focus on indicators with stronger theoretical and empirical foundations.

[97]  Revolvers, the most common type of non-semiautomatic handgun, typically hold only 5 or 6 rounds (and sometimes up to 9).  Semiautomatic pistols, in contrast, hold ammunition in detachable magazines that, prior to the ban, typically held 5 to 17 bullets and sometimes upwards of 30 (Murtz et al., 1994).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

The impact of this trend is debatable. Although the gun homicide rate rose considerably during the late 1980s and early 1990s (Bureau of Justice Statistics, 1994, p. 13), the percentage of violent gun crimes resulting in death was declining (see Figure 9-1 and the related discussion in section 9.3). Similarly, the percentage of victims killed or wounded in handgun discharge incidents declined from 27% during the 1979-1987 period to 25% for the 1987-1992 period (calculated from Rand, 1990, p. 5; 1994, p. 2) as semiautomatics were becoming more common crime weapons.[98] On the other hand, an increasing percentage of gunshot victims died from 1992 to 1995 according to hospital data (Cherry et al., 1998), a trend that could have been caused in part by a higher number of gunshot victims with multiple wounds (also see McGonigal et al., 1993). Most notably, the case fatality rate for assaultive gunshot cases involving 15 to 24-year-old males rose from 15.9% in late 1993 to 17.5% in early 1995 (p. 56).

## Figure 9-1. Percentage of Violent Gun Crimes Resulting in Death (National), 1982-2002



Based on gun homicides, gun robberies, and gun assaults reported in the Uniform Crime Reports and Supplemental Homicide Reports.

---

[98] A related point is that there was a general upward trend in the average number of shots fired by offenders in gunfights with New York City police from the late 1980s through 1992 (calculated from Goehl, 1993, p. 51). However, the average was no higher during this time than during many years of the early 1980s and 1970s.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Some researchers have inferred links between the growing use of semiautomatics in crime and the rise of both gun homicides and bystander shootings in a number of cities during the late 1980s and early 1990s (Block and Block, 1993; McGonigal et al., 1993; Sherman et al., 1989; Webster et al., 1992). A study in Washington, DC, for example, reported increases in wounds per gunshot victim and gunshot patient mortality during the 1980s that coincided with a reported increase in the percentage of crime guns that were semiautomatics (Webster et al., 1992).

Nevertheless, changes in offender behavior, coupled with other changes in crime guns (e.g., growing use of large caliber handguns – see Caruso et al., 1999; Koper, 1995; 1997; Wintemute, 1996), may have been key factors driving such trends. Washington, DC, for example, was experiencing an exploding crack epidemic at the time of the aforementioned study, and this may have raised the percentage of gun attacks in which offenders had a clear intention to injure or kill their victims. Moreover, studies that attempted to make more explicit links between the use of semiautomatic firearms and trends in lethal gun violence via time series analysis failed to produce convincing evidence of such links (Koper, 1995; 1997). However, none of the preceding research related specific trends in the use of AWs or LCMs to trends in lethal gun violence.

### 9.2. Shots Fired in Gun Attacks and the Effects of Weaponry on Attack Outcomes

The evidence most directly relevant to the potential of the AW-LCM ban to reduce gun deaths and injuries comes from studies examining shots fired in gun attacks and/or the outcomes of attacks involving different types of guns. Unfortunately, such evidence is very sparse.

As a general point, the faster firing rate and larger ammunition capacities of semiautomatics, especially those equipped with LCMs, have the potential to affect the outcomes of many gun attacks because gun offenders are not particularly good shooters. Offenders wounded their victims in no more than 29% of gunfire incidents according to national, pre-ban estimates (computed from Rand, 1994, p. 2; also see estimates presented later in this chapter). Similarly, a study of handgun assaults in one city revealed a 31% hit rate per shot, based on the sum totals of all shots fired and wounds inflicted (Reedy and Koper, 2003, p. 154). Other studies have yielded hit rates per shot ranging from 8% in gunfights with police (Goehl, 1993, p. 8) to 50% in mass murders (Kleck, 1997, p. 144). Even police officers, who are presumably certified and regularly re-certified as proficient marksman and who are almost certainly better shooters than are average gun offenders, hit their targets with only 22% to 39% of their shots (Kleck, 1991, p. 163; Goehl, 1993). Therefore, the ability to deliver more shots rapidly should raise the likelihood that offenders hit their targets, not to mention innocent bystanders.[99]

---

[99] However, some argue that this capability is offset to some degree by the effects of recoil on shooter aim, the limited number of shots fired in most criminal attacks (see below), and the fact that criminals using non-semiautomatics or semiautomatics with small magazines usually have the time and ability to deliver multiple shots if desired (Kleck, 1991, pp. 78-79).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

A few studies have compared attacks with semiautomatics, sometimes specifically those with LCMs (including AWs), to other gun assaults in terms of shots fired, persons hit, and wounds inflicted (see Tables 9-1 and 9-2). The most comprehensive of these studies examined police reports of attacks with semiautomatic pistols and revolvers in Jersey City, New Jersey from 1992 through 1996 (Reedy and Koper, 2003), finding that use of pistols resulted in more shots fired and higher numbers of gunshot victims (Table 9-1), though not more gunshot wounds per victim (Table 9-2).[100] Results implied there would have been 9.4% fewer gunshot victims overall had semiautomatics not been used in any of the attacks. Similarly, studies of gun murders in Philadelphia (see McGonigal et al., 1993 in Table 9-1) and a number of smaller cities in Pennsylvania, Ohio, and Iowa (see Richmond et al., 2003 in Table 9-2) found that attacks with semiautomatics resulted in more shots fired and gunshot wounds per victim. An exception is that the differential in shots fired between pistol and revolver cases in Philadelphia during 1990 did not exist for cases that occurred in 1985, when semiautomatics and revolvers had been fired an average of 1.6 and 1.9 times, respectively. It is not clear whether the increase in shots fired for pistol cases from 1985 to 1990 was due to changes in offender behavior, changes in the design or quality of pistols (especially an increase in the use of models with LCMs – see Wintemute, 1996), the larger sample for 1990, or other factors.

---

[100] But unlike other studies that have examined wounds per victim (see Table 9-2), this study relied on police reports of wounds inflicted rather than medical reports, which are likely to be more accurate.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 9-1.  Shots Fired and Victims Hit in Gunfire Attacks By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Shots Fired | Avg. = 3.2 – 3.7 (n=165 pistol cases) *<br><br>Avg. = 2.3 – 2.6 (n=71 revolver cases) * |
| Gun homicides with semiautomatic pistols and revolvers, Philadelphia, 1985 and 1990 [b] | Shots Fired | Avg. = 1.6 (n=21 pistol cases, 1985)<br>Avg. = 1.9 (n=57 revolver cases, 1985)<br><br>Avg. = 2.7 (n=95 pistol cases, 1990)<br>Avg. = 2.1 (n=108 revolver cases, 1990) |
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Victims Hit | Avg. = 1.15 (n=95 pistol cases) *<br><br>Avg. = 1.0 (n=40 revolver cases) * |
| Mass shootings with AWs, semiautomatics having LCMs, or other guns, 6+ dead or 12+ shot, United States, 1984-1993 [c] | Victims Hit | Avg. = 29 (n=6 AW/LCM cases)<br><br>Avg. = 13 (n=9 non-AW/LCM cases) |
| Self-reported gunfire attacks by state prisoners with AWs, other semiautomatics, and non-semiautomatic firearms, United States, 1997 or earlier [d] | % of Attacks With Victims Hit | 19.5% (n=72 AW or machine gun cases)<br><br>22.3% (n=419 non-AW, semiautomatic cases)<br><br>23.3% (n=608 non-AW, non-semiautomatic cases) |

a. Reedy and Koper (2003)
b. McGonigal et al. (1993)
c. Figures calculated by Koper and Roth (2001a) based on data presented by Kleck (1997, p. 144)
d. Calculated from Harlow (2001, p. 11).  (Sample sizes are based on unpublished information provided by the author of the survey report.)
* Pistol/revolver differences statistically significant at p<.05 (only Reedy and Koper [2003] and Harlow [2001] tested for statistically significant differences).  The shots fired ranges in Reedy and Koper are based on minimum and maximum estimates.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 9-2.  Gunshot Wounds Per Victim By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Gunshot Wounds | Avg. = 1.4 (n=107 pistol victims)<br><br>Avg. = 1.5 (n=40 revolver victims) |
| Gun homicides with semiautomatic pistols and revolvers, Iowa City (IA), Youngstown (OH), and Bethlehem (PA), 1994-1998 [b] | Gunshot Wounds | Avg. = 4.5 total (n=212 pistol victims)*<br>Avg. = 2.9 entry<br><br>Avg. = 2.0 total (n=63 revolver victims)*<br>Avg. = 1.5 entry |
| Gun homicides with assault weapons (AWs), guns having large capacity magazines (LCMs), and other firearms, Milwaukee, 1992-1995 [c] | Gunshot Wounds | Avg. = 3.23 (n=30 LCM victims) **<br>Avg. = 3.14 (n=7 AW victims)<br><br>Avg. = 2.08 (n=102 non-AW/LCM victims)** |

a.  Reedy and Koper (2003)
b.  Richmond et al. (2003)
c.  Roth and Koper (1997, Chapter 6)
*  Pistol/revolver differences statistically significant at p<.01.
** The basic comparison between LCM victims and non-AW/LCM victims was moderately significant (p<.10) with a one-tailed test.  Regression results (with a slightly modified sample) revealed a difference significant at p=.05 (two-tailed test).  Note that the non-LCM group included a few cases involving non-banned LCMs (.22 caliber attached tubular devices).

Also, a national survey of state prisoners found that, contrary to expectations, offenders who reported firing on victims with AWs and other semiautomatics were no more likely to report having killed or injured victims than were other gun offenders who reported firing on victims (Table 9-1).  However, the measurement of guns used and attack outcomes were arguably less precise in this study, which was based on offender self-reports, than in other studies utilizing police and medical reports.[101]

Attacks with AWs or other guns with LCMs may be particularly lethal and injurious, based on very limited evidence.  In mass shooting incidents (defined as those in which at least 6 persons were killed or at least 12 were wounded) that occurred during the decade preceding the ban, offenders using AWs and other semiautomatics with LCMs (sometimes in addition to other guns) claimed an average of 29 victims in comparison to an average of 13 victims for other cases (Table 9-1).  (But also see the study discussed in the preceding paragraph in regards to victims hit in AW cases.)

Further, a study of Milwaukee homicide victims from 1992 through 1995 revealed that those killed with AWs were shot 3.14 times on average, while those killed with any

---

[101]  See the discussion of self-reports and AW use in Chapter 3.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

gun having an LCM were shot 3.23 times on average (Table 9-2). In contrast, victims shot with guns having small magazines had only 2.1 wounds on average. If such a wound differential can be generalized to other gun attacks – if, that is, both fatal and non-fatal LCM gunshot victims are generally hit one or more extra times – then LCM use could have a considerable effect on the number of gunshot victims who die. To illustrate, the fatality rate among gunshot victims in Jersey City during the 1990s was 63% higher for those shot twice than for those shot once (26% to 16%) (Koper and Roth, 2001a; 2001b). Likewise, fatality rates are 61% higher for patients with multiple chest wounds than for patients with a single chest wound (49% to 30.5%), based on a Washington, DC study (Webster et al., 1992, p. 696).

Similar conclusions can also be inferred indirectly from the types of crimes involving LCM guns. To illustrate, handguns associated with gunshot victimizations in Baltimore (see the description of the Baltimore gun and magazine data in the preceding chapter) are 20% to 50% more likely to have LCMs than are handguns associated with other violent crimes, controlling for weapon caliber (Table 9-3). This difference may be due to higher numbers of shots and hits in crimes committed with LCMs, although it is also possible that offenders using LCMs are more likely to fire on victims. But controlling for gunfire, guns used in shootings are 17% to 26% more likely to have LCMs than guns used in gunfire cases resulting in no wounded victims (perhaps reflecting higher numbers of shots fired and victims hit in LCM cases), and guns linked to murders are 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations (perhaps indicating higher numbers of shots fired and wounds per victim in LCM cases).[102] These differences are not all statistically significant, but the pattern is consistent. And as discussed in Chapter 3, AWs account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.

---

[102] Cases with and without gunfire and gunshot victims were approximated based on offense codes contained in the gun seizure data (some gunfire cases not resulting in wounded victims may not have been identified as such, and it is possible that some homicides were not committed with the guns recovered during the investigations). In order to control for caliber effects, we focused on 9mm and .38 caliber handguns. Over 80% of the LCM handguns linked to violent crimes were 9mm handguns. Since all (or virtually all) 9mm handguns are semiautomatics, we also selected .38 caliber guns, which are close to 9mm in size and consist almost entirely of revolvers and derringers.

The disproportionate involvement of LCM handguns in injury and death cases is greatest in the comparisons including both 9mm and .38 caliber handguns. This may reflect a greater differential in average ammunition capacity between LCM handguns and revolvers/derringers than between LCM handguns and other semiautomatics. The differential in fatal and non-fatal gunshot victims may also be due to caliber effects; 9mm is generally a more powerful caliber than .38 based on measures like kinetic energy or relative stopping power (e.g., see DiMaio, 1985, p. 140; Warner 1995, p. 223; Wintemute, 1996, p. 1751).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 9-3.  Probabilities That Handguns Associated With Murders, Non-Fatal Shootings, and Other Violent Crimes Were Equipped With Large Capacity Magazines in Baltimore, 1993-2000**

| Handgun Sample | % With LCM | % Difference (#2 Relative to #1) |
|---|---|---|
| **A.  Handguns Used in Violent Crimes With and Without Gunshot Injury** | | |
| 1) 9mm and .38:  violence, no gunshot victims | 23.21% | |
| 2) 9mm and .38:  violence with gunshot victims | 34.87% | 50%* |
| 1) 9mm:  violence, no gunshot victims | 52.92% | |
| 2) 9mm:  violence with gunshot victims | 63.24% | 20%* |
| **B.  Handguns Used in Gunfire Cases With and Without Gunshot Injury** | | |
| 1) 9mm and .38:  gunfire, no gunshot victims | 27.66% | |
| 2) 9mm and .38:  gunfire with gunshot victims | 34.87% | 26% |
| 1) 9mm:  gunfire, no gunshot victims | 54.17% | |
| 2) 9mm:  gunfire with gunshot victims | 63.24% | 17% |
| **C. Handguns Used in Fatal Versus Non-Fatal Gunshot Victimizations** | | |
| 1) 9mm and .38:  non-fatal gunshot victims | 32.58% | |
| 2) 9mm and .38:  homicides | 38.18% | 17% |
| 1) 9mm:  non-fatal gunshot victims | 61.14% | |
| 2) 9mm:  homicides | 66.04% | 8% |

* Statistically significant difference at p<.01 (chi-square).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The findings of the preceding studies are subject to numerous caveats. There were few if any attempts to control for characteristics of the actors or situations that might have influenced weapon choices and/or attack outcomes.[103] Weapons data were typically missing for substantial percentages of cases. Further, many of the comparisons in the tables were not tested for statistical significance (see the notes to Tables 9-1 and 9-2).[104]

Tentatively, nonetheless, the evidence suggests more often than not that attacks with semiautomatics, particularly those equipped with LCMs, result in more shots fired, leading to both more injuries and injuries of greater severity. Perhaps the faster firing rate and larger ammunition capacities afforded by these weapons prompt some offenders to fire more frequently (i.e., encouraging what some police and military persons refer to as a "spray and pray" mentality). But this still begs the question of whether a 10-round limit on magazine capacity will affect the outcomes of enough gun attacks to measurably reduce gun injuries and deaths.

---

[103] In terms of offender characteristics, recall from Chapter 3 that AP buyers are more likely than other gun buyers to have criminal histories and commit subsequent crimes. This does not seem to apply, however, to the broader class of semiautomatic users: handgun buyers with and without criminal histories tend to buy pistols in virtually the same proportions (Wintemute et al., 1998b), and youthful gun offenders using pistols and revolvers have very comparable criminal histories (Sheley and Wright, 1993b, p. 381). Further, semiautomatic users, including many of those using AWs, show no greater propensity to shoot at victims than do other gun offenders (Harlow, 2001, p. 11; Reedy and Koper, 2003). Other potential confounders to the comparisons in Tables 9-1 and 9-2 might include shooter age and skill, the nature of the circumstances (e.g., whether the shooting was an execution-style shooting), the health of the victim(s), the type of location (e.g., indoor or outdoor location), the distance between the shooter and intended victim(s), the presence of multiple persons who could have been shot intentionally or accidentally (as bystanders), and (in the mass shooting incidents) the use of multiple firearms.

[104] Tables 9-1 and 9-2 present the strongest evidence from the available studies. However, there are additional findings from these studies and others that, while weaker, are relevant. Based on gun model information available for a subset of cases in the Jersey City study, there were 12 gunfire cases involving guns manufactured with LCMs before the ban (7 of which resulted in wounded victims) and 94 gunfire cases involving revolvers or semiautomatic models without LCMs. Comparisons of these cases produced results similar to those of the main analysis: shot fired estimates ranged from 2.83 to 3.25 for the LCM cases and 2.22 to 2.6 for the non-LCM cases; 1.14 victims were wounded on average in the LCM gunshot cases and 1.06 in the non-LCM gunshot cases; and LCM gunshot victims had 1.14 wound on average, which, contrary to expectations, was less than the 1.47 average for other gunshot victims.

The compilation of mass shooting incidents cited in Table 9-1 had tentative shots fired estimates for 3 of the AW-LCM cases and 4 of the other cases. The AW-LCM cases averaged 93 shots per incident, a figure two and a half times greater than the 36.5 shot average for the other cases.

Finally, another study of firearm mass murders found that the average number of victims killed (tallies did not include others wounded) was 6 in AW cases and 4.5 in other cases (Roth and Koper, 1997, Appendix A). Only 2 of the 52 cases studied clearly involved AWs (or very similar guns). However, the make and model of the firearm were available for only eight cases, so additional incidents may have involved LCMs; in fact, at least 35% of the cases involved unidentified semiautomatics. (For those cases in which at least the gun type and firing action were known, semiautomatics outnumbered non-semiautomatics by 6 to 1, perhaps suggesting that semiautomatics are used disproportionately in mass murders.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*9.2.1. Will a 10-Round Magazine Limit Reduce Gunshot Victimizations?*

Specific data on shots fired in gun attacks are quite fragmentary and often inferred indirectly, but they suggest that relatively few attacks involve more than 10 shots fired.[105] Based on national data compiled by the FBI, for example, there were only about 19 gun murder incidents a year involving four or more victims from 1976 through 1995 (for a total of 375) (Fox and Levin, 1998, p. 435) and only about one a year involving six or more victims from 1976 through 1992 (for a total of 17) (Kleck, 1997, p. 126). Similarly, gun murder victims are shot two to three times on average according to a number of sources (see Table 9-2 and Koper and Roth, 2001a), and a study at a Washington, DC trauma center reported that only 8% of all gunshot victims treated from 1988 through 1990 had five or more wounds (Webster et al., 1992, p. 696).

However, counts of victims hit or wounds inflicted provide only a lower bound estimate of the number of shots fired in an attack, which could be considerably higher in light of the low hit rates in gunfire incidents (see above).[106] The few available studies on shots fired show that assailants fire less than four shots on average (see sources in Table 9-1 and Goehl, 1993), a number well within the 10-round magazine limit imposed by the AW-LCM ban, but these studies have not usually presented the full distribution of shots fired for all cases, so it is usually unclear how many cases, if any, involved more than 10 shots.

An exception is the aforementioned study of handgun murders and assaults in Jersey City (Reedy and Koper, 2003). Focusing on cases for which at least the type of handgun (semiautomatic, revolver, derringer) could be determined, 2.5% of the gunfire cases involved more than 10 shots.[107] These incidents – all of which involved pistols – had a 100% injury rate and accounted for 4.7% of all gunshot victims in the sample (see Figure 9-2). Offenders fired a total of 83 shots in these cases, wounding 7 victims, only 1 of whom was wounded more than once. Overall, therefore, attackers fired over 8 shots

---

[105] Although the focus of the discussion is on attacks with more than 10 shots fired, a gun user with a post-ban 10-round magazine can attain a firing capacity of 11 shots with many semiautomatics by loading one bullet into the chamber before loading the magazine.

[106] As a dramatic example, consider the heavily publicized case of Amadou Diallo, who was shot to death by four New York City police officers just a few years ago. The officers in this case fired upon Diallo 41 times but hit him with only 19 shots (a 46% hit rate), despite his being confined in a vestibule. Two of the officers reportedly fired until they had emptied their 16-round magazines, a reaction that may not be uncommon in such high-stress situations. In official statistics, this case will appear as having only one victim.

[107] The shots fired estimates were based on reported gunshot injuries, physical evidence (for example, shell casings found at the scene), and the accounts of witnesses and actors. The 2.5% figure is based on minimum estimates of shots fired. Using maximum estimates, 3% of the gunfire incidents involved more than 10 shots (Reedy and Koper, 2003, p. 154).

A caveat to these figures is that the federal LCM ban was in effect for much of the study period (which spanned January 1992 to November 1996), and a New Jersey ban on magazines with more than 15 rounds predated the study period. It is thus conceivable that these laws reduced attacks with LCM guns and attacks with more than 10 shots fired, though it seems unlikely that the federal ban had any such effect (see the analyses of LCM use presented in the previous chapter). Approximately 1% of the gunfire incidents involved more than 15 shots.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

for every wound inflicted, suggesting that perhaps fewer persons would have been wounded had the offenders not been able to fire as often.[108]

---

**Figure 9-2. Attacks With More Than 10 Shots Fired**

**Jersey City Handgun Attacks, 1992-1996**

- **2.5% - 3% of gunfire incidents involved 11+ shots**
  - **3.6% - 4.2% of semiauto pistol attacks**
- **100% injury rate**
- **Produced 4.7% of all gunshot wound victims**
- **8.3 shots per gunshot wound**

---

Based on data reported by Reedy and Koper (2003). Injury statistics based on the 2.5% of cases involving 11+ shots by minimum estimate.

Caution is warranted in generalizing from these results because they are based on a very small number of incidents (6) from one sample in one city. Further, it is not known if the offenders in these cases had LCMs (gun model and magazine information was very limited); they may have emptied small magazines, reloaded, and continued firing. But subject to these caveats, the findings suggest that the ability to deliver more than 10 shots without reloading may be instrumental in a small but non-trivial percentage of gunshot victimizations.

On the other hand, the Jersey City study also implies that eliminating AWs and LCMs might only reduce gunshot victimizations by up to 5%. And even this estimate is probably overly optimistic because the LCM ban cannot be expected to prevent all incidents with more than 10 shots. Consequently, any effects from the ban (should it be extended) are likely to be smaller and perhaps quite difficult to detect with standard statistical methods (see Koper and Roth, 2001a), especially in the near future, if recent patterns of LCM use continue.

### 9.3. Post-Ban Trends in Lethal and Injurious Gun Violence

Having established some basis for believing the AW-LCM ban could have at least a small effect on lethal and injurious gun violence, is there any evidence of such an effect to date? Gun homicides plummeted from approximately 16,300 in 1994 to 10,100 in 1999, a reduction of about 38% (see the Federal Bureau of Investigation's *Uniform Crime*

---

[108] These figures are based on a supplemental analysis not contained in the published study. We thank Darin Reedy for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

*Reports*).  Likewise, non-fatal, assaultive gunshot injuries treated in hospitals nationwide declined one-third, from about 68,400 to under 46,400, between 1994 and 1998 (Gotsch et al., 2001, pp. 23-24).  Experts believe numerous factors contributed to the recent drop in these and other crimes, including changing drug markets, a strong economy, better policing, and higher incarceration rates, among others (Blumstein and Wallman, 2000). Attributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that crimes with LCMs appear to have been steady or rising since the ban.  For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence.[109]

But a more casual assessment shows that gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect if crimes with AWs and LCMs had both declined.  For instance, the percentage of violent gun crimes resulting in death has been very stable since 1990 according to national statistics on crimes reported to police (see Figure 9-1 in section 9.1).[110]  In fact, the percentage of gun crimes resulting in death during 2001 and 2002 (2.94%) was slightly higher than that during 1992 and 1993 (2.9%).

Similarly, neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die.  If anything, this percentage has been higher since the ban, a pattern that could be linked in part to more multiple wound victimizations stemming from elevated levels of LCM use. According to medical examiners' reports and hospitalization estimates, about 20% of gunshot victims died nationwide in 1993 (Gotsch et al., 2001).  This figure rose to 23% in 1996, before declining to 21% in 1998 (Figure 9-3).[111]  Estimates derived from the Uniform Crime Reports and the Bureau of Justice Statistics' annual National Crime Victimization Survey follow a similar pattern from 1992 to 1999 (although the ratio of fatal to non-fatal cases is much higher in these data than that in the medical data) and also show a considerable increase in the percentage of gunshot victims who died in 2000 and 2001 (Figure 9-3).[112]  Of course, changes in offender behavior or other changes in crime

---

[109]  In our prior study (Koper and Roth 2001a; Roth and Koper, 1997, Chapter 6), we estimated that gun murders were about 7% lower than expected in 1995 (the first year after the ban), adjusting for pre-existing trends.  However, the very limited post-ban data available for that study precluded a definitive judgment as to whether this drop was statistically meaningful (see especially Koper and Roth, 2001a).  Furthermore, that analysis was based on the assumption that crimes with both AWs and LCMs had dropped in the short-term aftermath of the ban, an assumption called into question by the findings of this study.  It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since.  We did not update the gun murder analysis because interpreting the results would be unavoidably ambiguous.  Such an investigation will be more productive after demonstrating that the ban has reduced crimes with both AWs and LCMs.

[110]  The decline in this figure during the 1980s was likely due in part to changes in police reporting of aggravated assaults in recent decades (Blumstein, 2000).  The ratio of gun murders to gun robberies rose during the 1980s, then declined and remained relatively flat during the 1990s.

[111]  Combining homicide data from 1999 with non-fatal gunshot estimates for 2000 suggests that about 20% of gunshot victimizations resulted in death during 1999 and 2000 (Simon et al., 2002).

[112]  The SHR/NCVS estimates should be interpreted cautiously because the NCVS appears to undercount non-fatal gunshot wound cases by as much as two-thirds relative to police data, most likely because it fails to represent adequately the types of people most likely to be victims of serious crime (i.e., young urban males who engage in deviant lifestyles) (Cook, 1985).  Indeed, the rate of death among gunshot victims

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

92

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

weaponry (such as an increase in shootings with large caliber handguns) may have influenced these trends. Yet is worth noting that multiple wound shootings were elevated over pre-ban levels during 1995 and 1996 in four of five localities examined during our first AW study, though most of the differences were not statistically significant (Table 9-4, panels B through E).

Another potential indicator of ban effects is the percentage of gunfire incidents resulting in fatal or non-fatal gunshot victimizations. If attacks with AWs and LCMs result in more shots fired and victims hit than attacks with other guns and magazines, we might expect a decline in crimes with AWs and LCMs to reduce the share of gunfire incidents resulting in victims wounded or killed. Measured nationally with UCR and NCVS data, this indicator was relatively stable at around 30% from 1992 to 1997, before rising to about 40% from 1998 through 2000 (Figure 9-4).[113] Along similar lines, multiple victim gun homicides remained at relatively high levels through at least 1998, based on the national average of victims killed per gun murder incident (Table 9-4, panel A).[114]

---

appears much higher in the SHR/NCVS series than in data compiled from medical examiners and hospitals (see the CDC series in Figure 9-3). But if these biases are relatively consistent over time, the data may still provide useful insights into trends over time.

[113] The NCVS estimates are based on a compilation of 1992-2002 data recently produced by the Inter-University Consortium for Political and Social Research (ICPSR study 3691). In 2002, only 9% of non-fatal gunfire incidents resulted in gunshot victimizations. This implies a hit rate for 2002 that was below pre-ban levels, even after incorporating gun homicide cases into the estimate. However, the 2002 NCVS estimate deviates quite substantially from earlier years, for which the average hit rate in non-fatal gunfire incidents was 24% (and the estimate for 2001 was 20%). Therefore, we did not include the 2002 data in our analysis. We used two-year averages in Figures 9-3 and 9-4 because the annual NCVS estimates are based on very small samples of gunfire incidents. The 2002 sample was especially small, so it seems prudent to wait for more data to become available before drawing conclusions about hit rates since 2001.

[114] We thank David Huffer for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Figure 9-3. Percentage of Gunshot Victimizations Resulting in Death (National), 1992-2001**



SHR/NCVS series based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey. CDC series based on homicide and hospitalization data from the Centers for Disease Control (reported by Gotsch et al. 2001).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**Table 9-4.  Short-Term, Post-Ban Changes in the Lethality and Injuriousness of Gun Violence:  National and Local Indicators, 1994-1998 [a]**

| Measure and Location | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| A.  Victims Per Gun Homicide Incident (National) | Jan. 1986-Sept. 1994<br>1.05<br>(N=106,668) | Oct. 1994-Dec. 1998<br>1.06<br>(N=47,511) | 1%** |
| B.  Wounds per Gun Homicide Victim:  Milwaukee County | Jan. 1992-Aug. 1994<br>2.28<br>(N=282) | Sept. 1994-Dec. 1995<br>2.52<br>(N=136) | 11% |
| C.  Wounds Per Gun Homicide Victim: Seattle (King County) | Jan. 1992-Aug. 1994<br>2.08<br>(N=184) | Sept. 1994-Jun. 1996<br>2.46<br>(N=91) | 18% |
| D.  Wounds Per Gunshot Victim: Jersey City (NJ) | Jan. 1992-Aug. 94<br>1.42<br>(N=125) | Sept. 1994-Jun. 1996<br>1.39<br>(N=137) | -2% |
| E.  % of Gun Homicide Victims With Multiple Wounds:  San Diego County | Jan. 1992-Aug. 1994<br>41%<br>(N=445) | Sept. 1994-Jun. 1996<br>43%<br>(N=223) | 5% |
| F.  % of Non-Fatal Gunshot Victims With Multiple Wounds: Boston | Jan. 1992-Aug. 1994<br>18%<br>(N=584) | Sept. 1994-Dec. 1995<br>24%<br>(N=244) | 33%* |

a.  National victims per incident figures based on unpublished update of analysis reported in Roth and Koper (1997, Chapter 5).  Gunshot wound data are taken from Roth and Koper (1997, Chapter 6) and Koper and Roth (2001a).  Wound data are based on medical examiners' reports (Milwaukee, Seattle, San Diego), hospitalization data (Boston), and police reports (Jersey City).
*  Chi-square p level < .1.
**  T-test p level < .01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

If anything, therefore, gun attacks appear to have been more lethal and injurious since the ban. Perhaps elevated LCM use has contributed to this pattern. But if this is true, then the reverse would also be true – a reduction in crimes with LCMs, should the ban be extended, would reduce injuries and deaths from gun violence.

**Figure 9-4. Percentage of Gunfire Cases Resulting in Gunshot Victimizations (National), 1992-2001**



Based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey.

### 9.4. Summary

Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs.

However, the grandfathering provision of the AW-LCM ban guaranteed that the effects of this law would occur only gradually over time. Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers. It is thus premature to make definitive assessments of the ban's impact on gun violence.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Having said this, the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement. AWs were used in no more than 8% of gun crimes even before the ban. Guns with LCMs are used in up to a quarter of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability to fire more than 10 shots (the current limit on magazine capacity) without reloading.

Nonetheless, reducing crimes with AWs and especially LCMs could have non-trivial effects on gunshot victimizations. As a general matter, hit rates tend to be low in gunfire incidents, so having more shots to fire rapidly can increase the likelihood that offenders hit their targets, and perhaps bystanders as well. While not entirely consistent, the few available studies contrasting attacks with different types of guns and magazines generally suggest that attacks with semiautomatics – including AWs and other semiautomatics with LCMs – result in more shots fired, persons wounded, and wounds per victim than do other gun attacks. Further, a study of handgun attacks in one city found that about 3% of gunfire incidents involved more than 10 shots fired, and those cases accounted for nearly 5% of gunshot victims. However, the evidence on these matters is too limited (both in volume and quality) to make firm projections of the ban's impact, should it be reauthorized.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 10. LOOKING TO THE FUTURE:  RESEARCH RECOMMENDATIONS AND SPECULATION ABOUT THE CONSEQUENCES OF REAUTHORIZING, MODIFYING, OR LIFTING THE ASSAULT WEAPONS BAN

In this chapter, we discuss future lines of inquiry that would be informative whether or not the AW-LCM ban is renewed in September 2004.  We then offer some brief thoughts about the possible consequences of reauthorizing the ban, modifying it, or allowing it to expire.

### 10.1.  Research Recommendations and Data Requirements

*10.1.1.  An Agenda for Assault Weapons Research and Recommendations for Data Collection by Law Enforcement*

The effects of the AW-LCM ban have yet to be fully realized; therefore, we recommend continued study of trends in the availability and criminal use of AWs and LCMs.  Even if the ban is lifted, longer-term study of crimes with AWs and LCMs will inform future assessment of the consequences of these policy shifts and improve understanding of the responses of gun markets to gun legislation more generally.[115]

Developing better data on crimes with LCMs is especially important.  To this end, we urge police departments and their affiliated crime labs to record information about magazines recovered with crime guns.  Further, we recommend that ATF integrate ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police departments that trace firearms.

As better data on LCM use become available, more research is warranted on the impacts of AW and LCM trends (which may go up or down depending on the ban's fate) on gun murders and shootings, as well as levels of death and injury per gun crime.  Indicators of the latter, such as victims per gunfire incident and wounds per gunshot victim, are useful complementary outcome measures because they reflect the mechanisms through which use of AWs and LCMs is hypothesized to affect gun deaths and injuries.[116]  Other potentially promising lines of inquiry might relate AW and LCM use to mass murders and murders of police, crimes that are very rare but appear more likely to involve AWs (and perhaps LCMs) and to disproportionately affect public perceptions.[117]

---

[115] Establishing time series data on primary and secondary market prices and production or importation of various guns and magazines of policy interest could provide benefits for policy researchers.  Like similar statistical series maintained for illegal drugs, such price and production series would be valuable instruments for monitoring effects of policy changes and other influences on markets for various weapons.

[116] However, more research is needed on the full range of factors that cause variation in these indicators over time and between places.

[117] Studying these crimes poses a number of challenges, including modeling of rare events, establishing the reliability and validity of methods for measuring the frequency and characteristics of mass murders (such as through media searchers; see Duwe, 2000, Roth and Koper, 1997, Appendix A), and controlling for factors like the use of bullet-proof vests by police.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Finally, statistical studies relating AW and LCM use to trends in gun violence should include statistical power analysis to ensure that estimated models have sufficient ability to detect small effects, an issue that has been problematic in some of our prior time series research on the ban (Koper and Roth, 2001a) and is applicable more generally to the study of modest, incremental policy changes.

Research on aggregate trends should be complemented by more incident-based studies that contrast the dynamics and outcomes of attacks with different types of guns and magazines, while controlling for relevant characteristics of the actors and situations. Such studies would refine predictions of the change in gun deaths and injuries that would follow reductions in attacks with AWs and LCMs. For instance, how many homicides and injuries involving AWs and LCMs could be prevented if offenders were forced to substitute other guns and magazines? In what percentage of gun attacks does the ability to fire more than ten rounds without reloading affect the number of wounded victims or determine the difference between a fatal and non-fatal attack? Do other AW features (such as flash hiders and pistol grips on rifles) have demonstrable effects on the outcomes of gun attacks? Studies of gun attacks could draw upon police incident reports, forensic examinations of recovered guns and magazines, and medical and law enforcement data on wounded victims.

### 10.1.2. Studying the Implementation and Market Impacts of Gun Control

More broadly, this study reiterates the importance of examining the implementation of gun policies and the workings of gun markets, considerations that have been largely absent from prior research on gun control. Typical methods of evaluating gun policies involve statistical comparisons of total or gun crime rates between places and/or time periods with and without different gun control provisions. Without complimentary implementation and market measures, such studies have a "black box" quality and may lead to misleading conclusions. For example, a time series study of gun murder rates before and after the AW-LCM ban might find that the ban has not reduced gun murders. Yet the interpretation of such a finding would be ambiguous, absent market or implementation measures. Reducing attacks with AWs and LCMs may in fact have no more than a trivial impact on gun deaths and injuries, but any such impact cannot be realized or adequately assessed until the availability and use of the banned guns and magazines decline appreciably. Additionally, it may take many years for the effects of modest, incremental policy changes to be fully felt, a reality that both researchers and policy makers should heed. Similar implementation concerns apply to the evaluation of various gun control policies, ranging from gun bans to enhanced sentences for gun offenders.

Our studies of the AW ban have shown that the reaction of manufacturers, dealers, and consumers to gun control policies can have substantial effects on demand and supply for affected weapons both before and after a law's implementation. It is important to study these factors because they affect the timing and form of a law's impact

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

on the availability of weapons to criminals and, by extension, the law's impact on gun violence.

## 10.2. Potential Consequences of Reauthorizing, Modifying, or Lifting the Assault Weapons Ban

### 10.2.1. Potential Consequences of Reauthorizing the Ban As Is

Should it be renewed, the ban might reduce gunshot victimizations. This effect is likely to be small at best and possibly too small for reliable measurement. A 5% reduction in gunshot victimizations is perhaps a reasonable upper bound estimate of the ban's potential impact (based on the only available estimate of gunshot victimizations resulting from attacks in which more than 10 shots were fired), but the actual impact is likely to be smaller and may not be fully realized for many years into the future, particularly if pre-ban LCMs continue to be imported into the U.S. from abroad. Just as the restrictions imposed by the ban are modest – they are essentially limits on weapon accessories like LCMs, flash hiders, threaded barrels, and the like – so too are the potential benefits.[118]  In time, the ban may be seen as an effective prevention measure that stopped further spread of weaponry considered to be particularly dangerous (in a manner similar to federal restrictions on fully automatic weapons). But that conclusion will be contingent on further research validating the dangers of AWs and LCMs.

### 10.2.2. Potential Consequences of Modifying the Ban

We have not examined the specifics of legislative proposals to modify the AW ban. However, we offer a few general comments about the possible consequences of such efforts, particularly as they relate to expanding the range of the ban as some have advocated (Halstead, 2003, pp. 11-12).

---

[118]  But note that although the ban's impact on gunshot victimizations would be small in percentage terms and unlikely to have much effect on the public's fear of crime, it could conceivably prevent hundreds of gunshot victimizations annually and produce notable cost savings in medical care alone.  To help place this in perspective, there were about 10,200 gun homicides and 48,600 non-fatal, assault-related shootings in 2000 (see the FBI's *Uniform Crime Reports* for the gun homicide estimate and Simon et al. [2002] for the estimate of non-fatal shootings).  Reducing these crimes by 1% would have thus prevented 588 gunshot victimizations in 2000 (we assume the ban did not actually produce such benefits because the reduction in AW use as of 2000 was outweighed by steady or rising levels of LCM use).  This may seem insubstantial compared to the 342,000 murders, assaults, and robberies committed with guns in 2000 (see the *Uniform Crime Reports*).  Yet, gunshot victimizations are particularly costly crimes.  Setting aside the less tangible costs of lost lives and human suffering, the lifetime medical costs of assault-related gunshot injuries (fatal and non-fatal) were estimated to be about $18,600 per injury in 1994 (Cook et al., 1999).  Therefore, the lifetime costs of 588 gun homicides and shootings would be nearly $11 million in 1994 dollars (the net medical costs could be lower for reasons discussed by Cook and Ludwig [2000] but, on the other hand, this estimate does not consider other governmental and private costs that Cook and Ludwig attribute to gun violence).  This implies that small reductions in gunshot victimizations sustained over many years could produce considerable long-term savings for society.  We do not wish to push this point too far, however, considering the uncertainty regarding the ban's potential impact.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Gun markets react strongly merely to debates over gun legislation. Indeed, debate over the AW ban's original passage triggered spikes upwards of 50% in gun distributors' advertised AW prices (Roth and Koper, 1997, Chapter 4). In turn, this prompted a surge in AW production in 1994 (Chapter 5). Therefore, it seems likely that discussion of broadening the AW ban to additional firearms would raise prices and production of the weapons under discussion. (Such market reactions may already be underway in response to existing proposals to expand the ban, but we have not investigated this issue.) Heightened production levels could saturate the market for the weapons in question, depressing prices and delaying desired reductions in crimes with the weapons, as appears to have happened with banned ARs.

Mandating further design changes in the outward features of semiautomatic weapons (e.g., banning weapons having any military-style features) may not produce benefits beyond those of the current ban. As noted throughout this report, the most important feature of military-style weapons may be their ability to accept LCMs, and this feature has been addressed by the LCM ban and the LCMM rifle ban. Whether changing other features of military-style firearms will produce measurable benefits is unknown.

Finally, curbing importation of pre-ban LCMs should help reduce crimes with LCMs and possibly gunshot victimizations. Crimes with LCMs may not decline substantially for quite some time if millions of LCMs continue to be imported into the U.S.

### 10.2.3. Potential Consequences of Lifting the Ban

If the ban is lifted, it is likely that gun and magazine manufacturers will reintroduce AW models and LCMs, perhaps in substantial numbers.[119] In addition, AWs grandfathered under the 1994 law may lose value and novelty, prompting some of their lawful owners to sell them in secondary markets, where they may reach criminal users. Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations, though this effect could be difficult to discern statistically.

It is also possible, and perhaps probable, that new AWs and LCMs will eventually be used to commit mass murder. Mass murders garner much media attention, particularly when they involve AWs (Duwe, 2000). The notoriety likely to accompany mass murders if committed with AWs and LCMs, especially after these guns and magazines have been deregulated, could have a considerable negative impact on public perceptions, an effect that would almost certainly be intensified if such crimes were committed by terrorists operating in the U.S.

---

[119] Note, however, that foreign semiautomatic rifles with military features, including the LCMM rifles and several rifles prohibited by the 1994 ban, would still be restricted by executive orders passed in 1989 and 1998. Those orders stem from the sporting purposes test of the Gun Control Act of 1968.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

## REFERENCES

Adler, W.C., Bielke, F.M., Doi, D.J., and Kennedy, J.F. (1995). *Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns With High Capacity Magazines*, Handgun Control, Inc., Washington, DC.

American Medical Association Council on Scientific Affairs. (1992). Assault weapons as a public health hazard in the United States. *JAMA* 267:3067-3070.

Berndt, E.R. (1990). *The Practice of Econometrics: Classic and Contemporary*, Addison Wesley, Reading, MA.

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., and Morton, D. (1993). *Survey of State Prison Inmates, 1991* (NCJ-136949), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Block, C.R. and Block, R. (1993). *Street Gang Crime in Chicago* (NCJ-144782), National Institute of Justice, United States Department of Justice, Washington, DC.

Blumstein, A. (2000). Disaggregating the violence trends. In Blumstein, A. and Wallman, J. (eds.), *The Crime Drop in America*, Cambridge University Press, New York, pp. 13-44.

Blumstein, A. and Wallman, J. (eds.), (2000). *The Crime Drop in America*, Cambridge University Press, New York.

Brady Center to Prevent Gun Violence. (2004). *On Target: The Impact of the 1994 Federal Assault Weapons Act*, Washington, DC.

Brill, S. (1977). *Firearm Abuse: A Research and Policy Report,* Police Foundation, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1976). *Project Identification: A Study of Handguns Used in Crime,* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1977). *Concentrated Urban Enforcement (CUE),* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1995). *The National Tracing Center 1994 Yearend Report*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1997). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities*, United States Department of the Treasury, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

102

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Bureau of Alcohol, Tobacco, and Firearms. (1999). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000). *Commerce in Firearms in the United States*, United States Department of the Treasury, Washington, DC.

Bureau of Justice Statistics. (1994). *Firearms and Crimes of Violence: Selected Findings from National Statistical Series* (NCJ-146844), United States Department of Justice, Washington, DC.

Bureau of Justice Statistics. (2000). *Correctional Populations in the United States, 1997* (NCJ-177613), United States Department of Justice, Washington, DC.

Caruso, R.P., Jara, D.I. and Swan, K.G. (1999). Gunshot wounds: Bullet caliber is increasing. *The Journal of Trauma: Injury, Infection, and Critical Care* 46:462-465.

Center to Prevent Handgun Violence. (1998). *On the Front Line: Making Gun Interdiction Work,* Handgun Control, Inc., Washington, DC.

Cherry, D., Annest, J.L., Mercy, J.A., Kresnow, M., and Pollock, D.A. (1998). Trends in nonfatal and fatal firearm-related injury rates in the United States, 1985-1995. *Annals of Emergency Medicine* 32:51-59.

Cook, P.J. (1985). The case of the missing victims: Gunshot woundings in the National Crime Survey." *Journal of Quantitative Criminology* 1:91-102.

Cook, P.J., Lawrence, B.A., Ludwig, J., and Miller, T.R. (1999). The medical costs of gunshot injuries in the United States. *JAMA* 282:447-454.

Cook, P.J. and Ludwig, J. (1996). *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Police Foundation, Washington, DC.

Cook, P.J. and Ludwig, J. (1997). *Guns in America: National Survey on Private Ownership and Use of Firearms* (NCJ-165476), National Institute of Justice, United States Department of Justice, Washington, DC.

Cook, P.J. and Ludwig, J. (2000). *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cook, P.J., Molliconi, S., and Cole, T.B. (1995). Regulating gun markets. *Journal of Criminal Law and Criminology* 86:59-92.

Cox Newspapers. (1989). *Firepower: Assault Weapons in America*, Cox Enterprises, Washington, DC.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DiMaio, V.J.M. (1985). *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques,* Elsevier, New York.

Duwe, G. (2000). Body-count journalism: The presentation of mass murder in the news media. *Homicide Studies* 4:364-399.

Federal Bureau of Investigation, (1982-2003). *Crime in the United States*, United States Department of Justice, Washington, DC.

Fjestad, S.J. (1990-2002). *Blue Book of Gun Values* (11th-23rd eds.), Blue Book Publications, Minneapolis.

Fox, J.A. and Levin, J. (1998). Multiple homicide: Patterns of serial and mass murder. In Tonry, M. (ed.), *Crime and Justice, Vol. 23*, University of Chicago Press, Chicago, pp. 407-455.

Friedman, M. (1962). *Price Theory: A Provisional Text*, Aldine Publishing Company, Chicago.

Goehl, G. (1993). *1992 Firearms Discharge Assault Report,* Police Academy Firearms and Tactics Section, New York City Police Department, New York.

Gotsch, K.E., Annest, J.L., Mercy, J.A., and Ryan, G.W. (2001). Surveillance for fatal and nonfatal firearm-related injuries – United States, 1993-1998. *Morbidity and Mortality Weekly Report (MMWR) CDC Surveillance Summaries* 50(SS-2):1-34.

Gun Tests. (1995). Magazine rule change unlikely. March.

Halstead, T.J. (2003). *The Assault Weapons Ban: Legal Challenges and Legislative Issues*, Congressional Research Service, Washington, DC (distributed by Penny Hill Press, Derwood, MD).

Hargarten, S.W., Karlson, T.A., O'Brien, M., Hancock, J., and Quebbeman, E. (1996). Characteristics of firearms involved in fatalities. *JAMA* 275:42-45.

Hargarten, S.W., Kuhn, E.M., Nie, C.L., O'Brien, M.E., Withers, R.L., and Wintemute, G.J. (2000). Homicide gun characteristics before and after the 1994 crime bill. In Blackman, P.H., Leggett, V.L., Olson, B.L., and Jarvis, J.P. (eds.), *The Varieties of Homicide and Its Research: Proceedings of the 1999 Meeting of the Homicide Research Working Group*, FBI Academy, Federal Bureau of Investigation, U.S. Department of Justice, Quantico, VA.

Harlow, C.W. (2001). *Firearm Use By Offenders* (NCJ-189369, Revised Feb. 2002), Bureau of Justice Statistics, U.S. Department of Justice, Washington, DC.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Hutson, H.R., Anglin, D., and Pratts, M.J., Jr. (1994). Adolescents and children injured or killed in drive-by shootings in Los Angeles. *New England Journal of Medicine* 330:324-327.

Hutson, H.R., Anglin, D., Kyriacou, D.N., Hart, J., and Spears, K. (1995). The epidemic of gang-related homicides in Los Angeles County from 1979 through 1994. *JAMA* 274:1031-1036.

Kennedy, D.M., Piehl, A.M., and Braga, A.A. (1996). Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law and Contemporary Problems* 59:147-196.

Kleck, G. (1991). *Point Blank: Guns and Violence in America.* Aldine de Gruyter, New York.

Kleck, G. (1997). *Targeting Guns: Firearms and Their Control*. Aldine de Gruyter, New York.

Knox, G.W., Houston, J.G., Laskey, J.A., McCurrie, T.F., Tromanhauser, E.D., Laske, D.L. (1994). *Gangs and Guns: A Task Force Report from the National Gang Crime Research Center*, National Gang Crime Research Center, Chicago

Kopel, D.B. (1995). Assault weapons. In Kopel (ed.), *Guns: Who Should Have Them?* Prometheus Books, Amherst, NY, pp. 159-232.

Koper, C.S. (1995). *Gun Lethality and Homicide: Gun Types Used By Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985-1993,* (Ph.D. Dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Koper, C.S. (1997). *Gun Density Versus Gun Type: Did the Availability of More Guns or More Lethal Guns Drive Up the Dallas Homicide Rate, 1980-1992?* (Report NCJ-187106 to the National Institute of Justice), Crime Control Institute, Philadelphia.

Koper, C.S. (2001). *A Follow-Up Assessment of the 1994 Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, Presentation at the annual meeting of the American Society of Criminology, Atlanta.

Koper, C.S. (2002). Federal legislation and gun markets: How much have recent reforms of the federal firearms licensing system reduce criminal gun suppliers? *Criminology and Public Policy* 1:151-178.

Koper, C.S. and Roth, J.A. (2001a). The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *Journal of Quantitative Criminology* 17:33-74.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

105

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Koper, C.S. and Roth, J.A. (2001b). A priori assertions versus empirical inquiry: A reply to Kleck. *Journal of Quantitative Criminology* 17:81-88.

Koper, C.S. and Roth, J.A. (2002a).  The impact of the 1994 federal assault weapons ban on gun markets: An assessment of short-term primary and secondary market effects. *Journal of Quantitative Criminology* 18:239-266.

Koper, C.S and Roth, J.A. (2002b). *An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets, 1994-2000* (Draft Report to the National Institute of Justice), Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia and The Urban Institute, Washington, DC.

Lennet, M.G. (1995). Taking a bite out of violent crime. *University of Daytona Law Review*  20:573-617.

Lott, J.R., Jr. (2003). *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control is Wrong*, Regnery Publishing, Washington, DC.

McDowall, D. and Loftin, C. (1983). Collective security and the demand for legal handguns. *American Journal of Sociology* 88:1146-1161.

McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Angood, P.B. (1993). Urban firearm deaths: a five-year perspective. *The Journal of Trauma*: 35:532-537.

Murtz, H.A. and the Editors of Gun Digest. (1994). *Guns Illustrated 1994*, DBI Books, Northbrook, IL.

National Institute of Justice. (1995). *Arrestees and Guns: Monitoring the Illegal Firearms Market* (NCJ-184205), United States Department of Justice, Washington, DC.

New Mexico Criminal Justice Statistical Analysis Center. (1998). *Controlling New Mexico Juveniles' Possession of Firearms*, Institute for Social Research, University of New Mexico, Albuquerque.

New York State Division of Criminal Justice Services. (1994). *Assault Weapons and Homicide in New York City*, Albany, New York.

Pierce, G.L., Briggs, L.R., and Carlson, D.A. (1998). *National Report on Firearm Trace Analysis for 1996-1997*, Northeastern University, Boston.

Rand, M.R. (1990). *Handgun Crime Victims* (NCJ-123559), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Rand, M.R. (1994). *Guns and Crime* (NCJ-147003), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Reedy, D.C. and Koper, C.S. (2003). Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention* 9:151-155.

Rennison, C.M. (2001). *Criminal Victimization 2000: Changes 1999-2000 With Trends 1993-2000* (NCJ-187007), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Richmond, T.S, Branas, C.C, Cheney, R.A, and Schwab, C.W. (2004, under review). *The Case for Enhanced Data Collection of Handgun Type*, Firearm and Injury Center at Penn, University of Pennsylvania, Philadelphia.

Roth, J.A. and Koper, C.S. (1997). *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*, The Urban Institute, Washington, DC.

Roth, J.A. and Koper, C.S. (1999). *Impacts of the 1994 Assault Weapons Ban: 1994-96* (NCJ-173405), National Institute of Justice, United States Department of Justice, Washington, DC.

Ruddell, R. and Mays, G.L. (2003). Examining the arsenal of juvenile gunslingers: trends and policy implications. *Crime and Delinquency* 49:231-252.

Shaw, J.W. (1994). *Community Policing Against Crime: Violence and Firearms* (Ph.D. dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Sheley, J.F. and Wright, J.D. (1993a). *Gun Acquisition and Possession in Selected Juvenile Samples* (NCJ-145326), National Institute of Justice, United States Department of Justice, Washington, DC.

Sheley, J.F. and Wright, J.D. (1993b). Motivations for gun possession and carrying among serious juvenile offenders. *Behavioral Sciences and the Law* 11:375-388.

Sherman, L.W., Steele, L., Laufersweiler, D., Hoffer, N., and Julian, S.A. (1989). Stray bullets and 'mushrooms': Random shootings of bystanders in four cities, 1977-1988. *Journal of Quantitative Criminology* 5:297-316.

Simon, T.R., Saltzman, L.E., Swahn, M.H., Mercy, J.A., Ingram, E.M., and Mahendra, R.R, Annest, J.L., and Holmgreen, P. (2002). Nonfatal physical assault-related injuries treated in hospital emergency departments – United States, 2000. *Morbidity and Mortality Weekly Report* 51:460-463.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Violence Policy Center. (1999). *Firearms Production in America* (1999 Edition), Washington, DC.

Violence Policy Center (2002).  *Firearms Production in America* (2002 Edition), Washington, DC.

Violence Policy Center (2003). *Bullet Hoses: Semiautomatic Assault Weapons – What Are They? What's So Bad About Them?* Washington, DC.

Warner, K. (ed.). (1995). *Gun Digest 1995/49th Annual Edition,* DBI Books, Northbrook, IL.

Webster, D.W., Champion, H.R., Gainer, P.S., and Sykes, L. (1992). Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990. *Archives of Surgery* 127:694-8.

Weil, D.S. and Knox, R. (1995). *Estimating the Impact in Baltimore of the Maryland Ban on the Sale of Assault Pistols and High Capacity Magazines*, The Center to Prevent Handgun Violence, Washington, DC.

Wintemute, G.J. (1994). *Ring of Fire: The Handgun Makers of Southern California*, Violence Prevention Research Program, University of California, Davis.

Wintemute, G.J. (1996). The relationship between firearm design and firearm violence: Handguns in the 1990s." *JAMA* 275:1749-1753.

Wintemute, G.J., Wright, M.A., Parham, C.A., Drake, C.M., Beaumont, J.J. (1998a). Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32.

Wintemute, G.J., Parham, C.A., Wright, M.A., Beaumont, J.J., and Drake, C.M. (1998b). Weapons of choice: Previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. *The Journal of Trauma: Injury, Infection, and Critical Care* 44:155-160.

Wright, J.D. and Rossi, P.H. (1986). *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, Aldine de Gruyter, New York.

Zawitz, M.W. (1995). *Guns Used in Crime* (NCJ-148201), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# FN 15™ M16 MILITARY COLLECTOR

**THE WORLD'S MOST BATTLE-PROVEN FIREARMS™**

CARBINES

FN 15™ SERIES

## FN 15™ M16 MILITARY COLLECTOR

| 5.56x45mm | 30 Rd. | 8.2 LBS. | 39.5˝ | 20˝ |
|---|---|---|---|---|
| CALIBER | MAGAZINE | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** DIRECT IMPINGEMENT

**FINISH:** BLACK

**SIGHTS:** A2-STYLE FRONT, ADJUSTABLE REAR SIGHT

The FN 15™ Military Collector Series M4 and M16 bring to market military replica rifles made to FN's exacting specifications. The semi-automatic rifles are chambered in 5.56x45mm NATO and feature M4 -profile 16 and 20-inch 1:7˝ RH, button broached and chrome-lined barrels, respectively. Each UID-labeled lower receiver is equipped with an ambidextrous selector switch, just like its select-fire big brother.

## PRIMARY FEATURES

Knights Armament M5RAS Adapter rail w/ rail adapter covers

Ambidextrous safety lever

## RECEIVER

Hard-anodized aluminum

Flat-top receiver, M-1913

MIL-STD rail at the 12 o'clock position

A2-style front sight, adjustable rear sight

UID Label

## BARREL

20˝ Button-broached, chrome-lined

A2-style compensator

1:7˝ RH twist

## STOCK

Fixed, A2 Rifle Butt-Stock

M16 with pistol grip

## OPERATING CONTROLS

Ambidextrous safety lever

Ergonomic magazine release

Forward assist

## MAGAZINE

Aluminum body, Low friction follower, AR-style 30 round capacity

## ACCESSORIES



**FN UNIVERSAL TACTICAL SLING**



**FN PREMIUM COLD HAMMER-FORGED AR-15 BARRELS**

| Product | Designation | Product Type | UPC |
|---|---|---|---|
| 36320 | FN 15™ M16 Military Collector | Consumer | 845737005061 |
| 36320-02 | FN 15™ M16 Military Collector LE | Law Enforcement | TBD |

FOR MORE INFORMATION, CONTACT YOUR LOCAL FIREARMS RETAILER OR VISIT FNAMERICA.COM

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned

William English, PhD

Georgetown University

Expanded Report: May 13, 2022

**Abstract**

This report summarizes the findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date. This online survey was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over, and it identified 16,708 gun owners who were, in turn, asked in-depth questions about their ownership and their use of firearms, including defensive uses of firearms.

Consistent with other recent survey research, the survey finds an overall rate of adult firearm ownership of 31.9%, suggesting that in excess of 81.4 million Americans aged 18 and over own firearms. The survey further finds that approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and it estimates that guns are used defensively by firearms owners in approximately 1.67 million incidents per year. Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and in most defensive incidents (81.9%) no shot was fired. Approximately a quarter (25.2%) of defensive incidents occurred within the gun owner's home, and approximately half (53.9%) occurred outside their home, but on their property. About one out of ten (9.1%) defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.

A majority of gun owners (56.2%) indicate that they carry a handgun for self-defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency. We estimate that approximately 20.7 million gun owners (26.3%) carry a handgun in public under a "concealed carry" regime; and 34.9% of gun owners report that there have been instances in which they had wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

The average gun owner owns about 5 firearms, and handguns are the most common type of firearm owned. 48.0% of gun owners – about 39 million individuals – have

Electronic copy available at: https://ssrn.com/abstract=4109697

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

owned magazines that hold over 10 rounds (up to 542 million such magazines in total), and 30.2% of gun owners – about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). Demographically, gun owners are diverse. 42.2% are female and 57.8% are male. Approximately 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms. In total, Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

# 1   Introduction

This report summarizes the main findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date.

Before this survey, the most authoritative resource for estimating details of gun ownership in the U.S. has been the "Comprehensive National Survey on Firearms Ownership and Use" conducted by Cook and Ludwig in 1994 (Cook and Ludwig, 1996), and the most authoritative resource for estimating defensive gun use in the U.S. has been the "National Self-Defense Survey" conducted by Kleck and Gertz in 1993 (Kleck and Gertz, 1995, 1998). While valuable resources, they are both now a quarter century old, and no surveys of similar scope and depth have documented firearms ownership and use in more recent years.

Hepburn et al. (2007) conducted a more limited survey to ascertain the "gun stock" in 2004, a version of which was repeated in 2015 (Azrael et al., 2017). However, as they explain in introducing their latter survey, data sources on firearms ownership and use remain scarce:

> Although the National Opinion Research Center's General Social Survey and other surveys have asked respondents whether they personally own a firearm or live in a home with firearms, few have asked about the number of guns respondents own, let alone more detailed information about these firearms and the people who own them, such as reasons for firearm ownership, where firearms were acquired, how much firearms cost, whether they are carried in public, and how they are stored at home (Smith and Son 2015; Gallup 2016; Morin 2014). Because of this, the best and most widely cited estimates of the number of firearms

Electronic copy available at: https://ssrn.com/abstract=4206984

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

in civilian hands are derived from two national surveys dedicated to producing
detailed, disaggregated, estimates of the U.S. gun stock, one conducted in 1994,
the other in 2004 (Cook and Ludwig 1997, 1996; Hepburn et al. 2007).

Miller, Zhang, and Azrael conducted an expanded survey in 2021 of 5,932 gun owners
with a focus on characterizing the demographics of those who acquired firearms for the first
time during the COVID-19 Pandemic, based on a sub-sample of 447 individuals who fit this
criterion (Miller et al., 2022). This team also described their survey as a "2021 National
Firearms Survey," and it is helpful to clarify that their survey was distinct from the survey
reported here.

Richer survey data on firearms ownership and use has been collected by industry asso-
ciations such as the National Shooting Sports Foundation (NSSF).[1] However, these surveys
generally aim at assessing industry trends and market segmentation and are not necessarily
designed to be nationally representative. In 2017, the Pew Research Center conducted one of
the most recent and detailed surveys of the demographics of gun ownership (Brown, 2017).[2]
Although it did not ask detailed questions concerning defensive use of firearms and the types
of firearms owned, this recent Pew survey serves as a helpful benchmark for corroborating
the general ownership estimates of the present survey.

Advances in survey research technologies make it possible to reach large, representative
respondent populations today at a much lower cost than a quarter century ago. One of the
limitations of the Cook and Ludwig survey, which sought to be nationally representative,
was that the survey sample was relatively small, with about 2,500 respondents of whom
only about 600, or (24.6%), owned a firearm when the survey was administered. As the
investigators noted in their report, some sub-questions were not sufficiently well powered to
make confident inferences, particularly concerning the defensive use of firearms. Similarly,
Kleck and Gertz's survey was limited to 4,977 respondents, and the more recent surveys by
Pew, Hepburn, and Azrael are all based on less than 4,000 respondents.

---

[1] See https://www.nssf.org/research/

[2] See Pew Research Center, June 2017, "America's Complex Relationship With Guns"
https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2017/06/Guns-Report-
FOR-WEBSITE-PDF-6-21.pdf

3

Electronic copy available at: https://ssrn.com/abstract=4209694

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Today, professional survey firms like Centiment[3] cultivate large pools of survey respondents, enabling representative sampling, and have techniques that encourage high response and completion rates while also ensuring the integrity of responses.[4]  The online survey summarized here was presented to a nationally representative sample (excluding residents of Vermont who had already responded to a pilot version of this survey) of 54,244 individuals aged 18 or over who completed an initial questionnaire that included an indirect question indicating whether they owned a firearm (respondents were presented with a list of items commonly owned for outdoor recreational purposes, including firearms, and were asked to select all items that they own).

This question identified 16,708 individuals as gun owners, who were then transferred to the main survey, which then asked detailed questions about their ownership and use of firearms. Given the length and detail of the survey, there was a slight amount of attrition, as 7.5%, or 1,258 individuals, did not make it through all questions to the end of the survey. However, 92.5% of the responding firearms owners (15,450) did proceed through all of the survey questions.

This survey thus contains what we believe is the largest sample of firearms owners ever queried about their firearms ownership and firearms use in a scientific survey in the United States. This survey was approved by Georgetown University's Institutional Review Board. Of note, this survey was conducted just after a period of widespread social unrest across the U.S. and a contentious presidential election, which background check data suggests led to record gun sales (approximately 39.7 million in 2020, up 40% from the prior year).[5]  It is thus a comprehensive and timely assessment of the state of firearms ownership and use in the United States. Finally, the extraordinarily large size of this sample enables us to make well-powered, statistically informative inferences within individual states, which considerably extends the value of this data.

The initial sample of respondents achieved excellent demographic representation across

---

[3]See https://www.centiment.co/

[4]See https://help.centiment.co/how-we-safeguard-your-data

[5]See McIntyre, Douglas A."Guns in America: Nearly 40 million guns were purchased legally in 2020 and another 4.1 million bought in January" https://www.usatoday.com/story/money/2021/02/10/this-is-how-many-guns-were-sold-in-all-50-states/43371461/

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

all 49 states and DC, excluding Vermont (see Appendix A and B). For the purpose of estimating firearms ownership rates for the general U.S. population we employed raked weighting on gender, income, age, race, and state of residence. Note that there was a brief period in the first two days after the soft launch of the survey that comprehensive demographic data was not collected from those respondents who did not indicate firearms ownership, and thus did not proceed to the main survey (approximately 300 respondents). Although the survey company, Centiment, maintained demographic data on these panel respondents, it was determined that this data was not as comprehensive as the data collected by the survey, at which point the demographic questions were moved to the front of the survey, and asked of all respondents, including those who did not indicate firearms ownership. For the purpose of calculating statistics on national firearms ownership rates, we exclude the entire sample of both firearms owners and non-firearms owners from these first two days (410 respondents), leaving us with 53,834 respondents after this date for whom we have comprehensive demographic data. Firearms-owning respondents from the first two days are included in subsequent analysis of firearms owners, and we do possess comprehensive demographic information for these individuals.

Appendix B contains tables reporting the demographic sampling rates and the Census demographics used for raked weighting of the national survey. Note that the overall effect of weights is minimal given the high representativeness of the initial sample. For the purposes of analyzing responses within the sub-sample of firearms owners, we do not employ weighting schemes, in part because the "true" demographics of gun ownership are not knowable from an authoritative source analogous to the U.S. Census Bureau. However, as a robustness exercise, using weights based on estimates derived from the larger survey response rates yields results that are substantially identical for the analysis of responses from firearms owners.

One of the challenges in asking questions about firearms is eliciting truthful responses from firearms owners who may be hesitant to reveal information about practices that are associated with public controversy. The "tendency to respond to questions in a socially acceptable direction" when answering surveys is often referred to as "social desirability bias" (Spector, 2004), and there is evidence that it can influence survey responses to questions regarding firearms. For example, when Rafferty et al. (1995) conducted a telephone survey

5

Electronic copy available at: https://ssrn.com/abstract=4209687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

of Michigan residents who had purchased a hunting license or registered a handgun, only 87.3 percent of the handgun registrants and 89.7 percent of hunting license holders reported having a gun in their household. Similarly, Ludwig et al. (1998) have documented a large gender gap in reporting of firearms ownership, finding that "in telephone surveys, the rate of household gun ownership reported by husbands exceeded wives' reports by an average of 12 percentage points." Asking questions via an anonymous survey instrument on the internet is likely to cause less concern or worry than traditional phone-based questionnaires with a live person on the other end or during face-to-face interviews, which is how the General Social Survey – one of the most prominent national surveys that regularly asks about firearm ownership – is conducted.[6] Even when presented in the more impersonal setting of a computer interface, however, a survey must be worded thoughtfully so as to assure anonymity, and not give respondents reason to worry about answering truthfully.

This survey employs five common devices to encourage more truthful responses. First, it uses an indirect "teaser" question to pre-screen respondents in order to select those who own firearms. The initial question prompt presents the survey as concerned with "recreational opportunities and related public policies" and asks respondents if they own any of the following items, presented in a random order: Bicycle, Canoe or Kayak, Firearm, Rock Climbing Equipment, None of the Above. Only those who select "Firearm" are then presented the full survey. We also ask demographic questions at the outset, which allows us to assess the representativeness of the sample, including those who do not indicate firearms ownership. Second, the survey was carefully phrased so as to not suggest animus towards gun owners or ignorance of firearms-related terminology. Third, the survey assures respondents of anonymity. Fourth, in order to ensure that respondents are reading the survey questions carefully, and then responding with considered answers thereto, a "disqualifying" question (sometimes referred to as a "screening" question) was embedded a little over half of the way through the survey instructing respondents to select a particular answer for that question, which only those who read the question in its entirety would understand. Anyone registering an incorrect answer to this question was disqualified from the survey and their responses to

---

[6]For a description of the methods of the General Social Survey see: `https://www.nsf.gov/pubs/2007/nsf0748/nsf0748_3.pdf`

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

any of the survey questions were neither considered nor tallied.

Finally, while responses were required for basic demographic questions, if questions of a sensitive nature were left blank, the software would first call attention to the blank response and prompt the respondent to enter a response. However, if a respondent persisted in not responding and again tried to progress, rather than kick them out of the survey, they would be allowed to progress to the next section in the interest of obtaining the maximum amount of information that they were willing to share. Respondents were not made aware of this possibility in advance, and in practice such "opting out" of a particular question was seldom done (less than 1% of responses for the average question). This is the reason that small variations are sometimes observed in the total number of respondents for certain questions.

A pilot version of this survey was first fielded in Vermont as part of a research project aimed at documenting firearms ownership and firearms use rates in that specific state. The Vermont survey served as a proof of concept for the national version, demonstrating that this survey is a viable instrument for eliciting responses from firearms owners with both high response rates and low disqualification rates. The results of the Vermont survey are presented separately in Appendix A of this report and closely mirror national results.

This report focuses on providing descriptive statistics of answers to the major questions asked in the survey. Future research will examine responses, and relationships between them, in more detail. The report proceeds as follows: the next (second) section summarizes national firearms ownership estimates and demographics; the third section examines defensive uses of firearms; the fourth section examines question regarding carrying for self-defense; the fifth section summarizes ownership statistics, and the sixth section concludes.

# 2    Gun Ownership Demographics

- About a third of adults in the U.S. report owning a firearm, totaling about 81.4 million adult gun owners.

- 57.8% of gun owners are male, 42.2% are female.

- 25.4% of Blacks own firearms.

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

- 28.3% of Hispanics own firearms.

- 19.4% of Asians own firearms.

- 34.3% of Whites own firearms.

With raked weighting employed for gender, state, income, race, and age we find that 32.5% of US adults age 21 and over own a firearm (95% Confidence Interval, 32.1 - 32.9%). Expanding the sample population to include those age 18-20, who are restricted in some states from purchasing firearms, 31.9% of US adults age 18 and over own firearms (95% Confidence Interval, 31.5% - 32.3%). This is slightly above, but consistent with, the most recent in-depth survey of firearms ownership conducted by Pew in 2017 before the Covid-19 pandemic, which found that 30% of adults in America own a firearm (Brown, 2017). It is also consistent with recent Gallup polling in 2020 and 2021, which found that 32% and 31% of adults personally own a firearm (Gallup, 2021).

As a benchmark to assess the accuracy of the teaser question used to ascertain firearm ownership, we can also compare ownership rates of other items reported by respondents for this question. We find 52% of respondents indicating owning a bicycle, which closely matches Pew's finding that 53% of Americans own a bicycle, according to a poll conducted in 2014.[7]

The distribution of gun owners surveyed by state is illustrated in Figure 1, and ranges from 1,287 in California and 1,264 in Texas to 26 in Washington, DC and 24 in North Dakota.

Table 1 shows the proportion of the population in each state estimated to own a firearm. Massachusetts, Hawaii, Rhode Island, and New Jersey have the lowest rates of ownership with less than 20% of the adult population owning firearms, while Kentucky, Montana, West Virginia, and Idaho have the highest rates of ownership with more than 45% of the adult population owning firearms.

With regard to the demographics of gun ownership, we find that 57.8% of gun owners are male and 42.2% are female, the average age of gun owners is 46-50 years old, and the average annual household income is $80,000-$90,000. Approximately 18% of gun owners do not identify as White (alone). Overall, approximately 10.6% of gun owners identify as Black,

---

[7]See   https://www.pewresearch.org/fact-tank/2015/04/16/car-bike-or-motorcycle-depends-on-where-you-live/

8

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



Figure 1: Distribution of Firearms Owners Surveyed

3.6% identify as Asian, 1.6% identify as American Indian, .2% identify as Pacific Islander, 82.0% identify as White, and 2.0% identify as Other. When analyzed within racial groups, we find that 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms.

According to the latest (2019) census estimates, there are approximately 255,200,373 individuals age 18 and over in the U.S., which implies that there are about 81.4 million adult gun owners.[8] Note that this figure does not include those under the age of 18 who may use or possess firearms for purposes such as hunting or shooting sports.

In sum, firearms ownership is widespread, and firearms owners are diverse.

## 3    Defensive Use of Firearms

- 31.1% of gun owners, or approximately 25.3 million adult Americans, have used a gun in self-defense.

- In most cases (81.9%) the gun is not fired.

- Gun owners engage in approximately 1.67 million defensive uses of firearms per year.

- The majority of defensive gun uses take place outside of the home (74.8%).

---

[8]Census date is available at https://www2.census.gov/programs-surveys/popest/tables/2010-2019/national/asrh/nc-est2019-syasexn.xlsx

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| State | Proportion of adult population estimated to own firearms | 95% Confidence Interval |
|---|---|---|
| Alabama | 39.6% | 35.2% − 44.1% |
| Alaska | 33.4% | 25.7% − 42.1% |
| Arizona | 32.0% | 28.8% − 35.4% |
| Arkansas | 36.6% | 31.1% − 42.5% |
| California | 25.5% | 24.0% − 27.0% |
| Colorado | 33.6% | 29.8% − 37.7% |
| Connecticut | 20.2% | 16.8% − 24.1% |
| Delaware | 24.7% | 18.9% − 31.6% |
| District of Columbia | 23.9% | 15.6% − 34.9% |
| Florida | 30.3% | 28.5% − 32.2% |
| Georgia | 37.1% | 34.5% − 39.9% |
| Hawaii | 16.4% | 10.6% − 24.5% |
| Idaho | 54.5% | 45.5% − 63.1% |
| Illinois | 26.5% | 24.3% − 28.9% |
| Indiana | 40.3% | 36.6% − 44.1% |
| Iowa | 33.2% | 28.1% − 38.8% |
| Kansas | 42.8% | 37.4% − 48.3% |
| Kentucky | 46.7% | 42.6% − 50.8% |
| Louisiana | 32.8% | 28.0% − 38.0% |
| Maine | 35.9% | 29.7% − 42.6% |
| Maryland | 21.7% | 18.5% − 25.2% |
| Massachusetts | 15.8% | 13.4% − 18.6% |
| Michigan | 34.7% | 32.0% − 37.5% |
| Minnesota | 32.5% | 28.4% − 36.8% |
| Mississippi | 39.5% | 33.5% − 45.8% |
| Missouri | 39.7% | 36.2% − 43.4% |
| Montana | 48.4% | 38.7% − 58.3% |
| Nebraska | 37.2% | 29.8% − 45.2% |
| Nevada | 38.0% | 32.8% − 43.4% |
| New Hampshire | 24.1% | 18.4% − 30.9% |
| New Jersey | 19.3% | 16.9% − 22.0% |
| New Mexico | 33.8% | 25.9% − 42.7% |
| New York | 22.7% | 21.3% − 24.2% |
| North Carolina | 37.3% | 34.5% − 40.2% |
| North Dakota | 42.6% | 29.9% − 56.4% |
| Ohio | 33.7% | 31.1% − 36.4% |
| Oklahoma | 40.5% | 36.2% − 45.0% |
| Oregon | 38.3% | 32.7% − 44.2% |
| Pennsylvania | 30.3% | 28.1% − 32.6% |
| Rhode Island | 16.9% | 11.4% − 24.2% |
| South Carolina | 40.7% | 36.5% − 45.1% |
| South Dakota | 39.2% | 32.4% − 46.4% |
| Tennessee | 43.0% | 39.5% − 46.6% |
| Texas | 36.0% | 34.1% − 38.0% |
| Utah | 42.8% | 36.1% − 49.8% |
| Virginia | 30.6% | 27.6% − 33.7% |
| Washington | 32.8% | 29.3% − 36.4% |
| West Virginia | 53.0% | 45.6% − 60.2% |
| Wisconsin | 33.3% | 29.9% − 36.9% |
| Wyoming | 42.7% | 34.5% − 51.2% |

Table 1: Proportion of the population estimated to own a firearm in each state.

- About half of defensive gun uses involve more than one assailant (51.2%).

- Handguns are the firearm most commonly used in defensive incidents (65.9%), followed

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

by shotguns (21.0%) and rifles (13.1%).

Defensive use of firearms was assessed through a series of questions that asked for increasingly detailed information from those who indicated that they had used a firearm in self-defense.

First, all gun owners were asked, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed? Please do not include military service, police work, or work as a security guard." About a third (31.1%) answered in the affirmative, and they were then asked how many times they defended themselves with a firearm (from "once" to "five or more times"). As Figure 2 shows, a majority of gun owners who have used a firearm to defend themselves have done so on more than one occasion.



Figure 2: Defensive Gun Use: 31.1% of firearms owners have defended themselves of their property with a gun, and a majority have done so more than once.

Both men and women report having used firearms in self-defense at high rates, with 33.8% of male gun owners indicating they have defensively used a gun, and 27.3% of female gun owners indicating they have defensively used a gun. Table 2 further breaks down reports of

11

Electronic copy available at: https://ssrn.com/abstract=4203684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

defensive use of firearms by categories of race and ethnic ancestry, illustrating that defensive gun use rates are higher in some minority groups.

| Demographic Group | Proportion of Gun Owners Who Used Gun Defensively | 95% Confidence Interval |
|---|---|---|
| White | 29.7% | 29.0% – 30.5% |
| Black | 44.3% | 41.2% – 47.5% |
| Asian | 26.0% | 21.7% – 30.9% |
| Native American | 47.7% | 42.7% – 52.7% |
| Pacific Islander | 37.1% | 26.0% – 49.7% |
| Other Ethnic Ancestry | 36.2% | 30.3% – 42.7% |
| Hispanic (any ancestry) | 39.3% | 36.0% – 42.8% |
| Male | 33.8% | 32.8% – 34.8% |
| Female | 27.3% | 26.2% – 28.4% |

Table 2: Demographics of defensive gun use.

Given that 31.1% of firearms owners have used a firearm in self-defense, this implies that approximately 25.3 million adult Americans have defended themselves with a firearm. Answers to the frequency question suggest that these gun owners have been involved in a total of approximately 50 million defensive incidents. Assuming that defensive uses of firearms are distributed roughly equally across years, this suggests at least 1.67 million defensive uses of firearms per year in which firearms owners have defended themselves or their property through the discharge, display, or mention of a firearm (excluding military service, police work, or work as a security guard).[9]

---

[9]This is calculated by taking the total number of defensive incidents represented by the survey responses (50 million) and dividing by the number of adult years of the average respondent, which is 30. According to U.S. Census data, the average age of U.S. adults (i.e. the average age of those in the set of everyone 18 years or older) is 48, which also matches our survey data. Thus, the average respondent of the survey has 30 years of adult experience (48 years - 18 years = 30 adult years), over which the defensive incidents captured in this survey are reported.

Note that this estimate is inherently conservative for two reasons. First, it assumes that gun owners possessed firearms, or had access to firearms, from the age of 18. In so far as firearms were only first ac-

Electronic copy available at: https://ssrn.com/abstract=4203684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



Figure 3: How Guns are Employed in Self-defense: In most defensive incidents no shots are fired.

Gun owner respondents were asked to answer detailed questions regarding each defensive

quired/accessed by some respondents in later years, this would reduce the number of adult firearms owning years represented by the survey responses and result in a higher estimate of the number of defensive incidents per year. Second, this figure only captures defensive gun uses by those currently indicating firearms ownership. According to Kleck and Gertz (1995), only 59.5% of respondents who reported a defensive gun use personally owed a gun (p.187). This would suggest that the true number of defensive gun uses, if those who do not personally own firearms are included in the estimate, could be substantially higher - perhaps as high as 2.8 million per year.

This approach is also robust to critiques that have been made by Hemenway (1996) and others who argue that defensive gun use estimates from surveys can be exaggerated due to recollection bias when respondents are asked to recount incidents within a limited time period. The intuition behind these critiques is that if respondents are asked, for example, if they used a gun defensively within the last year, there is a possibility that people will respond affirmatively if they used a gun in self-defense in recent memory, even if that incident wasn't strictly within the last 12 months. This could lead to inflated "per year" estimates of defensive gun uses, which would only be further magnified when extrapolated out to total defensive gun uses over many years. However, the approach of this survey is not vulnerable to this critique because the survey asks about defensive gun use at any time, not simply those within the last year or some other short time horizon. We thus do not engage in the exercise of extrapolating out estimates from potentially biased measures of comparatively rare events in a restricted window of time. Rather our approach asks questions about defensive gun use in the manner that is most methodologically sound for eliciting unbiased estimates.

Finally, note that our overall approach assumes that children are not employing firearms for self-defense

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

incident that they reported. As Figure 3 shows, in the vast majority of defensive gun uses (81.9%), the gun was not fired. Rather, displaying a firearm or threatening to use a firearm (through, for example, a verbal threat) was sufficient. This suggests that firearms have a powerful deterrent effect on crime, which, in most cases, does not depend on a gun actually being fired or an aggressor being injured.

Figure 4 shows where defensive gun uses occurred. Approximately a quarter (25.2%) of defensive incidents took place within the gun owner's home, and approximately half (53.9%) occurred outside their home but on their property. About one out of ten (9.1%) of defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.



Figure 4: The Location of Defensive Incidents: Most take place outside the home.

For each incident, respondents were asked to indicate what sort of firearm was used. Figure 5 show the distribution of types of firearms employed in defensive incidents. Handguns were the most commonly used firearm for self-defense, used in nearly two-thirds (65.9%) of defensive incidents, followed by shotguns (21.0%) and rifles (13.1%).

Respondents were also asked to indicate how many assailants were involved in each de-

with any meaningful frequency. However, for the purpose of sensitivity analysis, if we lower the age used for calculating defensive incident frequency to assume that children as young as 12 years old are commonly possessing and using firearms for self-defense (and no non-firearms owning adults used firearms for self-defense), this would still imply 1.39 million defensive uses of firearms per year (48 years - 12 years = 36 years over which 50 million defensive incidents took place).

Electronic copy available at: https://ssrn.com/abstract=4203687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



What sort of firearm did you use during this incident? (%)

Figure 5: Type of Gun Used for Defense: Handguns are the most common type of firearm used in defensive encounters, followed by shotguns and rifles.

fensive incident. As Figure 6 illustrates, about half of defensive encounters (51.2%) involved more than one assailant. Presumably, part of the value of using a firearm in self-defense is that it serves as a force multiplier against more powerful or more numerous assailants. Survey responses confirm that encountering multiple assailants is not an infrequent occurrence in defensive incidents. 30.8% of defensive incidents involved two assailants, and 20.4% involved three or more, while slightly less than half (48.8%) involved a single assailant.

Finally, after respondents answered these detailed questions about each defensive incident, which all flowed from their initial affirmative answer to the question, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed?", all gun owners were asked, "Separate from any incident in which you directly used a gun to defend yourself, has the presence of a gun ever deterred any criminal conduct against you, your family, or your property?" This question was meant to capture incidents that did not involve active self-defense, but for which individuals believed that the presence of a firearm helped deter predatory behavior. For example, a situation in which a combative customer calmed down after noticing that shop owner had a handgun on his or her hip, or a situation in which a trespasser cooperatively left a property when questioned by a landowner who had a rifle slung over his or her shoulder, or a situation in which a friend showed up with a firearm

15

Electronic copy available at: https://ssrn.com/abstract=4203684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



Figure 6: Distribution of the Number of Assailants Involved in a Defensive Incident: Multiple assailants are common.

to help diffuse a dangerous situation, could fall into this category. Respondents answering in the affirmative could indicate how many times such deterrence occurred, from once to five or more occasions. As Figure 7 illustrates, separate from the self-defense incidents summarized earlier, 31.8% of gun owners reported that the mere presence of a gun has deterred criminal conduct, and 40.2% of these individuals indicated that this has happened on more than one occasion. Extrapolated to the population at large, this suggests that approximately 25.9 million gun owners have been involved in an incident in which the presence of a firearm deterred crime on some 44.9 million occasions. This translates to a rate of approximately 1.5 million incidents per year for which the presence of a firearm deterred crime.

# 4    Carry Outside of the Home

- A majority of gun owners (56.2%) indicate that there are some circumstances for which they carry a handgun for self-defense.

- Approximately 26.3% of gun owners, or 20.7 million individuals, carry handguns for defensive purposes under a "concealed carry" regime.

- About a third of gun owners (34.9%) have wanted to carry a handgun for self-defense

16

Electronic copy available at: https://ssrn.com/abstract=4109687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D





Figure 7: Frequency with which Firearms Deter Crime: 31.8% of firearms owners report that the presence of a firearm has deterred criminal conduct against them, often on more than one occasion.

in a particular situation but local rules prohibited them from doing so.

As Figure 8 illustrates, a majority of gun owners (56.2%), or about 45.8 million, indicate that there are some circumstances in which they carry a handgun for self-defense (which can include situations in which no permit is required to carry, such as on their own property); and about 35% of gun owners report carrying a handgun with some frequency (indicating that they carry "Sometimes," "Often," or "Always or almost always."). Moreover, as Figure 9 summarizes, 34.9% of gun owners report that there have been instances in which they wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

Assessing the number of people who carry a concealed handgun in public is complicated due, in part, to the proliferation of so-called "constitutional carry" or "permitless carry" states in recent years. These states - about 18 at the time this survey was conducted - generally allow adults in good legal standing (often restricted to those age 21 and older) to

17

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



Figure 8: Frequency of Defensive Carry: Carrying a handgun for self-defense is common.



Figure 9: Prohibition of Carry: About a third of gun owners have wanted to carry a handgun for self-defense in a particular situation but local rules prohibited them from doing so.

carry a concealed weapon without a permit. Most of these states previously had a permitting process for concealed carry and required permits to be renewed at regular intervals in order to remain valid. Under constitutional carry, law abiding adults in these states are permitted to carry concealed without an official "permit." However, most of these states continue to issue permits to residents who desire them because such permits can be useful for reciprocal carry benefits in other states. For example, a person acquiring a Utah carry permit would be entitled to carry a handgun in a number of other states such as neighboring Colorado and

18

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Nevada.[10] Thus, while basically all gun owners age 21 and over are "permitted" to carry a handgun for self-defense in constitutional carry states, many individuals may also possess a "permit," even though it is redundant for in-state carry.

Unsurprisingly, when asked "Do you have a concealed carry permit?" gun owning residents of many constitutional carry states respond in the affirmative at high rates. Also complicating this question about concealed carry permits is the fact that many states refer to such permits by different names, the fact that the right to carry a handgun can be conferred in certain circumstances by hunting or fishing licenses in some states,[11] and the existence of other related permits, some of which do not license concealed carry (e.g. standard pistol permits in North Carolina or New York, eligibility certificates in Connecticut) and some of which do (most License To Carry permits required for handgun ownership in Massachusetts, state pistol permits in Connecticut, and LEOSA permits available to current and retired law enforcement officers nationwide). Finally, it is also possible for individuals to obtain concealed carry permits in states other than the one in which they reside.

In order to provide a robust but conservative estimate of those who actually carry in public, we code as "public carriers" those individuals who indicated both that they have a concealed carry permit and that they carry a handgun for self-defense at least "sometimes." We also restrict analysis and population estimates to those age 21 and over given that most states restrict those under 21 from carrying concealed in public.

Using this simple definition, we find that 26.3% of gun owners are "public carriers," which translates to approximately 20.7 million individuals who carry handguns in public under a concealed carry regime. Note that this could include current and former law enforcement officers who may be represented in the survey. However, the number of active law enforcement officers in the U.S. is well under a million (approximately 700,000 in 2019).[12]

---

[10]See https://bci.utah.gov/concealed-firearm/reciprocity-with-other-states/

[11]For example, a number of states such as California, Georgia, and Oregon allow those with a hunting or fishing license to carry concealed while engaged in hunting or fishing or while going to or returning from an expedition. See: https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/pdf/cfl2016.pdf, https://law.justia.com/codes/georgia/2010/title-16/chapter-11/article-4/part-3/16-11-126/, https://codes.findlaw.com/or/title-16-crimes-and-punishments/or-rev-st-sect-166-260.html

[12]See https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-74

Electronic copy available at: https://ssrn.com/abstract=4209687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# 5    Types of Firearms and Magazines Owned

- 82.7% of gun owners report owning a handgun, 68.8% report owning a rifle, and 58.4% report owning a shotgun.

- The average gun owner owns about 5 firearms. The median gun owner owns 3.

- 29.0% of gun owners own only one firearm.

- 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.

- 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.

- Overall, Americans own in excess of 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

## 5.1    Rifles, Shotguns, and Handguns

Respondents were asked to indicate the number of rifles, shotguns, and handguns that they owned. 82.7% of gun owners report owning a handgun (95% CI 82.0% - 83.3%), 68.8% reported owning a rifle (95% CI 68.1% - 69.6%), and 58.4% report owning a shotgun (95% CI 57.6% - 59.2%). Note that using survey weights based on in-survey demographics of firearms ownership has no substantive effect on these estimates: Handgun, 83.7% (82.9% - 84.4%), Rifle, 68.6% (67.7% - 69.6%), Shotgun 58.6% (57.6% - 59.6%).

Approximately 99.8% of respondents indicated owning fewer than 100 firearms of each type, and approximately 97.2% indicated owning fewer than 10 firearms of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 firearms in any category in the analysis that examines average numbers of guns owned. Also, 1.5% of respondents entered zero for each category of firearms ownership. While ostensibly inconsistent with having earlier indicated ownership of a firearm, there are a number of plausible explanations for this discrepancy including a reluctance to

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



Percentage of gun owners reporting ownership of at least one firearm in the indicated category.

Figure 10: Percent of gun owners who own each type of firearm.

provide this level of detailed information, having use of a firearm in one's household which one does not personally own, or owning a firearm that technically does not fall into one of these three categories. We exclude these response in analyzing ownership rates below. However, including them has no significant effect on estimates.

On average, gun owners owned 5.1 firearms, consisting of 1.8 rifles, 1.2 shotguns, and 2.1 handguns. Figure 11 plots histograms of the number of firearms owned by respondents. Unsurprisingly, these are skewed right, indicating that most gun owners own a small number of guns, while a smaller portion of gun owners own a large number of guns. The median gun owner owned 3 firearms. 29.0% of firearms owners owned only one firearm.[13] Among those who only own one firearm, handguns are the most commonly owned type of gun (64.7%), followed by rifles (22.5%) and shotguns (13.3%).

Overall, these estimates imply that Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

---

[13]An earlier draft had estimated that 21.9% of gun owners owned only one firearm, but the denominator for that calculation mistakenly included respondents who did not provide an answer to this question. The estimate of 29.0% properly incorporates all information provided by respondents.

Electronic copy available at: https://ssrn.com/abstract=4209687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



(a) Histogram of number of rifles owned    (b) Histogram of number of shotguns owned

(c) Histogram of number of handguns owned    (d) Histogram of total number of guns owned

Figure 11: Histograms showing the distributions of gun ownership.

## 5.2   Magazine Ownership

The survey asked respondents whether they have ever owned a magazine that holds more than 10 rounds. Those who answered in the affirmative were then asked to indicate the purposes for which they owned such magazines and to estimate how many magazines of different types they owned.

48.0% of gun owners (95% CI 47.2%-48.7%) responded yes to the question, "Have you ever owned a handgun or rifle magazine that holds more than 10 rounds? (You can count magazines that you may keep in another state if there are local restrictions against ownership.)" indicating that they had owned such magazines. Note that, again, using survey

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

weights based on in-survey demographics of firearms ownership has no substantive effect on this estimate (47.4%, CI 46.5%-48.4%). This suggests that approximately 39 million adults in the U.S. have owned magazines that hold more than 10 rounds.



Percentage indicating each factor was a reason for ownership.

Figure 12: Purposes indicated for owning 11+ capacity magazines.

Figure 12 shows the percentage of respondents who indicated that they owned magazines that can hold more than 10 rounds for the following purposes: defense outside the home (41.7%), home defense (62.4%), competitive shooting sports (27.2%), recreational target shooting (64.3%), hunting (47.0%), and other (3.9%). Note that respondents could choose multiple purposes for which they owned such magazines. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

Respondents who indicated that they had owned magazines that can hold more than 10 rounds were also asked to estimate the number of pistol and rifle magazines they owned of particular sizes. Numerical responses were unbounded. Approximately 99.8% of respondents indicated owning fewer than 100 magazines of each type, and approximately 96.5% indicated owning fewer than 10 magazines of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 magazines

Electronic copy available at: https://ssrn.com/abstract=4209687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

in a category.



Average number of handgun magazines owned by capacity.

Figure 13: About how many handgun magazines of each type would you estimate you have owned?

Figure 13 shows the average number of handgun magazines of each type reported by respondents in this section: 10 rounds or less (3.1 magazines), 11-15 rounds (2.5 magazines), more than 15 rounds (4.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 10 handgun magazines, and more than two-thirds of these magazines hold more than 10 rounds. Note that the question asked whether respondents have ever owned such magazines and how many such magazines they have owned, so these estimates should be interpreted as an upper bound on current ownership given that some magazines may have been resold. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 269 million handgun magazines that hold over 10 rounds.

Figure 14 shows the average number of rifle magazines of each type reported by respondents in this section: 10 rounds or less (2.4 magazines), 11-15 rounds (1.8 magazines), over 15 rounds (5.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 9.6 rifle magazines, and about three-quarters of these magazines hold more than 10 rounds. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 273 million rifle magazines that

24

Electronic copy available at: https://ssrn.com/abstract=4269697

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

hold over 10 rounds.



Average number of rifle magazines owned by capacity.

Figure 14: About how many rifle magazines of each type would you estimate you have owned?

These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds. Finally, note that these questions about the types of magazines owned were only asked of those who indicated that they had owned a magazine that holds more than 10 rounds, and thus we do not know how many magazines up to 10 rounds are owned by the 52.0% of gun owners who are not in this category.

Table 3 shows the breakdown of ownership of magazines that hold over 10 rounds across different demographic segments.

Table 4 shows the percentage of gun owners in each state who indicated that they have owned magazines that hold more than 10 rounds. Note that this question explicitly instructed respondents that "You can count magazines that you may keep in another state if there are local restrictions against ownership." This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such magazines. It's also possible that those answering in the affirmative possess magazines that were grandfathered in because they were acquired before such bans or that some respondents have gotten rid of magazines that they owned in the past.

Another dynamic that likely contributes to such differences in ownership rates derives

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| Demographic Group | Proportion Owned 11+ Mags | 95% Confidence Interval |
|---|---|---|
| White | 47.0% | 46.1% – 47.8% |
| Black | 55.2% | 52.2% – 58.2% |
| Asian | 50.0% | 44.8 – 55.2% |
| Native American | 52.6% | 47.7% – 57.4% |
| Pacific Islander | 59.1% | 47.4% – 69.9% |
| Other Ethnic Ancestry | 59.6% | 53.3% – 65.6% |
| Hispanic (any ancestry) | 61.6% | 58.3% – 64.7% |
| Male | 57.7% | 56.7% – 58.7% |
| Female | 34.1% | 33.0% – 35.3% |

Table 3: Demographics of ownership of magazines that hold more than 10 rounds.

from the fact that in states with low rates of firearms ownership, such as DC and Hawaii, those few individuals who do own guns are presumably more likely to be gun enthusiasts. Indeed, analysis of the survey data reveals that states with higher rates of firearms ownership are associated with slightly lower rates of ownership of magazines that own over 10 rounds, and this difference is statistically significant (coef = -0.36, p=.03).

Given that such a large percentage of gun owners indicated that they owned magazines that hold over ten rounds for defensive purposes, we further analyze the potential value of these magazines for defense. Recall that a majority of defensive incidents involved multiple assailants (51.2%). Presumably, it would be advantageous to have a firearm with a larger capacity magazine if one needed to engage more than one assailant, which these responses suggest is indeed common. Although in most defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired.

As part of the self-defense section of the survey, respondents were invited to answer an open response question that asked: "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes

26

Electronic copy available at: https://ssrn.com/abstract=4203687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| State | Owned 11+ cap. mags | 95% Confidence Interval |
|---|---|---|
| Alabama | 48.1% | 42.7% − 53.6% |
| Alaska | 52.7% | 39.6% − 65.4% |
| Arizona | 47.5% | 42.3% − 52.8% |
| Arkansas | 50.7% | 44.1% − 57.3% |
| California | 53.8% | 51.0% − 56.5% |
| Colorado | 51.4% | 45.3% − 57.4% |
| Connecticut | 42.6% | 34.4% − 51.3% |
| Delaware | 50.6% | 39.8% − 61.5% |
| District of Columbia | 69.2% | 49.5% − 83.8% |
| Florida | 46.9% | 43.9% − 49.8% |
| Georgia | 52.4% | 48.7% − 56.2% |
| Hawaii | 59.3% | 40.3% − 75.8% |
| Idaho | 45.4% | 36.7% − 54.4% |
| Illinois | 51.5% | 47.3% − 55.6% |
| Indiana | 46.5% | 41.8% − 51.2% |
| Iowa | 35.4% | 28.0% − 43.6% |
| Kansas | 42.2% | 35.4% − 49.4% |
| Kentucky | 43.7% | 38.5% − 49.0% |
| Louisiana | 47.4% | 41.1% − 53.8% |
| Maine | 37.9% | 28.7% − 48.0% |
| Maryland | 50.8% | 43.7% − 57.8% |
| Massachusetts | 53.3% | 45.7% − 60.8% |
| Michigan | 37.1% | 33.2% − 41.1% |
| Minnesota | 39.8% | 34.0% − 46.0% |
| Mississippi | 44.6% | 37.3% − 52.2% |
| Missouri | 50.6% | 45.8% − 55.5% |
| Montana | 52.6% | 39.8% − 65.1% |
| Nebraska | 45.5% | 35.9% − 55.3% |
| Nevada | 61.0% | 52.8% − 68.5% |
| New Hampshire | 43.9% | 31.6% − 56.9% |
| New Jersey | 52.2% | 46.5% − 57.8% |
| New Mexico | 49.2% | 36.9% − 61.5% |
| New York | 54.9% | 51.8% − 58.0% |
| North Carolina | 43.9% | 39.9% − 47.9% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 42.0% | 38.4% − 45.7% |
| Oklahoma | 47.5% | 41.7% − 53.4% |
| Oregon | 49.8% | 42.9% − 56.6% |
| Pennsylvania | 39.6% | 36.0% − 43.2% |
| Rhode Island | 55.3% | 39.5% − 70.1% |
| South Carolina | 42.8% | 37.7% − 48.0% |
| South Dakota | 50.0% | 40.2% − 59.8% |
| Tennessee | 44.1% | 39.5% − 48.7% |
| Texas | 54.1% | 51.3% − 56.8% |
| Utah | 46.8% | 38.2% − 55.6% |
| Virginia | 47.5% | 42.7% − 52.4% |
| Washington | 53.1% | 47.8% − 58.4% |
| West Virginia | 44.8% | 37.7% − 52.1% |
| Wisconsin | 33.6% | 28.5% − 39.0% |
| Wyoming | 63.0% | 51.4% − 73.3% |

Table 4: Percent of gun owners who have indicated that they have ever owned magazines that hold over 10 rounds by state. Note that this includes magazines that an owner holds in other states if there are local ownership restrictions.

Electronic copy available at: https://ssrn.com/abstract=4209687

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

to have a firearm with a magazine capacity in excess of 10 rounds?  If so, please briefly describe that situation."  Approximately 550 respondents gave a affirmative response with most sketching out details of the encounter.  Examples of these responses (reported verbatim) include:

- I got jumped by multiple people in a carjacking in front of our apartments with my wife and children.

- Yes. I was robbed on a street 1 time by a group of about 6 people that at least 1 was armed and I wasn't. It took about 6 hours of emergency surgery to gat my bones in face jaws and skull back in place form being beaten in the head face kicked all over. Damn near killed me.

- Yes, a man broke into our apartment, high. He was approx 6'4, 300 pounds & threw a friend of ours around the living room like a rag doll. Beat her repeatedly.

- Yes. The first incident I mentioned. Three men attempted to rob me outside my home, with the intention of entering my home thereafter. My wife and child were inside the home at the time. That was in California with a magazine that only held 7 shots. I am a great shot, prior military and other firearms training, but I hate to only have 7 shots with three people. In such a situation, very well trained people, pumped up with adrenalin can and do miss their target. Thank you.

- Yes, absolutely. I am mobility challenged and was walking my dog one day. Three men ambushed me from behind, but luckily my dog chased them away. My dog actually bit one of the men.

- On the farm, we have had mountain lions killing our calves so a larger animal could require more rounds

- When two people attacked my company's warehouse

- Yes, I was alone with my son and 3 large men were trying to break in, I was unable to reload, thank goodness they realized and left.

28

Electronic copy available at: https://ssrn.com/abstract=4293684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

- I was charged by a bear. It was very scary in the moment I panicked and rattled over multiple shots. Most missed but some hit home and eventually stopped him.

- Yes. I went in but into a store and 4 thugs approached me telling me to give them money. I produced my handgun at my side and they left. If this had been a shooting with multiple bad guys with guns a 15 round magazine is best.

- When I was a teenager 4 guys did a home invasion at our house. I could easily see needing a 20 to 30 round clip would be necessary.. we didnt have weapons and my mom and dad were hurt pretty bad. Dad was stabbed 4 times and they had a gun too. Thats when I decided when I was on my own that I would have protection.

- About 20 coyotes attacked some of my livestock. It took two 30 round magazines to repel the animals and then only after killing 10 of them.

- Yes. I was surrounded by would-be assailants in a perking lot. I was able to escape unharmed, but if they had rushed me, I would most certainly had to lay down a rapid field of fire, alternately in various directions. In that scenario, I probably would have missed the targets and needed multiple, rapid follow-up shots to hit or at least dissuade the attackers from pressing forward. Only a firearm with 10 or more round magazine would offer that kind of defensive capability.

- Had several people trespass on my property doing something illegal and when I called the police said it would be a while before they could come out so when I asked the people to leave they threatened to kill me but after they seen that I was open carry the left if the situation went a different way I dont know if I would have been about to protect myself with as many of them as there was

- The time when there were 4 people in my home and I was fearful of being hurt and my concern was do I have enough rounds to protect myself what if I missed if I had to fire the weapon .

- Yes. Been stalked by a pack of coyotes while hiking with my children

29

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

- Yes when I had more than one person trying to break into my car. I live out in the country so I do not have time to wait for police to get to me I have to act fast and protect myself and my family.

- Yes, I ran into a situation where there were numerous criminals breaking the law and rioting at a public venue during an annual festival event. They were blocking my self and my friends, two of which were females, from leaving the area as well as preventing the police from reaching us. I was very glad that I had multiple magazines that had more then a 10 round capacity.

- 2 men broke into my home while I was sleeping. I woke up and heard them breaking stuff downstairs. I grabbed my gun and ran down stairs and confronted them. I pointed my gun at them and told them to get out. They ran off.

- I was stopped at a red light. Car in front of me backed up and the car behind me pulled up to my bumper. Both drivers got out and approached both sides of my car. Light turned green. I gassed it pushing the car in front of me out of the way. They had bats to break my windows. Would've robbed me I think. Was under a overpass.

- Twice it was people attempting to break into my home I was alone age 64 and 4 burly men thought no one was home as I had been napping. They learned quickly this old lady was not without protection. They saw the gun and quickly left. I called 911 and they were apprended they had been robbing homes for 6 weeks in the area. Those home who had guns they left and went elsewhere. Another time people a group wanted a big party came to the wrong road half were drunk or stoned. I had small children. There was finally someone sober enough to see I had a gun and that I meant business it was the middle of the night and they wanted to party but had the wrong road. The sane person got them to all leave and they never came back. We had no phone at that time. The third time was a cougar attacking my livestock. It ran off but had killed 4 goats. We called the game warden they had a special hunt and killed it as we had been the 4th place hit it had killed livestock. We have had cougar on our property in our yard 3 times since once my son shot one stalking him and his dog the other time

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

it ran off before he could get his gun ready.

- yes, but not at home, we were camping in prescott arizona and several men came up and wanted to harass and steal from our family. We all felt very threatened and if another couple of people had not shown up with their guns the people would have over ran us and my family would have been hurt.

- It could have helped during a robbery at my residence where 4 intruders entered my home

- I was a small business owner before I became disabled. I would often carry large amounts of cash. On more than 1 occasion I was faced with pulling my weapon or lose my cash

- I was walking a long distance through Philadelphia to get to a restaurant and was approached by 3 men who demanded to know why I thought I could go through their neighborhood. I told them I did not want any trouble and tried to continue walking but one stood in my way and asked if I actually thought I was going to leave without answering them. I began to wonder if I was going to be robbed or assaulted when they first approached and at this point it seemed like they would prevent me from leaving. I lifted my shirt and placed my hand on a pistol I was legally able to conceal carry and said yes I would be leaving. They backed away from me but continued to yell things at me as I left the area. I never pulled the gun out, but them knowing I had it and may use it to stop them was enough to escape unharmed. Having less than 10 rounds against 3 attackers, especially if they were also armed, would have put me at a disadvantage if I was unable to accurately hit my targets initially and they continued to Pursue me.

- Yes, I was in Illinois, which does not honor Indiana concealed carry. I had to leave my firearm at home. This was truly the only time in my life I felt I needed to actually use a firearm, but almost was killed. 4 men (3 with guns displayed and 1 with a knife in his hand) were walking up to me fast in a parking lot screaming stop and give me everything you have. The parking lot was near empty, and dark outside. I was able

31

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

to unlock my car while running, start the car and speed off. Just as I got in the car, I had just enough time to lock the door before the 3 men pointed there guns at the car and the other was stabbing the window with a knife. They intended to rob and kill me. I couple rounds were fired as I sped off. I would have needed minimally 10 rounds if I had discharged given their distancing. I almost died because of Illinois law and my street smarts and luck was the only thing that saved me

- Yes An incident occurred when a man was drunk and crashed his car in front of me while I was carrying my 2 small children. A large group of his friends tried to get the drunk away before the police arrived. A fight started with them punching my elderly dad and threatened my elderly mother with violence.

- I was confronted then attacked by a group of about 12 teens when I was a teenager. They kicked me and caused a sever head injury and fractured ribs. I was defenseless. Being able to brandish a weapon with the capacity to take on a group of that size would have deterred their next step of physically assaulting me

- The two large males that attempted to break into my home. Much larger than myself. A 9mm would take several shots to slow down either and/or both.

- Yes. I am a 5'2" disabled female. I was stalked by a homeless drug addict. He was detained 4-5 times due to red behavior because he was high on methamphetamine. This person could have potentially done great harm to me. Meth addicts don't always go down easy. Sometimes it takes numerous rounds to get them down.

- My brother and I were robbed at gun point when ione of the men got in the car with me after my brother got out of the car. The man had already told my brother that he wanted his money and that there were other people watching across the parking lot in case he had any problems with us. So when my brother got out, that man got in with a gun and stuck it right into my right side. He told me not to look at him and to give him all my money. With the other men standing in different positions in the parking lot my brother could have tried to shoot them (or at them) to try and scare them off

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

and if he could have had a larger capacity magazine he could have been able to fire more rounds at them to keep them away while we tried to get help from someone.

Finally, it is worth noting that, although a majority of these scenarios involve the prospect of defending against criminal aggression, a number involve defending against animals. The pilot survey in Vermont similarly documented a number of incidents involving animals (see Appendix A). This is a phenomenon that has been largely neglected in the scholarly literature examining the value of firearms for self-defense, and it would be helpful for future research to evaluate the frequency with which firearms are employed in defense against animal threats.

## 5.3   Ownership of AR-15 and similarly styled rifles

All gun owners were asked, "Have you ever owned an AR-15 or similarly styled rifle? You can include any rifles of this style that have been modified or moved to be compliant with local law." 30.2% of gun owners, about 24.6 million people, indicated that they have owned an AR-15 or similarly styled rifle. Using survey weights based on in-survey demographics of firearms ownership has no effect on this estimate. Respondents were then asked to indicate how many of such rifles they have owned. Approximately 99.7% indicated owning under 100 and 98.4% under 10. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we disregard the 0.3% that indicate owning over 100 in calculating average ownership numbers. Among those who indicate having owned AR-15 and similarly styled rifles, they indicate having owned an average of 1.8, with the median owner having owned 1. This suggest that up to 44 million AR-15 styled rifles have been owned by U.S. gun owners. Note, again, that this estimate is based on a question that asks whether someone has ever owned such a rifle, so this estimate should be interpreted as an upper bound on current ownership given that some rifles may have been resold.

Figure 15 shows the percentage of respondents who indicated that they owned AR-15 styled rifles for the following purposes: defense outside the home (34.6%), home defense (61.9%), competitive shooting sports (32.1%), recreational target shooting (66.0%), hunting (50.5%), and other (5.1%). Note that respondents could choose multiple purposes for which

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D



Percentage indicating each factor was a reason for ownership.

Figure 15: Purposes indicated for owning AR-15 styled rifles.

they owned such firearms. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

| Demographic Group | Proportion Owned AR-15 Styled Rifle | 95% Confidence Interval |
|---|---|---|
| White | 29.6% | 28.9% − 30.4% |
| Black | 34.0% | 31.0% − 37.1% |
| Asian | 29.2% | 24.6% − 34.2% |
| Native American | 35.4% | 30.8% − 40.3% |
| Pacific Islander | 48.4% | 36.3% − 60.7% |
| Other Ethnic Ancestry | 34.6% | 28.8% − 41.1% |
| Hispanic (any ancestry) | 38.3% | 35.0% − 41.8% |
| Male | 36.4% | 35.5% − 37.4% |
| Female | 21.3% | 20.3% − 22.3% |

Table 5: Demographics of ownership of AR-15 styled rifles.

Table 5 shows the breakdown of ownership of AR-15 styled rifles across different demographic segments. As this table demonstrates, AR-15 styled rifles are commonly owned at

34

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

high rates across many different demographic groups.

Table 6 shows the percentage of gun owners in each state who indicated that they have owned AR-15 styled rifles. Note that this question explicitly instructed respondents that "You can include any rifles of this style that have been modified or moved to be compliant with local law." Thus, as with magazines, these answers can include firearms that are kept in other states, as well as firearms that were grandfathered in or modified to be compliant with local law, or respondents who have since sold or disposed of such guns. This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such firearms.

# 6    Conclusion

This report summarizes the main findings of the most comprehensive survey of firearms ownership and use conducted in the United States to date. While many of its estimates corroborate prior survey research in this area, it also provides unique insights that are relevant to timely public policy debates, particularly regarding the defensive use of firearms and the ownership and use of AR-15 styled rifles and magazines that hold over 10 rounds.

This survey finds firearms ownership rates slightly above those documented before the Covid-19 pandemic, which is consistent with other recent scholarly research finding a large surge in firearms purchases during the pandemic, particularly among first time buyers (Crifasi et al., 2021; Miller et al., 2022).

In sum, about 31.9% of U.S. adults, or 81.4 million Americans, own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns. About 24.6 million individuals have owned a up to 44 million AR-15 and similarly styled rifles, and 39 million individuals have owned up to 542 million magazines that hold over 10 rounds. Approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and guns are used defensively by firearms owners in approximately 1.67 million incidents per year. A majority of gun owners (56.2%) indicate that they carry a handgun for self- defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency.

Electronic copy available at: https://ssrn.com/abstract=4206684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| State | Owned AR-15 Style Rifle | 95% Confidence Interval |
|---|---|---|
| Alabama | 28.9% | 24.1% − 34.3% |
| Alaska | 37.0% | 24.4% − 51.6% |
| Arizona | 28.8% | 24.2% − 34.0% |
| Arkansas | 35.0% | 28.7% − 41.8% |
| California | 37.5% | 34.8% − 40.2% |
| Colorado | 33.3% | 27.7% − 39.5% |
| Connecticut | 21.8% | 15.3% − 30.2% |
| Delaware | 20.3% | 12.6% − 30.9% |
| District of Columbia | 30.0% | 14.1% − 52.7% |
| Florida | 28.1% | 25.5% − 30.9% |
| Georgia | 31.4% | 27.9% − 35.1% |
| Hawaii | 34.6% | 19.1% − 54.3% |
| Idaho | 31.0% | 23.3% − 40.0% |
| Illinois | 32.6% | 28.7% − 36.7% |
| Indiana | 30.8% | 26.5% − 35.5% |
| Iowa | 27.1% | 20.4% − 35.1% |
| Kansas | 28.4% | 22.4% − 35.4% |
| Kentucky | 29.9% | 25.2% − 35.1% |
| Louisiana | 27.5% | 22.0% − 33.7% |
| Maine | 22.0% | 14.6% − 31.6% |
| Maryland | 29.9% | 23.7% − 36.9% |
| Massachusetts | 33.8% | 26.9% − 41.4% |
| Michigan | 24.9% | 21.5% − 28.6% |
| Minnesota | 20.7% | 16.1% − 26.3% |
| Mississippi | 30.4% | 23.8% − 38.0% |
| Missouri | 28.0% | 23.8% − 32.7% |
| Montana | 26.8% | 16.8% − 39.8% |
| Nebraska | 22.4% | 15.3% − 31.8% |
| Nevada | 42.4% | 34.6% − 50.6% |
| New Hampshire | 23.2% | 14.0% − 36.0% |
| New Jersey | 30.7% | 25.7% − 36.2% |
| New Mexico | 29.5% | 19.4% − 42.1% |
| New York | 37.8% | 34.8% − 41.0% |
| North Carolina | 25.6% | 22.2% − 29.4% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 25.9% | 22.7% − 29.4% |
| Oklahoma | 29.3% | 24.1% − 35.0% |
| Oregon | 25.6% | 20.0% − 32.2% |
| Pennsylvania | 24.4% | 21.3% − 27.8% |
| Rhode Island | 29.7% | 17.3% − 46.1% |
| South Carolina | 25.3% | 21.0% − 30.2% |
| South Dakota | 35.8% | 26.8% − 45.9% |
| Tennessee | 28.9% | 24.8% − 33.3% |
| Texas | 36.0% | 33.3% − 38.7% |
| Utah | 24.8% | 17.9% − 33.2% |
| Virginia | 26.0% | 21.9% − 30.6% |
| Washington | 35.3% | 30.3% − 40.6% |
| West Virginia | 27.4% | 21.3% − 34.5% |
| Wisconsin | 19.7% | 15.6% − 24.6% |
| Wyoming | 36.1% | 25.9% − 47.8% |

Table 6: Percent of gun owners who have indicated that they have ever owned an AR-15 styled rifle by state. Note that this includes rifles that an owner holds in other locations if there are local ownership restrictions and rifles modified to be compliant with local laws.

Electronic copy available at: https://ssrn.com/abstract=4203684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Finally, the demographics of firearms ownership and defensive use are diverse, with different demographic groups commonly owning and using firearms at substantial rates.

Electronic copy available at: https://ssrn.com/abstract=4203684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# References

Deborah Azrael, Lisa Hepburn, David Hemenway, and Matthew Miller. The stock and flow of us firearms: results from the 2015 national firearms survey. *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5):38–57, 2017.

Anna Brown. *America's Complex Relationship With Guns: An In-depth Look at the Attitudes and Experiences of US Adults.* Pew Research Center, 2017.

Philip J Cook and Jens Ludwig. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Police Foundation Washington, DC, 1996.

Cassandra K Crifasi, Julie A Ward, Emma E McGinty, Daniel W Webster, and Colleen L Barry. Gun purchasing behaviours during the initial phase of the covid-19 pandemic, march to mid-july 2020. *International review of psychiatry*, 33(7):593–597, 2021.

Gallup. *In Depth: Topics, Guns.* https://news.gallup.com/poll/1645/guns.aspx , https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx, 2021.

David Hemenway. Survey research and self-defense gun use: an explanation of extreme overestimates. *J. Crim. L. & Criminology*, 87:1430, 1996.

Lisa Hepburn, Matthew Miller, Deborah Azrael, and David Hemenway. The us gun stock: results from the 2004 national firearms survey. *Injury prevention*, 13(1):15–19, 2007.

Gary Kleck and Marc Gertz. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J. Crim. L. & Criminology*, 86:150, 1995.

Gary Kleck and Marc Gertz. Carrying guns for protection: results from the national self-defense survey. *Journal of Research in Crime and Delinquency*, 35(2):193–224, 1998.

Jens Ludwig, Philip J Cook, and Tom W Smith. The gender gap in reporting household gun ownership. *American Journal of Public Health*, 88(11):1715–1718, 1998.

Matthew Miller, Wilson Zhang, and Deborah Azrael. Firearm purchasing during the covid-19 pandemic: results from the 2021 national firearms survey. *Annals of internal medicine*, 175(2):219–225, 2022.

Electronic copy available at: https://ssrn.com/abstract=4209683

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Ann P Rafferty, John C Thrush, Patricia K Smith, and Harry B McGee. Validity of a household gun question in a telephone survey. *Public Health Reports*, 110(3):282, 1995.

Paul Spector. Social desirability bias. *The SAGE encyclopedia of social science research methods*, 2004.

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# Appendix A: Vermont Pilot Survey

An initial version of this survey was fielded in Vermont. We report below the top line results from the Vermont survey, which closely mirror the results of the national survey.

In sum, 572 Vermont residents were surveyed, of which 163 indicated owning firearms. The survey sample represented the demographics of Vermont well on all dimensions except gender, as women were over represented and comprised 65.2% of respondents. Thus, weights were employed for gender.

With weighting employed, we find that 30% of Vermont residents own a firearm. Given that the adult population of Vermont is approximately 486,000, this suggest that there are over 145,600 firearms owners in Vermont. 42.1% of Vermont firearms owners are estimated to be female and 57.9% male.

As Figure 16 illustrates, almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property (not counting incidents that were due to military service, police work, or work as a security guard). In nearly half of these defensive gun uses (45.9%), respondents reported facing multiple assailants. 85.8% of all incidents were resolved without the firearm owner having to fire a shot (e.g. by simply showing a firearm or verbally threatening to use it).



Figure 16: Proportion of gun owners in Vermont who have use a firearm in self-defense and number of assailants involved.

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

Sample of Vermont responses to open ended question prompt of "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds?":

- in the first incident it was five to one. I was outnumbered. three rounds per person if needed

- The time I was assaulted by 10 individuals.

- Yes. We have bear that frequently come to our home. They've attempted to get into my truck, they have come onto our porch thru the dog door (XL size) they have been in our chicken coops and in our garage. They have damaged many items, destroyed gas grills and threatened my dogs and children. Sometimes a warning shot isn't enough. And if, God forbid, the bear turned and started to attack us multiple bullets would be needed to stop him.

- About 6 individuals broke into my house one night. I locked myself in my room and they tried to break my door down. I threatened them with use of deadly force, but they kept trying. One of them was outside and broke my bedroom window and I aimed my shotgun at him and he ran off. I threatened again with the sound of charging my shotgun that they knew I wasn't bluffing and they all fled. Had they entered with the intent to kill my family and I, then we would have been out numbered. If there was an exchange of gun fire, I wouldn't want to have the restriction of reloading within the time I needed to protect my family and myself. Outgun the enemy or the enemy will surely outgun you. Limiting everyone's right to weapons is not the answer, and clearly this attempt to ban high capacity magazines is just the catalyst to a government gun grab for easier totalitarian control of the population.

- Yes, i had two run ins with a mountain lion.

- We had a home invasion two times in a month

- Yes. We live in VT. Every time I fired my gun in defense of my property it was to deter bears from damaging my property. It takes more than 1 shot to scare a bear. If

41

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

it charges you or your family it'll definitely take a bunch of shots to stop the bear.

- Yes. Just because there are 10 rounds in a magazine does not mean all will be on target during a self defense incident. In 2012 while I was in college in Connecticut, I got jumped by 4 people in Hartford ct. I had nothing on me to defend myself. The men all threatened me with knives and handguns. I wish I was able to carry a firearm at that point.

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# Appendix B: Sampling Proportions With and Without Weights for National Survey

| Gender | Initial Sample Proportions | Census Based Weighted Proportions |
|--------|------------|------------|
| Male | 49.32% | 49.23% |
| Female | 50.68% | 50.77% |

| Age Range | Initial Sample Proportions | Census Based Weighted Proportions |
|-----------|------------|------------|
| 18-20 | 7.89% | 5.04% |
| 21-25 | 8.11% | 8.58% |
| 26-30 | 7.30% | 9.24% |
| 31-35 | 11.67% | 8.67% |
| 36-40 | 12.66% | 8.44% |
| 41-45 | 8.49% | 7.70% |
| 46-50 | 6.46% | 8.09% |
| 51-55 | 6.37% | 8.13% |
| 56-60 | 7.39% | 8.52% |
| 61-65 | 7.67% | 7.87% |
| 66-70 | 8.03% | 6.59% |
| 71-75 | 5.07% | 5.13% |
| 76-80 | 1.94% | 3.50% |
| Over 80 | 0.93% | 4.49% |

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| Annual Household Income | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Less than $10,000 | 8.87% | 3.40% |
| $10,000-20,000 | 8.95% | 4.89% |
| $20,000-30,000 | 9.69% | 6.26% |
| $30,000-40,000 | 8.78% | 7.06% |
| $40,000-50,000 | 7.44% | 7.21% |
| $50,000-60,000 | 7.72% | 6.96% |
| $60,000-70,000 | 6.00% | 6.96% |
| $70,000-80,000 | 6.37% | 6.37% |
| $80,000-90,000 | 4.51% | 5.76% |
| $90,000-100,000 | 5.89% | 5.76% |
| $100,000-150,000 | 17.67% | 19.11% |
| Over $150,000 | 8.12% | 20.23% |

44

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| State of Residence | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Alabama | 1.83% | 1.52% |
| Alaska | 0.39% | 0.22% |
| Arizona | 2.10% | 2.16% |
| Arkansas | 1.10% | 0.91% |
| California | 9.75% | 11.95% |
| Colorado | 1.59% | 1.75% |
| Connecticut | 1.23% | 1.09% |
| Delaware | 0.56% | 0.30% |
| District of Columbia | 0.27% | 0.21% |
| Florida | 7.29% | 6.51% |
| Georgia | 3.67% | 3.24% |
| Hawaii | 0.36% | 0.44% |
| Idaho | 0.44% | 0.56% |
| Illinois | 4.14% | 3.87% |
| Indiana | 2.13% | 2.05% |
| Iowa | 0.91% | 0.96% |
| Kansas | 0.92% | 0.89% |
| Kentucky | 1.61% | 1.36% |
| Louisiana | 1.23% | 1.41% |
| Maine | 0.51% | 0.41% |
| Maryland | 1.67% | 1.87% |
| Massachusetts | 1.88% | 2.13% |
| Michigan | 3.21% | 3.05% |
| Minnesota | 1.36% | 1.73% |
| Mississippi | 0.83% | 0.90% |
| Missouri | 1.93% | 1.86% |
| Montana | 0.25% | 0.33% |
| Nebraska | 0.53% | 0.59% |
| Nevada | 0.90% | 0.94% |
| New Hampshire | 0.40% | 0.42% |
| New Jersey | 2.97% | 2.81% |
| New Mexico | 0.36% | 0.64% |
| New York | 8.09% | 6.11% |
| North Carolina | 3.18% | 3.16% |
| North Dakota | 0.13% | 0.24% |
| Ohio | 4.13% | 3.57% |
| Oklahoma | 1.32% | 1.20% |
| Oregon | 1.05% | 1.28% |
| Pennsylvania | 4.30% | 3.93% |
| Rhode Island | 0.33% | 0.33% |
| South Carolina | 1.68% | 1.55% |
| South Dakota | 0.48% | 0.27% |
| Tennessee | 2.18% | 2.09% |
| Texas | 6.91% | 8.81% |
| Utah | 0.56% | 0.99% |
| Virginia | 2.43% | 2.61% |
| Washington | 2.03% | 2.33% |
| West Virginia | 0.71% | 0.54% |
| Wisconsin | 1.83% | 1.78% |
| Wyoming | 0.32% | 0.17% |

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

| Race | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| White | 81.26% | 76.30% |
| Black | 9.85% | 13.40% |
| Asian | 3.98% | 5.90% |
| Native American | 2.19% | 1.30% |
| Pacific Islander | 0.49% | 0.20% |
| Other | 2.22% | 2.90% |

46

Electronic copy available at: https://ssrn.com/abstract=4209684

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# ANNUAL FIREARMS MANUFACTURING AND EXPORT REPORT



**YEAR 2020 Final\***

**MANUFACTURED**

| *PISTOLS* | | *REVOLVERS* | |
|---|---|---|---|
| TO .22 | 678,967 | TO .22 | 597,015 |
| TO .25 | 195,992 | TO .32 | 4,124 |
| TO .32 | 56,887 | TO .357 MAG | 152,921 |
| TO .380 | 659,899 | TO .38 SPEC | 181,585 |
| TO 9MM | 3,211,775 | TO .44 MAG | 27,151 |
| TO .50 | 705,663 | TO .50 | 30,282 |
| **TOTAL** | **5,509,183** | **TOTAL** | **993,078** |

| *RIFLES* | 2,760,392 |
|---|---|
| *SHOTGUNS* | 476,682 |
| *MISC. FIREARMS* | 1,324,743 |

**EXPORTED**

| *PISTOLS* | 382,758 |
|---|---|
| *REVOLVERS* | 19,264 |
| *RIFLES* | 99,454 |
| *SHOTGUNS* | 17,874 |
| *MISC. FIREARMS* | 9,788 |

\* FOR PURPOSES OF THIS REPORT ONLY, "PRODUCTION" IS DEFINED AS:
FIREARMS, INCLUDING SEPARATE FRAMES OR RECEIVERS, ACTIONS OR
BARRELED ACTIONS, MANUFACTURED AND DISPOSED OF IN COMMERCE
DURING THE CALENDAR YEAR.

PREPARED BY LED 03/10/2021
REPORT DATA AS OF 03/10/2021

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

# FN 15™ M4 MILITARY COLLECTOR

## THE WORLD'S MOST BATTLE-PROVEN FIREARMS™

**CARBINES**

**FN 15™ SERIES**



### FN 15™ M4 MILITARY COLLECTOR

| 5.56x45mm | 30 Rd. | 6.6 LBS. | 30.5"-34.2" | 16" |
|---|---|---|---|---|
| CALIBER | MAGAZINE | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** DIRECT IMPINGEMENT

**FINISH:** BLACK

**SIGHTS:** A2-STYLE FRONT, ADJUSTABLE REAR SIGHT

The FN 15™ Military Collector Series brings to market military replica rifles made to FN's exacting specifications. The semi-automatic rifles are chambered in 5.56x45mm NATO and feature M4 -profile 16 and 20-inch 1:7" RH, button broached and chrome-lined barrels, respectively. Each UID-labeled lower receiver is equipped with an ambidextrous selector switch, just like its select-fire big brother.

### PRIMARY FEATURES
Knights Armament M4RAS Adapter rail w/ rail adapter covers

Ambidextrous safety lever

### RECEIVER
Hard-anodized aluminum

Flat-top receiver, M-1913

MIL-STD rail at the 12 o'clock position

A2-style front sight, adjustable rear sight

UID Label

### BARREL
16" Button-broached, chrome-lined

A2-style compensator (Permanently attached)

1:7" RH twist

### STOCK
Collapsible, 6-position with sling mount

M4 with pistol grip

### OPERATING CONTROLS
Ambidextrous safety lever

Ergonomic magazine release

Forward assist

### MAGAZINE
Aluminum body, Low friction follower, AR-style 30 round capacity

### ACCESSORIES



**FN UNIVERSAL TACTICAL SLING**



**FN PREMIUM COLD HAMMER-FORGED AR-15 BARRELS**

| Product | Designation | Product Type | UPC |
|---|---|---|---|
| 36318 | FN 15™ M4 Military Collector | Consumer | 845737006211 |
| 36318-02 | FN 15™ M4 Military Collector LE | Law Enforcement | TBD |

**FOR MORE INFORMATION, CONTACT YOUR LOCAL FIREARMS RETAILER OR VISIT FNAMERICA.COM**

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

DocuSign Envelope ID: 33D91FDF-105F-4D4F-A65A-E863E9A5067D

**FN**
CARRY THE FUTURE®

# FN M249S®



FN M249S
Standard Black

FN M249S
Standard FDE

FN M249S
Para Black



FN M249S
Para FDE

RIFLE

FN M249S®

### FN M249S® STANDARD

| 5.56x45mm | 30/200 Rd. | 17.2 LBS. | 40.7" | 18.5" |
|---|---|---|---|---|
| CALIBER | CAPACITY | WEIGHT | LENGTH | BARREL LENGTH |

### FN M249S® PARA

| 5.56x45mm | 30/200 Rd. | 16.9 LBS. | 31.5-37" | 16.1" |
|---|---|---|---|---|
| CALIBER | CAPACITY | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** SEMI-AUTOMATIC, CLOSED BOLT

**FINISH:** BLACK OR FDE

**SIGHTS:** STEEL, ADJUSTABLE TO 1,000 METERS

## PRIMARY FEATURES
Semi-automatic, closed-bolt operation

Primary sights graduated to 1000 meters with MIL-STD 1913 rail system for optics

Quick change barrel and integral steel bipod

## RECEIVER
Formed steel frame with magazine well for alternate feed

Fixed, pivoting ejector for robust ejection

Top cover integrated MIL-STD 1913 mounting rail for sighting systems

## BARREL
Changeable barrel

Cold hammer-forged steel

Chrome-lined bore and chamber

Heat shield and carry handle included

## STOCK
STANDARD - Highly ergonomic polymer butt-stock assembly with hydraulic recoil buffer system and non-slip buttplate

PARA - Rotating, telescoping buttstock with hydraulic recoil buffer and non-slip buttplate

## OPERATING CONTROLS
Crossbolt safety

Curved trigger for improved finger position and control

Non-reciprocating charging handle

## FEED SYSTEM
Standard disintegrating link belt-fed

Under-mounted polymer ammunition container helps keep ammunition cleaner for reduced wear and added reliability

The FN M249S Standard and Para, semi-automatic versions of the M249 SAW light machine gun, originally developed by FN Herstal as the FN MINIMI® and adopted by the U.S. Military in 1988. Features the signature FN cold hammer-forged, chrome-lined barrel and operates from a closed bolt position. Chambered in 5.56x45mm NATO, the rifle will accept both magazine and linked belt ammunition.

| Product | Designation | UPC |
|---|---|---|
| 46-100169 | M249S Standard Black | 845737015077 |
| 46-100170 | M249S Standard FDE | 845737015091 |
| 46-100171 | M249S Para Black | 845737015084 |
| 46-100172 | M249S Para FDE | 845737015107 |