James L. Buchal, OSB No. 921618
E-mail: jbuchal@mbllp.com
MURPHY & BUCHAL LLP
P.O. Box 86620
Portland, OR  97286
Tel:  503-227-1011
*Attorney for Plaintiffs Fitz et al.*

THE HONORABLE KARIN J. IMMERGUT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

|  |  |
|---|---|
| OREGON FIREARMS FEDERATION, INC., *et al*.,<br><br>                    Plaintiffs,<br>      v.<br><br>KATE BROWN, *et al.,*<br><br>                    Defendants. | Case No. 2:22-cv-01815-IM (Lead Case)<br>         3:22-cv-01859-IM (Trailing Case)<br>         3:22-cv-01862-IM (Trailing Case)<br>         3:22-cv-01869-IM (Trailing Case) |
| MARK FITZ, *et al*.,<br><br>                    Plaintiffs,<br>      v.<br><br>ELLEN F. ROSENBLUM<br><br>                    Defendants. | **THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM** |
| KATERINA B. EYRE, *et al*.,<br><br>                    Plaintiffs,<br>      v.<br><br>ELLEN F. ROSENBLUM<br><br>                    Defendants. |  |
| DANIEL AZZOPARDI, *et al*.,<br><br>                    Plaintiffs,<br>      v.<br><br>ELLEN F. ROSENBLUM<br><br>                    Defendants. |  |

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

Table of Authorities .......................................................................................................... iii

MOTION............................................................................................................................1

MEMORANDUM OF LAW ..............................................................................................1

Introduction........................................................................................................................1

Background .........................................................................................................................2

Argument ...........................................................................................................................5

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE
        OREGON HAS BANNED ARMS IN COMMON USE FOR LAWFUL
        PURPOSES...........................................................................................................6

        A.      Measure 114 Bans Conduct Protected by the Text of the Second
                Amendment.................................................................................................6

        B.      Measure 114 Bans Arms in Common Use for Lawful Purposes and
                So Cannot Be Historically Justified............................................................9

        C.      Even If the State's Historical Evidence Is Considered, Measure 114
                Is Still Unconstitutional ...........................................................................16

II.     IF THE COURT FINDS PLAINTIFFS ARE LIKELY TO SUCCEED ON
        THE MERITS, EVERY OTHER INJUNCTION FACTOR ALSO WEIGHS
        IN THEIR FAVOR .............................................................................................19

        A.      Plaintiffs Will Be Irreparably Harmed Without a Preliminary
                Injunction .................................................................................................19

        B.      The Balance of the Equities and Public Interest Both Favor Plaintiffs .....20

Conclusion .......................................................................................................................23

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

# TABLE OF AUTHORITIES

**Cases**

*Alliance For the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...............................................................5

*Am. Trucking Ass'ns v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) .............................................................19

*Arizona Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) .........................................................3, 20

*Arnold v. Brown,*
  No. 22CV41008 (Harney County Cir. Ct.) ...........................................3

*Ashcroft v. Am. Civ. Liberties Union,*
  542 U.S. 656 (2004) ...............................................................................6

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey,*
  910 F.3d 106 (3d Cir. 2018) .........................................................7, 8, 13

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) .............................................................................15

*California v. Health & Hum. Servs.,*
  390 F. Supp. 3d 1061 (N.D. Cal. 2019) ...............................................19

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.,*
  840 F.2d 701 (9th Cir. 1998) .................................................................5

*Cockrum v. State,*
  24 Tex. 394 (1859) ...............................................................................17

*Dist. of Columbia v. Heller,*
  554 U.S. 570 (2008) ...................................................................... *passim*

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) .............................................................20

*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) (*en banc*) ....................................10, 13, 20

*Ezell v. Chicago,*
  651 F.3d 684 (7th Cir. 2011) ...............................................................20

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

*Friedman v. City of Highland Park*,
    577 U.S. 1039 (2015) ........................................................................................15

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) .............................................................................7

*Gonzales v. O Centro Espiritas Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ..........................................................................................5

*Heller v. Dist. of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ......................................................................13

*Luis v. United States*,
    578 U.S. 5 (2016) ...............................................................................................7

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ......................................................................19, 21

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .............................................................................. *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ............................................................................13

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .........................................................................21

*Silveira v. Lockyer*,
    328 F.3d 567 (9th Cir. 2003) ...........................................................................16

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................5

**State Statutes**

ORS 180.060(5) ............................................................................................................5

ORS 181A.080 .............................................................................................................5

**Other Authorities**

*2021 National Firearms Survey* ...............................................................................14

Massad Ayoob, THE COMPLETE BOOK OF HANDGUNS 87 (2013) .....................................12

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

*Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*,
THE FIREARM INDUS. TRADE ASS'N (July 20, 2020).........................................................12

Grant Duwe, *Patterns and Prevalence of Mass Violence*,
2019 J. Crim. & Pub. Pol'y 1 (2019) ...............................................................................23

William English, *2021 National Firearms Survey:*
*Updated Analysis Including Types of Firearms Owned* (May 18, 2022) ........11, 12, 13, 15

GUN DIGEST 2018 386-88 (Jerry Lee and Chris Berens, ed. 2017) (Glocks) ...................12

Lillian Mongeau Hughes, Oregon voters approve permit-to-purchase for guns and
ban high-capacity magazines, NPR (Nov. 15, 2022).........................................................13

Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings:*
*The Plausibility of Linkages*, 17(1) JUST. RES. AND POL'Y 27 (2016) ..............................22

David Kopel, *The history of magazines holding 11 or more rounds:*
*Amicus brief in 9th Circuit*, Wash. Post (May 29, 2014)............................................15, 16

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
78 ALB. L. REV. 849 (2015) .............................................................................................12

David Kopel, *The legal history of bans on firearms and Bowie knives before 1900*,
REASON (Nov. 20, 2022)...................................................................................................17

Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban:*
*Impacts on Gun Markets and Gun Violence, 1994-2003*,
NAT'L INST. OF JUST., U.S. DEP'T OF JUST. (2004)...........................................................21

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*.....................................12

RAND Corporation, *Effects of Assault Weapons and High-Capacity Magazine*
*Bans on Mass Shootings* (April 22, 2020) ........................................................................22

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

**MOTION**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 7-4 and 65, Plaintiffs Mark Fitz, Grayguns, Inc., G4 Archery, Second Amendment Foundation, and Firearms Policy Coalition, Inc. respectfully request that this court enter a preliminary injunction enjoining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction from enforcing the provisions of Oregon Ballot Measure 114 which restrict the possession, use, manufacture, sale, or transfer of ammunition magazines capable of holding more than 10 rounds of ammunition ("banned magazines"). In support of this motion, Plaintiffs submit the attached memorandum of law.

**MEMORANDUM OF LAW**

**Introduction**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense" and that it is not legislation, but "the traditions of the American people—that demands our unqualified deference." *Id.* at 2131 (quotation omitted). In this case, Oregon voters have approved by a slim margin a ballot measure that is irreconcilable with the traditions of the American people. Measure 114, which bans the use, sale, production, and transfer of ammunition magazines capable of holding more than 10 rounds of ammunition, is unconstitutional under the Second Amendment.

The Supreme Court has now repeatedly said that the Second Amendment "protects the possession and use of weapons that are in common use at the time." *Bruen*, 142 S. Ct. at 2128 (quotation omitted). The banned magazines certainly qualify for protection under this standard.

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

They are integral for the operation of many common firearms and estimates suggest there are over *half a billion* of them in circulation in the United States today.  As such, there is no possible justification for Oregon's unconstitutional ban.  The State has not found *any* historical restrictions that would support banning a commonly owned arm, and to the extent the State identifies other historical restrictions that it claims are analogous, those restrictions should be disregarded as out of step with *Bruen*.  Even if they are considered, such restrictions inevitably fail *Bruen*'s requirement that historical analogues be "relevantly similar."

Because the law Plaintiffs challenge is unconstitutional, they are entitled to a preliminary injunction to stop it from going into effect.  Not only are they likely to succeed on the merits, but the threatened constitutional violation of removing Plaintiffs' freedom to use their existing magazines for self-defense, to acquire new magazines, and to supply their customers with additional magazines, would be irreparable if it were to occur, and public interest always favors the injunction of unconstitutional laws.

**Background**

On November 8, 2022, Oregon voters approved Ballot Measure 114 which, among other things, criminalizes the "manufacture, importation, possession, use, purchase, sale, or . . . transfer[] of large-capacity magazines."  Measure 114, § 11(2).  "Large-capacity magazines," with a few limited exceptions, include any magazine "that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload".  *Id.* § 11(1)(d).  Given how common magazines holding more than 10 rounds of ammunition are, Oregon's "large capacity" label is a misnomer.  They in fact are standard capacity magazines on many of the most popular firearms in the Nation.

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

The magazine ban would have gone into effect on December 8, 2022, *Oregon State Police Firearms Instant Check System (FICS) Update – Oregon*, https://bit.ly/3TZYw7Y (Nov. 16, 2022), if it had not been enjoined by an Oregon state court.  *See Arnold v. Brown*, No. 22CV41008 (Harney County Cir. Ct.).  At present, the magazine ban remains preliminarily enjoined by the state court, but litigation is ongoing.  If the injunction is dissolved, licensed dealers will be required to permanently dispose of existing noncompliant magazines in their inventory or permanently modify them to accept at most 10 rounds of ammunition.  Measure 114, § 11(3)(a).  Going forward, dealers and manufacturers will only be allowed to sell banned magazines to military or law-enforcement buyers and even then, only if the magazines have been manufactured with a permanent stamp indicating they were manufactured after the effective date of Measure 114 and were produced in compliance with it.  *Id.* § 11(4)(a) & (b).  And Oregon citizens who already possess magazines holding more than 10 rounds of ammunition will be barred from acquiring new magazines and required to use their old magazines only under limited circumstances—circumstances that notably exclude carriage in public for self-defense.  *Id.* § 11(5)(c).

The *Fitz* Plaintiffs in this case are one individual, two licensed firearm dealers, and two organizations who bring this action to prevent the irreparable harm that would result if the magazine ban goes into effect.  Plaintiff Mark Fitz is a law-abiding Oregon citizen and member of Plaintiffs Second Amendment Foundation ("SAF") and Firearms Policy Coalition, Inc. ("FPC") who currently possesses magazines with more than a 10-round capacity.  Declaration of Mark Fitz in Supp. of Plfs.' Emergency Mots. for a TRO and Prelim. Inj. ¶ 4, Doc. 9 (Nov. 30, 2022) ("Fitz Decl.").  If it were not for the magazine ban, he would acquire additional noncompliant magazines as necessary and would continue to use his existing magazines in

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

lawful ways other than those specifically enumerated as acceptable in Measure 114. *Id.* ¶ 6. However, because he fears prosecution by Defendants under the magazine ban, and because the ban destroys the legal market for such magazines in Oregon, he will not be able to exercise his Second Amendment rights by purchasing and using these commonly possessed magazines. *See id.*

Plaintiffs Grayguns and G4 Archery are both federally licensed firearm dealers and their principals are members of Plaintiffs SAF and FPC. Decl. of Bruce Gray in Supp. of Plfs.' Emergency Mots. for a TRO and Prelim. Inj. ¶¶ 2–3, Doc. 10 (Nov. 30, 2022) ("Gray Decl."); Decl. of Jessica Harris in Supp. of Plfs.' Emergency Mots. for a TRO and Prelim. Inj. ¶¶ 2–3, Doc. 11 (Nov. 30, 2022) ("Harris Decl."). Measure 114 will force them to stop selling magazines capable of holding more than 10 rounds of ammunition to customers in Oregon. Gray Decl. ¶ 5; Harris Decl. ¶ 5. Before Measure 114, both Grayguns and G4 Archery have done significant business selling banned magazines. Gray Decl. ¶ 7; Harris Decl. ¶ 7. The only reason they will cease this activity is because of fear of prosecution by Defendants under Measure 114. Gray Decl. ¶ 8; Harris Decl. ¶ 8.

Plaintiff SAF is a nonprofit educational foundation that seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. Decl. of Alan Gottlieb in Supp. of Plfs.' Emergency Mots. for a TRO and Prelim. Inj. ¶ 4, Doc. 8 (Nov. 30, 2022) ("Gottlieb Decl."). SAF has thousands of members in Oregon, including the named Plaintiffs, and brings this action to vindicate the rights of its members. *Id.* ¶¶ 5, 7.

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

Plaintiff FPC is a nonprofit organization that seeks to defend and promote the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advance individual liberty and restore freedom.  Decl. of Brandon Combs in Supp. of Plfs.' Emergency Mots. for a TRO and Prelim. Inj. ¶ 4, Doc. 7 (Nov. 30, 2022) ("Combs Decl."). It has members in Oregon, including the named Plaintiffs, and brings this action to vindicate the rights of its members.  *Id.* ¶ 6.

The Defendants are Oregon officials with authority to enforce the magazine ban against Plaintiffs. Defendant Ellen Rosenblum, as Oregon Attorney General, has the authority to direct district attorneys in prosecuting violations of the magazine ban, ORS 180.060(5), and Defendant Terri Dave, as Superintendent of the Oregon State Police, has authority to enforce all criminal laws, including the magazine ban, throughout the state, ORS 181A.080.

## Argument

"The basic function of a preliminary injunction is to preserve the *status quo* pending a determination of the action on the merits."  *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1998).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A plaintiff must "make a showing on all four prongs" of the *Winter* test, but a court may employ a "sliding scale" approach in weighing the four factors.  *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  "[T]he burdens at the preliminary injunction stage track the burdens at trial."  *Gonzales v. O Centro Espiritas Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).  So where, as here, the non-moving party bears the burden of persuasion at trial, the

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

moving party "must be deemed likely to prevail" if the non-movant fails to make an adequate showing.  *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 666 (2004).

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE OREGON HAS BANNED ARMS IN COMMON USE FOR LAWFUL PURPOSES.

Measure 114 prevents the use, possession, manufacture, and sale of magazines with a capacity of more than ten rounds.  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' "  *Bruen*, 142 S. Ct. at 2129-30.

### A.  Measure 114 Bans Conduct Protected by the Text of the Second Amendment.

At the textual level, the Second Amendment protects the right to "keep and bear Arms." Interpreting "Arms," the Supreme Court in *Heller* explained that "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*."  *Dist. of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (citations omitted); *see also Bruen*, 142 S. Ct. at 2132.  Therefore, at the level of the text the only question for this Court is whether Measure 114 impacts the rights to "keep and bear" any "instruments that constitute bearable arms."

Measure 114 does impact that right.  Magazines are integral for the operation of many common firearms.  Just as the First Amendment would not allow the government to ban the ink used to print newspapers, the Second Amendment does not permit it to ban triggers, barrels, magazines, or any other component integral to an operable firearm.  *See Or. Firearms Fed'n, Inc. v. Brown*, 2:22-cv-01815-IM (D. Or.), Op. and Order at 19, Doc. 39 (Dec. 6, 2022) ("*OFF*

6

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

TRO Op.") ("The Second Amendment covers firearms and items 'necessary to use' those firearms."). Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The Ninth Circuit previously recognized that "caselaw supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). As the Third Circuit held before *Bruen*, "Because ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*"). Looking at it another way, the clear purpose and effect of Measure 114's magazine provisions is to functionally ban firearms capable of firing more than ten rounds without reloading. *See, e.g.*, Preamble to Measure 114 (noting that "large-capacity magazines are often associated with semiautomatic assault rifles, and can also be used with many semiautomatic firearms including shotguns and pistols"). As discussed in more detail below, firearms capable of firing more than ten rounds without reloading are unquestionably "bearable arms" that are "in common use" and therefore entitled to protection.

That should be the end of the textual analysis, but in its opinion denying a TRO, this Court applied a much more restrictive definition of "Arms," requiring Plaintiffs to show that magazines specifically capable of accepting more than ten rounds of ammunition (1) are necessary to effectively use firearms for self-defense and (2) are in fact commonly used for that purpose (and finding Plaintiffs had not made such a showing). *OFF* TRO Op. at 19.

7

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

There are several problems with this reasoning, including the Court's bottom-line conclusion that magazines holding more than ten rounds are not in common use for self-defense, but the primary flaw is analytical.  Under *Bruen*, the first stage of the analysis should be *exclusively* textual, and *Heller*'s discussion of the text demonstrates that whether an arm is commonly used in self-defense is *immaterial* to whether it is an "Arm."  If magazines in general are integral components of bearable arms, they fall within the scope of the Amendment.  *See ANJRPC*, 910 F.3d at 116.  *Heller* only reached the question of commonality as part of its analysis of historical restrictions that define the contours of the right.  *See Heller* 554 U.S. at 627 (holding that "the sorts of weapons protected [by the Second Amendment] were those 'in common use at the time,'" a limitation that "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'").

In other words, under *Bruen* and following the example of *Heller* there are two separate questions this Court must answer.  First, are magazines (or firearms equipped with them) "Arms" within the meaning of the Amendment's plain text, and *second*, can the government, nevertheless, show that there is a relevant exception to this textual protection rooted in our nation's historical tradition.  Of course, *Heller* and *Bruen* have already established the test for determining whether an arm falls within a historically supported exception:  whether an arm is "dangerous and unusual" as opposed to "in common use."  The important point is that the textual and historical inquiries are analytically distinct under *Heller* and *Bruen*.  For example, a fully automatic firearm is a bearable arm and thus would be presumptively protected by the plain text of the Amendment.  *Heller* and *Bruen* suggest, however, that automatic firearms are dangerous

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

and unusual and thus could be banned on that basis as falling within an exception to the plain-text scope of the Second Amendment.[1]

By combining these two questions, the Court in its TRO ruling offered an interpretation of the text of the Second Amendment that conflicts with *Heller* and flips the burden of proof inappropriately on Plaintiffs to show that the magazines in question are in common use for self-defense. *See, e.g.*, *OFF* TRO Op. 20. Under *Bruen*, once the (more limited) textual analysis is completed, if there is an apparent conflict between the text and the challenged law, as there is here, that law should be treated as presumptively unconstitutional. *Bruen*, 142 S. Ct. at 2126. In that case, the law can only be saved if the government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* That means that it is Oregon's burden to demonstrate the existence of founding-era historical evidence banning certain types of arms and that its own ban *fits* that evidence. As discussed, *Heller* establishes the test for whether a ban on possession fits with this historical evidence from the time of the founding: are the arms in question "in common use" by law abiding citizens for lawful purposes or are they instead "dangerous and unusual" arms? It is up to the State to prove that the arms are not commonly used. As discussed below, the State cannot carry its burden.

**B.    Measure 114 Bans Arms in Common Use for Lawful Purposes and So Cannot Be Historically Justified.**

When properly analyzed, Measure 114 bans "Arms" within the meaning of the Second Amendment, so it is "presumptively invalid" unless Oregon can prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As explained,

---

[1] Of course, *Heller* had no occasion to decide definitively that fully automatic firearms could be banned. We use the example here to illustrate how the analysis would work on the assumption for purposes of argument that *Heller*'s dicta about automatic firearms being dangerous and unusual is correct.

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

in this case the historical work has already been done.  In *Heller*, the Court held that—although the Court's definition of "Arms" included *all* bearable arms—the Second Amendment only protected the right to "keep and bear" "those 'in common use at the time.' "  *Heller*, 554 U.S. at 627.  "That limitation is fairly supported by the *historical* tradition of prohibiting the carrying of 'dangerous and unusual weapons.' ".  *Id.* (emphasis added).  The only question is whether magazines holding more than ten rounds are "dangerous and unusual" and therefore can be banned.  Stated the other way, Supreme Court precedent makes clear that when firearms are "in common use at the [present] time," they cannot be banned.  *Id.*

The State has not shown that these magazines can be banned under this framework.  As noted above, the Court erroneously concluded on the TRO record that magazines holding more than ten rounds are not protected because they are not "necessary to the use of firearms for self-defense," (TRO Op. 19) and are not "in common use for lawful purposes like self-defense," *OFF* TRO Op. 24 (cleaned up).

As to the first of these conclusions, there is no place for courts to weigh whether a firearm is "necessary" in the *Bruen* analysis. Requiring a showing of necessity—and allowing the State to rebut that showing with statistical evidence—is forbidden means-ends or interest-balancing scrutiny under another name.  The State's argument is effectively that individuals can, in most cases, adequately defend themselves without firing more than ten shots while, on the other hand, the State has legitimate interests in keeping the magazines out of the hands of criminals.  This is *precisely* the ground on which the Ninth Circuit determined to apply intermediate scrutiny to similar restrictions *before* the Supreme Court decided *Bruen*.  *See Duncan v. Bonta*, 19 F.4th 1087, 1106 (9th Cir. 2021) (en banc) ("[L]arge-capacity magazines

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

provide significant benefit to soldiers and criminals who wish to kill many people rapidly.  But the magazines provide at most a minimal benefit for civilian, lawful purposes.").

The Supreme Court in *Bruen* specifically rejected this portion of the post-*Heller* courts of appeals decisions as "one step too many" and made clear that *no* means-end scrutiny is ever appropriate under the Second Amendment.  *Bruen*, 142 S. Ct. at 2127.  "[T]he very enumeration of the right takes it out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).  The Court also made clear that means-ends scrutiny could not be smuggled into the analysis under a new label.  *See id.* at 2133 n.7 (making clear that courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry").  It is for the American people to decide what firearms are necessary for self-defense, not Oregon or the Court.  *Heller* underscores this point.  In *Heller*, it was "no answer" to say that D.C. residents could possess rifles instead of handguns when "the American people have considered the handgun to be the quintessential self-defense weapon."  *Heller*, 554 U.S. at 629.  While the Supreme Court believed there were many reasons handguns *could* be preferred, ultimately that did not matter, for the Court concluded that, "*whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home," (*id.,* (emphasis added)), and that settled things.

The proper question under *Bruen* is the second one the Court asked in its TRO ruling— whether magazines holding more than ten rounds are in common use for self-defense or other lawful purposes.  There can be no doubt that they are.  Forty-eight percent of gun owners have owned magazines that hold more than 10 rounds.  William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 22 (May 18, 2022), *available*

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

*at* https://bit.ly/3yPfoHw.  Given the survey's estimate that 81.4 million Americans own firearms, approximately 39 million Americans have owned at least one magazine that holds more than 10 rounds.  And that is a conservative estimate since only current gun owners were polled. Those individuals frequently owned more than one such magazine.  In fact, Professor English found that American gun owners have owned as many as 269 million handgun magazines that hold over 10 rounds and an additional 273 million rifle magazines over that threshold for a total of 542 million such magazines.  *Id.* at 24.

There is nothing surprising about this result. Many of the most popular handguns in the country are manufactured with magazines holding more than 10 rounds.  *See, e.g.,* GUN DIGEST 2018 386-88 (Jerry Lee and Chris Berens, ed. 2017) (Glocks); *id.* at 374 (Beretta); *id.* at 408 (Smith & Wesson); *id.* at 408 (Sig Sauer); Massad Ayoob, THE COMPLETE BOOK OF HANDGUNS 87, 90 (2013) (noting that Glock pistols, which are "hugely popular for . . . home and personal defense," typically come equipped with magazines with a capacity over ten rounds).  The same is true of many of the most popular semi-automatic rifles.  *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."); *see also Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, THE FIREARM INDUS. TRADE ASS'N (July 20, 2020), *available at* https://bit.ly/3QBXiyv.  Data from the Firearm Industry Trade Association indicates that over *three quarters* of modern sporting rifle magazines in the country have a capacity of more than 10 rounds, and 52% have a capacity of 30 rounds.  *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*, *available at* https://bit.ly/3GLmErS (last accessed Dec. 21, 2022).

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

These magazines are commonly possessed for lawful purposes.  According to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%).  English, *supra*, at 23.  And such magazines may be lawfully owned in the vast majority of states; only eight other states have laws as strict as Oregon's that limit magazine capacity to ten rounds for all firearms.  *See* Lillian Mongeau Hughes, *Oregon voters approve permit-to-purchase for guns and ban high-capacity magazines*, NPR (Nov. 15, 2022), https://n.pr/3Vehl88.

These statistics conclusively demonstrate that the banned magazines are commonly owned and used overwhelmingly by law-abiding Americans for lawful purposes.  "[C]ourts throughout the country [including in this Circuit,] agree that large-capacity magazines are commonly used for lawful purposes."  *Duncan*, 19 F.4th at 1155–56 (Bumatay, J., dissenting); *see also Fyock*, 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use."); *ANJRPC*, 910 F.3d at 116–17 ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of [large capacity magazine] regulation.") (cleaned up); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

rounds, and approximately 4.7 million more such magazines were imported into the United

States between 1995 and 2000.  There may well be some capacity above which magazines are

not in common use but, if so . . . that capacity surely is not ten.").

In its order addressing this specific evidence, the Court acknowledged the support that the

*2021 National Firearms Survey* provided for Plaintiffs' position, but rejected it because

"Defendants have presented substantial conflicting evidence to support the claim that large-

capacity magazines are rarely used in practice in self-defense situations."  *Fitz* Order at 4, Doc.

26 (Dec. 6, 2022) ("*Fitz* TRO Op.").  In large part, the Court rejected Plaintiffs' evidence

because it drew a distinction between magazines *owned* by law-abiding citizens, and magazines

*used* by law-abiding citizens.  *See OFF* TRO Op. at 22. ("Defendants, for their part, counter

Plaintiffs' assertion with statistics showing that [it] is exceedingly rare for an individual, in a

self-defense situation, to fire more than ten rounds.")), but that distinction should never have

been made.

The Second Amendment protects the rights of Americans to "keep and bear Arms."  By

its plain terms then, it contemplates ways of "using" firearms other than just shooting them.  In

construing the word "bear," *Heller* explained the term meant "being *armed and ready* for

offensive or defensive action in a case of conflict with another person."  *Heller*, 554 U.S. at 584

(quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting))

(emphasis added).  Similarly, in *Bruen* the Court explained that "[a]lthough individuals often

'keep' firearms in their home, *at the ready for self-defense*, most do not 'bear' (*i.e.*, carry) them

in the home beyond moments of actual confrontation.  To confine the right to 'bear' arms to the

home would nullify half of the Second Amendment's operative protections."  *Bruen*, 142 S. Ct.

at 2134–35 (emphasis added).  The Court's analysis in its TRO decision would go further and

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

nullify *both* of the Second Amendment's operative protections.  It is impossible to square the Court's equating "use" with "firing" with the Supreme Court's repeated acknowledgement that the purpose of "keep[ing] and bear[ing] Arms" is to be "ready."  Therefore, when large numbers of law-abiding citizens *own* a magazine with the intent to use it for a lawful purpose when the opportunity or need arises, then that magazine is in "common use" within the meaning of the Second Amendment and cannot be banned.

This comports with the way the Supreme Court has applied the common use test.  In *Caetano v. Massachusetts,* 577 U.S. 411 (2016), Justice Alito did not ask how often stun guns were actually discharged to prevent an attack. Instead, he explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states."  *Id.* at 420 (Alito, J., concurring) (cleaned up)). And when analyzing an "assault weapons" ban, Justice Thomas said "the ban is thus highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly five million Americans own AR-style semiautomatic rifles." *Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from the denial of certiorari).  In both cases the touchstone for "common use" was ownership.

Finally, even if the Court defines "use" more narrowly, it makes no sense to confine use to occasions where more than ten rounds are fired. Even when a gun is "used" in self-defense, most of the time (81.9%) it is not fired *at all*.  *See* English *2021 National Firearms Survey*, *supra*, at 9.  Under the Court's reasoning, the Second Amendment right could be left intact enough if magazines were limited to a single round, since *most of the time* a single round will be *one more* than is needed.  But the Second Amendment does not protect an American's right to have access to the amount of self-protection that will be sufficient *most of the time*.  "The Second

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

Amendment is a doomsday provision, one designed for . . . exceptionally rare circumstances."

*Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting).  The "common

use" analysis the Court performed in analyzing the TRO would not permit law-abiding citizens

to be prepared for anything but *ordinary* circumstances.  It is therefore inconsistent with the

Second Amendment and the Court should not repeat the error at this stage.

### C.    Even If the State's Historical Evidence Is Considered, Measure 114 Is Still Unconstitutional.

As explained above, the "common use" analysis *is* the historical analysis that *Bruen*

requires.  There is no need for the Court to go any further in examining these issues.  The

magazines banned by Oregon are in common use, therefore there is no historical justification for

banning them.  But even if the Court does go further—as it did in its TRO ruling—it should

reject each of the historical analogues proffered by the State.

The Court was mistaken to conclude in its TRO ruling that magazines holding more than

ten rounds "represent the kind of dramatic technological change envisioned by the *Bruen* Court."

*OFF* TRO Op. 26.  In fact, firearms capable of holding more than ten rounds without reloading

have been available for centuries and their "commercial breakthrough . . . began in the late

1850s. . . . [B]y the time the Fourteenth Amendment was ratified in 1868, rifles holding more

than 10 rounds were common in America."  David Kopel, *The history of magazines holding 11

or more rounds: Amicus brief in 9th Circuit*, Wash. Post (May 29, 2014), *available at*

https://wapo.st/3uSBtBU.  And even if this case *were* about such a technological change, it

would *still* only be appropriate to consider whether the state's ban fits within the tradition of

regulating "dangerous and unusual" arms, since that test accounts for technological changes and

the nature of modern arms.  *See Bruen*, 142 S. Ct. at 2143 ("[E]ven if these colonial laws

prohibited the carrying of handguns because they were considered 'dangerous and unusual

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

But considering the additional historical regulations the State has proffered does not affect the analysis, because there is no evidence of *any* historical law limiting the number of shots a firearm could fire without reloading, so none of them imposed "a comparable burden" that was "comparably justified" to Measure 114's magazine ban. *Bruen*, 142 S. Ct. at 2133.

First, the Court in its TRO ruling pointed to laws from the 1800s regulating the concealed carriage of weapons or the carriage of certain types of weapons, like Bowie knives, that allegedly were most commonly used by criminals. *See OFF* TRO Op. 28. To the extent these laws were valid when they were in place,[2] that is only because these laws regulated "dangerous and unusual" weapons; the State has not pointed to a single law that banned carriage of a weapon that was "in common use at the time" and so its laws are not appropriate analogues under *Bruen* and *Heller*.

Next, the State pointed to prohibitions on private militias, which the Court acknowledged in its opinion do "not squarely pertain to restricting certain weapons" and noted that "a more fully developed evidentiary record in this regard would be beneficial." *Id.* at 29. There is no benefit to considering such evidence and it should be disregarded altogether. Prohibiting private militias, even if such laws could be justified under *Bruen*'s analysis, would have no effect on an

---

[2] There is considerable basis to conclude these laws were, in fact, *not* valid at any point. *See, e.g.*, *Cockrum v. State*, 24 Tex. 394, 402 (1859) ("The right to carry a bowie-knife for lawful defense is secured, and must be admitted."). "There were very few bans of particular types of firearms during the nineteenth century, and all of them are plainly unconstitutional under modern doctrine." David Kopel, *The legal history of bans on firearms and Bowie knives before 1900*, REASON (Nov. 20, 2022), *available at* https://bit.ly/3Ves6ag.

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

individuals' right to keep or bear whatever firearm he chose for self-defense and the present law does, so they are not "relevantly similar" under *Bruen*. *Bruen,* 142 S. Ct. at 2132.

The Court only accepted these laws as legitimate analogues because its framework for its historical analysis was at odds with *Bruen*. When asking whether the burden of Measure 114 on the exercise of the Second Amendment is similar to the burden imposed by these historical restrictions, *Bruen* points courts to "at least two metrics: *how and why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (emphasis added). And yet the question the Court asked was not *how*, but *how much*? The Court concluded "on this record, that the burden imposed by Measure 114 on the core Second Amendment right of self-defense is minimal." *OFF* TRO Op. at 30. And when comparing the "why" of historical regulations and Measure 114, the Court concluded that "it may consider the public safety concerns of today" and held that "[i]n light of the evidence of the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines—and absent evidence to the contrary regarding the role of large-capacity magazines for self-defense— Defendants are comparably justified in regulating large capacity magazines to protect the public." *Id*. at 30-31. Yet again, this reasoning is indistinguishable from means-end scrutiny.

Indeed, it is phrased as a balance of interests—the state showed an interest in regulating the magazines that was, in the Court's judgment, more powerful than the interest Plaintiffs have in owning them for self-defense, so the State wins. *Bruen* bars this sort of loose analogizing that reinstates the Circuit Court tests struck down in *Bruen*. *See also Bruen*, 142 S. Ct. at 2133 n.7. This Court should simply follow *Bruen*, pursuant to which it is clear that no historical justification can support Measure 114's magazine prohibitions and Plaintiffs are likely to succeed on the merits.

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

II.     **IF THE COURT FINDS PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS, EVERY OTHER INJUNCTION FACTOR ALSO WEIGHS IN THEIR FAVOR.**

      A.     **Plaintiffs Will Be Irreparably Harmed Without a Preliminary Injunction.**

Plaintiffs will be irreparably harmed by Measure 114's prohibitions on acquiring new magazines holding more than ten rounds and its prohibition on carrying firearms equipped with such magazines for self-defense.[3]  The Ninth Circuit has repeatedly emphasized:  "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted).  Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm."  *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009).

In denying Plaintiffs' motion for a TRO, the Court rejected this "well established" proposition and suggested that it applied to First Amendment claims, but that "neither the Supreme Court nor the Ninth Circuit have explicitly extended that holding to the Second Amendment."  *OFF* TRO Op. at 38.  However, the Ninth Circuit has been quite clear that *all* deprivations of constitutional rights are to be treated this way.  *Melendres*, for example, is a Fourth Amendment case.  695 F.3d at 995.  And *American Trucking* was a Commerce Clause case. 559 F.3d at 1051.  Even if such treatment is only appropriate in the context of a certain, select group of constitutional claims, the Supreme Court *has* specifically said Second Amendment claims must be among them.  "The constitutional right to bear arms in public for

---

[3] As Plaintiffs explained in their statement in the Joint Status Report, Doc. 33 (Dec. 20, 2022), "the existence of another injunction—particularly one in a different [court] that could be overturned or limited at any time—does not negate [Plaintiffs'] claimed irreparable harm." *California v. Health & Hum. Servs.*, 390 F. Supp. 3d 1061, 1065–66 (N.D. Cal. 2019).

19

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780)).  Indeed, other courts have treated Second Amendment claims this way, even before *Bruen* reaffirmed the Amendment's importance.  *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011); *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1135 (S.D. Cal. 2017) ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury.").

The Court inappropriately required Plaintiffs to show "a non-speculative, immediate risk of irreparable harm" *beyond* the loss of a fundamental right.  *OFF* TRO Op. 38.  Because Plaintiffs could not show that they would immediately need to purchase a magazine holding more than ten rounds or would be in a self-defense situation where they would need to fire more than ten rounds during the pendency of this litigation, the Court found they would not be irreparably injured.  *Id.* at 38–39; *see also id.* at 5.  But as discussed above, it is not for this Court to determine whether Plaintiffs are likely to "need" their Second Amendment rights—the Second Amendment takes away "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Bruen*, 142 S. Ct. at 2129.  Because Plaintiffs have a Second Amendment right to purchase and use magazines capable of holding more than ten rounds, they will be irreparably injured by enforcement of Measure 114's ban on those magazines.

B.      **The Balance of the Equities and Public Interest Both Favor Plaintiffs.**

When the government is a party, the balance-of-equities and public-interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  And by establishing a likelihood that Oregon has violated the Constitution, Plaintiffs have "also established that both the public interest and the balance of the equities favor a preliminary injunction."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).  This is

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (citation omitted).  The State, for its part, "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  In denying a TRO, the Court also considered the State's asserted interest in public safety.  *OFF* TRO Op. at 42. This interest should be accorded *no weight* in comparison with Plaintiffs' Second Amendment rights.  The "balance struck by the founding generation" in ratifying the Second Amendment "demands our unqualified deference" and unless a restriction of firearms use is "consistent with the Nation's historical tradition of firearm regulation," (*Bruen*, 142 S. Ct. at 2126, 2133) there can be no legitimate interest in enforcing it.

Although it is irrelevant, it should also be noted that there is no reason to think enjoining Measure 114 will imperil the public interest in any way; in fact, permitting it to go into effect poses a much more significant danger to Oregonians.  First, though the State attempts to justify the law by reference to the dangers of mass shootings, there is no reason to think that mass shooters will follow this law—if they are intent on killing people, there is no basis to believe they will be deterred by the less severe sanction for possessing these magazines.  Second, there is no reason to think Measure 114 will effectively keep mass shooters from obtaining magazines when they can simply drive to a bordering state to acquire them or purchase them illegally in the black market in Oregon.  *See* Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, 81 n.95, NAT'L INST. OF JUST., U.S. DEP'T OF JUST. (2004), *available at* https://bit.ly/3NDzBUK (explaining that "it is hard to draw definitive conclusions" about the effectiveness of state assault weapons bans in part because "the impact of [such] laws is likely undermined to some degree by the influx of [assault weapons] from other states").  Third, even if the law was effective at keeping mass shooters from

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

acquiring the banned magazines, there is no reason to think it would make a difference. Mass shooters choose the time and place of their crimes and even apart from magazine bans they typically come equipped with multiple firearms and magazines. *See* Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17(1) JUST. RES. AND POL'Y 27, 42, 43 (2016), *available at* https://bit.ly/3WJqQxn (noting that "there were no mass shootings in the United States in 1994-2013 known to have involved LCMs in which the shooter did not possess either multiple guns or multiple detachable magazines" and that "the pauses due to additional magazine changes would be no longer than the pauses the shooter typically took between shots even when not reloading"). Likely for these reasons, bans on "high capacity magazines" have been found to have an inconclusive effect on mass shootings. *See* RAND Corporation, *Effects of Assault Weapons and High-Capacity Magazine Bans on Mass Shootings* (April 22, 2020), https://bit.ly/2H6K8re.

On the other hand, victims of such attacks do not choose where or when they need to defend themselves, and are left to rely only on the ammunition they can carry in their firearms to defend themselves. As this Court observed in its TRO decision, the evidence already before the Court shows that citizens fire more than ten rounds in two of 736 instances. *OFF* TRO Op. 22. As Justice Alito noted in *Bruen*, "defensive firearm use occurs up to 2.5 million times per year." *Bruen*, 142 S. Ct at 2159 (Alito, J., concurring). Simple math suggests that citizens need and use larger magazines to save their own lives nearly 6,800 times a year.

Some appreciable fraction of these citizens will die if they run out of ammunition while engaged in a firefight with criminals. In contrast, from 1976 to 2018 an average of 26 people were killed annually in public mass shooting incidents (defined as "incidents that occur in the absence of other criminal activity (*e.g.,* robberies, drug deals, and gang 'turf' wars') in which a

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

gun was used to kill four or more victims in a public location within a 24-hour period"). Grant Duwe, *Patterns and Prevalence of Mass Violence*, 2019 J. Crim. & Pub. Pol'y 1, 12 (2019). This means that if even ten percent of the 6,800 people who fire more than ten rounds in self-defense in a given year died because they ran out of bullets, that total death rate would significantly outweigh the lives lost in all mass shootings—and Measure 114 will in all likelihood have no appreciable effect on the annual mass shooting toll at all.

## Conclusion

For the foregoing reasons, the Court should grant Plaintiffs' request for a preliminary injunction.

Dated:  January 6, 2023.                    Respectfully submitted,

*s/  James L. Buchal*
James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
P.O. Box 86620
Portland, OR  97286
Tel:  503-227-1011
Fax:  503-573-1939
E-mail:  jbuchal@mbllp.com

Derek Angus Lee, OSB No. 213139
ANGUS LEE LAW FIRM, PLLC
9105a NE Hwy 99, Ste. 200
Vancouver, WA  98665
Tel:  360-635-6464
Fax:  888-509-8268
Email: angus@angusleelaw.com

William V. Bergstrom, *Pro Hac Vice*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC  20036
Tel:  202-220-9622
Fax:  202-220-9601
Email:  wbergstrom@cooperkirk.com

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2023, the foregoing **THE *FITZ* PLAINTIFFS'**

**AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING**

**MEMORANDUM** (trailing consolidated case no. 3:22-cv-01859-IM) will be electronically

mailed to all parties enrolled to receive such notice in lead case no. 2:22-cv-01815-IM and in the

trailing consolidated case nos. Case No. 3:22-cv-01859-IM, 3:22-cv-01862-IM, and 3:22-cv-

01869-IM.


*s/ James L. Buchal*
James L. Buchal, OSB No. 921618
*Attorney for Fitz et al. Plaintiffs*

THE *FITZ* PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM