Shawn M. Lindsay
shawn@jurislawyer.com
Daniel J. Nichols
dan@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475
  *Attorneys for Eyre Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>TINA KOTEK, et al.,<br><br>          Defendants. | Case No. 2:22-cv-01815-IM *(Lead Case)*<br>Case No. 3:22-cv-01859-IM *(Trailing Case)*<br>Case No. 3:22-cv-01862-IM *(Trailing Case)*<br>Case No. 3:22-cv-01869-IM *(Trailing Case)*<br><br>CONSOLIDATED CASES<br><br>**PLAINTIFFS' AND DEFENDANTS' CONSOLIDATED PROPOSED PRETRIAL ORDER** |
| MARK FITZ, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>          Defendants. | |
| KATERINA B. EYRE, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>          Defendants. | |
| DANIEL AZZOPARDI, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>          Defendants. | |

PLAINTIFFS' AND DEFENDANTS' CONSOLIDATED PROPOSED PRETRIAL ORDER

## NATURE OF THE ACTION

This case involves a set of consolidated challenges to the constitutionality of Oregon Measure 114 (2022), the Changes to Firearm Ownership and Purchase Requirements Initiative.

The consolidated challenges will be decided together in a bench trial.

## BASIS FOR JURISDICTION

Plaintiffs' causes of action arise under 42 U.S.C. § 1983 and the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

## AGREED-UPON FACTS

The parties are continuing to confer, and intend to submit additional agreed facts, if possible, before the pretrial conference.

1. Plaintiff Katerina B. Eyre is a resident of Washington County, Oregon.

2. Plaintiff Tim Freeman is a resident of Douglas County, Oregon.

3. Plaintiff Mazama Sporting Goods ("Mazama"), a d/b/a of Sitatunga Services, LLC, is a family-owned sporting goods store that sells firearms, fishing gear, and related products, including ammunition and magazines, located in Eugene, Oregon.

4. Before Measure 114 took effect, Mazama possessed and sold magazines with a capacity of more than 10 rounds.

5. Plaintiff National Shooting Sports Foundation is a trade association for the firearm, ammunition, and hunting and shooting sports industry.

6. Plaintiff Oregon State Shooting Association is an Oregon not-for-profit corporation. Its organizational objectives include promoting, in every lawful way, all types of legal firearms activities in the State of Oregon; raising the general proficiency in the use of firearms; supporting the Second Amendment to the Constitution of the United States; educationally imparting to the citizens of good repute a better knowledge in the safe handling and proper care of firearms; encouraging the sport of competitive marksmanship and target shooting; and coordinating and encouraging efforts of member clubs and individuals in the field of firearm safety, marksmanship training and all types of recreational shooting.

7. Plaintiff Daniel Azzopardi is a resident of Yamhill County, Oregon.

8. Sportsman's Warehouse, Inc. ("Sportsman's") is a firearms retailer with eight locations in Oregon. Sportsman's has retail locations in Multnomah, Washington, Jackson, Douglas, Marion, Deschutes, Linn, and Klamath Counties. Sportsman's is a publicly traded company.

9. Each Sportsman's location in Oregon is a federally licensed firearm dealer.

10. Plaintiff Mark Fitz is a resident of Clackamas County, Oregon.

11. Mr. Fitz owns a firearm equipped with a magazine in excess of ten rounds.

12. Grayguns, Inc. is a federally licensed firearm dealer located in Douglas County which sells firearms in Oregon equipped with magazines with a capacity in excess of ten rounds, as well as standalone magazines with a capacity in excess of ten rounds.

13. G4 Archery, LLC ("G4 Archery") is a federally-licensed firearm dealer located in Washington County, Oregon, which sells firearms in Oregon equipped with magazines with a capacity in excess of ten rounds, as well as standalone magazines with a capacity in excess of ten rounds.

14. Second Amendment Foundation ("SAF") is a 501(c)(3) nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.

15. Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware with its principal place of business in Sacramento, California.

16. Plaintiff Oregon Firearms Federation, Inc. ("OFF") is an Oregon public benefit non-profit corporation.

17. Plaintiff Adam Johnson is a resident of Marion County, Oregon.

18. Mr. Johnson owns Coat of Arms Custom Firearms, a store in Keizer, Oregon.

19. Plaintiff Harold Richard Haden is resident of Umatilla, County.

20. Plaintiff Brad Lohrey is a resident of Sherman County and the Sheriff of Sherman County.

21. Lohrey owns magazines with a capacity of 10 or more rounds.

22. Plaintiff Cody Bowen is a resident of Union County and the Sheriff of Union County.

23. Bowen owns magazines with a capacity of 10 or more rounds.

24. Plaintiff Brian Pixley is a resident of Columbia County and the Sheriff of Columbia County.

25. Pixley owns magazines with a capacity of 10 or more rounds.

26. Plaintiff Terry Rowan is a resident of Umatilla County and the Sheriff of Umatilla County.

27. Rowan owns magazines with a capacity of 10 or more rounds.

28. Plaintiff Kevin Starrett is a resident of Clackamas County.

29. Starrett is the President of the Oregon Firearms Federation.

30. Plaintiff Damian Bunting is a resident of Multnomah County.

31. Defendant Ellen F. Rosenblum is the Attorney General of Oregon. She is the chief law officer for the state and all its departments. Attorney General Rosenblum is a resident of Oregon, and her principal place of business is in Salem, Oregon.

32. Casey Codding is Superintendent of the Oregon State Police.

33. The Superintendent of the Oregon State Police is the executive and administrative head of the Oregon State Police.

34. As described in ORS 181A.080, the Oregon State Police are charged with the enforcement of all criminal laws in Oregon.

35. Oregon voters passed Ballot Measure 114 ("Measure 114") on November 8, 2022.

36. Measure 114 was scheduled to take effect on December 8, 2022.

37. The Oregon State Police ("OSP") has adopted administrative rules that govern some procedures for issuing permits to purchase. OAR 257-010-0065(1)-(6).

38. OSP has prepared an application for permits to purchase.

39. OSP is prepared today to receive completed applications and fingerprint cards collected by permit agents via fax or United States Mail.

40. Some permit agents have access to LiveScan electronic fingerprint machines that permit the electronic transfer of fingerprints.

41. OSP estimates it will take 30 business days for the vendor to set up the LiveScan fingerprint system.

42. The FBI has informed OSP that it will not perform fingerprint-based criminal background checks for permit applicants based on its determination that Ballot Measure 114 does not meet the requirements of Pub. L. 92-544.

43. The Oregon State Sheriffs Association ("OSSA") and Oregon Association of Chiefs of Police ("OACP") have created working groups that address the implementation of Measure 114.  The workgroups have made recommendations about the process for permit agents to issue permits and certify in-person demonstration instructors.

44. A firearm magazine is a device attached or attachable to a firearm that stores ammunition.

45. A firearm magazine is a device that feeds ammunition into firearms.

46. Firearm magazines can either be detachable or fixed.

47. A detachable magazine can be loaded or unloaded while detached from a firearm and readily inserted in a firearm.

48. A fixed magazine is contained in or permanently attached to a firearm in such a manner that the device cannot be removed without disassembly of the firearm action.

49. Magazines that hold more than 10 rounds of ammunition are owned and possessed by millions of Americans.

50. Americans sometimes use magazines capable of holding more than 10 rounds for lawful purposes.

51. Some semiautomatic pistols currently on the market today in some states come standard with detachable magazines capable of holding more than 10 rounds of ammunition.

52. Some semiautomatic rifles currently on the market today in some states come standard with detachable magazines capable of holding more than 10 rounds of ammunition.

53. The Sig Sauer P365, Smith & Wesson M&P92, and Smith & Wesson M&P AR15 are capable of using a magazine with more than 10 rounds of ammunition.

54. The Sig Sauer P365, Smith & Wesson M&P92, and Smith & Wesson M&P AR15 are capable of using a magazine with 10 or fewer rounds.

55. Some people sometimes carry firearms equipped with magazines to defend themselves.

56. The federal government did not regulate the firing capacity of semi-automatic firearms until 1994.

57. The federal government ceased regulating the firing capacity of semi-automatic firearms after 2004.

58. Most gun owners in the Eighteenth Century owned single-shot, muzzle loading firearms, such as muskets.

59. The Girardoni air rifle, developed around 1779, had a 22-round capacity.

60. Samuel Colt patented a revolver in 1836. [*Plaintiffs and Defendants agree; Intervenor Defendant does not agree*].

61. During the mid-19th century, advances in technology transformed ammunition from powder and ball (bullet) inserted loose or in paper cartridges, to metallic cartridges that contained primer, powder, and bullet.

62. The Henry rifle came onto the U.S. market in 1860.

63. The Henry rifle could fire sixteen shots without reloading.

64. In 1896, Mauser developed a semi-automatic, recoil-operated pistol.

65. Murders committed by individuals wielding firearms occurred in the United States in the 19th century.

66. Episodes in which multiple individuals were killed by people wielding firearms occurred in the U.S. in the 19th century.

67. The magazines prohibited from sale under Measure 114 have some monetary value on the open market.

68. The state has not issued guidance on what it means to "[p]ermanently alter" a magazine "so that it is not capable, upon alteration in the future, of accepting more than 10 rounds of ammunition."

69. All ten of the highest-selling pistols in the U.S. in 2022 can function with magazines with a maximum capacity of 10 or fewer rounds.

70. Most major firearm manufacturers offer models that come standard with a magazine with a maximum capacity of 10 rounds or fewer.

71. Most major firearm manufacturers already make models that are compliant with laws in other states that also prohibit the sale of magazines with more than 10 rounds (e.g., California).

## STATEMENT OF CLAIMS

### ***Plaintiffs Raise Six Constitutional Challenges***

Count I:    Measure 114's permitting provisions violate the Second Amendment.

Count II:   Measure 114's permitting provisions violate the Due Process Clause of the Fourteenth Amendment.

Count III:  Measure 114's prohibitions on magazines with a capacity of more than 10 rounds violates the Second Amendment.

Count IV:   Measure 114's prohibitions on magazines with a capacity of more than 10 rounds violate the Takings Clause.

Count V:    Measure 114's prohibitions on magazines with a capacity of more than 10 rounds violate the Due Process Clause of the Fourteenth Amendment.

Count VI:   Measure 114's prohibitions on magazines with a capacity of more than 10 rounds are void for vagueness.

The parties provide their contentions on each claim below.

<u>**COUNT I**</u>
**(Second Amendment Challenge to M114's Permitting Regime)**

<u>***Plaintiffs contend that Count I should be analyzed and resolved as follows***</u>**:**

**Question 1:**   Do Measure 114's new restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), restrict conduct that is presumptively protected by the Second Amendment?

1. Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the first question in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *Id.* at 2126.

2. The relevant conduct here is acquiring a firearm. *See* M114 §§3(4), 4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2) (imposing various restrictions on an individual's ability "to purchase or acquire a firearm").

3. The Second Amendment's plain text clearly covers that conduct, as one can neither "keep [nor] bear Arms," U.S. Const. amend. II, if one cannot acquire an arm in the first place.

4. Measure 114's new restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), thus tread on ground "presumptively protect[ed]" by the Constitution. *Bruen*, 142 S.Ct. at 2126.

5. Defendants therefore "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

*If the Court answers Question 1 YES, then it should move on to Question 2.*

*If the Court answers Question 1 NO, then it should enter judgment for Defendants on Count I.*


**Question 2:**   Have Defendants proven that Measure 114's new restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), are consistent with a longstanding historical tradition of firearm regulation in this country?

1. Defendants have not proven and cannot prove that Measure 114's new restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), are consistent with a longstanding historical tradition of firearm regulation in this country.

2. Only six states have ever had a permit-to-purchase regime for any substantial period of time—and all of those came in the twentieth century.

3. That is too little and "too late to provide insight into the meaning of" constitutional provisions adopted long beforehand. *Id.* at 2137. Under *Bruen*, the kind of historical

tradition the government must prove to justify a burden on Second Amendment rights is "an enduring American tradition of state regulation" that dates back to the Founding (or Reconstruction), not just a handful of later laws from "outlier jurisdictions." *Id.* at 2155-56; *see id.* at 2138 (rejecting reliance on "a handful of late-19th-century [analogues]").

4. Measure 114's new restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), are not analogous to other permitting regimes that the Supreme Court has discussed.

5. All permitting regimes the Supreme Court discussed in *Bruen* govern public carry; not a single one of them requires a permit just to purchase or acquire firearms.

6. This distinction matters, because the test that *Bruen* established requires the government to come forward with historical regulations that are actually analogous to the challenged regulation in terms of "two metrics": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S.Ct. at 2132-33.

7. Laws that restrict individuals' right to publicly carry firearms impose lesser burdens on the right of armed self-defense than laws, like Measure 114, that restrict individuals' ability to have a firearm at all. After all, one who is denied a public-carry permit can at least still exercise the right of armed self-defense in his home—but one who is denied a permit to purchase under Measure 114 cannot do even that much.

8. The fact that Measure 114 calls itself a "shall issue" regime makes no difference to the constitutional analysis.

   a. The regime in *Bruen* also called itself a "shall issue" regime. There, carry licenses "shall be issued" if applicants meet objective requirements and have certain kinds of employment, and licenses "shall be issued" for all other applicants that showed "proper cause." N.Y. Penal Law §400.00(2)(c)-(f). Yet the Court saw through the label New York applied and held that a regime under which "authorities have discretion to deny … licenses even when the applicant satisfies the statutory criteria" is actually an unconstitutional "may issue" regime that does not comport with our nation's tradition of firearms regulation. *Bruen*, 142 S.Ct. at 2123-24, 2156.

   b. That also describes Measure 114's new regime. Under Measure 114, permit agents may deny an application for a permit-to-purchase, even if the applicant has already passed a background check and completed an approved safety course, if they determine that the applicant is "reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." M114 §§4(1)(b)(C), 5(2). This provision on its face allows permit agents to deny permits based on the exercise of judgment and formation of an opinion about the applicant's suitability to own a firearm. Defendants have never denied this. And these features are indistinguishable from New York's regime for public carry.

9. Oregon's new regime creates significant costs and barriers to compliance.

10. Oregon's new regime authorizes undue delays.

11. While Measure 114 requires *permit agents* to render a decision within 30 days after receiving notice from OSP that the applicant has passed a background check, it imposes no time limits on OSP in conducting background checks.

12. The 30-day deadline is itself too long for the regime to be constitutional. *Cf.* 18 U.S.C. §922(t)(1)(B)(ii) (deeming four days too long to force law-abiding citizens to wait even without background-check results); *see also Silvester v. Becerra*, 138 S.Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari) (California's ten-day cooling-off period, the second-longest such mandatory delay in the country, violates the Second Amendment).

13. Even assuming arguendo that a 30-day deadline by which to complete the permitting process would not deny anyone their Second Amendment rights, Measure 114 is still unconstitutional, because it repeals the longstanding Oregon-law provision that allowed dealers to "deliver [a] firearm to [a] purchaser' when OSP "fail[ed] to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check," ORS 166.412(3)(c) (repealed), and replaces it with a blanket ban on transfers unless and until OSP gives the green light. That means that Measure 114 on its face countenances the imposition of interminable delays on Oregonians who have already passed one background check.

14. Defendants have offered no historical analogue to this sort of duplicative regime that frustrated individuals' ability to acquire firearms. That is because there is none.

15. Defendants thus have failed to meet their burden under *Bruen*.

*If the Court answers this question YES, then it should move on to Question 3.*

*If the Court answers this question NO, then it should enter judgment for Plaintiffs on Count I and declare unconstitutional Measure 114's restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c).*

**Question 3:** Are Defendants currently able to implement Measure 114's restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), in a manner that allows individuals to obtain the permits that are required to lawfully acquire firearms in Oregon?

1. A system that requires a permit to exercise a fundamental constitutional right, but no one can actually obtain that permit, violates the constitutional right in question.

2. Defendants are currently unable to implement Measure 114's new permitting regime.

3. Defendants may also *never* be able to do so. Under Measure 114, "the criminal background check" that is required for all applicants (1) "shall … includ[e] … a fingerprint

identification, through the Federal Bureau of Investigation," and (2) is not considered "complet[e]" until after the FBI has "return[ed] the fingerprint cards used to conduct the criminal background check." M114 §5(e). Yet, as Defendants have admitted, the FBI "will not process fingerprint background checks from OSP for permits." State.PI.Br.29.

4.   In short, until either the FBI changes its interpretation of federal law such that it can begin processing applications or the Oregon Legislature amends Measure 114, the new regime cannot be allowed to take effect.

*If the Court answers this question YES, then it should enter judgment for Defendants on Count I.*

*If the Court answers this question NO, then it should enter judgment for Plaintiffs on Count I and enjoin Defendants from enforcing Measure 114's restrictions on individuals' ability to acquire firearms, set forth in Measure 114 §4, §5, §6(3)(c), §6(13)(b), §6(14), §7(3)(d)(B), §8(3)(B)(c), until such as time as it can implement those restrictions in a manner that allows individuals to obtain the required permits.*


**Plaintiffs' Note on the Scope of Plaintiffs' Challenge to M114's Permitting Regime:**

1.   Plaintiffs are aware that there is a disagreement between the parties on the scope of Plaintiffs' challenge to M114's permitting regime.  Specifically, Defendants contend that: "Plaintiffs have not challenged Measure 114's revisions to Oregon's existing background check statutes in their complaints," because "[t]he complaints request that the Court find the 'permitting provisions' unconstitutional, not the revisions to Oregon's existing background check provisions."  *Infra*, p.12 (citing *Eyre* 1st Am. Compl. ¶ 98 (ECF#67); *OFF* 3rd Am. Compl. ¶ 133 (ECF #133)).

2.   Plaintiffs' complaints plainly challenge *both* the need to obtain a permit-to-purchase *and* the inability to obtain a firearm until OSP has completed a background check that it has infinite time to complete.  *See Eyre* First Amended Complaint, Dkt. 67 at ¶¶5-11, 37-43, 73-77, 88-97, 101; *OFF* Third Amended Complaint, Dkt. 158 at ¶¶6-7, 123-131, 136.  Indeed, Plaintiffs cite *by section number* the background check provisions they are challenging, *see Eyre* First Amended Complaint, Dkt. 67 at ¶85 (citing M114 §§3(4), 4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2)); *OFF* Third Amended Complaint, Dkt. 158 at ¶120 (same), and then concludes that "Measure 114's permitting *provisions* violate the Second Amendment," *see Eyre* First Amended Complaint, Dkt. 67 at ¶98 (emphasis added); *OFF* Third Amended Complaint, Dkt. 158 at ¶133 (same).  Moreover, this Court has previously noted that Plaintiffs' amended complaints "raise … substantive challenges to Measure 114's background check requirements."  ECF 70 at 5 n.1.

3.   Plaintiffs' challenge to M114's permitting regime therefore applies to M114's permitting regime in its entirety, including both the permit-to-purchase requirements and the second background check requirement, as alleged in their operative complaints.

4. Here and elsewhere, Defendants have argued that because Plaintiffs' claim is "facial," Plaintiffs "must show that no set of circumstances exists under which the statute would be valid." *Infra*, p. 12. But as the Fifth Circuit recently explained, *Bruen*, not *Salerno*, provides the standard for a facial challenge to a law that implicates Second Amendment rights. *See United States v. Rahimi*, 61 F.4th 443, 453-54 (5th Cir. 2023). *Bruen* itself was a facial challenge, and yet the Court never once applied (or even mentioned) the *Salerno* standard that Defendants insist governs Plaintiffs' challenges here. And in any event, if a law flunks the *Bruen* test, that means it is unconstitutional in all applications, and thus *Salerno* is satisfied.

5. Defendants' remaining contentions as to the scope of the challenge to M114's permitting regime likewise repeat arguments defendants have raised as to *all* of M114's permitting requirements, such as severability, ripeness, and a substantive argument under the Second Amendment. These are addressed in Plaintiffs' main arguments above.

### *Defendants contend that Count I should be analyzed and resolved as follows*:

1. *Bruen* expressly allows states to enact shall-issue permit regimes that are designed to ensure that those bearing arms are, in fact, law-abiding, responsible citizens. Defendants deny plaintiffs' proposed framework for analyzing and resolving this claim. Firearm permits do not violate the Second Amendment because they are consistent with the historic tradition of limiting firearm usage to "law-abiding, responsible" citizens.

2. Defendants deny that Measure 114's permit regime differs from the regimes approved in *Bruen*.

3. "Shall issue" permit regimes can require fingerprinting, background checks, mental health records checks, and firearms/use of force training.

4. Measure 114's permit provisions create a "shall issue" regime that is consistent with Supreme Court precedent.

5. Measure 114 does not impose unconstitutional delays. Even a 30-day delay is consistent with the Constitution.

6. Applicants whose applications have been denied or who have not received a response in 30 days may appeal to state circuit court.

7. Measure 114's application fees are not unconstitutionally high.

8. Measure 114's mental health review provision is objective, constitutional, and consistent with licensing regimes that *Bruen* expressly approves.

9. Even if the Court concludes that Measure 114's permitting provisions is not a "shall issue" regime approved by Supreme Court precedent, Measure 114's permitting provisions are

consistent with the Nation's historical tradition of firearms regulation. There are many historical analogs to permitting provisions.

10. To succeed on a facial challenge, plaintiffs must show that no set of circumstances exists under which the statute would be valid. Plaintiffs cannot show that defendants cannot implement Measure 114 in every set of circumstances. Plaintiffs' contentions that defendants cannot implement Measure 114 because, in some instances, some applicants might be subject to delays, unreasonable denials, or other impediments is not a sufficient basis to conclude that Measure 114 is facially unconstitutional.

11. The Oregon State Police are prepared to implement their functions under Measure 114. The Associations for Oregon Sheriffs and Police Chiefs are working to provide guidance to their members on how to implement their functions under Measure 114.

12. The Oregon State Police are able to implement Measure 114 even though the FBI will not run fingerprint background checks. As required by Measure 114, the Oregon State Police will report the outcome of the FBI fingerprint checks to the permit agents, which is that the FBI will not run a background check.

13. Even if the Court concludes that the Oregon State Police cannot implement the FBI fingerprint check requirement, the Court should not conclude that Measure 114 cannot be implemented. The Court should conclude that because the FBI fingerprint check requirement is a nullity that can be lawful disregarded; that it is severed from the Measure 114 pursuant to Section 12 of the Measure; and that it is preempted by federal law.

14. To the extent plaintiffs advance an as-applied challenge, plaintiffs' claim is not ripe.

**Defendants' Note on the Scope of Plaintiffs' Challenge to M114's Permitting Regime:**

1. Plaintiffs have not challenged Measure 114's revisions to Oregon's existing background check statutes in their complaints. The complaints request that the Court find the "permitting provisions" unconstitutional, not the revisions to Oregon's existing background check provisions. (*Eyre* 1st Am. Compl. ¶ 98 (ECF#67); *OFF* 3rd Am. Compl. ¶ 133 (ECF #133)). No claim in any of plaintiffs' complaints requests the Court declare Measure 114's revisions to Oregon's background check statutes unconstitutional separate and apart from the permit-to-purchase provisions. The revisions to Oregon's background check statutes can be implemented separately from the permit provisions.

2. Even if the Court concludes that plaintiffs' complaints raise a challenge to the revisions to the background check statutes, plaintiffs bring a facial challenge and therefore must show that no set of circumstances exists under which the statute would be valid. Plaintiffs cannot make that showing. Plaintiffs' complaints concede that some background checks are resolved in fewer than 10 days. (*OFF* 3rd Am. Compl. ¶ 128 ("more often than not it has taken OSP more than 10 days to complete a background check"); *Eyre* 1st Am. Compl. ¶ 93 (same).)

3. To the extent plaintiffs bring an as-applied challenge, Measure 114 has not gone into effect and any future injury is too speculative for the claim to be ripe.

4. As this Court has already held, "'background checks,' like [Measure 114's revisions to Oregon's background check statutes], are constitutionally permissible." (1/5/2023 Order (ECF #70)

## COUNT II
### (Due Process Clause Challenge to M114's Permitting Regime)

***Plaintiffs contend that Count II should be analyzed and resolved as follows*:**

1. A system under which a permit is required to exercise a fundamental constitutional right, but no one can actually obtain that permit, violates the Due Process Clause of the Fourteenth Amendment.

2. Defendants are currently unable to implement Measure 114's new permitting regime.

3. Defendants may also *never* be able to do so. Under Measure 114, "the criminal background check" that is required for all applicants (1) "shall … includ[e] … a fingerprint identification, through the Federal Bureau of Investigation," and (2) is not considered "complet[e]" until after the FBI has "return[ed] the fingerprint cards used to conduct the criminal background check." M114 §5(e). Yet, as Defendants have admitted, the FBI "will not process fingerprint background checks from OSP for permits." State.PI.Br.29.

4. In short, until either the FBI changes its interpretation of federal law such that it can begin processing applications or the Oregon Legislature amends Measure 114, the new regime cannot be allowed to take effect.

***Defendants contend that Count II should be analyzed and resolved as follows*:**

1. Measure 114 does not violate the Due Process Clause.

2. Defendants are prepared to implement Measure 114's permitting regime.

3. The Oregon State Police are prepared to implement their functions under Measure 114. The Associations for Oregon Sheriffs and Police Chiefs are working to provide guidance to their members on how to implement their functions under Measure 114.

4. The Oregon State Police are able to implement Measure 114 even though the FBI will not run fingerprint background checks. As required by Measure 114, the Oregon State Police will report the outcome of the FBI fingerprint checks to the permit agents, which is that the FBI will not run a background check.

5. Even if the Court concludes that the Oregon State Police cannot implement the FBI fingerprint check requirement, the Court should not conclude that Measure 114 cannot be implemented. The Court should conclude that because the FBI fingerprint check requirement is a nullity that can be lawful disregarded; that it is severed from the Measure 114 pursuant to Section 12 of the Measure; and that it is preempted by federal law.

6. To succeed on a facial challenge, plaintiffs must show that no set of circumstances exists under which the statute would be valid. Plaintiffs cannot show that defendants cannot implement Measure 114 in every set of circumstances.

7. To the extent plaintiffs bring an as-applied challenge, Measure 114 has not gone into effect and any future injury is too speculative for the claim to be ripe.

8. Applicants whose applications have been denied or who have not received a response in 30 days may appeal to state circuit court.

## COUNT III
### (Second Amendment Challenge to M114's Magazine Prohibitions)

**_Plaintiffs contend that Count III should be analyzed and resolved as follows_:**

**Question 1:** Are the ammunition feeding devices that Measure 114 prohibits covered by the plain text of the Second Amendment?

1. Under *Bruen*, the first question a court must ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. 142 S.Ct. at 2126.

2. Because the Second Amendment's plain text secures "the right of the people to keep and bear Arms," U.S. Const. amend. II, here that question turns on whether ammunition feeding devices fit "the Second Amendment's definition of 'arms,'" *Bruen*, 142 S.Ct. at 2132.

3. The Supreme Court has definitively construed the term "arms" in the Second Amendment as covering all "modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding,'" regardless of whether they are strictly "necessary" for self-defense. *Id.* at 2132 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)).

4. Magazines fit squarely within that definition. Citizens carry firearms equipped with magazines and other ammunition feeding devices for the same reason they carry firearms loaded with ammunition: "[W]ithout bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014).

5. The magazines that Measure 114 bans are "Arms" under the Second Amendment.

*If the Court answers this question YES, then it should move on to Question 2.*

*If the Court answers this question NO, then it should enter judgment for Defendants on Count III.*

**Question 2:** Are the ammunition feeding devices that Measure 114 prohibits "in common use"?

1. Because the feeding devices that Measure 114 bans fit "the Second Amendment's definition of 'arms,'" the next question is whether they are "in common use today" or instead are "'highly unusual in society at large.'" *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

2. The way to answer this question is *not* to ask whether people commonly fire more than 10 rounds of ammunition in self-defense situations.

3. Rather, the way to this question is to ask the question the Supreme Court has asked, namely, whether magazines capable of holding more than 10 rounds of ammunition are "typically *possessed* by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added); *see also Bruen*, 142 S.Ct. at 2143 (reiterating that the only "Arms" that fall outside the Second Amendment's protection—and thus the only "Arms" a state may ban—are those that are "highly unusual in society at large" (quoting *Heller*, 554 U.S. at 627)); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (Alito, J., concurring in the judgment) (explaining that, in confronting a ban on a class of arms, "the pertinent Second Amendment inquiry is whether" the class of arms in question—here, magazines that can hold more than ten rounds—"are commonly *possessed* by law-abiding citizens for lawful purposes" (emphasis added)); *Heller*, 554 U.S. at 720 (Breyer, J., dissenting) (admitting that, under "[t]he majority" opinion in *Heller*, the "[Second] Amendment protects those weapons 'typically possessed by law-abiding citizens for lawful purposes'")

4. The ammunition feeding devices that Measure 114 bans are the furthest thing from "highly unusual in society at large." *Bruen*, 142 S.Ct. at 2143.

5. Even Defendants agree that there are millions of these products in American hands today.

6. Simply put, as the D.C. Circuit put it more than a decade ago, while "[t]here may well be some capacity above which magazines are not in common use[,] … that capacity surely is not ten." *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

7. And there is no question that the *typical* individual who possesses these commonplace arms does so *for lawful purposes*.

8. In the vast majority of states, these devices are perfectly lawful.

9. The reasons most frequently cited by the millions of Americans who own magazines capable of holding more than ten rounds are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%).

10. That makes sense: When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm. *See Jackson*, 746 F.3d at 967.

11. Of course, as with any arms, there are some who misuse these arms for unlawful—indeed, awful—purposes. But that was equally true of the handguns at issue in *Heller*. The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question does not turn on whether arms are misused by criminals; it turns on whether law-abiding citizens commonly own and use them for lawful purposes. That is why it was enough in *Heller* that handguns are *typically* possessed for lawful purposes. *See id.* at 624-25 (majority op.).

And what was true in *Heller* is no less true here, given the millions of law-abiding Americans who lawfully own the arms that Oregon has banned.

12. On Count III, the Court can and should end its analysis there. "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131, and the tradition here is that law-abiding citizens may keep and bear arms that are commonly possessed for self-defense. That *is* the historical test—*i.e.*, the key inquiry under *Bruen*—and it forecloses the state's effort to ban these commonly possessed arms.

*If the Court answers this question YES, then it should enter judgment for Plaintiffs on Count III.*

*If the Court answers this question NO, then it should enter judgment for Defendants on Count III.*

**Question 3:** Have Defendants proven that there is a longstanding historical tradition of banning ammunition feeding devices above a certain capacity for semi-automatic firearms?

1. Even if further historical inquiry were necessary, Defendants have not met and cannot meet their burden of demonstrating any historical tradition of prohibiting firearms capable of firing more than ten rounds without reloading.

2. Indeed, the very fact that tens of millions of Americans have chosen these arms in the hundreds of millions confirms that there is not, and never has been, any tradition of banning them. To the contrary, the historical record reveals a long tradition of welcoming technological advancements that enable civilian firearms to fire more rounds more accurately and efficiently.

3. At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity or firing capacity of semiautomatic weapons.

4. That did not change until the twentieth century.

5. Defendants have never argued otherwise. They have not cited even a single restriction on firing or magazine capacity from the 1700s or the 1800s.

6. The Court can stop here. *See Bruen*, 142 S.Ct. at 2137-38 (rejecting reliance on "a handful of late-19th-century [laws]" allegedly similar to the challenged restriction, because laws first enacted long after ratification "come too late to provide insight into the meaning of [the Constitution]" (first alteration added).

7. Even if the Court goes on, the answer is the same.

8. To be sure, a few states enacted laws restricting firing capacity of semiautomatic weapons in the 1920s and 1930s. But each of these laws was either repealed outright or replaced with a law that restricted only fully automatic weapons, *i.e.*, machine guns—which, unlike *semi*automatics, were never widely adopted by law-abiding citizens for lawful purposes. And none of these laws was ever understood to apply to feeding devices, regardless of

capacity, as opposed to the firearms themselves.  Only the District of Columbia restricted magazines qua magazines before 1990—two centuries after the founding and well over a century after the ratification of the Fourteenth Amendment

9. That explains why the Supreme Court, when discussing modern semiautomatic rifles that come standard with 20- or 30-round detachable magazines, correctly opined that such arms "traditionally have been widely accepted as lawful possessions" in the United States. *Staples v. United States*, 511 U.S. 600, 612 (1994).

10. And the vast majority of states still today allow ordinary law-abiding citizens to choose for themselves what ammunition capacity they believe best suits their needs.

11. As for the federal government, it did not regulate magazine capacity until 1994, when Congress adopted a nationwide ban on ammunition feeding devices with a capacity of more than ten rounds.  *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)).  Unlike Oregon's ban here, however, that federal law was time-limited and operated only prospectively, allowing people who had already lawfully acquired such magazines to keep them.  *Id.*  What is more, Congress allowed this law to expire in 2004 after a study by the Department of Justice revealed that it had produced "no discernible reduction" in violence with firearms across the country.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), available at https://bit.ly/3wUdGRE.

12. In short, there is no longstanding national tradition of government regulation of these commonplace arms—let alone of outright bans.  *See Heller*, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on … large-capacity magazines are longstanding[.]").

*If the Court answers this question YES, then it should enter judgment for Defendants on Count III.*

*If the Court answers this question NO, then it should enter judgment for Plaintiffs on Count III.*

**Question 4:** Have Defendants proven that ammunition feeding devices capable of accepting more than 10 rounds constitute a dramatic technological change or novel societal phenomenon that justifies a "more nuanced approach"?

1. The fact that ammunition feeding devices have been in common lawful use by civilians for over a century precludes any search for a "more nuanced approach."  *Bruen*, 142 S.Ct. at 2132.  *Bruen* authorizes such an inquiry only in narrow circumstances where there is new technology that is not in common use for lawful purposes.  Such a situation does not exist here.

2. Even if such an inquiry can be pursued, the lack of any historical (or even modern-day) tradition supporting the state's ban is not owing to any "dramatic technological changes." *See Bruen*, 142 S.Ct. at 2132.

Page 18    PLAINTIFFS' AND DEFENDANTS' CONSOLIDATED PROPOSED PRETRIAL ORDER

3. Firearms capable of firing more than ten rounds of ammunition without reloading are nothing new, and neither are ammunition feeding devices capable of holding more than ten rounds.

4. To be sure, feeding devices capable of holding more than ten rounds were not as common in the nineteenth century as they are today.  But the same could be said of pretty much any modern arm.  The more relevant point is that what fed ammunition into the chamber of these firearms were magazines and other ammunition feeding devices capable of holding more than ten rounds.  Indeed, civilian ownership of ammunition feeding devices capable of holding more than ten rounds have been part of the fabric of American life for well more than 150 years.

5. The state has argued that its law is justified because "guns capable of firing ten or more shots were … 'vanishingly rare'" in 1791 and thus magazines capable of holding more than ten rounds "are an example of 'dramatic technological change[].'"  State.PI.Op.9.  In the first instance, the Supreme Court has rejected this type of analysis as "bordering on the frivolous."  *Heller*, 554 U.S. at 582.  In any event, the transition from single-shot to multi-shot weapons that the state is concerned about occurred approximately 175 years ago, when first revolvers, then repeating rifles, came on the market.  They were, as the record in this case will reflect, headline news *nearly two centuries ago*, and they were soon sold by the hundreds of thousands and then millions.  And it was at this exact time that the nation reaffirmed its commitment to the Second Amendment right by incorporating it via the Fourteenth Amendment.

6. History thus refutes any notion that there is something novel about what Oregon has banned.

7. And while modern firearms equipped with magazines like the ones Oregon has banned are more accurate and capable of quickly firing more rounds than their founding-era predecessors, that does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified.  *Heller*, 554 U.S. at 624-25; *see also Caetano*, 577 U.S. at 416-17 (Alito, J., concurring in the judgment).  After all, it would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense— which likely explains why no such historical tradition exists.  *See Bruen*, 142 S.Ct. at 2156.

8. Finally, to the extent Defendants seek to excuse the relative novelty of banning commonplace arms by pointing to some "unprecedented societal concern[]" heretofore unseen, *see id.* at 2132, that argument fails too.

9. Even accepting the dubious proposition that there is some causal link between the arms Oregon has banned and the horrific acts on which the state's briefing has focused, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time.  Nevertheless, before the 1990s, there were almost no efforts to restrict the firing capacity of semiautomatic arms or so-called large-capacity magazines.  Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict

in the hands of someone bent on misusing them.  To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm.  *See id.*; *Heller*, 554 U.S. at 627.  Because Measure 114 flies in the face of that longstanding historical tradition, it violates the Second Amendment.

*If the Court answers this question YES, then it should enter judgment for Defendants on Count III.*

*If the Court answers this question NO, then it should enter judgment for Plaintiffs on Count III.*

### **_Defendants contend that Count III should be analyzed and resolved as follows_:**

1. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed."  But the right secured by the Second Amendment is not unlimited.

2. Plaintiffs must demonstrate that the plain text of the Second Amendment covers the conduct regulated by Measure 114. To do this, at a minimum, they must show that (1) large capacity magazines are "Arms" under the Second Amendment, and (2) large capacity magazines are in common use today for lawful purposes like self-defense.

3. Large-capacity magazines are not "Arms" under the Second Amendment.  Large-capacity magazines are not necessary to use firearms, including for self-defense. Most firearms function for self-defense without large-capacity magazines.

4. Large-capacity magazines are not in common use for lawful purposes like self-defense.  Large-capacity magazines are typically used in military service.  Large-capacity magazines are rarely used by civilians for self-defense and are disproportionately used in mass shootings.

5. If the Court concludes that the plain text of the Second Amendment covers the conduct, that conduct is presumptively protected.  *Bruen*, 142 S. Ct. at 2129-30.  Then, the State must "demonstrate[e] that [its regulation] is consistent with the Nation's historical tradition of firearm regulation."  *Id*. at 2130.

6. Where the case "implicat[es] unprecedented societal concerns or dramatic technological changes," the court should "conduct . . . reasoning by analogy" to determine whether the "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified. . ."  *Id*. at 2132-33.

7. The problem of mass murders by individual gunmen is an unprecedented societal concern.

8. Modern firearms equipped with large-capacity magazines differ dramatically from 18th and 19th Century firearms.

9. There were no laws on magazine capacity at the founding because there were virtually no firearms that could hold more than *one* round.  Firearms capable of holding more than 10 rounds were virtually unknown at the founding, extraordinarily rare during the Nineteenth

Century, and uncommon until recently.  Regulations on large-capacity magazines arose when such magazines became common.

10. Restrictions on large-capacity magazines are consistent with this country's historical tradition of regulating dangerous weapons. Restrictions on large-capacity magazines are analogous to well-established prohibitions against unusually dangerous weapons that are associated with unlawful activities.

11. Any burden on the right of armed self-defense posed by Measure 114's restriction on large-capacity magazines is comparable to the burden posed by founding-era regulations, because Measure 114 leaves a broad range of weapons available for lawful self-defense.


## COUNT IV
### (Fifth Amendment Takings Clause Challenge to M114's Magazine Prohibitions)

***Plaintiffs contend that Count IV should be analyzed and resolved as follows***:

**Question 1:** Does Measure 114 §11 effect a physical taking?

1. When the government dispossesses an owner of his or her property "for some public purpose, it has a categorical duty to compensate the former owner."  *Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002); *see* U.S. Const. amend. V.

2. The same rule applies if the dispossession arises from a regulation, rather than from the exercise of eminent domain:  "Government action that physically appropriates property is no less a physical taking because it arises from a regulation."  *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021).

3. And the same rule applies regardless of whether the state-authorized "invasion" is only partial.  *See id.* (temporary visit by union organizers).

4. Measure 114 plainly runs afoul of those settled principles.

5. First, as to licensed gun dealers (separate from individuals), the statute makes it a crime for licensed dealers to continue to possess magazines that they lawfully acquired and that, but for Measure 114, they would lawfully sell to law-abiding citizens.

6. "[L]icensed gun dealer[s]" in Oregon that lawfully acquired and currently possess "large-capacity magazines" can avoid committing "a class A misdemeanor" only if, "within 180 days of the effective date of [the Act]," they transfer or sell the magazines to a dealer out of state, render the magazines inoperable (and thus unsalable), or dispossess themselves of them altogether.  M114 §11(2), (3)(a), (6).  And come "180 days following the effective date," not even those options will be on the table.

7. There can be no question that surrendering the magazine to law enforcement and transferring or selling it to a third party requires physical dispossession; in either case, the

owner must literally hand the property over to someone else. That is the definition of a taking.

8. The option to move the lawfully acquired property out of Oregon to another state where it is lawful to own or possess such a feeding device, is no less a taking either. Oregon cannot invoke the permissive laws of another state to validate its own unconstitutional restriction. And even putting that problem aside, requiring someone to remove property from the state is no less a dispossession than a forced confiscation. Like a mandatory sale or a surrender to the government, a mandatory transfer of property out of state directly interferes with the owner's right to possess the property, not just to her right to use it as she pleases.

9. The option to permanently alter the magazines to accept fewer than ten rounds does not eliminate the taking either. In *Horne v. Department of Agriculture*, it made no difference that the raisin growers could have avoided the taking by "plant[ing] different crops" or selling "their raisin-variety grapes as table grapes or for use in juice or wine." 576 U.S. 350, 365 (2015). Likewise, in *Loretto v. Teleprompter Manhattan CATV Corp.*, it made no difference that the owner could have avoided the taking by converting her building into something other than an apartment complex. 458 U.S. 419, 439 n.17 (1982). This case is no different

10. By forcing dealers to surrender, destroy, or send away their property, Measure 114 effects a physical taking.

11. Oregon must therefore provide just compensation.

12. Second, as to individuals, Measure 114 subjects to criminal punishment any person who possesses even a single "large-capacity magazine," regardless of when or how it was acquired. An individual can escape criminal punishment only by affirmatively proving that she obtained her property long ago, which will be very difficult for many people to do. It is hard to imagine a greater invasion of property rights than a prohibition on keeping the property against which one must "affirmative[ly] defen[d]" oneself. *See* M114 §11(5).

*If the Court answers this question YES, then it should enter judgment for Plaintiffs on Count IV, because Measure 114 §11 provides no compensation.*

*If the Court answers this question NO, then it should move on to Question 2.*

**Question 2:** Does Measure 114 §11 effect a regulatory taking?

1. Absent Measure 114, the magazines that the state now deems contraband would be salable and in demand (as evidenced by the fact that Americans have purchased hundreds of millions of them and counting).

2. Because of Measure 114, however, they are now effectively worthless to any dealer in Oregon.

3. Yet Oregon offers dealers who find themselves in this situation exactly zero compensation. That violates the Takings Clause.

4. At a minimum, forcing regulated businesses to sell their property, move it out of state, or permanently alter it places an unconstitutional condition on constitutionally protected conduct, which thereby effects a taking. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604-07 (2013).

5. As to individuals, making individuals prove that they obtained their property before Measure 114 took effect in order to avoid criminal liability, *and* limiting individuals' ability to use their lawfully obtained property to a small handful of locations, destroys such a large portion of the property right that it constitutes a regulatory taking for which just compensation must be paid.

6. At a minimum, forcing citizens to affirmatively prove that they acquired their property before a date certain (and limiting their ability to use their lawfully obtained property to a small handful of locations) places an unconstitutional condition on constitutionally protected conduct, which thereby effects a taking. *See Koontz.*, 570 U.S. at 604-07.

*If the Court answers this question YES, then it should enter judgment for Plaintiffs on Count IV, because Measure 114 §11 provides no compensation.*

*If the Court answers this question NO, then it should enter judgment for Defendants on Count IV.*


### ***Defendants contend that Count IV should be analyzed and resolved as follows***:

1. The Takings Clause of the Fifth Amendment states that private property shall not be taken "for public use, without just compensation."

2. Measure 114 is not a physical or regulatory taking from licensed gun dealers or individuals.

3. Measure 114 is an exercise of police power, not a taking, regulatory or otherwise, for public use.

4. Exercises of police power are not compensable under the Takings Clause.

5. Furthermore, to establish a regulatory taking, a plaintiff must establish the extent to which the regulation has interfered with distinct investment backed expectations. Plaintiffs cannot show a sufficient diminution in the value of their property to make the requisite showing.

6. In addition, to succeed on a facial takings claim, a plaintiff must show that such a taking occurs in every case. Plaintiffs cannot do so.

7. A permanent injunction is not a proper remedy for a takings claim, which can be remedied with damages.

## COUNT V
### (Due Process Clause Challenge to M114's Magazine Prohibitions)

***Plaintiffs contend that Count V should be analyzed and resolved as follows*:**

**Question:** Do the confiscatory, retroactive aspects of Measure 114 §11 violate due process?

1. Due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation" and prevents Congress from enacting retroactive laws that would infringe those protected interests without adequate justification. *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016).

2. Oregon's retroactive ban cannot satisfy that high bar.

3. To be sure, the state asserts an interest in public safety, which is generally considered compelling. But applying a criminal prohibition retroactively against licensed dealers, who have complied with the law at every turn, does not meaningfully further that interest.

4. It is unreasonable to think that applying a criminal prohibition to federally licensed individuals and enterprises who lawfully possessed the now-banned magazines without posing a public-safety threat for decades before the statute took effect will have any tangible public safety benefit.

5. The state's effort to change the legal consequences of transactions long closed cannot meet the test of due process.

***Defendants contend that Count V should be analyzed and resolved as follows*:**

1. Measure 114 is not retroactive. Measure 114 does not attach new legal consequences to any conduct completed before Measure 114 is in effect.

2. There is adequate constitutional justification for Measure 114, including public safety.

# COUNT VI
## (Void-for-Vagueness Challenge to M114's Magazine Prohibitions)

***Plaintiffs contend that Count VI should be analyzed and resolved as follows:***

**Question:** Is Measure 114 §11 void for vagueness?

1. Due process requires the government to define what it requires with sufficient definiteness that people of ordinary intelligence can understand whether their actions will result in adverse consequences. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

2. "[A] stricter standard is applied in reviewing the statute for vagueness" here, moreover, because (1) criminal penalties may be imposed for violations of this law, (2) the statute lacks a mens rea requirement, and (3) regulates conduct implicating fundamental constitutional rights. *See City of Chicago v. Morales*, 527 U.S. 41, 55 (1999); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982).

3. Yet the language Oregon has deployed here is anything but clear. While the words "permanent" and "alter" are understandable enough on their own, in the context of what the statute actually requires, they beg more questions than they resolve. Most pressingly, they leave unclear whether "permanently alter" means that the magazine has to have been rendered unable to be restored to full capacity by an expert using professional tools, or will it suffice that "the person in possession" cannot restore it to its initial capacity. *See Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 535, 537 (1998) (holding "unconstitutionally vague" a municipal ordinance that banned "assault weapons" and defined that term in part to mean "any firearm which may be restored to an operable assault weapon as defined in [other provisions]," because "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited"). The statute does not say, leaving dealers and citizens to guess as to what, if anything, will be enough to allow them to keep their (modified) property without winding up in prison.

4. This provision is all the more problematic because ammunition does not come in a single shape or size, yet nothing in Measure 114 defines "ammunition," except insofar as the statute clarifies that the term "'[l]arge capacity magazine' … does not include … [a]n attached tubular device designed to accept, and capable of operating only with 0.22 caliber rimfire ammunition." M114 §11(1)(d)(B). As written, then, it is anyone's guess whether a feeding device is legal or illegal if more than ten of some fire-able projectiles (other than .22 caliber rimfire ammunition), even if not designed to be used in or typically associated with the device in question, will fit.

5. This provision is void for vagueness, rendering the entire magazine restriction invalid.

***Defendants contend that Count VI should be analyzed and resolved as follows***:

1. In a facial challenge, a statute is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited.

2. Measure 114's provisions provide a person of ordinary intelligence fair notice of what is prohibited.  Measure 114 restricts magazines that can be quickly altered to accept more than 10 rounds.

3. The definition used in Measure 114 to describe the large-capacity magazines has been used in laws in other jurisdictions for decades without widespread confusion.

## GENERAL CONTENTIONS

*Defendants contend:*

1. An injunction should not issue because it is not in the public interest.

2. Damages are not available because of sovereign and Eleventh Amendment immunity and qualified immunity.

3. Any portion of Measure 114 that is found unconstitutional should be severed and all other provisions given effect.

*Plaintiffs Respond*:

1. This Court should defer consideration of the appropriate remedy until after the trial on the merits.  That said, if Plaintiffs prevail on the merits, "'[i]t is always in the public interest to prevent the violation of a party's constitutional rights.'"  *Bowman v. Matteucci*, 2021 WL 5316440, at *3 (D. Or. Nov. 15, 2021) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

2. Plaintiffs have not asked for compensatory damages, recognizing the Eleventh Amendment and sovereign immunity issues this would create.  Nominal damages, however, have been requested and are addressed by both parties' ongoing Rule 12(c) briefing.  As Plaintiffs therein maintain, a decision on this front should also be deferred until the resolution of this action on the merits.

3. Severance cannot be assessed in the abstract.  Plaintiffs request to brief and/or argue the issue as to the specific question when and if it should arise.