Jessica A. Skelton, OSB #102714
jessica.skelton@pacificalawgroup.com
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
206-245-1700

*Attorney for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>TINA KOTEK, et al.,<br><br>    Defendants,<br><br>  and<br><br>OREGON ALLIANCE FOR GUN SAFETY,<br><br>    Intervenor-Defendant. | Case No. 2:22-cv-01815-IM *(Lead Case)*<br>Case No. 3:22-cv-01859-IM *(Trailing Case)*<br>Case No. 3:22-cv-01862-IM *(Trailing Case)*<br>Case No. 3:22-cv-01869-IM *(Trailing Case)*<br><br>CONSOLIDATED CASES<br><br><br>**INTERVENOR-DEFENDANT OREGON ALLIANCE FOR GUN SAFETY'S TRIAL BRIEF** |
| MARK FITZ, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>    Defendants. | |
| KATERINA B. EYRE, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>    Defendants,<br><br>  and | |

ALLIANCE'S TRIAL BRIEF

| |
|---|
| OREGON ALLIANCE FOR GUN SAFETY,<br><br>                    Intervenor-Defendant. |
| DANIEL AZZOPARDI, et al.,<br><br>                         Plaintiffs,<br>        v.<br>ELLEN F. ROSENBLUM, et al.,<br><br>                    Defendants. |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 2

III. ISSUES TO BE DECIDED BY THE COURT ................................................... 3

IV.  ARGUMENT ...................................................................................................... 4

    A.   Plaintiffs' Challenge Against the LCM Provision Fails ............................................ 4

        1.   Legal standard under *Bruen* ...................................................................... 5

        2.   LCMs are not protected by the Second Amendment's plain text ............................. 5

        3.   Measure 114's LCM restrictions are consistent with historical tradition ............... 17

        4.   Plaintiffs cannot succeed on their Due Process and Takings Clause claims ........... 19

    B.   Plaintiffs' Challenge Against the Permitting Provision Fails ................................... 21

        1.   Measure 114 mirrors laws that were approved by the *Bruen* Court ...................... 22

        2.   Plaintiffs misunderstand the nature of their facial challenge .................................. 25

V.   CONCLUSION ................................................................................................. 27

# TABLE OF AUTHORITIES

### Federal Cases

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678, (1987)...................................................................................................... 25

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
  910 F.3d 106 (3d Cir. 2018)........................................................................................... 13

*Barnett v. Raoul*,
  No. 3:23-CV-00141-SPM, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ............................ 2, 17

B*evis v. City of Naperville*, 22 C,
  4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023...................................................... 4, 17, 18

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016)........................................................................................................ 12

*Calvary Chapel Bible Fellowship v. County of Riverside*,
  948 F.3d 1172 (9th Cir. 2020) ....................................................................................... 25

*Colony Cove Properties, LLC v. City of Carson*,
  640 F.3d 948 (9th Cir. 2011) ......................................................................................... 21

*Croman Corp. v. United States*,
  724 F.3d 1357 (Fed. Cir. 2013)...................................................................................... 26

*Crown Point Dev., Inc. v. City of Sun Valley*,
  506 F.3d 851 (9th Cir. 2007) ......................................................................................... 21

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).................................................................................................. passim

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) .................................................................................... passim

*Durning v. Citibank, N.A.*,
  950 F.2d 1419 (9th Cir. 1991) ....................................................................................... 20

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ..................................................................................... 16, 17

*Fyock v. Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) ..................................................................................... 10, 11

*Hanson v. District of Columbia*, CV 22-2256 (RC),
    2023 WL 3019777 (D.D.C. Apr. 20, 2023 ...................................................................... passim

*Heller v. District of Columbia,*
    *(Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011) ................................................................... 13, 14

*Herrera v. Raoul,*
    *N*o. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023 ............................................. 4, 18

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015).......................................................................................................... 20

*Hunters United for Sunday Hunting v. Pa. Game Comm'n,*
    28 F. Supp. 3d 340 (M.D. Pa. 2014).................................................................................. 5, 6

*In re Taffi,*
    68 F.3d 306 (9th Cir. 1995) (following as persuasive authority a decision vacated by........... 20

*Jackson v. City and County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ........................................................................................ 10, 11

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).................................................................... 24

*Kim v. United States,*
    121 F.3d 1269 (9th Cir. 1997) ..................................................................................... 24, 25

*Knick v. Township of Scott* 139 S. Ct. 2162 (2019) ..................................................... 19

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ............................................................................................ 16

*Kornahrens v. Evatt,*
    66 F.3d 1350 (4th Cir. 1995) ............................................................................................ 20

*Laurel Park Cmty., LLC v. City of Tumwater,*
    698 F.3d 1180 (9th Cir. 2012) .......................................................................................... 20

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005).......................................................................................................... 21

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982).......................................................................................................... 20

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992)........................................................................................................ 20

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010).......................................................................................................... 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ................................................................................ passim

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
   618 F. Supp. 3d 901 (N.D. Cal. 2022) ......................................................... 5

*Nat'l Mining Ass'n v. Zinke*,
   877 F.3d 845 (9th Cir. 2017) ...................................................................... 11

*Ocean State Tactical, LLC v. Rhode Island*,
   No. 22-CV-246 JJM-PAS, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) .......................... passim

*Penn Central Transp. Co. v. N.Y.C.*,
   438 U.S. 104 (1978) ................................................................................... 21

*Prof'l Beauty Fed'n of Cal. v. Newsom*,
   No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126 (C.D. Cal. June 8, 2020) ........................... 19

*Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty.*,
   122CV02113CNSMEH, 2022 WL 4098998 (D. Colo. Aug. 30, 2022) .................................... 4

*Roe v. Anderson*,
   134 F.3d 1400 (9th Cir. 1998) .................................................................... 20

*Rosenbloom v. Pyott*,
   765 F.3d 1137 (9th Cir. 2014) .................................................................... 20

*Del. State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
   CV 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023 ................................. 4, 17, 19

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ...................................................................... 10

*Teter v. Connors*,
   460 F. Supp. 3d 989 (D. Haw. 2020) ............................................................ 8

*United States v. Al-Azhari*,
   No. 8:20-cr-206-T-60AEP, 2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ........................... 8

*United States v. Booker*,
   543 U.S. 220 (2005) ................................................................................... 11

*United States v. Cox*,
   906 F.3d 1170 (10th Cir. 2018) .................................................................... 8

*United States v. Hasson*,
   No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) ............................... 8, 10

*United States v. Lanier,*
    520 U.S. 259 (1997) .................................................................................. 21

*United States v. Royce,*
    No. 1:22-CR-130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) ............................. 8, 9

*United States v. Saleem*, --- F. Supp. 3d ----, No. 3:21-cr-00086-FDW-DSC,
    2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ......................................................... 7, 8

*United States v. Salerno,*
    481 U.S. 739 (1987) .................................................................................. 26

*United States v. Tilotta,*
    No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ............... 13

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) .............................................................................. 26, 27

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019) ..................................................................... 16

### State Cases

*Andrews v. State,*
    50 Tenn. 165 (1871) ................................................................................ 10

*Arnold v. Kotek,*
    370 Or. 716, 524 P.3d 955 (2023) ......................................................... 26

*Dwyer v. Farrell,*
    475 A.2d 257 (Conn. 1984) ................................................................... 24

*Rocky Mountain Gun Owners v. Polis,*
    467 P.3d 314 (Colo. 2020) ..................................................................... 14

*State v. Misch,*
    256 A.3d 519 (Vt. 2021) ......................................................................... 14

### Federal Statutes

26 U.S.C. §§ 5845(a), 5861(d) .......................................................................... 8

U.S. Const. amend. II ......................................................................................... 6

U.S. Const. amend. V ...................................................................................... 19

### State Statutes

720 ILCS 5/24-1.10(a)(1) ................................................................................. 7

Colo. Rev. Stat. § 18-12-301(2)(a)(I) ............................................................. 7

Colo. Rev. Stat. § 18-12-206(1) ..................................................................... 26

Conn. Gen. Stat. § 29–28(b) .......................................................................... 23

Del. Code Ann. tit. 11, § 1469(a) ................................................................... 7

Ill. Comp. Stat., ch. 430, § 66/10(e) (same) ................................................. 27

Or. Const. art. I, § 18 ..................................................................................... 19

Vt. Stat. tit. 13, § 4021(e)(1) ......................................................................... 7

# I.    INTRODUCTION

This Court's Opinion and Order denying Plaintiffs' motions for temporary restraining order ("TRO Order"), ECF 39, rests on five key, well-supported conclusions. First, Plaintiffs "failed to show that" large-capacity magazines ("LCMs") are "covered by the plain text of the Second Amendment," because they are both not "necessary to the use of firearms for lawful purposes" and not "'in common use today for self-defense.'" ECF 39 at 20 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2134 (2022)). Second, the 20th-century development and proliferation of LCMs—and their pairing with semi-automatic firearms—represents a "dramatic change in firearms technology" and "implicates unprecedented societal concerns," including LCMs' frequent use in mass shootings. *Id.* at 25, 27. Third, Measure 114's LCM provision is "analogous" to "historical firearm regulations" because they "impose comparable burdens on the right to self-defense" that are "comparably justified." *Id.* at 28. Fourth, Measure 114's permit provision is "presumptively constitutional under . . . *Bruen*," because the case endorses 43 states' "shall-issue" concealed-carry laws, including Oregon's, which uses nearly identical language to Measure 114. *Id.* at 31. Fifth, Plaintiffs' takings claim is unlikely to succeed, both on the merits and "because the appropriate remedy" for a taking is damages, "not injunctive relief." *Id.* at 35.

Since this Court's TRO Order, no developments—whether in the relevant law or in the factual record developed through discovery—call any of those conclusions into question. On the law, a clear judicial consensus is emerging in support of this Court's LCM ruling, with "all but one" of the six federal district courts to consider the issue concluding that other states' parallel laws are constitutional. ECF 162 at 6 (collecting cases). The one outlier, which entered a preliminary injunction against Illinois's LCM restrictions, has been stayed pending appeal. *See*

*Barnett v. Raoul*, No. 3:23-CV-00141-SPM, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023), *stayed pending appeal*, No. 23-1825, ECF 30 (7th Cir. May 12, 2023). On the facts, Plaintiffs will present no credible evidence to support their numerous ahistorical, unsupported, and illogical claims—including that LCMs are commonly used for self-defense, that firearms capable of firing more than 10 rounds were popular before the late 19th century, and that LCMs have rarely been used in mass shootings. In contrast, Defendants will present clear evidence from credible experts that the challenged provisions do not implicate the Second Amendment and are consistent with our nation's historical traditions. Plaintiffs have had half a year to assemble a more complete record to support their challenge. They have failed. Intervenor-Defendant Oregon Alliance for Gun Safety (the "Alliance") respectfully requests that the Court deny Plaintiffs' challenges to Measure 114 at the conclusion of trial and enter judgment in favor of Defendants.

## II.    STATEMENT OF FACTS

The Alliance incorporates by reference background section set forth in the Trial Brief filed by State Defendants (the "State"), ECF 167, which the Alliance joins in full. Additionally, the Alliance will call three witnesses whose testimony will establish the following facts:

First, Professor Dennis Baron is a linguist and Professor of English at the University of Illinois. He will testify that he conducted an extensive analyses of the historical use of the terms "arms" and "accoutrements," focusing on the Founding Era through the Reconstruction Era. His testimony will show that in the vast majority of historical examples, "arms" referred to weapons and the term did not encompass devices for holding ammunition (then called "cartridge boxes" or "cartouch boxes"), which were considered "accoutrements." "Arms" referred to the weapons themselves, while "accoutrements" referred to a cartouch box or other ammunition storing device—the colonial equivalent of a modern-day magazine. According to the historical record,

"magazines"—including large-capacity magazines (although they were largely unknown during the Founding and Reconstruction Eras)—would not have been considered "arms" during these periods. *See Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *13 (D.R.I. Dec. 14, 2022) (crediting and relying on Professor Baron's opinion).

Second, Dr. Mackenzie Cook is a trauma surgeon at Oregon Health and Science University ("OHSU") in Portland, Oregon. Based on his firsthand experience and expertise treating shooting victims—who appear in his ER every shift—Dr. Cook will testify that patients who have been shot multiple times are significantly more likely to experience debilitating injuries or death. He will also testify that mass shootings in particular can overwhelm hospital resources, even at OHSU, one of the best-resourced facilities in the state. Finally, Dr. Cook's testimony will also show that there is a limit to what a surgeon can do, and that many of his patients experience debilitating injuries—both physical and psychological.

Third, Jenna Longenecker is an Oregonian who lost both of her parents to firearms. Her mother was killed by a mass shooter armed with an AR-15 and LCMs in the Clackamas Town Center attack. Her horrific murder exacerbated the depression of Ms. Longenecker's father, who took his own life with a firearm in 2016. Ms. Longenecker's testimony will demonstrate that the unprecedented societal harms that Measure 114 addresses—mass shootings and other gun violence—are all too real and reverberate far beyond the most immediate victims of gun violence.

### III.    ISSUES TO BE DECIDED BY THE COURT

1.   LCMs are not arms and are not commonly used for self-defense; they are dangerous and unusual accessories. They are also a dramatic technological change and are disproportionately used in mass shootings—an unprecedented societal concern. Measure 114, which was approved at the ballot box by a majority of Oregon voters, restricts the possession and sale of many LCMs in

Oregon. Is the LCM provision of the law consistent with the Second Amendment, the Takings Clause, and the Due Process Clause?

2.   Measure 114 also establishes a permitting system similar to Oregon's permitting system for concealed handguns, which was cited approvingly by the Supreme Court. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2123 n.1 (2022)). Is the permitting provision of the law consistent with the Second Amendment and the Due Process Clause?

## IV.   ARGUMENT

### A.   Plaintiffs' Challenge Against the LCM Provision Fails

This Court, along with five of the other six federal courts to consider the question post-*Bruen*, correctly determined that Plaintiffs were unlikely to prevail in demonstrating that regulating LCMs violates the Second Amendment. ECF 39; *Ocean State Tactical*, 2022 WL 17721175; *Bevis v. City of Naperville*, 22 C 4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, CV 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023); *Hanson v. District of Columbia*, CV 22-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023).[1] Plaintiffs' Second Amendment challenge fails because they cannot show that LCMs are covered by the constitutional text—which is their burden to prove. Even if they could carry that burden, their challenge also fails because Measure 114 is consistent with our nation's historical tradition of regulating dangerous firearms. Plaintiffs' takings claim is foreclosed by the

---

[1] As this Court has previously noted, the ruling in *Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty.*, 122CV02113CNSMEH, 2022 WL 4098998 (D. Colo. Aug. 30, 2022), was issued without a hearing or the defendants filing a response in opposition, and it provides no guidance on the constitutionality of large-capacity magazine restrictions post-*Bruen*.  ECF 39 at 15 n.10.

unavailability of injunctive relief for such claims and an on-point Ninth Circuit decision. And Plaintiffs have no viable due process claim, which is subsumed within their takings claim.

### 1.  Legal standard under *Bruen*

In *Bruen*, the Supreme Court established a new method for resolving Second Amendment challenges, dividing the analysis into two parts: (1) a textual inquiry to determine if "the Second Amendment's plain text covers an individual's conduct" regulated by the challenged law, 142 S. Ct. at 2129–30, and (2) a historical inquiry into whether the statute "is consistent with this Nation's historical tradition of firearm regulation," *id.* at 2130. Thus, Plaintiffs bear the initial "burden to show that large-capacity magazines fall within the purview of the Second Amendment." *Ocean State Tactical*, 2022 WL 17721175, at *12. Only if they succeed does the burden shift to Defendants on the history prong. *See Bruen*, 142 S. Ct. at 2135; *see also Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 914 (N.D. Cal. 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation . . . .").

### 2.  LCMs are not protected by the Second Amendment's plain text

The *Bruen* Court divided the threshold prong into three distinct questions, each tied to a "textual element" in the Second Amendment: "the people," "arms," and "keep and bear." 142 S. Ct. at 2134. As applied here, Plaintiffs must provide evidence to affirmatively answer three questions. First, are Plaintiffs part of "the people" protected by the Second Amendment? *Id*. Second, are LCMs "weapons 'in common use' today for self-defense"?[2] *Id.* (quoting *District of*

---

[2] Even if the Second Amendment protects lawful uses other than self-defense, like hunting, "individual self-defense is the *central component* of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (cleaned up); *see also Hunters United for Sunday Hunting v. Pa. Game Comm'n*, 28 F. Supp. 3d 340, 346 (M.D. Pa. 2014) (finding "no legal support for Plaintiffs' argument that Second Amendment protections extend to recreational hunting").

*Columbia v. Heller*, 554 U.S. 570, 627 (2008)). And third, does "the plain text of the Second Amendment protect[] [Plaintiffs'] proposed course of conduct," i.e., purchasing or possessing LCMs "for self-defense"? *Id.*

Plaintiffs cannot carry their burden on the textual prong. Unlike handguns, LCMs are not weapons and they are not commonly used for self-defense. Further, even if LCMs were weapons, they belong to a class of dangerous and unusual ones that the Second Amendment does not protect.

### a. Detachable LCMs are accessories, not arms

Measure 114 regulates both detachable and fixed magazines, but the vast majority of the affected magazines are detachable. *See* Measure 114 § 11(1)(d) (defining LCM as a "fixed or detachable magazine" but exempting significant categories of fixed LCMs). A detachable LCM is not an "Arm[]." U.S. Const. amend. II. It is a firearm accessory that is not necessary for a firearm to function—and thus not within the Second Amendment's plain text. That was this Court's conclusion in its TRO Order, ECF 39 at 20, and Plaintiffs will offer no evidence to convincingly rebut it. *See also Ocean State Tactical*, 2022 WL 17721175, at *13 ("[P]laintiffs have failed to meet their burden of establishing that [detachable] LCMs are 'Arms' within the textual meaning of the Second Amendment."). Plaintiffs submit at trial will call the Court's ruling into doubt.

A magazine is an "ammunition feeding device" for a firearm. Measure 114 § 11(b), (c); ECF 161 at 5 (Agreed-Upon Facts ## 44–48). A detachable magazine is one that can be removed from the firearm for loading or unloading. *Id.* An LCM is a magazine that accepts a large number of rounds. Fourteen states and the District of Columbia prohibit the sale, manufacture, transfer, or possession of LCMs. Giffords L. Ctr., *Large Capacity Magazines*, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/ (last visit May 9, 2023). Those 15 jurisdictions together contain over one-third of the U.S. population. *See* U.S. Census Bur., QuickFacts, https://www.census.gov/quickfacts/ (last visit

May 9, 2023). And the near-universal dividing line for detachable LCM capacity is ten rounds—the same number used by Measure 114. *Id.*[3]

Alone, a detachable LCM cannot be used as a "weapon[] of offence, or armour of defence," which is how *Heller* defined "Arms." 554 U.S. at 581 (cleaned up); *see also Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc) ("On its own, a magazine is practically harmless and poses no threat to life or limb."), *cert. granted, judgment vacated in light of Bruen*, 142 S. Ct. 2895 (2022). For the first time in their trial brief, Plaintiffs conjure a new definition of "arms," arguing that LCMs are arms simply because they "are instruments that facilitate armed self-defense." ECF 165 at 42. This new definition takes language from *Bruen* out of context. In reiterating that the meaning of "arms" in the Second Amendment "does not apply 'only [to] those arms in existence in the 18th century,'" the *Bruen* Court confirmed that "though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). This passage did not purport to redefine "arms" as any "instruments that facilitate armed self-defense," as Plaintiffs now contend. Such a broad understanding would sweep far beyond "weapons" and "armour," applying to not just firearm accessories (like holsters and gun safes) but practically every self-defense product imaginable— from burglar alarms to night-vision goggles. Nothing in *Bruen* suggests the Supreme Court departed from *Heller*'s far narrower definition of "Arms," on which countless courts have relied both before and after *Bruen*. *See, e.g.*, *United States v. Saleem*, --- F. Supp. 3d ---, No. 3:21-cr-

---

[3] The four exceptions set the limit at 17 rounds (Delaware), 15 rounds for handguns but 10 rounds for long guns (Illinois and Vermont), or 8 rounds for shotguns but 15 rounds for all other firearms (Colorado). Colo. Rev. Stat. § 18-12-301(2)(a)(I); Del. Code Ann. tit. 11, § 1469(a); 720 ILCS 5/24-1.10(a)(1); Vt. Stat. tit. 13, § 4021(e)(1).

00086-FDW-DSC, 2023 WL 2334417, at *8 (W.D.N.C. Mar. 2, 2023) ("[T]o receive Second Amendment protection, the instrument must be a bearable weapon for offense or defense."); *United States v. Royce*, No. 1:22-CR-130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) ("Arms are defined as 'weapons of offence, or armour of defense' and 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another . . . .'") (quoting *Heller*, 554 U.S. at 581); *Teter v. Connors*, 460 F. Supp. 3d 989, 999 (D. Haw. 2020) ("the Court agrees that butterfly knives are indeed bearable arms as that term was defined in Heller").

For example, in *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018), the court rejected a challenge to a federal law prohibiting possession of unregistered firearm silencers, 26 U.S.C. §§ 5845(a), 5861(d). The challengers claimed that silencers were "commonly used by law-abiding citizens for lawful purposes." *Cox*, 906 F.3d at 1186. But the court declined to reach the common-use question because silencers failed "a more basic question." *Id.* Invoking *Heller*'s definition of "Arms," the Tenth Circuit reasoned that a "silencer is a firearm accessory[,] . . . not a weapon in itself (nor . . . 'armour of defence')," so it "can't be a 'bearable arm' protected by the Second Amendment." *Id.*; *see also Royce*, 2023 WL 2163677, at *4 (same) (citing *Cox*, 906 F.3d at 1186); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) (same) (citing *Cox*, 906 F.3d at 1186); *Saleem*, 2023 WL 2334417, at *9 ("[S]ilencers, because they are not independently operable and do not serve any central self-defense purpose, are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection."); *United States v. Al-Azhari*, No. 8:20-cr-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) ("[A] silencer is not a bearable arm within the meaning of the Second Amendment.") (citing *Heller*'s interpret[ation of the] meaning of 'Arms,'" 554 U.S. at 581, and *Cox*, 906 F.3d at 1186). By itself, an LCM is no

more an "Arm" than a silencer, flash suppresser, or other accessory, which is precisely how manufacturers themselves market LCMs. *See Ocean State Tactical*, 2022 WL 17721175, at *13 n.26.

A second reason why detachable LCMs are not "Arms" within the meaning of the Second Amendment is that they are not necessary for any firearm to effectively function. *See Ocean State Tactical*, 2022 WL 17721175, at *13 ("To the ordinary reader, magazines themselves are neither firearms nor ammunition. They are *holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling."); *see also Royce*, 2023 WL 2163677, at *4 ("A silencer is not necessary to make a firearm operable. Rather a silencer is simply a means to reduce sound omitted from a firearm.").  Indeed, Professor Baron's testimony will show that the equivalent of magazines in the Founding and Reconstruction Eras were not referred to as "arms," but as "accoutrements." Although some firearms require a detachable magazine to fire bullets, Plaintiffs will not present evidence that any firearm requires a *large-capacity* magazine to function. *See Ocean State Tactical*, 2022 WL 17721175, at *12 ("[A] firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful."); *see also* ECF 161 at 6 (Agreed-Upon Facts ## 69–71). Because detachable LCMs are unnecessary for a firearm to operate, they are properly considered accessories, not "Arms" in themselves, and thus fall outside the Second Amendment's protection.

Like silencers, scopes, or bump stocks, detachable LCMs provide an additional feature to a firearm—the ability to fire more bullets in rapid succession—but they are not *necessary* for the firearm to function as designed. What one court said of a silencer is equally true of an LCM: it "does not serve any intrinsic self-defense purpose" and "is not useful independent of its attachment

to a firearm." *Hasson*, 2019 WL 4573424, at *4; *accord Ocean State Tactical*, 2022 WL 17721175, at *12 ("LCMs, like other accessories to weapons, are not used in a way that 'casts at or strikes another.' . . . 'You can't hurt anybody with one unless you hit them over the head with it.'") (cleaned up) (quoting *Heller*, 554 U.S. at 582, and *Hasson*, 2019 WL 4573424, at *2). That some firearms may be sold in tandem with LCMs is immaterial. If retailers began including silencers as standard with all firearm sales, such bundling would not transform a silencer from an accessory into an "Arm" for Second Amendment purposes. The same principle applies to LCMs.

Plaintiffs' reliance on *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), and *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), is misplaced. Neither case holds that LCMs are protected "Arms" as a matter of constitutional *text*. Rather, each court addressed whether the challenged laws "regulate[d] conduct *historically* understood to be protected by the Second Amendment"—a separate question from *Bruen*'s text-focused threshold inquiry. *Jackson*, 746 F.3d at 967 (emphasis added) (cleaned up); *see also Fyock*, 779 F.3d at 997 (considering "whether the regulation resembled prohibitions *historically* exempted from the Second Amendment") (emphasis added). In *Jackson*, the court upheld a restriction on hollow-point bullets but concluded that "prohibitions on the sale of ammunition do not fall outside 'the historical understanding of the scope of the [Second Amendment] right.'" *Id.* at 968 (quoting *Heller*, 554 U.S. at 625). The court reasoned that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* at 967 (cleaned up). This is consistent with the principle that "'[t]he right to keep arms . . . necessarily involves the right . . . to purchase and provide ammunition suitable for such arms'"—as opposed to ammunition-feeding accessories. *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc) (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)). Plaintiffs' reliance on *Jackson* ignores the atextual nature of its holding, as well as

ALLIANCE'S TRIAL BRIEF - 10

the significant "distinction between bullets and magazines, between ammunition and the *holder* of ammunition." *Ocean State Tactical*, 2022 WL 17721175, at *12 n.25 (distinguishing *Jackson*).

Similarly, the *Fyock* plaintiffs challenged an ordinance banning LCMs and the Ninth Circuit upheld the district court's denial of a preliminary injunction. 779 F.3d at 994. In dicta, the court assumed that, because handguns are commonly possessed for self-defense, "there must also be some corollary, albeit not unfettered, right to possess the magazines *necessary* to render those firearms operable." *Id.* at 998 (emphasis added) (citing *Jackson*, 746 F.3d at 967). But the court expressly did not reach whether LCMs were "arms" as a matter of text or even history. *See id.* at 997 n.3 (noting that it was "bypassing the historical analysis step and assuming without deciding that [the challenged LCM ordinance] burdens the Second Amendment"); *see also Ocean State Tactical*, 2022 WL 17721175, at *12 n.25 (noting that *Fyock* contains "no discussion of whether LCMs are 'Arms'").

Thus, no circuit precedent addresses the threshold question under *Bruen* of whether "the plain text of the Second Amendment protects" LCMs. 142 S. Ct. at 2134. For the reasons above, the answer to that question is no. Because detachable magazines are not "Arms" at all, the Court should at the very least conclude that Measure 114's application to detachable magazines does not implicate the text of the Second Amendment. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 862 (9th Cir. 2017) ("We must retain any portion of a statute which is (1) 'constitutionally valid,' (2) 'capable of functioning independently' from any unconstitutional provision, and (3) 'consistent with Congress' basic objectives in enacting the statute.'") (quoting *United States v. Booker*, 543 U.S. 220, 258–59 (2005)); Measure 114 § 12 (severability clause).

### b.  LCMs are not necessary, nor typically used, for self-defense

An independent reason why LCMs fall outside the "plain text of the Second Amendment" applies to detachable and fixed LCMs alike: even if LCMs were weapons (or a component of a

weapon), they are not "*self-defense* weapons." *Bruen*, 142 S. Ct. at 2143 (emphasis added). As this Court held in its TRO Order, there is no evidence that LCMs are "'in common use' for lawful purposes like self-defense." ECF 39 at 24 (cleaned up) (quoting *Heller*, 554 U.S. at 624). Numerous district courts have agreed. Criticizing this conclusion, Plaintiffs have contended that the Court erred in distinguishing "between magazines *owned* by law-abiding citizens, and magazines *used* by law-abiding citizens" for self-defense. ECF 83 at 19; *see also* ECF 84 at 24; ECF 161 at 17; ECF 165 at 47–48.

They are mistaken. The Supreme Court has repeatedly emphasized that "individual self-defense 'is the *central component*' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599). For that reason, the Second Amendment "guarantee[s] the individual the right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. Reaffirming *Heller* and *McDonald*, the *Bruen* Court made clear that the Second Amendment's text covers "weapons 'in common use' today for self-defense." 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627); *see also Caetano v. Massachusetts*, 577 U.S. 411, 416–17 (2016) (Alito, J., concurring in judgment) (rejecting proposition that Second Amendment does not protect stun guns because they "were not in existence at the end of the 18th century"; "the same is true for the weapons most *commonly used today for self-defense*, namely, revolvers and semiautomatic pistols") (emphasis added). The Second Amendment protects self-defense weapons only, not machineguns or other weapons "most useful in military service." *See Heller*, 554 U.S. at 627. Thus, the purpose of the "common use" inquiry is to determine whether "there is a link between LCMs and the use of firearms for self-defense." *Ocean State Tactical*, 2022 WL 17721175, at *15 (concluding there is not); Hanson, 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023) (same).

The operative question under *Bruen*, then, is not how many LCMs *exist* in the United States, but whether LCMs are "in common *use* today *for self-defense*." 142 S. Ct.  at 2134 (emphasis added) (cleaned up); *see also United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *4 (S.D. Cal. Aug. 30, 2022) (noting that *Bruen* asks "if the type of weapon at issue, handguns, was in 'common use' today for self-defense"); *Hanson*, 2023 WL 3019777, at *7 (same); *Ocean State Tactical*, 2022 WL 17721175, at *15 (same). More specifically, because Measure 114 does not restrict magazines of ten or fewer rounds, the relevant inquiry is how common and necessary it is for a civilian to consecutively fire more than ten bullets in self-defense. *See* ECF 39 at 24 (finding that, on the TRO record, LCMs "are rarely used by civilians for self-defense"). As Judge Berzon wrote in her *Duncan* concurrence (joined by five other judges), "*Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon." *Duncan*, 19 F.4th at 1127 (Berzon, J., concurring); *see also Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (framing "common use" question as "whether these weapons are commonly used or are useful specifically for self-defense"). This Court asked the right "common use" question in its TRO Order, and Plaintiffs' objections misread *Bruen* and *Heller*.

This Court also reached the right answer in concluding that LCMs are not in common use today for self-defense. ECF 39 at 24. Many courts, including the Ninth Circuit, have recognized that LCMs provide little if any benefit for individual self-defense. *Duncan*, 19 F.4th at 1105 (majority) ("[T]he record here, as in other cases, does not disclose whether the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home."); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 118 (3d Cir. 2018) ("The record here demonstrates that LCMs are not well-

suited for self-defense."); *Heller II*, 670 F.3d at 1262 ("[P]laintiffs present hardly any evidence that semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport"); *State v. Misch*, 256 A.3d 519, 553 n.29 (Vt. 2021) (per curiam) ("[N]o one has come forward with even anecdotal examples of any LCM being necessary for individual self-defense."); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020) ("[T]estimony at trial established that '[i]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more.'").[4] Recent decisions agree with this pre-*Bruen* case law. *Ocean State Tactical*, 2022 WL 17721175, at *14 ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not."); *Hanson*, 2023 WL 3019777, at *8 (concluding that "that law-abiding individuals do not use LCMs for self-defense because incidents where a civilian actually expends more than ten bullets in self-defense are vanishingly rare.") (cleaned up).

Plaintiffs will offer no credible evidence at trial to rebut the conclusions of these courts. The best they can offer are a few isolated and thinly-sourced anecdotes and the say-so of their most obviously biased witnesses.[5] Their arguments overlook the Supreme Court's clear and repeated instruction that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited."

---

[4] *Bruen* abrogated many of these cases to the extent they applied means-end scrutiny in the two-step approach adopted by nearly every circuit after *Heller*. *See* 142 S. Ct. at 2127. But the Supreme Court's rejection of the second step does not undermine the courts' analysis of LCMs' utility for self-defense.

[5] In its response to Plaintiffs' motions for preliminary injunction, the Alliance explained in detail why most of Plaintiffs' purported experts were either unqualified or obviously biased (or both). *See* ECF 127 at 28–30. The Alliance stands by this criticism of Plaintiffs' experts, with one minor correction: Although the Alliance previously noted that Massad Ayoob seemingly copied verbatim portions of Stephen Helsley's report, *id.* at 10, upon a closer examination, it appears that it was actually the other way around— Helsley copied Ayoob. Plaintiffs have withdrawn Helsely as a witness, and Ayoob's serious shortcomings as an expert are evident for other reasons, including his obvious bias.

*Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *see also id.* at 2162 (Kavanaugh, J.,

concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations.")

(quoting *Heller*, 554 U.S. at 636). One important limitation on the right is that it protects only

weapons "'in common use' today for self-defense"—the "'*central component* of the Second

Amendment right.'" *Id.* at 2134, 2135 (majority) (cleaned up) (quoting *Heller*, 554 U.S. at 627,

599). Because LCMs are neither commonly used nor *useful* for self-defense, Plaintiffs cannot meet

their burden of demonstrating that LCMs are protected by the Second Amendment's plain text.

### c.  LCMs are dangerous and unusual

A third reason places LCMs outside the Second Amendment's textual scope: there is no

Second Amendment right to bear "dangerous and unusual" arms. *Heller*, 554 U.S. at 627; *Bruen*,

142 S. Ct. at 2128. LCMs are both.

The testimony of the State Defendants' witnesses at trial will demonstrate the modern

phenomena of mass shootings and the critical role that LCMs play in increasing their deadliness.

In addition, Dr. Mackenzie Cook, a trauma surgeon who treats many victims of gun violence in

Oregon, will testify regarding the challenges medical providers face in treating patients with

multiple bullet wounds—which are the inevitable byproduct of LCMs because they enable

attackers to fire more bullets more rapidly. Dr. Cook's testimony will establish that the more

bullets fired, the more likely a victim is to receive a critical injury. And if a victim is hit by multiple

bullets, the wounds can interact in ways that dramatically increase the risk of disability or death.

Additionally, mass shootings—which generally involve LCMs—can overwhelm trauma centers,

forcing doctors to make difficult decisions about how to use their limited resources. Nor are those

who are gunned down the only victims of mass shootings. Jenna Longenecker will testify about

how losing her mother in the Clackamas Town Center Shooting—in which the killer used an AR-

15 rifle and multiple 30-round magazines—changed her life forever. Over a decade later, she still deals with the psychological trauma of that violent act every day.

Courts examining LCM restrictions pre-*Bruen* recognized the serious danger posed by LCMs. The First Circuit described how semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Similarly, the Fourth Circuit recognized that LCMs are dangerous even when not combined with assault rifles, describing how handguns equipped with LCMs were used in mass shootings at Virginia Tech (32 dead and 17 wounded); Fort Hood, Texas (13 killed and over 30 wounded); Binghamton, New York (13 killed and four wounded); and Tucson, Arizona (six killed and 13 wounded, including a member of Congress). *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Nothing in *Bruen* casts doubt on the dangerous lethality of LCMs.

As described above, LCMs are not commonly used for self-defense (or, indeed, any lawful purpose) and as such are unusual. Plaintiffs assert that many LCMs are in circulation, ECF 161 at 17, but federal courts have considered and convincingly rejected the argument that the Second Amendment applies "to each and every weapon deemed sufficiently popular—no matter how violent or dangerous that weapon." *Kolbe*, 849 F.3d at 141; *see also Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015). As *Friedman* notes, submachine (or "Tommy") guns were "all too common" during Prohibition before being federally prohibited in 1934. 784 F.3d at 408. The Tommy gun's "popularity didn't give it a constitutional immunity," *id.*, and *Heller* expressly approved of the "National Firearms Act's restrictions on machineguns." 554 U.S. at 624.

Relying on a weapon's popularity at the time legislation was passed would be nonsensically circular, as Judge Easterbrook observed: "Machine guns aren't currently owned for lawful purposes today because they are illegal . . . . Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so it isn't commonly owned." *Friedman*, 784 F.3d at 409.[6]

This logic applies with equal force post-*Bruen*. The constitutionality of firearm regulations does not depend on how successful marketing campaigns are in encouraging gun owners to adopt a particular technology. The question of *how* LCMs are actually used must factor into the analysis of whether they are unusual. As explained above, LCMs are rarely if ever used for self-defense, but commonly used in mass shootings. Accordingly, they are dangerous and unusual devices, and thus fall outside the Second Amendment's textual scope.

### 3.  Measure 114's LCM restrictions are consistent with historical tradition

For the reasons above, Plaintiffs cannot meet their burden to show Measure 114's LCM provision is covered by the Second Amendment's plain text. Even if they could, however, the State persuasively explains how the evidence at trial will show that Measure 114 is consistent with a historical tradition of arms regulation. *See* ECF 167. Indeed, since this Court concluded that plaintiffs were unlikely to succeed on the merits of their historical argument, a chorus of federal district courts have agreed. *Del. State Sportsmen's Ass'n.*, 2023 WL 2655150, at *13; *Bevis*, 2023

---

[6] Plaintiffs' mistaken understanding of common use also undergirds the only post-*Bruen* federal court decision to conclude that a law regulating LCMs likely violated the Second Amendment. *See Barnett v. Raoul*, No. 3:23-CV-00141-SPM, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023) (erroneously concluding that there need only be 200,000 of a given arm in circulation for it to be in "common use"), *stayed pending appeal*, No. 23-1825, ECF 30 (7th Cir. May 12, 2023). Judge Easterbrook's machine gun example is especially apt in displaying the flaw in this reasoning. *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,* CV 22-951-RGA, 2023 WL 2655150, at *5 (D. Del. Mar. 27, 2023) (noting that, as of 2016, there are 176,000 civilian-owned machine guns in the United States and plaintiffs' argument would upend almost a century of laws regulating civilian acquisition of machine guns).

WL 2077392, at *14-16; *Herrera*, 2023 WL 3074799, at *7; *Hanson*, 2023 WL 3019777, at *12; *cf. Ocean State Tactical*, 2022 WL 17721175, at *14, 16 (concluding that plaintiffs' historical experts, including Ashley Hlebinsky, were not credible, but declining to reach question of historical tradition because the text of the Second Amendment did not apply to LCMs). Nevertheless, Plaintiffs offer the same arguments that they raised in their motion for a temporary restraining order. *See* ECF 161 at 18–19. The Court should reject them once again.

The Court should also reject Plaintiffs' new argument that the Court may not even reach the history prong because "the historical work has already been done." ECF 165 at 46. Once again misreading *Bruen*, Plaintiffs contend that "the only question after *Bruen* is whether arms are 'typically possessed by law-abiding citizens for lawful purposes,'" *id.* (quoting *Heller*, 554 U.S. at 625), and, if so, "then they are not 'dangerous and unusual,' so the state may not ban them," *id.* (quoting *Bruen*, 142 S. Ct. at 2128) (emphasis omitted). Plaintiffs' attempt to short-circuit the historical analysis finds no support in *Bruen*, which makes clear that the "common use" question goes to the textual question of whether the plaintiff's conduct is constitutionally protected at all, not the history prong. *See Bruen*, 142 S. Ct. at 2128 ("[*Heller*] found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'") (quoting *Heller*, 554 U.S. at 627); *Bevis*, 2023 WL 2077392, at *9 n.7 ("[B]ans on weapons not in common use fall outside the Second Amendment's text only protecting certain 'arms.'"). Although the Second Amendment's text does not protect LCMs for the reasons explained above, if LCMs were "presumptively protected" as a textual matter, *Bruen* leaves no doubt as to the next step: to determine whether Measure 114 is "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2117, 2130. The Court should decline

Plaintiffs' invitation to bypass the history prong altogether, just as other courts have refused to do. *See, e.g.*, *Del. State Sportsmen's Ass'n*, 2023 WL 2655150 at *8 ("Plaintiffs argue that, once a weapon is found to be 'in common use' within the meaning of the Second Amendment, it cannot be regulated, and no historical analysis is necessary. I disagree.") (cleaned up).

### 4. Plaintiffs cannot succeed on their Due Process and Takings Clause claims

Finally, Plaintiffs' challenge to the LCM provision based on the Takings and Due Process Clauses fails for three reasons. First, as this Court noted in its TRO Order, a takings claim generally does not provide a basis for injunctive relief. ECF 39 at 34–35. Because the Takings Clause provides that "private property" may not be "taken for public use, *without just compensation*," U.S. Const. amend. V (emphasis added), the "proper remedy for a taking" is an award of "damages—not injunctive relief." *Prof'l Beauty Fed'n of Cal. v. Newsom,* No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020). As the Supreme Court explained in *Knick v. Township of Scott*, "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." 139 S. Ct. 2162, 2176 (2019). Oregon has an adequate, effective procedure to compensate takings of property. *See* Or. Const. art. I, § 18; O.R.S. 35.015(6). Even if Plaintiffs had a viable takings claim (which they do not), their sole remedy would be damages, not injunctive relief. Yet Plaintiffs do not seek compensatory damages—only declaratory and injunctive relief, and nominal damages. *See* ECF 158 at 52; ECF 67 at 42.

Second, Plaintiffs' takings claim here has already been rejected by the en banc Ninth Circuit. *See Duncan*, 19 F.4th at 1111–13. Although *Duncan* was vacated in light of *Bruen*'s new

Second Amendment standard, nothing in *Bruen* affected the court's Takings Clause analysis.[7] *See, e.g.*, *Kornahrens v. Evatt*, 66 F.3d 1350, 1356–57 (4th Cir. 1995) (finding that a decision vacated on other grounds was still "instructive" and "persuasive").

In *Duncan*, the plaintiffs challenged an LCM regulation that allowed the owners of prohibited magazines four choices: (1) modify the magazine to accept ten rounds or fewer; (2) sell it to a firearms dealer; (3) remove it to another state; or (4) turn it over to a law enforcement agency for destruction. 19 F.4th at 1111–12. The en banc court concluded that this was neither a physical nor a regulatory taking. *Id.* at 1112 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992); *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012)). In fact, *Duncan* rejected the precise arguments raised by Plaintiffs in this case. *Compare* ECF 161 at 23 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982); *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015), *with Duncan*, 19 F.4th at 1112 ("We do not read the Supreme Court's decisions in *Loretto* and *Horne* as expansively as Plaintiffs do.") (cleaned up). Measure 114 affords the same options to owners of LCMs as the California law challenged in *Duncan*. Plaintiffs point to no new authority that would warrant a different result.[8]

---

[7] Even the dissents in *Duncan* did not take issue with the majority's Takings Clause Analysis. *See Duncan*, 19 F. 4th at 1141–59 (Bumatay, J., dissenting); *id.* at 1159–73 (Vandyke, J., dissenting).

[8] Plaintiffs' suggestion that this Court ignore *Duncan*'s Takings Clause holding because it was vacated by *Bruen* on other grounds makes little sense. ECF 165 at 61. While it's true that "a decision that has been vacated has no precedential authority," *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) (cleaned up), a vacatur based on independent grounds *does* have persuasive value in this circuit. *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n. 14 (9th Cir. 2014) ("[D]ecisions vacated for reasons unrelated to the merits may be considered for the persuasive of their reasoning."); *Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998), *aff'd sub nom. Saenz v. Roe*, 526 U.S. 489 (1999) (noting that prior decision "remains viable as persuasive authority, notwithstanding the Supreme Court's vacatur."); *In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (following as persuasive authority a decision vacated by the Supreme Court on other grounds).

Third, Plaintiffs have no cognizable due process claim because any such claim is preempted by their takings claim. In general, "if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997). The Ninth Circuit has held that, where the allegations in a plaintiff's "complaint fall[] within one of th[e three] categories" of takings—i.e., permanent physical invasions, deprivation of all economically beneficial use, and regulatory takings under *Penn Central Transp. Co. v. N.Y.C.*, 438 U.S. 104 (1978)—"the claim must be analyzed under the Fifth Amendment" Taking Clause, "whether or not it proves successful." *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855–56 (9th Cir. 2007). The exception is for when a property "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005)). Measure 114's LCM provision plainly serves the powerful state interest of "enhanc[ing] the safety of residents" by restricting magazines that "increase casualties" in mass shootings and other "serious violent crimes." Measure 114, Preamble. The Ninth Circuit recognized in *Duncan* that California's LCM restriction are a "reasonable fit for the compelling goal of reducing gun violence." 19 F.4th at 1111. The *Lingle* exception does not apply, so Plaintiffs' due process claim is "subsumed by the Takings Clause." *Colony Cove Properties, LLC v. City of Carson*, 640 F.3d 948, 960 (9th Cir. 2011).

**B.    Plaintiffs' Challenge Against the Permitting Provision Fails**

Plaintiffs' challenge to Measure 114's permitting provision is also based on a misreading of *Bruen*. The Supreme Court was careful to describe the difference between permissible "shall issue" permitting regimes and impermissible "may issue" regimes. The plain text of Measure

114—and *Bruen* itself—establishes that it is in the former category, and therefore passes constitutional muster.

### 1. Measure 114 mirrors laws that were approved by the *Bruen* Court

Measure 114 is modeled after Oregon's existing Concealed Handgun License ("CHL") law, and uses nearly identical language and criteria. *Compare* Measure 114 § 4(3)(a) ("the permit agent shall issue the permit-to-purchase"), *with* O.R.S. 166.291(1) (the "sheriff of a county . . . shall issue the person a concealed handgun license"). The *Bruen* majority included Oregon's CHL law in a list of "shall issue" permitting regimes that do not run afoul of the Second Amendment. *Bruen*, 142 S. Ct. at 2123 n.1. Justice Kavanaugh's concurrence (joined by the Chief Justice) was even more specific: Oregon, along with 42 other states with shall-issue regimes, "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). Unlike the New York law that *Bruen* invalidated, "those shall issue regimes to not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense." *Id.*

In dissent, Justice Breyer observed that Oregon's CHL law appears to allow "some degree of discretion" to the permitting authority. *Id.* at 2172 (Breyer, J., dissenting). Justice Breyer was certainly correct that Oregon's CHL law provides for certain situations in which the sheriff must decline to issue a permit, but has some discretion to determine whether some specific disqualifying criteria apply. *See* O.R.S. 166.291(1)(a)–(p). And those criteria are markedly similar to the criteria in Measure 114. *See* Measure 114 § 4(1)(b)(A)–(E) . Despite Justice Breyer's dissent, the majority retained Oregon's CHL law in its list of constitutionally valid "shall issue" regimes. The *Bruen*

Court evidently did not see Oregon's CHL law as, to use Plaintiffs' phrase, an "impermissible shall-issue-in-name-only regime." ECF 84 at 16.

Plaintiffs' contention that Measure 114 vests permit agents with "unconstitutional subjective discretion" is impossible to square with *Bruen*'s blessing of Oregon's CHL law. *Id.* at 17. The provision of Measure 114 that Plaintiffs say is too discretionary allows for denial of a permit only if there are "reasonable grounds" to find that "the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or . . . past pattern of behavior involving unlawful violence or threats of unlawful violence." Measure 114 §§ 4(1)(b)(C), 5(2). But this mental-health review provision is nearly identical to Oregon's constitutional CHL law, which authorizes denial of a license "if the sheriff has reasonable grounds"—the same reasonableness standard as Measure 114—to find that "the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large"—the same substantive disqualifier as Measure 114—"as a result of the applicant's mental or psychological state or . . . past pattern of behavior involving unlawful violence or threats of unlawful violence"—the same criteria as Measure 114. O.R.S. 166.293(2). Thus, Measure 114 mirrors the text of a CHL law that *Bruen* approved. Plaintiffs' argument that Measure 114's permit provision runs afoul of *Bruen* is foreclosed by *Bruen* itself.

Measure 114's mental-health review provision is also similar to the requirements of a permitting system in Connecticut, which the *Bruen* Court also approved. Connecticut's law mandates that the permitting agent determine whether an applicant is a "suitable person to receive a permit [to carry a pistol or revolver in the state]." Conn. Gen. Stat. § 29–28(b). The statute's "suitable person" requirement precludes permits for "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon."

*Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984) (cleaned up). In *Bruen*, the majority recognized that Connecticut's law has "discretionary criteria." 142 S. Ct. at 2123 n.1; *see also id.* at 2172 (Breyer, J., dissenting). Indeed, Connecticut's "suitable person" standard appears to afford substantially more discretion than Measure 114, which requires a nexus to mental or psychological health or past violent behavior. Nevertheless, the *Bruen* Court still included Connecticut in the list of "shall-issue" states whose laws were not constitutionally suspect. *Id.* at 2123 n.1 (majority).[9]

Plaintiffs' discretion argument only makes sense if one supposes that the *Bruen* majority not only failed to read closely the text of the very statutes it cited as valid but also ignored the dissent's specific call-outs of Oregon and Connecticut. A far more likely explanation—and one supported by a text of *Bruen* and the relevant statutes—is that the majority and concurring Justices viewed the two statutes as a presumptively constitutional "shall issue" regimes, despite their allowance for a modicum of discretion to determine whether a given case satisfies the specific disqualifier standard. Measure 114 presents no meaningful distinctions from the concealed carry laws approved by the *Bruen* Court. And like those statutes, it is constitutional.[10]

Finally, even if the Court agrees with Plaintiffs that Measure 114's mental-health review provision affords too much discretion to permit agents, the proper remedy would not be to

---

[9] It is unsurprising the Court allows this type of discretion. The *Heller* Court held that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." 554 U.S. at 626, 627 n.26. And in *Kanter v. Barr*, then-Judge Barrett explained that regulatory schemes that consider whether an applicant's individual "history or characteristics make him likely to misuse firearms" are less suspect than categorical prohibitions. 919 F.3d 437, 468–69 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111.

[10] It is of no constitutional consequence that Measure 114 allows a permit agent—rather than a court—to make the issuance decision in the first instance. Measure 114's robust appeal provisions ensure that an aggrieved party can quickly appeal to a county circuit court, who will then (within 15 days) engage in the same de novo analysis incorporated into the CHL law. Measure 114 § 5(8). To the extent Plaintiffs suggest that a court must make the ultimate denial decision, Measure 114's provision for immediate de novo judicial review surely suffices. *See, e.g.*, *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997) (provision for district court's de novo review of agency sanction "satisfies the strictures of procedural due process").

invalidate the permitting scheme in its entirety. Measure 114 contains a severability clause which expresses the voters' intent, should "any provision of [the Measure] . . . [be] held invalid," to give effect to "other provisions . . . of this Act which can be given effect without the invalid provision." Measure 114 § 12. Because the permitting system is readily operable without the mental-health review provision, and because the voters "would have adopted" Measure 114 without it, *id.*, if the Court finds that provision unconstitutional, it must sever it from the law while upholding the remainder. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, (1987) ("The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.") (cleaned up).

## 2.    Plaintiffs misunderstand the nature of their facial challenge

Plaintiffs argue that Measure 114 will create a doomsday scenario where prospective gun buyers face interminable delays that functionally deprive them of the ability to purchase any new firearms. ECF 158 ¶ 127 (alleging that "delay is baked into" the permitting regime); ECF 165 at 38 (describing the permitting regime as "Kafkaesque"). But the evidence will show that Plaintiffs' parade of horribles is divorced from both the text of the statute and the facts on the ground.  It is also irrelevant to their facial challenge, in which the statutory text alone controls. *See Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020) ("[W]hen reviewing a facial challenge, we are limited to reviewing the text of the [statute] itself . . . . How the statute has been interpreted and applied by local officials is the province of an as-applied

challenge, which is not before us today.").[11] Unlike their facial attack on the danger-to-self-or-others provision, Plaintiffs' challenge to the permitting system as a whole fundamentally misunderstands this principle.

"Facial challenges are disfavored for several reasons." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). In *Washington State Grange*, the Supreme Court highlighted three reasons why facial challenges are disfavored, all of which apply here.

First, "[c]laims of facial invalidity often rest on speculation." *Wash. State Grange*, 552 U.S. at 450. Plaintiffs' challenge is rife with exactly such speculation. *See* ECF 67 ¶ 42 (alleging that permit applicants "invite[] a fishing expedition"); ECF 84 at 16–18. They argue that a "permit agent can sit on the application for 30 days after making a determination." ECF 165 at 13. Their hypothetical imagines that a permitting agent would intentionally slow the review of applications and distorts a provision with the very opposite purpose—to ensure that applications are processed promptly. Plaintiffs' cynicism runs counter to the rule that "[g]overnment officials are presumed to act conscientiously in the discharge of their duties." *See Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) (cleaned up) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."). It also overlooks that many states provide far longer time limits for issuance of concealed carry licenses. *See, e.g.*, Colo. Rev. Stat. § 18-12-206(1) (90-

───────────────

[11] Plaintiffs cannot mount an as-applied challenge; the permitting provision has not gone into effect. *See Arnold v. Kotek*, 370 Or. 716, 524 P.3d 955 (2023).

day limit); Ill. Comp. Stat., ch. 430, § 66/10(e) (same); *see also Bruen*, 142 S. Ct. at 2123 n.1 (citing approvingly Colorado and Illinois's permitting regimes).

Second, "[f]acial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange*, 552 U.S. at 450 (cleaned up). Plaintiffs ask this Court to declare a regulatory scheme invalid based on baseless speculation as to how it will operate in practice. Their fact-specific arguments are premature. Justice Kavanaugh underscored this principle in *Bruen*, along with the appropriate remedy for an alleged violation: "[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an *as-applied challenge* if a shall-issue licensing regime does not operate in that manner in practice." 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (emphasis added).

Last, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. The Constitution exists to provide a structure for democratic governance, as well as to protect individual rights. "A ruling of unconstitutionality frustrates the intent of the elected representatives of the people," or, as in this case, the people themselves. *Id.* at 450 (cleaned up). Before a single person can plausibly claim an actual constitutional deprivation stemming from the permit system, Plaintiffs ask this Court to enjoin a law supported a majority of Oregon voters, who determined that its common-sense provisions will help keep their loved ones safe from gun violence. Plaintiffs' facial challenge should be rejected.

## V.    CONCLUSION

Measure 114 is constitutional, and the Court should so find at the conclusion of the trial.

DATED this 15th day of May, 2023.

PACIFICA LAW GROUP LLP

*s/ Zachary J. Pekelis*

Jessica A. Skelton, OSB #102714
Zachary J. Pekelis, *Pro Hac Vice*
Kai A. Smith, *Pro Hac Vice*
W. Scott Ferron, *Pro Hac Vice*

*Attorneys for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

**CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2)**

This brief complies with the applicable page-count limitation under LR 7-2(b) because it contains fewer than 27 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 15th day of May, 2023.

PACIFICA LAW GROUP LLP

*s/ Zachary J. Pekelis*

Jessica A. Skelton, OSB #102714
Zachary J. Pekelis, *Pro Hac Vice*
Kai A. Smith, *Pro Hac Vice*
W. Scott Ferron, *Pro Hac Vice*

*Attorneys for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2023, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 15th day of May, 2023.

_____
Erica Knerr