Shawn M. Lindsay
shawn@jurislawyer.com
Daniel J. Nichols
dan@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorneys for Eyre Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
| Plaintiffs, | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
| | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| v. | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| TINA KOTEK, et al., | |
| Defendants. | CONSOLIDATED CASES |
| MARK FITZ, et al., | **PLAINTIFFS' *DAUBERT* MOTIONS** |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| DANIEL AZZOPARDI, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

LR 7-1 CERTIFICATE ................................................................................................... 1

MEMORANDUM ........................................................................................................... 2

INTRODUCTION ........................................................................................................... 2

LEGAL STANDARDS ................................................................................................... 3

ARGUMENT ................................................................................................................... 5

I.      Several Of Defendants' Experts Offer Testimony That Is Legally Impermissible
        And/Or Irrelevant Under Binding Supreme Court Precedent ................................. 5

        A.      Some of Defendants' Historical Experts Offer Impermissible Legal-
                Interpretation or Legal-Conclusion Testimony ........................................ 5

        B.      Some of Defendants' Experts Offer Testimony that Is Not Relevant to
                the Legal Inquiry that *Bruen* Requires this Court to Conduct ............... 9

II.     Some of Defendants' Experts Have Further Flaws Under *Daubert* ................... 15

        A.      Dennis Baron's Testimony Lacks a Proper Foundation ....................... 15

        B.      Dr. Siegel's Opinions That Discretionary Denials of Permits Reduce
                Gun Violence Is Unsupported ............................................................... 19

        C.      Kevin Sweeney's Testimony Relies Entirely on Incomplete and
                Inaccurate Data ..................................................................................... 21

CONCLUSION ............................................................................................................. 23

CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(b)(2)

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Int'l Longshoremen's Union Loc. No. 10*,
    966 F.2d 443 (9th Cir. 1992) ............................................................................ 2, 5

*Arjangrad v. JPMorgan Chase Bank, N.A.*,
    2012 WL 1890372 (D. Or. May 23, 2012)............................................................ 23

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*,
    2018 WL 4688345 (D.N.J. Sept. 28, 2018) ......................................................... 12

*Barrett v. Rhodia, Inc.*,
    606 F.3d 975 (8th Cir. 2010) ............................................................................. 21

*Bordelon v. Airgas USA, LLC*,
    603 F.Supp.3d 946 (D. Or. 2022) ......................................................................... 3

*Bridgetown Condo. Homeowner's Ass'n v. Ford Dev., Inc.*,
    2009 WL 1743759 (D. Or. June 18, 2009) ......................................................... 6, 7

*Burkhart v. Wash. Metro. Area Transit Auth.*,
    112 F.3d 1207 (D.C. Cir. 1997).............................................................................. 5

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016).................................................................................. 3, 11, 14

*Chaney v. Wadsworth*,
    2015 WL 4388420 (D. Mont. July 15, 2015)............................................... 2, 5, 6, 7

*Crow Tribe of Indians v. Racicot*,
    87 F.3d 1039 (9th Cir. 1996) ................................................................................ 6

*Daubert v. Merrell Dow Pharms. Co.*,
    509 U.S. 579 (1993)......................................................................................... 3, 4

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................................................................................... *passim*

*Duncan v. Becerra*,
    366 F.Supp.3d 1131 (S.D. Cal. 2019) ................................................................. 13

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021)....................................................................... 10, 12

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022)............................................................................... 4

*FTC v. BurnLounge, Inc.*,
   753 F.3d 878 (9th Cir. 2014) ................................................................. 3

*Fyock v. City of Sunnyvale*,
   25 F.Supp.3d 1267 (N.D. Cal. 2014) .................................................... 12

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ............................................................... 12

*Gen. Elec. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................ 4

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ............................................................ 5, 8

*Hannah v. United States*,
   2019 WL 718119 (E.D. Cal. Feb. 20, 2019) .......................................... 5

*Indep. Living Res. v. Oregon Arena Corp.*,
   1 F.Supp.2d 1159 (D. Or. 1998) ............................................................ 6

*Indep. Living Res. v. Oregon Arena Corp.*,
   982 F.Supp. 698 (D. Or. 1997) .......................................................... 5, 7

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ............................................................... 12

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................ 4

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ................................................................................ 9

*McHugh v. United States Auto. Ass'n*,
   164 F.3d 451 (9th Cir. 1999) ................................................................. 6

*Mukhtar v. Cal State Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002) ............................................................... 5

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S.Ct. 2111 (2022) .................................................................. *passim*

*Pooshs v. Phillip Morris USA, Inc.*,
   287 F.R.D. 543 (N.D. Cal. 2012) ........................................................... 4

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ................................................... 2, 3, 4, 10

*Smith v. Pac. Bell Tel. Co.*,
    649 F.Supp.2d 1073 (E.D.Cal.2009) ................................................. 23

*Specht v. Jensen*,
    853 F.2d 805 (10th Cir. 1988) ........................................................ 5

*Stobie Creek Invs., LLC v. United States*,
    81 Fed.Cl. 358 (Fed. Cl. 2008) ....................................................... 5

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
    949 F.3d 825 (3d Cir. 2020) .......................................................... 4

*United States v. Flores*,
    901 F.3d 1150 (9th Cir. 2018) ........................................................ 4

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002) ...................................................... 17

*United States v. Rincon*,
    28 F.3d 921 (9th Cir. 1994) ......................................................... 20

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ..........................................................11

**Rules**

Fed. R. Evid. 401 .......................................................................... 4

Fed. R. Evid. 402 ...................................................................... 2, 4

Fed. R. Evid. 702 .................................................................. 2, 14

Fed. R. Evid 704 .......................................................................... 5

**Other Authorities**

29 Wright & Miller, *Fed. Prac. & Proc. Evid.* §6265.2 (2d ed. 2023) ......................................... 4

Brian DeLay, Tweet (June 23, 2022), https://bit.ly/40XW6Ku ..................................... 7

Louis Klarevas, *Closing the Gap*, The New Republic (Jan. 13, 2011),
    https://bit.ly/3o3PKfg................................................................. 13

Robert J. Spitzer, *How the Supreme Court Rewrote History to Justify its Flawed
Gun Decision*, NBC News (June 23, 2022), https://nbcnews.to/3NAFzZM ........................... 7

**LR 7-1 CERTIFICATE**

The parties made a good faith effort through telephone conference to resolve the dispute and have been unable to do so.

**MOTION – FRE 702**

Plaintiffs respectfully submit this consolidated *Daubert* motion pursuant to Federal Rule of Evidence 702 and this Court's Order of April 24, 2023 (Dkt. 132).  For the reasons set forth in the motion below, this Court should:

1. Exclude Rivas's testimony in its entirety; Spitzer's testimony in its entirety; and DeLay's third opinion, *see* DeLay Decl. ¶¶61-77.

2. Exclude Cook's, Siegel's Allen's, McDowall's and Sweeney's testimony in their entirety; and Klarevas's first, second, and fifth opinions, *see* Klarevas Decl. ¶11.

3. Exclude Baron's testimony in its entirety.

4. Exclude Dr. Siegel's opinion that that discretionary denials of permits reduce gun violence, *see* Siegel Decl. ¶¶35-49.

5. Exclude Sweeney's testimony in its entirety.

This motion is supported by the accompanying Memorandum, the record in this matter, the declaration of Shawn M. Lindsay and the attachments thereto, and all other matters properly before this Court.

## MEMORANDUM

### INTRODUCTION

The Supreme Court could not have been clearer in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), that it was rejecting the till-then-prevalent practice of "[f]ederal courts … making … empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny.'" *Id.* at 2131. Yet the bulk of Defendants' twelve expert witnesses have been offered to do exactly that—discuss the relative wisdom of Oregon's Measure 114 as a policy matter, including by offering in many instances the exact same testimony they offered in pre-*Bruen* cases. Because such testimony is not relevant under *Bruen*, it is not "relevant" under the Federal Rules of Evidence either, and the witnesses offering it should be excluded. *See* Fed. R. Evid. 402, 702; *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010) ("What is relevant depends on what must be proved, and that is controlled by [the underlying substantive] law.").

*Bruen* made equally clear who is responsible for doing what under its new history-focused test. While historians perform historical research and parties' lawyers present argument, "'legal inquiry is a refined subset' of a broader 'historical inquiry,'" and that *legal* inquiry is "[t]he job of judges." *Bruen*, 142 S.Ct. at 2130 n.6. But Defendants in this case offer three witnesses who testify at length to the correct interpretations of statutes. This flies in the face not only of *Bruen*, but of black letter law: "[m]atters of law" are "for the court's determination." *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 447 (9th Cir. 1992). "An expert witness may not testify as to conclusions of law … or provide an interpretation of what a particular statute requires—tasks that are exclusively reserved for the court." *Chaney v. Wadsworth*, 2015 WL 4388420, at *10 (D. Mont. July 15, 2015). This rule—as *Bruen* shows—does not have an exception for old statutes. Defendants' witnesses offering legal testimony should be excluded.

Finally, three of Defendants' witnesses offer testimony that is flawed for additional reasons. Dennis Baron may be an qualified linguist, but by his own admission he knows nothing about firearms—and as a result, he chose a linguistic comparator, "cartridge box," that has no equivalence to modern magazines. He made this choice, moreover, in an unreliable way. His testimony is thus both irrelevant and unreliable. Michael Siegel, a doctor who is offering means-ends testimony barred under *Bruen* to begin with, did not differentiate between permit-to-purchase regimes and other types of permitting regimes (such as concealed-carry licensing) in making his report, thus rendering it unreliable on one of the central questions in this case. And historian Kevin Sweeney's survey of arms owned at the time of the founding not only is foreclosed by three independent Supreme Court decisions, *see District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (rejecting an argument based on such an inquiry as "bordering on the frivolous"); *Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (summarily reversing a court for focusing on whether stun guns were prevalent at the founding); *Bruen*, 142 S.Ct. at 2143 (reiterating that what matters is whether arms are in common use "today"); but is methodologically flawed, to boot. All of these three witnesses' testimony should also be excluded.

## LEGAL STANDARDS

To be offered at trial, expert opinion testimony must meet two threshold requirements. *See Daubert v. Merrell Dow Pharms. Co.*, 509 U.S. 579, 595-97 (1993); *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("[T]he trial court's gatekeeping function explained in *Daubert* applies not only to scientific testimony, but to all expert testimony."); *Bordelon v. Airgas USA, LLC*, 603 F.Supp.3d 946, 952 (D. Or. 2022) (Immergut, J.). First, like all evidence, expert opinion testimony must be relevant. "What is relevant depends on what must be proved, and that is controlled by [the underlying substantive] law." *Primiano*, 598 F.3d at 567. "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue or is based on factual assumptions that

are not supported by the evidence." 29 Wright & Miller, *Fed. Prac. & Proc. Evid.* §6265.2 & nn.2-3 (2d ed. 2023) (collecting cases). Expert opinion testimony is thus typically relevant "if the knowledge underlying it has a valid connection to the pertinent inquiry." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022); *see* Fed. R. Evid. 401, 402; *see also Primiano*, 598 F.3d 563, 567 (Rule 702's requirement that an expert witness's "specialized knowledge will assist the trier of fact" "'goes primarily to relevance.'" (quoting *Daubert*, 509 U.S. at 591)).

Second, expert opinions—*i.e.*, testimony "in the form of an opinion" by "a witness who is qualified as an expert by knowledge, skill, experience, training, or education"—must be reliable. So, in addition to being relevant, expert opinion must have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *see Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 546 (N.D. Cal. 2012) (identifying factors that "might be considered," "includ[ing] whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion … or whether an expert has adequately accounted for obvious alternative explanations"). "In addition, a court may exclude expert testimony on the ground that an expert's purported methodology fails to explain his final conclusion." *Pooshs*, 287 F.R.D. at 546. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997); *see Kumho Tire*, 526 U.S. at 152.

"Rule 702 applies whether the trier of fact is a judge or a jury." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) ("By using the term 'trier of fact,' rather than specifying judge or jury, Rule 702 does not distinguish between proceedings."); *accord United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018); *see also Hannah v. United*

*States*, 2019 WL 718119, at \*4 (E.D. Cal. Feb. 20, 2019) ("[A] bench trial does not exempt an expert witness from Rule 702's reliability requirement.").

## ARGUMENT

### I.    Several Of Defendants' Experts Offer Testimony That Is Legally Impermissible And/Or Irrelevant Under Binding Supreme Court Precedent.

#### A.    Some of Defendants' Historical Experts Offer Impermissible Legal-Interpretation or Legal-Conclusion Testimony.

Expert witnesses may not provide legal analysis or offer conclusions of law, period.  "Each courtroom comes equipped with a 'legal expert,' called a judge."  *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (reversing admission of expert testimony on legal issues at trial); *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (same).  "This holds just as true when the finder of fact is the court, if not more so; the court is well equipped to instruct itself on the law."  *Stobie Creek Invs., LLC v. United States*, 81 Fed.Cl. 358, 360-61 (Fed. Cl. 2008) (collecting cases).  Thus, although "expert testimony that is 'otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact' …, 'an expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law.'"  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (emphasis in original) (quoting Fed. R. Evid 704(a) and *Mukhtar v. Cal State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002)).  Such "legal matters" are instead "for the court's determination" alone.  *Aguilar*, 966 F.2d 443 at 447.

This rule has a wide sweep: "An expert witness may not testify as to conclusions of law … or provide an interpretation of what a particular statute requires—tasks that are exclusively reserved for the court."  *Chaney v. Wadsworth*, 2015 WL 4388420, at \*10 (D. Mont. July 15, 2015); *see also Indep. Living Res. v. Oregon Arena Corp.*, 982 F.Supp. 698, 765 (D. Or. 1997) ("As a general rule … the interpretation of a law is peculiarly within the court's own expertise and thus

is not a proper subject for expert testimony."), *supplemented*, 1 F.Supp.2d 1159 (D. Or. 1998).  As this Court has noted previously, "expert testimony is not proper for issues of law because the role of experts is to interpret and to analyze factual evidence rather than to testify about the law." *Bridgetown Condo. Homeowner's Ass'n v. Ford Dev., Inc.*, 2009 WL 1743759, at *1 (D. Or. June 18, 2009) (citing *McHugh v. United States Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999), and *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996)).

That bedrock principle renders much of the expert testimony that Defendants have offered impermissible.  Defendants have offered twelve expert witnesses.  Of these, five are historians who address the history of firearms regulations.[1]  In so doing, three tread over the line into impermissible legal interpretation.  *See supra*, pp.5-6.  This happens in two ways.  The most obvious is that defense experts have testified straightforwardly to how they think statutes or regulations should be interpreted.  *See Chaney*, 2015 WL 4388420, at *10 ("An expert witness may not … provide an interpretation of what a particular statute requires—[a] task[] that [is] exclusively reserved for the court.").  Dr. Rivas, for instance, summarizes her opinion as an "exploration of historical record regulations."  Rivas Decl. ¶10; *see also id.* ¶9 ("[A]n historian interpret[s] … laws …."); *id.* (discussing Westlaw research); Lindsay Decl., Exhibit 1, Rivas Tr. ("Rivas Tr.") 17:3-20:3 (discussing statutory research on Westlaw and HeinOnline).  Likewise, Dr. Spitzer described his "approach" as "looking at the constitution, looking at founding debates, finding document, statutory law, case law …."  Lindsay Decl., Exhibit 2, Spitzer Tr. ("Spitzer Tr.") 12:7-8.  Given this, it is unsurprising to find Rivas's and Spitzer's expert reports full of pages upon pages of statutory interpretation and interpretations of case law.  *See* Rivas Decl. 9-13, 22-33; Spitzer Decl. 13-19, 32-48.  This is not appropriate testimony for expert witnesses, and it should

---

[1] Brian DeLay; Roger Pauly; Brennan Rivas; Robert Spitzer; and Kevin Sweeney.

be disallowed. *See Chaney*, 2015 WL 4388420, at *10; *Indep. Living Res.*, 982 F.Supp. at 765 ("[T]he interpretation of a law is peculiarly within the court's own expertise and thus is not a proper subject for expert testimony."). Defendants' *counsel* are free to cite any statutes or regulations they want to this Court and urge, at the appropriate times at trial or in briefing, that the Court give those laws certain interpretations. But they are *not* free to offer experts to do the job in the Court's stead.

*Bruen* itself clearly illustrates this point. There, the Court wrestled with interpretations of statutes stretching back to the 13th century, yet it never once suggested that the normal rule against expert testimony interpreting them could or should be altered. To the contrary, the Court resolved the question before it without considering any expert testimony at all, instead relying on the arguments of counsel, amici, and ultimately, its own expertise in analyzing such statutes. In doing so, moreover, the Court specifically emphasized that "'legal inquiry is a refined subset' of a broader 'historical inquiry,'" and that the *legal* inquiry is "[t]he job of judges." *Bruen*, 142 S.Ct. at 2130 n.6. Thus, *Bruen* reinforces the general rule that "the role of experts is to interpret and to analyze factual evidence rather than to testify about the law." *Bridgetown Condo. Homeowner's Ass'n*, 2009 WL 1743759, at *1.

The Court should be particularly wary of the expert testimony Defendants have offered because most of their experts disagree with—indeed openly disdain—the *Bruen* decision, including the binding historical conclusions that the Supreme Court reached.[2] Indeed, their reports

---

[2] *E.g.*, "In NYSRPA v. Bruen, the high court has tossed aside the lessons—and facts—of law, history and good public policy." Robert J. Spitzer, *How the Supreme Court Rewrote History to Justify its Flawed Gun Decision*, NBC News (June 23, 2022), https://nbcnews.to/3NAFzZM; "Bruen follows from Heller. These are political decisions, unmoored from history. When these disastrous rulings are eventually overturned—it will take a long time but I think that's inevitable - better justices will turn the 'Originalists' bogus concern for history against them." Brian DeLay, Tweet (June 23, 2022), https://bit.ly/40XW6Ku.

provide good reason to think that, in the guise of (impermissible) statutory interpretation, experts are trying to persuade this Court to repudiate some of the very same historical analysis that the Supreme Court has already conducted.  For example, *Bruen* held definitively that the 1328 Statute of Northampton and its American analogues applied only to "bearing arms to terrorize the people." 142 S.Ct. at 2143; *see id*. 2140-43.  Yet Rivas's report not only continues to treat the law as a "concealed-carry statute[]," but declares defiantly that "[s]cholarly historical research has shown that, under common law, courts considered the act of carrying deadly weapons in public spaces to be inherently terrifying and therefore a breach of the peace"—which is exactly the contention that the Supreme Court rejected in *Bruen*.  Rivas Decl. 9 & n.7; *see also* Rivas Tr. 45:23-46:17. Similarly, Spitzer's declaration relitigates a debate from *Heller* regarding the significance of 18th century gunpowder-storage laws ***without even mentioning that* Heller *considered and rejected this argument.*  Compare** Spitzer Decl. 46-48 *with Heller*, 554 U.S. at 632; *id.*at 685-87 (Breyer, J., dissenting).  There is thus particular reason in this case to adhere to the well-established rule against allowing experts to offer legal interpretation.

Finally, other defense experts offer "legal conclusion[s]," *Hangarter*, 373 F.3d at 1016 (emphasis removed), whether built on legal interpretations or simply by making an impermissible leap from other types of testimony.  Thus, for instance, Brian DeLay offers a report that is in some respects properly focused on historical facts, yet at the end veers into an analysis of state laws from the 1920s, culminating in the conclusion that "[i]n [passing them], these lawmakers acted consistently with American tradition and practice dating back to the early colonial era."  DeLay Decl. 39.  This "an opinion on an ultimate issue of law,'" *Hangarter*, 373 F.3d at 1016, under *Bruen*, which asks whether "the regulation is consistent with this Nation's historical tradition of

firearm regulation," 142 S.Ct. at 2126, and thus it is an impermissible "legal conclusion." *Hangarter*, 373 F.3d at 1016 (emphasis removed).

Accordingly, this Court should exclude: Rivas' testimony in its entirety; Spitzer's testimony in its entirety; and DeLay's third opinion, *see* DeLay Decl. ¶¶61-77.

### B.    Some of Defendants' Experts Offer Testimony that Is Not Relevant to the Legal Inquiry that *Bruen* Requires this Court to Conduct.

"What is relevant depends on what must be proved." *Primiano*, 598 F.3d at 567.  And that, in turn, "is controlled by [the underlying substantive] law." *Id.*  Here, the underlying substantive law is set by *Bruen*, which prescribes two inquiries: [1] whether "the Second Amendment's plain text covers an individual's conduct"; and [2] whether "the regulation is consistent with this Nation's historical tradition of firearm regulation."   142 S.Ct. at 2126.   In assessing these questions, courts also ask whether the firearms and magazines banned by Measure 114 are within the Second Amendment's definition of "arms," which includes all "modern instruments that facilitate armed self-defense," *id.* at 2132; whether they are "in common use today" for lawful purposes or are instead "dangerous *and* unusual," *i.e.*, "'highly unusual in society at large,'" *id.* at 2143 (emphasis added) (quoting *Heller*, 554 U.S. at 627); whether the regulation "addresses a general societal problem that has persisted since the 18th century," and if so, whether there is a "distinctly similar historical regulation addressing that problem," *id.* at 2131; or whether the regulation is justified by "unprecedented societal concerns or dramatic technological changes," and if so, whether the regulation is "relevantly similar" to historical regulations, including consideration of "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2132-33.  But *Bruen* explicitly *forbids* conducting interest balancing or generalized policy inquiries.  142 S.Ct. at 2129 (citing *Heller*, 554 at U.S. at 334; *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010)); *id.*at 2131, 2133 n.7; *see id.* at 2127 n.4

(overturning prior circuit-level precedent incorporating an interest-balancing element).  And the Supreme Court's decision in *Heller* rejected as "bordering on the frivolous" the idea that courts should use whether a certain arm was common *at the time of the founding* to determine whether it is lawful *now*.  554 U.S. at 582.

Given this underlying substantive law, a significant proportion of defendants' expert witness testimony is not "relevant."  *Primiano*, 598 F.3d at 567.  Approximately half of defendants' experts—Lucy Allen, Louis Klarevas, David McDowall, Michael Siegel, and Mackenzie Cook—offer testimony that goes to the now-forbidden interest-balancing inquiry, and that could *only* be considered relevant under that old, pre-*Bruen* standard.  Before *Bruen*, Ninth Circuit law required courts to "first ask 'if the challenged law affects conduct that is protected by the Second Amendment,'" then (generally) to apply intermediate scrutiny, under which the court asked whether "the government's statutory objective [was] 'significant, substantial, or important,'" and whether there was a "'reasonable fit' between the challenged law and that objective."  *Duncan v. Bonta*, 19 F.4th 1087, 1100, 1107 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022).  Both in selecting the tier of scrutiny and in applying intermediate scrutiny, this involved weighing the "burden" the law imposed on a citizen's right against the public-safety benefits of the law as asserted by the state (to which "defer[ence]" was owed).  *See id.* at 1103-04, 1108-11.  But *Bruen* explicitly rejected the second step of that inquiry "as one step too many," holding that courts may not engage in means-ends balancing.  142 S.Ct. at 2127, 2129.

Yet defendants offer evidence that goes (and could only go) to just such inquiry now. Perhaps the most egregious examples of this are the testimony of Drs. Cook and Siegel.  Dr. Cook is a trauma surgeon whose opinions can be summarized as: (1) treating gunshot victims with multiple wounds is challenging, and (2) the number and severity of gunshot wounds has increased

in recent years.  Cook Decl. 1-4.  These opinions clearly bear no relationship to the *Bruen* inquiries of whether "the Second Amendment's plain text covers an individual's conduct" and whether "the regulation is consistent with this Nation's historical tradition of firearm regulation."  142 S.Ct. at 2126.  Nor can they be justified as relating to whether a given weapon is "dangerous *and* unusual": "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual," because of course *all* firearms are deadly.  *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment).  Dr. Cook's testimony is plainly being offered for the same reason that similar testimony was offered in pre-*Bruen* cases—to argue that the state has a particularly strong justification for banning these particular sorts of weapons.  *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019) (testimony of trauma surgeon weighed in intermediate-scrutiny analysis), *abrogated by Bruen*, 142 S.Ct. 2111.  Putting aside for the moment that Dr. Cook could not even make that showing,[3] the showing itself has been ruled out by *Bruen*.

For his part, Dr. Siegel, an epidemiologist, offers essentially the same testimony elevated to a society-wide level, opining that "There is Strong Evidence that the Use of Large Capacity Magazines Increases the Number of Fatalities in Mass Shooting Events" and that their reduction would be helpful, as well as offering similar opinions as to the efficacy of the state's permitting regime.  Siegel Decl. 7; *see id.* at 5.  Such arguments were a staple of pre-*Bruen* interest balancing

---

[3] Dr. Cook offers the opinion that in "recent years, doctors in trauma centers across the country have been troubled by what appears to be an increase in the number and severity of gunshot victims that we treat."  Cook Decl. ¶13. The studies cited by Dr. Cook in support of this opinion make it clear that he is considering "recent years" as the prior two decades. *Id.* n.1.  But as he conceded in his deposition, these studies actually show a decrease or no change in gunshot victims during that period, though they show an increase in hospitalization due to gunshot wounds.  Lindsay Decl., Exhibit 7, Cook Tr. ("Cook Tr.") 36:4-19; 37:18-38:18, 42:11-23.

decisions.[4] And yet again, this evidence is irrelevant under the inquiries prescribed by *Bruen*, *see supra*, p.9. Thus the expert testimony to that effect is irrelevant under *Daubert* and *Kumho Tire*.

While Drs. Cook and Siegel provide particularly stark illustrations of this tendency to offer irrelevant testimony going to pre-*Bruen* interest balancing—after all, *Bruen* does not provide for consulting medical doctors on whether constitutional rights are being infringed—they are by no means unique in that regard. At her deposition, Defense expert Lucy Allen repeatedly disclaimed any ability to answer whether the magazines at issue in this case are in "common use" or "commonly owned" for self-defense (the relevant inquiries under *Bruen*), maintaining that her testimony was limited only to the opinion that they are not "commonly *needed*" (an irrelevant inquiry under *Bruen*). *See* Lindsay Decl. Exhibit 3, Allen Tr. ("Allen Tr.") 33:6-39:18; 57:11-58:21; 64:9-13; 65:22-66:18. Indeed, Allen offered the exact same testimony in a pre-*Bruen* case, *Fyock v. City of Sunnyvale*, in which it was used in the intermediate-scrutiny interest-balancing inquiry. *See* 25 F.Supp.3d 1267, 1279-80 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018).

Likewise, Louis Klarevas was retained to address the "relationship between large-capacity magazines (LCMs) and mass shootings, including how restrictions on LCMs impact mass shooting violence," which is almost an exact recitation of the pre-*Bruen* balancing inquiry. Klarevas Decl. ¶2; *compare Fyock*, 779 F.3d at 1000 ("Sunnyvale also presented evidence that large-capacity magazines are disproportionately used in mass shootings as well as crimes against law

---

[4] *See, e.g.*, *Duncan*, 19 F.4th at 1096, 1109-11; *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015); *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc), *abrogated by Bruen*, 142 S.Ct. 2111.

enforcement, and it presented studies showing that a reduction in the number of large-capacity magazines in circulation may decrease the use of such magazines in gun crimes.").[5]

Moreover, the effects of allowing such testimony will spiral:  Because Allen offered her arguments about defensive gun use and Klarevas offered his opinion as to the policy balance between lawful gun ownership and gun violence, plaintiffs had to offer Gary Kleck to respond. *See* Kleck Decl. 5-15 (responding to Allen), 15-22 (responding to Klarevas).  Then, in turn, Defendants offered David McDowall to critique Kleck.  *See* McDowall Rep. 2-8; *but see id.* at 5 ("[M]any of Kleck's critics acknowledge … as conceivable" the point McDowall is attacking). The result is dozens of pages of expert testimony—and, if not stopped, hours and hours of trial time—spent on questions that were *ruled out of bounds* by the Supreme Court in *Bruen*.  *See* 142 S.Ct. at 2131 (rejecting "federal courts … making … empirical judgments regarding firearms regulations"), 2133 n.7 (courts may not "engage in independent means-ends scrutiny").

That Defendants' experts continue to offer such opinions is perhaps unsurprising, given that they nigh-uniformly think *Bruen* was wrongly decided.  But expert testimony seeking to relitigate *Bruen* is neither relevant nor permissible.  So too of efforts to relitigate *Heller*.  Yet that is exactly what Kevin Sweeney does in his report and deposition, where he focuses on what types of firearms were and were not commonly owned in the 18th century.  *See* Sweeney Decl. 4-27; Lindsay Decl. Exhibit 4, Sweeney Tr. ("Sweeney Tr.") 9:6-8 ("They asked me to testify about what kind of firearms were commonly owned and used by Americans in the 18th century.").  As the

---

[5] Even in a pre-*Bruen* posture, Klarevas's testimony was actually rejected by one court because, while he maintained, there as here, that banning magazines with a capacity of over ten rounds would "reduce violence and force shooters to take a critical pause," this was contradicted by his admission elsewhere that "'a person set on inflicting mass casualties will get around any clip prohibitions by having additional clips on his person … or by carrying more than one fully loaded weapon.'"  *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1173 (S.D. Cal. 2019) (citing Louis Klarevas, *Closing the Gap*, The New Republic (Jan. 13, 2011), https://bit.ly/3o3PKfg).

Supreme Court explained in summarily reversing a court for employing such reasoning, "[t]his is inconsistent with *Heller*'s clear statement that the Second Amendment 'extends ... to ... arms ... that were not in existence at the time of the founding.'"  *Caetano*, 577 U.S. at 412 (per curiam). Indeed, *Heller* rejected the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" as "bordering on the frivolous."[6]  554 U.S. at 582.  As the Court explained, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Id.* (citations omitted).  Expert testimony offered to support an argument that the Supreme Court has rejected as "border[line] … frivolous" is patently not "relevant" for *Daubert* purposes.

Accordingly, this Court should exclude:  Cook's, Siegel's, Allen's, McDowall's and Sweeney's testimony in their entirety; and Klarevas's first, second, and fifth opinions, *see* Klarevas Decl. ¶11.

*** * ***

Plaintiffs do not maintain that *all* of Defendants' expert testimony is legally inadmissible. To take two examples, James Yurgealitis possesses firearms expertise that could be useful in "help[ing] the trier of fact to understand the evidence" if the court is not familiar with how the firearms at issue here operate.  Fed. R. Evid. 702(a).  Roger Pauly's history of firearms likewise meets that Rule 702 test.  But as much as Defendants may wish to litigate this case in a pre-*Bruen*

---

[6] The feeling is apparently mutual:  Dr. Sweeney, for his part, remarks that "[i]f a student had presented that kind of historical reasoning [the Supreme Court employed in *Heller*] to me in a research paper in my seminar The American Revolution, I might have given it a B plus if I was in a generous mood."  Sweeney Tr. 47:1-4.

(or even pre-*Heller*) world, this Court is bound by the holdings of the Supreme Court. And it certainly would not serve the interests of either reasoned analysis or judicial economy to hear hours upon hours of testimony speaking to issues that the Supreme Court has declared legally irrelevant.

## II.   Some of Defendants' Experts Have Further Flaws Under *Daubert*.

### A.   Dennis Baron's Testimony Lacks a Proper Foundation.

Defendants offer the testimony of Professor Dennis Baron as an expert in corpus linguistics. Baron would testify that "[t]he lexical evidence leads me to conclude that ammunition and ammunition storage containers were considered accoutrements and not arms during the Founding and Reconstruction Eras." Baron Decl. ¶3; Lindsay Decl., Exhibit 5, Baron Tr. ("Baron Tr.") 11:17-20. This opinion rests on Baron's survey of linguistic corpora for the term "cartridge box" (and close synonyms), which he identified as "analogues to modern firearm magazines." Baron Decl. ¶26; Baron Tr. 23:2-4. Though Plaintiffs do not challenge Baron's qualifications as a linguist, his entire analysis turns out to rest on an improper foundation: He simply *assumed* that "cartridge box" is an appropriate 18th century linguistic analogue for "magazine"—even though common sense dictates that it is not. *See* Baron Tr. 25:18-30:5.

In the first instance, Baron did not follow reliable methods in selecting this analogue. He consulted no other experts or written sources on firearms in choosing "cartridge boxes" as the analogue to "magazines." And he repeatedly disclaimed knowing in any detail or with any certainty how firearms or magazines worked, or how or when they have evolved. *See* Baron Tr. 27:5-20; 28:13-15; 29:12-18; 30:15-19; 37:7-13; 99:20-24. Indeed, Baron testified that "the first time I actually read something about how modern firearms magazines work" was when he read an article about them "in the Washington Post just the other day." Baron Tr. 27:10-12. Baron could not explain his process for selecting "cartridge box" as the analogue for "firearms magazine." *See*

*id*. at 25:21-26:15.[7]  To the extent Baron eventually did settle on an explanation for his choice, it was that the two purportedly share "functional similarity" because "[b]oth hold ammunition."  *Id*. at 26:25-27:1.  Only someone who concededly knows nothing about how firearms actually work could make such a fundamentally flawed claim.

At the time of the Founding, while the cartridge box did indeed "hold ammunition," it did nothing more than that.  It was simply a box in which ammunition was stored.  To actually *use* the ammunition that a cartridge box held took more than a dozen steps.  *See* Baron Tr., Ex. 29 at 15, 30-37.  One had to *remove* the gunpower stored in the cartridge box and feed it by hand into the barrel of the musket, followed by a ball that was loaded using a ramrod.  Gunpowder was also introduced into the flintlock mechanism as priming.  *See id*.  The cartridge box played no role in any part of that process.  A modern magazine, by contrast, plays a critical role in the *functionality* of a firearm.  The magazine is attached to the firearm, and it actively feeds a fresh round into the chamber (by use of a spring) automatically after each shot is fired.  It thus combines the functions of the cartridge box, powder horn, ramrod, *and* individual loading the weapon—none of which Baron even considered.  *See, e.g.*, Baron Tr. 29:24-30:5; 47:1-48:23; 100:2-4.  Baron ultimately acknowledged this crucial flaw in his analysis:

> Q: Given that they are relevantly similar in that both hold bullets, what is the difference between a modern magazine and a box that contains bullets?

---

[7] Q: **In terms of your procedure, how did you select** "**cartridge box**" **as your analog for** "**firearms magazines**"? A. You know, I'm not entirely sure. … A. It happened several months ago when I first made the connection, and I don't remember exactly how it happened. **Q. Did you consult with one of the other experts in making this conclusion?** A. No. **Q. Did you consult any written sources in making this conclusion?**  A. I believe it came through some of the reading I was doing about magazines. **Q. Did you talk with any firearms engineers or firearms historians before deciding that** "**cartridge box**" **was the analog you would use for** "**magazine**"? A. No. **Q. Why didn't you consult any of these sources?** A. I didn't know anybody to consult.

A: The magazine, once it contains bullets, combines the function of holding the bullets and feeding the bullets into the firearm.

Baron Tr. 103:17-22; *see id.* at 26:25-27:1 (defining "cartridge box" as a box that "hold[s] ammunition"); *cf. id.* at 25:1-17 (agreeing with the *Bruen* Court's definition of analogues as a search for things "relevantly similar"). Indeed, Baron ultimately testified that "there is *no* analogy to a mechanical feeding device in common use in the founding period." Baron. Tr. 108:22-25 (emphasis added).

The analogy between "firearms magazine" and "cartridge box" is the foundation of Barons' report. Yet, as seen, that foundation does not bear weight, as this case is not about an effort to ban boxes that merely hold ammunition. It is about an effort to ban devices that actually feed ammunition into a firearms. Baron is thus unable to "establish[] that his interpretations of … words and phrases … were supported by reliable methods." *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (holding that a *Daubert* challenge should have been granted on this basis). His testimony should be excluded in its entirety under *Daubert*.

At a minimum, this Court should reject Baron's opinion as to the public meaning of "arms" at the time of the Fourteenth Amendment, which is fatally flawed for additional reasons. Baron states in his report that he did not consider public uses of "magazine" at the time of the Fourteenth Amendment because "[t]he word 'magazine' was not typically used to refer to a container of ammunition until late in the nineteenth century." Baron Decl. 12; *see* Baron. Tr. 62:11-14; 63:25-64. Rather, he continued to search for uses of "cartridge box." But as Baron acknowledged at his deposition, the Civil War-era patents for the Henry, Sharps, and Winchester repeating rifles *did* use the word "magazine" in its modern sense. *See* Baron Tr. 48:24-55:18; Exs. 35, 36, 38. So did the *New York Times*, which used the phrase "repeater or magazine carbine" without further explanation as early as 1864. *See* Baron Tr., Ex.32. As Baron himself explained, that means that the readership

of the *New York Times* would have been familiar with the term "magazine" in its modern sense. Baron. Tr. 55:21-59:23. Yet Baron nevertheless focused only on public uses of the word "cartridge box" even when it came to the time of the Fourteenth Amendment.[8]  Compounding the problem, Baron admitted that neither the patents nor the *New York Times* article appeared in his corpora, raising separate reliability issues.  *See* Baron Tr. 56:23-25 ("This [article] is one that did not come up in my newspaper searches, which is curious, because they did cover the Times."); *id.* at 100:12-25 (patents not in corpora).  His opinion as to the public meaning of "arms" at the time of the Fourteenth Amendment should therefore be excluded, as it is not a reliable means of assisting the Court in answering any question that is relevant to this case.

Finally, Baron's report is not "reliable" or "relevant" under *Daubert* for yet another reason. The Second Amendment uses "arms" without reference to "accoutrement" or "ammunition."  Yet Baron testified that he did not "analyze the several thousand instances of the use of 'arms' on its own" in his corpora "to see if they, in context, covered ammunition and accoutrement also," because there were "[t]oo many" to allow him to do so in a timely manner.  Baron Tr. 66:23-67:3. In other words, he looked only at instances in which accoutrement or cartridge boxes were specified as *distinct* from "arms", and then reasoned from this that cartridge boxes were accoutrements.  But that, of course, does not answer the question of whether ammunition or accoutrements would have been considered parts of "arms."  Indeed, Baron indicated that, based on examples he was given at deposition, ammunition and accoutrements would have been considered part of "arms" when that term was used on its own.  *See* Baron. Tr. 67:7-79:25.  Baron

---

[8] This is, again, in any event not a reliable methodology for answering any legal question that matters in this case, because this case is not about an effort to ban boxes that merely hold ammunition, but about an effort to ban devices that actually feed ammunition into a firearms.

thus was not even studying the question that actually matters under *Bruen*, rendering his report not "relevant" under *Daubert*.

Baron's testimony should be excluded in its entirety.

**B.    Dr. Siegel's Opinions That Discretionary Denials of Permits Reduce Gun Violence Is Unsupported.**

One of the questions in this case is whether Oregon's permit-to-purchase and double-background-check regime is legally similar to other permitting regimes, such as the shall-issue laws discussed by the Supreme Court in *Bruen*.  *See* Dkt. 161 at 7-9, 11-12.  But nobody doubts that these two types of regimes are *factually* dissimilar in a critical respect—i.e., one applies to any citizen who seeks to acquire an arm, and the other applies only to the subset of owners who wish to carry an arm concealed in public.  Defendants have offered Dr. Siegel to opine that "state laws that require state permits for the purchase and possession of firearms are effective in reducing firearm violence, both from firearm homicide generally and from mass public shootings."  Siegel Decl. 24.  Yet, in his research, Dr. Siegel did not differentiate between types of permitting regimes.  This makes his opinion unsupported, misleading, and, for the purposes of this case, irrelevant.

Specifically, Dr. Siegel did not compare the components or language of the permit laws, even as he aggregated studies to draw generalized conclusions about "state permitting laws." Siegel Decl. ¶49; *see id.* ¶¶35-48; Lindsay Decl., Exhibit 6, Siegel Tr. ("Siegel Tr.") 55:5-13 ("Q. In your review of … the literature and your research, did you consider any of the differences between those state permitting schemes and how that would affect your opinion? A. No…").  He instead inexplicably just declared *all* permitting regimes effective, even as he acknowledged that he did not actually study whether one type is more or less effective than another:  "[T]here is no reason to believe that details about the permitting system are going to change my opinion about its effectiveness."  Siegel Tr. 55:24-56:3; *see id.* at 55:14-18 ("Q. So do you have an opinion as to

whether particular details of a state permitting scheme are more or less important, essential to your conclusion about reduction of homicides and mass shootings?  A. I don't believe that they are important ….").   Because Dr. Siegel—by his own admission—has not done the homework of actually looking at the differences between types of permitting regime, his conclusion about effectiveness of Oregon's permit-to-purchase regime is *by definition* unsupported.

It is also misleading: Dr. Siegel's testimony gives the impression that Measure 114's permit-to-purchase requirement will reduce firearm violence, but in reality, the most it could support is the idea that some type of permitting requirement may reduce firearms violence.  That is precisely the kind of misleading and unhelpful expert testimony that courts have a duty to exclude.  *See United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("District courts must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony.").

Moreover, even if Dr. Siegel had broken out permit-to-purchase versus concealed-carry permits, his testimony would still be flawed, because he did not attempt to review which specific components of the permitting laws are beneficial to reducing gun violence.  Siegel Tr. 55:14-56:3. For example, Dr. Siegel could not opine as to whether the various recordkeeping components of permitting laws reduced gun violence.  Siegel Tr. 58:12-25.  Nor could he opine as to the effect of time delays—a crucial question in this case.  *See*  Siegel Tr. 56:4-9 ("Q. So, for example, if different state law permitting schemes have different periods of time between how long it takes to apply for and obtain a permit, that in your opinion wouldn't change your conclusion in this case. A. No.").

Even when it comes to Measure 114 itself, Dr. Siegel could opine as to only *some* components of law.  For example, Dr. Siegel opined that criminal background checks (section 4(1)(b)(A) and what he called red flag laws (section 4(1)(b)(B)) would tend to reduce gun

violence. *See* Siegel Tr. 63:16-64:14; 67:6-68:6. But he could give no firm answer one way or the other on one of the most constitutionally problematic aspects of the law, Section 4(1)(b)(C), which empowers the permitting officer to decline a permit application on his own discretion if he "conclude[]s that the applicant has been or is reasonably likely to be a danger to self or others or to the community at large as a result of the applicant's mental or psychological state." *See* Siegel Tr. 68:7-19. Instead, he was left to state that his opinion went only to the statute "as a whole," and that he was not "really asked to say … which part of this is going to have [a given] effect." Siegel Tr. 62:1-17.

In short, Dr. Siegel has concluded that permit regimes are effective at reducing gun violence, but he has not accounted for the alternative explanation any reduction in firearm violence that appears correlated to permitting regimes may be a product of certain *features* of a permit regime that are not necessarily included in Measure 114 or that would exist with or without it. *See Barrett v. Rhodia, Inc.*, 606 F.3d 975, 981 (8th Cir. 2010) (explaining that when an expert failed to "rule out alternative causes of [] injury" that testimony was "speculative or unsupported by sufficient facts."). This omission is particularly glaring in light of the state's aggressive severability arguments regarding Measure 114. *See* Dkt. 161 at 12, 14, 26.

Dr. Siegel's opinion that discretionary denials of permits reduce gun violence, *see* Siegel Decl. ¶¶35-49, should be excluded.

### C.    Kevin Sweeney's Testimony Relies Entirely on Incomplete and Inaccurate Data.

Defendants offer Professor Kevin Sweeney as a historical expert. Even setting aside the problem that his testimony speaks only to an argument that the Supreme Court has rejected as "bordering on the frivolous," *Heller*, 554 U.S. at 582, *see supra* Part I.B, his testimony has flaws that render it inaccurate and thus inappropriate as expert testimony.

The core of Sweeney's testimony relies on two bodies of evidence: historical probate inventories and newspapers that have been archived in the America's Historical Newspapers database.  Sweeney Tr. 10:12-12:18.  As to the first, by Sweeney's own admission, his probate inventory data is incomplete and inaccurate.  The probate inventories do not account for weapons owned by men killed in combat, Sweeney Tr. 69:19-22 ("If someone used their own personal arm in battle and left it on the field or he was dead it was left on the field, it would not be in the estate inventory"); for weapons borrowed but not owned, Sweeney Tr. 67:15-68:2 ("[O]ne in six militiamen would be from 16-20.  They probably aren't owning … their own firearms … they'll show up at the Continental Army without their own firearm unless an older brother or, you know, grandfather has given it to them. So that's a probate inventory bias"); for weapons owned by anyone who was not maintaining a household, including women, Sweeney Tr. 72:2-7 ("It does not include women. It does not include men, as I've said, who–whose possessions were limited to livestock, financial instruments or slaves because those are probably not individuals maintaining a household or, you know, serving in the militia"); or even for weapons that owner's executors simply did not know about, Sweeney Tr. 62:10-21 ("[The executor or appointed administrator] would go through the house, the barns, and the whole thing and presumably see it. It is also clear that they asked family members and survivors [if] something is not [t]here").  Yet Sweeney openly acknowledges that he did not make any adjustments to his probate inventory data to account for any of the potential discrepancies that he acknowledges causes probate inventory bias.  Sweeney Tr. 70:23-71:10.

Moreover, by Sweeney's admission, the data from newspapers he relies on to determine whether repeating arms were common in the 18th century is likewise incomplete.  At least two significant newspapers are missing from Sweeney's datasets, because they are simply not part of

America's Historical Newspapers database.  Sweeney Tr. 74:9-25 (notes that the South Carolina Gazette and Savannah Gazette are not part of the database and that he has not finished his research of those papers). Because the data on which he relies is admittedly incomplete and inaccurate, so too are the opinions that he formed based on that incomplete and inaccurate data.  *See Arjangrad v. JPMorgan Chase Bank, N.A.*, 2012 WL 1890372 at *6 (D. Or. May 23, 2012) (quoting *Smith v. Pac. Bell Tel. Co.*, 649 F.Supp.2d 1073, 1097 (E.D.Cal.2009)) ("Reliance on incomplete facts and data may make an expert opinion unreliable because an expert must 'know[] of facts which enable him to express a reasonably accurate conclusion.'").

Sweeney's testimony should be excluded in its entirety.

## CONCLUSION

For the reasons set forth above, this Court should:

1. Exclude Rivas's testimony in its entirety; Spitzer's testimony in its entirety; and DeLay's third opinion, *see* DeLay Decl. ¶¶61-77.

2. Exclude  Cook's, Siegel's, Allen's, McDowall's and Sweeney's testimony in their entirety; and Klarevas's first, second, and fifth opinions, *see* Klarevas Decl. ¶11.

3. Exclude Baron's testimony in its entirety.

4. Exclude Dr. Siegel's opinion that that discretionary denials of permits reduce gun violence, *see* Siegel Decl. ¶¶35-49.

5. Exclude Sweeney's testimony in its entirety.

Respectfully submitted,

DATED:  May 15, 2023

Paul D. Clement[*]
Erin E. Murphy[*]
Matthew D. Rowen[*]
Nicholas M. Gallagher[*]
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

[*] admitted *pro hac vice*


s/ Stephen Joncus
Stephen J. Joncus, OSB #013072
JONCUS LAW PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, OR  97086
(971) 236-1200
steve@joncus.net

JURISLAW LLP

s/ Shawn M. Lindsay
Shawn M. Lindsay (OSB No.: 020695)
Daniel J. Nichols (OSB No.: 101304)
Three Centerpointe Drive
Suite 160
Lake Oswego, OR 97035
(503) 968-1475
shawn@jurislawyer.com

*Counsel for Eyre Plaintiffs*


s/ Leonard W. Williamson
Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Ste 100
Salem, OR 97302
(503) 365-8800
l.williamson@vwllp.com

*Counsel for OFF Plaintiffs*


s/ James L. Buchal
James L. Buchal, OSB #910020
MURPHY & BUCHAL LLP
PO Box 86620
Portland, OR 97286
(503) 227-1011
jbuchal@mbllp.com

*Counsel for Fitz and Azzopardi Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2)

I certify that this brief complies with the applicable word-count limitation under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 7,508 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED this 15th day of May, 2023.

s/ Shawn M. Lindsay
Shawn M. Lindsay (OSB No.: 020695)
Counsel for Eyre Plaintiffs