Shawn M. Lindsay
shawn@jurislawyer.com
Daniel J. Nichols
dan@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorneys for Eyre Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>TINA KOTEK, et al.,<br><br>              Defendants. | Case No. 2:22-cv-01815-IM *(Lead Case)*<br>Case No. 3:22-cv-01859-IM *(Trailing Case)*<br>Case No. 3:22-cv-01862-IM *(Trailing Case)*<br>Case No. 3:22-cv-01869-IM *(Trailing Case)*<br><br>CONSOLIDATED CASES<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| MARK FITZ, et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>              Defendants. | |
| KATERINA B. EYRE, et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>              Defendants. | |
| DANIEL AZZOPARDI, et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>              Defendants. | |

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.  Measure 114's Permitting Regime Is Unconstitutional As A Whole And In Its Parts................................................................................................................ 2

        A.  Defendants Do Not Dispute That Measure 114's Permitting Regime Falls Under the Plain Text........................................................................ 2

        B.  Defendants Have Not Carried Their Burden to Demonstrate that Measure 114's Permitting Regime Is "Consistent with this Nation's Historical Tradition of Firearms Regulation." ........................................ 3

        C.  Defendants Have Failed to Prove that Permits Would Be Available to *Anyone* Under Measure 114 .................................................................... 7

        D.  Even Assuming that Permits Were a Practical Reality Under Measure 114, Defendants Have Failed to Prove that the Permitting Regime Could Operate in a Manner Consistent with the Second Amendment or Due Process ................................................................................................... 9

        E.  Measure 114's Duplicative and Dysfunctional Background-Check Regime is Indefensible................................................................................ 10

        F.  The Implementation of Measure 114 Already is a Disaster, And It's Going to Get Worse.................................................................................. 12

    II.  Measure 114's Magazine Ban Violates The Second Amendment.................................... 13

        A.  Magazines Are Arms as Defined by the Second Amendment and the Supreme Court ....................................................................................... 13

        B.  Defendants Do Not Dispute Commonality .......................................... 15

        C.  Defendants Fail to Show That Magazines Banned by Measure 114 Are Not Used For Lawful Purposes........................................................... 17

        D.  Detachable Magazines, Which Predate the Ford Model A, Are Not a "Dramatic Technological Change" or an "Unprecedented Societal Concern" ............................................................................................... 18

    III.  The Confiscatory Aspect Of Measure 114 Violates The Takings Clause ......................... 19

    IV.  Measure 114 Is Impermissibly Retroactive And Vague .................................................. 23

CONCLUSION..................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Barnett v. Raoul*,
  2023 WL 3160284 (S.D. Ill. April 28, 2023) ....................................................... 15

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ........................................................................................... 15, 17

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987) ................................................................................................. 2

*Chicago, Burlington & Quincy Railway Co. v. Illinois*,
  200 U.S. 561 (1906) ............................................................................................... 20

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................................................ *passim*

*Duncan v. Bonta*,
  970 F.3d 1133 (9th Cir. 2020) ......................................................................... 16, 18

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998) ............................................................................................... 23

*Emery v. Pierce Cnty.*,
  435 F.App'x 611 (9th Cir. 2011) ................................................................ 1, 11, 15

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ................................................................................ 18

*Hardaway v. Nigrelli*,
  2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ...................................................... 3

*Haw. Hous. Auth. v. Midkiff*,
  467 U.S. 229 (1984) ............................................................................................... 20

*Held v. Hanlin*,
  244 P.3d 895 (Or. Ct. App. 2010) .......................................................................... 8

*Helgeson v. Tillamook Cnty.*,
  2014 WL 1946614 (D. Or. May 14, 2014) ............................................................. 6

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*,
  535 U.S. 826 (2002) ................................................................................................. 2

*Horne v. Dep't of Agriculture*,
  576 U.S. 350 (2015) ............................................................................................... 22

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ................................................................ 16

*Langlotz v. Noelle,*
    39 P.3d 271 (Or. Ct. App. 2002) ........................................................... 6

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ............................................................................. 20

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992) ........................................................................... 21

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S.Ct. 2111 (2022) ................................................................. *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ................................................................ 16

*Peoples Rts. Org., Inc. v. City of Columbus,*
    152 F.3d 522 (6th Cir. 1998) ............................................................... 24

*Peruta v. Cnty. of San Diego,*
    824 F.3d 919 (9th Cir. 2016) ................................................................ 4

*Richardson v. City & Cnty. of Honolulu,*
    124 F .3d 1150 (9th Cir. 1997) ............................................................ 20

*Samica Enters. LLC v. Mail Boxes Etc., Inc.,*
    460 F.App'x 664 (9th Cir 2011) .............................................. 1, 11, 15

*Silvester v. Harris,*
    843 F.3d 816 (9th Cir. 2016) ............................................................... 10

*Spencer v. Nigrelli,*
    2022 WL 17985966 (W.D.N.Y. Dec. 29, 2022) ................................... 3

*Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City,*
    473 U.S. 172 (1985) ............................................................................. 20

**Constitutional Provision**

U.S. Const. amend. II .................................................................................. 23

**Statutes**

1 Wm. & Mary c. 15, in 3 Eng. Stat. at Large 399 (1688) ............................ 4

18 U.S.C. §922 ............................................................................................. 9

ORS 166.273 ................................................................................................................. 6

ORS 166.291 ................................................................................................................. 6

ORS 166.293 ................................................................................................................. 6

**Other Authorities**

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice (2004), available at https://bit.ly/3wUdGRE ...................... 16

Joseph Bilby, *A Revolution in Arms* (2015) ................................................................. 19

Nat'l Shooting Sports Found., *Firearm Production in the United States* (2020), https://bit.ly/3jfDUMt .............................................................................................. 15

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* (2d ed. 2018) ................ 18

*Top 10 Reasons to Use Access with Excel*, Microsoft (last accessed May 22, 2023), https://tinyurl.com/4zrk6shu ..................................................................................... 12

William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw ....................................... 16

## MEMORANDUM

### INTRODUCTION

The Supreme Court just reiterated that the government bears the burden of proving that efforts to restrict constitutional rights are "consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2126 (2022). Yet, in response to Plaintiffs' 55-page Motion for Summary Judgment detailing why Defendants cannot meet that burden when it comes to Measure 114, Defendants chose to submit a brief that is, in substance, all of 14 pages long. Unsurprisingly, this approach results in forfeiture on several key issues. *See Samica Enters. LLC v. Mail Boxes Etc., Inc.*, 460 F.App'x 664, 666 (9th Cir 2011) ("Arguments not raised in opposition to summary judgment … are waived."); *Emery v. Pierce Cnty.*, 435 F.App'x 611, 613 (9th Cir. 2011) ("[A party] waived their remaining arguments … by … not making their arguments in their summary judgment response."). For instance, for the fourth time in eight days, Defendants have refused to offer any substantive defense of Measure 114's new background-check provisions, arguing *only* that Plaintiffs' complaints do not raise any such challenge—even though this Court already recognized that the operative complaints "raise … substantive challenges to Measure 114's background check requirements," Dkt.70 at 5 n.1, and Plaintiffs have now filed *three* briefs confirming the existence of that challenge and explaining the grounds for it at length. Defendants likewise make no effort to demonstrate that the magazines Measure 114 bans are not common, even though the Supreme Court has instructed—repeatedly— that this question is central to the constitutional analysis.

Defendants' seeming unwillingness to engage in the legal analysis that *Bruen* requires is understandable; Measure 114 fares exceedingly poorly when measured against constitutional text and historical tradition. But their head-in-the-sand approach cannot obviate the need for *this* Court

to faithfully follow the Supreme Court's teachings.  And doing so compels the conclusion that Plaintiffs are entitled to summary judgment.

## ARGUMENT

### I.    Measure 114's Permitting Regime Is Unconstitutional As A Whole And In Its Parts.

Defendants spend much of their already-short brief parsing Plaintiffs' challenge to Measure 114's novel permitting regime into seven separate claims of their own making, *see* Defs.Resp.2-3, which they then proceed to try to knock down one at a time.  Those attempts at artificially constraining Plaintiffs' arguments fare no better here than they did in Defendants' own motion for partial summary judgment.  *See* Pltfs.Resp.19 n.7; *see also Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) ("[T]he plaintiff is 'the master of the complaint.'" (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987))).  Plaintiffs have challenged the permitting regime as a whole, so Defendants must defend Measure 114 as whole, including the manner in which its many byzantine features work together to compound the burdens on Second Amendment rights.  To be sure, many of those individual features suffice to render the regime unconstitutional even standing alone—for instance, mandating an FBI background check that the FBI legally may not perform.  But the Court cannot determine whether the permitting regime may go into effect consistent with the Second Amendment without considering how the regime as a whole will work.  In all events, whether viewed as a whole or carved up into a series of individual features, the record confirms that allowing Measure 114 to take effect would grind to a halt law-abiding Oregonians' efforts to exercise their constitutional right to obtain a firearm.

### A.    Defendants Do Not Dispute That Measure 114's Permitting Regime Falls Under the Plain Text.

Under *Bruen*, the first question a court must ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" in which the

plaintiff seeks to engage.  142 S.Ct. at 2126.  The relevant conduct here is acquiring a firearm, and the Second Amendment's plain text clearly covers that conduct, as one can neither "keep [nor] bear Arms," U.S. Const. amend. II, if one cannot acquire them in the first place.  *See* Pltfs.MSJ.12-13.  Defendants nowhere contest that point, presumably because it is not contestable.  *See* Defs.Resp.3-4; *see also* Defs.Tr.Br.6-7; PTO.11.

Defendants instead seem at times to suggest that *Bruen* declared so-called "shall-issue" regimes per se constitutional.  *Bruen* says no such thing, but even if it did, any such rule would derive from historical tradition, not the plain text of the Second Amendment, as the textual inquiry concerns the conduct in which an individual seeks to engage, not the manner in which the state seeks to regulate that conduct.  *See Bruen*, 142 S.Ct. at 2126 (asking whether "the Second Amendment's plain text covers an individual's conduct"); *see also, e.g.*, *Spencer v. Nigrelli*, 2022 WL 17985966, at *11 (W.D.N.Y. Dec. 29, 2022) (addressing sensitive-places-doctrine argument under second step of *Bruen*); *Hardaway v. Nigrelli*, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022) (same); *cf.* Def.Tr.Br.6-7.  Accordingly, there can be no doubt—especially given the state's failure to argue otherwise—that Measure 114's permitting regime regulates conduct that is covered by the plain text of the Second Amendment.

### B.    Defendants Have Not Carried Their Burden to Demonstrate that Measure 114's Permitting Regime Is "Consistent with this Nation's Historical Tradition of Firearms Regulation."

The only contested issue, then, is whether the state can meet its burden of proving that Measure 114 is "consistent with this Nation's historical tradition of firearms regulation."  *Bruen*, 142 S.Ct. at 2126.  Yet rather than try to meet that burden, Defendants try to shift it, arguing that *Plaintiffs* have not proven that "permit-to-purchase regimes are *always* unconstitutional." Resp.Br.2-3.  But that is not Plaintiffs' burden to prove.  As Plaintiffs explained in their motion, in order to justify Measure 114, "*Defendants* must come forward with historical analogues" to their

permit-to-purchase law—analogues that, as the Supreme Court says, are relevantly similar in terms of the "how" and "why" they exist.  Pltfs.MSJ.15 (emphasis added); 142 S.Ct. at 2133.  Plaintiffs posited that Defendants would not be able to do so, and Defendants responded by declining to even try.

Defendants instead argue that *all* permit laws are per se licit so long as they are dubbed "shall-issue."  Defs.Resp.3-4.  That is wrong several times over.  *First*, Defendants nowhere contest (because, again, it is not contestable) that *Bruen* said nothing at all about regimes that require people to obtain a permit just to *purchase* a firearm, as Bruen concerned only *carry*-license regimes.  The Court plainly did not declare per se constitutional permitting regimes that it had no occasion to consider.  Nor could it have, as almost all state permitting regimes to date have focused on the public concealed carry of pistols, not the bare ability to obtain a firearm at all.  *See, e.g.*, *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 940 (9th Cir. 2016) (permitting requirement applied to carriage outside the home); *Bruen*, 142 S.Ct. at 2169 (Breyer, J., dissenting) ("This licensing requirement applies only to handguns (*i.e.,* 'pistols and revolvers') and short-barreled rifles and shotguns, not to all types of firearms. For instance, the State does not require a license to carry a long gun (*i.e.*, a rifle or a shotgun over a certain length) in public."); *see also District of Columbia v. Heller*, 554 U.S. 570, 629 (2008) (D.C.'s ban applied to handguns but not to long guns).  These distinctions have deep (if complex) historical roots.  *See, e.g.*, *Bruen*, 142 S.Ct. 2142 n.12 (noting that under the Bill of Rights 1689, "[e]ven Catholics, who fell beyond the protection of the right to have arms, and who were stripped of all 'Arms, Weapons, Gunpowder, [and] Ammunition,' were at least allowed to keep 'such necessary Weapons as shall be allowed ... by Order of the Justices of the Peace ... for the Defence of his House or Person.' (quoting 1 Wm. & Mary c. 15, §4, in 3 Eng. Stat. at Large 399 (1688)); *id.* at 2143, 2154 (even outlier jurisdictions that banned public

carriage usually made an exception for long guns).  Thus, Defendants' argument that "nothing in the text of the Second Amendment nor in the *Bruen* opinion suggests" "that the Court should treat permits to purchase firearms differently than permits to carry them," Defs.Resp.3, is belied by multiple decisions of the Supreme Court, the Ninth Circuit, and other circuits, as well as by history.[1]  It thus remains very much Defendants' burden to *show* that this type of permitting regime is consistent with historical tradition—and pointing to *other* types of permitting regimes does not cut it.

*Second*, Measure 114 is not in fact a shall-issue regime; like the regime at issue in *Bruen*, it wears the label while being in substance may-issue.  *See* Pltfs.MSJ.16-18.  In particular, Measure 114 provides that permit agents may deny an application for a permit-to-purchase even if the applicant has already passed a background check and completed an approved safety course, if they determine that the applicant is "reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state."  M114 §§4(1)(b)(C), 5(2).  Plaintiffs claim that *Bruen* blessed a substantially identical provision of the state's concealed-carry law.  *See* Resp.Br.4; Defs.MSJ.14-15.  That is misleading in the extreme:

The provision *Bruen* cited in the course of describing what constitutes a shall-issue regime was ORS 166.29**1**, which is a model of the kind of *objective* criteria the Supreme Court identified as typifying a *true* shall-issue regime:  "The sheriff of a county, upon a person's application for an Oregon concealed handgun license … shall issue the permit if the person: … [h]as not been found to be a person with mental illness and is not subject to an order under ORS 426.130 [Court determination of mental illness] that the person be prohibited from purchasing or possessing a

---

[1] Indeed, many countries around the world with far stricter gun control regimes than would be permissible under the Second Amendment still treat shotguns or long guns in general differently from handguns.

firearm as a result of that mental illness." *Id.* at (1)(j); *see Bruen*, 142 S.Ct. at 2123 n.1 (citing ORS 166.291); *see also* ORS 166.273 (providing procedure to petition the Psychiatric Security Review Board for relief from this prohibition). The section of the Oregon code to which Defendants now point is ORS 166.29**3**, which is an entirely separate provision that allows permits to be denied "[n]otwithstanding" ORS 166.291(1). *See Langlotz v. Noelle*, 39 P.3d 271, 274 (Or. Ct. App. 2002) (noting that the "ostensibly mandatory language [of ORS 166.291] is overridden by ORS 166.293, which allows the sheriff to deny an application 'notwithstanding' the 'shall issue' language of subsection (1)").

*Bruen* nowhere cited that provision of Oregon law, and there is no indication whatsoever than the Supreme Court was even aware of it, let alone that it implicitly sanctioned that kind of discretion. Nor would it have made any sense for the Court to do so after going out of its way to explain that a "shall issue" regime is one "where authorities *must* issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S.Ct. at 2123. That Defendants themselves now admit that their law does *not* function in this manner, and is instead analogous to a statutory scheme that this Court has recognized "does not '*mandate* any outcome' because ***even when the statutory requirements are met, a sheriff may deny a CHL based on discretionary criteria***," *Helgeson v. Tillamook Cnty.*, 2014 WL1946614, at *3 (D. Or. May 14, 2014) (first emphasis in original), *aff'd*, 679 F. App'x 628 (9th Cir. 2017), just reinforces the conclusion that their effort to defend Measure 114 as a "shall-issue" regime fails even on its own terms. In reality, it is a quintessential regime "under which authorities have discretion to deny [permits] even when the applicant satisfies the statutory criteria," which is precisely what *Bruen* held does *not* pass constitutional muster. 142 S.Ct. at 2124.

In all events, even if Measure 114 were a "shall-issue" regime, *Bruen* made clear that even otherwise-permissible permitting regimes can still violate the Second Amendment if "put toward abusive ends," and thus did "not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." 142 S.Ct. at 2138 n.9. That, of course, is exactly what Plaintiffs have alleged here, and Defendants' shall-issue arguments give them no cover whatsoever when it comes to the fatal flaws in how Measure 114 actually operates.

### C. Defendants Have Failed to Prove that Permits Would Be Available to *Anyone* Under Measure 114.

Not only have Defendants failed to prove that Measure 114 is consistent with historical tradition; they have not even proven that permits could even issue if Measure 114 took effect. Defendants agree that the FBI will not and cannot provide the background checks that Measure 114 requires. Agreed Upon Facts ("AUF") 42, Dkt.161. Defendants instead continue the charade of claiming that "Measure 114's § 4(1)(e) does not require the FBI to complete a criminal background check." Defs.Resp.7. But the plain text of Measure 114 dispels any notion that the background-check requirement is a polite request that the FBI is free to disregard as it pleases, with no effect on the permitting process. An FBI background check is a legal prerequisite to the issuance of a permit. Lest there be any doubt of that, Measure 114's FBI-background-check requirement reads in full:

> The applicant **must** submit to fingerprinting and photographing by the permit agent. The permit agent **shall** fingerprint and photograph the applicant and **shall** conduct any investigation necessary to determine whether the applicant meets the qualifications described in paragraph (b) of this section. The permit agent **shall request the department to conduct a criminal background check, including but not limited to a fingerprint identification, <u>through the Federal Bureau of Investigation</u>. <u>The Federal Bureau of Investigation</u> shall return the fingerprint cards** used to conduct the criminal background check and may not keep any record of the fingerprints. **Upon completion** of the criminal background check **and determination of whether the permit applicant is qualified or disqualified** from

purchasing or otherwise acquiring a firearm **the department shall report the results, including the outcome of the fingerprint-based criminal background check,** to the permit agent.

§4(1)(e). Five "shall[s]" and a "must" is hardly permissive language, and the words "through the FBI" admit of no ambiguity. Unless and until ***the FBI*** "complet[es]" the mandatory background check, and deems the applicant either "qualified or disqualified," the permitting process cannot proceed. There is no option to just grant a permit without one if the department reports "that the FBI will not run a background check." PTO.12.

It is thus clear as a matter of law that permit agents cannot issue permits without the background checks that it is clear as a matter of fact the FBI will not provide. That is evident not only from the text of Measure 114 itself, but from the principles that apply to Oregon's already extant concealed handgun license: Where an Oregon statute "requires a sheriff to issue a CHL 'after compliance with the procedures set out in this section,'" "includ[ing], among other things, conducting the investigation required by [a statute]," and the sheriff "has not performed those procedures, … there is no statutory basis upon which to issue [the license]." *Held v. Hanlin*, 244 P.3d 895, 899 (Or. Ct. App. 2010). Thus, not only is the state simply wrong to argue that "Plaintiffs have offered no evidence that permit agents would refuse to issue permits on this basis"—as Plaintiffs have repeatedly pointed out, the uncontested testimony of sheriffs that they would enforce the law as written means exactly that, *see* Pltfs.MSJ.26—but Defendants have identified no legal basis on which permit agents could do otherwise.

Implicitly recognizing how weak their contrary claim is, Defendants repeat their plea that this Court simply declare the FBI-background-check provision "a legal nullity" and sever it from Measure 114. Defs.Resp.8; Defs.MSJ.9-10. But Defendants continue to fail to recognize that this Court could not grant such relief without granting judgment for *Plaintiffs*, as federal courts have

no freestanding power to simply nullify state laws that state lawyers find inconvenient.  *See* Pltfs.Resp.17.  Moreover, whether this provision even could be severed is a question that would require separate briefing and analysis, as a federal court cannot sever a provision of a duly enacted state law just because the state's attorneys would prefer that outcome.  It is far from clear that the voters would have enacted Measure 114's permitting regime if its *core* background-check requirement were a nullity.  And in all events, even if that provision could be severed, Defendants fail to explain how this Court could take the additional step of effectively replacing it with a requirement that the state police implement their own background check provision in its stead.

**D.** **Even Assuming that Permits Were a Practical Reality Under Measure 114, Defendants Have Failed to Prove that the Permitting Regime Could Operate in a Manner Consistent with the Second Amendment or Due Process.**

Even assuming Measure 114 could function in the manner that its plain text envisions, it would still be a classic example of a permitting regime "put to abusive ends," as it is riddled with delays, unknown costs, and procedures that border on Orwellian.  In trying to prove otherwise, Defendants continue to misunderstand how *Bruen*'s burden-shifting works:  It is on Defendants to demonstrate that the wait times, costs, and other burdens Measure 114 will impose are "consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126, 2130, 2135.  They are not.  A clue lies in the fact that the "I" in both the FBI's NICS background-check system and Oregon's analogous FICS stands for "instant."  That is because background checks in this nation have always been coupled with an understanding that they cannot long delay the exercise of Second Amendment rights by law-abiding individuals.  That is why the federal government provides that if "3 business days … have elapsed" since a background check was initiated and no answer has been received, a licensed firearms dealer may complete the transaction, 18 U.S.C. §922(t)(1)(B)(ii)—which is what Oregon likewise did before Measure 114.  *See* Pltfs.MSJ.22 n.8.

Defendants attempt to defend the 30-day clock that Measure 114 now provides by invoking the Ninth Circuit's decision in *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), which upheld California's ten-day cooling off period.  But *Silvester* (which is not even good law anymore, *see* Pltfs.MSJ.21) did not consider a "relevantly similar" regulation.  For one thing, the "why" was different:  California wanted to ensure *deliberately* that individuals were delayed a fixed number of days to avoid rash actions.  Oregon, by contrast, is simply spotting itself a month's grace in an apparent nod to bureaucratic inertia.  Moreover, to state the obvious, 30 days is three times as long as 10, and Silvester certainly did not hold that there is *no* limit to how long a state may delay the exercise of Second Amendment rights.  And in all events, Defendants have not even proven that all background checks would actually be completed within 30 days, and testimony from the Executive Director of the Oregon Association of Chiefs of Police now indicates that even "30 days [i]s not enough time" for Oregon's system to work as currently constructed.  Lindsay Decl., Ex. 1, Campbell Vol. II Dep. 203:1-2.  As for the mystery costs for compliance with Measure 114, Defendants have not even tried to quantify what they are, let alone to shoulder their burden of proving that they are consistent with the Constitution.  They instead chose to assert only the ipse dixit that the burden will be "modest" and wrongly shift to Plaintiffs the burden of proving otherwise.  Defs.Resp.8.

## E.    Measure 114's Duplicative and Dysfunctional Background-Check Regime is Indefensible.

Defendants' Response brief marks the fourth time in eight days that Defendants have refused to offer a substantive defense of Measure 114's duplicative background-check provisions, arguing only that Plaintiffs' complaints do not challenge them.  As Plaintiffs have now thrice explained, that is belied by a simple reading of their complaints, as this Court itself recognized when it observed that the operative complaints "raise … substantive challenges to Measure 114's

background check requirements," Dkt. 70 at 5 n.1.  Having nonetheless declined yet *another* opportunity to defend that aspect of the regime, Defendants have unquestionably forfeited the right to do so.  *See Samica Enters.*, 460 F.App'x at 666; *Emery*, 435 F.App'x at 613.

The few "[i]n any event" lines that Defendants now offer on the subject do not alter that conclusion in the slightest, as they are simply generalized recitations of defenses Defendants make as to Measure 114's permitting requirements *as a whole*, and do not address the specific problems Plaintiffs have pointed out with the duplicative background-check regime—most notably, that the second background check is subject to no time limit whatsoever.  *See* Pltfs.MSJ.2, 7-9, 21-29.  Moreover, the lone fact that Defendants raise that is unique to the background-check regime is damning rather than exculpatory:  They themselves acknowledge that Measure 114 background checks are processed in a timely manner only a mere 40% of the time.  Defs.Resp.10.  In other words, Measure 114 leaves citizens with only a one-in-three chance of being able to exercise their constitutional rights in anything close to a constitutionally permissible timeframe (even assuming the lack of the requisite FBI background check were not a complete barrier).  *See* Pltfs.Resp.7-18, 16.

More fundamentally, yet again Defendants do not meaningfully grapple with the problem that *all* of Measure 114's problematic provisions—from its discretion-conferring mental-health provision, to its already-abandoned FBI-background-check provision, to the 30-day bureaucratic-delay-enabling initial deadline, to the imposition of a prophylactic second background check with no deadline at all—work in tandem to compound the burden on Second Amendment rights, making this the paradigm permitting regime put toward "abusive ends."  142 S.Ct. at 2138 & n.9.  Defendants cannot shield the sum from constitutional scrutiny by trying to isolate each of its constituent parts.

**F.    The Implementation of Measure 114 Already is a Disaster, And It's Going to Get Worse.**

In the face of a mountain of uncontested evidence to the contrary, Defendants maintain that they are "prepared to implement Measure 114 now." Defs.Resp.8. That begs the question why they have not returned to the Harney County Court to request a hearing for relief from its stay, as that court's order permits them to do. *See* Dkt. 61 at 9; 61-3 at 1-2. The answer is obvious: That claim cannot withstand scrutiny.

Rather, uncontested evidence from Plaintiffs' 30(b)(6) witnesses has demonstrated that the implementation of Measure 114 is in shambles. *See* Pltfs.MSJ.24-28; Pltfs.Resp.5-8. To take just a few examples, inordinate delay is triggered by things as innocuous as having a common last name. *See* Lindsay Decl. ISO Pltfs' MSJ, Exhibit B, LeJeune Dep. (CLEAN) 32:22; *see id.* 16:20-17:4; 29:4-36:18; 26:9-24. Those whose background checks have been marked "delayed" are given a timeline the state knows to be wrong, as well as instructions to direct any questions to a phone number and email that the state has decided not to answer. Lindsay Decl. ISO Pltfs' MSJ, Exhibit D, LeJeune Dep. (ROUGH) 60:1-62:20; 65:22-67:14. The current state of technology for the "database" required by the law is an empty Excel spreadsheet. *See* Pltfs.MSJ.24-25. And the FBI is not cooperating—and for reasons of federal law, will not cooperate—in the administration of the background checks that Measure 114 requires the FBI to conduct. AUF.42; M114 §4(1)(e).

Defendants only response to all these glaring problems is to cite bare assertions by witnesses that OSP is ready to implement Measure 114 "now" and to argue that an empty Excel spreadsheet is good enough for government work because "Microsoft Excel [is] one of the most popular, versatile, and well-known database programs in the world." Defs.Resp.9. But Microsoft itself states that "Excel is not a database"; it is a tool for *creating* them. *Top 10 Reasons to Use Access with Excel*, Microsoft (last accessed May 22, 2023), https://tinyurl.com/4zrk6shu. And

anyone who has used a computer in an office setting knows that Defendants' plan to have 20 employees working on a single spreadsheet (as they manually perform background checks on applications and fingerprint cards sent through the mail) is not going to work at anything like the speed and accuracy required to protect the constitutional right guaranteed by the Second Amendment.  Thus, even if there were some manner in which Measure 114 could be implemented consistent with the Constitution, Defendants have fallen woefully short of proving that they are actually prepared to follow that course.

## II.    Measure 114's Magazine Ban Violates The Second Amendment.

### A.    Magazines Are Arms as Defined by the Second Amendment and the Supreme Court.

Defendants continue to insist that  magazines are not "arms" at all under the Second Amendment, but they fail to make any meaningful effort to reconcile that argument with the Supreme Court's unambiguous holding that "the Second Amendment's definition of 'arms'" presumptively covers all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132.  Instead, they simply incorporate by reference their argument in their trial brief that "magazines are not arms" because they are "not 'necessary to use' firearms."  Defs.Tr.Br.24.  *See* Defs.Resp.10.  That is not the test the Supreme Court has articulated, and for good reason, as it would restrict the Second Amendment right to a single hand-fed round in the chamber.[2]  As the Supreme Court has made abundantly clear, "arms" include "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581.  When a citizen takes into his hands a semiautomatic pistol equipped with a magazine, *see id.*

---

[2] And "necessity" does not fit logically into the "plain text" inquiry of *Bruen*'s first step: Anything from a semi-automatic pistol to a halberd may or may not be "necessary," depending on the time and place, but they would always and everywhere be an "arm."

at 635, he holds both the frame of the pistol and the magazine within it, as well as the bullet within that, all for the lawful purpose of self-defense.  The magazine is no mere bystander to the operation of the firearm, like a cartridge box or a carrying case; after each pull of the trigger, the spring in the magazine actively feeds the bullet into the chamber for the next pull of the trigger, and it is that bullet which "strike[s] another."  *Id*.  A firearm equipped with a magazine thus plainly satisfies *Bruen*'s definition of "arms," rendering any effort to ban magazines a presumptive infringement upon the right to keep and bear them.  That is so regardless of how many rounds a magazine holds; indeed, Defendants never even try to explain how a firearm equipped with a 12-round magazine could somehow cease to be "an instrument[] that facilitate[s] armed self-defense."  *Bruen*, 142 S.Ct. at 2132.

Nor do Defendants have any meaningful response to the problem that Measure 114 bans even firearms with a fixed magazine that the state deems "too large."  Because fixed-capacity magazines are *part of* the firearm, there is not even a plausible argument that this provision does not ban presumptively protected "arms."  That is so regardless of whether such a magazine can be "altered to accept ten or fewer rounds."  Defs.Resp.10.  The only question at the *first* step of *Bruen* is whether what the state has banned is an arm at all.  *See* Pltfs.MSJ.32 ("Something that is not just integral to the firing mechanism of a firearm, but literally part of it, is obviously an arm, not an accessory.").[3]  Defendants' seeming concession that these arms *would* be protected if they were just modified to accept fewer rounds is an implicit concession that they are, quite obviously, arms.

---

[3]  Because of this, Defendants' argument that "plaintiffs do not identify a single firearm *anywhere* that has a fixed magazine that holds more than ten rounds and is not subject to one of Measure 114's exceptions" is thus beside the point.  Defs.MSJ.11.  But even if it were not, it would be easily answered:  such weapons have existed since the nineteenth century, e.g., the Colt Lightning Rile, a pump-action rifle that has a 12- or 15-round fixed tubular magazine.  Several companies offer versions of this firearm today.  *See, e.g.*, 1884 Lightning Rifle & Carbine, Uberti (last visited May 22, 2023), https://bit.ly/3MtiO8h.

### B.    Defendants Do Not Dispute Commonality.

Because magazines are plainly "arms," Oregon's ban is "presumptively invalid," and the burden shifts to Defendants to "affirmatively prov[e]" that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126-27.  And here, the task of identifying the relevant tradition has already been done:  As the Supreme Court explained in *Bruen*, historical tradition protects arms that are "in common use today," as opposed to those "'highly unusual in society at large.'"  *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627); *see also Barnett v. Raoul*, 2023 WL3160284, at *11 (S.D. Ill. April 28, 2023) ("[T]he commonality of 'arms' banned under [the law challenged there] is dispositive.").

Defendants nevertheless attempt to skip over the topic of commonality altogether.  *See* Defs.Resp.11.  But this they may not do:  Under *Bruen*, *Heller*, and *Caetano*—a case that appears nowhere in Defendants' Response—the question of commonality is essential.  *See Bruen*, 142 S.Ct. at 2143; *Heller*, 554 U.S. at 627; *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring); *see also Barnett*, 2023 WL 3160284, at *11 ("[T]he commonality of 'arms' banned under [the law challenged there] is dispositive.").  Moreover, under *Bruen*'s burden-shifting test, *Defendants* bear the burden of showing that magazines capable of holding more than ten rounds are not common.  Having failed to even try to do so, Defendants have waived any such argument. *See Samica Enters.*, 460 F.App'x at 666; *Emery*, 435 F.App'x at 613.

In all events, Defendants presumably declined to even try to contest the point because the commonality of the magazines it has banned cannot reasonably be denied, as court after court has recognized for the better part of a decade when confronted with comparable bans.  There is overwhelming evidence that Americans own hundreds of millions of magazines that can hold over ten rounds of ammunition.  *See* Nat'l Shooting Sports Found., *Firearm Production in the United States* 7 (2020), https://bit.ly/3jfDUMt (finding, based on industry sales data, that American

Page 15        REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

consumers purchased more than 304 million magazines across both pistols and rifles from 1990 to 2018, 52% of which—almost 160 million—had a capacity of more than ten rounds)[4]; William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 22-23 (May 13, 2022), https://bit.ly/3yPfoHw (estimating that 39 million Americans, or more than 15% of all American adults, own or have owned a magazine that hold more than ten rounds); Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 65-67 (2004), available at https://bit.ly/3wUdGRE.  It is thus not surprising that multiple circuit courts, including the Ninth, have concluded that such magazines are ubiquitous.  *See, e.g.*, *Duncan v. Bonta*, 970 F.3d 1133, 1142 (9th Cir. 2020) ("One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation."); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc) ("46% of all magazines owned"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("[A]bout 25 million large-capacity magazines were available in 1995" and another "nearly 50 million such magazines … were approved for import by 2000.").

While Defendants have played coy as to how many magazines capable of holding more than ten rounds they think there are in America, even they agreed in interrogatories that Americans own at least one million firearm magazines that hold more than 10 rounds of ammunition; they just declined to take a position on "whether that number was greater than 50 or 115 million.  *See* RFAs 9-11.  And the testimony of their own experts has since confirmed that the number is far

---

[4] Defendants own experts have testified to the reliability of NSSF's numbers.  *See* Lindsay Decl., Ex. 5, Klarevas Dep. 26:23-27:2 (noting that Klarevas has cited this very report in some of his own declarations); *id.*, Ex. 6, DeLay Dep. 46:9-14 ("Q. Any reason to distrust th[e NSSF] data? A. Not to my knowledge.").

higher than Defendants are willing to admit.  *See, e.g.*, Lindsay Decl., Ex. 2, Spitzer Dep. 61:8-12.

("Oh, I believe it's more in the tens of millions at this point.").  In all events, it makes no difference,

as even one million is quintuple the number that Justice Alito deemed sufficient to be "common"

in *Caetano*.  *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (stun guns common because 200,000

civilians own them).  Defendants thus have not only waived any opportunity to try to meet their

burden of proving that the magazines they have banned are "'highly unusual in society at large,'"

*Bruen*, 142 S.Ct. at 2143, but have affirmatively conceded that they are not.

### C.  Defendants Fail to Show That Magazines Banned by Measure 114 Are Not Used For Lawful Purposes.

Defendants also bear the burden of trying to prove that the magazines they have banned

are not commonly used for lawful purposes.  Again, they have not even tried to do so.  And

understandably so, as the sheer numbers involved make any such claim inherently improbable:  It

is simply not plausible that most, or even very many, of the 100+ million magazines in civilian

hands are not "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S.

at 625.  As everything from studies to common sense shows, Americans keep and use such

magazines for all the same lawful purposes that Americans keep and use firearms in general—self-

defense, hunting, and recreational shooting.  Instead of confronting the question to which *Bruen*

and *Heller* demand an answer, Defendants continue to focus on an irrelevant inquiry:  the number

of rounds typically fired in a self-defense situation.  Defs.Tr.Br.25-27.  But that question is not the

same as, and is indeed orthogonal to, the question that the Supreme Court has actually instructed

lower courts to ask, which is simply whether arms are "typically possessed by law-abiding citizens

for [all] lawful purposes."  *Heller*, 554 U.S. 625; *see* Defs.MSJ.36-37.  Again, Defendants have

not even tried to answer that question, presumably because the answer is obviously yes.

**D. Detachable Magazines, Which Predate the Ford Model A, Are Not a "Dramatic Technological Change" or an "Unprecedented Societal Concern."**

Instead of focusing on the test that the Supreme Court has actually articulated, Defendants embrace an argument that the Supreme Court has rejected as "bordering on the frivolous," *Heller*, 554 U.S. at 582, insisting that magazines capable of holding over ten rounds of ammunition are "an example of dramatic technological change[]" because "[t]hey 'were not common in 1791.'" Defs.Tr.Br.28 (quoting *Bruen*, 142 S.Ct. at 2131-32, and *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015)). *Heller* is answer enough to that: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted). And *Bruen* makes clear that the "in common use" test turns on whether firearms are in common use "today," not whether they were common at the founding. 142 S.Ct. at 2143. Indeed, *Bruen* eliminated any doubt about that when it explicitly held that handguns could not be banned even if they *were* considered "dangerous and unusual" at the founding, because what matters is whether they are "in common use *today*." *Id*. Thus, any "dramatic technological change" argument that begins with a comparison to commonality at the founding is fatally flawed.

Defendants' felt-need to stretch so far back is understandable; firearms capable of firing more than 10 rounds without reloading have been around since before the founding, and the detachable magazines the states seek to ban have been on the civilian market since at least the 1890s. *See Duncan*, 970 F.3d at 1148; *see also* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018). Indeed, to the extent there was ever some "dramatic technological change," it came about nearly two centuries ago. Samuel Colt patented his first revolver in 1836. AUF.60. In the 1860s, hundreds of thousands of repeating rifles were being

sold.  Pltfs.MSJ.43.  Their use of magazines was so well-known that they were referred to as "repeater or magazine carbines," without further explanation, and they often held more than ten rounds.  Lindsay Decl., Ex. 3, *News from Washington, N.Y. Times* (Dec. 23, 1864); *see* Lindsay Decl., Ex. 4, Baron Dep. 55:21-59:23 (lack of explanation indicates the public's familiarity with term).  This was widely acknowledged to be a "revolution in arms."  *See generally* Joseph Bilby, *A Revolution in Arms* (2015).  Shortly thereafter, and contemporaneous with the passage of the Fourteenth Amendment, the "famous Winchester" came onto the scene, eventually selling millions of copies.  *See* Pltfs.MSJ.43.  In the 1880s, semiautomatic weapons were invented, with modern box magazines following in the 1890s.  *See id.* 44.  Anything that is older than the Wright Brother's first flight at Kitty Hawk or the Ford Model A is plainly not a "dramatic technological change."[5]

None of that means, as Defendants try to claim, that any and all firearms capable of firing more than ten rounds are necessarily protected by the Constitution.  The question still remains whether a particular arm is "in common use."  *Bruen*, 142 S.Ct. at 2143.  But if it is, then it matters not a whit whether that arm was common at the founding (or, for that matter, the ratification of the Fourteenth Amendment).  That is the square teaching of *Bruen*, and it compels the conclusion that the state's magazine ban is unconstitutional.

### III.  The Confiscatory Aspect Of Measure 114 Violates The Takings Clause.

Defendants' sole argument in response to Plaintiffs' takings-clause challenge is that the government may evade the just compensation requirement when it effects a physical taking pursuant to its police power.  But the force of the Takings Clause does not vary with the source of power the state invokes.  When the Supreme Court extended the Bill of Rights to the states, it

---

[5] Nor have Defendants demonstrated that the abuse of firearms, including those that use magazines, is a novel societal challenge.  *See* Pltfs.MSJ.46-47

assumed that states had near-plenary powers. Yet it still held that states could not use any of those powers to violate fundamental constitutional rights. The Takings Clause is no different. The Supreme Court long ago rejected the argument that invoking the police power immunizes the government from its obligation to pay just compensation when it takes private property.

To be sure, the police power may make a taking *permissible,* insofar as it tends to show that the state took the property for public use, because "the 'public use' … requirement is ... coterminous with the scope of a sovereign's police powers." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984); *see also Richardson v. City & Cnty. of Honolulu*, 124 F .3d 1150, 1156 (9th Cir. 1997). But that has nothing to do with whether the government has an obligation to pay just compensation. The Supreme Court long ago rejected the argument that the source of the state's authority determines whether it must pay just compensation. In *Chicago, Burlington & Quincy Railway Co. v. Illinois*, 200 U.S. 561 (1906), the Court made clear that "if, in the execution of *any power, no matter what it is,* the government . . . finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner." *Id.* at 593 (emphasis added). The Court reaffirmed that holding in *Loretto v. Teleprompter Manhattan CATV Corp.*, where it held that a law requiring physical occupation of private property was both "within the State's police power" *and* a physical taking that required compensation. 458 U.S. 419, 425 (1982). As the Court explained, whether a law effects a physical taking is "a separate question" from whether the state has the police power to enact it, and an uncompensated taking is unconstitutional "without regard to the public interests that it may serve." *Id.* at 425-26; *see also Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 197 (1985) (distinguishing between physical taking and exercise of police power).

Indeed, the Supreme Court has held that a law enacted pursuant to a state's "police power" is not immune from scrutiny even under the *regulatory* takings doctrine. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1020-27 (1992). As the Court explained there, the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated." *Id.* at 1026. The same is true *a fortiori* for the categorical rule that the government must compensate for physical takings. To be sure, *Lucas* recognized that personal property is subject to "an implied limitation" that a state may regulate in a way that may deprive citizens' property of value. *Id.* at 1027. But the "implied limitation" to which the Court referred was "the State's traditionally high degree of control over *commercial* dealings." *Id.* at 1027-28 (emphasis added). Thus, the Court observed that to the extent "property's only economically productive use is sale or manufacture for sale," restricting sale might "render [the] property economically worthless." *Id.* at 1027-28. But *Lucas* certainly never suggested that personal property is held subject to the "implied limitation" that the state may order its owner to dispossess himself of the property entirely or physically alter it into something else.

Moreover, *Lucas* emphasized the importance of asking whether a property owner could use his property in a particular manner *before* the state tried to restrict it. *See id.* Here, the state seeks to dispossess citizens of magazines that they lawfully obtained *before* the state decided to prohibit them. *See* Pltfs.MSJ.50-51. Of course, a citizen who *unlawfully* obtained such a magazine after the ban was already in place could not object (at least under the Takings Clause) to having it confiscated. But just as "confiscatory regulations" of real property "cannot be newly legislated or decreed (without compensation)," *id.* at 1029, nor can confiscations of personal property be decreed after the fact. After all, whatever expectations people may have regarding property

regulations, they "do not expect their property, real or personal, to be actually occupied or taken away." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 361 (2015).

Accordingly, this Court should reject Defendants' assertion of a police-power exception to the Takings Clause.  In addition to finding no support in precedent (outside of *Duncan*, which the Supreme Court *entirely* abrogated, and which Defendants signally no longer rely on in their Response), the state's position would essentially rewrite takings law and constitutional law more generally.  As a general matter, the Constitution is indifferent to the source of state power used to violate a constitutional prohibition.  While the federal government is one of limited and enumerated powers, the Constitution generally assumes that states exercise plenary or police powers.  And once the Supreme Court incorporated the Bill of Rights against the states, those provisions prohibited certain state actions, whatever the source of power under state law.  The only reason the source of state power is even discussed in takings cases is because it has some relevance to whether the government can satisfy the threshold requirement of taking private property for public use.  But once that hurdle is cleared, the source of power used to take private property is of no further moment.  Otherwise, the very fact that the taking was for a public use not only would allow it to occur but would obviate the need for just compensation.  That result would be wholly antithetical to the Takings Clause.  Such a rule would mean that, as the state put it, the Takings Clause "doesn't apply as a matter of law to this exercise of Oregon's police power over personal property."  Defs.Resp.12.  That sweeping proposition would subordinate property rights to government whim, in direct contravention of the Takings Clause.

To make matters worse, Oregon is confiscating property that is *protected by the Constitution.*  It is bad enough that the state is flatly prohibiting citizens from possessing what the Constitution protects.  To hold that the state may *confiscate* what the Constitution provides the

people may "keep," U.S. Const. amend. II, without even providing just compensation, adds constitutional insult to constitutional injury.  Even if that result could somehow be reconciled with the Second Amendment, there is no Second Amendment exception to the Takings Clause.

**IV.  Measure 114 Is Impermissibly Retroactive And Vague.**

Defendants' arguments as to retroactivity are based on the misapprehension that Measure 114 would have to "punish" those it targets to be retroactive.  Defs.Resp.13.  Not so, as demonstrated by the primary case on which Plaintiffs rely:  *Eastern Enterprises v. Apfel* was not about punishment, but about future regulatory requirements based on past transactions.  *See* 524 U.S. 498, 517 (1998).  That did not stop the Supreme Court from concluding that those regulatory requirements violated the rule against retroactivity.  *See id.* at 528-29.  Moreover, Measure 114 *is* a criminal statute: Any (law-abiding, federally regulated) dealer in Oregon who entered into a lawful transaction (purchasing a magazine capable of holding more than ten rounds) before December 8, merely by consequence of the passage of 180 days since it and without doing anything else, faces criminal sanctions.  That is the definition of retroactive.

As to Plaintiffs' vagueness claims, Measure 114 charges ordinary citizens with responsibility to make a mechanical alteration to their property: "[p]ermanently alter[ing a magazine] … so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition" and so that it cannot be "readily restored." M114 §11(3)(a)(C), 11(1)(d).[6] Yet it does not tell them anything about what will or will not satisfy that command.  Defendants cannot scorn Plaintiffs concerns about what standard of mechanical operation is necessary to comply with the commands of a criminal prohibition.  *See* Defs.Resp.14.  The Sixth Circuit found

---

[6] These two provisions are the flip side of the same coin.  Defendants' attempt to parse two different challenges out of them, *see* Defs.Resp.13, is yet another example of Defendants' propensity to try to split Plaintiffs' claims.

functionally indistinguishable language to be "unconstitutionally vague in its own right inasmuch as the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited." *Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998). This Court should follow the same course.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

DATED: May 22, 2023                    JURISLAW LLP

Paul D. Clement*                        s/ Shawn M. Lindsay
Erin E. Murphy*                         Shawn M. Lindsay (OSB No.: 020695)
Matthew D. Rowen*                       Daniel J. Nichols (OSB No.: 101304)
Nicholas M. Gallagher*                  Three Centerpointe Drive
Clement & Murphy, PLLC                  Suite 160
706 Duke Street                         Lake Oswego, OR 97035
Alexandria, VA 22314                    (503) 968-1475
(202) 742-8900                          shawn@jurislawyer.com

* admitted *pro hac vice*              *Counsel for Eyre Plaintiffs*


s/ Stephen Joncus                       s/ Leonard W. Williamson
Stephen J. Joncus, OSB #013072          Leonard W. Williamson, OSB #910020
JONCUS LAW PC                           VAN NESS WILLIAMSON LLP
13203 SE 172nd Ave Ste 166 #344         960 Liberty St. SE, Ste 100
Happy Valley, OR  97086                 Salem, OR 97302
(971) 236-1200                          (503) 365-8800
steve@joncus.net                        l.williamson@vwllp.com

                                        *Counsel for OFF Plaintiffs*


                                        s/ James L. Buchal
                                        James L. Buchal, OSB #910020
                                        MURPHY & BUCHAL LLP
                                        PO Box 86620
                                        Portland, OR 97286
                                        (503) 227-1011
                                        jbuchal@mbllp.com

                                        *Counsel for Fitz and Azzopardi Plaintiffs*