## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, et al.**, | Case No. 2:22-cv-01815-IM (Lead Case) |
| | 3:22-cv-01859-IM (Trailing Case) |
| Plaintiffs, | 3:22-cv-01862-IM (Trailing Case) |
| | 3:22-cv-01869-IM (Trailing Case) |
| v. | |
| **TINA KOTEK, et al.**, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants, | |
| and | |
| **OREGON ALLIANCE FOR GUN SAFETY**, | |
| Intervenor-Defendant. | |
| **MARK FITZ, et al.**, | |
| Plaintiffs, | |
| v. | |

**ELLEN F. ROSENBLUM, et al.**,

    Defendants.

_____

**KATERINA B. EYRE, et al.**,

    Plaintiffs,

  v.

**ELLEN F. ROSENBLUM, et al.**,

    Defendants,

    and

**OREGON ALLIANCE FOR GUN SAFETY,**

      Intervenor-Defendants.

_____

**DANIEL AZZOPARDI, et al.**,

    Plaintiffs,

  v.

**ELLEN F. ROSENBLUM, et al.**,

    Defendants.

_____

Karen Louise Osborne, KOsborne Law, LLC, 9721 NW Livingston Mountain Ct., Camas, WA 98607. Leonard W. Williamson, Van Ness Williamson, 960 Liberty St. SE, Suite 100, Salem, OR 97302. Pete Serrano, Silent Majority Foundation, 5238 Outlet Dr., Pasco, WA 99301. Stephen J. Joncus, Joncus Law, PC, 13203 SE 172nd Ave., Suite 166 #344, Happy Valley, OR 97086. Daniel Nichols, JurisLaw, LLP, Three Centerpointe Dr., Suite 160, Lake Oswego, OR 97035. Attorneys for Plaintiffs Oregon Firearms Federation, Inc., Brad Lohrey, Adam Johnson, Cody Bowen, Harold Richard Haden, Jr., Kevin Starrett, Terry Rowan, Brian Pixley, and Damian Bunting.

Adam Kraut and William Aaron Sack, Second Amendment Foundation, 12500 NE 10th Pl., Bellevue, WA 98005. Derek Angus Lee, Angus Lee Law Firm, PLLC, 9105a NE Hwy 99, Suite 200, Vancouver, WA 98665. William V. Bergstrom, Cooper & Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington, DC 20036. James J. Buchal, Murphy & Buchal, LLP, PO

Box 86620, Portland, OR 97286. Attorneys for Plaintiffs Mark Fitz, Grayguns, Inc., G4 Archery, LLC, Second Amendment Foundation, and Firearms Policy Coalition, Inc.

Paul D. Clement, Trevor W. Ezell, Nicholas Gallagher, Erin E. Murphy, and Matthew Rowen, Clement & Murphy, PLLC, 706 Duke St., Alexandria, VA 22314. Christian Cho, Shawn M. Lindsay, and Daniel Nichols, JurisLaw, LLP, Three Centerpointe Dr., Suite 160, Lake Oswego, OR 97035. Attorneys for Plaintiffs Katerina B. Eyre, Tim Freeman, Mazama Sporting Goods, National Shooting Sports Foundation, Inc., and Oregon State Shooting Association.

Adam Kraut and William Aaron Sack, Second Amendment Foundation, 12500 NE 10th Pl., Bellevue, WA 98005. Derek Angus Lee, Angus Lee Law Firm, PLLC, 9105a NE Hwy 99, Suite 200, Vancouver, WA 98665. William V. Bergstrom, Cooper & Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington, DC 20036. James J. Buchal, Murphy & Buchal, LLP, PO Box 86620, Portland, OR 97286. Attorneys for Plaintiffs Daniel Azzopardi and Sportsman's Warehouse, Inc.

Brian Simmonds Marshall, Oregon Department of Justice, Trial Division, Special Litigation Unit, 100 SW Market St., Portland, OR 97201. Erin N. Dawson, Hannah Hoffman, Anit K. Jindal, Harry B. Wilson, Markowitz Herbold, PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201. Attorneys for Defendants Tina Kotek, Ellen Rosenblum, and Terri Davie.

Scott Ferron, Zachary J. Pekelis, Jessica A. Skelton, and Kai Smith, Pacifica Law Group, 1191 2nd Ave., Suite 2000, Seattle, WA 98101. Attorneys for Intervenor-Defendant Oregon Alliance for Gun Safety.

## Table of Contents

I.     INTRODUCTION ........................................................................................ 6

II.    PROCEDURAL BACKGROUND ............................................................. 7

III.   SECOND AMENDMENT LEGAL FRAMEWORK ....................................... 10

IV.    FINDINGS OF FACT: BALLOT MEASURE 114'S STATUTORY

       FRAMEWORK ...................................................................................... 14

       A.    Purchase and Possession of Firearms in Oregon Prior to BM 114 ................. 14

       B.    LCM Restrictions under BM 114 ................................................... 15

       C.    Permit-to-Purchase .......................................................................... 17

V.     FINDINGS OF FACT: MODERN LARGE-CAPACITY MAGAZINES ......... 19

       A.    LCMs and Firearm Technology ....................................................... 19

       B.    LCMs and the U.S. Civilian Firearms Market ................................ 21

       C.    LCMs and Self-Defense .................................................................. 25

       D.    LCMs and Mass Shootings .............................................................. 29

       E.    LCMs and Public Health ................................................................. 32

VI.    FINDINGS OF FACT: HISTORY AND TRADITION ................................... 33

       A.    The American Colonies and the Early Republic (1700-1800) ...................... 36

       B.    Early-to-Mid-Nineteenth Century (1800-1850) ............................. 40

       C.    The Civil War and Reconstruction (1850-1880) ............................. 46

       D.    Late Nineteenth and Early Twentieth Century (1880 to 1940) ...................... 51

VII.     CONCLUSIONS OF LAW ................................................................. 55

  A.    Second Amendment ......................................................................... 55

  B.    Fifth Amendment ......................................................................... 107

  C.    Fourteenth Amendment ................................................................ 113

VIII.    CONCLUSION ........................................................................... 120

**IMMERGUT, District Judge.**

## I.    INTRODUCTION

Before this Court are two core questions: (1) can the State of Oregon limit the number of bullets to ten, that a law-abiding citizen can fire without reloading; and (2) can the State of Oregon require firearm purchasers to obtain a permit, which imposes various requirements, including a completed background check, safety training, and consideration of mental health status, before purchasing a firearm. After a weeklong bench trial, this Court concludes that the answer to each of these questions is yes. Accordingly, Oregon Ballot Measure 114 is constitutional.

As explained below, Plaintiffs have not shown that the Second Amendment protects large-capacity magazines, defined as magazines capable of firing eleven or more rounds without reloading. And even if the Second Amendment were to protect large-capacity magazines, this Court finds that Defendants and Intervenor-Defendant have established that Oregon's restrictions on the use and possession of large-capacity magazines are consistent with the Nation's history and tradition of firearm regulation. Consequently, Oregon's large-capacity magazine restrictions are constitutional under the Second Amendment. This Court also finds that the text of Oregon's permit-to-purchase framework is consistent with the type of regulations that the United States Supreme Court has deemed constitutional under the Second Amendment. Finally, this Court finds that Oregon's large-capacity magazine restrictions are not an unconstitutional taking of property, are not unconstitutionally retroactive, and are not unconstitutionally vague. Accordingly, this Court enters judgment for Defendants and Intervenor-Defendant on all of Plaintiffs' claims.

## II.    PROCEDURAL BACKGROUND

This consolidated action includes four separate lawsuits, all filed in the wake of the passage of Oregon Ballot Measure 114 ("BM 114"), which amends existing state regulations on the purchase and possession of firearms.[1] Plaintiffs in the consolidated action include advocacy groups, firearms dealers, firearms owners, county sheriffs, and one private security guard.

Plaintiffs bring six constitutional challenges against BM 114: a Second Amendment challenge to BM 114's large-capacity magazine ("LCM") restrictions, a Second Amendment challenge to BM 114's permit-to-purchase regime, a Fifth Amendment takings challenge to BM 114's LCM restrictions, a Fourteenth Amendment due process challenge to BM 114's permit-to-purchase regime, and two Fourteenth Amendment challenges—due process and void for vagueness—to BM 114's LCM restrictions.

On December 6, 2022, this Court denied Plaintiffs' initial motions for a temporary restraining order, which sought to prevent BM 114 from taking effect as scheduled on December 8, 2022. *See generally* ECF 39. In that order, this Court found that Plaintiffs had failed to demonstrate that they would suffer immediate and irreparable harm if BM 114 were allowed to take effect. *Id.* at 3. This Court also held that Plaintiffs had failed to demonstrate a likelihood of success on the merits with respect to their facial challenge to BM 114's permitting regime as well as their constitutional challenges to BM 114's restriction on LCMs. *Id.* Nonetheless, this

---

[1] *Oregon Firearms Fed'n, Inc. v. Kotek*, the lead case in this consolidated action, was the first lawsuit to be filed and challenged all aspects of Ballot Measure 114 ("BM 114")—including Oregon's permit-to-purchase regime and the restrictions on large-capacity magazines ("LCMs"). No. 2:22-cv-01815-IM. *Fitz v. Rosenblum*, the second case filed, challenged only BM 114's LCM restrictions. No. 3:22-cv-01859-IM. *Eyre v. Rosenblum*, the third case filed, challenged all aspects of BM 114, including both Oregon's permit-to-purchase regime and Oregon's restrictions on LCMs. No. 3:22-cv-01862-IM. Finally, *Azzopardi v. Rosenblum*, the fourth and final case filed, challenged only BM 114's permit-to-purchase regime. No. 3:22-cv-01869-IM.

Court—at the request of Defendants—entered an order staying implementation of BM 114's permitting provision for thirty days to allow Defendants to prepare for implementation. *Id.* at 4.

Following this Court's denial of Plaintiffs' motions for a temporary restraining order, this Court ordered that the four separate cases be consolidated into the present action. ECF 62. This Court also granted Intervenor-Defendant Oregon Alliance for Gun Safety's motion to intervene in the action under Federal Rule of Civil Procedure 24(b). ECF 59. This Court then set this matter for briefing and a hearing on Plaintiffs' motions for a preliminary injunction. ECF 66.

On February 9, 2023, with the consent of the parties, this Court vacated the scheduled preliminary injunction hearing and set this matter for an expedited trial. ECF 134. The parties conducted discovery between February and May of 2023. ECF 139. On May 12, Plaintiffs moved for summary judgment on all six of their claims, ECF 165, while Defendants moved for summary judgment on Plaintiffs' facial challenge to BM 114's permitting regime and dismissal of Plaintiffs' as-applied challenge to the permitting regime as unripe for adjudication, ECF 163. This Court initially denied both sides' motions, finding that this matter implicates both important and unsettled questions of law, as well as genuine disputes of material fact. ECF 216 at 2–3.

On May 30, 2023, this Court held a Pretrial Conference with the parties, wherein the parties clarified both their legal positions regarding Plaintiffs' challenges to BM 114's permitting provisions and their intentions with respect to evidence regarding these claims at trial. ECF 222. Following that hearing, this Court found it appropriate to clarify the type of evidence it would receive regarding Plaintiffs' facial challenge to BM 114's permitting provisions and to revisit its prior ruling denying Defendants' motion to dismiss. ECF 234. This Court ultimately concluded that Plaintiffs' as-applied challenge to BM 114's permitting regime was not ripe for trial, as the permitting regime has not yet gone into effect, and dismissed that claim without prejudice and

with leave to refile should BM 114 go into effect at some future date. *Id.* at 7. As written, BM

114 was scheduled to go into effect on December 8, 2022, but Defendants are currently

restrained from enforcing BM 114 by state court order. *See* Opinion Letter, December 15, 2022,

*Arnold v. Brown*, No. 22-cv-41008 (granting preliminary injunction of BM 114's LCM

restrictions and temporary restraining order of BM 114's permitting provisions).

This Court held a bench trial on all of Plaintiffs' remaining claims beginning on June 5,

2023. ECF 240. Over the course of the weeklong trial, this Court heard testimony from twenty

witnesses and received more than 100 exhibits into evidence. ECF 248; ECF 251. In addition to

witness testimony and evidence admitted into the record, Plaintiffs have asked this Court to

consider as legislative facts thirteen documents. ECF 223. These documents are authored by

individuals who were not called to testify at trial, making these documents inadmissible hearsay.

ECF 238; *see also* Fed. R. Evid. 802. This Court concludes that these thirteen documents deserve

no weight in this case.[2]

---

[2] Plaintiffs did not identify any nonhearsay purpose or exception to the rule against
hearsay for these documents. Instead, Plaintiffs argue that this Court may consider them as
legislative facts, which are not subject to the Federal Rules of Evidence. ECF 223. Defendants
and Intervenor-Defendant object, arguing that these documents contain adjudicative rather than
legislative facts. ECF 233; ECF 238 at 4. This Court agrees.

The Ninth Circuit has described the difference between legislative and adjudicative facts
as follows: Adjudicative facts resolve factual disputes pertaining to the elements of the claims at
issue in a particular case. *See Perry v. Brown*, 671 F.3d 1052, 1075 (9th Cir. 2012), *vacated sub
nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013) ("Adjudicative facts are . . . the types of 'facts
that go to a jury in a jury case,' or to the factfinder in a bench trial."). Legislative facts, on the
other hand, are "those which have relevance to legal reasoning and the lawmaking process." Fed.
R. Evid. 201(a) advisory committee's note to 1972 Proposed Rules.

The legislative fact exhibits offered by Plaintiffs address factual questions that this Court
must answer, including the commonality of LCMs, their use by ordinary citizens, and the
relevancy of certain historical firearms regulations. Thus, the thirteen documents are replete with
adjudicative facts. This Court offered Plaintiffs the opportunity to identify specific legislative
facts and the purpose for which those purported legislative facts were offered. Plaintiffs failed to
do so with any specificity. It is not appropriate for this Court to rummage through voluminous

### III.    SECOND AMENDMENT LEGAL FRAMEWORK

#### 1.    Pre-*Bruen* and the Means-End Test for Second Amendment Challenges

The Second Amendment to the United States Constitution reads, in full: "*A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.*" U.S. Const. amend. II (emphasis added).

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms unconnected with militia service. 554 U.S. 570, 583, 592 (2008). In arriving at this interpretation, the Supreme Court emphasized "the inherent right of self-defense" as "central to the Second Amendment right." *Id.* at 628. The Supreme Court explicitly cautioned, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and noted that the Second Amendment does not protect a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Supreme Court then struck down a District of Columbia law that generally prohibited the possession of handguns, as violating the Second Amendment,

———————————

materials submitted by Plaintiffs to divine which facts, if any, might properly be deemed legislative facts. It is up to the party offering such legislative facts to provide concrete guidance as to which facts this Court should consider and for what purpose.

While legislative facts are often considered by appellate courts deciding Second Amendment challenges, *see Jones v. Bonta*, 34 F.4th 704, 726 n.24 (9th Cir. 2022), *vacated*, 47 F.4th 1124, this Court is a trial court. It is the function of the trial court to receive evidence and testimony that has been tested through the adversarial process. This process helps the fact-finder "ascertain[] [the] truth" and "minimiz[e] the risk of error," by subjecting witnesses to cross-examination on potential bias and credibility, and by excluding evidence that is irrelevant, prejudicial, or lacking indicia of reliability. *See Mackey v. Montrym*, 443 U.S. 1, 13 (1979); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The adversarial process also "crystallizes the pertinent issues and facilitates appellate review . . . ." *Neitzke v. Williams*, 490 U.S. 319, 330 (1989). Without subjecting Plaintiffs' legislative facts to the adversarial process, this Court cannot adequately assess issues of credibility or bias.

concluding that it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]." *Id* at 628.

Two years after *Heller*, the Supreme Court once again considered the scope of the Second Amendment right in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *McDonald*, the Supreme Court reiterated that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense." *Id.* at 749–50. The Supreme Court then held that the Second Amendment is "fully applicable to the States" through the Fourteenth Amendment. *Id.* at 750. In so holding, the Supreme Court reversed a Seventh Circuit Court of Appeals decision upholding two citywide bans on the possession of handguns in the home. *Id.* at 791.

Following *Heller* and *McDonald*, circuit courts across the country—including the Ninth Circuit—adopted a two-step means-end analysis for Second Amendment challenges. First, courts considered whether the challenged regulation burdened conduct protected by the Second Amendment. If it did, courts then balanced the state's interests in the regulation against the burden on the constitutional right. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). This inquiry allowed courts to consider not only the text and history of the Second Amendment, but also the state's interest in public safety and the general welfare.[3]

---

[3] Pre-*Bruen*, the Ninth Circuit, sitting en banc, upheld the constitutionality California's LCM restrictions under the means-end test. *Duncan v. Bonta*, 19 F.4th 1087, 1100, 1102–03 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022). In assessing the constitutionality of the ban, the Ninth Circuit first asked whether the challenged law involved conduct protected by the Second Amendment. *Id.* at 1102. The Ninth Circuit assumed, without deciding, that California's law implicated the Second Amendment. *Id.* at 1103. Finding that California's restrictions imposed only a minimal burden on the Second Amendment right, the Ninth Circuit proceeded to analyze the law under intermediate scrutiny. *Id.* at 1108. At this second step, the Ninth Circuit concluded that California's LCM restrictions were a reasonable fit for the compelling state interest of reducing gun violence, and held that the law did not violate the Second Amendment. *Id.* at 1111.

### 2. *Bruen* and the History and Tradition Test for Second Amendment Challenges

In June of 2022, the Supreme Court again considered the scope of the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*. In *Bruen*, the Supreme Court reiterated that the Second Amendment protects the right to keep and bear arms for "law-abiding citizens with ordinary self-defense needs." 142 S. Ct. 2111, 2156 (2022). But *Bruen* explicitly rejected the two-step, means-end analysis for Second Amendment challenges. *Id.* at 2126. Instead, *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct," the government must affirmatively "demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, *Bruen* creates a new two-step analysis for assessing the constitutionality of firearms regulations. First, a plaintiff challenging a firearm regulation must show the plain text of the Second Amendment covers the conduct regulated by the challenged law. *See id.*[4] To determine whether the conduct at issue is covered by the plain text of the Second Amendment, a court must determine whether the weapon in question is a "bearable arm" that is "in common use today for self-defense." *Id.* at

---

[4] While *Bruen* does not specify that the plaintiff bears the burden of showing that the challenged conduct falls within the plain text of the Second Amendment, this Court finds that is the most logical reading of the Supreme Court's opinion. The Supreme Court explicitly states that "when the Second Amendment's plain text covers an individual's conduct . . . the government *must then* justify its regulation . . . ." *Bruen*, 142 S. Ct. at 2129–30 (emphasis added). This Supreme Court language strongly suggests that the burden shifts to the government only after the plaintiffs have shown that the challenged conduct is covered by the plain text of the Second Amendment. *See id.* This also comports with "one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law." *Lemon v. Kurtzman*, 411 U.S. 192, 208 (1973) (citation omitted). In applying this "first principle" to the holding of *Bruen*, this Court finds that the burden is on the plaintiff, in the first instance, to show that the challenged law implicates conduct covered by the plain text of the Second Amendment. If the plaintiff makes such a showing, then the burden shifts to the government to show that the challenged regulation is consistent with the Nation's history and tradition of firearm regulation.

2132, 2134 (internal quotation marks omitted). If the weapon is in common use today for self-defense, then the Constitution presumptively protects that conduct. *Id.* at 2128, 2134, 2135. Under *Bruen*'s second step, the government must then affirmatively prove that the challenged regulation is consistent with the historical tradition of firearm regulation. *See id.* at 2130.

      *Bruen* also made clear that "the right secured by the Second Amendment is not unlimited," and that governments may still impose certain restrictions on the purchase, possession, and use of firearms. *Id.* at 2128 (citation omitted); *see also id.* at 2162 (Kavanaugh, J., concurring) ("[T]he Second Amendment allows a 'variety' of gun regulations," including "presumptively lawful regulatory measures" such as laws prohibiting the keeping and carrying of "dangerous and unusual weapons.") (citation omitted).

      While *Bruen*'s test for Second Amendment challenges is grounded in history and tradition, *Bruen* also acknowledged that modern regulations may implicate either "unprecedented societal concerns" or "dramatic technological changes" different from those that existed at the Second Amendment's ratification in 1791 or at the Fourteenth Amendment's ratification in 1868. *Id.* at 2132. In those circumstances, *Bruen* directs courts to consider "a more nuanced approach" and determine whether historical regulations are "relevantly similar" to the current challenged regulation based on two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

      In analyzing whether a challenged regulation violates the Second Amendment, *Bruen* directed courts to rely on "various evidentiary principles and default rules to resolve uncertainties." *Id.* at 2130 n.6 (internal quotation marks omitted). This case involved disputed issues of fact involving whether BM 114 prohibits conduct covered by the plain text of the Second Amendment, such as whether LCMs are "in common use today for self-defense" by

"law-abiding citizens with ordinary self-defense needs." *Id.* at 2134, 2156 (internal quotation marks omitted). This case also involved disputed issues regarding the historical record that required this Court to assess witness credibility and bias. Accordingly, this Court held a weeklong bench trial to resolve these issues and now makes the following findings of fact in accordance with Federal Rule of Civil Procedure 52(a).

## IV.    FINDINGS OF FACT: BALLOT MEASURE 114'S STATUTORY FRAMEWORK

BM 114 was approved by a majority of Oregon voters in November of 2022. *Measure 114*, *November 8, 2022, General Election Abstract of Votes*, OREGON SECRETARY OF STATE, http://perma.cc/7ZCU-5CU3 (last visited July 14, 2023).[5] The express purpose of BM 114, as stated in its preamble, is to enhance public safety and reduce gun violence, particularly mass shootings associated with LCMs. Ex. 1.

Excluding certain exceptions for law enforcement and military use, BM 114 prohibits the sale and restricts the use of LCMs that hold eleven or more rounds of ammunition. *Id.* § 11. BM 114 also requires individuals to obtain a permit before purchasing firearms. *Id.* § 4.

### A.  Purchase and Possession of Firearms in Oregon Prior to BM 114

Prior to BM 114, Oregon imposed no restrictions on the capacity of firearm magazines. And, any individual who wanted to purchase a firearm in Oregon was required to complete a background check at the time of purchase, including a criminal history check, to determine whether the individual was disqualified from purchasing a gun under Oregon law. O.R.S.

_____

[5] Oregon has a statutory ballot measure system, which includes initiative, referenda, and legislative referral. Ballot initiatives allow Oregon voters to propose revisions or additions to the Oregon Revised Statutes. To be placed on the ballot, a statutory initiative must garner 1,000 sponsorship signatures followed by signatures totaling six percent of the total votes cast for governor at the last election. *Make or Change State Law*, OREGON SECRETARY OF STATE, http://perma.cc/6F54-BVPQ (last visited July 14, 2023).

166.412(2) (effective Jan. 1, 2019–Dec. 7, 2022). Oregon law disqualifies the following persons

from possessing a firearm: felons, certain criminal defendants, individuals with certain adjudged

mental illnesses, and individuals subject to protective orders for domestic abuse or extreme risk

protection. O.R.S. 166.250(1). If the required background check was not completed within three

days, the gun dealer could nonetheless deliver the firearm to the individual. O.R.S. 166.412(3)(c)

(effective Jan. 1, 2019–Dec. 7, 2023). There was no requirement that individual firearm owners

complete any kind of safety training, except to obtain a concealed handgun license or a hunting

license for youth. Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90.

### B.  LCM Restrictions under BM 114

BM 114 makes it a misdemeanor offense to manufacture, import, possess, use, purchase,

sell, or otherwise transfer any LCM in Oregon after BM 114 goes into effect. Ex. 1 § 11(2), (6).

BM 114 defines LCMs as "a fixed or detachable magazine . . . or similar device . . . that has an

overall capacity of, or that can be readily restored, changed, or converted to accept, more than

[ten] rounds of ammunition and allows a shooter to keep firing without having to pause to reload

. . . ." *Id.* § 11(d).

### 1.  Exceptions to BM 114's LCM Restrictions

BM 114 contains various exceptions to the general prohibition on the manufacture,

purchase, sale, or possession of LCMs. Licensed gun dealers that have LCMs in their inventory

have several options for complying with BM 114's new restrictions within 180 days after BM

114 takes effect. During that time, a licensed gun dealer may transfer or sell LCMs within their

inventory to a non-resident gun dealer or other transferee located out of state. *Id.* § 11(3)(a)(A).

The licensed dealer may also purchase LCMs from any owner for permanent removal from

Oregon. *Id.* § 11(3)(a)(B). And, a licensed dealer may permanently alter any LCM in their

inventory such that it is no longer capable of accepting more than ten rounds of ammunition. *Id.* § 11(3)(a)(C).

BM 114 also contains exceptions for certain firearms manufacturers that produced LCMs before the regulations went into effect. If a firearm manufacturer is properly licensed under federal, state, and local law and is party to a binding contract pre-dating the effective date of the measure with an entity outside of the state of Oregon for the manufacture of LCMs, then it may fulfill that contract so long as all manufacture is completed no later than 180 days after the effective date of the measure and the manufacturer makes the entity aware of BM 114's future requirement in writing. *Id.* § 11(3)(b)(A)–(B). BM 114 does not apply, at any time, to a properly licensed firearms manufacturer that manufactures LCMs exclusively for the United States Armed Forces or law enforcement, or a licensed gun dealer that sells or otherwise transfers LCMs to the United States Armed Forces or law enforcement. *Id.* § 11(4)(a)–(b).[6]

Current owners and future inheritors of LCMs can still possess and use LCMs obtained prior to BM 114's effective date, subject to certain limitations.[7] Current owners and inheritors of LCMs may only use those firearms at their home (or on property under their control), on the premises of a gun dealer, at shooting ranges, for recreational activities like hunting, at firearms

---

[6] Any magazine manufactured, sold, or otherwise pursuant to this exception must "include a permanent stamp or marking indicating that the large-capacity magazine was manufactured or assembled after the effective date of [BM 114]." Ex. 1 § 11(4)(a)(B).

[7] BM 114 states, in relevant part, that "it shall be an affirmative defense . . . that (a) [t]he large-capacity magazine was owned by the person before the effective date of this 2022 Act and maintained in the person's control or possession; or (b) [t]he possession of a large-capacity magazine was obtained by a person who, on or after the effective date of this section, acquired possession of the large-capacity magazine by operation of law upon the death of a former owner who was in legal possession of the large-capacity magazine . . . ." Ex. 1 § 11(5).

competitions or exhibitions, for certain educational purposes, or during transport to or from one

of these permissible locations. *Id.* § 11(5)(c)(A)–(E). BM 114 does not apply at all to any

member of the United States Armed Forces or law enforcement who acquire, possess, or use

LCMs, so long as that acquisition, possession, or use "is related directly to activities within the

scope of that person's official duties." *Id.* § 11(4)(c).[8]

### C. Permit-to-Purchase

Under BM 114, any individual seeking to purchase a firearm in Oregon must first apply

for a permit. *See id.* §§ 6(2)(a), 7(3)(a), 8(2), 9(1)(a)(A). Applicants receive a permit if they: (1)

are not prohibited from purchasing or acquiring a firearm under state or federal law; (2) are not

subject to certain protective orders which prohibit individuals in Oregon from possessing guns;

(3) are not reasonably likely to be a danger to themselves, others, or the community at large;[9] (4)

provide proof that they have completed a firearm safety course;[10] and (5) pay a fee.[11] *Id.* §

---

[8] BM 114's military and law enforcement exception covers "peace officer[s]" as that term is defined in O.R.S. 133.005. Ex. 1 § 11(4)(c). This definition excludes private security guards. *See* O.R.S. 133.005(3).

[9] BM 114 prohibits an individual from obtaining a permit if they "present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." Ex. 1 § 4(1)(b)(C).

[10] Per BM 114, the safety course must include review of applicable state and federal firearm laws, including laws about safe storage and reporting lost or stolen firearms. The course must also cover the dangers associated with the misuse of firearms. Safety courses can be completed in-person or online, though all permit applicants must complete an in-person demonstration that shows that the applicant can lock, load, unload, fire, and store a firearm. Ex. 1 § 4(8)(c)(A)–(D).

[11] BM 114 states that fees for first-time applicants must be "reasonable" and cannot exceed sixty-five dollars. Ex. 1 § 4(3)(b). Fees for permit renewals must likewise be "reasonable" and cannot exceed fifty dollars. *Id.* § 4(7)(c). Fees are intended to "reflect[] the

4(1)(b)(A)–(E). The applicant must submit to fingerprinting and photographing by a permitting agent. *Id.* § 4(1)(e).[12] The applicant must also submit to a criminal background check conducted by the Oregon State Police ("OSP"), including but not limited to a fingerprint identification, through the Federal Bureau of Investigation ("FBI"). *Id.*[13] Within thirty days of receiving an application for a permit, if the applicant meets the criteria, the permit agent "shall issue the permit-to-purchase." *Id.* § 4(3)(a). A permit is valid for five years. *Id.* § 4(7)(a).[14]

If the permit application is denied, or if no written response has been received within thirty days of the application, the applicant may file an action in state circuit court to compel the issuance of the permit. *Id.* § 5(1), (5). The state circuit court reviews the application anew and must issue a decision on the matter "within [fifteen] judicial days of filing or as soon as practicable thereafter." *Id.* § 5(8), (10). That decision is appealable, as a matter of right, to the Oregon Court of Appeals. *Id.* § 5(11).

---

actual cost of the process . . . including the cost of obtaining a criminal background check and photographing." *Id.*

[12] BM 114 defines a "permit agent" as either the police chief or county sheriff in the place where the applicant lives, or an individual designated to be a permit agent by the police chief or sheriff. Ex. 1 §§ 3(5), 4(1)(a).

[13] BM 114 requires the permitting agent to request that OSP "conduct a criminal background check, including but not limited to a fingerprint identification, through the Federal Bureau of Investigation." Ex. 1 § 4(1)(e). The law states that the FBI "shall return the fingerprint cards used to conduct the criminal background check and may not keep any record of the fingerprints." *Id.* BM 114 also states that "[u]pon completion of the criminal background check and determination of whether the permit applicant is qualified or disqualified from purchasing or otherwise acquiring a firearm, [OSP] shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent." *Id.*

[14] Any individual seeking to renew their permit must submit a new application, but they are not required to take another safety course or undergo fingerprinting if the earlier set "has been retained by the permit agent or is otherwise available." Ex. 1 § 4(7)(b)(A)–(B).

BM 114 requires licensed dealers to verify that any potential firearm purchaser has a valid permit and forbids a dealer from transferring the firearm to the purchaser unless the dealer receives a unique approval number from OSP. *Id.* § 6(3)(c).[15] BM 114 likewise requires individuals seeking to transfer firearms to confirm that the individual to whom the firearm is being transferred has a valid permit. *Id.* § 7(3)(a). And BM 114 requires anyone seeking to sell or transfer a firearm at a gun show to confirm that the individual to whom the firearm is being sold or transferred has a valid permit. *Id.* §§ 8(3)(c), 9(1)(a)(A). BM 114 makes it a misdemeanor to sell or transfer firearms to an individual who does not have a permit. *Id.* §§ 6(14), 7(5)(a), 9(5)(a). BM 114 does not criminalize possession of a firearm without a permit. Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90.

## V.    FINDINGS OF FACT: MODERN LARGE-CAPACITY MAGAZINES

### A.  LCMs and Firearm Technology

Under *Bruen*, a court must first consider whether the plain text of the Second Amendment covers the regulated conduct. 142 S. Ct. at 2126. Because the regulated conduct at issue in this case is the ability to keep and bear LCMs, this Court received evidence regarding how magazines, and LCMs specifically, operate. Based on that evidence this Court finds as follows: A magazine is a device that contains and facilitates the feeding of ammunition cartridges into a firearm. Trial Transcript ("Tr.") 6/6/2023 523:5–7. A magazine is a rectangular box generally made of steel, though magazines can also be made from plastic, polymer, or other

---

[15] Pre-BM 114, under both state and federal law, firearms dealers could transfer a firearm to a purchaser without a completed background check if the background check process took longer than three business days. O.R.S. 166.412(3)(c); 18 U.S.C. § 922(t)(1)(B)(ii). BM 114 ends this practice by requiring a firearms dealer to receive a unique approval number before transferring a firearm to the prospective purchaser.

materials. Tr. 5/30/2023 43:21–44:2; Tr. 6/5/2023 118:14–15. The bottom of the magazine is called the floor plate. Tr. 5/30/2023 43:24. Inside the magazine is a carrier that sits atop a spring. Tr. 5/30/2023 43:25–44:1. When the magazine is loaded with bullet cartridges, the spring is compressed. Tr. 5/30/2023 44:3–4. When an individual fires a modern semi-automatic firearm, the top portion of a firearm—known as the slide—is driven back by recoil force. Tr. 5/30/2023 44:4–5. An extractor inside of the gun catches the rim of the spent shell casing, pulling it backwards and striking a stud known as an ejector, which in turn kicks the spent shell casing out of the firearm's ejection port. Tr. 5/30/2023 44:6–10. With the slide now completely moved to the rear of the firearm, the spring-loaded magazine pushes the next cartridge towards the top of the magazine's box. Tr. 5/30/2023 44:11–12. A recoil spring, located parallel to and underneath the barrel of the firearm, moves the slide forward. Tr. 5/30/2023 44:13–15. As the slide moves forward, it picks up the cartridge that has been pushed to the top of the magazine box and places it in the firing chamber. Tr. 5/30/2023 44:15–16. With a new round now chambered, the operator of the firearm can resume shooting. Tr. 5/30/2023 44:16–17.

Magazines can be either fixed or detachable. Tr. 6/6/2023 523:10–14. A fixed magazine is permanently attached to the firearm. Tr. 6/6/2023 523:15–19. A detachable magazine is a magazine that can be easily removed from the firearm when empty and replaced with another fully loaded detachable magazine. Tr. 6/6/2023 523:10–13. Detachable magazines facilitate more rapid reloading of a firearm when the previous magazine is empty. Tr. 6/6/2023 523:13–14. It takes a skilled firearm user approximately three and a half seconds to reload a firearm with a detachable magazine. Tr. 5/30/2023 78:14–19.

Magazines vary in their capacity, or the number of rounds that the magazine can hold. Some magazines hold a maximum of ten rounds. Tr. 6/6/2023 523:20–23. Other magazines hold

as many as 100 rounds. Tr. 6/5/2023 123:3–4. Magazine capacity is not a determining factor in

the operability of a firearm, and most firearms that accept detachable magazines will function the

same regardless of the magazine's capacity. Tr. 6/6/2023 527:4–5. Glock semi-automatic pistols,

Beretta pistols, and most AR-15-style rifles will function with a ten-round magazine as well as

with an LCM. Tr. 6/6/2023 527:10–13. Aside from the number of rounds available without

reloading, the mechanical function of an LCM and a ten-round magazine is the same: both

deliver ammunition into the firearm. Tr. 6/5/2023 127:19–23; 128:11–12. LCMs and ten-round

magazines also offer the same reliability. Tr. 6/6/2023 526:24–527:1. When a detachable

magazine is inserted into a handgun's magazine well, it is difficult to discern the total capacity of

the magazine. *See* Tr. 6/6/2023 529:2–4.

Some magazines that hold a maximum of ten rounds can be extended to hold more

rounds. Tr. 6/5/2023 79:10–15. To extend a ten-round magazine, a user must first remove the

magazine's baseplate, which can be done with a tool like a punch or a screwdriver, or sometimes

can be done by hand. Tr. 6/5/2023 79:11–13. The user must then add an extended baseplate to

their ten-round magazine. Tr. 6/5/2023 79:12–14. An extender replaces the original baseplate of

the magazine. Tr. 6/6/2023 531:16–18. In some firearms, a magazine that has been extended will

also require the user to replace the original spring with a stronger spring to push the cartridges

out of the magazine and into the chamber of the firearm. Tr. 6/6/2023 531:19–532:6. An

individual must add these parts—an extender, and possibly a stronger spring—before they can

successfully extend the capacity of their magazine. *See* Tr. 6/6/2023 532:7–10.

### B.  LCMs and the U.S. Civilian Firearms Market

Under *Bruen*, a court must consider whether a regulated firearm or firearm accessory is

"in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks

omitted). Accordingly, this Court received evidence at trial regarding the commonality of LCMs among U.S. civilians. Based on that evidence, this Court now as finds follows: LCMs first achieved commercial success in the U.S. civilian market in the 1980s. Tr. 6/5/2023 131:13–21. In 1954, only two models of firearms available in the civilian marketplace were sold with factory-issued LCMs, which accounted for 0.7 percent of firearms sold. Tr. 6/6/2023 408:18–21; Ex. 565.[16] In 1964, 0.6 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 408:22–25; Ex. 565. In 1974, 1.7 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 409:1–2; Ex. 565. In 1984, 5.4 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 409:3–4; Ex. 565. And, in 1994, 7.2 percent of all firearm models available in the civilian marketplace were sold with factory-issued LCMs. Tr. 6/6/2023 409:4–7; Ex. 565. In 1994, Congress passed the Federal Assault Weapons Ban, which capped the maximum capacity for detachable magazines at ten rounds. Tr. 6/6/2023 525:21–526:7; *see also* Pub. L. No. 103-322, § 110103(b), 108 Stat. 1999 (1994). The Federal Assault Weapons Ban expired in 2004. Tr. 6/6/2023 405:22–23.

Today, many popular firearms come standard with LCMs. Tr. 6/5/2023 43:23–44:7; 44:14–19. Many firearms also come standard with multiple LCMs. Tr. 6/5/2023 44:17–18; 67:6–

---

[16] During trial, Defendants' expert Dr. Louis Klarevas testified about the number of firearm models sold with factory-issued LCMs in the United States from 1954 to 1994. Tr. 6/6/2023 407:6–409:7. This testimony corresponds to Exhibit 565, which is a chart labeled "Firearm Models Sold with Factory-Issue LCMs in U.S., 1955-1995." *See generally* Ex. 565. According to Dr. Klarevas's testimony, the data compiled in Exhibit 565 relates to firearms sold in the previous year, such that statistics from 1955 are reflective of the number of these firearms sold in 1954, and so on. Tr. 6/6/2023 408:1–4. Accordingly, this Court uses the years in which the firearms were sold, rather than the years listed in the Exhibit.

17. Millions of Americans today own LCMs. ECF 206 at ¶ 49.[17]  Magazines typically cost

between twelve to twenty-five dollars for standard models, while more unique models can cost

upwards of fifty dollars each. Tr. 6/5/2023 130:11–15. Some LCMs sold to civilians are the same

as LCMs used by the military and are marketed to civilians as such. Tr. 6/5/2023 145:1–19.

     Plaintiffs presented evidence regarding the total number of LCMs possessed by civilians

through a 2018 National Shooting Sports Foundation ("NSSF") Industry Intelligence Report,

which contains a chart estimating the number of detachable magazines in circulation in the

United States from 1990 to 2018 ("NSSF Magazine Chart").[18] Tr. 6/6/2023 363:17–22. The

NSSF Magazine Chart includes data from three sources: the Bureau of Alcohol, Tobacco,

Firearms and Explosives' ("ATF") Annual Firearms Manufacturing and Exportation Report

("AFMER"), the U.S. International Trade Commission ("ITC"), and "industry insights." Tr.

6/6/2023 362:24–25. To create the chart, NSSF uses firearm production data from government

sources. Tr. 6/6/2023 366:3–368:4. The NSSF then takes those firearm production numbers and

asks firearm manufacturers and distributors how many magazines, and of what capacity, they

include with those firearms. Tr. 6/6/2023 367:25–368:4. The NSSF uses those responses to

---

[17] The parties presented this fact as stipulated in their joint Stipulation of Agreed-Upon Facts filed prior to trial. *See generally* ECF 206. Neither party moved for this stipulation to be admitted into evidence at trial. Nonetheless, this Court accepts this fact as true given the parties' stipulation.

[18] Plaintiffs offered the chart as an industry report through the testimony of Salam Fatohi, who serves as the Director of Research at the National Shooting Sports Foundation ("NSSF"). Tr. 6/6/2023 356:4–5. Although this Court received the chart in evidence, *see* Ex. 33 at 7, in assessing the weight and credibility to give Mr. Fatohi's testimony, this Court notes that the NSSF is a plaintiff in this case and has been a plaintiff in several Second Amendment challenges to firearms regulations. The NSSF is a firearm and industry trade association which advocates for the firearm and ammunition industry. NSSF members have a significant financial interest in the outcome of this case.

extrapolate how many magazines, and of what capacity, are in circulation in the United States. Tr. 6/6/2023 368:5–8.[19]

According to the NSSF Magazine Chart, between 1990 and 2018, 106.8 million pistol magazines were in circulation with a capacity of ten rounds or fewer. Tr. 6/6/2023 370:16–17. Between 1990 and 2018, 71.2 million pistol magazines were in circulation with a capacity of eleven rounds or more. Tr. 6/6/2023 370:18–19. Between 1990 and 2018, 37.7 million rifle magazines were in circulation with a capacity of ten rounds or fewer. Tr. 6/6/2023 370:20–21. Between 1990 and 2018, 9.4 million rifle magazines were in circulation with a capacity of between eleven and twenty-nine rounds. Tr. 6/6/2023 370:22–24. Between 1990 and 2018, 79.2 million rifle magazines were in circulation with a capacity of thirty or more rounds. Tr. 6/6/2023 370:25. In total, the NSSF Magazine Chart shows that between 1990 and 2018, there were 304.3 million detachable magazines in circulation in the United States. Tr. 6/6/2023 371:1–2. Of those 304.3 million detachable magazines, approximately 160 million had a capacity of eleven rounds or greater. Tr. 6/6/2023 371:10–11.

After hearing and evaluating the trial evidence, this Court finds that the NSSF Magazine Chart is entitled to little weight. On cross-examination, Salam Fatohi, who serves as the NSSF's Director of Research, admitted that he did not know how many industry representatives were consulted to obtain the "industry insights" data that went into the magazine chart. Tr. 6/6/2023 377:18. Mr. Fatohi admitted that the NSSF report could have extrapolated the number of magazines in circulation from as few as two industry representatives. Tr. 6/6/2023 377:21–22.

---

[19] Mr. Fatohi testified that he was not personally involved in compiling the data included in the 2018 NSSF Industry Intelligence Report's magazine chart, but that he is currently personally involved in updating the chart with data from 2022. Tr. 6/6/2023 365:20–366:7.

Mr. Fatohi also testified that prior versions of Exhibit 33 had been used by the NSSF in litigation challenging firearms regulations. Tr. 6/6/2023 382:11–13.

Nevertheless, based on the parties' pretrial stipulation, this Court finds that millions of Americans today own LCMs. But this Court also finds that the number of LCMs possessed by Americans is influenced to some degree by whether a firearms manufacturer sells a particular model of firearm standard with an LCM, and whether that firearm is sold standard with more than one LCM. Tr. 6/5/2023 44:16–19; 67:6–17.

### C. LCMs and Self-Defense

Under *Bruen*, a court must consider whether a regulated firearm or firearm accessory is "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). Accordingly, this Court received evidence at trial regarding the use of LCMs in self-defense. Plaintiffs presented evidence at trial that some individuals purchase LCMs for self-defense. Tr. 6/5/2023 46:4–7. LCMs allow an individual to fire more bullets without reloading than a magazine that holds ten bullets or fewer. Tr. 6/5/2023 128:13–15; 129:2–5. Detachable magazines also allow an individual to reload their firearm more quickly than with a fixed magazine. Tr. 6/6/2023 523:13–14.

According to Plaintiffs' expert Massad Ayoob, most civilians who attend his self-defense classes bring a semi-automatic pistol with a magazine capacity of greater than ten rounds. Tr. 5/30/2023 31:16–18.[20] According to Plaintiffs' fact witness Jessica Harris, who owns an outdoor

---

[20] This Court cannot give significant weight to the testimony of Plaintiffs' expert Massad Ayoob. This Court acknowledges that Mr. Ayoob has decades of experience as a firearms instructor for law enforcement and served for nineteen years as the chair of the Firearms Deadly Force Training Committee for the American Society of Law Enforcement Trainers. Tr. 5/30/2023 21:9–17. Mr. Ayoob has also written about self-defense and the use of deadly force by private citizens. Tr. 5/30/2023 22:16–23:7. Nevertheless, Mr. Ayoob testified that he has served

sporting goods store that sells firearms, most of her customers who purchase firearms for self-defense purchase "things with as many rounds as possible." Tr. 6/5/2023 38:9–24; 46:4–7.

Plaintiffs offered only limited anecdotal evidence of LCMs actually being used in self-defense. Mr. Ayoob described an incident in which a law enforcement officer fired thirty-three rounds in pursuit of an armed bank robber. Tr. 5/30/2023 39:24–40:16. On cross-examination, Mr. Ayoob also testified about an incident in which two individuals fired nine and three rounds, respectively, at an armed intruder. Tr. 5/30/2023 56:16–57:14. On re-direct, Mr. Ayoob testified to two other incidents with civilians firing more than ten rounds in self-defense: two brothers who owned a jewelry store and fired between thirty and forty rounds to stop an attempted robbery, and one gun shop owner who used an M16-rifle and a sub-machine gun to stop an attempted robbery. Tr. 5/30/2023 95:15–96:13.

By contrast, Defendants presented substantial and highly credible evidence at trial showing that ordinary civilians in self-defense situations rarely fire more than ten rounds. Defendants offered Lucy Allen as an expert on the statistical use of LCMs in defensive gun use situations ("DGUs"). Ms. Allen received her bachelor's degree from Stanford University, and received a master's degree in economics, a Master of Philosophy in economics, and a Master of Business Administration, all from Yale University. Tr. 6/7/2023 659:17–20. Ms. Allen is the senior managing director at National Economic Research Associates ("NERA"), an economic

---

for decades on the Board of Trustees for the Second Amendment Foundation, which is an advocacy organization for gun rights and a plaintiff in the present action. Tr. 5/30/2023 59:13–23. Mr. Ayoob testified on cross-examination that he has served as president of the Second Amendment Foundation since September of 2020. Tr. 5/30/2023 59:24–60:2. Mr. Ayoob testified that, as president, he has input into litigation decisions and yet has not implemented any sort of screen within the Second Amendment Foundation due to his role as an expert in the present case. Tr. 5/30/2023 60:12–61:6.

consulting firm that provides quantitative and analytic research for clients in both the public and private sectors. Tr. 6/7/2023 657:3–16. Ms. Allen has worked at NERA for twenty-five years. Tr. 6/7/2023 658:13–14. Prior to her work at NERA, Ms. Allen was an economist for the Council of Economic Advisors under the first President Bush and President Clinton. Tr. 6/7/2023 658:16–17. Ms. Allen has been conducting statistical analyses related to crime and gun use for twenty-five years and began researching DGUs specifically ten years ago. Tr. 6/7/2023 659:5–15; 660:7–8. On cross-examination, Plaintiffs were unable to develop any persuasive evidence of Ms. Allen's bias. Accordingly, this Court finds Ms. Allen to be a highly qualified and credible witness and gives significant weight to her testimony and statistical conclusions.

Ms. Allen analyzed the number of shots fired in DGUs using two sources: the National Rifle Association's ("NRA") Armed Citizens Database, which Ms. Allen described as "the largest collection of [DGUs]," and a compilation of news articles taken from the aggregator Factiva. Tr. 6/7/2023 660:24–661:4; 660:19–21. Ms. Allen testified that NERA analysts, as well as other economic research firms and academics, commonly use Factiva for their research. Tr. 6/7/2023 672:25–673:6.

The NRA Armed Citizens Database consists of DGUs compiled by the NRA. Tr. 6/7/2023 661:5–8. When it first began, the NRA database consisted of incidents compiled and summarized by the NRA itself. Tr. 6/7/2023 661:11–14. More recently, the NRA database consists of links to news articles about relevant DGUs. Tr. 6/7/2023 661:15–20. Ms. Allen used the NRA database to analyze DGUs over a six-and-a-half-year period, from January 2011 to May 2017. Tr. 6/7/2023 662:19–22. Of those 736 incidents, 134, or about 18 percent, involved no shots fired. Tr. 6/7/2023 663:25–664:2; Ex. 536. For 587 of the incidents, or around 80 percent, one to five shots were fired. Tr. 6/7/2023 664:3–5. For thirteen of the incidents, or a

little less than 2 percent, six to ten shots were fired. Tr. 6/7/2023 664:5–6. More than ten shots were fired in only two incidents, or 0.3 percent. Tr. 6/7/2023 664:7–8; Ex. 536.[21] Based on data from the NRA database, an average of 2.2 shots are fired in DGUs. Tr. 6/7/2023 664:9–10; Ex. 536.

Ms. Allen also testified that she conducted a similar analysis using her own sample of news stories pulled from a database compiled by the aggregator Factiva. Tr. 6/7/2023 673:7–8. This analysis looked at a random sample of 200 incidents from the roughly 4,800 news stories describing DGUs over the same six-and-a-half-year period as the NRA database. Tr. 6/7/2023 673:8–17. Ms. Allen testified that this analysis produced roughly identical results to her analysis of the NRA database: no shots were fired in 11.3 percent of incidents, one to five shots were fired in 86 percent of incidents, and six to ten shots were fired in 2.7 percent of incidents, and in no incidents were more than ten shots fired. Tr. 6/7/2023 674:8–12; Ex. 537. Based on data from the Factiva database, an average of 2.3 shots are fired in DGUs. Tr. 6/7/2023 674:7; Ex. 537.

Accordingly, based on the credible evidence presented at trial, this Court finds that many Americans purchase LCMs with the intent to use them for self-defense. This Court finds, however, that it is exceedingly rare (far less than 1 percent) for an individual to fire more than ten shots in self-defense. Therefore, this Court finds that the features unique to LCMs—the ability to shoot more than ten bullets without reloading—are not "commonly used . . . for self-defense." *Bruen*, 142 S. Ct. at 2138.

---

[21] Ms. Allen also explained that these two incidents were added to the NRA database after her initial research was made public through litigation challenging firearm regulations in New York and Maryland. Tr. 6/7/2023 665:4–11.

**D. LCMs and Mass Shootings**

Under *Bruen*, a court must analyze analogous historical weapons regulations under "a more nuanced approach" if the modern regulation implicates an "unprecedented societal concern." *Id.* at 2132. Accordingly, this Court received evidence at trial regarding LCMs and mass shooting events, which Defendants and Intervenor-Defendant argue represent an unprecedented societal concern. Based on that evidence, this Court finds as follows: In the field of criminology, mass shootings are defined as a shooting involving four or more people shot. Tr. 6/6/2023 398:22–24; 464:21–23. This definition excludes large inner group violence, including things like race riots, labor riots, and battle skirmishes. Tr. 6/6/2023 464:21–465:2. A fatal mass shooting is a mass shooting where at least one of the four victims died. Tr. 6/6/2023 399:3–6. A high-fatality mass shooting is defined as a shooting where at least six or more people died, not including the perpetrator. Tr. 6/6/2023 399:6–8.

Between 1776 and 1949, or for about 70 percent of American history, there was no example of a mass shooting event that resulted in double digit fatalities. Tr. 6/6/2023 403:25–404:3; Ex. 564. The first known mass shooting involving more than ten fatalities, not including the perpetrator, occurred in 1949. Tr. 6/6/2023 404:1–5; *see also* Ex. 564. The annual incidence of high-fatality mass shootings has increased along a linear trend line from 1990 to 2022. Tr. 6/6/2023 413:5–9; Ex. 567. The number of fatalities in mass shooting events has also increased along a linear trend line from 1990 to 2022. Tr. 6/6/2023 414:12–14; Ex. 568.

Since 1990, 78 percent of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:14–16; Ex. 569. Since 2000, 79 percent of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:16–18; Ex. 569. Since 2010, 86 percent of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:19–22; Ex. 569. Since 2020, 100 percent

of all high-fatality mass shootings have involved LCMs. Tr. 6/6/2023 415:23–416:2; Ex. 569. The average number of shots fired in a mass shooting where an LCM was not used was sixteen. Tr. 6/7/2023 681:17–19. By contrast, the average number of shots fired in a mass shooting where an LCM was used was ninety-nine. Tr. 6/7/2023 681:13–14. More than ten shots were fired in 94 percent of mass shootings where an LCM was used. Tr. 6/7/2023 681:14–16.

Between 1982 and 2022, at least 179 mass shootings have occurred in which more than four people were killed in a public place, excluding the shooter. Tr. 6/7/2023 680:18–21; 681:2–6. Of the seventy-three of those incidents in which it is known that an LCM was used, there was an average of ten fatalities and sixteen injuries. Ex. 538. Of the forty-two incidents in which it is known that an LCM was not used, there was an average of six fatalities and three injuries. Ex. 538.

The deadliest mass shooting event in American history took place in Las Vegas, Nevada in 2017. Ex. 564. Sixty people were killed and more than 410 people were shot. Tr. 6/6/2023 423:1–6; Ex. 564. The perpetrator used 100-round LCMs. Tr. 6/5/2023 138:2–140:4. Using LCMs and semi-automatic rifles—some of which were equipped with a feature known as a bump-stock, which allows a semi-automatic firearm to be fired automatically—the shooter was able to fire 100 rounds in between nine and eleven seconds. Tr. 6/6/2023 423:11–21. The shooter shot for approximately eleven minutes and fired over 1,000 rounds. Tr. 6/6/2023 424:25–425:5.

The second deadliest mass shooting in American history took place in Orlando, Florida in 2016. Ex. 564. Forty-nine people were killed. Ex. 564. The shooter used an LCM. Ex. 564.

The third-deadliest mass shooting in American history took place in Blacksburg, Virginia in 2007. Ex. 564. Using a firearm equipped with an LCM, the shooter fired 174 rounds in

approximately nine to ten minutes. Tr. 6/7/2023 602:24–603:2; Ex. 564. Thirty-two people were killed. Ex. 564.

Magazine capacity is highly related to the lethality of a weapon, because capacity is what determines the number of shots that can be fired within a given time without having to pause to reload. Tr. 6/6/2023 513:5–10. State laws banning LCMs reduce the incidents of mass shootings between 48 to 72 percent and decrease the number of fatalities that occur in these mass shootings by 37 to 75 percent. Tr. 6/6/2023 506:14–19. Defendants presented credible evidence at trial demonstrating that the relationship between restrictions on LCMs and reductions in mass shootings is so pronounced that it is a causal relationship, meaning that the restrictions were at least partly responsible for the reductions. Tr. 6/6/2023 507:20–508:1.

When a shooter has fired all the available rounds in a magazine's chamber, the shooter must pause shooting to either swap out magazines or change firearms. Tr. 6/6/2023 427:19–428:3. Defendants' expert Dr. Louis Klarevas, who studies mass shootings, testified that he was not aware of a mass shooting event in which it took the shooter less than five seconds to swap out magazines. Tr. 6/6/2023 401:15–23; 428:4–6. During a mass shooting event in 2022 in Buffalo, New York, it took the mass shooter approximately eight to nine seconds to swap out magazines. Tr. 6/6/2023 428:10–12; Ex. 564. Pauses in mass shootings allow potential victims to respond by fleeing, hiding, or fighting back. Tr. 6/6/2023 426:15–427:2. During the Newtown, Connecticut mass shooting that occurred at Sandy Hook Elementary school in 2012, nine children were able to flee and two were able to hide when the shooter paused to reload magazines. Tr. 6/6/2023 429:10–15; Ex. 564. During a 2019 shooting at the Poway synagogue in California, the shooter was confronted by congregants and chased out after he had fired all ten

rounds from his firearm and paused to reload. Tr. 6/6/2023 446:5–20. These pauses occur less frequently when a mass shooter uses a firearm equipped with an LCM. Tr. 6/6/2023 429:1–4.

Accordingly, this Court finds as follows: Mass shootings are a recent phenomenon in American history. The annual incidence of mass shootings has increased since 1990. LCMs are commonly used in high-fatality mass shootings, and their use in these shootings has increased in recent years. The use of LCMs in mass shooting events increases the lethality of those events. The features unique to LCMs—the ability to shoot more than ten bullets without reloading—are useful for mass shooters. Pauses where a shooter must reload magazines or switch firearms provide an opportunity for potential victims to flee, hide, or fight back.

### E.  LCMs and Public Health

Under *Bruen*, a court must analyze historical weapons regulations under "a more nuanced approach" if the modern regulation implicates "an unprecedented societal concern" or "dramatic technological change[]." *Bruen*, 142 S. Ct. at 2132. Accordingly, this Court received evidence at trial regarding the severity of gunshot wounds from LCM-equipped firearms and the burdens imposed on hospital capacity by mass shooting events. Based on the credible evidence presented at trial, this Court finds as follows: Gunshot victims typically die from gunshot wounds in one of two ways. First, a victim dies if the bullet enters a critical organ such as the brain stem or heart. Tr. 6/6/2023 486:16–21. If an individual is shot multiple times, there is a greater likelihood they will suffer a gunshot wound to a critical organ. Tr. 6/6/2023 487:15–18. Second, a victim may die if they have multiple gunshot wounds that hit less critical structures but cause rapid bleeding. Tr. 6/6/2023 486:22–25. A victim who is shot multiple times is more likely to suffer rapid bleeding, though that it is not always a linear relationship. Tr. 6/6/2023 490:20–21. A patient

shot multiple times in non-critical areas might lose less blood than a patient shot fewer times with major blood vessel injuries. Tr. 6/6/2023 490:20–25.

Surge capacity is the capacity of any given hospital to deal with multiple casualty incidents in a short period of time. Tr. 6/6/2023 494:6–12. In Oregon, Oregon Health and Sciences University ("OHSU") is one of two hospitals with a level one trauma center, which is the largest and most well-resourced level of trauma center. Tr. 6/6/2023 483:1–5. OHSU and Legacy Emanuel, another level one trauma center, receive all acutely injured patients from the Portland metropolitan area. Tr. 6/6/2023 483:3–6. If a mass shooting event resulted in more than five or ten critically injured patients being taken to OHSU in a short period of time, OHSU would rapidly run out of available resources to treat patients. Tr. 6/6/2023 495:2–13. The surge capacity of hospitals around the state of Oregon would likely be much smaller. Tr. 6/6/2023 496:2–12. Once a hospital reaches surge capacity, the hospital must decide how to allocate care to patients, which can result in delayed care and the postponement of elective cancer surgeries or other treatments. Tr. 6/6/2023 495:14–21.

## VI. FINDINGS OF FACT: HISTORY AND TRADITION

Under *Bruen*, courts are tasked with determining whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Accordingly, this Court received evidence about the evolution of firearms and weapons technology. In addition, this Court heard evidence about societal concerns that arose from the proliferation of such weapons and the regulations that were enacted to address those concerns.

Plaintiffs and Defendants both offered expert testimony regarding the existence and prevalence of weapons—including repeating firearms, which are firearms that can be fired more than once without reloading, and large-capacity repeating firearms, which are firearms that can

be fired more than ten times without reloading—throughout American history. Defendants also offered expert testimony regarding the societal context amid which certain historical regulations arose. Plaintiffs offered Ashley Hlebinsky, formerly a curator at the Cody Firearms Museum at the Buffalo Bill Center of the West and current Senior Fellow at the University of Wyoming College of Law's Firearms Research Center. Tr. 6/5/2023 162:3–7; 153:24–154:5; 154:10–21. Ms. Hlebinsky earned a bachelor's degree and a master's degree in American History from the University of Delaware. Tr. 6/5/2023 156:8–10; 160:12–15. Ms. Hlebinsky worked for the Cody Firearms Museum from 2013 to 2020. Tr. 6/5/2023 161:11–13; 165:19. Her published work is largely limited to non-peer-reviewed articles in firearms publications, such as Recoil Magazine and Armax Journal. Ex. 196.

Defendants offered five historical experts: Dr. Brian DeLay, Dr. Kevin Sweeney, Dr. Roger Pauley, Dr. Brennan Rivas, and Dr. Robert Spitzer. Dr. DeLay is a professor of history at the University of California, Berkeley, where he focuses on the international arms trade in the eighteenth and nineteenth centuries. Tr. 6/6/2023 545:17–546:4. Dr. DeLay received his bachelor's degree from the University of Colorado at Boulder, and his master's degree and Ph.D. in American History from Harvard University. Tr. 6/6/2023 545:10–14. Dr. Sweeney is a professor emeritus at Amherst College, where he taught in both the History and American Studies departments from 1989 to 2016. Tr. 6/7/2023 618:1–3. Dr. Sweeney received his bachelor's degree in history from Williams College and his Ph.D. in history from Yale University. Tr. 6/7/2023 617:7–9. Dr. Pauley is a professor of history at the University of Central Arkansas, where he has been teaching since 2001. Tr. 6/8/2023 1004:13–16. Dr. Pauley received his bachelor's degree in history from St. Olaf College, his master's degree in history from Villanova University, and his Ph.D. from the University of Delaware. Tr. 6/8/2023 1005:9–12.

Dr. Rivas received her bachelor's degree in history from Oklahoma State University, and her master's degree and Ph.D. in history from Texas Christian University. Tr. 6/7/2023 704:17–20. And Dr. Spitzer, who serves as a professor emeritus at the State University of New York at Cortland, and has taught at Cornell University and the College of Law at William and Mary, received his bachelor's degree in political science from the State University of New York at Fredonia, and his master's degree and Ph.D. in political science from Cornell University. Tr. 6/8/2023 854:25–855:5; 856:9–12. Defendants' historical experts have a combined ninety-three years of experience studying the history of firearms, the history of firearms-related regulations, or the history of firearms policy. Tr. 6/6/2023 548:22–23; Tr. 6/7/2023 619:10–18; 705:8–9; Tr. 6/8/2023 856:13–857:2; 1006:3–8. Additionally, Defendants' experts have all published either peer-reviewed scholarship or books in these fields. Tr. 6/6/2023 500:9–13; Tr. 6/7/2023 619:18; 706:3; Tr. 6/8/2023 857:5; 1005:15–17.

Defendants' experts come from neutral academic backgrounds and possess no economic interest in the sale of LCMs. Ms. Hlebinsky, by contrast, offers a curatorial perspective on the evolution of firearms technology in the United States, including personal experience handling firearms from different eras. Tr. 6/5/2023 168:20–25. But Ms. Hlebinsky lacks background and training as a historian. More troubling to this Court, Ms. Hlebinsky has both professional and personal ties to pro-gun groups and the firearms industry, which this Court finds limit her ability to serve as a neutral expert in this case. Ms. Hlebinsky has received numerous awards from pro-gun advocacy groups, has co-founded a research center that advocates for the firearms industry and denounces gun regulation, and has a strong financial interest in the success of the firearms industry. For example, Ms. Hlebinsky has done speaking engagements and received awards from the Second Amendment Foundation, which is an advocacy organization for gun rights and a

plaintiff in this case. Tr. 6/5/2023 281:25–282:13. She received the Second Amendment

Foundation's "Defender of the Constitution" award in 2022. Tr. 6/5/2023 282:8–10. She has also

received awards from the National Shooting Sports Foundation, Inc., which is also a plaintiff in

this case. Tr. 6/5/2023 281:2–11.

Perhaps most importantly, however, Ms. Hlebinsky is married to Mark Hanish, who also

served as an expert witness in this case. Tr. 6/5/2023 278:14–17. Mr. Hanish has spent decades

working for gun dealers and gun manufacturers and currently serves as the Vice President of

Sales and Marketing for Timney Triggers. Tr. 6/5/2023 278:18–24. Not only does Mr. Hanish

derive his standard income from the firearms industry, but he also owns over one million dollars

in stock in Ammo, Inc. Tr. 6/5/2023 278:25–279:2; 279:13–15. Ms. Hlebinsky testified that Mr.

Hanish's financial interest in the firearms industry is part of the couple's marital assets. Tr.

6/5/2023 279:13–18. This Court finds the testimony of Defendants' neutral historical experts to

be significantly more credible—and entitled to more weight—than that of Ms. Hlebinsky.

## A.  The American Colonies and the Early Republic (1700-1800)

### 1.  Firearms and Weapons Technology

Because *Bruen* instructs courts to consider whether a challenged regulation "is consistent

with the Nation's historical tradition of firearm regulation," this Court admitted evidence at trial

about the history of firearms and weapons technology since the Nation's founding in 1776 and

the ratification of the Second Amendment in 1791 through to the mid-twentieth century. *Bruen*,

142 S. Ct. at 2130. Based on the evidence presented, this Court finds that detachable magazines

did not exist at the time of the Founding. *See* Tr. 6/7/2023 597:17–25. In the eighteenth century,

the word "magazine" referred to a storage facility or depot that housed gunpowder and, on

occasion, weapons. Tr. 6/7/2023 768:15–21; Ex. 736. Items that contained ammunition in the

eighteenth century, such as cartridge boxes, were considered "accoutrements," which was used as a semantically distinct term from "arm." Tr. 6/7/2023 767:4–9.

While repeating firearms existed prior to the ratification of the Second Amendment, these firearms were exceedingly rare, particular within the general populace. Tr. 6/6/2023 551:14–150; 552:23–553:16. Defendants' expert Dr. DeLay testified about two specific types of repeating firearms that existed in early Colonial America and at the time of the Founding: the Cookson repeating firearm and the Belton repeating firearm. The Cookson repeating firearm was a firearm designed by English master gunmaker John Cookson that could fire nine shots without reloading. Tr. 6/6/2023 554:3–14. There is evidence of only one nine-shot Cookson repeating firearm, produced in England, that existed in America prior to the Founding. Tr. 6/6/2023 556:9–17. The Belton repeating firearm was a superposed load firearm, which operated like a Roman candle, in which a single charge would ignite each subsequent charge until the firearm had fired all its rounds. Tr. 6/6/2023 557:14–558:9. While there is evidence that the Continental Congress offered to purchase 100 of these firearms for use in the Revolutionary War, there is no evidence that this firearm existed outside of a prototype. Tr. 6/6/2023 559:14–17; 560:3–12.

Repeating firearms were not commonly owned by civilians in the years immediately prior to, or following, the Founding of the United States of America in 1776. Repeating firearms were expensive and laborious to produce, and the technology was beyond the mechanical and technical capacity of most firearms manufacturers at the time. Tr. 6/6/2023 555:9–15; Tr. 6/7/2023 574:6; 577:6–11. Because of their rarity amongst civilians, these repeating firearms were viewed more as curiosities than as weapons for self-defense. Tr. 6/7/2023 576:18–20. And

large-capacity repeating firearms, which could fire more than ten rounds without reloading, likely did not exist in America prior to the Founding in 1776.[22]

Instead, the firearms most commonly possessed by civilians in the eighteenth century fell into four categories: muskets, rifles, pistols, and lighter smoothbore firearms used for hunting. Tr. 6/7/2023 630:24–631:4. An eighteenth-century musket held one round, and reloading it required the user to complete at least eight steps, including opening a paper cartridge with a premeasured amount of gunpowder and single ammunition ball, pouring some of the gunpowder into a priming pan, pouring the rest of the gunpowder into the muzzle of the musket, inserting the ammunition ball covered with the paper from the cartridge into the muzzle, and ramming the powder and ammunition together to form a seal. Tr. 6/7/2023 641:21–643:9. A well-trained militia person in the eighteenth century could fire two to three rounds per minute from a musket. Tr. 6/7/2023 643:10–17. An eighteenth-century rifle user could, at most, fire three rifle shots in two minutes. Tr. 6/7/2023 646:10–16. Reloading a rifle took longer than reloading a musket because there were no paper cartridges for rifles, meaning that a shooter had to use a gunpowder horn to pour the gunpowder into the muzzle. Tr. 6/7/2023 645:5–9. Reloading a rifle also required the shooter to put a grease patch, which was a greased piece of linen, between the gunpowder and the ammunition ball, to provide a seal between the two. Tr. 6/7/2023 645:10–22. An eighteenth-century smoothbore long gun was reloaded like a musket, in that it did not require

---

[22] Ashley Hlebinsky, whom Plaintiffs' offered as an expert on the history of firearms technology, testified that she "believed" that there was a twelve-shot Cookson-style firearm that existed in America prior to the Founding. Tr. 6/5/2023 218:15–219:9. On cross-examination, Ms. Hlebinsky was unable to offer any compelling evidence that suggests this firearm existed in America prior to 1776. *See generally* Tr. 6/5/2023 218:23–219:14. Aside from this firearm, Ms. Hlebinsky testified that she was not aware of any firearm capable of firing more than ten shots without reloading that existed in America prior to 1776. Tr. 6/5/2023 219:10–14.

a grease patch, but smoothbores also did not commonly use paper cartridges, such that reloading

a smoothbore long gun took slightly longer than reloading a musket but was not as slow as

reloading a rifle. Tr. 6/7/2023 647:2–3. An eighteenth-century pistol was reloaded like a musket,

except that the pistol's size allowed the user to load slightly faster, such that it could be fired

three to four times per minute. Tr. 6/7/2023 647:11–20.

Given these technological limits on firearms, interpersonal gun violence was not

widespread in society prior to the middle of the nineteenth century. Tr. 6/7/2023 587:23–588:4.

Between 1776 and 1860, only ten to fifteen percent of homicides between family members

involved a firearm. Tr. 6/7/2023 587:7–9. Because most firearms were muzzleloading powder

firearms, they were difficult to keep loaded and at the ready for self-defense or spontaneous

violence due to the powder's corrosive properties. Tr. 6/7/2023 588:5–10.

Accordingly, based on the credible evidence presented at trial, this Court finds as

follows: Repeating firearms were not commonly owned by civilians at the time of the Second

Amendment's ratification in 1791. Repeating firearms that could fire more than ten rounds

without reloading did not exist in America prior to 1791. Interpersonal gun violence was not a

general societal concern in 1791.

### 2. Firearms and Weapons Regulations

Because *Bruen* instructs courts to consider how and why historical weapons regulations

burdened the right to self-defense, this Court received evidence at trial regarding historical

weapons regulations and the justifications underlying those regulations. *Bruen*, 142 S. Ct. at

2133.

Before 1791, firearms could not fire without gunpowder. Tr. 6/5/2023 227:9–22.

Gunpowder in the eighteenth century was unstable and could lead to explosions and fires if

stored improperly. Tr. 6/5/2023 166:10–11; Tr. 6/8/2023 880:25–881:2. Because of these risks, gunpowder was subject to regulation throughout colonial America and, after 1776, throughout the early Republic. Tr. 6/8/2023 879:25–880:1. In the eighteenth and early-nineteenth centuries, gunpowder-related explosions posed a particular societal risk because of the lack of uniform safety codes or fire departments, meaning that even small fires could potentially turn catastrophic. Tr. 6/8/2023 880:25–881:8. Pre-1800, nine colonies or states passed laws limiting or regulating the possession, use, or sale of gunpowder. Maryland, Massachusetts, New Hampshire, New York, Pennsylvania, Rhode Island, and Virginia all enacted laws regulating the storage of gunpowder. Ex. 640. Connecticut, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Rhode Island all enacted laws regulating the manufacture, inspection, sale, or ignition of gunpowder. Ex. 640. And Maryland and New York additionally enacted laws regulating the transport of gunpowder. Ex. 640.

Based on the above evidence, this Court makes the following finding: Large quantities of gunpowder posed a threat to public safety at the time of the Second Amendment's ratification in 1791. In the late-eighteenth century, colonies and states responded to this danger by regulating the amount of gunpowder that could be stored in a given area and placed restrictions on the manufacture, inspection, sale, and transport of gunpowder.

### B. Early-to-Mid-Nineteenth Century (1800-1850)

#### 1. Firearms and Weapons Technology

At the beginning of the nineteenth century, repeating firearms were still a rarity in American daily life. Defendants' expert Dr. DeLay testified about the existence of one repeating rifle in America in the period between 1791, when the Second Amendment was adopted, and 1830, when repeating pistols began to emerge onto the U.S. civilian market: the Girandoni

repeating firearm. The Girandoni repeating rifle was an air rifle created by an Italian gun maker and was regarded, for its time, as the best repeating air gun available. Tr. 6/7/2023 572:16–21. The Girandoni air rifle relied on a reservoir of compressed air to fire; to prime the reservoir such that the firearm could fire without reloading, an individual had to complete 1,500 strokes of the firearm's air pump, which made priming the gun a laborious process. Tr. 6/7/2023 573:16–21. There is no evidence of the Girandoni air rifle existing in America prior to 1776. Tr. 6/7/2023 572:22–24. There is, however, evidence that a Girandoni air rifle was brought on the Lewis and Clark expedition from 1803 to 1804. Tr. 6/7/2023 573:3–9.

Following the Founding in 1776 and the ratification of the Second Amendment in 1791, most repeating firearms that appear in the historical record before the mid-nineteenth century are all variations of the superposed system used by the Belton firearm. Tr. 6/7/2023 578:4–9. These firearms enjoyed very limited success in the United States. Tr. 6/7/2023 578:15–16. A few hundred of these superposed firearms were used by the U.S. Navy during the War of 1812. Tr. 6/7/2023 579:13–17. These superposed firearms did not enjoy any commercial success among the public. Tr. 6/7/2023 580:10–15.

In the early nineteenth century, pistols remained single-shot, muzzleloading devices. Tr. 6/7/2023 724:7–8. Early nineteenth century pistols came in three traditional sizes: a large pistol known as a horse pistol, which was designed to be carried for mounted combat, a mid-size pistol known as a belt pistol, which was designed to be hung from a belt, and a pocket pistol, which was designed to be concealed in a pocket. Tr. 6/7/2023 724:7–725:4.

In the 1820s, firearms moved from a flintlock ignition system, which relied on an external charge caused by the friction of flint on steel to spark the firearm's charge, to a percussion ignition system, which employed an internal combustion caused by pressure and a

chemical compound to spark the firearm's charge. Tr. 6/5/2023 182:16–183:2; Tr. 6/7/2023 581:9–16; 581:23–582:12. Around this time, firearms also moved from round-ball ammunition to a conically shaped projectile. Tr. 6/5/2023 183:2–4. Following these technological advancements, the first reliable repeating handguns began entering the civilian market in the 1830s. Tr. 6/7/2023 582:19–22. None were large-capacity firearms. Tr. 6/7/2023 586:2–9.

The first type of reliable repeating handgun, known as a pepperbox, was a handgun with multiple barrels that revolved around a single axis. Tr. 6/7/2023 582:23–583:3. A pepperbox could typically hold between three and six rounds, and reloading was a time-consuming process that involved multiple steps. Tr. 6/7/2023 584:23–585:1; Tr. 6/7/2023 584:8–12. The second type of reliable repeating pistol, known as a revolver, was a handgun with rotating chambers. Tr. 6/7/2023 582:25–583:2. The first commercially successful revolver was patented by Samuel Colt, and came to be known as the Colt revolver. Tr. 6/5/2023 183:14–16; Tr. 6/7/2023 583:6–10. A Colt revolver in the 1830s could hold between five and seven rounds, with the most common capacity being six rounds. Tr. 6/7/2023 584:18–21. It took a user five steps to reload a single chamber, meaning that it took a user thirty separate steps to fully reload a popular six-shot revolver. Tr. 6/7/2023 584:7–10. Colt revolvers did not become popular among the civilian population until the mid-to-late 1840s. Tr. 6/7/2023 726:2–10. Large-capacity pepperboxes or revolvers, which could fire more than ten rounds without reloading, were not common in the early or mid-nineteenth century. Tr. 6/7/2023 586:2–9. No large-capacity firearms, including revolvers or rifles capable of firing more than ten rounds without reloading, enjoyed any commercial success before 1860. Tr. 6/7/2023 586:5–9.

Based on the credible evidence presented at trial, this Court finds as follows: the first reliable repeating handguns entered the civilian market in the 1830s, but were not popular with

civilians until the mid-to-late 1840s. None of these handguns had a capacity of more than ten

rounds. No firearm with a capacity of more than ten rounds enjoyed any commercial success

before 1860.

### 2.   Firearms and Weapons Regulations

The beginning half of the nineteenth century saw a rise in "deadly weapons" regulations,

wherein local and state governments sought to regulate weapons viewed as being particularly

dangerous to public safety. Tr. 6/7/2023 713:16–20; 714:3–7; 721:8–11. Many of these weapons

were considered particularly dangerous because of how easily they could be concealed. Tr.

6/7/2023 721:10–14.

These "deadly weapons" regulations took various forms, largely related to the type of

weapon—or the feature of the deadly weapon—that the government sought to regulate. At the

beginning of the nineteenth century, for instance, the most popular pistols were single-shot,

muzzleloading devices. Tr. 6/7/2023 724:7–8. These pistols gave the user one shot, after which

the pistol would be essentially as useful as a bludgeon. Tr. 6/7/2023 717:6–8. Knives, on the

other hand, could be used as many times as the individual desired and could be exceedingly

deadly. Tr. 6/7/2023 717:9–12. Accordingly, laws regulating knives were often broad, trying to

capture as many kinds of fighting knives as possible, including "daggers," "dirks," "stilettos,"

"Arkansas tooth-picks," and others. Tr. 6/7/2023 717:13–16; *see, e.g.*, Ex. 636 at 2, 5. Often,

these laws took the form of anti-concealed carry statutes, which prohibited the carrying of a

concealed knife in public. Tr. 6/7/2023 714:13–18. An anti-concealed carry statute passed in

1813 in Louisiana, for instance, made it a criminal offense for any person to "be found with any

concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Ex. 636 at

33.

These laws typically did not ban possession of knives outright, however, because of the relative simplicity and commonality of knives as a household item. Tr. 6/8/2023 868:14–19. Governments in early-to-mid-nineteenth century America lacked the type of policing infrastructure necessary to ban possession of a common and easily made item. Tr. 6/8/2023 868:6–19. Instead, these laws sought to prevent what was viewed as the most dangerous feature of a knife: its ability to be concealed on a person in public places. Tr. 6/7/2023 721:11–14. Often, concealed carry laws that restricted the carrying of knives contained exceptions for ordinary pocketknives. *See, e.g.*, Ex. 636 at 15, 78, 87.

Regulations in the early to mid-nineteenth century also targeted a specific type of knife, known as a Bowie knife. A Bowie knife is a long, large knife, typically six or more inches in length, with a guard on the handle and a double-edge blade near the tip. Tr. 6/7/2023 718:5–11. While it is difficult to gauge in numerical terms the popularity of Bowie knives during the nineteenth century, Bowie knives were frequently reported as being associated with crime in the mid-nineteenth century. Tr. 6/7/2023 719:22–720:4. Defendants' expert Dr. Brennan Rivas testified that, from these reports, she could conclude that there was a significant amount of societal concern associated with the carrying of Bowie knives, and particularly with the concealed carrying of these knives. Tr. 6/7/2023 720:25–721:3.

Governments responded to the carrying of Bowie knives by enacting laws criminalizing their concealed carry. Tr. 6/8/2023 865:19–25. Prior to 1850, four states prohibited the concealed carrying of Bowie knives. Tr. 6/8/2023 866:21–22; Ex. 639. Bowie knives were particularly regulated via concealed carry statutes because the ability to conceal a Bowie knife was thought to render the weapon particularly dangerous. Tr. 6/7/2023 721:10–20.

The early and mid-nineteenth century also saw a rise in interpersonal violence and murder, particularly in the American South. Tr. 6/8/2023 877:17–21. Much of this violence involved pistols, which at this time were still typically single-shot, muzzleloading devices. Tr. 6/7/2023 724:7–8; Tr. 6/8/2023 877:20–21. Governments responded to this rise in interpersonal violence by enacting anti-concealed carry laws targeting pistols. Tr. 6/8/2023 877:21–23. These concealed carry laws often targeted pocket pistols specifically, which were the smallest size of pistol and were readily concealable. A Memphis city ordinance passed in 1826, for instance, prohibited the carry—open or concealed—of any pocket pistol. Ex. 636 at 77. New Jersey also specifically targeted pocket pistols in its anti-concealed carry law. Ex. 636 at 52. Between 1800 and 1850, eleven states or municipalities enacted regulations prohibiting the concealed carry of pistols. Ex. 634. Some of these laws, such as those passed in Alabama and Arkansas, exempted individuals who were "upon a journey." Ex. 636 at 2, 8.

Some laws went beyond prohibiting the concealed carry of weapons that were considered particularly dangerous. In Florida, for instance, an 1838 law made it unlawful for anyone to sell pocket pistols without first paying a yearly fee. Ex. 636 at 19. The same 1826 Memphis law that outlawed the carrying of pocket pistols also made it a misdemeanor to sell a Bowie knife. Ex. 636 at 76–77. In Alabama, an 1837 law imposed greater criminal penalties for the use of a Bowie knife and taxed the sale or gift of Bowie knives; two years later, Alabama passed another law prohibiting the concealed carry of Bowie knives. Ex. 636 at 1–2.

Based on the credible evidence presented at trial, this Court finds as follows: State and municipal governments in the beginning half of the nineteenth century regulated weapons viewed as being particularly dangerous to public safety. These regulations were tailored to address the particular features of the weapons that made them most dangerous to public safety.

### C. The Civil War and Reconstruction (1850-1880)

#### 1. Firearms and Weapons Technology

In the mid-nineteenth century, metallic cartridges for firearms, which combined primer, propellant, and projectile into a single package that could be loaded in one step, were introduced onto the American market. Tr. 6/7/2023 589:9–15. In the decades before the Civil War began in 1861, another technological advancement paved the way for reliable repeating rifles: breech loading, wherein a firearm user could load their firearm through the breech, or the rear of the barrel, as opposed to the muzzle, or the front of the barrel. Tr. 6/7/2023 609:25–610:7. Between 1811 and 1860, there was a flurry of patent activity around breech loading firearms, with various gun manufacturers attempting to perfect the technology. Tr. 6/7/2023 609:21–22; 610:16–21. Towards the beginning of the Civil War, gun manufacturers began combining breech loading and metallic cartridges with levers that could cycle spent casings and new rounds into firearms. Tr. 6/7/2023 590:1–8.

This combination of metallic cartridges, breech loading, and lever-action technology first appeared in the 1840s and improved through the 1850s. Tr. 6/7/2023 590:9–13. In the 1860s, the Henry and Winchester rifles, which were lever-action firearms, became the first large-capacity repeating firearms to enjoy limited commercial success in the United States. Tr. 6/7/2023 590:14–591:2. Both rifles had a capacity of more than ten rounds. Tr. 6/7/2023 591:14–16. Unlike modern detachable LCMs, both rifles relied on a fixed magazine and lever to cycle spent metallic cartridges out of the chamber and cycle new metallic cartridges into the chamber. Tr. 6/7/2023 590:1–20. An individual using a Winchester or Henry could fire their rounds only as quickly as they could work the lever and trigger. Tr. 6/7/2023 651:1–3. Both models required the user to reload the rounds one by one after the fixed magazine had been emptied. Tr. 6/7/2023

593:4–8. The Henry rifle, which came onto the market in 1860, required the user to insert rounds

through the tip of the firearm's magazine, which was located near the muzzle of the rifle. Tr.

6/7/2023 591:3–10. The Winchester rifle, which came onto the market in 1866, improved upon

this technology by allowing the user to load cartridges through a side gate on the rifle. Tr.

6/7/2023 591:7–10.

Between 1861 and 1872, there were 74,000 Henry and Winchester rifles produced; of

those, about 65,000 were exported to foreign militaries and 8,500 were purchased by or for

officers in the Union Army during the Civil War, leaving just 500 for the civilian market. Tr.

6/7/2023 594:4–21. According to Dr. DeLay's estimates, large-capacity firearms accounted for

less than 0.002 percent of firearms in the United States at the time of the ratification of the

Fourteenth Amendment in 1868. Tr. 6/7/2023 595:18–22. This Court finds that, while large-

capacity repeating firearms became commercially available in the United States around 1860,

they nevertheless represented an exceedingly small portion of the U.S. civilian gun stock at that

time.

The mid-nineteenth century also saw a proliferation in the production of revolvers. Colt's

patent on the revolver expired in 1857, at which point various other firearms manufacturers

began making their version of a revolver. Tr. 6/7/2023 727:16–24. At the beginning of the Civil

War, these manufacturers obtained government contracts to produce revolvers for the military.

Tr. 6/7/2023 727:23–25. These contracts allowed manufacturers to vastly increase their

production of revolvers. Tr. 6/7/2023 727:24–728:1. When the Civil War ended in 1865, these

manufacturers turned to the civilian market to continue selling revolvers at the level they had

previously been producing for the military. Tr. 6/7/2023 728:1–7. The revolvers had an

ammunition capacity of less than eleven rounds. Tr. 6/7/2023 726:23–724:4. The rise in

production of these handguns also led to a drop in price. Tr. 6/8/2023 878:11. In the years immediately following the Civil War, a Colt revolver sold for about thirty-two dollars; by the end of the nineteenth century, an individual could purchase a working handgun for just two dollars. Tr. 6/8/2023 878:12–14.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: The first large-capacity repeating rifles entered the U.S. civilian market in the 1860s. These rifles used fixed magazines, could only be fired as quickly as the user could work the lever and trigger, and required rounds to be loaded one at a time after the user had fired all the rounds in the magazine. The Henry and Winchester rifles were not commonly owned by U.S. civilians at the time of the Fourteenth Amendment's ratification in 1868. The expiration of Colt's patent led to an increase in the number of revolvers produced by firearms manufacturers. These revolvers were sold to the military before and during the Civil War. Following the Civil War, gun manufacturers began selling revolvers to U.S. civilians in larger quantities. The existing revolvers did not allow an individual to shoot more than ten rounds without reloading.

### 2. Firearms and Weapons Regulations

The proliferation of relatively inexpensive revolvers in the U.S. civilian market following the end of the Civil War led to an increase in interpersonal violence involving firearms. Tr. 6/8/2023 877:24–878:3. The influx of these revolvers, which could fire multiple rounds— although less than ten—without needing to be reloaded, injected a new and more lethal technology into the already rising rates of violence and crime throughout the county. Tr. 6/7/2023 729:6–15. In response, states enacted statutes specifically targeted at revolvers, and primarily targeted the concealed carry of these revolvers, which was considered a particularly dangerous feature of these weapons. Tr. 6/7/2023 732:5–12.

From the beginning of the Civil War in 1861 through to the end of the nineteenth century, at least nine states and territories passed anti-concealed carry statutes that specifically prohibited the concealed carrying of revolvers. Ex. 636 at 5, 14, 41, 58, 67, 70, 78, 88, 91. Cities in Illinois, Iowa, Kansas, Missouri, Nebraska, and Washington also passed anti-concealed carry statutes specifically prohibiting the concealed carry of revolvers. Ex. 636 at 25, 26, 28, 29, 46, 47, 50, 51, 87, 88. Still other states passed broad anti-carry laws prohibiting the carry of revolvers, concealed or otherwise, with any intent to do harm. A West Virginia law from 1882, for instance, made it a misdemeanor for someone to "carry about his person *any* revolver." Ex. 636 at 89 (emphasis added). A Syracuse, New York law from 1885 also prohibited the carry, concealed or otherwise, of revolvers with "intent to do bodily harm to any person." Ex. 636 at 60. Notably, all laws that mention "revolver" specifically were enacted after 1860, mirroring the surge of revolvers entering the civilian market after the Civil War. *See generally* Ex. 636.

In the years leading up to and after the Civil War, states also continued to regulate the carrying of Bowie knives. Fourteen states banned the concealed carry of Bowie knives between 1850 and 1875. Ex. 639. An additional six states enacted laws that completely prohibited the carry, concealed or otherwise, of these knives. Ex. 639. Between 1875 and 1900, twenty-two states had laws prohibiting the concealed carry of Bowie knives. Ex. 639. As with mid-nineteenth century regulations on Bowie knives, some states also went beyond prohibiting the concealed carry of Bowie knives to prohibit the sale or transfer of these weapons. An 1881 Arkansas law, for instance, made it a misdemeanor to sell, barter, exchange, or furnish a Bowie knife "in any manner" to "any person." Ex. 903 § 3.

In the mid-to-late nineteenth century, a weapon known as a slungshot—which was a handheld weapon with a piece of metal, stone, or some similar type of weighted object attached

to a flexible strap or handle—became widely associated with criminal and gang violence. Tr.
6/8/2023 870:21–871:7. Slungshots were considered particularly dangerous due to their
relatively small size, which made them easy to conceal. Tr. 6/8/2023 871:10. The slungshot's
flexible handle also magnified its striking power, meaning that the user could inflict more
damage than with other kinds of blunt objects. Tr. 6/8/2023 871:10–14. States and local
governments responded to the proliferation of the slungshot largely by prohibiting the carry, and
particularly the concealed carry, of these weapons. Tr. 6/8/2023 871:5–7. Between 1850 and
1875, sixteen states and municipalities enacted laws regulating the concealed carry of slungshots.
Ex. 634; Ex. 636. Between 1875 and 1900, thirty-one states and municipalities enacted laws
regulating the carry of slungshots. Ex. 634. States also regulated the carrying of blunt objects and
bludgeons more generally, with eight states passing regulations on bludgeons and thirteen states
passing regulations on billy clubs, the equivalent of a modern-day baton or night stick, between
1875 and 1900. Ex. 634.

In the late nineteenth century, states also passed laws regulating the use of trap guns,
which were conventional firearms rigged with a wire or other device to fire without the firearm
operator being physically present. Tr. 6/8/2023 874:18–23; 876:5–11. Trap guns were
particularly dangerous because they did not need an operator present to fire, which meant that
trap guns could fire at unintended targets or victims. Tr. 6/8/2023 874:25–875:11. While the
earliest regulation on trap guns was passed in New Jersey in 1771, by the end of the nineteenth
century, eleven states had passed regulations on trap guns. Ex. 633. By 1925, this number would
grow to fourteen states. Ex. 633.[23]

---

[23] In addition to these fourteen states, there is evidence of an individual being criminally
prosecuted for setting a trap gun in New York and Missouri. *See* Ex. 633.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: In the mid-to-late nineteenth century, the proliferation of revolvers among the U.S. civilian population led to an increase in these weapons being used for interpersonal violence. As they had done in the early nineteenth century, governments responded to this rise in violence by regulating the feature of revolvers thought to contribute most to their dangerousness—their ability to be easily concealed. Governments also responded to a rise in the use of dangerous weapons like Bowie knives, trap guns, and slungshots by enacting regulations that targeted the features that made these weapons particularly dangerous.

### D. Late Nineteenth and Early Twentieth Century (1880 to 1940)

#### 1. Firearms and Weapons Technology

Firearms were not designed around detachable magazines until the end of the nineteenth century, and it was rare to see the word "magazine" used in connection with firearms before 1900. Tr. 6/7/2023 597:19–25; 774:6–11. Semi-automatic firearm technology was developed around the end of the nineteenth century and the beginning of the twentieth century, first in Europe and then spreading to the United States. Tr. 6/8/2023 1006:11–13. Most semi-automatic handguns in the early twentieth century had detachable magazines, and most held a capacity of seven to eight rounds. Tr. 6/8/2023 1009:10–14. The most important semi-automatic handgun to enter the U.S. market in the early twentieth century was the Colt 1911, which was developed by an American firearms developer in collaboration with the Colt Firearms Company. Tr. 6/8/2023 1006:21–22; 1007:15–17. The Colt 1911 held seven rounds in the magazine and an additional round in the chamber, for a total capacity of eight rounds. Tr. 6/8/2023 1008:4–6. The Colt 1911 began to circulate in the United States most commonly after World War I, resulting from a post-war surplus of these pistols. Tr. 6/8/2023 1008:12–14.

The first fully-automatic handheld firearm marketed to U.S. civilians was the Thompson sub-machine gun, also known as the "Tommy gun." Tr. 6/8/2023 1010:23–25. The Thompson sub-machine gun was initially developed for use in World War I, which ended in 1918, and entered the U.S. market in the 1920s. Tr. 6/7/2023 601:25–602:3. The Thompson sub-machine gun was marketed to civilians for self-defense, but eventually became associated with criminal activities including police shootings and intergang warfare. Tr. 6/8/2023 883:24–884:4; 1010:10–12.

Also around the 1920s, large-capacity ammunition feeding devices—the type of detachable magazines capable of holding more than ten rounds that are associated with modern-day LCMs—first became commercially available in the United States. Tr. 6/8/2023 885:16–886:1. These devices were initially developed for military use and allowed soldiers to fire without pausing to reload. Tr. 6/8/2023 886:4–19.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: Detachable magazines capable of holding more than ten rounds of ammunition, and automatic firearms were invented for military-use in World War I. Semi-automatic firearms were invented in Europe in the late nineteenth century and spread to the United States in the early twentieth century. The most popular semi-automatic handgun in the early twentieth century held a total of eight rounds. The first fully-automatic handheld firearm marketed to U.S. civilians was the Thompson sub-machine gun, which was marketed for self-defense but became widely associated with violence and criminal activity.

### 2. Firearms and Weapons Regulations

As revolvers continued to enter the civilian market in the late nineteenth century and early twentieth century, anti-concealed carry laws specifically prohibiting the carrying of

revolvers continued to spread across the country. Between 1900 and 1930, five more states and territories passed laws prohibiting the concealed carry of revolvers, among other deadly weapons. Ex. 636 at 24, 29, 56, 62, 65. Additionally, California and Massachusetts prohibited the carry, concealed or otherwise, of a revolver with unlawful intent. Ex. 636 at 12, 41.

States also responded to the proliferation of automatic and semi-automatic firearms in the early twentieth century. Between 1925 and 1934, at least thirty-two states enacted laws restricting or, in many instances, prohibiting the possession of a fully-automatic firearm. Tr. 6/8/2023 884:10–12. In 1934, the federal government began regulating machine guns through the National Firearms Act, which required firearms manufacturers and importers to register machine guns before those guns could be imported, made, or transferred. 26 U.S.C. §§ 5841, 5845.[24] At least twenty-three states enacted regulations between 1920 and the early 1930s restricting magazine capacity by restricting possession or use of guns that could fire more than a certain number of rounds without reloading. Tr. 6/8/2023 887:13–16.

At least six states, plus the District of Columbia, enacted restrictions on semi-automatic weapons capable of firing a certain number of rounds without reloading. These restrictions varied in the maximum capacity they allowed. Tr. 6/8/2023 888:24–25. A 1927 Massachusetts law defined a machine gun to include "[a]ny gun of small arm calibre designed for rapid fire and operated by a mechanism" that could shoot more than one round without reloading, and prohibited possession of this type of gun. Ex. 635 at 13. Michigan, in 1927, made it illegal to manufacture, sell, or possess any machine gun or firearm capable of firing more than sixteen

---

[24] In 1986, Congress passed the Firearm Owners' Protection Act, which bans, with certain limited exceptions, the possession and transfer of machine guns made after May 19, 1986. 18 U.S.C. § 922(o). This law is still in effect.

times without reloading. Ex. 635 at 14. Minnesota passed a law in 1933 that outlawed any firearm capable of automatically reloading after each shot and that had a capacity of more than twelve rounds. Ex. 635 at 14. In 1933, Ohio passed a law limiting possession of semi-automatic firearms that could fire more than eighteen rounds without reloading. Ex. 635 at 20. Rhode Island passed a law in 1927 that banned the sale, purchase, or possession of machine guns, defined to include any weapon that shoots more than twelve shots semi-automatically without reloading. Ex. 635 at 23. In Virginia, a 1934 law made it illegal to possess or use a machine gun for an offensive purpose, and defined machine gun to include a weapon that could fire more than seven bullets semi-automatically from a magazine. Ex. 635 at 30. And the District of Columbia, in 1932, passed a law prohibiting possession of any gun that could fire, automatically or semi-automatically, more than twelve shots without reloading. Ex. 635 at 3. This law was passed by Congress and was modeled heavily after a uniform law created by the Uniform Law Commission. Tr. 6/8/2023 891:21–892:13. In some instances, states that restricted semi-automatic or fully-automatic firearms allowed possession if an individual obtained a permit. Tr. 6/8/2023 917:10–11; 921:4–15.

Accordingly, based on the credible evidence presented at trial, this Court finds as follows: As semi-automatic and fully-automatic firearms and ammunition feeding devices became increasingly popular in the early twentieth century, governments responded by passing regulations limiting the possession and use of these firearms. Prohibitions on the possession of automatic firearms were widespread. Prohibitions on the possession of semi-automatic firearms were also common, with six states plus the District of Columbia prohibiting these weapons. These regulations functionally limited magazine capacity, because they prevented individuals from possessing firearms that could fire over a certain number of rounds without reloading.

## VII.   CONCLUSIONS OF LAW

### A.  Second Amendment

#### 1.  BM 114's LCM restrictions do not violate the Second Amendment.

When assessing whether BM 114 violates the Second Amendment under *Bruen*, this
Court must first consider whether the plain text of the Second Amendment covers conduct that
BM 114 restricts. If the Second Amendment does not cover the restricted conduct, then BM 114
is constitutional. If the Second Amendment does cover the restricted conduct, then the State of
Oregon must demonstrate that BM 114 is consistent with the Nation's history and tradition of
firearm regulation. As explained below, at both steps, this Court finds that BM 114's LCM
restrictions do not violate the Second Amendment.

##### a.  LCMs are not covered by the Second Amendment.

###### i.    LCMs are not "bearable arms."

When assessing whether a regulation of a particular weapon violates the Second
Amendment, courts begin by asking whether the weapon constitutes a "bearable arm." *Heller*,
554 U.S. at 582. ("[T]he Second Amendment extends, prima facie, to all instruments that
constitute bearable arms, even those that were not in existence at the time of the Founding.")
Recently, the Supreme Court clarified that "even though the Second Amendment's definition of
'arms' is fixed according to its historical understanding, that general definition covers modern
instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. This means that a
firearm need not have existed in 1791 to be considered a "bearable arm" protected by the Second
Amendment.

Courts have held that handguns are "bearable arms" as contemplated by the Second
Amendment. *See Heller*, 554 U.S. at 628 (defining handguns as arms). And courts have found
that the Second Amendment "protects ancillary rights necessary to the realization of the core

right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Within the Ninth Circuit, these "ancillary rights" have included accessories like bullets, without which "the right to bear arms would be meaningless." *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015), *abrogation on other grounds recognized by United States v. Alaniz*, 69 F.4th 1124, 1127–28 (9th Cir. 2023).

BM 114 restricts LCMs, which are a subset of magazines. *See* Ex. 1 § 11(1)(d) (defining LCMs); Tr. 6/8/2023 885:6–8. Magazines are an accessory to firearms, rather than a specific type of firearm. Tr. 6/6/2023 523:5–7. At the time of the Second Amendment's ratification through to the late nineteenth century, firearm accessories like cartridge boxes—which held ammunition but, unlike modern magazines, did not feed the ammunition into firearms—were not considered "arms" but instead were considered "accoutrements." Tr. 6/7/2023 767:4–9; 767:22– 23; 768:5–9.

Nevertheless, just because a magazine is an accessory does not mean that it fails to qualify as a "bearable arm" as that term is used in Second Amendment jurisprudence. Like bullets, magazines are often necessary to render certain firearms operable. Tr. 6/6/2023 523:10– 19. The Ninth Circuit has recognized a "corollary, albeit not unfettered, right to possess the magazines necessary to render . . . firearms operable." *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). "Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun." *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) (citation omitted), *rev'd en banc on other grounds, Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *vacated on other grounds*, *Duncan v. Bonta*, 142 S. Ct. 2895 (2022).

This case, however, is not simply about the constitutionality of all magazines generally; it is about magazines that allow the user to shoot eleven or more rounds without reloading. Both Plaintiffs' and Defendants' experts testified that LCMs are a subset of magazines. Tr. 6/5/2023 65:14–17; 68:4–9. This Court therefore must decide whether LCMs specifically are necessary to render firearms operable. Based on the evidence presented at trial, this Court finds that while magazines may often be necessary to render a firearm operable, LCMs are not. Plaintiffs' expert Mark Hanish, a firearms marketing executive with approximately twenty years of experience in the industry, testified that a magazine with a capacity of ten rounds "performs the same basic function" as an LCM in that both "deliver[] ammunition to the action." Tr. 6/5/2023 128:11–12. Mr. Hanish also testified that, aside from the number of rounds available to the user, the mechanical function of a firearm is the same whether that firearm is equipped with a magazine with a ten-round capacity or equipped with an LCM. Tr. 6/5/2023 127:19–23. Defendants' expert Jim Yurgealitis likewise testified that "magazine capacity is not a determining factor in operability of a firearm" and that "any firearm that will accept a ten-round magazine will function identically . . . as it would with a larger capacity magazine." Tr. 6/6/2023 527:4–5; 527:14–16.

The evidence received at trial also shows that most firearms that accept detachable LCMs can accept detachable magazines that hold ten or fewer rounds of ammunition. Tr. 6/5/2023 76:5–8. Mr. Yurgealitis, for instance, testified that most major firearms manufacturers have some variation of specific firearm models, such as the AR-15-style rifles, which can accept a detachable magazine with ten rounds or less in capacity. Tr. 6/6/2023 524:9–11. Mr. Yurgealitis also testified that popular firearm models like the Glock semi-automatic pistol, the Beretta pistol,

and most AR-15-style rifles "will function with a ten-round magazine . . . as well as [they] would with a larger capacity magazine." Tr. 6/6/2023 527:10–13.

In sum, the evidence at trial shows that while magazines may be necessary to render firearms operable, LCMs, as a subset of magazines, are never necessary to render firearms operable. A firearm is not useless without an LCM because magazine capacity is not a determining factor in the operability of a firearm. And the right to bear arms does not become "meaningless" because the government chooses to restrict LCMs. Unlike the total handgun ban in *Heller*, for instance, BM 114 does not restrict "an entire class of 'arms,'" but merely a subset of an accessory to firearms. *See Heller*, 554 U.S. at 628. Notably, BM 114 does not restrict the number of ten-round magazines individuals may own or carry at any one time. BM 114 simply requires that the user reload after expelling ten rounds. Nor does it limit the type of firearm that an individual may carry for self-defense. Because most popular gun models accept both LCMs and magazines that hold ten or fewer rounds, individuals are still free to choose any type of firearm that best suits their needs—from semi-automatic handguns to semi-automatic rifles—so long as that firearm cannot fire eleven or more rounds without reloading. Accordingly, this Court finds that LCMs are not "bearable arms" as that term is used in Second Amendment jurisprudence.

### ii.    LCMs are not in common use today for self-defense.

Even if this Court were to find that LCMs are "bearable arms," that would not end this Court's inquiry into whether LCMs are covered by the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2126. In considering the scope of the Second Amendment right, the Supreme Court in *Heller* emphasized that it protects an individual right to keep and bear arms "'in common use' . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. In *Bruen*, the Supreme Court reemphasized *Heller*'s central holding, stating that the Second Amendment

extends only to bearable arms that are "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). This Court accordingly considers whether Plaintiffs have shown that LCMs are in common use, and whether they are in common use for self-defense.

### (a) Are LCMs "in common use"?

As announced in *Heller* and reiterated in *Bruen*, the Second Amendment extends only to bearable arms that are in "common use." *Id.* Pre-*Bruen*, courts struggled to reach a consensus framework for deciding what renders a firearm "in common use" as stated in *Heller*. *See, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("The record shows that perhaps 9 [percent] of the [N]ation's firearms owners have assault weapons, but what line separates 'common' from 'uncommon' ownership is something the [Supreme] Court did not say."); *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) ("[T]here is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use."). This lack of a unifying framework often led courts to apply divergent approaches, *compare Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 788 (D. Md. 2014) (considering whether assault weapons comprise a high percentage of the overall civilian gun stock) *with Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (considering only the absolute number of assault weapons and LCMs sold), or more commonly, to sidestep the question altogether, *see, e.g.*, *Duncan*, 19 F.4th at 1103; *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019); *Ass'n. of N.J. Rifle and Pistol Clubs, Inc. v. Attn'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018).

Despite this ambiguity, *Bruen* itself declined to clarify the metric by which courts should determine whether a firearm is "in common use." Instead, the Supreme Court repeated *Heller*'s

observation that the Second Amendment "protects the possession and use of weapons that are 'in common use at the time'" and found, without identifying any particular evidence, that handguns "are weapons 'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2128, 2134 (citations omitted).

Without clear guidance from binding authority, this Court is forced to determine which metric is most appropriate for evaluating "common use." Is it sufficient, for instance, for a court to consider the absolute number of LCMs sold in the United States? Or should a court consider the percentage of LCMs relative to the overall civilian gun stock in the United States? Should a court consider not only the absolute number of LCMs, but the number of Americans that own those LCMs? And if this ratio suggests that a relatively small percentage of gun owners possess a disproportionate number of LCMs, does that mean that LCMs are not commonly owned?

Plaintiffs argue that, of these potential options, only the absolute number of LCMs possessed by Americans is relevant. To support their argument, Plaintiffs rely on the NSSF Magazine Chart, which they say shows that Americans possessed 160 million detachable LCMs between 1990 and 2018, or roughly 52 percent of all detachable magazines possessed during that period. Ex. 33 at 7. NSSF Director of Research Salam Fatohi testified that this data comes from three sources. Tr. 6/6/2023 359:21–25. First, the NSSF collects data related to the number and type of firearms produced from two government sources: the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Annual Firearms Manufacturing and Exportation Report ("AFMER") and the U.S. International Trade Commission ("ITC"). Tr. 6/6/2023 362:24–25. Then, the NSSF asks industry members—firearms manufacturers, distributors, and retailers—to tell them how many magazines, and of what capacity, they typically ship with a given type of firearm. Tr. 6/6/2023 368:1–8. The NSSF then uses those "industry insights" to extrapolate the

total number of magazines possessed relative to the number and type of firearms produced. Tr. 6/6/2023 368:10–22.

This Court is unable to give this evidence significant weight for two reasons. First, though the chart itself is labeled as "magazines in possession," Mr. Fatohi testified that the chart shows the number of firearms *produced* as opposed to firearms actually purchased and therefore possessed. Tr. 6/6/2023 386:23–387:7. For the chart to reflect magazine possession, in other words, this Court must assume that every firearm produced in the country is subsequently sold to U.S. consumers. Plaintiffs failed to present evidence to support such an assumption. Second, Mr. Fatohi testified that he did not know how many industry members supplied information from which the number of magazines was extrapolated. Tr. 6/6/2023 377:15–20. Indeed, he testified that it was "possible" that this data was extrapolated from information provided by only two industry members or up to 200 industry members. Tr. 6/6/2023 377:21–22. Without knowing how many industry members supplied information, this Court cannot determine whether the numbers in the NSSF chart represent a fair extrapolation of detachable magazine possessed by consumers. If those industry members that supplied the data distribute fewer magazines than is typical within the industry, for instance, the chart could underestimate the number; if, on the other hand, the members distribute more magazines than is typical, the chart could overestimate the number. Without more information, this Court cannot be confident in the NSSF's extrapolation of magazine possession from government data on firearm production.

Nevertheless, this Court accepts the parties' stipulation that magazines holding more than ten rounds of ammunition are owned and possessed by millions of Americans. ECF 206 at ¶ 49. In closing argument, Plaintiffs' counsel argued that if a firearm or firearm accessory is owned by at least 200,000 or more individuals, then it merits constitutional protection as "in common use."

Tr. 6/9/2023 1102:15–1103:12. Plaintiffs therefore argue that even if this Court were to find only that magazines that hold more than ten rounds of ammunition are owned and possessed by millions of Americans—a number that is clearly higher than Plaintiffs' 200,000 threshold—it would need to find that those magazines are protected by the Second Amendment. This Court need not decide whether the metrics offered by Plaintiff are sufficient to show common use because there is an additional component to the *Bruen* analysis—that is, the common use must be related to self-defense.

### (b) "Common use" alone is insufficient to establish Second Amendment Protection.

This Court finds that, while magazines that hold more than ten rounds of ammunition are owned and possessed by millions of Americans, this fact alone does not automatically entitle these magazines to Second Amendment protection. This Court rejects Plaintiffs' invitation to equate "commonly owned" with "in common use today for self-defense." Tr. 6/9/2023 1102:23–1103:7; *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). Under Plaintiffs' interpretation, if the firearms industry were able to successfully market a firearm or firearm accessory to 200,000 Americans—which is 0.0006 percent of the overall U.S. population—then the firearm or firearm accessory would be constitutionally protected, regardless of that firearm or firearm accessory's features or typical use. *See Range v. Attn'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc) (noting that there are "over 330 million people" in the United States). Plaintiffs' argument would make "commonality" the dispositive inquiry, and would erase any consideration of how firearms or firearm accessories are used. This Court finds such an interpretation troubling for several reasons.

First, this Court notes that firearm manufacturers and dealers make decisions that both limit consumer choice and magnify the commonality of LCMs. At trial, Plaintiffs' witness

Jessica Harris testified that at her store, all firearms that do not have a fixed magazine come with a detachable magazine, and that many firearms come from the factory with multiple magazines. Tr. 6/5/2023 41:7–9; 44:16–19. The Glock 19, for instance, is sold with three fifteen round magazines. 6/5/2023 Tr. 67:9–10. The Sig Sauer P320, another popular handgun model, comes from the factory with either two or three detachable magazines that hold anywhere from fifteen to twenty-one rounds. Tr. 6/5/2023 67:12–17. Plaintiffs' witnesses also testified that a number of popular firearm models, such as the AR-style rifle, come standard with LCMs. Tr. 6/5/2023 43:21–25. This evidence illustrates that the commonality of LCMs is at least partially due to choices made by firearms manufacturers and dealers rather than firearm purchasers. The absolute number of LCMs owned, then, is not necessarily reflective of an affirmative choice by consumers. Further, this evidence adds little to the determination of whether LCMs are commonly used for "ordinary self-defense needs." *Bruen*, 142 S. Ct. at 2156.

Additionally, this Court notes the inherent tension in allowing the firearms industry to control the bounds of the Second Amendment because of the firearm industry's economic interest in the increased sale of firearms. At trial, Plaintiffs' expert Mark Hanish testified that magazines usually cost somewhere between twelve and twenty-five dollars. 6/5/2023 Tr. 130:11–13. Using Plaintiffs' estimate of 160 million LCMs as a baseline and considering the lowest estimate for the average cost of a magazine, this Court finds that the sale of LCMs approached two billion dollars between 1990 and 2018. Mr. Hanish, who testified that he would not support any regulation on magazine capacity of any kind (even regulations on 100-round magazines), Tr. 6/5/2023 151:11–12, also testified that his personal economic investments in the firearms industry exceed one million dollars, Tr. 6/5/2023 149:16–18. This Court declines to

adopt an interpretation of the Second Amendment that solely allows those with the greatest

economic interest in the sale of LCMs to define the boundaries of a constitutional right.

This Court does not mean to suggest that the realities of the firearms market—including

the economic interest of firearms dealers and manufacturers, or marketing decisions made by

these entities—should have no bearing on whether a firearm or firearm accessory is in common

use for self-defense. This Court simply holds today that the popularity of a firearm or firearm

accessory alone cannot be dispositive when considering whether that item is "in common use

today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotation marks omitted). Instead,

this Court finds that the standard requires consideration of not only the commonality of the

firearm or firearm accessory in question, but also the *use* of that firearm or firearm accessory.

This Court therefore next considers whether Plaintiffs have shown that LCMs are in common use

for the lawful purpose of self-defense. *See Heller*, 554 U.S. at 624.

### (c) The Second Amendment protects an individual's right to possess a firearm for use in self-defense.

In considering the scope of the Second Amendment, the Supreme Court in *Heller* focused

largely on the concept of self-defense, noting for instance that at the time of the Second

Amendment's adoption, "[t]he traditional militia was formed from a pool of men bringing arms

'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. Moreover, in

assessing whether the District of Columbia's ban on assembled handguns in the home passed

constitutional muster, the Supreme Court focused squarely on the issue of self-defense, noting

that "the inherent right of self-defense has been central to the Second Amendment right" and that

the handgun was "overwhelmingly chosen by American society for that lawful purpose." *Id.* at

628. The District's ban was particularly violative of the Second Amendment, the Supreme Court

held, because it prohibited handguns in "the home, where the need for defense of self, family,

and property is most acute." *Id.* The Supreme Court thus ultimately held that the challenged regulation "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.

The Supreme Court cases that follow *Heller* emphasize that self-defense is the central right protected by the Second Amendment.[25] In *McDonald v. City of Chicago*, for instance, the Supreme Court reiterated that *Heller* found that "the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense*." 561 U.S. 742, 749 (2010) (emphasis added). The Supreme Court also observed that this "core lawful purpose of self-defense" is "deeply rooted in this Nation's history and tradition." *Id.* at 767–68 (citations omitted). *McDonald* also stated that the central holding in *Heller* is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, *most notably for self-defense* within the home." *Id.* at 780 (emphasis added).

*Bruen* continues this trend. First, *Bruen* notes that *Heller* and *McDonald* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home *for self-defense*." 142 S. Ct. at 2122 (emphasis added); *see also id.* at 2128 (explaining that *Heller* held that "the Second Amendment protected an individual right to armed self-defense" and "relied on the historical understanding of the Amendment to

---

[25] Indeed, at nearly every turn, some justices have found it important to individually re-emphasize the Second Amendment's central purpose of self-defense. In dissenting from a denial of certiorari, for instance, Justice Thomas wrote that self-defense is "a basic right and the central component of the Second Amendment's guarantee of an individual's right to keep and bear arms." *Jackson v. City and Cnty. of San Francisco*, 135 S. Ct. 2799, 2799 (2015) (Thomas, J., dissenting) (internal quotation marks omitted) (citation omitted). And in a concurrence to an opinion that considered the Second Amendment and stun guns, Justice Alito wrote that the individual right to keep and bear arms "vindicates the basic right of individual self-defense." *Caetano v. Massachusetts*, 577 U.S. 411, 413 (2016) (Alito, J., concurring) (internal quotation marks omitted) (citations omitted).

demark the limits on the exercise of that right"). And when considering the metrics against which courts should evaluate whether modern regulations are consistent with the Nation's tradition of firearm regulation, *Bruen* states that "individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 2133 (citations omitted).

This Court acknowledges that there may be lawful purposes other than self-defense for which an individual can use a firearm. Jessica Harris, a plaintiff and fact witness, testified that customers at her store include hunters and those who use firearms for sport or target shooting. Tr. 6/5/2023 45:25–46:3. Mark Hanish, one of Plaintiffs' expert witnesses, testified that LCMs are particularly useful in the sporting context. Tr. 6/5/2023 105:18. And Sheriff Kevin Lohrey, a plaintiff and fact witness, testified that he sees community members in his rural county use firearms, including firearms with LCMs, to protect their livestock from predators. Tr. 6/5/2023 86:16–17.

While these uses may be lawful, they have never been explicitly recognized as being "the *central component*" of the Second Amendment right; only self-defense enjoys that kind of unique focus within the Supreme Court's caselaw. *Heller*, 554 U.S. at 559. "Hunting and other recreational uses of guns have no explicit or otherwise direct protection in the text of the Constitution or under existing doctrine, nor does the historical evidence support such a conclusion." Joseph Blocher, *Hunting and the Second Amendment*, 91 NOTRE DAME L. REV. 133, 153 (2015). Accordingly, this Court finds that the Second Amendment protects an individual right to commonly used firearms for the central purpose of self-defense.

### (d) An individual's subjective intent, while relevant, is not sufficient to show that a firearm is in common use for self-defense.

The parties stake divergent legal positions on what evidence is relevant to the question of whether an LCM is in common use for self-defense. Plaintiffs' interpretation relies on the

subjective belief of the LCM owner to determine whether the LCM is used for self-defense—that is, if an individual purchases an LCM and states that they purchased that LCM for self-defense, then the LCM is being used for self-defense. Defendants and Intervenor-Defendant, on the other hand, both argue for an interpretation of "use" that includes some objective metric of an LCM's actual use in self-defense. Under Defendants and Intervenor-Defendant's view, common use for self-defense relies not on the subjective view of the LCM owner, but on whether LCMs objectively facilitate armed self-defense.

This Court assumes that most firearm owners purchase their firearms, and firearm accessories such as LCMs, with the intent to use them for lawful purposes such as self-defense. If the subjective intent of an individual were enough to show that a firearm or firearm accessory is used for a lawful purpose—primarily self-defense—then nearly every firearm or firearm accessory purchased in this country would satisfy that test. The constitutionality of a firearm or firearm accessory, in other words, would depend only on how common a firearm or firearm accessory is—not on how the firearm is used. As discussed above, this Court finds that sheer commonality is not dispositive in determining whether a particular firearm or firearm accessory is protected by the Second Amendment. As such, this Court finds that an individual's subjective intent in purchasing a firearm or firearm accessory for self-defense, while relevant, also cannot be dispositive in assessing whether a firearm or firearm accessory is in common use for self-defense.

### (e) Objective standards are common when assessing the boundaries of constitutional rights.

In *Bruen*, the Supreme Court emphasized that "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561

U.S. at 780). The Supreme Court in *Bruen* suggests that the Second Amendment framework should reflect the frameworks that courts use to analyze the scope of other constitutional rights. Therefore, in determining whether it is appropriate to consider objective evidence of use in assessing whether LCMs are in common use for self-defense, this Court finds it appropriate to consider the extent to which objective standards are used in delineating the boundaries of other constitutional rights.

In the First Amendment context, courts in the Ninth Circuit apply both a subjective and objective standard to judge whether speech can be considered a "true threat" and therefore outside of the bounds of protected speech. *Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008). In considering whether speech is a true threat, the objective standard requires a court to consider the speech in "light of [its] entire factual context, including the surrounding events and reaction of the listeners." *Id.* (alteration in original) (citations omitted).

Objective standards are also prevalent in the Fourth Amendment context. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("In the Fourth Amendment context . . . we have almost uniformly rejected invitations to probe subjective intent.") (internal quotation marks omitted) (citations omitted). When reviewing the constitutionality of arrests under the Fourth Amendment, courts assess whether "the circumstances, viewed objectively, justify [the challenged] action." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (alteration in original) (citation omitted). In considering whether an individual was subject to an unreasonable search, courts assess both whether the person being searched had an objectively reasonable expectation of privacy as well as the objective effect of the officer's actions. *Bond v. United States*, 529 U.S. 334, 338, 338 n.2 (2000). And in analyzing claims of unreasonable use of force under the Fourth

Amendment, courts look to whether that force "is excessive under objective standards of reasonableness." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citation omitted).

In considering whether the government has violated its duty to provide conditions of reasonable health and safety to people in its custody under the Due Process Clause of Fifth Amendment, courts consider, among other factors, whether the government failed to "take reasonable available measures to abate [a substantial] risk" of serious harm. *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). The government's actions must be "objectively unreasonable," which turns "on the facts and circumstances of each particular case." *Id.* (citation omitted).

In the context of the Sixth Amendment, a criminal defendant claiming a violation of their right to effective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). A pretrial detainee's claim for violation of the right to adequate medical care under the Fourteenth Amendment is judged against an objective deliberate indifference standard, *Gordon*, 888 F.3d at 1124–25, as is a pretrial detainee's failure-to-protect claim under the Fourteenth Amendment, *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).

Indeed, even in the Second Amendment context, the Supreme Court has suggested that some objective standard could be relevant in judging whether a constitutional violation has occurred. In *Bruen*, for instance, the Supreme Court held that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens *with ordinary self-defense needs* from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This Court reads the qualifier of "ordinary self-defense needs" to

include some consideration of how and why firearms or firearm accessories are actually used in typical self-defense scenarios.

In sum, it is common in constitutional law for courts to consider objective evidence—such as the factual context of a particular piece of speech, or the societal understanding of an individual's expectation of privacy—in considering whether the violation of a constitutional right has occurred. Because the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees," this Court finds that it may fairly consider objective evidence to determine whether LCMs are commonly used in self-defense. *See Bruen*, 142 S. Ct. at 2156.

### (f)  Whether LCMs are in common use for self-defense must be measured by an objective standard.

The question is whether Plaintiffs have shown that the LCMs restricted by BM 114 are in common use for self-defense, based not only on the subjective belief of individuals who possess LCMs, but also on the objective evidence related to LCM use in self-defense. Or, to adopt Plaintiffs' framing of the question in their closing argument, this Court asks whether LCMs, according to any objective evidence, "facilitate armed self-defense." Tr. 6/9/2023 1208:12–13.

Based on the credible evidence presented at trial, this Court concludes that LCMs are not "commonly used . . . for self-defense." *Bruen*, 142 S. Ct. at 2138. Plaintiffs failed to provide compelling evidence at trial that the ability to fire eleven or more shots without reloading facilitates armed self-defense for "law-abiding citizens with ordinary self-defense needs." *Id.* at 2156. Instead, the evidence produced at trial establishes that LCMs are not, by any objective metric, commonly used for self-defense.

The evidence at trial establishes that it is extremely rare for an individual to fire more than ten rounds in self-defense. Lucy Allen, an expert for Defendants, testified that she analyzed

DGUs taken from the NRA Armed Citizens Database over a six-and-a-half-year period, from January 2011 to May 2017. Tr. 6/7/2023 662:19–25. Of the 736 incidents Ms. Allen analyzed, the individual fired more than ten shots in just two—or about 0.3 percent of incidents. Tr. 6/7/2023 663:24–664:8. In approximately 80 percent of incidents, the individual fired one to five shots. Tr. 6/7/2023 664:3–5. Based on Ms. Allen's analysis, the average number of rounds fired in self-defense is 2.2. Tr. 6/7/2023 664:10; Ex. 536. And, because many firearms come standard with LCMs today, the low number of rounds fired cannot be attributed to a lack of ammunition. Rather, the evidence shows that law-abiding citizens with ordinary self-defense needs simply do not commonly fire more than ten rounds when acting in self-defense.

This objective evidence greatly undermines the testimony of Plaintiffs' self-defense expert Massad Ayoob, who testified that LCMs are useful in self-defense situations because "[LCMs] allow[] [individuals] to continue the fight." Tr. 5/30/2023 32:18–20. The gist of Mr. Ayoob's testimony was that LCMs facilitate armed self-defense by allowing individuals to fire more rounds without having to reload in the face of an attack. Tr. 5/30/2023 32:24–33:9. But the objective evidence shows that having more rounds does not facilitate self-defense because those rounds are rarely, if ever, used.

Indeed, Plaintiffs' own evidence at trial illustrates how rare it is for "law-abiding citizens with ordinary self-defense needs" to fire more than ten rounds in self-defense. *See Bruen*, 142 S. Ct. at 2156. Mr. Ayoob, for instance, testified about an incident involving a police officer who engaged in a car chase with a heavily-armed bank robber in which the officer fired thirty-three rounds. Tr. 5/30/2023 39:19–40:18. Mr. Ayoob described this incident as "a classic example of why so many police departments and private citizens have gone to the higher capacity guns." Tr. 5/30/2023 40:19–21. But this incident involved a police officer engaged in the active pursuit of

an armed suspect, which is hardly a scenario that implicates "ordinary self-defense needs." *See Bruen*, 142 S. Ct. at 2156. Mr. Ayoob admitted as much on cross-examination, stating that "the law enforcement officer has different duties" than a civilian. Tr. 5/30/2023 74:12–13. As noted previously, BM 114 does not restrict LCMs for police officers or military use.

Plaintiffs' fact witness Adam Johnson, a gun store owner and a plaintiff in this action, testified that he was involved in a defensive gun use incident while working for a "plainclothes loss prevention company" at a convenience store. Tr. 6/5/2023 70:2–14. Mr. Johnson testified that an individual attempted to rob the convenience store while brandishing a firearm. Tr. 6/5/2023 70: 8–11. Mr. Johnson testified that he drew his firearm and fired what he believed to be thirteen rounds at the assailant. Tr. 6/5/2023 70:13–17. This Court gives Mr. Johnson's testimony little weight, given his economic interest in the outcome of this case. However, even if this Court did consider Mr. Johnson's testimony to be entirely credible, this Court nonetheless finds that an armed private security guard engaging in a DGU with an armed robber does not exemplify "ordinary self-defense needs." *See Bruen*, 142 S. Ct. at 2156.

Plaintiffs argue, and this Court agrees, that an individual need not fire a gun to use it for self-defense.[26] This Court finds that in brandishing a firearm to intimidate an attacker, for

---

[26] This Court finds a short passage from Justice Scalia's dissent from *Smith v. United States*, which considered whether the exchange of a gun for cocaine constitutes "use" of a firearm "during and in relation to . . . [a] drug trafficking crime" under federal law, instructive in considering the meaning of "using" a firearm or firearm accessory:

> To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, "Do you use a cane?," he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of "using a firearm" is to speak of using it for its distinctive purpose, *i.e.*, as a weapon.

*Smith v. United States*, 508 U.S. 223, 242 (1993) (Scalia, J., dissenting).

instance, the individual uses the firearm for self-defense. But this Court again emphasizes that this case is about LCMs, not about firearms generally. Plaintiffs presented no evidence at trial that brandishing a firearm with an LCM, as opposed to brandishing a firearm with a magazine holding ten or fewer rounds, facilitates armed self-defense. Fact witness and plaintiff Jessica Harris testified about an incident in which she brandished a handgun, equipped with an LCM, to deter a potential attacker. Tr. 6/5/2023 47:15–19. Notably absent from Ms. Harris's testimony is any evidence that the LCM itself had any impact on the would-be-assailant's decision to flee. Tr. 6/5/2023 47:20–21.

Instead, this Court finds that, based on the credible evidence presented at trial, brandishing an LCM does not facilitate self-defense. Defendants' expert Jim Yurgealitis testified that he could not tell the magazine capacity of a Glock 19, a popular handgun model, when the magazine is inserted into the firearm. *See* Tr. 6/6/2023 529:2–4 ("It certainly appears to be a Glock 19. Although, the magazine capacity itself is hard to determine because . . . it's actually inserted in the magazine well."). This Court finds that if Mr. Yurgealitis, a former ATF agent who was specially trained in the field of firearm identification and has personally viewed over 5,000 firearms throughout his career, Tr. 6/6/2023 522:3–6, cannot determine the capacity of a popular handgun model's magazine when it is inserted into the firearm, then the size of a firearm's magazine—as opposed to the firearm itself—has little deterrent effect in the average civilian self-defense context.

The Second Amendment protects the right of law-abiding citizens with ordinary self-defense needs to keep and bear arms commonly used for lawful purposes, centrally self-defense. *See Bruen*, 142 S. Ct. at 2156. For an item to be used in self-defense, it must somehow be employed to that end. *Voisine v. U.S.*, 579 U.S. 686, 692 (2016) ("Dictionaries consistently

define the noun 'use' to mean the 'act of employing' something."). Plaintiffs have not shown that LCMs are commonly employed for self-defense. Defendants have produced credible evidence showing that they are not. This Court accordingly finds that the Second Amendment does not protect LCMs.

### iii.    LCMs have features that are "dangerous and unusual."

As the Supreme Court reiterated in *Bruen*, just as weapons that are commonly used for self-defense are presumptively covered by the Second Amendment, weapons that are "dangerous and unusual" fall outside of the Second Amendment's protections. *Bruen*, 142 S. Ct. at 2128 ("[In *Heller*], we found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'") (citing *Heller*, 554 U.S. at 627). "To determine [whether a firearm is dangerous and unusual], we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." *Fyock*, 779 F.3d at 997 (citation omitted).

As noted above, this Court finds that while LCMs may be possessed by millions of Americans today, they are not commonly used for self-defense. Further, this Court finds based on the evidence in the record that LCMs have uniquely dangerous propensities. This Court finds, based on the testimony of Plaintiffs' expert Mark Hanish, that the LCMs sold to civilians are often the same LCMs used in the military context. Tr. 6/5/2023 135:16–22. Mr. Hanish testified that Surefire, a firearms manufacturer for which he served as Vice President of Marketing and Sales, sells to both the Department of Defense and the U.S. domestic civilian market through the same website. Tr. 6/5/2023 145:1–5. On that website, Surefire markets its LCMs—which it sells with capacities of sixty and 100 rounds—as delivering "twice the violence of action and half the required reloads[,] providing a crucial edge in any firefight." Tr. 6/5/2023 136:10–17; 145:10–

12; *see also* Ex. 816. Mr. Hanish testified that he thought this was a reasonable way to market LCMs to civilians. Tr. 6/5/2023 146:4–6. This testimony suggests that LCMs, even in civilian hands, are closely related to weapons used in warfare.

This Court also finds, based on the testimony of Defendants' experts Michael Siegel and Louis Klarevas, that LCMs enhance the lethality of shooting events. Tr. 6/6/2023 422:21–424:13. Dr. Siegel, whose area of scholarly focus includes firearm violence prevention policy, specifically testified that the capacity of a firearm is highly related to the lethality of the weapon because the capacity is what determines the number of shots that can be fired within a given time without having to pause to reload. Tr. 6/6/2023 500:5–8; 513:5–10. And Mr. Yurgealitis testified that detachable magazines "facilitate[] more rapid reloading of a firearm when the previous magazine is empty." Tr. 6/6/2023 523:13–14.

Again, this Court finds it necessary to compare this testimony to the objective evidence regarding the "ordinary self-defense needs" of "law-abiding citizens." *Bruen*, 142 S. Ct. at 2156. While the average number of shots fired in self-defense is around 2.2, in a mass shooting involving an LCM, the average number of shots fired is ninety-nine. Tr. 6/7/2023 681:10–12. And while more than ten shots are fired in just 0.3 percent of DGUs, more than ten shots are fired in 94 percent of mass shootings where an LCM is used. Tr. 6/7/2023 681:14–16. Thus, while it is uncommon for an individual to fire more than ten shots in self-defense, it *is* common for mass shooters to fire more than ten shots, especially when the mass shooter is using an LCM.

In sum, this Court finds that Plaintiffs have not met their burden to show that LCMs are protected by the Second Amendment. The evidence in the record illustrates that LCMs are not necessary for firearms to function and are not commonly used for self-defense. Because this

Court finds that the Second Amendment's plain text does not cover LCMs, BM 114's restrictions on LCMs are constitutional.

> **b.  BM 114's LCM restrictions are consistent with the Nation's history and tradition of firearm regulation.**

Even if Plaintiffs could show that LCMs are protected by the Second Amendment, this Court finds that Defendants and Intervenor-Defendant have met their burden of showing that BM 114's restrictions on LCMs are consistent with the Nation's history and tradition of firearm regulation.[27]

In some instances, the historical inquiry set forth in *Bruen* will be straightforward. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the

---

[27] Plaintiffs argue that if this Court were to find that LCMs are in common use for self-defense, it does not need to inquire into whether the challenged regulations are "consistent with this Nation's historical tradition of firearm regulation" because, under Plaintiffs' formulation of *Bruen*, historical tradition protects arms that are "in common use today," as opposed to those "highly unusual in society at large." *Bruen*, 142 S. Ct. at 2143 (internal quotation marks omitted). This Court disagrees with Plaintiffs' interpretation. This Court notes that *Bruen* did find that "[a]part from a few late-[nineteenth]-century outlier jurisdictions, American governments . . . have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. But this Court does not read this statement to automatically render any regulation that covers a firearm or firearm accessory that is commonly used for self-defense unconstitutional. First, as the Supreme Court made clear, "when the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively* protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126 (emphasis added). This suggests that even when a firearm is commonly used for self-defense, and is therefore covered by the plain text of the Second Amendment, the government may still rebut the presumption that the firearm is protected. Second, the Supreme Court in *Bruen* did not apply the more nuanced analogical approach required for technology or societal concerns that did not exist at the Founding, because the *Bruen* Court found that the challenged regulation sought to address a societal concern that had existed since the eighteenth century. *Id.* at 2131–32. As discussed more fully below, this Court finds that a nuanced approach must apply to the present case. Accordingly, *Bruen*'s historical conclusions stem from a more "straightforward" analysis not applicable here. *See id.*

[eighteenth] century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Or "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* The challenged regulation in *Heller,* for instance, sought to address technology (handguns) and a societal problem (interpersonal firearm violence) that the Supreme Court found existed at the time of the Second Amendment's ratification in 1791 and, later, the adoption of the Fourteenth Amendment in 1868. *See id.* at 2131.

But *Bruen* also acknowledged that not all inquiries will be so straightforward. The Second Amendment, as this Court has noted, protects not only the types of arms that were in existence in 1791 but also "modern instruments that facilitate armed self-defense." *Id.* at 2132 (citation omitted). But if an instrument of self-defense did not exist—or was exceedingly rare— in 1791, we would not expect to find any regulations limiting or restricting the possession or use of this rare or non-existent instrument.[28] The Supreme Court thus clarified its rule in *Bruen* to account for technology or societal ills that the Founders could not have envisioned by explaining that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.

_____

[28] It would be a mistake to treat this absence of evidence as evidence of BM 114's unconstitutionality. In *Hanson v. District of Columbia*, which considered the constitutionality of the District of Columbia's restrictions on LCMs, the court explained that while the first patent for a personal jetpack was taken out in 1919, jetpacks remain unregulated today. *Hanson v. District of Columbia*, --- F. Supp. 3d ----, 2023 WL 3019777, at *16 (D.D.C. Apr. 20, 2023). Nonetheless, it would be absurd for a future court, in reviewing the regulatory landscape around personal jetpacks in 2023, to view the lack of widespread regulation as illustrating "an ideological disposition against regulating jetpacks." *Id.* Rather, it shows that personal jetpacks remain an "expensive and experimental curiosity," too rare to attract the kind of societal (and political) attention necessary to lead to widespread regulation in 2023. *Id.*

In these cases, *Bruen* instructs courts to "reason[] by analogy," which "requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (citation omitted). In making that determination, *Bruen* focuses on two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. And, in assessing whether a modern-day regulation is relevantly similar to a historical analogue, *Bruen* notes that the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors," in other words, "it still may be analogous enough to pass constitutional muster." *Id.*

### i. LCMs implicate both "unprecedented societal concerns" and "dramatic technological changes."

Under *Bruen*, a "more nuanced" analogical approach is necessary if a case implicates either "unprecedented societal concerns" or "dramatic technological changes." *Id.* at 2132. As this Court explains below, Defendants and Intervenor-Defendant have shown that this case implicates both.

### (a) Mass shootings using LCMs are an "unprecedented societal concern."

First, this Court finds that based on the evidence presented at trial, Defendants and Intervenor-Defendant have shown that mass shootings using LCMs are an unprecedented societal concern rather than a general societal problem that has persisted since the eighteenth century.

First, the evidence at trial shows that the shooting of multiple victims by a single assailant using a firearm is a recent phenomenon in American history. The first example in American history of a mass shooting involving more than ten fatalities, not including the perpetrator,

occurred in 1949.[29] Tr. 6/6/2023 464:6–10; *see also* Ex. 564. The annual incidence of high-fatality mass shootings—which are defined as a mass-shootings where six or more individuals died, not including the perpetrator—has increased along a linear trend line from 1990 to 2022. Tr. 6/6/2023 413:5–17. Defendants' expert Dr. Klarevas concluded that the trend line is "indicative of a growing problem" related to high-fatality mass shootings. Tr. 6/6/2023 413:18; *see also* Ex. 567. Dr. Klarevas also testified that in addition to observing a rise in the occurrence of mass shooting events, he has also observed a rise in the fatalities or victims killed in recent years from mass shooting events. Tr. 6/6/2023 414:7–17; *see also* Ex. 568. Plaintiffs produced no evidence at trial to rebut Dr. Klarevas's testimony.

Defendants also produced evidence showing that, in recent years, it has become more common for LCMs to be used in mass-shooting events. Tr. 6/6/2023 415:14–416:2. Since 1990, 78 percent of all high-fatality mass shootings have involved LCMs. Ex. 569. But that percentage goes up as one approaches present-day. Since 2000, for instance, 79 percent of all high-fatality mass shootings have involved LCMs. Ex. 569. Since 2010, 86 percent of all high-fatality mass shootings have involved LCMs. Ex. 569. And since 2020, every single high-fatality mass shooting in which six or more individuals were killed involved an LCM. Ex. 569. Again, Plaintiffs produced no evidence at trial to rebut this evidence.

Finally, Intervenor-Defendant produced evidence showing that mass shootings have created new societal concerns related to the capacity of health care systems. Mass shooting

---

[29] As noted above, Dr. Klarevas's testimony relies on a definition of "mass shooting" that excludes large inner group violence. This Court accepts Dr. Klarevas's definition of mass shooting as the kind of definition that those in his field would typically use, while acknowledging that covers a specific type of event: a mass shooting against civilians using a firearm, and therefore necessarily excludes some instances of mass violence in American history.

events impact a hospital's surge capacity, which is the ability of a given hospital to deal with multiple casualties in a short period of time. Tr. 6/6/2023 494:8–17. If a mass shooting event results in more than five or ten critically injured patients in a short period of time, OHSU— which is one of Oregon's largest, most well-resourced trauma hospitals—would rapidly run out of available resources to treat patients. Tr. 6/6/2023 493:15–20; 495:2–13. The surge capacity of hospitals around the state of Oregon is likely much smaller than that of OHSU, meaning that a mass shooting that resulted in four casualties could overwhelm these hospitals. Tr. 6/6/2023 496:6–12. Once a hospital reaches surge capacity, a hospital must decide how to allocate care to patients, which can result in delays and postponements of certain treatments. Tr. 6/6/2023 495:15–21. Plaintiffs produced no evidence at trial to rebut this evidence, or to suggest that these administrative concerns have existed since the eighteenth century.

In sum, this Court finds that Defendants and Intervenor-Defendant produced sufficient evidence at trial to show that mass shootings related to LCMs are an unprecedented societal concern. Incidents of mass shootings were rare even a half a century ago and have increased rapidly in very recent years. In the last decade, most mass shootings in which more than five individuals were killed involved LCMs. And the rise in these mass casualty events is placing an unprecedented pressure on society's medical institutions, which must now be prepared to handle mass casualty events at the expense of other patients. Though gun violence certainly has long plagued the United States, Defendants and Intervenor-Defendant have shown that these incidents of singular and concentrated violence against civilians are unprecedented.

**(b) LCMs represent a "dramatic technological change."**

Additionally, this Court finds that Defendants and Intervenor-Defendant have shown that LCMs represent a "dramatic technological change" from the technology available at the Founding.

The evidence presented at trial overwhelmingly shows that large-capacity repeating firearms—defined as firearms capable of firing more than ten rounds without requiring the shooter to reload—were extremely rare at the adoption of the Second Amendment. Defendants' expert Dr. Brian DeLay described repeating firearms from the Founding Era as "vanishingly rare" and "perhaps nonexistent." Tr. 6/6/2023 552:25–553:1. Examples of repeating firearms from this era included a single nine-shot firearm brought to the Colonies from England, as well as a prototype for a repeating firearm that operated like a Roman candle. Tr. 6/6/2023 556:12–15; 557:18–19; 559:14–560:12. And while there is evidence that a Girardoni air rifle was brought on the Lewis and Clark expedition in the early 1800s, repeating air rifles were broadly viewed as uncommon and unusual curiosities rather than common weapons of self-defense. Tr. 6/7/2023 573:3–9; 576:18–20. According to Dr. Delay's testimony, there is no evidence that ordinary Americans would have had any familiarity with large-capacity repeating firearms at the time of the Second Amendment's ratification in 1791. Tr. 6/7/2023 577:6–16.

At the time of the ratification of the Fourteenth Amendment in 1868, large-capacity magazines or repeating firearms capable of firing more than ten rounds without reloading were likewise uncommon. Dr. DeLay testified that between 1776 and 1868, repeating firearms did become easier to manufacture and more reliable to use. Tr. 6/7/2023 582:19–22; 590:14–20. The first type of repeating firearm to gain some limited commercial success, according to Dr. DeLay, was the Colt revolver, which entered the civilian market in the 1830s and could hold between

five to and seven rounds. Tr. 6/7/2023 582:19–22; 583:9–10; 584:20–21. Dr. DeLay testified that

loading those rounds was a time-consuming process that required an individual to complete five

separate steps to reload a single chamber. Tr. 6/7/2023 583:14–584:7.

 As for large-capacity firearms at the time the Fourteenth Amendment was ratified in

1868, Dr. DeLay testified that there were two models capable of firing more than ten rounds

without reloading: the Winchester rifle and the Henry rifle. Tr. 6/7/2023 591:16. Both models

required the shooter to reload the rounds one by one once the rifle's fixed magazine had been

emptied, unlike modern detachable magazines which allow the user to simply insert an already-

fully-loaded magazine into their firearm. Tr. 6/7/2023 593:4–8. Neither firearm was semi-

automatic, unlike many firearms that come standard with LCMs today. Tr. 6/7/2023 593:9–10.

And both rifles enjoyed only minimal success on the domestic civilian market. According to Dr.

DeLay's testimony, 74,000 of these rifles were produced between 1861 and 1872; of those, about

65,000 were exported to foreign militaries and 8,500 were purchased by or for officers in the

Union Army during the Civil War, leaving just 500 for the civilian market. Tr. 6/7/2023 594:8–

21.  According to Dr. DeLay's estimates, large-capacity firearms accounted for less than 0.002

percent of firearms in the United States at the time of the Fourteenth Amendment. Tr. 6/7/2023

595:18–22.

 Indeed, the evidence at trial shows that the commonality of LCMs within the American

civilian market today is itself a relatively recent phenomenon. In 1954, there were only two

models of firearms that were sold with factory-issued large-capacity magazines, which accounted

for 0.7 percent of firearms sold. Tr. 6/6/2023 408:18–21. LCMs did not come factory-issued with

more than five percent of firearm models until 1984. Tr. 6/6/2023 409:3. This is around the time

that Plaintiffs' experts testified that LCMs first became popular within the civilian firearm market. Tr. 5/30/2023 84:23–85:5; 6/5/2023 131:13–21.

This Court concludes that modern-day LCMs represent a dramatic technological change from the Founding and Reconstruction-era firearms based on at least two key metrics: the time and effort involved in reloading and the time involved in shooting the firearm's rounds. Plaintiffs' expert Massad Ayoob testified that he can reload a handgun with a detachable LCM in three-and-a-half seconds. Tr. 5/30/2023 78:14–16. And Defendants' expert Jim Yurgealitis testified that detachable magazines "facilitate[] more rapid reloading of a firearm when the previous magazine is empty." Tr. 6/6/2023 523:13–14. By comparison, reloading a muzzle-loading weapon—the typical style of weapon popular at the time of the Second Amendment's adoption in 1791—required an individual to complete at least eight steps, including priming the firearm, pouring in gunpowder, inserting the musket ball, and ramming the gunpowder and musket ball with a ramrod. Tr. 6/7/2023 641:22–643:9. Repeating firearms at the time of the ratification of the Fourteenth Amendment were more streamlined, but still less so than modern-day LCMs. As discussed above, even the most reliable multi-shot firearms of the nineteenth century—the Colt revolver, the Henry rifle, and the Winchester rifle—had to be reloaded round by round, meaning that a repeating firearm could only be reloaded as quickly as the shooter could insert the individual rounds. Tr. 6/7/2023 583:14–584:7; 593:4–8; 601:15–18.

Modern LCMs also allow an individual to fire more rapidly than the firearms of the Founding or Reconstruction eras. Dr. DeLay testified that the shooter in the Virginia Tech massacre fired 174 rounds in around nine to ten minutes using an LCM, which means that the shooter could discharge between seventeen and nineteen rounds in a single minute. Tr. 6/7/2023 603:1–2; Ex. 556. Dr. DeLay testified that this rate of shooting would have been impossible

between 1860 and the turn of the twentieth century using a Winchester or Henry rifle. Tr. 6/7/2023 603:3–8; 603:15–16. Dr. DeLay also testified that this rate of shooting would have been impossible using a six-shot Colt revolver from the 1830s. Tr. 6/7/2023 603:9–12. Nor would this rate of firing have been possible with the most popular weapons at the Founding: according to Defendants' expert Dr. Kevin Sweeney, the most highly-trained soldiers could reload and fire a muzzleloading musket three times per minute. Tr. 6/7/2023 643:10–19. An eighteenth-century rifle could be reloaded and fired once every ninety seconds. Tr. 6/7/2023 650:14–16. And while eighteenth-century pistols could be reloaded and fired slightly faster, they could still only fire three to four times per minute—far slower than a modern-day LCM. Tr. 6/7/2023 647:11–20.

The evidence presented at trial thus establishes that LCMs—and large-capacity repeating firearms in general—were exceedingly rare among the U.S. civilian population through the ratification of the Fourteenth Amendment. Moreover, a modern LCM allows an individual to fire at least four times more rapidly than the most well-trained soldier of the Founding era. These LCMs represent a dramatic technological change from the types of weapons available at the Founding and Reconstruction. This Courts' analysis of BM 114's restrictions on LCMs must therefore use the more nuanced approach called for in *Bruen*.

> ### ii. Modern and historical regulations impose a comparable burden on the right of armed self-defense, and that burden is comparably justified.

Under *Bruen*'s nuanced approach, a court must compare the challenged modern regulation to historical analogues presented by the government. *Bruen*, 142 S. Ct. at 2132. In determining whether these analogues are "relevantly similar," a court must consider whether the modern regulation imposes comparable burdens on the right to self-defense and decide whether the burden imposed is comparably justified. *Id.* at 2133. In other words, a court must consider *how* the regulation restricts the right to self-defense and *why* the restrictions were implemented.

At trial, Defendants presented credible evidence about several types of historical analogues that impose comparable burdens on the right to self-defense as BM 114's restrictions on LCMs, and which are comparably justified. These include regulations on the use of trap guns, the storage of gun powder, the possession and carrying of blunt objects like clubs, the possession and carrying of certain fighting knives, the concealed carrying of pistols, the concealed carrying of revolvers, and the use and possession of fully-automatic and semi-automatic firearms. This Court considers each in turn.

### (a) Trap Guns

As described above, a trap gun is a conventional firearm that is rigged, with a string, wire, or similar mechanism, to discharge without the firearm operator being physically present. Tr. 6/8/2023 874:18–20. Trap guns were used by individuals to protect property, protect livestock, and deter thieves. Tr. 6/8/2023 874:21–23. Defendants' expert Dr. Robert Spitzer testified that certain features of trap guns made them particularly dangerous, including the "haphazard manner" in which individuals would fashion them, as well as the fact that the guns could fire without any individual being present. Tr. 6/8/2023 874:25–875:9.

At least sixteen states criminalized the setting of trap guns in the nineteenth and twentieth centuries. Ex. 633. Fourteen states enacted specific anti-trap gun laws. Ex. 633; Tr. 6/8/2023 876:5–7. There is also evidence of individuals being criminally prosecuted for setting a trap gun in two states. Ex. 633; Tr. 6/8/2023 876:7–9. The primary method of regulating the trap gun was to prohibit the use or setting of a trap gun. Tr. 6/8/2023 876:23–877:1.

This Court finds that these laws prohibiting the use or setting of a trap gun placed a minimal burden on the right to armed self-defense. The laws only prohibited individuals from using or setting their firearms in a particularly dangerous way; it did not limit individuals from

possessing or using the underlying firearms themselves. Similarly, BM 114 imposes a minimal burden on the right to armed self-defense. This Court reiterates the objective evidence discussed above: it is exceedingly rare for an individual with ordinary self-defense needs to fire more than ten rounds in self-defense. According to objective evidence, an individual discharges more than ten rounds in just 0.3 percent of self-defense incidents. That means that in 99.7 percent of all self-defense incidents, BM 114's restrictions on LCMs would place no burden on the right to self-defense.

Moreover, under BM 114, an individual may possess and use any model or type of firearm of their choosing, so long as that firearm is not capable of firing more than ten rounds without reloading. Firearms that use LCMs allow a shooter to fire more shots without having to pause, which increases the potential lethality of the weapon. Tr. 6/6/2023 513:5–10. An LCM, in other words, takes a firearm and makes it more lethal. A trap gun, too, takes a firearm and makes it more lethal by allowing the firearm to discharge without the presence of a shooter. Thus, just as trap gun laws sought to regulate a particularly dangerous feature of a firearm, so too do BM 114's restrictions on LCMs seek to regulate a particularly dangerous feature of a firearm.

### (b) Gunpowder Storage

Defendants also presented evidence regarding restrictions on the storage of gunpowder in early American history. Before 1900, nine states regulated the possession, use, or sale of gunpowder. Ex. 640.  Dr. Spitzer testified that these regulations were passed to protect public safety, because of the risk of explosion and fire associated with the storage of gunpowder. Tr. 6/8/2023 880:25–881:8.

This Court finds that these gunpowder regulations acted as a kind of limit on the amount of firepower that an individual could amass in a single place. The gunpowder laws did not

severely restrict the right to armed self-defense because an individual could still purchase gunpowder but could not store that gunpowder in amounts that would place the public at risk by leading to a catastrophic explosive event.

Similarly, BM 114 restricts the ability of an individual to amass a level of firepower deemed to be a threat to public safety. While described as an LCM restriction, this Court has explained that BM 114 is more accurately described as a limit on the amount of ammunition that an individual is permitted to fire without reloading. Like the gunpowder laws, BM 114 does not prohibit an individual from purchasing ammunition or amassing firepower; it merely limits the amount of firepower that an individual can amass and use without reloading. Indeed, BM 114 does not restrict the number of ten-round magazines that an individual may carry or possess. It simply requires reloading after ten rounds are spent. This Court therefore finds that these gunpowder regulations placed a relevantly similar burden on the right to armed self-defense as BM 114.

This Court also finds that the justifications underpinning these gunpowder laws are relevantly similar to the justifications underpinning BM 114. As discussed above, mass civilian casualty events involving firearms were extremely uncommon—indeed, according to the evidence at trial, unheard of—in the nineteenth century. But gunpowder-related fires did create the fear of mass civilian casualty events. Tr. 6/8/2023 880:25–881:8. Accordingly, governments restricted the amount of gunpowder that could be stored in an individual's home and regulated where large amounts of gunpowder could be stored, to protect the public from the dangers associated with gunpowder explosions and fires. BM 114 likewise restricts the amount of ammunition that an individual can fire at any given time without reloading to protect the public from mass civilian casualty events.

### (c) Blunt Objects

Defendants also produced credible evidence regarding the regulation of blunt weapons in the eighteenth and nineteenth centuries. These blunt weapons included things like bludgeons, billy clubs, and slungshots Tr. 6/8/2023 869:12–870:3.

Restrictions on bludgeons typically involved laws criminalizing the carrying of such objects. Tr. 6/8/2023 869:18–21. By the beginning of the twentieth century, thirteen states regulated billy clubs. Tr. 6/8/2023 870:6–9; Ex. 634. By the beginning of the twentieth century, eight states regulated bludgeons. Between 1850 and 1875, sixteen states regulated slungshots. Ex. 634. By 1900, that number had grown to thirty-one. Ex. 634. According to Dr. Spitzer, the purpose of these laws restricting the carry of blunt objects was to improve public safety, with the goal being to sever the link between the carrying of these objects and their use in crime. Tr. 6/8/2023 873:19–23.

Plaintiffs argued at trial that these laws are not sufficiently analogous because the laws restricting blunt objects restricted only the concealed carry of these objects, rather than the possession of these objects. BM 114, by contrast, restricts both the purchase and the carrying of LCMs. This Court acknowledges this distinction, but does not find that it changes this Court's analysis of the comparative burdens on the right to armed self-defense. As Dr. Spitzer testified, the social and political realities of the eighteenth and nineteenth century likely made an outright ban on the possession of blunt objects impossible. Tr. 6/8/2023 874:9–16. Given the ease with which an individual could fashion a blunt object, it made little sense for fledgling state and municipal governments to attempt to ban their outright possession. *Id.* The same cannot be said about modern LCMs, which cannot be fashioned by an individual and must be purchased. This Court also notes that our modern regulatory system is more sophisticated than that of our

eighteenth and nineteenth century predecessors. This Court therefore finds the absence of laws banning the possession of blunt objects outright to be of little value when considering whether the laws restricting blunt objects are relevantly similar to BM 114's restrictions on LCMs.

Instead, this Court focuses on whether the laws restricting the concealed carry of blunt objects placed a comparable burden on the right to armed self-defense as BM 114's LCM restrictions. Here, this Court finds that the burdens are relevantly similar. Laws regulating blunt objects typically sought to restrict the concealed carrying of these objects, which was viewed as a feature of these weapons that made them particularly dangerous and suited to criminal use. The laws therefore did not prohibit the carrying of all blunt objects, but only those that were small enough or able to be concealed. This left open some means of self-defense using blunt objects, whether the individual chose to openly carry the object or chose a larger object that could not be concealed. BM 114 likewise does not prohibit the carrying, or possession, of all firearms. Instead, BM 114 seeks to regulate the feature of firearms that makes them particularly dangerous and suited to criminal use: the ability to fire more than ten shots quickly without reloading. BM 114 leaves open ample channels for self-defense, including all rifles and handguns, so long as those firearms cannot fire more than ten rounds without reloading.

This Court likewise finds that laws restricting the concealed carry of blunt objects, and particularly laws criminalizing the concealed carry of the slungshot, are comparably justified to BM 114. As discussed above, laws prohibiting the concealed carry—or the carrying altogether—of slungshots sought to protect public safety by preventing the use of a particularly dangerous weapon and, particularly, the feature that rendered that weapon so dangerous. Similarly, BM 114 seeks to protect public safety by restricting a feature of firearms that renders them particularly dangerous.

89 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (d) Bowie Knives

Defendants also produced credible evidence regarding the regulation of knives and, in particular, Bowie knives, during the nineteenth century. While Defendants' expert Dr. Brennan Rivas testified that it is difficult to gauge in numerical terms the popularity of Bowie knives during the nineteenth century, Bowie knives were frequently reported on in the media as being associated with crime. Tr. 6/7/2023 719:22–720:4. Dr. Rivas testified that, from these reports, she could conclude that there was a significant amount of societal concern associated with the carrying of Bowie knives, and particularly with the concealed carrying of these knives. Tr. 6/7/2023 720:25–721:2. Dr. Rivas testified that Bowie knife regulations were most often regulated via concealed carry statutes because the ability to conceal a Bowie knife was thought to render the weapon particularly dangerous. Tr. 6/7/2023 721:10–20.

Defendants' expert Dr. Spitzer also testified that governments responded to the concern around Bowie knives by enacting laws criminalizing their concealed carry. Tr. 6/8/2023 865:19–25. At least twenty-nine states or municipalities prohibited the concealed carrying of Bowie knives. Ex. 636; Ex. 639. And fifteen states or municipalities prohibited the carrying of Bowie knives altogether, concealed or open. *Id.*; Tr. 6/8/2023 866:21–25. Dr. Spitzer also testified that some states prohibited the general public from acquiring a Bowie knife, referring specifically to an 1881 Arkansas law that made it a crime to sell, barter, exchange, or provide a Bowie knife. Tr. 6/8/2023 932:17–933:5.

Plaintiffs again argue that these laws are not analogous to BM 114 because states typically did not ban possession of Bowie knives, while BM 114 does restrict possession of LCMs. Again, Defendants' expert Dr. Spitzer testified that in the nineteenth century, laws banning possession of Bowie knives altogether would not have been feasible, because the United

States was still a relatively new system of government with a "primitive" system of policing. Tr. 6/8/2023 868:6–13. According to Dr. Spitzer's testimony, "governments generally did not have the mechanisms, the ability, the capability to simply ban a knife outright, especially in light of the fact that a knife is a very simple thing technologically." Tr. 6/8/2023 868:14–17. This Court agrees that it must consider the political realities of an era when evaluating whether a law is sufficiently analogous to a modern-day regulation, and finds Dr. Spitzer's testimony persuasive.

Accordingly, this Court focuses on whether the laws restricting Bowie knives placed a comparable burden on the right to armed self-defense as BM 114's LCM restrictions. This Court again finds that the prohibition on the carry of a Bowie knife likely placed a greater burden on the right to armed self-defense than BM 114's restrictions on LCMs. Defendants' expert Dr. Rivas testified that, for much of the nineteenth century, single-shot pistols were as useful to individual self-defense as clubs. Tr. 6/7/2023 717:8. Knives, on the other hand, were "exceedingly deadly," and could be used by individuals as many times as they were so inclined. Tr. 6/7/2023 717:9–13. A Bowie knife, then, was likely a useful device for self-defense in the nineteenth century, particularly compared to other available options. By contrast, LCMs are not commonly used for self-defense, and restrictions on the use of LCMs do not prevent individuals from obtaining firearms, like handguns, that *are* commonly used in self-defense, so long as those handguns cannot fire more than ten rounds without reloading.

The justifications underpinning these regulations are also relevantly similar. Both Bowie knife regulations and BM 114 seek to protect public safety. And the mechanisms of both laws are likewise relevantly similar because both target the feature of the weapon thought to be the most dangerous: concealment for Bowie knives, and the ability to shoot more than ten rounds without reloading for LCMs.

### (e) Pistols

Defendants produced credible evidence regarding the regulation of pistols in the early-to-mid nineteenth century. In fact, according to Dr. Spitzer's testimony, by the early twentieth century, there was some form of anti-concealed carry law passed in every state or territory, or cities within those states or territories, except for New Hampshire. Ex. 634; Tr. 6/8/2023 877:6–10. Some of these laws specifically targeted the carrying or sale of pocket pistols, which were viewed as particularly dangerous due to their size and ease of concealment. Tr. 6/7/2023 725:1–4; 732:6–10.

These anti-concealed carry laws targeting pistols were passed in response to both technological advances and an increase in commonality of pistols within the civilian population. Dr. Rivas testified that around 1850, firearms technology had advanced such that any individual who wanted to purchase a pistol—and who had the money to do so—could. Tr. 6/7/2023 726:19–22. And Dr. Spitzer testified that there was an increase in interpersonal violence and murders throughout the country in the pre-Civil War nineteenth century involving pistols. Tr. 6/8/2023 877:15–23.

These anti-concealed carry laws targeting pistols imposed a similar, if not greater, burden on the right to armed self-defense than BM 114's LCM restrictions. On their face, these laws appear to restrict the concealed carry of an entire class of arms: pistols. But by prohibiting the concealed carry of pistols, these laws restricted only those pistols that were small enough to be readily concealed; these laws still allowed individuals to carry small pistols openly, or carry the larger horse or belt pistols. The laws thus did not completely prevent an individual from carrying pistols for their self-defense. Indeed, laws that made exceptions to the carrying of pistols for those on journeys seem to recognize that pistols were useful in certain self-defense situations.

*See, e.g.*, Ex. 636 at 2, 8, 24. Similarly, BM 114 does not restrict the carry—open or otherwise— or possession of any broad category of arms. Rather, BM 114's LCM restrictions restrict only a subset of magazines that are particularly dangerous to public safety, in the same way that the concealed carry laws targeted a subset of firearms thought to be particularly useful in the commission of crimes.

These anti-concealed carry laws are likewise comparably justified to BM 114. These laws were passed in response to a rise in the commission of violent crime using pistols, and sought to restrict a feature of a firearm that made it particularly dangerous to public safety: the pistol's size, which made it easily concealable and useful in the commission of crime. Tr. 6/7/2023 725:1–4; 732:6–10. Similarly, BM 114 was passed in response a rise in mass shootings involving LCM-equipped firearms and seeks to restrict a feature of a firearm that makes it particularly dangerous to public safety: the firearm's magazine capacity, which makes it able to shoot more than ten bullets in a short period of time, well above the number of bullets commonly used for self-defense.

### (f) Revolvers

Defendants also produced credible evidence regarding the regulation of revolvers as a specific subset of firearms in the mid-to-late nineteenth century, following the relative commercial success of the Colt revolver and the increase in production of revolvers following the Civil War. At least thirteen states passed regulations on the concealed carry of pistols between 1861 and 1930. Ex. 636.

This Court finds that these nineteenth century laws prohibiting or limiting concealed carry of revolvers burdened the right to armed self-defense to a much greater degree than BM 114's restrictions on LCMs. These laws restricted the carry of all revolvers regardless of

capacity, and most popular revolvers in the mid-to-late nineteenth century held between five to seven rounds. BM 114, by contrast, imposes a minimal burden on the right to armed self-defense, because BM 114's restrictions on LCMs do not prevent individuals from possessing or using any model or type of firearm of their choice, so long as that firearm is not capable of firing more than ten rounds without reloading. Again, this Court reiterates that, based on the evidence produced at trial, LCMs are not commonly used in self-defense, such that restricting their possession would have no impact on 99.7 percent of ordinary self-defense situations.

This Court notes that regulations on the carrying of revolvers increased as these revolvers became more common in the civilian market. While the Colt revolver was first created in the 1830s, they did not become popular among the civilian population until the mid-to-late 1840s, and became very popular in the civilian market in the years following 1860. Tr. 6/7/2023 583:4–10; 726:2–10; 728:1–7. Regulations that specifically limited the carrying of revolvers likewise began appearing after 1860. Ex. 363. This is analogous to modern regulations on LCMs. Plaintiffs' expert Mark Hanish testified that modern LCMs became popular on the civilian market in the 1980s. Tr. 6/5/2023 131:15–21. LCMs were subsequently prohibited under federal law beginning in 1994. Tr. 6/6/2023 525:22–526:7.

Plaintiffs argued at trial that these laws are not sufficiently analogous because the laws restricted only the concealed carrying of revolvers, while BM 114's restrictions on LCMs restrict both the purchase and the carrying of LCMs. This Court acknowledges this distinction, but does not find that it changes this Court's analysis of the comparative burdens on the right to armed self-defense. As discussed above, this Court finds that the objective evidence shows that LCMs are not commonly used in self-defense because the unique features of an LCM—the ability to shoot more than ten rounds without reloading—are rarely, if ever, "commonly used . . . for self-

defense." *Bruen*, 142 S. Ct. at 2138. By contrast, revolvers or other types of handguns are commonly used in self-defense situations, both in firing and in brandishing. An outright prohibition on the concealed carrying of an item that is commonly used in self-defense is more burdensome than restrictions on the purchase and carrying of an item that is almost never used in self-defense situations.

This Court likewise finds that the anti-concealed carry laws of the nineteenth century are comparably justified to BM 114. The anti-concealed carry laws of the nineteenth century sought to restrict the use of a weapon that posed a threat to public safety by virtue of its increased popularity in the civilian market. Tr. 6/7/2023 729:6–15. These concealed carry laws were also aimed at limiting what was viewed as a particularly dangerous feature of these firearms: their design as being readily concealable, which was viewed as rendering them more deadly. Tr. 6/7/2023 721:10–20; 731:19–21. Similarly, BM 114 seeks to restrict the use of a firearm accessory that poses a threat to public safety by virtue of its particularly dangerous features.

### (g) Semi and Fully-Automatic Firearms

Finally, Defendants' presented evidence related to twentieth century laws regulating semi- and fully-automatic firearms. Before discussing whether these regulations are analogous to BM 114, it is necessary to consider *Bruen*'s discussion of the relevant time period to which courts should look when considering whether a regulation is consistent with the Nation's history and tradition.

*Bruen* cautioned courts that, when considering historical evidence, "not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Most useful to understanding whether a modern regulation is consistent with history and tradition, the Supreme Court noted, is evidence that does not "long predate[]" either the adoption of the Second Amendment in 1791 or the Fourteenth

Amendment in 1868. *Id.* Accordingly, and as discussed above, the vast majority of the historical analogues on which Defendants rely come from either the eighteenth or nineteenth centuries. Historical evidence that post-dates the adoption of the Fourteenth Amendment, according to the Supreme Court, can be used to confirm earlier historical traditions, but cannot be used as evidence to contradict or override those traditions. *Id.* at 2137 (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (Kavanaugh, J., dissenting) ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.")). Accordingly, historical evidence from the twentieth century is useful only to the extent that it confirms the historical traditions from the eighteenth and nineteenth centuries on which Defendants chiefly rely.

Fully-automatic and semi-automatic firearms, as well as large-capacity ammunition feeding devices, entered the U.S. civilian market following World War I. Tr. 6/8/2023 883:1–5; 885:16–886:1; 884:23–885:5. These changes in firearm technology allowed individuals to fire a greater number of rounds than ever before without needing to reload. Tr. 6/8/2023 887:8–12.

According to Dr. Spitzer, governments quickly responded to the proliferation of these new technologies among civilians. Between 1925 and 1934, at least thirty-two states enacted laws restricting or, in some instances, prohibiting the possession of fully-automatic firearms. Tr. 6/8/2023 884:10–13. Dr. Spitzer testified that at least twenty-three states enacted regulations in the 1920s that effectively restricted magazine capacity by prohibiting individuals from possessing firearms that could fire over a certain number of rounds. Tr. 6/8/2023 887:13–16. And while many of these statutes only applied to automatic firearms, at least six states and the District of Columbia passed restrictions on firearms that could fire more than a certain number of rounds semi-automatically without reloading. Ex. 635 at 3, 13, 14, 20, 23, 30. Some states, like

Ohio, allowed possession only if any individual obtained a permit. Tr. 6/8/2023 919:7–13; Ex. 635 at 20. Other states, by contrast, did not allow possession of these firearms under any circumstances, and limited the capacity of possessable firearms well-below the restrictions of BM 114. Ex. 635 at 13, 30.

Dr. Spitzer testified that he was not aware of any law from the early twentieth century that specifically addressed LCMs. However, LCMs were effectively restricted by laws regulating firearms capable of firing over a certain number of rounds, such as laws restricting the possession of semi-automatic firearms that could fire more than twelve rounds. Tr. 6/8/2023 926:4–8. Some states specifically prohibited semi-automatic firearms where the magazines had been expanded to accept extra capacity, illustrating a regulatory focus on limiting the number of rounds that an individual could fire without reloading. Ex. 365 at 14. Thus, restrictions on semi- and fully-automatic firearms were closely associated with restrictions on ammunition magazines or their equivalents.[30]

This Court finds that these twentieth century restrictions on semi- and fully-automatic firearms overall imposed a comparable burden on the right to self-defense as BM 114's restrictions on LCMs. As Dr. Spitzer testified, semi- and fully-automatic firearms were first created for warfare and were of limited value to civilian self-defense, though Tommy guns were marketed to civilians for that purpose. A restriction on their possession or use therefore imposed a relatively minimal burden on the right to self-defense. The twentieth century restrictions on

----

[30] While Defendants did not rely on this evidence at trial, this Court also notes that magazine capacity was capped at ten rounds for detachable magazines throughout the entire country from 1994 to 2004. Tr. 6/6/2023 405:22–23; 525:21–526:7; *see also* Pub. L. No. 103-322, § 110103(b), 108 Stat. 1999 (1994). This further confirms a tradition of regulating firearms based on magazine capacity.

semi- and fully-automatic firearms also did not prohibit an individual from purchasing multiple

firearms, or multiple magazines, to increase their firepower. This Court notes that while some

regulations on semi- and fully-automatic firearms allowed possession if an individual obtained a

permit, other regulations allowed for no such exceptions, and limited capacity to near or below

that of BM 114's ten-round restriction. *See, e.g.*, Ex. 635 at 2, 13, 14, 23. Accordingly, this Court

finds that some of these regulations burdened the right to self-defense less than BM 114, while

some burdened the right to self-defense more; in general, however, these regulations imposed a

minimal burden on the right to self-defense.

Similarly, as discussed above, BM 114's restrictions on LCMs impose a minimal burden

on the right to self-defense. Unlike many of the twentieth century restrictions on semi- and fully-

automatic firearms, BM 114 only limits capacity, and does not limit the type of firearm an

individual can purchase. Under BM 114, an individual can purchase a semi-automatic handgun,

so long as that handgun is not capable of firing more than ten rounds without reloading. And

similar to the twentieth century restrictions, under BM 114, an individual is allowed to purchase

as many firearms and as many magazines as they desire—so long as no single magazine is

capable of firing more than ten rounds without reloading.

This Court also finds that the twentieth century restrictions on semi- and fully-automatic

firearms and BM 114 are comparably justified. Both seek to protect public safety by limiting a

particularly dangerous feature of a weapon: in both cases, the ability to fire a large number of

bullets without pausing to reload. Restrictions on semi- and fully-automatic firearms in the

twentieth century were passed in response to the use of these firearms in the commission of

violent crimes. Similarly, BM 114 was passed in response to the use of LCMs in violent mass

shootings. As noted above, while these restrictions cannot independently form the basis of a

historical tradition of firearm regulation, they confirm the historical traditions from the eighteenth and nineteenth centuries discussed earlier, which is the tradition of regulating new firearms and weapons technology to restrict the features that rendered these weapons particularly dangerous.

In sum, this Court finds that Defendants have presented sufficient evidence to show that BM 114's restrictions on LCMs are consistent with the Nation's history and tradition of firearm regulation. Throughout this Nation's history, new technologies have led to the creation of particularly dangerous weapons. As those weapons became more common, they became tied with violence and criminality. In response, governments passed laws that sought to address the features of those weapons that made them particularly dangerous to public safety. BM 114's restrictions on LCMs are no different, and are thus constitutional under *Bruen*'s history and tradition test.

### 2.  BM 114's permitting provisions do not violate the Second Amendment.

*Bruen* considered the constitutionality of New York's public carry licensing regime that required an applicant to demonstrate a special need for self-defense before the state would issue a license. *Bruen*, 142 S. Ct. at 2122. In striking down New York's law as violative of the Second Amendment, the Supreme Court noted that respondents—the New York state government—had failed to "identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. But the Supreme Court also noted that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" *Id.* at 2138 n.9 (alteration in original) (citation omitted). Accordingly, BM 114's permitting provisions are constitutional under *Bruen* if they constitute a *shall-issue* licensing regime.

### a. BM 114's permitting provisions constitute a "shall-issue" licensing regime.

As described above, BM 114's permit-to-purchase regime requires applicants to satisfy several criteria before obtaining a permit: applicants must undergo a background check, fingerprinting, and a mental health check, complete a training course in firearms, and pay a fee. Ex. 1 § 4(1)(b)(A)–(E). If an applicant meets the criteria for a permit, the permit agent "shall issue" the permit. *Id.* § 4(3)(a). BM 114's mental health provision states that an applicant is not qualified to obtain a permit, however, if they "present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." *Id.* § 4(1)(b)(C).

Plaintiffs argue that BM 114 is not a shall-issue regime because the mental health provision makes the permitting agent's decision to approve or deny the application discretionary.[31] Defendants counter that BM 114's permitting regime, including the mental health provision, tracks with the types of permitting regimes explicitly approved of in *Bruen*.

In describing the types of constitutionally-permissible "shall-issue" licensing regimes, the Supreme Court explained that such regimes "often require applicants to undergo a background check or pass a firearms safety course [and] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9

---

[31] In pretrial briefing, Plaintiffs also argued that Defendants would be unable to implement the other portions of BM 114's permitting regime —including the firearms courses— without significant delays. This Court found that any claims regarding BM 114's constitutionality that hinged on future implementation of the permitting regime were unripe for adjudication and dismissed those claims without prejudice. *See* ECF 234.

(citation omitted). The Court explained that "the vast majority of states—43 by [its] count—are

'shall issue' jurisdictions." *Id*. at 2123. The Court then collected these forty-three "shall-issue"

regimes in *Bruen*'s first footnote. *Id*. at 2123 n.1. One of these constitutional "shall-issue"

regimes was Oregon's concealed handgun license ("CHL") regime. *Id*. (citing O.R.S. 166.291).

The Court then explained in *Bruen*'s ninth footnote that these permitting regimes are "shall-

issue" regimes because they "appear to contain only 'narrow, objective, and definite standards'

guiding licensing officials . . . rather than requiring the 'appraisal of facts, the exercise of

judgment, and the formation of an opinion.'" *Id*. at 2138 n.9 (internal citations omitted).

Defendants argue that *Bruen* approved of Oregon's CHL regime as a shall-issue regime

and that BM 114 contains a mental health provision that mirrors Oregon's CHL regime.

*Compare* Ex. 1 § 4(1)(b)(C) (stating that an individual is qualified to obtain a permit-to-purchase

if they "[do] not present reasonable grounds for a permit agent to conclude that the applicant has

been or is reasonably likely to be a danger to self or others, or to the community at large, as a

result of the applicant's mental or psychological state or as demonstrated by the applicant's past

pattern of behavior involving unlawful violence or threats of unlawful violence") *with* O.R.S.

166.293(2) (stating that a sheriff may deny an individual a CHL if the sheriff "has reasonable

grounds to believe that the applicant has been or is reasonably likely to be a danger to self or

others, or to the community at large, as a result of the applicant's mental or psychological state

or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or

threats of unlawful violence."). Defendants thus argue that the Supreme Court has implicitly

approved the mental health provision found in BM 114 as constitutional.

Plaintiffs counter that *Bruen* only explicitly approves of the language of one section of

Oregon's CHL permitting regime—O.R.S. 166.291—and the mental health provision comes

from a subsequent section of Oregon's CHL permitting regime: O.R.S. 166.293. Plaintiffs therefore argue that the Supreme Court would not approve of BM 114's mental health provision, which mirrors the language found in O.R.S. 166.293—not O.R.S. 166.291. Although Plaintiffs are correct that *Bruen* cites only to the first section of Oregon's CHL permitting regime, O.R.S. 166.291, their argument that the *Bruen* Court only approved that section is not well-taken. Oregon's CHL permitting regime includes a number of sections, including the mental health provision found in O.R.S. 166.293. To obtain a CHL permit under O.R.S. 166.291, the mental health provision in O.R.S. 166.293 must be satisfied. The language of BM 114's mental health provision mirrors the language in O.R.S. 166.293. One simply cannot legitimately read O.R.S. 166.291 as divorced from the sections that follow and supply further conditions for obtaining a CHL.

Moreover, review of the shall-issue statutes cited in *Bruen*'s first footnote shows that the Supreme Court only included citations to a single section of each of the forty-three cited shall-issue regimes, typically the first substantive section to deal with permitting requirements. There is no example of a citation that goes beyond a single section, which, again, is usually the regime's general permitting section. It is implausible that the Supreme Court intended to convey approval of only a single section of these forty-three permitting regimes. Rather, this Court finds that the most reasonable interpretation is that the *Bruen* Court's citations are used to refer to the entirety of each state's referenced firearms permitting regime. This interpretation is supported by the language of *Bruen* itself, in which the Supreme Court specifically refers to the statutes in the first footnote as coming from "'shall-issue' *jurisdictions*." *Bruen*, 142 S. Ct. at 2123 (emphasis added). Like Oregon's CHL permitting statutes, several of the statutes cited with approval in *Bruen* involve subsequent statutory sections that continue or clarify the state's permitting

framework. *See, e.g.*, Alaska Stat. § 18.65.705 (2020) (outlining qualifications to obtain a concealed handgun permit); Ark. Code Ann. § 5–73–310 (2019) (describing the application form for a concealed handgun permit); Colo. Rev. Stat. § 18–12–207 (2021) (describing the judicial review process for denial of a concealed handgun permit). This Court concludes that the statutes cited in *Bruen*'s first footnote are meant to convey approval of these shall-issue permitting regimes as a whole, rather than specific statutory sections.

Further, even if the Supreme Court did intend for these citations to signal approval of only those specifically-cited sections, several of the statutory sections cited in *Bruen*'s first footnote include nearly identical language to BM 114's mental-health provision. For example, in Missouri, "[a] concealed carry permit . . .  shall be issued . . . if the applicant . . . [h]as not engaged in a pattern of behavior, documented in public or closed records, that causes the sheriff to have *a reasonable belief* that the applicant presents a danger to himself or others." Mo. Rev. Stat. § 571.101 (2016) (emphasis added). In Montana, a sheriff "*may deny an applicant a permit to carry a concealed weapon if the sheriff *has reasonable cause to believe* that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community to the extent that the applicant should not be allowed to carry a concealed weapon." Mont. Code Ann. § 45-8-321 (2021) (emphasis added).[32] In North Dakota, the bureau of criminal investigation, which grants concealed carry permits, "*may* deny approval for a license if the bureau *has reasonable cause to believe* that the applicant . . . has been or is a danger to self or others as demonstrated by evidence, including past pattern of behavior

---

[32] Montana amended its concealed carry statute in 2023, but did not amend this language. *See* Mt. Legis. 474 (2023).

involving unlawful violence or threats of unlawful violence; past participation in incidents involving unlawful violence or threats of unlawful violence; or conviction of a weapons offense." N. D. Cent. Code Ann. § 62.1–04–03 (Supp. 2021) (emphasis added).[33] And in Wyoming, the state shall deny a permit "upon *reasonable grounds* for denial" which include "facts known to the sheriff which establish *reasonable grounds to believe* that the applicant has been or is *reasonably likely* to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as demonstrated by a past pattern or practice of behavior, or participation in incidents involving a controlled substance, alcohol abuse, violence or threats of violence as these incidents relate to criteria listed in this section." Wyo. Stat. Ann. § 6–8–104 (2021) (emphasis added). This Court finds that the language in BM 114's mental health provision mirrors the language of these statutes, and that the specific approval of these statues in *Bruen* demonstrates that BM 114's mental health provision is constitutional.

Plaintiffs next argue that Oregon courts have interpreted O.R.S. 166.293(2) as giving the permitting agents discretion to deny a CHL, which, in turn, means that BM 114's substantially similar mental health provision makes BM 114's permitting decision discretionary. It is true that both state and federal courts have interpreted O.R.S. 166.293(2) as giving permitting agents discretion to deny an applicant a CHL based on an applicant's mental health, even when other statutory criteria have been satisfied. *See*, *e.g.*, *Helgeson v. Tillamook Cnty.*, No. 3:13–cv–01222–PK, 2014 WL 1946614, at *3 (D. Or. May 14, 2014); *Held v. Hanlin*, 239 Or. App. 486, 489 (2010). First, this Court notes that these decisions, while persuasive, do not bind this Court to a similar finding. Second, this Court is not aware of any state or federal decision that

---

[33] North Dakota amended its concealed carry statute in 2023, but did not amend this language. *See* N.D. Legis. H.B. 1339 (2023).

considered the CHL permitting regime in the context of the Second Amendment. Third, this Court finds that any limited discretion conferred by BM 114's mental health provision—which does mirror O.R.S. 166.293(2)—does not automatically convert BM 114 from a shall-issue regime to a constitutionally suspect regime.

Indeed, the *Bruen* Court acknowledged that some limited amount of discretion does not render a firearm permitting regime unconstitutional. In its first footnote, the Supreme Court stated, with approval, that "[t]hree States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like 'shall issue' jurisdictions." *Bruen*, 142 S. Ct. at 2123 n.1 (citation omitted). Connecticut's permitting regime gives officials "discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,'" which, in turn, "precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.'" *Id.* (quoting Conn. Gen. Stat. § 29–28(b); *Dwyer v. Farrell*, 193 Conn. 7, 12 (1984)). This Court finds that the "suitable person" standard conveys *more* discretion than BM 114's mental-health provision. Likewise, in interpreting Rhode Island's permitting regime, the Supreme Court of Rhode Island has held that "while issuance of a license . . . is mandatory if an applicant has satisfied the statutory criteria, whether an applicant has satisfied such criteria 'involves an exercise of discretion' on the part of local officials." *Gadomski v. Tavares*, 113 A.3d 387, 390 (R.I. 2015) (citation omitted). Notwithstanding this discretion, the Supreme Court of Rhode Island found that the licensing regime did not "commit [the permitting regime] to the unfettered discretion of an executive agency," in large part because the regime includes "certain procedural steps . . . to allow a meaningful review" of any licensing decisions. *Id.* (citation omitted).

Like Rhode Island, BM 114 includes judicial review—available as a matter of right to any individual whose permit application is denied, and reviewed de novo, or without deference to the permitting agent's findings—which significantly limits the discretion of individual permitting agents. *See* Ex. 1 § 5.

Finally, Plaintiffs argue that even if BM 114 aligns perfectly with the type of shall-issue licensing regimes described in *Bruen*, any discussion of these regimes is dicta and therefore irrelevant to this Court's analysis. Plaintiffs are correct that the constitutionality of shall-issue regimes was not before the Supreme Court in *Bruen*, and so the Supreme Court's statements regarding shall-issue permitting regimes were not necessary to the disposition of the case. But within the Ninth Circuit, well-reasoned dicta is binding. *Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013). The Ninth Circuit has defined well-reasoned dicta as discussion in an opinion that, while not necessary to the ultimate disposition of the case, is both "reasoned and deliberate." *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019). Well-reasoned dicta does not include comments "made casually and without analysis," "uttered in passing without due consideration of the alternatives," or "[done as] a prelude to another legal issue that commands the [court's] full attention." *Id.* (alteration in original) (citation omitted).

This Court concludes that *Bruen*'s discussion of shall-issue permitting regimes is well-reasoned dicta. The discussion was made neither in passing nor without analysis. Instead, the Supreme Court's discussion of shall-issue regimes appears both in the body of the opinion itself, *see Bruen*, 142 S. Ct. at 2123–24, and in multiple footnotes, *see id.* at 2123 n.1; *id.* at 2124 n.2; *id.* at 2138 n.9. In those discussions, the Supreme Court considered the statutory language of all forty-three shall-issue jurisdictions, *see id.* at 2123 n.1, and compared that statutory language to five proper-cause jurisdictions, *see id.* at 2124 n.2. The Supreme Court also grounded its

discussion of the presumptive constitutionality of shall-issue regimes in case law. *See id.* at 2138 n.9. Justice Kavanaugh, joined by Chief Justice Roberts, also separately reiterated the presumptive constitutionality of shall-issue regimes in his concurrence. *See id.* at 2162 (Kavanaugh, J., concurring). Though a concurrence is obviously not the same as a majority opinion, this Court nonetheless finds Justice Kavanaugh's independent discussion of the constitutionality of shall-issue regimes highly persuasive, particularly when considered in conjunction with the majority's own well-reasoned discussion about state firearms permitting regimes. And while it is true that the discussion of shall-issue regimes occurs before the larger discussion of the constitutionality of New York's proper-cause regime, this Court does not find that the discussion is a mere "prelude" to another legal issue. *Bruen* fundamentally alters the test against which Second Amendment challenges are judged. Accordingly, this Court finds that *Bruen*'s discussion of the presumptive constitutionality of certain widespread permitting regimes provides important context and analysis for the decision as a whole.

Accordingly, this Court holds that BM 114's permitting provisions do not, on their face, violate the Second Amendment. BM 114's permitting provisions contain the kind of narrow, objective criteria endorsed as constitutional in *Bruen*. BM 114's mental health provision is substantially similar to language contained in other shall-issue jurisdictions. And BM 114 contains sufficient procedural safeguards, like de novo judicial review, to prevent permitting agents from exercising unbridled discretion when conducting BM 114's mental health check.

## B.  Fifth Amendment

### 1.  BM 114's LCM restrictions are not an unconstitutional taking.

The Fifth Amendment provides, in relevant part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. There are two kinds of government action which fall within the ambit of the Fifth Amendment: physical takings and

regulatory takings. Exercises of police power are not compensable under the Takings Clause. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . .").

As noted above, with respect to licensed gun dealers, BM 114 makes it a misdemeanor to manufacture, import, possess, use, purchase, sell, or otherwise transfer any LCM in Oregon. Ex. 1 § 11(2). However, BM 114 contains various exceptions to this general prohibition. Licensed gun dealers that have LCMs in their inventory have several options within the 180 days after BM 114 takes effect. During that time, a licensed gun dealer may transfer or sell LCMs within their inventory to a non-resident gun dealer or other transferee located out of state. *Id.* § 11(3)(a)(A). The licensed dealer may also purchase LCMs from any owner for permanent removal from Oregon. *Id.* § 11(3)(a)(B). And a licensed dealer may permanently alter any LCM in their inventory such that it is no longer capable of accepting more than ten rounds of ammunition. *Id.* § 11(3)(a)(C).

Similarly, as noted above, current owners and future inheritors of LCMs can possess and use LCMs obtained prior to BM 114's effective date. *Id.* § 11(5). However, they may only use LCMs at their home (or on property under their control), on the premises of a gun dealer, at shooting ranges, for recreational activities like hunting, at firearms competitions or exhibitions, for certain educational purposes, or during transport to or from one of these permissible locations. *Id.* § 11(5)(c)(A)–(E).

Plaintiffs argue that absent BM 114, LCMs would be sellable and in demand, but, because of BM 114, LCMs are effectively worthless. With respect to licensed gun dealers,

Plaintiffs argue that forcing businesses to sell their property, move it out of state, or permanently alter it places an unconstitutional condition on constitutionally protected conduct, which thereby effects a taking. With respect to individuals, Plaintiffs contend that making individuals prove that they obtained property before BM 114 took effect and limiting the ability to use that property destroys such a large portion of the property right that it constitutes a regulatory taking. According to Plaintiffs, BM 114, at a minimum, places an unconstitutional condition on constitutionally protected conduct, constituting a taking.

Defendants respond that BM 114 is neither a physical nor a regulatory taking because BM 114 is an exercise of police power, which is not compensable under the Takings Clause. Furthermore, Defendants argue that a permanent injunction is not a proper remedy for a takings claim, which can be remedied with damages. Finally, with respect to Plaintiffs' regulatory takings claim, Defendants argue that Plaintiffs cannot show a sufficient diminution in the value of their property to establish that the regulation has interfered with distinct investment backed expectations.

This Court agrees with Defendants that BM 114 effects neither a physical nor a regulatory taking. The Takings Clause only applies to property that has been taken for public use. U.S. Const. amend. V. Property seized pursuant to the police power is not taken for public use and is not compensable under the Fifth Amendment. *Lucas*, 505 U.S. at 1027 (1992); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 417 (1922); *see also AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008). The Supreme Court has long held that states may regulate the use of certain property, without compensation, to protect public health and safety without violating the Fifth Amendment. *See e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887)

(holding that a state law prohibiting the manufacture and sale of intoxicating liquors except for limited purposes did not constitute a compensable taking).

At trial, Defendants demonstrated that BM 114's regulation of LCMs serves Oregon's public health and safety interests. Defendants presented credible and undisputed evidence that state laws banning LCMs reduce the incidents of mass shootings between 48 to 72 percent and decrease the number of fatalities that occur in these mass shootings by 37 to 75 percent. Tr. 6/6/2023 506:14–19. According to Defendants' expert Dr. Michael Siegel, the relationship between these restrictions and reductions in mass shootings is so pronounced that it is a causal relationship, meaning that the restrictions led, at least in part, to the reductions. Tr. 6/6/2023 508:11–509:21.

Indeed, in *Duncan v. Bonta*, the Ninth Circuit sitting en banc rejected a takings claim challenging an even stricter ban on LCMs in California. *Duncan*, 19 F.4th at 1111–12. Unlike BM 114, the California ban did not contain a "grandfather clause" allowing current owners or future inheritors of large-capacity magazines to keep those magazines. *See* Cal. Penal Code § 32310. The Ninth Circuit explained that "[n]othing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item." *Duncan*, 19 F.4th at 1112. The Ninth Circuit noted that, "[t]o the contrary, the Supreme Court has made clear that 'the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers.'" *Id.* (quoting *Lucas*, 505 U.S. at 1027).

Plaintiffs concede that, had the *Duncan* en banc decision not been vacated post-*Bruen*, "their Takings challenge would be foreclosed by Ninth Circuit precedent." ECF 165 at 50.

110 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

However, Plaintiffs argue that this Court should not consider the *Duncan* decision because it "*was* vacated—and it was vacated in its entirety." ECF 165 at 50. Although the Supreme Court certainly vacated the *Duncan* decision following its decision in *Bruen*, the Court vacated and remanded the case "for further consideration *in light of* [*Bruen*]." *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) (emphasis added); *see also Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022). As the *Bruen* Court did not consider a Fifth Amendment challenge, *Duncan*'s takings analysis cannot be reconsidered "in light of" *Bruen*. While an opinion that has been vacated is no longer binding circuit precedent, *Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998), since nothing in *Bruen* affected the Ninth Circuit's takings analysis, this Court finds that *Duncan* is still persuasive authority with respect to Plaintiffs' takings claim. *See In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (a decision vacated on other grounds is still persuasive authority); *see also Orhorhaghe v. INS*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (a decision vacated as moot is still persuasive authority); *Roe*, 134 F.3d at 1404 (a decision vacated as unripe is still persuasive authority). This Court agrees with the Ninth Circuit's reasoning in *Duncan* and concludes that LCMs regulated or seized as a result of BM 114 are not compensable under the Fifth Amendment because, in enacting BM 114's restrictions on LCMs, Oregon was acting pursuant to its police power.

Furthermore, even if Plaintiffs had viable takings claims, injunctive relief is not generally a proper remedy for a takings claim, which can be remedied with damages. "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin government action effecting a taking." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use . . . when a suit for compensation can

be brought against the sovereign subsequent to the taking.") (citation omitted). "Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." *Knick*, 139 S. Ct at 2176; *see* 28 U.S.C. §§ 1346(a), 1491 (providing a federal cause of action for takings claims in the Court of Federal Claims); O.R.S. 35.015 *et seq.* (prescribing the procedure for eminent domain cases in Oregon). In short, as long as there is an adequate remedy at law, a plaintiff is not ordinarily entitled to injunctive relief. *Knick*, 139 S. Ct. at 2176. Plaintiffs do not seek compensatory damages for their Fifth Amendment challenge—they seek only declaratory and injunctive relief, and nominal damages. *See* ECF 158 at 52; ECF 67 at 42. This Court finds that there is an adequate remedy at law for Plaintiffs' takings claim and there is, therefore, no basis for this Court to enjoin BM 114 as a remedy for a takings claim.

Finally, to succeed on a regulatory takings claim, Plaintiffs must show both "the economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment backed interests." *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012). Plaintiffs have failed to do so. Plaintiffs produced no evidence at trial, beyond speculative statements by fact witnesses about potential losses, to support a finding that BM 114's LCM restrictions would have a substantial adverse economic impact on Plaintiffs. At trial, Plaintiffs' witness Jessica Harris testified that she did not know how much of a potential loss her store might suffer if she had to comply with BM 114 by selling or otherwise moving her LCMs out of state. Tr. 6/5/2023 56:10–16. Ms. Harris testified that she "would speculate" that the price would be less than the cost of the LCMs, but admitted that she had done no research to confirm that suspicion. Tr. 6/5/2023 56:25–57:5. Ms. Harris also testified that while customers currently primarily purchase LCMs, it is entirely possible that those customers will simply

switch to purchasing ten-round magazines. Tr. 6/5/2023 54:17–20. Plaintiff Adam Johnson

likewise testified that his assumption that BM 114 would cause his business economic loss was

based on "speculation" rather than accounting data. Tr. 6/5/2023 76:16–22. These speculative

assertions about loss are insufficient to prove that BM 114 would have a negative economic

impact on Plaintiffs.

Plaintiffs' Fifth Amendment physical and regulatory takings challenges thus fail for three

reasons. First, BM 114 is an exercise of police power, and Defendants have presented evidence

at trial showing that BM 114 is related to public health and safety. Second, even if Plaintiffs'

claims were viable, the relief they seek is not appropriate for this Court to grant. Third, Plaintiffs

have failed to provide any non-speculative evidence regarding the potential negative economic

impact of BM 114 to support their regulatory takings claim. Therefore, this Court concludes that

Plaintiffs have failed to prove that BM 114's LCM restrictions are a taking in violation of the

Fifth Amendment.

## C. Fourteenth Amendment

### 1. BM 114's permitting regime does not violate due process.

In addition to challenging BM 114's permitting provisions as violating the Second

Amendment, Plaintiffs argue that BM 114's permitting provisions violate the Due Process clause

of the Fourteenth Amendment. The Fourteenth Amendment provides, in relevant part, "nor shall

any State deprive any person of life, liberty, or property, without due process of law." U.S.

Const. amend. XIV.

Plaintiffs did not, either in briefing or at trial, provide this Court with a standard by which

their Due Process challenge to BM 114's permitting provisions should be assessed. In their

motion for summary judgment, for instance, Plaintiffs do not use the phrase "due process" even

once in their argument challenging BM 114's permitting provisions under the Fourteenth

Amendment. *See* ECF 165 at 12–18. Plaintiffs also cite to no case that has considered a firearm permitting regime under the Due Process Clause of the Fourteenth Amendment.

This Court acknowledges that courts typically follow the principle of party presentation, where courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Plaintiffs have failed to frame their Due Process claim for this Court. Nonetheless, this Court finds that to succeed on their Due Process claim, Plaintiffs must show both a deprivation of a constitutionally protected liberty or property interest, and a denial of adequate procedural protections. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

Plaintiffs do not appear to argue that they have a protected property interest in firearms; they argue that BM 114's permitting regime deprives them of a constitutionally protected liberty interest, or the right to keep and bear arms. As discussed above, this Court does not find that BM 114's permitting provisions violate the Second Amendment on their face.[34] Because Plaintiffs

---

[34] The thrust of Plaintiffs' argument with respect to their Due Process claim hinges on implementation of BM 114. Plaintiffs essentially argue that when BM 114 is implemented, it will operate in such a way that individuals will be unable to receive a permit, due to lack of funding, bureaucratic disorganization, and the refusal of the FBI to process background checks. *See* ECF 165 at 18–28. As this Court has previously held, *see* ECF 234 at 5–6, this evidence goes to Plaintiffs' unripe as-applied challenge, not their facial challenge. Speculation about how BM 114 might be implemented in the future—including whether the FBI's refusal to process background checks will in practice prohibit a permitting agent from issuing a permit—is irrelevant to a facial challenge, which looks only at the language of the statute. *Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020) ("[W]hen reviewing a facial challenge, [courts] are limited to reviewing the text of the ordinance itself, not what others have said the statute means. How the statute has been interpreted and applied by local officials is the province of an as-applied challenge . . . .") At trial, Plaintiffs argued that the FBI cannot run background checks under BM 114 as a matter of law. But the law to which Plaintiffs aver—Public Law 92-544—requires the FBI to consider certain discretionary factors, like whether a law is in violation of public policy, before deciding whether the agency can run background checks. *See* Pub. L. 92-

have not shown that BM 114's permitting regime violates their Second Amendment rights, Plaintiffs have not shown that the permitting regime deprives them of a protected liberty interest. Plaintiffs' Due Process claim therefore fails because Plaintiffs have failed to make out the threshold element of their claim.

### 2.  BM 114's LCM restrictions do not violate due process.

#### a.  BM 114's LCM restrictions are not retroactive.

Plaintiffs argue that BM 114's prohibitions on magazines with a capacity of more than ten rounds apply retroactively. Plaintiffs suggest that the law is retroactive because it "appl[ies] a criminal prohibition to federally licensed individuals and enterprises who lawfully possessed the now-banned magazines for decades before the statute took effect." ECF 165 at 52.

Defendants respond that BM 114 is not retroactive because it "does not punish past purchases, possession, or any acts that occurred before its effective date" and "[l]ike other health and safety measures, it operates prospectively." ECF 185 at 13; *see also* ECF 167 at 40–41.

This Court agrees with Defendants that BM 114's restrictions on LCMs are not retroactive. The Supreme Court has explained that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269 (1994) (citation omitted). Nor does it operate retrospectively because it "upsets expectations based in prior law." *Id.* Rather, "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70.

---

544 (Oct. 25, 1972). It is not clear from the face of that law that BM 114 runs afoul of these provisions, and any stipulated fact to the contrary is outside of the scope of a facial challenge.

BM 114's LCM restrictions do not operate retroactively because they do not attach new legal consequences to any conduct completed before BM 114's enactment. BM 114 does not criminalize purchases, possession, or use of LCMs that occurred prior to the measure's enactment. Indeed, BM 114 expressly allows current owners and inheritors to keep and continue to use LCMs purchased prior to the measure's enactment. BM 114 does not render Plaintiffs' already-possessed LCMs illegal. BM 114 allows Plaintiffs to retain possession of these LCMs on their property, and allows Plaintiffs to use these LCMs in limited situations. Ex. 1 § 11(5)(c)(C)–(D).

> ### i. Even assuming BM 114's LCM restrictions are retroactive, Defendants provide adequate justification for these restrictions.

Even if this Court were to find that BM 114 operates retroactively, Plaintiffs due process rights are not infringed if Defendants can justify its retroactive application. A retroactive law does not violate due process where "the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means." *Pension Ben. Guar Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

Defendants' public safety interest in regulating LCMs is a legitimate legislative purpose. As discussed above, Defendants set forth evidence showing that LCMs are frequently used in the commission of mass shootings and that the use of LCMs in mass shootings increases the lethality of these events. Tr. 6/6/2023 415:23–416:2; 422:21–424:13. The LCM restrictions are also a rational means of furthering this interest in public safety. Defendants produced evidence at trial showing both that LCMs are connected to increased lethality in mass shooting events, and that state-level restrictions on LCMs reduce the occurrence of these events and their overall lethality. Tr. 6/6/2023 422:21–424:13; 506:2–5. Indeed, Plaintiffs concede that a state's interest in public safety is generally considered a compelling interest. ECF 161 at 24. Accordingly, this Court

116 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

finds that BM 114's LCM restrictions do not violate the Due Process Clause of the Fourteenth Amendment.

      **b.  BM 114's LCM restrictions are not void for vagueness.**

Plaintiffs argue that BM 114's LCM restrictions are unconstitutionally vague because they include any fixed or detachable magazine, or similar device, "that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition." Ex. 1 § (11)(1)(d). Plaintiffs argue that this language is unconstitutionally vague because it does not give fair notice about what types of magazines are restricted.

A law is void-for-vagueness if it does not give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When a violation of the statute may result in a criminal penalty and when the statute does not include a scienter requirement, a court must scrutinize a potentially vague law with heightened scrutiny. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

BM 114 makes it a misdemeanor to manufacture, import, possess, use, purchase, sell, or otherwise transfer LCMs. Ex. 1 § 11(6). BM 114 does not include a scienter requirement. Accordingly, this Court pays particular attention to whether BM 114's restrictions on LCMs give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Plaintiffs argue that BM 114 is unconstitutionally vague because it prohibits magazines that "can be readily restored, changed, or converted to accept" more than ten rounds. Ex. 1 § 11(1)(d). Defendants argue that BM 114 is not vague because it gives the person of ordinary intelligence notice that "magazines that can be quickly altered to accept more than ten rounds" are prohibited. ECF 167 at 39.

117 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs counter that if BM 114 means what Defendants say it means, then BM 114 restricts essentially all magazines because any magazine that can hold ten rounds or fewer can be "quickly altered" to accept more than ten rounds. To support this position, Plaintiffs elicited testimony from their fact witness Adam Johnson, a plaintiff in this action who owns a gun store. Mr. Johnson testified that, based on his experience as a gunsmith, "almost all supposed ten-round magazines . . . are easily readily modifiable with either factory or aftermarket parts that would make them not compliant with [BM] 114." Tr. 6/5/2023 74:2–5. Mr. Johnson testified that "even the ten-round magazines . . . most of them do not even require tools, or if they do require, a very simple hand tool, like a punch or a screwdriver, to remove the baseplate from the magazine and then add an extended baseplate, which would increase the capacity of that magazine." Tr. 6/5/2023 79:10–15. Mr. Johnson further testified that some magazines "don't require any tools at all" to modify, and that an individual "can just use [their] fingers." Tr. 6/5/2023 80:18–19.

Mr. Johnson's testimony is unpersuasive for several reasons. First, this Court notes that Defendants' expert Jim Yurgealitis testified that a ten-round capacity magazine cannot be extended without an individual taking affirmative steps of purchasing additional equipment (at least a baseplate extender, but also sometimes a stronger spring), removing the existing baseplate of the magazine, and adding the extender. Tr. 6/6/2023 531:15–25; 532:7–10. Contrary to Plaintiffs argument, this Court does not find that a standard ten-capacity magazine is "readily convertible" to an LCM if such conversion requires an individual to complete at least three affirmative, additional steps to extend the magazine. Indeed, a ten-round capacity magazine is not readily convertible until the individual removes the baseplate of the magazine—without removing the baseplate, the magazine cannot be extended. Accordingly, any ten-round magazine with an intact baseplate would not violate BM 114.

Plaintiffs produced no evidence suggesting that an individual would remove a baseplate of a ten-round magazine for any other purpose than extending the magazine's capacity. This Court acknowledges that the evidence at trial shows that an individual could take steps to alter a ten-round capacity magazine such that it might run afoul of BM 114's restrictions. But a statute is not void for vagueness merely because an individual could take affirmative steps to come close to breaking the law.[35] *See Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.") (citations omitted).

Second, this Court notes that the "readily convertible" language with which Plaintiffs take issue appeared, in almost identical form, in the Federal Assault Weapons Ban, which was in effect from 1994 to 2004. The federal ban defined LCMs as "a magazine, belt, drum, feed strip, or similar device . . . that has a capacity of, or that can be readily restored or converted to accept, more than [ten] rounds of ammunition." Pub. L. No. 103-322, § 110103(b), 108 Stat. 1999 (1994). Plaintiffs have not found, and this Court is not aware, of any court that found this provision of the federal ban to be void for vagueness. Nor have Plaintiffs shown that there was widespread confusion for a decade across the country about the meaning of this law. To the contrary, Plaintiffs' expert Mark Hanish testified that he sold magazines with a capacity of ten rounds during the federal ban. Tr. 6/5/2023 131:22–132:12. Mr. Hanish testified that during the

---

[35] Whether a ten-round magazine with the baseplate removed would violate BM 114 is not for this Court to decide. This Court need not parse every potential hypothetical scenario to find what is generally prohibited under BM 114. BM 114's prohibition on magazines that hold more than ten rounds of ammunition would be clear to the ordinary person. Cases in which BM 114 might be enforced in a manner inconsistent with this general meaning are best saved for as-applied challenges.

federal ban, there were no regulatory barriers to the sale of magazines, other than obtaining a Federal Firearms License. Tr. 6/5/2023 133:3–5.[36]

In sum, this Court finds that BM 114 gives "the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and is not unconstitutionally vague. *Grayned*, 408 U.S. at 108.

## VIII.   CONCLUSION

The Supreme Court has held that Second Amendment protects an individual right to self-defense inside and outside of the home. LCMs are not commonly used for self-defense, and are therefore not protected by the Second Amendment. Even if LCMs are protected by the Second Amendment, BM 114's restrictions are consistent with this Nation's history and tradition of regulating uniquely dangerous features of weapons and firearms to protect public safety. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Second Amendment challenge to BM 114's LCM restrictions.

The Second Amendment also allows governments to ensure that only law-abiding, responsible citizens keep and bear arms. BM 114's permit-to-purchase regime, on its face, sets forth objective criteria for the issuance of permits, and does not allow unfettered discretion by permitting agents in assessing an applicant's mental health status to ensure that only law-abiding and responsible citizens can purchase firearms in the state of Oregon. This Court accordingly

---

[36] Plaintiff Adam Johnson testified that "[w]ithin a day or two after the passage of [BM] 114 . . . almost all [firearms] distributors" stopped shipping to his store because of confusion around what magazines were permitted. Tr. 6/5/2023 73:15–19. This is inconsistent with Mr. Johnson's testimony that following BM 114's passage, his store continued to purchase LCMs "in bulk" and was "overnighting cases" of 30-round magazines to meet customer demand. Tr. 6/5/2023 73:4–11.

enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Second Amendment challenge to BM 114's permit-to-purchase regime.

The Fifth Amendment protects an individual from having their property taken by the government for public use without just compensation. But the Fifth Amendment does not prevent the government from exercising its police power to protect the public welfare. BM 114's LCM restrictions are a valid exercise of police power. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fifth Amendment challenge to BM 114's LCM restrictions.

The Due Process Clause of the Fourteenth Amendment prevents the government from depriving a person of liberty without due process of law. Plaintiffs have failed to show that BM 114's permitting provisions deprive them of liberty, because BM 114's permitting provisions do not violate their Second Amendment rights. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fourteenth Amendment challenge to BM 114's permitting provisions.

The Due Process Clause of the Fourteenth Amendment also prevents the government from passing retroactive laws, unless the government can point to a legitimate legislative purpose furthered by rational means. BM 114 does not impose retroactive penalties on the possession of LCMs, and is therefore not retroactive. Moreover, Defendants' interest in public safety provides a legitimate legislative purpose furthered by rational means. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fourteenth Amendment challenge to BM 114's LCM restrictions.

Finally, the Due Process Clause of the Fourteenth Amendment prevents governments from passing laws that are so vague that they fail to give a person of ordinary intelligence fair

notice of what is prohibited. BM 114's LCM restrictions give a person of ordinary intelligence fair notice of what is prohibited. This Court accordingly enters judgment in favor of Defendants and Intervenor-Defendant on Plaintiffs' Fourteenth Amendment challenge to BM 114's LCM restrictions.

This Court enters judgment in favor of Defendants and Intervenor-Defendant on all claims.

**IT IS SO ORDERED.**

DATED this 14th day of July, 2023.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge